# EXHIBIT 38

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF FLORIDA

3                      TAMPA DIVISION

4

5   REBOTIX REPAIR, LLC

6            Plaintiff,

7   vs.                           Case No. 8:20-CV-02274

8   INTUITIVE SURGICAL, INC.,

9            Defendant.

10  -----------------------------/

11

12

13                   REMOTELY CONDUCTED

14    VIDEOTAPED DEPOSITION OF RONALD LEE BAIR, JR.

15      Livermore, California (Witness's location)

16                 Monday, May 24, 2021

17

18

19

20

21  Stenographically reported by:
    LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22  California CSR No. 10523
    Washington CSR No. 3318
23  Oregon CSR No. 19-0458
    Texas CSR No. 11318

24

25  Job No. 194222

Page 98

 1   next exhibit.  This will be from Folder 3.  I

 2   believe this will be Exhibit 14.

 3            THE STENOGRAPHER:  I believe so.

 4            (Marked for identification purposes,

 5             Exhibit 14.)

 6            MR. ERWIG:  This will be 6'20'19 Bair to

 7   Cooley.

 8            BY MR. ERWIG:

 9       Q.   Screen share this with you, Mr. Bair.  Do

10   you see this on the screen in front of you?

11       A.   Yes, I do.

12       Q.   I'll draw your attention to an e-mail a

13   little bit lower on this thread.

14            Do you recognize this e-mail from

15   June 20th, 2019?

16       A.   Yes, it does ring a bell.

17       Q.   How do you recognize it?

18       A.   I authored it.

19       Q.   What do you mean by that?

20       A.   I wrote the e-mail from my e-mail address

21   and sent it to a sales representative -- I believe

22   Jack Groner is one of our key accounts directors --

23   and Matt Pate with whom we were working with at

24   USPI, or United Surgical Partners, I believe.

25       Q.   And down below there's an e-mail from Jack

1    Groner to Matt Pate, yourself, and AJ Inacay.

2              Do you see that?

3         A.   Yes.

4         Q.   It mentions a third-party company that's

5    placing nonapproved computer chips back into an

6    instrument; is that right?

7         A.   That is correct.

8         Q.   Your response later up the thread is --

9    well, withdrawn.

10             Matt then sends a question to Jack Groner

11   that asks "What section of the contract prohibits

12   reprocessing?"

13             Do you see that?

14        A.   Yes.

15        Q.   Then you reply, "Hi, Jack/Matt.  It's

16   traditionally in the second sentence of Section 3.4

17   of the sales license and service agreement."

18             Do you see that?

19        A.   Yes.

20        Q.   And you specifically cite something that

21   you refer to as standard language in a section in

22   its entirety.  Do you see that?

23        A.   Yes.

24        Q.   That cited language is "Customer will not

25   nor will customer permit any third party to modify,

 1  disassemble, reverse-engineer, alter, or misuse the

 2  system or instruments and accessories."

 3          Do you see that?

 4     A.   That is correct.

 5     Q.   Is it your understanding that that's

 6  standard language in each sales contract that

 7  Intuitive has with its hospital customers?

 8     A.   That is my understanding.

 9     Q.   And it's your understanding that the

10  standard -- withdrawn.

11          It's your understanding that the sales

12  license and service agreement is meant to stop the

13  hospitals from engaging third parties to repair

14  EndoWrists; right?

15          MS. LENT:  Object to the form.

16          THE WITNESS:  One implication of the

17  limited license would include, as stated here, third

18  parties engaging in activities that would modify,

19  disassemble, reverse-engineer, alter, or misuse the

20  system or instruments and accessories.

21          BY MR. ERWIG:

22     Q.   And it's your understanding that, in the

23  manner in which those terms are written into the

24  contract, that hospitals are not permitted to

25  utilize third parties to perform repairs or services

 1   on their EndoWrists; right?

 2       A.   Could you clarify what you mean, "service"?

 3   As I mentioned, there are user serviceable

 4   components, and reprocessing and sterilization --

 5   disinfection, cleaning, reprocessing, sterilization,

 6   et cetera, could all be considered permissible

 7   services under the licensing as long as they do not

 8   modify, disassemble, reverse-engineer, alter, or

 9   misuse.

10       Q.   Well, let's talk about disassemble.  If a

11   third party inserts a chip into the EndoWrist to

12   reset the use counter, that would constitute a

13   violation of Section 3.4; is that right?

14       A.   That is correct.

15       Q.   And the purpose of the sales license and

16   service agreement is to stop hospitals from using

17   third parties to performance those types of

18   services; right?

19           MS. LENT:  Object to the form.

20           THE WITNESS:  We do not deem what you

21   stated to be a service, as I stipulated in my

22   previous response.

23           BY MR. ERWIG:

24       Q.   Well, it's your understanding that the

25   sales license and service agreement is designed to

Page 150

1    of the things you examined?

2              MS. LENT:  Object to the form.

3              THE WITNESS:  I believe one of the

4    objectives was potentially as it related to markets

5    or more cost-sensitive procedures.  I don't know

6    that it was specifically related to individual

7    customers.

