Samuel Maida (SBN 333835)
HAUSFELD LLP
600 Montgomery Street, Suite
3200 San Francisco, CA 94111
Tel: 415-633-1908
Fax: 415-358-4980
Email: smaida@hausfeld.com

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
Email: jdominguez@cohenmilstein.com

Jeffrey J. Corrigan (appearance *pro hac vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@srkattorneys.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION** | **Lead Case No. 3:21-CV-03825-VC** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **PLAINTIFFS' OPPOSITION TO INTUITIVE'S MOTION TO EXCLUDE TESTIMONY OF EINER ELHAUGE**<br><br>The Hon. Vince Chhabria<br><br>Date: June 8, 2023<br>Time: 1:00 p.m. |

## TABLE OF CONTENTS

INTRODUCTION, FACTUAL BACKGROUND, AND STATEMENT OF ISSUES ................. 1

LEGAL STANDARDS ................................................................................................ 3

ARGUMENT ............................................................................................................... 4

I.      PROFESSOR ELHAUGE'S DAMAGES ESTIMATES ARE RELIABLE ..................... 4

        A.      Professor Elhauge's EndoWrist Damages Estimates Are Reliable ...................... 5

                1.      The Price-Effect Damages Estimate Is Reliable ......................................... 5

                2.      The Use-Limit Damages Estimate Is Reliable ............................................ 7

                3.      The Combined Price/Use-Limit Damages Estimate Is Reliable ................ 9

                4.      Professor Elhauge's EndoWrist Rival Entry-Date Scenarios Are
                        Reliable ....................................................................................................... 9

                5.      The Inclusion of Damages for X/Xi EndoWrists Is Reliable ................... 10

        B.      Professor Elhauge's da Vinci Service Damages Estimate Is Reliable ................. 12

II.     THE OTHER CHALLENGED OPINIONS ARE ADMISSIBLE ................................... 13

CONCLUSION ............................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
    738 F.3d 960 (9th Cir. 2013) ................................................................................3

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010).......................................................................................1

*AMX Corp. v. Pilote Films*,
    2007 WL 2428940 (N.D. Tex. Aug. 27, 2007).......................................................14

*Apple iPod iTunes Antitrust Litig.*,
    2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) .............................................6

*Autowest, Inc. v. Peugeot, Inc.*,
    434 F.2d 556 (2d Cir. 1970)...........................................................................6

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)..................................................................................3, 4, 6

*In re Blood Reagents Antitrust Litig.*,
    2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)...............................................4

*Bonds v. Dautovic*,
    2011 WL 13228307 (S.D. Iowa Feb. 7, 2011)..........................................14

*Castro v. Sanofi Pasteur Inc.*,
    134 F. Supp. 3d 820 (D.N.J. 2015) ...............................................................1

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ................................................................3

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................6, 7, 8

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
    411 F.3d 1030 (9th Cir. 2005) ................................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)....................................................................................7

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ...............................................................3, 9

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
   198 F. Supp. 2d 598 (E.D. Pa. 2002) .......................................................15

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ...................................................................................1

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .................................................................13

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   2015 WL 12645766 (E.D. Pa. Dec. 22, 2015)...................................7, 15

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .....................................................13

*Masimo Corp. v. Tyco Health Care Grp.*,
   2004 WL 7094930 (C.D. Cal. May 28, 2004) ...........................................1

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ...................................................................3

*Moehrl v. Nat'l Ass'n of Realtors*,
   2023 WL 2683199 (N.D. Ill. Mar. 29, 2023)............................................1

*In re: Se. Milk Antitrust Litig.*,
   2010 WL 11462847 (E.D. Tenn. Dec. 9, 2010)........................................1

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931)..............................................................................6, 7

*Tawfilis v. Allergan, Inc.*,
   157 F. Supp. 3d 853 (C.D. Cal. 2015) .............................................10, 12

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods.*
   *Liab. Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............................................7, 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)..................................................................................4

*William Inglis & Sons Baking Co. v. Cont'l Baking Co.*,
   942 F.2d 1332 (9th Cir. 1991) .................................................................13

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)..................................................................5, 6

**Other Authorities**

Fed. R. Evid. 702(b)..............................................................................................................6

Proving Antitrust Damages: Legal and Economic Issues (ABA 2017)..........................................4

PLAINTIFFS' OPPOSITION TO INTUITIVE'S MOTION TO EXCLUDE TESTIMONY OF EINER ELHAUGE
CASE NO. 3:21-CV-03825-VC

## INTRODUCTION, FACTUAL BACKGROUND, AND STATEMENT OF ISSUES

Professor Einer Elhauge is a leading antitrust scholar, described by many federal courts as an "antitrust titan."[1] He is an author of widely cited books on antitrust law and economics, including *U.S. Antitrust Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*, and is the editor of *The Research Handbook on the Economics of Antitrust Law*. Ex. 1 (Corrected Expert Rep. of Prof. Einer Elhauge) ¶ 6, Ex. A.[2] He has testified as an economic expert before Congress, and his scholarship has been cited approvingly by the Supreme Court.[3] In nearly two dozen antitrust cases, he has uniformly been found qualified to opine on economic issues, and his analyses have consistently been found reliable.[4]

