1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6
7    **IN RE: DA VINCI SURGICAL ROBOT**          Case No.  21-cv-03825-AMO
     **ANTITRUST LITIGATION**
8
9                                               **ORDER RE: MOTIONS TO EXCLUDE**
                                                **EXPERT WITNESSES**
10                                              Re: Dkt. Nos. 122, 123, 124, 126
11                                              **FILED UNDER SEAL**
12
13          This is an antitrust case involving a surgical robot system.  The Court heard Defendant

14   Intuitive Surgical, Inc.'s ("Intuitive") motions to exclude the expert testimony of Dr. Eugene

15   Rubach (ECF 122), Kimberly A. Trautman (ECF 123), Dr. T. Kim Parnell (ECF 124), and Prof.

16   Einer Elhauge (ECF 126) on September 7, 2023.  Having read the papers filed by the parties and

17   carefully considered their arguments therein and those made at the hearing, as well as the relevant

18   legal authority, the Court hereby **GRANTS in part and DENIES in part** Defendants' motions,

19   for the reasons herein.

20          Today, the Court issues this order in addition to one resolving the parties' pending motions

21   for summary judgment.  Below the Court assumes familiarity with the case's facts, which are

22   more fully fleshed out in the summary judgment order.  After setting forth the legal standard for

23   motions to exclude expert testimony, the Court addresses each *Daubert* challenge in turn.

24   **A.     Legal Standard**

25          Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

26   or otherwise" when: (a) the expert's scientific, technical, or other specialized knowledge will help

27   the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

28   based on sufficient facts or data; (c) the testimony is the product of reliable principles and

United States District Court
Northern District of California

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010))

"Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147-49 (1999)).  "A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."  *Id.* (citing *Kumho Tire*, 526 U.S. at 152).  The courts' gatekeeping function under Rule 702 centers "not [on] the correctness of the expert's conclusions but the soundness of his methodology."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citation omitted).  For example, courts routinely exclude expert testimony where the expert's opinion is not within the scope of his expertise.  *See, e.g.*, *Avila v. Willits Envt'l Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."  *Alaska Rent-A-Car*, 738 F.3d at 969-70.  Courts should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  *Id.* at 969; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").  The Ninth Circuit has placed great emphasis on *Daubert*'s admonition that a district court should conduct this analysis "with a 'liberal thrust' favoring admission."  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

In general, flaws in a proffered expert's analysis typically go to the weight, rather than the admissibility, of the expert's testimony.  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Cir. 2002) ("In most cases, objections to the inadequacies of a study are more appropriately

2   considered an objection going to the weight of the evidence rather than its admissibility.  Vigorous

3   cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged

4   defects and reduces the possibility of prejudice." (internal citation omitted)).  "In some cases,

5   however, the analysis may be 'so incomplete as to be inadmissable as irrelevant.'"  *Id.* (quoting

6   *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

7   **B.      Dr. Eugene Rubach**

8         Intuitive challenges three categories of Dr. Rubach's testimony: (1) his opinions regarding

9   EndoWrist use and repair, (2) his opinions regarding minimally invasive robot providers and

10  features, and (3) his opinions regarding the effect of the da Vinci on hospital recruiting and

11  marketing.  The Court considers these groups of testimony in turn.

12        When an expert's testimony relies heavily on the expert's knowledge and experience,

13  rather than scientific methodology, the *Daubert* factors (peer review, publication, potential error

14  rate, etc.) are simply not applicable.  *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir.

15  2000).  "Despite the importance of evidence-based medicine, much of medical decision-making

16  relies on judgment – a process that is difficult to quantify or even to assess qualitatively."

17  *Primiano*, 598 F.3d at 565 (quoting Harrison's Principles of Internal Medicine 3 (Dennis L.

18  Kasper et al. eds., 16th ed. 2005)).  A court therefore may admit medical expert testimony "if

19  physicians would accept it as useful and reliable" and the medical knowledge provides a

20  "reasonable opinion."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

21        Dr. Rubach is a general surgeon who practices in the State of New York.  Lannin Decl.

22  Ex. 1 (Rubach Report) ¶ 1.  The majority of the operations he has performed over the course of his

23  17-year career "were done using minimally invasive techniques (both laparoscopic and robotic)."

24  *Id.* ¶¶ 1, 2.  Dr. Rubach has extensive experience using the da Vinci surgical system.  *Id.* ¶¶ 3, 7.

25  Intuitive moves to exclude several of the opinions Dr. Rubach offers as lacking in proper scientific

26  or other reliable support in the record, though Intuitive does not seek to exclude all of his

27  testimony.

28

First, Intuitive seeks exclusion of Dr. Rubach's opinions on (a) the arbitrariness of EndoWrist use limits (Rubach Report ¶¶ 12, 28-33, 35-36; Lannin Decl. Ex. 2 (Rubach Rebuttal Report) ¶¶ 3(e), 4-9, 30); (b) the arbitrariness of EndoWrist "repair restrictions" (Report ¶¶ 34-35; Rebuttal ¶¶ 3(g), 7, 15-16, 18); and (c) how physicians and doctors supposedly practice "off-label use" of the da Vinci and its instruments (Rebuttal ¶¶ 12-14).  Plaintiffs argue that Dr. Rubach's opinions on these matters are based on Dr. Rubach's background, experience, and record evidence, and should therefore not be excluded.  *Primiano*, 598 F.3d at 567.  The Court agrees.

Dr. Rubach, as an experienced surgeon who has extensively used both EndoWrists and traditional laparoscopic instruments, opines that, "from a surgical perspective," the repair restrictions do not "advance any medical objectives."  Rubach Report ¶¶ 34-35; *see Elosu*, 26 F.4th at 1024 ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").  Intuitive attacks his opinion testimony as reaching beyond his medical expertise and opining instead about engineering aspects of the da Vinci system.[1]  Dr. Rubach specifies in his report, for instance, that EndoWrist use limits are "based on criteria which, *in my opinion as a surgeon*, are arbitrary and do not reflect whether the EndoWrist is suitable for clinical use."  Rubach Report ¶ 33 (emphasis added); *see also* Rubach Rebuttal ¶ 5.  Dr. Rubach based this opinion on his extensive experience, his familiarity with the da Vinci and EndoWrists, and his review of the record, including the testimony and expert reports submitted by other experienced surgeons.  *Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  Dr. Rubach's many years of experience as a surgeon qualify him to opine on the potential consequences to patient health and safety of using inadequate instruments to perform surgical procedures.  Therefore, his opinions regarding the clinical relevance and patient safety implications of Intuitive's use counter are relevant and reliable.

