# ATTACHMENT 9

1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4

5    Lead Case No. 3:21-cv-03825-VC

6    ------------------------------------x

7    IN RE: Da Vinci SURGICAL ROBOT

     ANTITRUST LITIGATION

8    ------------------------------------x

9    AND RELATED CASE.

     ------------------------------------x

10                            March 15, 2023

11                            9:07 a.m.

12

13

14        Remote Virtual Zoom Deposition of

15   KIMBERLY A. TRAUTMAN  take Plaintiff, pursuant

16   to Notice, with the Witness located at the

17   offices of Covington & Burling 850 Tenth Street

18   NW, Washington, D.C., before William Visconti,

19   a Shorthand Reporter and Notary Public within

20   and for the State of New York.

21

22

23

24

25

                                        Page 1

1              KIMBERLY ANN TRAUTMAN

2       discussions, I'm sure there were.  Whether that

3       specific question was asked outright, I don't

4       remember.

5              Q.     Do you remember whether when

6       you were doing your work for Trautman International

7       Services on the general consulting side,

8       whether any clients came to you and said, we

9       are trying to figure out whether we qualify as

10      a re-manufacturer under the Quality System

11      Regulation?

12             A.     I do not remember any

13      remanufacturing discussions per se under those

14      couple of months under Trautman International

15      Services, no.

16             Q.     What do you mean by per se?

17             A.     I'm sorry, I have to ask the court

18      reporter to read it back please.

19             Q.     That's okay, I won't make you stop

20      what you're doing.

21                    You said you do not remember any

22      remanufacturing discussion per se under those

23      couple of months.  That is what you just said.

24      And I was trying to understand what you meant

25      when you said per se in that answer?

Veritext Legal Solutions
866 299-5127

```
 1                    KIMBERLY ANN TRAUTMAN
 2            A.    It was really just I'm trying to
 3      think of some of the clients that I had
 4      discussions of servicing and whether the topic
 5      of remanufacturing came up particularly.  I
 6      don't think so, but I don't remember.
 7            Q.    So did you have clients who you
 8      characterized an engaged in servicing?
 9            A.    I had clients that had servicing
10      as part of their quality management system,
11      yes, sir.
12            Q.    What is your definition of
13      servicing in this context?
14            A.    Servicing is capital equipment
15      that has either preventive maintenance or other
16      mechanisms by which the device comes back to a
17      particular center, whether that be the client's
18      or a subcontracted arranged service center.
19      And typically there is checklist of looking at
20      what the device is as it arrived into the
21      service center.  There is procedures and
22      protocols as far as cleanliness and so forth
23      both for the safety of the workers as well as
24      further progressing into ensuring that there is
25      appropriate cleaning and cleaning disinfection.
```

Veritext Legal Solutions
866 299-5127

```
1              KIMBERLY ANN TRAUTMAN
2              Sometimes there is wear out
3      failures, other types of component replacements
4      and like I said, that is typically done according to
5      set procedures and that's the type of servicing
6      that I would be referring to.
7              Q.    In your general consulting work
8      for Trautman International Services, did you
9      have any clients who came to you and said they
10     were contemplating modifying a finished device
11     in commercial distribution and asked you
12     whether the modifications they had would
13     significantly change the performance or safety
14     specifications or intended use?
15             A.    Yes, sir, there were those general
16     discussion, yes, sir.
17             Q.    What do you recall about those
18     discussions?  Do you recall any specific type
19     of devices that you were asked to consult on on
20     that topic?
21             A.    I do.  They had to do with
22     different types of reusable scopes.
23             Q.    When say reusable scopes, are you
24     talking about scopes for colonoscopies,
25     endoscopies?
```

