# ATTACHMENT 14

HIGHLY CONFIDENTIAL

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE NORTHERN DISTRICT OF CALIFORNIA

4    Case No. 3:21-cv-03825-VC

5    ----------------------------------x

6    IN RE: DA VINCI SURGICAL ROBOT LITIGATION,

7    _____

8    THIS DOCUMENT RELATES TO:

9    ALL CASES

10   ----------------------------------x

11                  November 1, 2022

12                  12:45 p.m.

13              HIGHLY CONFIDENTIAL

14              Videotaped deposition of IMRON

15   ZAFAR, pursuant to subpoena, before Jineen

16   Pavesi, a Registered Professional

17   Reporter, Registered Merit Reporter,

18   Certified Realtime Reporter and Notary

19   Public of the State of New York, via Zoom,

20   with all other parties in person at Cohen

21   Milstein, 88 Pine Street, New York, New

22   York.

23

24

25

HIGHLY CONFIDENTIAL

Page 37

1                    ZAFAR

2    issued?

3        A.        I don't see any signs to say

4    otherwise, but, again, based on my

5    ten-second eyeballing of it, yes, it looks

6    familiar.

7        Q.        So taking Exhibits 112 and 113

8    together, the two reports, focusing on the

9    reports, why did Deutsche Bank issue these

10   reports generally?

11       A.        Because Intuitive Surgical is

12   one of the stocks under our coverage and

13   the competitive implications of this, of

14   these emerging third parties, you know,

15   was notable to me.

16                 And, you know, given the

17   potential theoretical repercussions for

18   Intuitive and its business model, which

19   relies very heavily on instruments, yeah,

20   I viewed this kind of theme, emerging

21   theme, as being potentially impactful to

22   Intuitive's business and stock price and

23   that is my job, is to, you know, provide

24   intelligence and recommendations around

25   stock price at the end of the day.

HIGHLY CONFIDENTIAL

Page 38

```
 1                    ZAFAR
 2              If I had to say my job in one
 3    sentence, that's what I do, provide stock
 4    recommendations.
 5         Q.       So the third parties that you
 6    mentioned in your answer just now, were
 7    those the third parties that were engaging
 8    in the Da Vinci instrument repair?
 9              MR. DeBAUGH:  Objection to
10    form.
11         A.       Correct.
12         Q.       Who were these reports intended
13    for, generally speaking?
14         A.       Institutional investors, so
15    portfolio managers at mutual funds, hedge
16    funds, et cetera.
17         Q.       Around this time did Deutsche
18    Bank issue company research reports
19    regularly?
20         A.       I don't remember the full of
21    reports, but, again, yes, this specific
22    time period, yes, it's safe to assume,
23    yes, that's what we do, we publish
24    regularly and consistently, so, yeah, I
25    would say yes.
```

HIGHLY CONFIDENTIAL

Page 92

1               ZAFAR

2    Refurbished Da Vinci Instruments:   Over

3    the past few weeks we consulted with five

4    regulatory and legal experts to gain

5    further clarity on both the regulatory/FDA

6    and service contract angles."

7               Who were those five experts

8    that you consulted with?

9               MR. DeBAUGH:   Objection.

10      A.      I don't recall off the top of

11   my head; again, we talked to so many

12   consultants all the time, literally

13   hundreds since this was published, I

14   literally don't remember.

15      Q.      And then if you can go to page

16   8, it is a slide that says "510(k)

17   Premarket Notification Does Not Appear

18   Applicable" at the top.

19               It says, "The immediate

20   feedback to our downgrade note was that

21   Restore Robotics is subject to 510(k)

22   approval requirement and that because the

23   company does not have 510(k) clearance, it

24   is therefore in clear violation of FDA

25   regulations."

HIGHLY CONFIDENTIAL

Page 144

1                    ZAFAR

2    EndoWrist can be used?

3                 MS. SCHOENBACH:  Objection,

4    vague.

5       A.       Anyone period, any --  before

6    you said I think any other company.

7       Q.       I changed my question --

8       A.       Okay --

9       Q.       For the record, let me repeat

10   my question.