8              BY MR. ERWIG:

9         Q.   Well, the refurbished instrument program,

10   it was your understanding that that program would

11   potentially expand the range of da Vinci surgeries

12   to other cost-sensitive procedures; right?

13        A.   That may have been one mode or mechanism

14   through which we may have been able to achieve that

15   objective.  That is correct.

16        Q.   Intuitive never adopted a refurbished

17   instrument model despite the potential to impact new

18   markets; right?

19             MS. LENT:  Objection.  Asked and answered.

20             THE WITNESS:  We have not launched a

21   refurbished program.

22             BY MR. ERWIG:

23        Q.   Sir, that's because that refurbished

24   program, that would be a money loser for Intuitive;

25   right?

 1            MS. LENT:  Objection.  Asked and answered.

 2            THE WITNESS:  As previously stated, there

 3   are many reasons why we may decide to engage or not

 4   engage in any specific business practices or the

 5   development of products within our portfolio and our

 6   road map.

 7            MR. ERWIG:  I'm going to screen share our

 8   next exhibit.  This will be Plaintiff's Exhibit 20.

 9   This will be 8'15'19 Bair to Davis.

10            (Marked for identification purposes,

11             Exhibit 20.)

12            BY MR. ERWIG:

13       Q.   Do you see this on the screen in front of

14   you, Mr. Bair?

15       A.   Yes, I do.

16       Q.   Do you recognize this?

17       A.   Yes, I do.

18       Q.   How do you recognize it?

19       A.   It was -- the communication was forwarded

20   to me in advance of a visit that I was making to --

21   I believe it was the New Orleans area where this

22   customer may have been located.

23       Q.   I want to scroll down to the first e-mail.

24   Who is Sherry Harvey?

25       A.   She appears to have been the chief nursing

Page 152

1   officer at Crescent City Surgical Centre.

2       Q.   I want to point to some of the bullet

3   points in Ms. Harvey's e-mail.

4           In the first bullet Ms. Harvey writes,

5   "Please explain the notion that we have engaged in

6   the 'usage of unauthorized instrumentation.'  What

7   gives Intuitive Surgical the right to determine how

8   Crescent City Surgical Centre uses instruments that

9   we own?"

10          Do you see that?

11      A.   I do.

12      Q.   Then in the second bullet point, Ms. Harvey

13  writes, "Please provide data that demonstrates that

14  patient safety is impacted by the safe, controlled

15  repair and reuse of robotic instruments."

16          Do you see that?

17      A.   That is correct.

18      Q.   Then Ms. Harvey goes on to say, "In lieu of

19  data that directly demonstrates this, please provide

20  any indication that patient safety is compromised.

21  Patient safety is our first concern, but we do not

22  act on vendor statements about safety; we act on

23  science."

24          Do you see that?

25      A.   She was saying it a long time before all

Page 153

1   the people were about COVID.  Yes, I do.

2       Q.   Were you able to provide Ms. Harvey with an

3   indication that patient safety was compromised by

4   the safe, controlled repair and reuse of robotic

5   instruments with the da Vinci surgical system?

6       A.   I don't recall the final disposition of the

7   response to Ms. Harvey, but I am aware that it is

8   not incumbent on Intuitive to prove the safety or

9   efficacy of a third-party device or a device that

10  has been modified by a third party such that it is

11  rendered no longer an approved FDA device.

12      Q.   Well, sir, that wasn't quite my question.

13  So let me reask it and focus on the question itself.

14           Were you able to provide Ms. Harvey with

15  any data that demonstrated that patient safety was

16  impacted by the safe, controlled repair and reuse of

17  robotic instruments?

18           MS. LENT:  Objection to form.

19           THE WITNESS:  I do not recall providing

20  data to Ms. Harvey related to products that have

21  been modified by other entities.

22           BY MR. ERWIG:

23      Q.   Were you able to provide any indication to

24  Ms. Harvey that patient safety is comprised by the

25  safe, controlled repair and reuse of robotic

Page 154

1    instruments?

2            MS. LENT:  Object to the form.

3            THE WITNESS:  We may have communicated to

4    Ms. Harvey that it was our understanding that these

5    modified devices were not approved by the

6    appropriate regulatory body whose principal aim and

7    objective is to protect patients as it relates to

8    both pharmaceuticals and medical devices.  And so I

9    don't recall providing anything beyond that.

10           BY MR. ERWIG:

11      Q.   I want to go to the next bullet point where

12   Ms. Harvey writes, "How does repair and reuse of

13   robotic instruments compromise 'product

14   performance'?"

15           Do you see that?

16      A.   I do.

17      Q.   Ms. Harvey writes, "We have audited the

18   quality system and testing protocols of our robotic

19   instrument repair partner as well as several

20   independent reports about materials degradation, and

21   we find no indication that the functionality of

22   robotic instruments is compromised when reusing the

23   instruments beyond the limited number of times

24   suggested by Intuitive Surgical."