Here, Prof. Elhauge applies straightforward methodologies to reliably estimate damages for the EndoWrist and da Vinci service markets. Ex. 1 § VII; Ex. 2 (Rebuttal Expert Rep. of Prof. Einer Elhauge) § VII. Prof. Elhauge estimates that Intuitive would have charged at least 20% less for EndoWrists in the but-for world, based not only on Intuitive business plans to cut prices by 20-40% in response to competition from independent repair companies (IRCs) (plans abandoned when it was able to drive IRCs out of the market by enforcing its restraints), Ex. 1 § VII.A.1, ¶¶ 352, 394-96, but

---

[1] *E.g.*, *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *5 (N.D. Ill. Mar. 29, 2023) ("Plaintiffs have retained . . . Elhauge to conduct an economic analysis . . . . There is no question that Elhauge is qualified to opine on antitrust matters . . . . Multiple district courts . . . have gone so far as to describe Elhauge as 'an antitrust titan.'" (citation omitted)); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 827, 830 (D.N.J. 2015) (calling Prof. Elhauge "a preeminent antitrust scholar" who is "eminently qualified" to testify on antitrust economics and has "been described as a 'highly qualified antitrust titan'" (citation omitted)); *In re: Se. Milk Antitrust Litig.*, 2010 WL 11462847, at *1, 3 (E.D. Tenn. Dec. 9, 2010) ("Mr. Elhauge is qualified by both education and experience to testify as an expert in an antitrust case. That he holds no degree in economics does not disqualify him; instead, his credentials . . . are imposing."); *Masimo Corp. v. Tyco Health Care Grp.*, 2004 WL 7094930, at *4 (C.D. Cal. May 28, 2004) ("[D]espite his lack of an economics degree, Mr. Elhauge's 'knowledge, skill, experience, training or education' give him special expertise in th[is] area . . . .").

[2] All exhibits are attached to the Declaration of Christopher J. Bateman, which is attached hereto.

[3] Ex. 1 ¶ 7; *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 194, 200, nn.5, 8 (2010); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006).

[4] *See, e.g.*, *supra* note 1. Plaintiffs are ready to provide a full list of these decisions upon request.

also on the fact that 20% was conservative relative to the alternative yardsticks, including the 55.5-64.5% price cut indicated by rival prices for robot instruments without similar restraints and the 45% price cut indicated by rival prices for repaired EndoWrists, Ex. 1 ¶¶ 353, 356, 393, 396; Ex. 2 ¶ 447. Prof. Elhauge also calculates separate damages from the artificially suppressed use limits Intuitive has imposed on EndoWrists, drawing on evidence and economic theory indicating that competition would have caused Intuitive to eliminate or at least increase these limits in the but-for world to at least 20 uses, relying not only on an Intuitive document so indicating, but also on █████████ ████████████████████████████████████████████████████████ █████████, and expert testimony that no use limit was necessary. Ex. 1 § VII.A.2, ¶¶ 359-61, 363, 405; Ex. 2 ¶¶ 300-302, 307, 310-311, 384, 450. In case the jury finds that Intuitive would have acted on its incentives to both cut prices and increase use limits in the but-for world, Prof. Elhauge also calculates damages from the combination of this price inflation and use-limit suppression. *Id.* § VII.A.3. For da Vinci service, Prof. Elhauge uses the competitive yardstick provided by medical equipment manufacturer Abbott Laboratories' service profit margins to estimate that Intuitive's service prices would have decreased by 12% in the but-for world. *Id*. § VII.B; Ex. 2 § VII.D.

Intuitive's attack on these damages estimates largely rests on a straw-man strategy of distorting them and omitting key evidence supporting them—for example, claiming Prof. Elhauge lacks evidence that, in the but-for world, IRCs could have circumvented the encrypted X/Xi EndoWrist use counter, while omitting that Rebotix *has in fact developed* a way to do exactly that. In truth, Prof. Elhauge's damages estimates—based on established methodologies, extensive evidence, and basic economic principles—are fundamentally sound and clearly admissible under the standards governing expert testimony and antitrust damages estimates.

Prof. Elhauge also offers opinions on other relevant economic issues, including market definition, anticompetitive effects, causation, and Intuitive's asserted procompetitive justifications. These issues necessarily implicate, to some extent, questions about the real and perceived functionality and safety of new and repaired EndoWrists, and the impact of 510(k) regulations on

competition in the EndoWrist market. *E.g.*, Ex. 1 §§ II.D, IV.C.1-2, VI.F. Many of Prof. Elhauge's opinions relating to these questions anticipate or respond to opinions by Intuitive's own economic expert.[5] Intuitive's cursory attempt to exclude broad swaths of this analysis also fails. These opinions are based on appropriate evidence for an economic expert in Prof. Elhauge's position (including the opinions of experts in these areas, and the conduct and expressed views of market participants), and respond to Intuitive's own economic expert's opinions on the topics.

## LEGAL STANDARDS

The focus of courts' gatekeeping function under Rule 702 is on "not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citation omitted). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013). Courts should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id.* at 969; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat."). The standard has "a 'liberal thrust' favoring admission."[6]

With respect to proving damages, "[i]n antitrust cases, we accept a degree of uncertainty when evaluating damages awards because of the inherent difficulty of ascertaining business damages when [t]he vagaries of the marketplace usually deny us sure knowledge of what [a] plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1045 (9th Cir. 2005), *vacated on other grounds and remanded sub nom. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) (citation omitted). While the jury should not be left to "speculation or guesswork,"

---

[5] *See, e.g.*, Ex. 1 ¶ 281, VI.F; *see generally* Ex. 2; Ex. 3 (Amended Expert Rebuttal Report of Loren K. Smith) §§ II.A-B, II.E, III, IV.B-E, VI.B-C.