---

[1] Ironically, this argument repeats itself in reverse for another of Intuitive's motions to exclude: that Plaintiffs' engineering expert is unqualified to opine on the use counter's deficiencies, as he is not a surgeon, and that Plaintiffs' surgical expert is unqualified to opine on the use counter's deficiencies, as he is not an engineer.  *See* Mot. Exclude Parnell, at 6-7; Mot. Exclude Rubach at 5-7.

United States District Court
Northern District of California

1      Similarly, Intuitive also claims Dr. Rubach's testimony regarding "off-label use" is

2  unreliable because he purports to testify on behalf of "doctors everywhere" (Mot. at 12), but Dr.

3  Rubach does not assert that all doctors engage in off-label use.  Rather, he testifies regarding

4  industry standards, based upon his "knowledge of, and experience within," the medical industry,

5  which is permissible.  *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017

6  n.14 (9th Cir. 2004).  Though Dr. Rubach may not "know the details of how his instruments are

7  manufactured or repaired," his extensive experience as a surgeon still qualifies him "to opine on

8  the potential consequences to patient health and safety of using" repaired instruments to perform

9  surgical procedures.  *See Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-

10  MJF, 2022 WL 19408080, at *5 (N.D. Fla. Feb. 7, 2022) (permitting Intuitive's surgeon expert to

11  testify based on his experience despite his lack of engineering expertise); *see also Primiano*, 598

12  F.3d at 567.  Dr. Rubach's opinions that are premised on his unique experience as a surgeon

13  having used the da Vinci and other surgical modalities need not be excluded.

14      Second, Intuitive attacks Dr. Rubach's observation that Intuitive is "dominant" in

15  minimally invasive robotic surgery, claiming that because Dr. Rubach is not an economist, he

16  cannot testify regarding Intuitive's "market power."  Mot. Exclude Rubachat 8.  At his deposition,

17  Dr. Rubach explained why he referred to Intuitive as the "dominant manufacturer of the robotic

18  platforms," testifying that while there are "many companies that produce many types of surgical

19  equipment that is used in surgeries . . . if you look at the robotic-assisted surgery, especially as it

20  pertains to the robot-assisted soft tissue surgery, . . . the da Vinci is really the dominant

21  manufacturer of the robotic platforms."  Spector Decl. Ex. 3 (Rubach Dep.) at 30:12-31:23; *see*

22  *also* Rubach Report ¶ 21 ("[N]o other company has – so far – been able to market a competitive

23  minimally invasive surgical robot.").  Dr. Rubach has extensive experience with and is qualified to

24  testify regarding the tools available to surgeons, particularly for minimally invasive surgery, a

25  subject that is "not within the common experience."  *Elosu*, 26 F.4th at 1026; Rubach Report ¶¶ 2-

26  5, App'x A; Rubach Dep. at 16:2-8, 80:9-81:6.

27      Intuitive also argues that Dr. Rubach's opinions regarding the Zeus robot and "haptic

28  feedback" are "based on speculation and hearsay" and therefore unreliable.  Mot. Exclude Rubach

at 10-11.  But Intuitive's argument ignores Dr. Rubach's firsthand knowledge of (a) "haptic feedback," (b) the da Vinci's failure to offer it, and (c) why that is a criticism.  *See* Rubach Report ¶ 22 (explaining from personal experience what haptic feedback is and that da Vinci lacks it); Rubach Dep. at 114:8-115:5 (detailing instructions he received on overcoming the da Vinci's lack of haptic feedback).  That Dr. Rubach did not use the Zeus before its removal from the market does not change the fact that he was and is aware that (a) the Zeus existed, (b) the company that offered it was purchased, and (c) after the company was acquired, the Zeus was no longer available.  *See Elosu*, 26 F.4th at 1026 ("the basic function of expert testimony" is to "help the trier of fact understand highly specialized issues that are not within common experience").  Moreover, Intuitive's arguments go to the weight of Dr. Rubach's testimony, not to its admissibility, and his opinion need not be excluded on this basis.

Third and finally, Intuitive attacks Dr. Rubach's testimony that hospitals without the da Vinci are disadvantaged in recruiting surgeons and attracting patients seeking minimally invasive surgery, claiming Dr. Rubach lacks the qualifications or reliable basis for these opinions.  Regarding surgeon recruitment, Dr. Rubach's opinion is based on extensive experience, including having been recruited "on many occasions," and his awareness of (a) surgeons' preferences during his 25-year career, including a recent recruitment, and (b) surgeon interest in offering services that require the robot system.  Rubach Dep. at 55:14-56:9, 57:10-58:15, 60:8-15.  As for attracting patients, again based on his 25-years of experience, Dr. Rubach explained that patients in need of elective surgery research their options before choosing a surgeon, and patients seeking minimally invasive treatments "will not look for the hospital that doesn't offer" minimally invasive surgery, including robotic.  *Id.* at 56:10-24, 94:17-25.  Dr. Rubach's multiple decades of experience provide him with unique insight to opine on such matters that fall outside common experience.  The same knowledge and experience support Dr. Rubach's testimony regarding the "halo effect" for hospitals that possess a da Vinci system.  Intuitive seeks to strike Dr. Rubach's testimony regarding a "halo effect" for hospitals that possess a da Vinci system on the premise that he relies only on anecdotes as the basis for his opinion.  But based on his knowledge and experience as a surgeon, Dr. Rubach may testify regarding "actual known perceptions" of how hospitals without a

1   da Vinci are disadvantaged, both in terms of recruiting surgeons and attracting patients.  *See*

2   *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL

3   3226769, at *4 (M.D. Fla. Aug. 10, 2022).  In sum, the Court DENIES Intuitive's motion to

4   exclude the testimony of Dr. Rubach.