Page 23

```
 1                    KIMBERLY ANN TRAUTMAN
 2          A.      The line of products was quite
 3    diverse, so they had everything from to
 4    endotoscopes to bronchoscopes, to a whole line
 5    of different reusable scopes for different
 6    purposes.
 7          Q.      Was the client that you're
 8    thinking of in that situation the original
 9    manufacturer of those scopes?
10          A.      Yes, sir.
11          Q.      When was that engagement?
12          A.      Shortly after I had the LLC.
13          Q.      How long did that last?
14          A.      It was actually a continuation of
15    some work from my previous employer who the
16    client wanted specifically to continue my
17    engagement and it was agreed upon, so that was
18    a continuation.  So, again, almost immediately
19    since they were a current client.
20          Q.      The company that you were talking
21    about before, is that NSF International?
22          A.      Yes.
23          Q.      You were with NSF International
24    for a little over five years from 2016 to 2021?
25          A.      Correct.
```

Page 24

```
 1                    KIMBERLY ANN TRAUTMAN
 2      more officially 2012 to 2015, '16 that program
 3      was formulated, signed off by the heads of
 4      agencies and really took off and it is now an
 5      official program for the different governments.
 6             Q.      Going back to NSF for a moment.
 7      You said one of the things that you did was you
 8      had consulting activities at NSF; is that right?
 9             A.      Yes, sir.
10             Q.      And you said at some point while
11      at NSF you started working with an OEM that had
12      reusable scopes; is that right?
13             A.      I did and it was more than one,
14      but yes, there was one client that followed me
15      per their request when I left, yes.
16             Q.      You had other manufactures of
17      reusable scopes besides the one that followed
18      you to your LLC?
19             A.      Yes.
20             Q.      How many did you have?
21             A.      Specifically for -- at least two
22      and some of the companies had some scopes in
23      their portfolio.  It may not have been my major
24      focus, but I would say there was probably at
25      least between 2 to 4 or 2 to 5.
```

Veritext Legal Solutions
866 299-5127

```
 1                    KIMBERLY ANN TRAUTMAN
 2            A.      Regulatory and quality issues,
 3       yes.
 4            Q.      When you say quality issues, what
 5       are you thing of?
 6            A.      For me like you said they are very
 7       intertwined.  In the biggest sense regulatory
 8       can cover everything.  But also some people
 9       differentiate the quality management system and
10       quality management system audit out separately
11       from an application type of scope or deliverable.
12            Q.      So focusing on your consulting
13       work since you left FDA to the present, have
14       you ever had any engagement with independent
15       servicing organizations?
16            A.      Not since I left FDA prior to this
17       case.
18            Q.      Have you had any -- since you
19       began your consulting in January of 2016 to the
20       present, have you had any engagements that had
21       any involvement with the da Vinci Surgical
22       System?
23            A.      No, sir.
24            Q.      Have you had any engagements since
25       January, 2016 that relate -- that have anything
```

                                              Page 31

```
 1                 KIMBERLY ANN TRAUTMAN
 2      to do with EndoWrist?
 3             A.    No, sir.
 4                   MR. MC CUAIG:   Objection, Andrew,
 5             are you talking about just consulting
 6             arrangements in all of these questions?
 7                   MR. LAZEROW:   Yes.
 8             A.    So not counting the case that we
 9      are talking about?
10             Q.    Right.
11             A.    Correct.
12             Q.    Let's me ask it the other way.
13                   MR. LAZEROW:   Thank you, Dan, I
14             appreciate the help there.
15             Q.    Let me ask it this way.  Is this
16      case the only matter on which you provided any
17      services that relates to the da Vinci Surgical
18      System or EndoWrist?
19             A.    Yes, I believe that is correct,
20      right.
21             Q.    You started at FDA in 1991?
22             A.    Yes.
23             Q.    Do I have it right, from 1991
24      until 1996 the focus of your efforts at FDA was
25      the Quality System Regulation?
```