11               Have you spoken to anyone as to

12   whether extending the number of times a Da

13   Vinci EndoWrist can be used requires

14   510(k) clearance?

15      A.       Yes.

16      Q.       Who have you spoken with about

17   that?

18      A.       I can't name specifics, but

19   consultants that were referenced in some

20   of these reports, regulatory experts,

21   consultants that do FDA regulatory

22   consulting for medical device companies,

23   et cetera.

24               But the specifics I can't tell

25   you, but those conversations definitely

HIGHLY CONFIDENTIAL

Page 145

```
 1                    ZAFAR
 2   were had with multiple expert consultants.
 3        Q.       You can't remember any
 4   individual specifically you spoke --
 5        A.       Correct, correct.
 6        Q.       In your general recollection of
 7   these conversations, about when did those
 8   conversations happen?
 9        A.       I don't remember.
10        Q.       Do you know whether or not
11   Restore Robotics is engaged in litigation
12   against Intuitive Surgical?
13        A.       I am.
14        Q.       When did you become aware that
15   Restore is in litigation with Intuitive
16   Surgical?
17        A.       I don't remember.
18        Q.       Was it before or after the date
19   of your report in Exhibit 112, January 27,
20   2020?
21        A.       I don't remember.
22        Q.       Do you know whether it was
23   before --  withdrawn.
24                 Do you know whether you became
25   aware that Restore Robotics was engaged in
```

HIGHLY CONFIDENTIAL

Page 194

```
 1                    ZAFAR

 2    three, four consultants a week, by

 3    consultants I mean surgeons, hospital

 4    CEOs.

 5                 If I said literally hundreds,

 6    that might have been a little bit

 7    hyperbolic, but suffice it to say it's in

 8    the dozens.

 9        Q.      My clarification question,

10    Mr. Zafar, is whether or not you were

11    talking to consultants about Intuitive

12    Surgical in this third-party repair issue

13    or consultants in the normal course of

14    your job?

15        A.      In the normal course of my job,

16    sorry for the...

17                 Just to clear up the record, if

18    I said hundreds, that was more a figure of

19    speech; if you want --  it was more in the

20    dozens, not hundreds.

21        Q.      Apologies, I don't recall your

22    answer to this earlier.

23                 Sitting here today, do you

24    recall the experts that you spoke with in

25    connection with this report?
```

HIGHLY CONFIDENTIAL

Page 195

                         ZAFAR

1

2        A.        I don't.

3        Q.        Turning to the first bullet,

4    which reads, "On the FDA side, while

5    summing knowledge that applicable

6    regulations are somewhat nebulous, the

7    majority of regulatory experts came to the

8    conclusion that Restore Robotics is not in

9    violation of FDA rules as a third-party

10   service provider of refurbished

11   instruments," do you see this?

12       A.        Yes.

13       Q.        Do you know what information

14   those experts that you spoke with had

15   about Restore Robotics in coming to this

16   determination?

17       A.        I don't remember specifically.

18       Q.        Do you know whether the experts

19   that are referred to in this paragraph had

20   spoken to anyone affiliated with Restore

21   Robotics in coming to their conclusion?

22       A.        I don't know.

23       Q.        Do you know whether the experts

24   referred to in this paragraph had observed

25   the process of EndoWrist, quote, repair

HIGHLY CONFIDENTIAL

Page 196

```
 1                    ZAFAR
 2   that Restore Robotics was allegedly
 3   performing?
 4        A.       No idea.
 5        Q.       Do you know whether the experts
 6   referred to in this paragraph had observed
 7   the process of extending the number of
 8   times an EndoWrist could be used by any
 9   other third party?
10        A.       No idea.
11        Q.       The last sentence of this first
12   page begins "given the abundance," do you
13   see that?
14        A.       I do.
15        Q.       It reads, "Given the abundance
16   of first-hand confirmation from hospital
17   customers that are exploring refurbished
18   instruments, the question is not whether,
19   but rather, how much Intuitive's business
20   will be impacted."
21                 How many hospital customers did
22   you speak with that were exploring, quote,
23   refurbished, end quote, instruments?
24        A.       I can't give you a specific.
25        Q.       Do you recall which customers
```