25           Do you see that?

Page 155

1      A.    Yes, I do.

2      Q.    Then Ms. Harvey asks, "Please provide test

3   results, studies, or data that document why the

4   instruments should be limited to 10 or 15 uses."

5          Do you see that?

6      A.    I do.

7      Q.    Did Intuitive perform any research as to

8   the functionality of robotic instruments that were

9   repaired by Ms. Harvey's robotics instrument repair

10  partner?

11     A.    I'm not privy to.  We may have engaged in

12  as it relates to testing of those products.  I don't

13  believe that we were provided the opportunity to

14  partner with that organization that was engaging it,

15  and it was outside of my purview to explore those

16  sorts of questions.

17     Q.    Mr. Bair, can you point the jury to any

18  scientific evidence that indicates that repair of

19  robotic instruments cannot safely be used for

20  surgery?

21     A.    That is outside the scope of my

22  responsibilities as I do not engage in verification

23  and validation of our products prior to submission

24  to the FDA.

25     Q.    Well, Ms. Harvey is certainly saying that

Page 156

 1    the robotic repair program is important in her

 2    hospital's efforts to provide the best possible care

 3    for her patients.

 4              Do you see that?

 5        A.    I do see that.

 6        Q.    Then Ms. Harvey is asking some questions of

 7    Intuitive to understand your claims about patient

 8    safety.

 9              Do you see that?

10        A.    That is -- yes, I do see that.

11        Q.    And were you able to provide any data to

12    Ms. Harvey in response to that request that the

13    safe, controlled repair and reuse of robotic

14    instruments was, in fact, compromising patient

15    safety?

16              MS. LENT:  Objection.  Asked and answered.

17              THE WITNESS:  I believe the intent -- the

18    intent and spirit of our response was as it related

19    to compliance with the contract or the sales

20    licensing and service agreement that we'd engaged in

21    with Crescent City as well as our understanding and

22    awareness that Crescent City was using devices that

23    were not approved by the FDA or other regulatory

24    bodies.

25    ///

Page 157

1        BY MR. ERWIG:

2     Q.    Hospitals care about patient safety; right?

3           MS. LENT:  Objection.

4           THE WITNESS:  I don't know that I can speak

5  to all of the things that hospitals care about.

6           BY MR. ERWIG:

7     Q.    Well, is it your understanding that

8  hospitals don't care about patient safety?

9     A.    That is generally not my understanding.

10    Q.    Is it generally your understanding that

11 hospitals, in fact, care very deeply for patient

12 safety?

13          MS. LENT:  Objection.

14          THE WITNESS:  I refer to my previous

15 response.

16          BY MR. ERWIG:

17    Q.    Well, it's a question of your

18 understanding, sir, as it relates to hospitals.  And

19 so I'll reask the question.  Withdrawn.

20          Is it your understanding that hospitals

21 care about patient safety?

22    A.    It is my understanding that that is an

23 element of the multitude of things that hospitals

24 care about.

25    Q.    Ms. Harvey is, in fact, asking some

Page 158

1    questions to determine whether Intuitive has any

2    data about the safety of repair of robotic

3    instruments; right?

4             MS. LENT:  Objection.  Asked and answered.

5             THE WITNESS:  That is what she appears to

6    be asking about.

7             BY MR. ERWIG:

8       Q.    Intuitive didn't provide any such data;

9    right?

10            MS. LENT:  Objection.  Asked and answered.

11            Can we move on?

12            THE WITNESS:  I do not believe that we

13   provided data in response to this.

14            BY MR. ERWIG:

15      Q.    Are you, in fact, aware, Mr. Bair, of any

16   data that was provided to any hospital that asked

17   Intuitive for data on patient safety related to the

18   repair and reuse of robotic instruments?

19      A.    As I mentioned before, that's -- the data

20   related to verification and validation to

21   demonstrate the safe and effective use of these

22   products in the marketplace is outside of my

23   purview.  And so I am not personally aware of any

24   instances where data has been provided, but there

25   certainly may have been as we are a fairly large

Page 159

1   organization.  And, again, I'm not an expert and/or

2   engaged in that space.

3       Q.   Can you personally point to any data that

4   you've seen that indicates that repaired robotic

5   instruments are not able to be used safely by

6   hospitals?

7            MS. LENT:  Objection.  Asked and answered.

8            THE WITNESS:  There was a reference in one

9   of the exhibits that we explored earlier in the day.

10  For example, the failure modes that were experienced

11  when instruments were attempted to -- where we

12  attempted to use them beyond their validated number

13  of lives.  That's the extent to which that I have

14  personal exposure to anecdotal results of life

15  testing.  But, again, that is outside of my purview

16  and area of responsibility.

17           BY MR. ERWIG:

18      Q.   Now, sir --

19           We can stop screen sharing this exhibit.

20           Now, sir, you personally had communications

21  with hospitals that were using third-party repair

22  services for Intuitive's EndoWrists; is that right?

23      A.   That is correct.

24      Q.   In any of your communications with any of

25  those third-party -- withdrawn.