[6] *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)).

it "may make a just and reasonable estimate of the damage based on relevant data . . . . [and is] allowed to act on probable and inferential as well as (upon) direct and positive proof. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (citation omitted).

## ARGUMENT

## I.    PROFESSOR ELHAUGE'S DAMAGES ESTIMATES ARE RELIABLE

As a threshold matter, Intuitive's criticism that Prof. Elhauge does not use an "established methodology such as a regression, yardstick, or before-and-after analysis,"[7] is misleading on several levels. First, Prof. Elhauge in fact *does* use yardstick analyses to support his damages estimates—for *both* markets affected by the challenged restraints.[8] Moreover, no particular methodology is required to estimate damages.[9] Here, because Intuitive's restrictions on IRCs have been in place since it began selling the da Vinci, there is no period of pricing or use-limit data untainted by these restraints to allow a "before-and-after analysis" or a similar regression. *See Blood Reagents*, 2015 WL 6123211, at *11 (finding damages estimate based on business plan sufficiently reliable, in part because "it would be difficult to apply regression analysis reliably in this case"); Ex. 4 (Proving Antitrust Damages: Legal and Economic Issues (ABA 2017)) at II.6.F.1 (regression model requires "data from a nonconspiracy period"). Given these practical constraints—a product of Intuitive's own long-term anticompetitive conduct—it is entirely reasonable, even necessary, for Prof. Elhauge to employ other methods, including the yardstick technique and analysis based on Intuitive's own statements, business plans, and projections. "[E]xperts frequently use . . . business plan[s] to

---

[7] Intuitive Surgical Inc.'s Mot. to Exclude Testimony of Einer Elhauge ("Br.") at 2, ECF No. 126.

[8] Ex. 1 ¶¶ 353, 366-68; Ex. 2 ¶¶ 447, 463-66.

[9] *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *11 (E.D. Pa. Oct. 19, 2015); *cf. Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016) (rejecting arguments for the "categorical exclusion" of a type of expert analysis used to prove claims).

estimate" a but-for world.[10]

### A.    Professor Elhauge's EndoWrist Damages Estimates Are Reliable

#### 1.    The Price-Effect Damages Estimate Is Reliable

Prof. Elhauge reasonably relied on planning documents from "Project Dragon," an Intuitive initiative to sell refurbished EndoWrists at discounts ranging from 20% to 40%, to estimate that Intuitive would have responded to competition from IRCs in the but-for world by lowering EndoWrist prices by at least 20%. While Intuitive now downplays this evidence as "a handful of old Intuitive documents about a never-adopted proposal," Project Dragon was in fact a major initiative extensively developed and seriously considered by top Intuitive executives from as early as 2016 into 2020.[11] The threat of rival EndoWrist repair was a driving factor behind the initiative.[12] Testing confirmed ████████████████████████████████████;[13] Intuitive shelved the program only after eradicating rival IRCs, determining that (absent such competition) it would be slightly

---

[10] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (also noting that "internal projections . . . often serve as legitimate bases for expert opinions"). Also misplaced is Intuitive's claim that Prof. Elhauge "ignore[d]" the question of precisely what market share IRCs would have obtained in the but-for world. Br. 2. Because Prof. Elhauge's damages estimate was based on the 20% price cut that Intuitive planned based on its own view about how significant rival competition would be, rather than based on the share of buyers who would switch to rivals charging 45% less, it sufficed for his analysis to show that Intuitive and credible third parties projected that IRCs would have achieved substantial market shares, Ex. 1 ¶ 357, and that there was broad hospital interest in using IRCs but for Intuitive's restraints, Ex. 1 ¶¶ 290-300, 311, 322, 380-81; Ex. 2 ¶¶ 146, 364-75.

[11] Ex. 5 at 7:25-9:1, 12:14-21; Ex. 6 at -952; Ex. 7 at -764 (████████████████████████████ ██████); Decl. of David Rosa ¶¶ 38-39 (describing 5-year "extensive analysis"), ECF No. 153-2.

[12] *E.g.*, Ex. 1 ¶ 172 & n.418 (quoting Intuitive-00273264 at -266-267 ████████████████████ ████████████████████████████████████████████████████████████████████); *id.* ¶ 394 & n.938 (quoting Intuitive-00273261) ("Objectives . . . Defensive revenue and margin protection: Displace non-validated 3ʳᵈ party re-programmers where already present").

[13] Ex. 1 ¶ 334, n.793 (quoting Scoville Dep. (*Rebotix*), Ex. 7 at Intuitive-00103429 (███████████ ████), at -439 ████████████████████████████████████████████████████████████ ████████████████████████████████); Ex. 8 (Goodson Dep.) 184:11-186:10 (██████████ ██████████).

more profitable to continue selling only new EndoWrists at its historical monopoly prices, in part because eliminating IRCs mooted Intuitive's goal of refurbishing EndoWrists to deny IRCs a stock of used EndoWrists to repair. Ex. 2 ¶¶ 277-81; *supra* note 12. Reliance on such sources to calculate antitrust damages is entirely appropriate.[14]