5   **C.      Kimberly A. Trautman**

6          Kimberly Trautman is a 24-year veteran of the subdivision of the United States Food &

7   Drug Administration ("FDA") charged with ensuring the safety of medical devices.  Lazerow

8   Decl. Ex. 1 (Trautman Report) ¶¶ 7, 9.  Plaintiffs proffer Trautman to opine as an expert on

9   whether third parties who modify used EndoWrists to extend their use limits beyond their original

10  FDA clearance "faced any regulatory bar" from the FDA.  Trautman Report ¶ 6.  Intuitive attacks

11  Troutman's testimony on three grounds: (1) she offers improper legal conclusions, (2) she is

12  unqualified to offer her opinions, and (3) her testimony is unreliable because of the underlying

13  evidence she relies upon or ignores.  The Court considers each challenge in turn.

14         **1.      Trautman's Legal Conclusions**

15         Intuitive challenges only two of Trautman's fundamental opinions: (1) that a third party

16  modifying an EndoWrist to circumvent its use counter is not a "remanufacturer" under FDA

17  regulations and thus does not require FDA clearance for such activity (*id.* ¶¶ 30, 82, 83); and

18  (2) that two of the third parties that engaged in this activity – Rebotix and Restore – did not

19  introduce modified EndoWrists "into commercial distribution" (*id.* ¶ 30).  Intuitive argues that

20  both of these opinions amount to conclusions of law because they interpret the regulatory

21  framework and apply it to the facts of independent repair company ("IRC") services.

22         Plaintiffs assert that Trautman's opinion need not be excluded because "[t]here is no

23  'ultimate issue of law' as to 510(k) clearance – it is not an element of any of Plaintiffs' claims, nor

24  is it an affirmative defense."  Opp. at 7.  That argument is disingenuous.  The necessity of Section

25  510(k) clearance for the third-party repair services offered by SIS and others is a fundamental

26  legal issue in this case.  Trautman's opinion applying the regulatory terms "remanufacturing" and

27  "into commercial distribution" to the facts of this case invade the legal interpretation province of

28  the Court.  *See Mannick v. Kaiser Found. Health Plan, Inc.*, 2006 WL 1626909, at *17 (N.D. Cal.

United States District Court
Northern District of California

1    June 9, 2006); *see also Blair v. Shinseki*, 2015 WL 12743841, at *8 (C.D. Cal. Apr. 29, 2015),

2    aff'd, 685 F. App'x 587 (9th Cir. 2017) (excluding "legal conclusion" testimony because

3    "[i]nterpretation of . . . regulations and policies is a question for the Court").  Troutman's opinions

4    interpreting how the regulatory framework applies to the facts of EndoWrist repair must be

5    excluded.  *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir.

6    2008) ("[a]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on

7    an ultimate issue of law.") (emphasis in original).

8          **2.**    **Trautman's Qualifications**

9        Intuitive further argues that "Trautman lacks 'sufficient expertise' to opine on whether the

10    activities in this case qualify as 'remanufacturing' under 21 C.F.R. § 820.3(w) or require clearance

11    under the 510(k) regulation."  Mot. at 9.  Because the Court concludes above that Troutman's

12    opinion applying the definition of remanufacturing to the facts of this case must be excluded as

13    legal conclusion, the Court does not address her specific qualifications to opine on that subject.

14    However, the parties' arguments on Trautman's qualifications require some additional

15    clarification because Trautman offers testimony beyond the legal conclusions the Court has

16    excluded.

17        Federal Rule of Evidence 702 requires that individuals be qualified by "knowledge, skill,

18    experience, training, or education" to provide expert testimony.  In arguing that she is unqualified

19    to offer expert testimony, Intuitive focuses on Trautman's experience in international regulatory

20    compliance and argues that she relied on others with greater expertise in the Section 510(k)

21    clearance process to make regulatory determinations.  Intuitive, however, improperly cherry-picks

22    these aspects of Trautman's expertise in an effort to overlook her abundant experience in

23    overseeing medical device regulations for FDA.[2]  Trautman spent 24 years with the Center for

24    Devices and Radiological Health, the FDA division specifically charged with ensuring the safety

25    of medical devices in the United States by, among other things, enforcing the Section 510(k)

26    clearance requirement.  Trautman Report ¶¶ 7, 9.  She authored the regulation that defines

27

28        [2] Perhaps unsurprisingly, Intuitive does not defend this position in its reply brief.

United States District Court
Northern District of California

"remanufacturer," an essential aspect of Intuitive's arguments in this case. *Id.* ¶ 10. Trautman's knowledge and experience with the regulatory framework will accordingly "help the trier of fact to understand the evidence or to determine a fact in issue," even if her legal conclusions are excluded. Fed. R. Evid. 702(a). Because Trautman's expert testimony generally reaches beyond her two legal conclusions and will likely help the fact finder to understand the regulatory framework, the Court follows the path set by the *Restore* court regarding similar expert testimony. That is, Trautman will be permitted to offer her insight into the FDA's practices and procedures as well as how such practices and procedures influence the parties' arguments regarding the Section 510(k) regulatory framework. However, Trautman "cannot offer an ultimate opinion as to Plaintiffs' compliance or noncompliance with regulatory requirements, because 'an expert may not testify that certain conduct did or did not violate the law.'" *Restore Robotics*, 2022 WL 19408080, at *3.

The parties advance additional arguments in footnotes regarding how the opinions of Intuitive's competing FDA expert, Christy Foreman, should be considered in light of the conclusions reached above regarding Troutman's opinions. Plaintiffs did not file a motion to exclude Foreman's opinions, and her testimony will not be excluded. But Intuitive makes clear "that Ms. Foreman will not testify about legal opinions if Ms. Trautman is precluded from doing so." Reply at 6 n.5 (citing Mot. at 7 n.2). The Court binds Intuitive to this representation – Intuitive's FDA expert may not offer legal opinions to the jury.