Page 32

```
 1                    KIMBERLY ANN TRAUTMAN
 2      different commodities, not just medical
 3      devices.
 4                    And then when a different
 5      standards group opened up related to specific
 6      medical device standards, which is called
 7      Technical Committee, TC 210, I was involved
 8      with that and that was also around the 1994
 9      timeframe.  I was then given -- I was a branch
10      chief in the Office of Compliance, I was a
11      cardiovascular branch chief in the Office of
12      Compliance in, gosh, maybe the '93, '94
13      timeframe.  So I was also doing management of
14      folks that were similar to some of the
15      descriptions that I just gave you.
16                    Then I was put on detail and led
17      the effort to finalize the regulation to handle
18      promulgation of the regulation, the preamble
19      around, I think it was around the 1994 time.
20           Q.     From 1991 until 1996 were you ever
21      in the office of device evaluation?
22           A.     No, sir.
23           Q.     Have you ever been a lead reviewer
24      on any 510(K) applications?
25           A.     No, sir, not at all during my time
```

Page 34

```
 1                    KIMBERLY ANN TRAUTMAN
 2      at FDA I was not lead reviewer in the Office of
 3      Device Evaluation.
 4              Q.      Were you a supervisor of any
 5      reviewers at your time at the FDA?
 6              A.      Was I -- yes, I just mentioned I
 7      was a supervisor in the Office of Compliance in
 8      the cardiovascular branch.
 9              Q.      When you were in that branch, did
10      you have reviewers who reported up to you?
11              A.      In the same reviewers as in a
12      generic sense?
13              Q.      No, reviewers of 510(K)
14      applications.
15              A.      Okay, I just wanted to make sure
16      because there is a difference.
17                      So I did not have 510(K) reviewers
18      report up to me.  We would issue consults to
19      them.  So I would be in charge of making sure
20      that consults were sent to them and taking the
21      outputs of those consults and furthering them
22      into enforcement actions as appropriate.
23              Q.      At the time that you were at FDA,
24      am I right that the Office of Compliance and
25      the Office of Device Evaluation were separate
```

Page 35

```
1                    KIMBERLY ANN TRAUTMAN
2       offices within CDRH?
3              A.    Yes, sir.  Except for the -- in
4       the in vitro diagnostic area, they were
5       combined.  But again, my position at that point
6       was outside of that in vitro diagnostic life
7       cycle division.
8                    MR. LAZEROW:   Let's make this a
9              little easier on you.  I'm going to mark
10             tab 1 as Defendant's Exhibit 287.  This is
11             the expert report of Kimberly A. Trautman.
12             You should have that in front of you and
13             hopefully Dan has a copy also.
14                   MR. MC CUAIG:   I do.
15                   MR. LAZEROW:   We will mark that as
16             DX 287.
17                   (DX Exhibit 287 for identification,
18             Expert report of Kimberly A. Trautman.)
19             Q.    Do you have your report in front
20       of you?
21             A.    Yes.
22             Q.    If you want to flip through it, is
23       that a copy of report that you submitted in
24       this matter on December 2nd, 2022?
25             A.    Yes, sir, it looks like the report
```

Page 36

```
 1                 KIMBERLY ANN TRAUTMAN
 2    all the way through even when I became the
 3    associate director for international, sometimes
 4    there I would be requested for consultations,
 5    but that would not have been my primary job.
 6    So roughly from '91 until that Novemberish,
 7    2011 timeframe.
 8          Q.      Did you have a focus in any
 9    particular type of issues that the Office of
10    Compliance was looking at with respect to
11    potential enforcement actions?
12          A.      No, sir, I would say that my
13    experience ran the gamut.
14          Q.      And so when you say ran the
15    gamut, are you including your experience -- did
16    you have experience in enforcement actions by
17    the FDA vis-a-vis companies that did not have
18    510(K) clearance but the agency believed
19    required it?
20          A.      Yes, sir.
21          Q.      Do you have any specific
22    recollection of any particular types of devices
23    where you had that kind of experience?
24          A.      Oh my gosh.  There has been to
25    many enforcement -- so everything from
```