Intuitive's main protest is that one "Backup" slide in a Project Dragon presentation that Prof. Elhauge cites contemplated a 20% discount for Germany and France but stated that "Details, tactics and package may vary by region," and that in the U.S. the tactic "Could be flat procedure pricing." Br. 6-7; Ex. 9 at -201. Other parts of that document, though, repeatedly reference a blanket "20% discount," and show Intuitive contemplating "a deeper 30% discount," which it eschewed only because its repair restrictions allowed it to avoid being "force[d] . . . into a commodity position." Ex. 9 at -185, -196. Moreover, at that time (July 2017), IRCs had begun repairing EndoWrists in Europe, but not yet in the U.S., making it reasonable to estimate that Intuitive, when faced with competitive entry in the U.S. in the but-for world, would likely have offered a similar 20-30% discount in the U.S. *See* Ex. 2 ¶¶ 275-76. And, as Intuitive concedes, another Dragon presentation contemplated discounts of 25-40%. Br. n.3; Ex. 1 ¶ 394. Prof. Elhauge's 20% is conservative relative to alternative yardsticks, such as the fact that IRCs charged *45%* less than Intuitive for repaired EndoWrists, and his yardstick comparison to rival surgical robot Senhance—whose instruments cost approximately *55-65%* less per procedure than Intuitive's. Ex. 2 ¶ 447; Ex. 1 ¶¶ 353-56, 393, 396.

Accordingly, there are "sufficient facts or data" for Prof. Elhauge's opinion that but-for prices would have been at least 20% lower to help the factfinder "make a just and reasonable estimate of the damage" based on "probable and inferential . . . proof." Fed. R. Evid. 702(b); *Bigelow*, 327 U.S. at 264. *See also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (damages

---

[14] *See ZF Meritor*, 696 F.3d at 292-93; *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 565-66 (2d Cir. 1970) (finding admissible sales and income projections that were "no mere interested guess" but "the product of deliberation by experienced businessmen charting their future course"); *cf. Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014) (rejecting argument that market definition requires "formal econometric analysis" and allowing expert opinion based on sources such as "internal Apple documents [and] employee testimony").

calculations "need not be exact"); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). "Vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means" for Intuitive to raise its criticisms. *Daubert*, 509 U.S. at 596.

### 2. The Use-Limit Damages Estimate Is Reliable

Intuitive asserts that "Prof. Elhauge cites no evidence to support his suggestion that use limits . . . would not have existed at all in the but-for world." Br. 8. But Prof. Elhauge is simply offering this scenario as a logical consequence in the event the jury finds that the limits are an unlawful restraint reinforcing Intuitive's contractual tie. Ex. 1 ¶ 403.[15] And there is ample evidence that the limits are unjustified: a) the FDA does not mandate them; b) the record clearly demonstrates their arbitrariness, including testimony from *both* sides' experts; c) the rigorous standards and excellent track record of IRC-repaired EndoWrists; and d) Senhance instruments and laparoscopic instruments (which Intuitive describes as "substantially equivalent" to EndoWrists) have no use limits.[16, 17]

Intuitive also argues that "Prof. Elhauge's alternative assumption that use limits would have been doubled to 20 . . . finds no reliable basis in the record." Br. 8. But Prof. Elhauge offers plenty of

---

[15] Experts may make assumptions so long as they "have a reasonable basis in the available record and are disclosed to the finder of fact." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 12645766, at *4 (E.D. Pa. Dec. 22, 2015) (allowing opinions as to "the anticompetitive effects of an unjustified reverse payment" where experts did not opine on whether the payments were justified but there was record evidence to rebut the justifications).

[16] *E.g.*, Ex. 1 ¶ 359; Ex. 2 ¶¶ 307-11, 381-82, 450; Ex. 10 (Parnell Report) §§ V, X; Ex. 11 (Rubach Rebuttal Report) ¶¶ 4-18 (citing admissions by Intuitive's surgeon and nurse experts as to the use counter's arbitrariness). Dr. Parnell in no way "concedes," as Intuitive claims, that EndoWrist use limits "are needed." In fact, he opines that Intuitive's use limits are "arbitrary" and unrelated to failure risk or actual wear and tear, and observes that EndoWrists are very similar to laparoscopic instruments that have no use limits. Ex. 10 ¶¶ 22, 24, 31, 76, 126, 147, 212-49, §§ V.A, X.

[17] Intuitive's argument that Prof. Elhauge "is not himself an expert on the safety and reliability of use limits" or FDA clearance is misplaced. Br. 8. Plaintiffs rely on their other experts and record evidence on these issues. And Prof. Elhauge is allowed to rely on those experts, as "expert opinions may find a basis in part 'on what a different expert believes on the basis of expert knowledge not possessed by the first expert.'" *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).

support for this estimate,[18] including: a) ███████████████████████████████

████████ (Ex. 1 ¶ 360, Table 4); b) the similarity of S/Si and X/Xi EndoWrists;[19] c) ███████

███████████████████████████████████████████████████████████ uses

(Ex. 1 n.859); d) evidence that Rebotix was able to achieve 29-59 uses (Ex. 1 ¶ 363); e) FDA's

clearance of Iconocare's reset EndoWrist with an additional 9 uses beyond its original 10 (Ex. 1

¶ 287); and e) that training EndoWrists had use limits of 30 (Ex. 1 ¶ 361; Ex. 2 ¶¶ 300, 450).