### 3.    Reliability of Trautman's Testimony

Intuitive's final argument related to Trautman is that her opinions are unreliable because of the sources on which she relies. Mot. Exclude Trautman at 9-13. Intuitive's argument is threefold.

First, Intuitive argues that Trautman's opinions are unreliable because she ignored all FDA correspondence regarding 510(k) clearance obligations. *Id.* at 9-13. But Intuitive again improperly cherry picks portions of Trautman's Report. Trautman did consider FDA correspondence, though it is not the correspondence Intuitive prefers to highlight. Trautman Report ¶ 32 (discussing email from Rebotix to FDA in which Rebotix official notes "[w]e

appreciate your acknowledgment on the call that whether a process constitutes remanufacturing is a 'murky area' under the current FDA guidelines"); *id.* ¶ 33 (discussing email from FDA to Rebotix regarding whether Rebotix's activities require 510(k) clearance); *id.* ¶ 71 (discussing FDA's "official advice" to Intuitive on whether its Extended-Use EndoWrists required 510(k) clearance). Nonetheless, "[t]here is no rule that an expert must consider and discuss all of the evidence on the record in order to proffer admissible testimony." *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2020 WL 5739316, at *4 (S.D. Cal. Sept. 24, 2020). The expert's purported failure to address evidence that may undermine his or her opinions serves as grounds for cross examination, not exclusion. *Id.* at *4. The Court declines to exclude Trautman's testimony on this basis.

Next, Intuitive argues that Trautman "ignores important factual and regulatory differences between Intuitive and third parties" in her discussion about whether IRCs meet the definition of "remanufacturers." Mot. Exclude Trautman at 11. Intuitive's argument amounts to a disagreement about Trautman's interpretation of the regulation and accordingly does not require exclusion of Trautman's testimony as unreliable. Intuitive may explore through cross-examination its disagreement with the conclusions Trautman reaches about what constitutes "remanufacture." To the extent this portion of Trautman's testimony offers legal opinion regarding which entities required 510(k) clearance, it is already excluded for the reasons discussed above.

Finally, Intuitive argues that Trautman improperly relies on a February 2020 report from a Deutsche Bank financial analyst that, in evaluating Intuitive's financial outlook, offered a series of opinions on whether third parties must have FDA clearance to modify EndoWrists to extend the number of uses beyond which they were cleared. Trautman Report ¶¶ 34-35, 45-46, 60, 81; Lazerow Decl. Ex. 21. But Trautman does not rely on the Deutsche Bank report for the breadth implied by Intuitive. Trautman points to the report to provide context – that market participants (along with market observers) did not believe that EndoWrist repair required Section 510(k) clearance. Trautman Report ¶ 60 (citing the Deutsche Bank report as evidence of the public "lack of clarity" regarding 510(k) clearance). Contrary to Intuitive's contention, Trautman does not rely

10

United States District Court
Northern District of California

1    on the report to interpret FDA regulations. This is not a basis to exclude Trautman's testimony as

2    unreliable.

3         In sum, the Court GRANTS Intuitive's motion to exclude the portions of Trautman's

4    testimony that constitute legal conclusions, but it otherwise DENIES Intuitive's motion.

5    **D.    Dr. T. Kim Parnell**

6         Dr. Parnell is a mechanical engineer who has worked on numerous projects involving an

7    array of medical products, product failures, product design, material selection, and medical device

8    development. Chaput Decl. Ex. 1 (Parnell Report) ¶¶ 1-13. Dr. Parnell has over 30 years of

9    experience as a mechanical engineer and is a licensed Professional Mechanical Engineer in

10   California. *Id.* ¶¶ 1-14. Plaintiffs tasked Dr. Parnell with responding to several opinions offered

11   by Intuitive's engineering expert, Dr. Robert Howe. Because Intuitive successfully moved to

12   exclude a portion of Dr. Parnell's opinion on similar subjects in the *Rebotix* case, the Court briefly

13   summarizes that Court's order before discussing the five of Dr. Parnell's opinions Intuitive

14   challenges in this case.[3]

15        **1.    Dr. Parnell and the *Rebotix* Case**

16        As Intuitive points out, Dr. Parnell was also retained by Rebotix to offer opinions in its

17   similar case against Intuitive in the Middle District of Florida. However, contrary to Intuitive's

18   mischaracterizations, the *Rebotix* court largely rejected Intuitive's *Daubert* motion and permitted

19   Dr. Parnell to offer many of the same opinions is offering to offer in the present cases. For

20   example, the *Rebotix* court found that "Dr. Parnell used sufficiently reliable methodologies to

21   opine on the safety of Rebotix's repair process." *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*,

22   No. 8:20-CV-2274-VMC-TGW, 2022 WL 3226767, at *4 (M.D. Fla. Aug. 10, 2022). That court

23   additionally allowed the jury to consider his opinions on, for example, (a) "the FDA's

24   manufacturing guidelines . . . , along with what can generally go wrong in medical-device

25

26   _____

27   [3] In addition to challenging Dr. Parnell's testimony in this case, Intuitive advances identical arguments to exclude Dr. Parnell's testimony in the related antitrust case brought against it by a competitor. *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, N.D. Cal. Case

28   No. 3:21-cv-03496-AMO. The analysis here is substantially similar to the order resolving the *Daubert* motions in that case.

manufacturing"; (b) "that Intuitive does not adequately address potential manufacturing defects"; (c) "the safety and reliability of repaired versus new EndoWrists"; and (d) "regarding failure-mode testing in general and his conclusions that Intuitive failed to perform such testing adequately." *Id.* at *4-5. The *Rebotix* court excluded, however, Dr. Parnell's opinion that the use counter did "not promote patient safety." *Id.* at *4. The court failed to see "how Dr. Parnell's training as a mechanical engineer makes him qualified to opine on patient safety. Most of the facts undergirding this opinion could just as easily be offered by surgeons or surgical technicians who work with the EndoWrists in the operating room." *Id.* In his *Rebotix* report, Dr. Parnell expressly stated, "It is my opinion that Intuitive's use counter does not promote patient safety" (Chaput Decl. Ex. 4 (Parnell Rebotix Report) ¶ 20), but that opinion is not being offered in these cases (*see* Parnell Larkin Report ¶¶ 24, 212-64). In the cases here in the Northern District of California, Intuitive again challenges Dr. Parnell's expert testimony.