Page 73

```
1                    KIMBERLY ANN TRAUTMAN
2       administrative actions -- so I will consider
3       enforcement actions kind of run the gamut of
4       administrative all the way through to judicial.
5       So I was involved with many warning letters
6       that had a variety of different allegations
7       from lack of 510(K) to inadequate medical
8       device reports, to lack of registration and
9       listing to Quality System Regulations.
10                   So administrative actions, civil
11      money penalties.  I worked on some of the
12      agency's first 518 mandatory recall aspects.
13      And I began several different aspects of a 518 A
14      and E provisions.  Worked on seizures,
15      injunctions, criminal cases.
16                   A lot of times those cases were
17      not a single regulation violation.  So often
18      times there were multiple different regulations
19      that were involved in those enforcement
20      actions.
21           Q.    Focusing on actions that involved
22      an entity that did not have premarket clearance, but
23      the agency believed it needed that clearance.
24      Are you with me?
25           A.    Yes, sir.
```

Page 74

```
1                    KIMBERLY ANN TRAUTMAN
2          Q.     Were you the person who determined
3     whether the premarket clearance was required or
4     not?
5          A.     As explained earlier, I would have
6     issued a consult out to the organization that
7     specifically handled -- see there is particular
8     divisions within even with the Office of Device
9     Evaluation for 510(K) or in other regulations,
10    for example the Office of Surveillance and
11    Biometrics for medical device reports, we would
12    issue, we being the Office of Compliance, would
13    issue those consults out, pull it together, put
14    the case together and then work with chief
15    counsel on the totality of the case.
16         Q.     Is the word consult a technical
17    term of art in this context?
18         A.     It's consultation.  So it was a
19    consultation process where there would be often
20    times it would start off with some written,
21    especially early on, a memo, in our days I'm
22    sure it is more just an e-mail.  But there
23    would be a specific request to the other office
24    as to this is the question, here is the
25    evidence and here is what we would like you to
```

```
 1              KIMBERLY ANN TRAUTMAN
 2     that I'm asking which is up until the point you
 3     get a consultation, a request for consultation,
 4     okay, and they say we want you to weigh in on
 5     whether this particular issue that I'm bringing
 6     to you requires premarket clearance.  Okay.
 7     Are you with me?
 8          A.     So I'm with you, but in my
 9     experience the roles were more reversed.  As we
10     established, the majority of my earlier career
11     was in the Office of Compliance and we would
12     not always or it was not as common for us to
13     get the consultation versus us to send out the
14     consultation.
15          Q.     What is the difference?
16          A.     Well, the difference is in some of
17     the roles that we just discussed as an international
18     expert for quality systems, I may personally
19     get a consultation request on a particular
20     finding or piece of evidence or investigation
21     and be asked to opine on whether this would
22     constitute a nonconformance to this regulatory
23     requirement related to the Quality System
24     Regulation.
25                    In the reverse, if someone in the
```

Page 79

```
 1                   KIMBERLY ANN TRAUTMAN
 2      Office of Compliance had evidence that wanted
 3      to have -- the people that were directly responsible for
 4      a clearance or PMA approval, that consultation
 5      would go from the Office of Compliance to the
 6      Office of Device Evaluation and ask those
 7      questions and then be brought back to the
 8      Office of Compliance for case development.
 9           Q.    I'm focusing on the first part
10      that you just talked about.  The first situation
11      where you get a consultation request on whether
12      a particular finding or piece of evidence
13      constitutes nonconformance with regulatory
14      requirement.  Okay.  That's what I'm focusing
15      on.
16           A.    Okay.
17           Q.    When you got that consultation,
18      did you take any particular steps to satisfy
19      yourself whether there was conformance or
20      nonconformance with regulatory requirements?
21           A.    Yes, I -- my responsibility would
22      be to ensure that there was objective evidence
23      and to make sure that objective evidence
24      supported that quality system nonconformance.
25      I was going to say and if I didn't find all the
```

```
1                    KIMBERLY ANN TRAUTMAN
2        were engaged in commercial activity?
3               A.     I would have to ask you to define
4        what you mean by commercial activity.
5               Q.     What is your understanding of the
6        phrase commercial activity?
7               A.     I tried to give you that context
8        by saying are they providing a service just
9        like I provide a consulting service and charging for
10       that service, yes.
11              Q.     What is your understanding of
12       whether Restore and Robotix were charging
13       hospitals?
14              A.     Were they charging hospitals, the
15       evidence that I saw there was a charge for
16       their activities, yes.
17              Q.     So from your perspective they were
18       providing a service to hospitals, right?
19              A.     They were providing a service to
20       the hospitals, yes, sir.
21              Q.     So from your understanding of the
22       phrase commercial activity, Restore and Robotix
23       were engaged in commercial activity, right?
24              A.     In the confines of the
25       hypothetical that we discussed.
```