 In seeking to discredit its own employee's estimate by arguing that ████████████

█████████████████████████████████████████ Br. 8 (emphasis

added), Intuitive fails to mention that it generally did not test these instruments to failure, but set out

only to "validate" use-limit targets set by its marketing department, ending the tests once the targets

were hit. Ex. 12 46:24-47:20; Ex. 13 at -995-56. The testing data thus provides limited insight into

the instruments' true longevity.[20] Intuitive also cites a lack of evidence that Rebotix ████████

████████████████████████████████ Br. 9. But Prof. Elhauge cites

substantial evidence that hospitals and others viewed Rebotix-reset EndoWrists as just as reliable as

new EndoWrists, and even Intuitive does not "guarantee" the reliability of its own new

EndoWrists.[21] Intuitive also has no answer to Iconocare's FDA clearance. Thus, substantial evidence

supports Prof. Elhauge's use-limit damages estimate, which "need not be exact" under the law.[22]

---

[18] The 20-use-limit estimate does not mean all "use limits would have been doubled" as Intuitive claims. Many EndoWrists already have limits ranging from 12 to 18. Br. 8; Ex. 2 ¶ 449.

[19] Ex. 1 ¶ 276; Ex. 2 ¶ 305 (noting, *e.g.*, Intuitive's engineering expert's opinion that "[w]hile the [EUP] targeted . . . X/Xi instruments, ***the X/Xi instruments and S/Si instruments . . . share enough similarities that similar life testing results would be expected.***" (emphasis added)); Ex. 2 ¶ 416(i).

[20] Moreover, even with this constraint, one of the models was validated to 20 uses—yet Intuitive still set the limit at only 18, and similarly set limits unnecessarily low for other models. Ex. 2 ¶ 302.

[21] *See* Ex. 2 § VI.C.1.i-iii; Mot. To Exclude Testimony of Dr. Eugene Rubach at n.3, ECF No. 122.

[22] *Comcast*, 569 U.S. at 35. Prof. Elhauge also offers two alternative measures of use-limit damages, not assuming that use limits would be extended to 20: (1) damages if the only difference in the but-

### 3.     The Combined Price/Use-Limit Damages Estimate Is Reliable

While, as explained above, Prof. Elhauge's price-effect and use-limit damages estimates are both reliable, Intuitive contends that a combined estimate *must* be unreliable, because it yields an "effective discount" exceeding the discount IRCs offered when stunted by Intuitive's restraints. Br. 9. This kind of results-based criticism is an improper basis for exclusion. *Elosu*, 26 F.4th at 1024 (focus of court's gatekeeping function is "not the correctness of the expert's conclusions but the soundness of his methodology" (citation omitted)). Moreover, as Prof. Elhauge explains, in competitive markets, firms compete on *both* price *and* quality—which is exactly what the combined estimate represents. Ex. 2 ¶ 443; Ex. 14 (Elhauge Dep.) 260:20-262:21. Economics predicts that, without the restraints, IRCs would have increased their economies of scale, lowered their costs, and competed with one another and Intuitive, thus forcing all participants in the market, including Intuitive, to further lower their prices. Ex. 2 ¶¶ 444-45. And in an unfettered market, Intuitive would have strong incentives not just to reduce nominal prices, but also to increase use limits, which would effectively cut per-procedure prices further, while also saving on manufacturing costs and reducing the supply of EndoWrists available to IRC rivals. Ex. 2 ¶ 446; *see also id.* ¶ 279. Indeed, the effective 55% discount under Prof. Elhauge's combined estimate would merely make EndoWrist prices the same as, or still higher than, the prices charged without similar restraints for rival Senhance instruments, which sell for 55-65% less. Ex. 2 ¶ 447; Ex. 1 ¶ 353.

### 4.     Professor Elhauge's EndoWrist Rival Entry-Date Scenarios Are Reliable

Similarly misguided is Intuitive's attempt to exclude as lacking factual "basis" damages

---

for world were that the EUP use limits for the X/Xi instruments included in the EUP would have been implemented at one of the posited but-for rival entry dates, Ex. 2 ¶ 455, Table 10; and (2) damages where (a) the EUP use limits would have been implemented earlier and also applied to the corresponding S/Si EndoWrists, and (b) use limits on other EndoWrists would also have been extended to 12, the lowest limit adopted in the EUP, *id.* ¶ 456, Table 11. Intuitive's motion does not address these estimates, both of which negate its criticism of the 20-use assumption, and the former of which also negates any criticism of applying extended uses to non-EUP EndoWrists.

scenarios that posit IRC entry in the U.S. EndoWrist market by May 21, 2017.[23] In fact, Prof. Elhauge cites extensive evidence predating 2017 of both a) the preparedness of Rebotix and large medical device company Stryker to enter the U.S. market, and b) demand from U.S. customers. Ex. 1 ¶¶ 304-06. Rebotix began investing in R&D to provide EndoWrist repair as early as 2012, successfully developed its method to reset EndoWrists by 2015-2016, began providing EndoWrist repair in Europe in 2016, and by 2016 had interest from major U.S. customers, including HCA (one of the country's largest hospital chains), which Intuitive already was threatening for considering EndoWrist repair services. *Id.* ¶¶ 304-05; Ex. 2 ¶ 409.[24] Stryker even signed a proposal to acquire Rebotix's EndoWrist repair business in December 2015, and planned to enter the market by 2017, but was deterred by Intuitive's exclusionary restraints. Ex. 1 ¶ 306. In the but-for world, "[w]ithout the exclusionary restraints, the potential profits from entry would have been much higher," making earlier entry (including by other IRCs, such as Restore and SIS) likely. *Id.* ¶¶ 163, 306; Ex. 2 ¶ 409. These facts and economic realities are more than sufficient to support Prof. Elhauge's earliest entry date scenario of May 21, 2017. *Cf. Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 866-68 (C.D. Cal. 2015) (plaintiff whose steps to enter a market occurred primarily abroad alleged sufficient intent and preparedness to enter in U.S., given defendant's actions to block entry).