### 2. Patient Safety

Intuitive seeks to exclude Dr. Parnell's opinion that the EndoWrist use counter is an "inadequate" method of ensuring patient safety. Intuitive attempts to analogize Dr. Parnell's reports here to portions of his testimony that the court excluded in the *Rebotix* case. The *Rebotix* court granted Intuitive's request to exclude Dr. Parnell's opinions only regarding the inadequacy of the use counter to the extent those opinions reached conclusions explicitly about patient safety, a subject the court viewed as within the expertise of others, like surgeons. *See Rebotix Repair*, 2022 WL 3226767, at *4. But Dr. Parnell does not opine on patient safety here; rather, he proffers an opinion regarding the design and efficacy of the EndoWrist use counter from an engineering perspective. Dr. Parnell directly responds to the opinion of Intuitive's engineering expert, Dr. Howe, by explaining what the use counter measures, and how it performs those measurements, fails to account for actual usage or wear and tear, mishandling or misuse, or the condition of the instruments. Parnell Larkin Report ¶¶ 221-64. All of these inquiries fall within the bounds of an engineer's opinion. Dr. Parnell's perspective on the engineering aspects of the use counter and alternatives therefore does not touch upon patient safety and need not be excluded.

United States District Court
Northern District of California

### 3.      Alternative Means of Measuring "Wear and Tear"

Intuitive also seeks to exclude Dr. Parnell's opinion concerning the feasibility of alternative means for measuring EndoWrist instrument "wear and tear." Intuitive frames Dr. Parnell's opinion on such alternative means of measuring instrument wear and tear as mere speculation. In substance, Dr. Parnell opines that the data already collected by Intuitive regarding the amount of time instruments are used and the amount of force to which they are subjected during surgeries is a better way to measure wear and tear. *See* Parnell Larkin Report ¶ 230; *see also* Sindoni Decl. Ex. 3 (Parnell Dep.) at 145:16-146:1 (discussing availability of information on duration of instrument use to surgeons through the "My Intuitive App"). Dr. Parnell's report shows that his opinion flows from his expertise as a mechanical engineer with extensive experience with manufacturing in biomedical and medical device industries, and more specifically product failures, product design, and medical device development. Parnell Larkin Report ¶¶ 1-13, App. A. Dr. Parnell addresses Intuitive's purported justification for its use limit being supported by testing of the instruments' risk of malfunction across their several uses or "lives" ("life testing") by explaining the deficiencies with Intuitive' life testing process. *Id.* ¶¶ 250-261. He contends that the use counter does not measure how intensely or how long an EndoWrist is used. *Id.* ¶¶ 217-232.[4] These opinions are both relevant and reliable. *Kumho Tire*, 526 U.S. at 150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. . . .  In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."). To the extent Intuitive discounts Dr. Parnell's assessment of the da Vinci system as deficiently derived from the deposition testimony of a "single" Intuitive employee, Dr. Parnell makes clear that his assessment relies on binding Rule 30(b)(6) testimony from one of Intuitive's lead engineers on topics related to (a) the electronic components in EndoWrists, (b) the sharing of information between those components, and a compatible da Vinci

---

[4] While Intuitive criticizes Dr. Parnell for ignoring the extensive risk management process and life testing underlying the use counter, the record shows that he considered all the Intuitive data that Dr. Howe considered and specifically analyzed Intuitive's instrument testing. *See* Parnell Larkin Report ¶ 255, App. B.

United States District Court
Northern District of California

1  Surgical Robot, and (c) the mechanical and electrical components of EndoWrists and their

2  functioning.  Chaput Decl. Ex. 11 (Duque 30(b)(6) Dep.) at 13:22-15:15; 16:6-17:14; 18:25-19:10;

3  Sindoni Decl. Ex. 2 (Duque Ex. 264, 30(b)(6) Notice).[5]  The Court will not exclude this relevant

4  and reliable expert testimony merely because Intuitive disagrees with it.  Dr. Parnell's opinion

5  regarding the design of the EndoWrist use counter need not be excluded.

6  **4.    Identification of Instruments "Unsuitable for Repair"**

7  Intuitive attacks Dr. Parnell's observations of EndoWrists identified as "unsuitable for

8  repair" while visiting the Rebotix repair facility in 2021.  Parnell Larkin Report ¶ 23, ¶¶ 86-92.

9  Dr. Parnell's report states that he "did not detect damage due to wear on the instrument" when

10  examining EndoWrists at Rebotix's facility that had been deemed "Unsuitable for Repair."  *Id.*

11  ¶ 91.  But Dr. Parnell articulates no methodology he applied to reach a conclusion on the cause of

12  failure for the small subset of instruments he examined.  Plaintiffs appear to concede this point,

13  stating that "[n]o rational reader would interpret" this statement as "an opinion on the cause of

14  failure of those instruments." Opp. at 11.  In light of this concession, the Court excludes opinions

15  from Dr. Parnell about the cause of failure of the EndoWrists he saw at the Rebotix repair facility.

16  **5.    Repairability**

17  Intuitive challenges Dr. Parnell's opinion that EndoWrists can be routinely repaired like

18  traditional laparoscopic instruments.  Intuitive focuses on the term "repair," arguing that Dr.

19  Parnell's description of the Rebotix process as repair is false because Rebotix never fixed broken

20  EndoWrists.  The Court declines to engage with this semantic argument regarding the meaning of

21  "repair" and whether IRCs conducted "repair" rather than "remanufacturing" in the context of a

22  motion to exclude expert testimony.  More importantly, for the reasons discussed in the Court's

23  order on the cross-motions for summary judgment, the Court abstains from finding that the

24  EndoWrist services provided by IRCs constituted a service that required FDA clearance where

25

26

27  [5] Intuitive additionally attacks Dr. Parnell's proposed alternative to the use counter as insufficient
to constitute a "substantially less restrictive alternative" to Intuitive's asserted justification for the

28  Use Counter.  This argument goes to the weight of Dr. Parnell's opinion, not whether it should be
excluded.

that agency took no enforcement action.  The Court accordingly declines to exclude Dr. Parnell's opinions about the repairability of EndoWrists and/or laparoscopic instruments.