Page 126

```
1                    KIMBERLY ANN TRAUTMAN
2          Q.     Did you see anything that
3     suggested they were a nonprofit?
4          A.     I did not.  You're talking about
5     Robotix, no, I did not in any -- I had no
6     indication.  I just wanted to make sure we
7     weren't talk about a nonprofit hospital.
8          Q.     No, sorry.  Apologies.
9          A.     No, I didn't see any indication
10    that those IRCs were nonprofit.
11         Q.     The devices that they were
12    servicing, the EndoWrists they were servicing,
13    they were intended for use with patients; isn't
14    that right?
15         A.     I would assume so, yes.
16         Q.     To your knowledge, do you know
17    whether some of those devices that Restore or
18    Robotix serviced were used with patients?
19         A.     Again, I believe there is an
20    assumption in the fact that there is evidence
21    of their products going back to healthcare
22    facilities.  Was I able to or did I do any type
23    of tracking to see that, no, that was not
24    within the confines of the scope of my work in
25    this case.
```

Page 127

1          KIMBERLY ANN TRAUTMAN

2          Q.    Is it your understanding that

3     these devices were not for the personal

4     consumption of Restore and Robotix?  Is that

5     fair to say?

6          A.    So Restore and Robotix were not

7     going to perform surgery on themselves, that is

8     correct.

9          Q.    And the hospitals were, to your

10    knowledge were using these devices to perform

11    surgery on patients, right?

12         A.    I would assume so, yes.

13         Q.    You would also assume that these

14    patients were paying the hospitals in some

15    manner or form whether directly or through

16    insurance for the surgery, would you agree with

17    me on that?

18         A.    Again, I would assume so, yes,

19    sir.

20         Q.    In preparation of your report that

21    we are looking at which is marked as DX 287,

22    what research, if any did you do into the

23    meaning of the phrase held for sale or offered

24    for sale?

25         A.    I went back to the FDA website to

                                        Page 128

1              KIMBERLY ANN TRAUTMAN

2      earlier in the day about how FDA officials have

3      to do exploratory processes, how they need to

4      investigate and that is what Mr. Lee was doing

5      and he was exploring those and discussing how

6      certain things might be remanufacturing and

7      what he thought might be or what might not be

8      later on, but ultimately when the discussions

9      came to a collusion in July of 2022, there was

10     no official determination that that activity

11     was remanufacturing.

12          Q.    At the time that you submitted

13     your opening report in this matter, did you

14     know there were other people at FDA who had

15     told third-parties like Robotix and Restore

16     that they considered their activities to be

17     remanufacturing?

18               MR. MC CUAIG:   Objection.

19          A.    Again, I looked at several

20     different documents, what I was focused on was

21     what did FDA officials come out and did they

22     give any official type of communication, was

23     there any type of, it has come to our attention

24     letter, was there any type of formal

25     communication to an entity that said, according

                                   Page 156

```
 1                     KIMBERLY ANN TRAUTMAN
 2      to this provision of the law you're doing this
 3      and you should file a 510(K), letters that I
 4      have see many, many, many times throughout my
 5      career and I didn't see any of those in this
 6      case in the communications.
 7                    So informal communications that
 8      are happening between different officials
 9      throughout FDA, did I review them, were I aware
10      of them, I cited some, others are in my
11      reliance list, but again, I was focused for
12      purposes of my review and report on what the
13      agency came out as their official determination.
14           Q.     What does it mean it has come to
15      our attention letter?
16           A.     So this is typically something
17      when it was not through the inspection process
18      that we had previously talked about this
19      morning.  During the inspection process an FDA
20      investigator would have been able to collect
21      different tangible objective evidence to lay
22      out a scenario and if a 510(K) or other
23      regulatory requirements were not being met,
24      they could have gone to what is called a
25      warning letter.  But instead of going to a
```