### 5.  The Inclusion of Damages for X/Xi EndoWrists Is Reliable

Intuitive argues that Prof. Elhauge "Does Not Have A Reliable Basis To Assume That Third Parties Would Have Modified X/Xi EndoWrists In The But-For World." Br. 11-12. However, Intuitive misleadingly omits that Rebotix *has already developed* a way to circumvent the encryption

---

[23] Prof. Elhauge does not affirmatively opine that entry *would have occurred* by May 21, 2017, but rather that there is evidence to support a damages scenario where entry would have occurred by then. Ex. 1 ¶¶ 398, 403; Ex. 2 ¶¶ 406, 413. He also calculates damages under the alternative entry-date scenario of the actual entry dates and notes his "methodology can also easily calculate damages based on any alternative but-for entry date that a factfinder might find." Ex. 2 ¶¶ 406, 413.

[24] The fact, highlighted by Intuitive, that Rebotix sought 510(k) clearance in 2014 and did not obtain it is irrelevant, because (to avoid 510(k) requirements) Rebotix changed its plan from selling repaired EndoWrists as a device to repairing EndoWrists owned by hospitals and entered the market without such clearance, as did others, and could have done so earlier in the but-for world.

on the X/Xi use counter.[25] That an IRC has surmounted the key technical obstacle to repairing X/Xi EndoWrists—which are otherwise similar to S/Si EndoWrists (Ex. 1 ¶ 276; Ex. 2 ¶¶ 305, 416(i))—despite Intuitive's restraints disincentivizing such efforts, indicates that IRCs would have overcome this barrier earlier and marketed this service in the but-for world, given the large business opportunity presented. *See* Ex. 1 ¶ 264; Ex. 2 ¶ 416. Intuitive also ignores other evidence relied on by Prof. Elhauge that IRCs long planned to repair X/Xi EndoWrists, but were derailed by Intuitive's anticompetitive conduct.[26] Rebotix, for example, began efforts to reset X/Xi EndoWrists in 2014, but "determined not to invest the resources to finalize a reset to the X/Xi usage counter because doing so would be futile in the face of Intuitive's reaction to hospitals using Rebotix's services."[27] This evidence supports Prof. Elhauge's modest conclusion that IRCs might have offered X/Xi EndoWrist repair absent Intuitive's anticompetitive conduct, and thus the inclusion of associated damages.[28]

---

[25] Ex. 1 ¶¶ 263, 275; Ex. 2 ¶ 416; Ex. 15, 42:1-11 ("So from a technical perspective . . . Rebotix has figured out how to reset the usage counter for Xi instruments. . . ? . . . [A]: Yes.").

[26] Ex. 1 ¶ 275 (citing, *e.g.*, Parker Dep. at 141:14-21 (Parker was "a hundred percent" confident that Restore will be able to bypass X/Xi chip)); *see also* Ex. 16 at 139:23-140:23 (Intuitive's "blocking" prevented Restore from moving forward with prospective X/Xi customers); Ex. 1 ¶ 163, n.397 (quoting May Dep. at 75:16-76:1 ("Q. . . . Did that harm cause any delay to Restore's business? … [A]: [A]bsolutely. . . . We had been counting on the revenues that we were generating from the repair business . . . to grow the Xi business and to do the research and development for the Xi.")); Ex. 15 at 24:5-19 ("Q. . . . Would the scope of reparable [E]ndoWrists have expanded in a world without Intuitive's anticompetitive conduct? … [A]: Well, clearly, the big expansion we've already talked about would be Xi. . . . Yes, I believe the process implementation would have expanded significantly . . . Xi . . . would have been a big, big increase in the number of instruments that were turning over."); Ex. 1 ¶ 263, n.621 (quoting REBOTIX171287 at -287 (regarding "next generation" (Xi) EndoWrists, Rebotix had "Sufficient confidence in success" and "initial analysis suggests success is possible")); *see also* Ex. 2 ¶ 416.

[27] Ex. 1 ¶ 275; Ex. 17 (Decl. of Glenn Papit) ¶¶ 6, 9; Ex. 2 ¶ 416. Prof. Elhauge draws further support from the opinion of SIS cryptography expert Kurt Humphrey that the "reverse engineering work" to circumvent the X/Xi use counter "could have been performed at any time in the last five years, if not earlier, had the appropriate funding and resources been available." Ex. 2 ¶ 416(j).

[28] This approach is further supported because Intuitive considered offering discounted refurbished X/Xi EndoWrists. Ex. 19 at -261-262; *see also* Ex. 18 at -713, -727; *see generally supra* § I.A.1.

11

**B.      Professor Elhauge's da Vinci Service Damages Estimate Is Reliable**

Intuitive here yet again fallaciously insinuates that because rival entry into this market was limited under Intuitive's oppressive restrictions, there is no reason to think entry would have expanded absent those restrictions. Br. 12. But record evidence shows that firms other than Restore were interested in entering this market, in which Intuitive has reaped eye-popping profit margins, and basic economics supports the same. Ex. 1 ¶¶ 313-14, 323-24, 366; Ex. 2 ¶ 186.[29]