### 6.    Assessment of Testing Data Utilized by IRCs

Finally, Intuitive seeks to exclude Dr. Parnell's opinion that "SIS properly relied on the testing of [its] trusted technology partner, Rebotix, regarding the EndoWrist repair process." Parnell Larkin Report ¶ 102.  Intuitive argues that Dr. Parnell's opinion improperly relies on business acumen outside his expertise, and the opinion improperly confers credibility in an assessment better left to the factfinder.  Plaintiffs counter that Dr. Parnell's report offers this opinion in response to the opinion of Dr. Howe, Intuitive's engineering expert, who stated that the information provided to Restore and SIS about repaired instruments was insufficient to determine whether the instruments were safe or reliable.  *See* Chaput Decl. Ex. 8 (Howe Report) ¶ 23.

In the challenged part of his report, Dr. Parnell evaluates Rebotix's risk management and life testing data underlying the information that was provided to Restore and SIS to evaluate whether the "information available [to SIS and Restore] was [] sufficient to determine whether the instrument was safe or reliable."  Parnell Larkin Report ¶¶ 103-156.  Dr. Parnell's opinion that such information was sufficient to determine instrument safety falls within the scope of his engineering expertise.  Thus, the Court does not exclude this portion of Dr. Parnell's opinion.

In sum, the Court GRANTS in part and DENIES in part Intuitive's motion to exclude the testimony of Dr. Parnell.  The Court only excludes opinions from Dr. Parnell about the cause of failure of the EndoWrists he saw at the Rebotix repair facility.

### E.    Prof. Einer Elhauge

Prof. Einer Elhauge is a professor at Harvard Law School, where he teaches antitrust law and other subjects.  Bass Decl. Ex. 1 (Elhauge Report) at ¶¶ 6-8.  Plaintiffs retained him to opine on the merits of their antitrust claims and on potential damages for those claims.  *Id.* at ¶ 5.  Prof. Elhauge provides separate estimates for damages associated with Intuitive's practices in the EndoWrist and da Vinci system service markets.  Intuitive moves to exclude some of Prof. Elhauge's opinions because they contend he is unqualified.  Intuitive additionally moves to exclude certain portions of his expert testimony as unreliable or based on unreliable material,

United States District Court
Northern District of California

1    including (1) his damage estimates regarding modified EndoWrists and (2) his damage estimates

2    regarding da Vinci service. The Court first considers Prof. Elhauge's qualifications and then

3    considers the reliability of his opinions.

### 1.      Prof. Elhauge's Qualifications

5         Intuitive challenges Prof. Elhauge's qualifications to opine on matters of antitrust

6    economics.  He is an author and co-author of multiple books on antitrust law and economics,

7    including U.S. Antitrust Law & Economics, and Areeda, Elhauge & Hovenkamp, Vol X, Antitrust

8    Law.  Elhauge Report ¶ 6, Ex. A.  "Multiple district courts before which he has testified have gone

9    so far as to describe Elhauge as 'an antitrust titan.'"  *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-

10   CV-01610, 2023 WL 2683199, at *5 (N.D. Ill. Mar. 29, 2023) (quoting *Castro v. Sanofi Pasteur

11   Inc.*, 134 F. Supp. 3d 820, 830 (D.N.J. 2015)).  There is no question that Prof. Elhauge is qualified

12   to opine on antitrust matters.

13        Intuitive argues further that Prof. Elhauge may not opine on the following topics because

14   he does not have expertise to offer opinions on them: (a) FDA clearance issues, (b) the safety of

15   EndoWrists, (c) the functionality of EndoWrists, (d) conclusions regarding hospital motivation

16   and intent, and (e) conclusions regarding Intuitive's motivation and intent.  Intuitive misreads

17   Prof. Elhauge's report, as his references to these subjects rely on other materials in the record,

18   including statements from other experts.  His reliance on the opinions of other experts in the case

19   is permissible, particularly given that all the other expert opinions he relies upon have been found

20   sufficiently reliable.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., &

21   Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) ("expert opinions may find a basis

22   in part 'on what a different expert believes on the basis of expert knowledge not possessed by the

23   first expert.'" (citation omitted)).  For example, Prof. Elhauge appropriately relies on the opinions

24   of FDA, engineering, and surgeon experts in this case, and similarly relies on record evidence

25   reflecting the views, analysis, conclusions, and conduct of market participants and analysts.  *See,

26   e.g.*, Elhauge Report ¶¶ 59-51, 380-84, §§ IV.C.1-2, V.C, VI.C.1; Elhauge Dep. at 152:20-153:24,

27   178:23-179:3.  Prof. Elhauge is qualified, and he does not offer opinions reaching outside his area

28   of expertise.

United States District Court
Northern District of California

### 2. Prof. Elhauge's Damages Estimates

Intuitive attacks as speculative the damages projections in Prof. Elhauge's reports. With respect to proving damages, "[i]n antitrust cases, [courts] accept a degree of uncertainty when evaluating damages awards because of the inherent difficulty of ascertaining business damages when [t]he vagaries of the marketplace usually deny us sure knowledge of what [a] plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1045 (9th Cir. 2005), *vacated on other grounds and remanded sub nom. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) (citation omitted). An antitrust jury "may make a just and reasonable estimate of the damage based on relevant data" and is "allowed to act on probable and inferential as well as (upon) direct and positive proof." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (citation omitted). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Id.*

Indeed, experts are regularly permitted to offer projections based on reliable methodology. In *Alaska Rent-A-Car*, for example, the plaintiff proffered expert testimony to prove damages. 738 F.3d at 967. The testimony required the expert to "address a hypothetical world that never existed," using data from similarly situated rental car companies to produce market projections and estimate the plaintiff's lost profits. *Id.* at 968. The defendant moved to exclude the expert's opinion as speculative, highlighting various market differences that undercut his conclusions. *Id.* at 968-69. The district court rejected defendant's assertion and the Ninth Circuit affirmed, observing that the defendant only criticized the accuracy and credibility of the final projections, not the expert's credentials, qualifications, or methodology. *Id.* at 970. The Ninth Circuit found that the countervailing considerations highlighted by the defendant were more appropriately resolved through impeachment, not exclusion. *Id.* at 969-70 ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."); *see also Elosu*, 26 F.4th at 1025.