Page 157

```
 1                    KIMBERLY ANN TRAUTMAN
 2      warning letter or regulatory meeting
 3      administrative action, it's come to our
 4      attention letter was rather a step below that
 5      from administrative purpose.  And that is where
 6      whether it be through promotional or
 7      advertising pieces of evidence, FDA may, again,
 8      just what it says, it may have come to their
 9      attention through different sources that this
10      activity was ongoing and that that activity
11      would require a particular compliance with a
12      regulation or in this case a 510(K).  And it
13      would notify that recipient officially that
14      this was the agency's thinking.
15             Q.    Do you consider an it has come to
16      our attention letter to be informal communication
17      by FDA?
18             A.    No, sir.  They actually had -- it
19      was titled -- it was an official correspondence.
20      Now if might have been via e-mail, but on an
21      FDA letterhead.  It was not just discussions
22      and e-mails going back and forth between
23      individuals.  And those letters -- it's come to
24      out attention letters had different authorities
25      as to who could signed those letters within the
```

Page 158

```
 1                    KIMBERLY ANN TRAUTMAN
 2      agency.
 3              Q.     So from what you said, I take it
 4      it has not come to our attention that FDA sent
 5      an it has come to our attention letter to
 6      Robotix?
 7              A.     If one exists, I'd be happy to
 8      look into that further.
 9              Q.     Can you answer my question?  It
10      has not come to your attention as of today that
11      the FDA sent an it has come to our attention
12      letter to Robotix, correct?
13              A.     Not that I remember off the top of
14      my head.
15              Q.     Looking back at paragraph 34 of
16      your report.  The Deutsche Bank report, you
17      said you cited this in part because there were
18      other folks who had come to the same view you
19      had about whether that constituted remanufacturing
20      or not, right?
21              A.     As well as the question as to
22      whether FDA was likely to take an enforcement
23      action, both of those prongs were pertinent in
24      that series with Deutsche Bank exhibits.
25                     MR. MC CUAIG:   Can we pause for a
```

Veritext Legal Solutions
866 299-5127

```
 1                    KIMBERLY ANN TRAUTMAN
 2            second.  I got text from Jeff Corrigan that
 3            he got bounced off the Zoom.
 4                    MR. LAZEROW:   Let's go off the
 5            record.
 6                    THE VIDEOGRAPHER:   The time is now
 7            1:27 going off the video record.
 8                    (Recess taken.)
 9                    THE VIDEOGRAPHER:   The time so now
10            1:29 back on the video record.
11      BY MR. LAZEROW:
12            Q.    Who were the people who Deutsche
13      Bank talked to for their report?
14            A.    So my understanding was from the
15      deposition of the gentleman who wrote the
16      report was that he did not divulge the five
17      experts that he had interviewed.
18            Q.    So you don't know who those people
19      actually are?
20            A.    No, sir.
21            Q.    Were you one of the people?
22            A.    No, sir.
23            Q.    Have you talked to anyone who told
24      you they were one of the people?
25            A.    No, sir.
```

Page 160

KIMBERLY ANN TRAUTMAN

1

2      Q.      Did you do anything to investigate

3  who those people were before you cited the

4  Deutsche Bank report in your expert report?

5      A.      Not outside of looking at the

6  documents in the report and the deposition of

7  the gentleman that wrote the report.

8      Q.      Earlier you said that these were

9  experts who were looking at the facts who

10  agreed with you.  Do you remember saying that?

11      A.      Not exactly those words, but they

12  were experts that were being asked to opine on

13  whether the activities of third-parties doing

14  the refurbishing functions that were described

15  with da Vinci as to, A, whether a 510(K) was

16  necessary and whether it was likely that FDA

17  would have an enforcement action.