Intuitive argues that Prof. Elhauge's damages estimate for the service market is unreliable because (1) it applies a price discount to all da Vinci service by Intuitive, even though Restore could not perform certain service, given Intuitive's control over proprietary servicing tools, and (2) Prof. Elhauge's use of Abbott Laboratories' servicing profit margins as a yardstick is flawed. Br. 12-13. Neither criticism is grounds for exclusion. Prof. Elhauge's application of a discount to all service by Intuitive is reasonable because, as he explains, Intuitive charges a uniform price for different types of service, whether IRCs already have been able to provide that service ("contestable") or not ("incontestable")—not just on a time-and-materials basis (as Intuitive concedes), but also under its service contracts. Ex. 1 ¶¶ 224-25, n.973; Ex. 2 ¶ 461. Notably, Intuitive points to no record evidence indicating that it contemplated bifurcated pricing for contestable and incontestable service, and the record shows it viewed maintaining uniform pricing as important in other contexts too.[30] Moreover, the Abbott yardstick used by Prof. Elhauge to derive his 12% discount estimate inherently incorporates the possibility that contestable and incontestable service would be priced differently, as Abbott's servicing represents "a mix of contestable and incontestable servicing," rendering it

---

[29] Such evidence supports Prof. Elhauge's service damages scenarios beginning before Restore's entry. Indeed, hospitals themselves, who commonly service their own complex medical equipment, have long been prepared to enter the da Vinci service market, with some in fact entering it in the 2000s. Ex. 1 ¶ 314 & n.751; Ex. 2 ¶ 329 & n.329; Ex. 20 (Waninger Dep.) 60:7-62:5. *See also Tawfilis*, 157 F. Supp. 3d at 866-68 (holding that "any lack of concrete affirmative steps" by rival to enter market, "or lack of background and experience" related to the market, "seems to be directly attributable to the anticompetitive conduct" and therefore excusable).

[30] Ex. 1 ¶ 400 & n.952 (citing, *e.g.*, Intuitive-00203904 at -905 (noting "strong one-price policy")).

"entirely appropriate to apply [this] yardstick . . . to [Intuitive's] total revenue" from da Vinci service. Ex. 2 ¶ 464. The reasonableness of this modest 12% discount for all service revenue is all the more apparent considering that Restore quoted prices *74%* lower than Intuitive. Ex. 1 ¶ 365.

Prof. Elhauge's use of Abbott as a comparator also is reasonable. Br. 13. Prof. Elhauge notes multiple relevant similarities between the two companies: Abbott is a "leading medical device OEM" that is "closest to Intuitive in size" and manufactures, repairs, and maintains complex equipment such as the EnSite Cardiac Mapping System, the maintenance of which "require[s] specialized equipment and training." Ex. 1 ¶ 366 & n.880, ¶ 413.[31] Moreover, the Abbott yardstick "is likely conservative because the industry average profit margin for other leading firms' relevant business segments is significantly lower than that of the Abbott yardstick." *Id.* ¶ 413.[32]

In short, Prof. Elhauge's methodology is sufficiently reliable to serve as the basis for an approximation of damages. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (yardstick proper unless there is "no meaningful economic similarity").

## II.    THE OTHER CHALLENGED OPINIONS ARE ADMISSIBLE

The court also should reject Intuitive's blunderbuss attempt to exclude numerous other aspects of Prof. Elhauge's testimony on the grounds that he lacks the expertise to offer it. With the exception of a few quoted "example" statements, Intuitive's request—expressed in terms of broad, ill-defined categories such as "FDA clearance issues" and "the functionality of EndoWrists," Br.

---

[31] Prof. Elhauge's reliance on Abbott is further justified because "[w]ith respect to any differences in size, there is no other MIST surgical robot manufacturer with service or total revenues similar to Intuitive." Ex. 2 ¶ 463. Notably, Prof. Elhauge's comparison to Abbott is far more direct than Intuitive's expert's use of pharmaceutical drugs as a yardstick for EndoWrists. Ex. 2 ¶ 463.

[32] The two cases Intuitive leans on here do not help it. In one, "the expert was unable to identify *any* particular significant respect in which Inglis was 'comparable' to the surveyed companies." *William Inglis & Sons Baking Co. v. Cont'l Baking Co.*, 942 F.2d 1332, 1341 (9th Cir. 1991) (emphasis added). In the other, the defendant presented compelling evidence that an obvious difference between the comparators (the greater popularity of the defendant's artist base) offered an innocent explanation for the defendant's higher prices—a difference the plaintiff expert had failed to account for. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974-76 (C.D. Cal. 2012). Intuitive has offered no such evidence, including no evidence that Abbott's larger revenues matter here.

14—is impermissibly vague about what it seeks to exclude and should be denied on this basis.[33] In any case, Intuitive's critique fails, as Prof. Elhauge's opinions touching on these subjects are proper.

As to "FDA clearance" and EndoWrist "safety" and "functionality" issues, Prof. Elhauge does not purport to be an expert on FDA clearance or engineering matters. He clarifies that he "offer[s] no opinion" on whether 510(k) clearance is needed to repair EndoWrists, Ex. 2 ¶ 297(f), and that he is "not resolving any disagreement between [Plaintiffs' and Defendant's engineering] experts on the safety of [repaired EndoWrists]," Ex. 14 at 152:20-153:24. But he analyzes evidence relating to these issues, because they bear on the economic issues he properly opines on. For example, EndoWrists' safety and functionality are relevant to market definition, alleged procompetitive justifications, and damages from suppressed use limits, while the effect of 510(k) regulations bears on causation and whether Intuitive's restraints had anticompetitive effects.[34] Moreover, much of Prof. Elhauge's discussion concerning these issues simply responds to (or anticipates) opinions offered by Intuitive's own economic expert on these same subjects, such as Dr. Smith's assertion that the restraints promote safety, or that concerns about 510(k) clearance reduce demand for repaired EndoWrists.[35] With respect to these matters—*i.e.*, to support economically relevant observations such as "[r]epaired EndoWrists are functionally equivalent to new EndoWrist replacements," "the use counter limit . . . did not appear to solve any safety issues," and "FDA clearance [for EndoWrist resets] may not have been necessary in the first place," Br. 14—Prof.