Intuitive challenges Prof. Elhauge's damage estimates related to IRC EndoWrist services as well as those related to da Vinci servicing.  The Court considers these specific challenges in turn.

### a.        EndoWrist Damage Estimates

Intuitive avers that Prof. Elhauge's damage estimates related to EndoWrist repair are founded on unreliable bases.

#### i.        *Reduced EndoWrist pricing by 20% in the but-for world*

Intuitive avers that Prof. Elhauge does not have a reliable basis to assert that Intuitive would have reduced its EndoWrist pricing by 20% in the but-for world.  Prof. Elhauge's source for the 20% reduction in price is the potential 20-40% discount contemplated by Intuitive as part of "Project Dragon," an internal initiative in which the company considered its own after-market repair service.  Elhauge Report ¶¶ 352, 396.  Intuitive downplays this record evidence as "a handful of old Intuitive documents about a never-adopted proposal," while Plaintiffs contend that the proposal was instead "a major initiative extensively developed and seriously considered by top Intuitive executives."  Mot. Exclude Elhauge at 5; Opp. at 5.

The ultimate success of Project Dragon does not determine whether the figures it contemplated are reliable.  Rather, the Court finds that the information used by Prof. Elhauge related to Project Dragon serve as a reliable basis to conceive of the discounts that may have existed in the but-for world because the 20% discount was not merely plucked out of thin air – it came from record evidence, Intuitive's own projections.  Elhauge Report ¶¶ 352-396 (citing Intuitive-00104183).  Prof. Elhauge's use of the 20% discount is rendered only more reliable given that it was based in part on a reality that already existed – Intuitive contemplated 20%-30% discounts in Europe, where IRCs had already begun repairing EndoWrists at the time.  *See* Elhauge Report ¶¶ 305, 352 & n.834.  Further still, as Intuitive concedes, another Project Dragon presentation contemplated discounts of 25-40%.  Mot. Exclude Elhauge at 6 n.3; Elhauge Report ¶ 394.  The 20% discount utilized by Prof. Elhauge is thus rather conservative relative to alternative measures of the potential discount.  Prof. Elhauge utilized sufficiently reliable

information to produce his price-effect damages estimate and the Court does not exclude that opinion.

### ii.      *EndoWrist Use Limits in the But-For World*

Intuitive asserts that "Prof. Elhauge cites no evidence to support his suggestion that use limits . . . would not have existed at all in the but-for world." Mot. Exclude Elhauge at 8. Experts may make assumptions so long as they "have a reasonable basis in the available record and are disclosed to the finder of fact." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 12645766, at *4 (E.D. Pa. Dec. 22, 2015). Here, Prof. Elhauge relies on record evidence as well as the opinions offered by other experts in the case as foundations for the premise that use limits may not have been necessary in the but-for world. *See, e.g.*, Elhauge Report ¶ 359 (citing Rubach Report). As discussed above, § E.1., this is reasonable. *See Toyota Motor Corp.*, 978 F. Supp. 2d at 1066. Moreover, Intuitive's attack is misplaced. Prof. Elhauge does not offer an opinion or conclusion that use limits would not have existed at all; rather, he presents a hypothetical scenario that is relevant to the circumstances of this case, considering damages if the jury first finds that use limits were an unlawful restraint. Elhauge Report ¶ 403. The Court declines to exclude this hypothetical from the jury's consideration merely because Intuitive disagrees with it.

Intuitive also argues that "Prof. Elhauge's alternative assumption that use limits would have been doubled to 20 . . . finds no reliable basis in the record." Mot. Exclude Elhauge at 8. Not so. Prof. Elhauge offers ample support for this estimate, including (a) a knowledgeable Intuitive employee's estimate that several X/Xi EndoWrists later included in the Extended Use Program could last to "mid-20s" or "low 20's" (Elhauge Report ¶ 360, Table 4); (b) results from testing to 30 uses showing that an EndoWrist lasted an average of 26.8, and no fewer than 20, uses (*id.* at n.859); (c) evidence that Rebotix was able to achieve 29-59 uses (*id.* ¶ 363); (d) FDA's clearance of Iconocare's reset EndoWrist with an additional 9 uses beyond its original 10 (*id.* ¶ 287); and (e) that training EndoWrists had use limits of 30 (*id.* ¶¶ 300, 361, 450). Prof. Elhauge's reliance on the comparatively conservative figure of only 20 further supports the reasonableness of his reliance on this record evidence. Intuitive's offer of competing evidence that "the testing data validated extending the uses on certain of the X/Xi instruments for only 12 to

18 lives" (Mot. at 8), serves as a potential ground for cross-examination, not exclusion of Prof. Elhauge's opinion.

Prof. Elhauge utilized sufficiently reliable information to produce his use limit damages estimate and the Court does not exclude that opinion.

### iii.   Effect of Combined Price and Use Limit

Intuitive also challenges Prof. Elhauge's calculation of EndoWrist damages assuming that Intuitive would have both lowered its prices and raised its use limits.  Elhauge Report § VII.A.3.  Intuitive argues that, because the assumptions underlying both price-effect damages and use-limit damages are faulty for the reasons discussed above, Prof. Elhauge's calculation of their combination must also be excluded as faulty.  This kind of results-based criticism is an improper basis for exclusion.  *Elosu*, 26 F.4th at 1024 (focus of court's gatekeeping function is "not the correctness of the expert's conclusions but the soundness of his methodology" (citation omitted)).  Prof. Elhauge provides a thorough explanation of this methodology for calculating the combined effective discount.  Elhauge Report ¶¶ 443-46.  The Court declines to exclude this opinion.