18          And again, one of the areas that I

19  was focusing on in this report and the supplemental

20  report was the whole concept that I was aware

21  of in the discussions back from the '90s is

22  whether the third-parties were actually

23  providing a service to the hospitals and

24  returning those devices to the hospitals or

25  whether they were collecting and servicing and

Page 161

```
 1                    KIMBERLY ANN TRAUTMAN
 2      putting them into commercial distribution via
 3      selling or reselling mechanisms.
 4           Q.     You do not know what information
 5      was available to the individuals that Deutsche
 6      Bank talked to at the time they talked with
 7      Deutsche Bank, right?
 8           A.     Not outside -- there was the
 9      report, there was graphs and PowerPoints and
10      the deposition of the authors, the evidence
11      that I had.
12           Q.     The deposition of the author did
13      not describe the information that was available
14      to the people that he spoke to for that report,
15      right?
16           A.     Not exactly.  If I remember
17      correctly, he did go into some of the questions
18      that he asked them, but I do remember the fact
19      that he didn't remember or was unwilling, I
20      honestly don't remember, but I have no
21      knowledge of who the individuals that he
22      consulted with, who they were.
23           Q.     Does it matter to you who they
24      were?
25           A.     No.  Again, I don't know what
```

Page 162

1                    KIMBERLY ANN TRAUTMAN

2        qualifies as FDA experts.  So my reliance on

3        that was more on the fact that there were other

4        people who in some way, shape or form had been

5        qualified as expertise in that area and they

6        were thinking and asking the same questions

7        that I were and they came to a similar

8        conclusion.

9             Q.     Qualified by Deutsche Bank?

10            A.     It could have been a consortium

11       like GLG or Guidepoint or other folks.  I know

12       I have opined for investment companies on

13       issues similar to this.  Not anything to do

14       with this particular issue.  It could have

15       been -- they could have been vetted through

16       another consortium.

17            Q.     Do you know what standard

18       Deutsche Bank used to determine that these

19       folks were FDA experts?

20            A.     Not outside of the testimony from

21       the author.

22            Q.     Do you know what information they

23       were given to review before they talked with

24       Deutsche Bank?

25            A.     Again, I know what he talked about

Page 163

```
 1                    KIMBERLY ANN TRAUTMAN
 2    as far as the interviews.  I don't know if he
 3    gave them or provided them any tangible
 4    websites or anything.  I just know from his
 5    testimony that he had given scenarios and
 6    given information to them and on that
 7    information they provided an opinion.
 8         Q.    So the sum total of what you
 9    know about that report is the report itself and the
10    deposition of the author, is that a fair
11    statement and the exhibits used at the
12    deposition, is that a fair statement?
13         A.    Yes, sir.  Again if the PowerPoints
14    and some of the graphs and so forth are all
15    considered up, I used the report in the bigger
16    sense, because I remember there was a couple of
17    different formats that that information was
18    presented.
19         Q.    Do you know if the people that
20    Deutsche Bank spoke to spoke to the FDA before
21    they gave their views to Deutsche Bank?
22         A.    I do not know that one way or the
23    other.
24         Q.    Have you talked to anyone at FDA
25    since you have been retained in this matter
```

Page 164

```
 1                    KIMBERLY ANN TRAUTMAN
 2          previously marked.)
 3          Q.     Can you take out exhibit tab 35.
 4    Tab 35 has already been marked as Defendant's
 5    Exhibit 268.
 6          A.     Yes, sir.
 7          Q.     Do you have DX 268 before you?
 8          A.     I do, yes, sir.
 9          Q.     This is a letter from Mark
10    Trumbore to Chris Gibson at Robotix dated
11    November 16th, 2021, do you see that?
12          A.     I do, yes, sir.
13          Q.     You've never read this letter
14    before today; correct?
15          A.     It does not look familiar to me.
16    So I would have to back and look at the list.
17          Q.     You're welcome to do that.  I will
18    tell you it is not on either list attached to
19    your report, right?
20          A.     I will believe you because it
21    doesn't -- sitting here right now it doesn't
22    look familiar.
23          Q.     I thought earlier you said you had
24    not seen an it has come to out attention letter
25    in that matter?
```