---

[33] *See, e.g.*, *Bonds v. Dautovic*, 2011 WL 13228307, at *4 (S.D. Iowa Feb. 7, 2011) ("[T]he Court cannot, and will not, render an advisory opinion on any unidentified pieces of evidence that might, theoretically, fall into the extremely broad categories listed by Defendants."); *AMX Corp. v. Pilote Films*, 2007 WL 2428940, at *2 (N.D. Tex. Aug. 27, 2007) (denying *Daubert* motion that failed to adequately specify opinions in question because "the specific content and nature of the opinions and testimony may impact" the admissibility analysis).

[34] *E.g.*, Ex. 1 §§ II.D, IV.C.1-2, VI.C, F, VII.A.2; Ex. 2 ¶¶ 206, 297, 299-315, §§ VI.C, VII.C.2.i.

[35] *E.g.*, Ex. 1 ¶¶ 281-300, § VI.F; Ex. 2 ¶¶ 206, 297, 299-315, 321-22, 363-400. Should the Court exclude any of Prof. Elhauge's opinions relating to the topics listed in Section III.C of Intuitive's motion, Plaintiffs respectfully submit that Dr. Smith's opinions relating to those topics should likewise be excluded, since Dr. Smith also claims no expertise in such subjects.

Elhauge appropriately relies on the opinions of FDA, engineering, and surgeon experts in this case, and similarly relies on record evidence reflecting the views, analysis, conclusions, and conduct of market participants and analysts.[36] This is entirely permissible.[37] Intuitive's contrary argument misleadingly omits words in Prof. Elhauge's statements that make clear he was relying on the views of experts or market participants, rather than offering his own opinions on such issues.[38]

As to what Intuitive terms "conclusions regarding . . . motivation and intent," Prof. Elhauge's opinions are again proper. The quoted examples supposedly going to "Intuitive's motivation and intent" focus instead on the exclusionary *aspects and effects* of Intuitive's conduct, and what "economic theory" predicts about Intuitive's conduct. Br. 14; Ex. 1 ¶ 361. Similarly, Prof. Elhauge's opinions about "hospital perceptions" focus on objective evidence of hospitals' *economic actions and expressed views*, which are relevant support for an economic expert's opinion on certain issues, such as market definition and causation. Ex. 1 ¶¶ 290-300, 326. Thus, this criticism fails.

**CONCLUSION**

For these reasons, Intuitive's motion should be denied.

---

[36] *E.g.*, Ex. 1 ¶¶ 59-51, 380-84, § IV.C.1-2; Ex. 2 §§ V.C, VI.C.1; Ex. 14 at 152:20-153:24, 178:23-179:3.

[37] *See Toyota*, 978 F. Supp. 2d at 1066 ("[E]xpert opinions may find a basis in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." (citation omitted)); *King Drug*, 2015 WL 12645766, at *5 ("Experts may combine objective data with the subjective analysis of another expert to create an admissible report, and the testifying expert's knowledge or understanding of the underlying facts goes to the expert testimony's weight, not its admissibility."); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 616 n.8 (E.D. Pa. 2002) (admitting economic expert's opinions on topics such as that plaintiff "likely infringe[d]" upon defendant's patents where those opinions were based in part on other experts' testimony, because "these opinions relate . . . to . . . economic consequences" and "it is customary for economic experts to rely on other expert reports when drawing conclusions").

[38] For example, Prof. Elhauge cited "plaintiff expert Ms. Kim Trautman's conclusion that third-party IRCs, in general, do not represent any safety/quality issues," Ex. 1 ¶ 380, and stated, "Intuitive and IRCs both indicate that repaired EndoWrists are functionally equivalent to new EndoWrist replacements." *Id.* ¶ 157. But Intuitive omits the beginning of each quote to assert these were Prof. Elhauge's own opinions. Br. 14.

Dated: April 20, 2023

Respectfully submitted,

/s/Manuel J. Dominguez

Jeffrey J. Corrigan (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
Email: jdominguez@cohenmilstein.com

Benjamin D. Brown (SBN 202545)
Daniel McCuaig (*pro hac vice*)
Zachary R. Glubiak (*pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., Suite 500
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
Email: bbrown@cohenmilstein.com
Email: dmccuaig@cohenmilstein.com

Gary I. Smith, Jr. (SBN 344865)
Samuel Maida (SBN 333835)
HAUSFELD LLP
600 Montgomery Street, Suite
3200 San Francisco, CA 94111
Tel: 415-633-1908
Fax: 415-358-4980
Email: gsmith@hausfeld.com
Email: smaida@hausfeld.com

Christopher J. Bateman (*pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: 212-838-7797
Fax: 212-838-7745
Email: cbateman@cohenmilstein.com

Brent W. Landau (*pro hac vice*)
Jeannine M. Kenney (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-3271
Email: blandau@hausfeld.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Michael J. Boni
Joshua D. Snyder (*pro hac vice*)
John E. Sindoni (*pro hac vice*)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
Email: mboni@bonizack.com
Email: jsnyder@bonizack.com
Email: jsindoni@bonizack.com

*Counsel for Plaintiffs and the Proposed Class*