### iv.   Third Party Modification of EndoWrists as Early as May 21, 2017

Intuitive avers that Prof. Elhauge "does not have a reliable basis to assert that the third parties would have modified EndoWrists in the but-for world as early as of May 21, 2017."  Mot. Exclude Elhauge at 10.  Intuitive argues that Rebotix, for example, did not begin selling modified EndoWrists in the U.S. until July 2018.  Elhauge Report ¶ 305.  But this misrepresents Prof. Elhauge's report and the particular evidence he cites showing that Intuitive was "aware that Rebotix had developed and was marketing a method to repair EndoWrists" in 2016.  *Id.* ¶ 304 (citing Intuitive-02068246 at 260 (Intutive's internal analysis in September 2016 identifying Rebotix by name as an entity that claimed to be able to extend instrument life)); ¶ 305 (describing Rebotix's demonstrated technological ability to sell EndoWrist repairs in Europe since 2016).  Intuitive frames this portion of Elhauge's report as the professor's unproven say-so, when in fact, Elhauge cites repeatedly to Intuitive's internal correspondence that third parties could have modified EndoWrists in the but-for world prior to May 2017.  *Id.*  The facts and economic realities relied upon by Prof. Elhauge are sufficient to support the earliest entry date scenario of May 21,

2017.  *Cf. Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 866-68 (C.D. Cal. 2015) (finding plaintiff alleged sufficient intent and preparedness to enter in U.S. where plaintiff's steps occurred primarily abroad due to  defendant's actions to block entry).  The Court declines to exclude that opinion.

### v.        *Third Party Modification of X/Xi EndoWrists in a But-For World*

Intuitive argues that Prof. Elhauge "Does Not Have A Reliable Basis To Assume That Third Parties Would Have Modified X/Xi EndoWrists In The But-For World."  Mot. Exclude Elhauge at 11-12.  Intuitive posits that any damages arising from the X/Xi EndoWrists cannot be included in Prof. Elhauge's damages calculations because "there is no evidence that even today a third-party company has a fully developed process to successfully modify an X/Xi EndoWrist to extend the number of uses beyond those cleared by the FDA."  *Id.* at 11.  Intuitive seems to ask the Court to ignore record evidence relied on by Prof. Elhauge that IRCs long planned to repair X/Xi EndoWrists but were derailed by Intuitive's allegedly anticompetitive conduct.  *See, e.g.*, Elhauge Report ¶ 263 n.621.  For example, Rebotix began efforts to reset X/Xi EndoWrists in 2014 but "determined not to invest the resources to finalize a reset to the X/Xi usage counter because doing so would be futile in the face of Intuitive's reaction to hospitals using Rebotix's services."  *Id.* ¶¶ 275, 416.  Prof. Elhauge's assumption that that IRCs might have offered X/Xi EndoWrist repair absent Intuitive's anticompetitive conduct thus finds support in the record.  The Court declines to exclude this opinion.

### b.        Da Vinci Service Damage Estimates

Intuitive argues that Prof. Elhauge's damages estimate for the da Vinci servicing market is unreliable because (1) it applies a price discount to all da Vinci service by Intuitive, even though Restore could not perform certain service given Intuitive's control over proprietary servicing tools, and (2) Prof. Elhauge's use of Abbott Laboratories' servicing profit margins as a yardstick is flawed.  Mot. Exclude Elhauge at 12-13.

Intuitive's argument regarding the difficulty in assessing the servicing market – that even in the but-for world, third parties would only have been able to provide certain limited types of da Vinci service that did not require Intuitive's proprietary tools – is well-taken.  But Prof. Elhauge

engages with and accounts for this very issue.  He explains that the application of a discount to all service by Intuitive in the but-for world is reasonable because Intuitive charges a uniform price for different types of service, whether IRCs already have been able to provide that service ("contestable") or not ("incontestable").  Elhauge Report ¶¶ 224-25, n.973.  Further, Prof. Elhauge points to Intuitive's uniform pricing across proprietary and non-proprietary servicing even in circumstances where a customer receives service on a time and materials basis.  *Id.* ¶ 414, n.973. Prof. Elhauge bases his opinions regarding pricing in the servicing market on record evidence, and it is thus sufficiently reliable to avoid exclusion.

Intuitive additionally challenges Prof. Elhauge's use of Abbot Laboratories as a comparator to quantify the effect that third parties would have provided in forcing Intuitive to lower its servicing prices.  Mot. Exclude Elhauge at 13.  Prof. Elhauge's methodology is sufficiently reliable to serve as the basis for an approximation of damages.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (concluding that yardstick comparator is proper unless there is "no meaningful economic similarity").  Intuitive's arguments that Abbott is an inapt yardstick based on the two companies' respective sizes and product offerings are simply nonsensical when viewed in context.  For example, in the data set of industry research on medical device original equipment manufacturers utilized by Prof. Elhauge, Abbott was the closest to Intuitive in size, and both provide highly-specialized medical device servicing for their own products.  Elhauge Report at 366, n.878, n.880.  Using Abbott as a yardstick is additionally apt because it inherently incorporates the possibility that contestable and incontestable service would be priced differently, as Abbott's servicing represents "a mix of contestable and incontestable servicing," rendering it "entirely appropriate to apply [this] yardstick . . . to [Intuitive's] total revenue" from da Vinci service.  Elhauge Report ¶ 464.  In sum, the Court finds Prof. Elhauge's opinions sufficiently reliable to avoid exclusion.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Intuitive's several motions to exclude expert testimony.

The Court **DENIES** Intuitive's motion to exclude the testimony of Dr. Rubach.

United States District Court
Northern District of California

The Court **GRANTS** Intuitive's motion to exclude the portions of Trautman's testimony that constitute legal conclusions, but otherwise **DENIES** Intuitive's motion.

The Court **GRANTS** Intuitive's motion to exclude the portions of Dr. Parnell's testimony about the cause of failure of the EndoWrists he saw at the Rebotix repair facility, but otherwise **DENIES** the motion to exclude Dr. Parnell's testimony.

The Court **DENIES** Intuitive's motion to exclude the testimony of Prof. Elhauge.

**IT IS SO ORDERED.**

Dated: March 31, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**