Page 236

```
 1                  KIMBERLY ANN TRAUTMAN
 2         A.     I mean, interesting that they did
 3   away with some of the formality, but the
 4   opening sentence does say it has come to our
 5   attention, yes, sir.
 6         Q.     This letter says, "it has come to
 7   our attention that you may be remanufacturing
 8   the da Vinci S EndoWrist Instruments which
 9   appear to meet the definition of a device as
10   that term is defined in Section 201(h) of the
11   Federal Food Drug and Cosmetic Act, (FD&C) in a
12   manner that potentially violates the FD&C Act."
13   Do you see that?
14         A.     Yes.
15         Q.     Do you know Mark Trumbore?
16         A.     I know him not on a personal
17   level, but I know that he is one of the supervisors.
18         Q.     When you look at his signature, he
19   appears to be the assistant director of the
20   Division of General Surgery Devices; is that
21   right?
22         A.     That is correct, yes, sir.
23         Q.     And in November of 2021 do you
24   know who besides Mr. Trumbore would have to
25   approve and sign off on an it has come to our
```

Page 237

```
 1                    KIMBERLY ANN TRAUTMAN
 2      case, just in general.  They said we are
 3      engaged in remanufacturing, we are going to
 4      submit a 510(K).  So that's a -- they are
 5      taking this third-party, there is an original
 6      equipment manufacturer, has a 510(K) and they
 7      are taking a device that's already in commercial
 8      distribution, they are remanufacturing it and
 9      they are going to submit a 510(K).
10                    You would not characterize that
11      510(K) by that third-party as a catchup 510(K)?
12           A.    I would not.
13           Q.    So a third-party servicer could
14      not submit a 510(K)?  Like if someone -- forget
15      it, I got it.
16                    At the time that you submitted
17      your opening report in this matter, December 1st,
18      2022, were you aware that there was a product
19      code for remanufactured EndoWrists?
20           A.    I believe that product code came
21      out after December 1st.  So my answer is, I did
22      not see the Iconocare 510(K) and I actually saw
23      it first in trade press until after my first report.
24           Q.    The Iconocare -- let's make sure
25      we are on the same page.  The Iconocare 510(K)
```

Page 316

```
1                   KIMBERLY ANN TRAUTMAN
2      clearance came on September 30th, 2022 or end
3      of September 2022.  Is that consistent with
4      your memory?
5              A.    I honestly didn't remember the
6      timeline, so then I was not aware of the
7      Iconocare 510(K) until after I submitted the
8      first report, I believe.
9              Q.    You weren't aware of the product
10     code?
11             A.    Well the product code didn't exist
12     until the Iconocare 510(K) came out.
13             Q.    So at the time that you submitted
14     your expert report in this matter you were not
15     aware of the QSM product code?
16             A.    I honestly don't remember from the
17     past couple of -- the past two, three months
18     between the two different reports when that
19     came into play.  I have to go back and look at
20     the reliance list to see.
21             Q.    Do you want to look at your
22     reliance list on Exhibit 1?
23             A.    I will be happy for you to tell me
24     one way or the other.
25             Q.    You cite to the Iconocare letter,
```

Page 317

```
1                    KIMBERLY ANN TRAUTMAN
2      third-parties who were engaged in remanufacturing
3      as that term is defined in the Quality System
4      Regulation?
5                    MR. MC CUAIG:   Objection to the
6             form.
7             A.     Can you ask the question again,
8      please?
9             Q.     Do you agree that FDA continues to
10     this day to enforce existing requirements to
11     third-parties engaged in remanufacturing as
12     that term is defined in the QS Regulation?
13                   MR. MC CUAIG:   Objection to the
14            form.
15            A.     I was say if the agency has
16     determined a manufacturer to be a manufacturer
17     or a re-manufacturer, then the applicable
18     regulatory requirements are applied.
19            Q.     You reference in your report the
20     510(K) regulation.  Are you familiar with that?
21            A.     807 in general you mean, yes, sir.
22            Q.     Were you involved in drafting that
23     regulation?
24            A.     No, sir.
25            Q.     I can't remember back to this
```

Page 341