# ATTACHMENT 25

SONYA D. WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>[ALL ACTIONS] | Lead Case No.: 3:21-cv-03825-VC<br><br>**INTUITIVE SURGICAL INC.'S MOTION TO EXCLUDE TESTIMONY OF EINER ELHAUGE**<br><br>Hearing Date:   June 8, 2023<br>Hearing Time:   1:00 PM PST<br>Hearing Place:  Courtroom 4<br><br>Judge: The Honorable Vince Chhabria |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

    I.     INTRODUCTION ........................................................................................... 1

    II.    FACTUAL BACKGROUND.......................................................................... 3

    III.   ARGUMENT ................................................................................................... 5

          A.     Prof. Elhauge's Damage Estimates Regarding Modified EndoWrists Are Unreliable............................................................................................... 5

          B.     Professor Elhauge's Da Vinci Service Damages Are Unreliable. ............12

          C.     Prof. Elhauge's Opinions In Areas Where He Is Unqualified Should Be Stricken. .......................................................................................14

CONCLUSION..........................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avila v. Willits Env't Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ..................................................................................................14

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  2020 WL 2553181 (S.D. Cal. May 20, 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) .................14

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ..........................................................................................................5

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................5, 10

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .......................................................................5, 7

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................................11, 13

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015) ...................................................................................................5

*Marion Healthcare LLC v. S. Illinois Healthcare*,
  2020 WL 1527771 (S.D. Ill. Mar. 31, 2020), *aff'd*, 41 F.4th 787 (7th Cir. 2022) ....................9

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) .............................................................................................5, 12

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
  2019 WL 8063989 (N.D. Fla. Sept. 16, 2019) ........................................................................13

*Toscano v. PGA Tour, Inc.*,
  201 F. Supp. 2d 1106 (E.D. Cal. 2002) ....................................................................................2

*William Inglis & Sons Baking Co. v. Cont'l Baking*,
  942 F.2d 1332 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds*,
  981 F.2d 1023 (9th Cir. 1992) ................................................................................................13

<u>**NOTICE OF MOTION AND MOTION**</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that on June 8, 2023, at 1:00 PM, or as soon thereafter as available, in the courtroom of the Honorable Vince G. Chhabria, located at 450 Golden Gate Avenue, Courtroom 4, 17th Floor, San Francisco, CA 94102, Defendant Intuitive Surgical, Inc. will and hereby does move for an order excluding certain opinions of Prof. Einer Elhauge, proffered as an expert witness for the three named plaintiffs in the above-captioned case (hereinafter "Plaintiffs").

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the accompanying Declaration of Ashley Bass and attached exhibits, any reply or other supplemental briefing and/or evidence submitted, and the oral argument of counsel.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

The three named plaintiff hospitals – Larkin, Franciscan and Valley Medical – have sued Intuitive challenging alleged restraints in Intuitive's contracts with its customers.  In addition to asserting their own claims, the named plaintiffs are seeking to represent a proposed class of hospitals that purchased EndoWrists and/or service on the da Vinci system from Intuitive in the U.S. from May 2017 to the present.  In support of their claims, Plaintiffs have offered Prof. Einer Elhauge to "evaluate the economic evidence in this case."  Bass Decl. Ex. 1 ¶ 5.  Prof. Elhauge is not an economist – he is a law professor, and his reports in this case read far more like a piece of legal advocacy than an expert opinion offered to assist the jury.

Prof. Elhauge offers a variety of opinions in his reports, all of which are of dubious value in light of (among other things) his lack of genuine economics training, and all of which Intuitive disputes, for reasons set forth in Intuitive's own experts' reports.  However, this motion largely focuses on his opinion regarding "[h]ow much less would Plaintiffs have paid for the products and services at issue in a but-for world without Intuitive's exclusionary restraints."  *Id.* ¶ 5(F).  Prof. Elhauge posits that hospitals, including the named plaintiffs, would have paid substantially less for replacement EndoWrists and for

service on the da Vinci system in the but-for world, and he opines that the putative class suffered billions of dollars in damages as a result.  In evaluating damages, a responsible expert will employ an established methodology, such as a regression, yardstick, or before-and-after analysis.[1]  Prof. Elhauge uses none of these methodologies and instead builds his damages estimates on rank speculation regarding key characteristics of the but-for world, including numbers he largely plucks from thin air.

Prof. Elhauge's first task should have been to model what sales would have been made in the but-for world by third-party competitors who would have been operating in the absence of the challenged restraints.  He ignores this step completely – he admits that he did nothing to model the but-for market share of competitors.  *Id.* Ex. 2 at 269:9–14.  Instead, he offers his view that because there was "some" interest among hospitals in the offerings of third parties, that alone would have operated as a huge competitive restraint on Intuitive in the but-for world.  *Id.* at 263:20–265:5.  He then leaps to the conclusion that the third-party competitors in whom there was "some" unspecified amount of interest would have had such an immense competitive impact that Intuitive would have had to lower its prices for EndoWrists by effectively 55% and its prices for service by 12% across the board, including in segments of these alleged markets in which there was no competition at all.  Prof. Elhauge treats this like an on-off switch:  so long as the third parties exist in the but-for world, they necessarily cause Intuitive to lower its prices on all products for all customers by these very substantial amounts.

Prof. Elhauge makes aggressive assumptions to reach these conclusions, which are not only unsupported by the record but are actually contradicted by it.  For his EndoWrist damages estimate, he assumes that Intuitive would have dropped its pricing in the but-for world by 20%, that Intuitive would have doubled the use limits on all EndoWrists to 20 (resulting in an effective 55% discount on EndoWrist pricing), that third parties would have entered the marketplace years earlier than they did in the real world, and that those third parties would have offered modified X/Xi instruments years ago (even though no company in the real world has managed to do so at all).  His estimates for purported

---

[1] *See, e.g.*, *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125–26 (E.D. Cal. 2002) (describing established methods for modeling damages).

service damages on the da Vinci system rest on similar speculative assumptions, many of which are flatly contradicted by the record, rendering his damage model inherently unreliable.

Amazingly, Prof. Elhauge asserts that his damages estimates in the case do not depend on whether modified EndoWrists are as safe as, or functionally equivalent to, new EndoWrists from Intuitive; he simply treats them as interchangeable. *See id.* at 26:22–28:6; 39:16–41:18. He acknowledges – as he must – that the amount of demand for third-party offerings is necessarily relevant to how Intuitive would need to respond to such competition in the but-for world. *See, e.g., id.* at 200:7–201:5. But he nonetheless just assumes that because there was "some" interest from hospitals, Intuitive necessarily would have had to drop its prices dramatically across the board, regardless of the quality – or even legality – of the competitive alternatives he assumes. This analytical leap is simply too large to support an expert opinion in this case.

Finally, Prof. Elhauge has offered a number of opinions in his expert reports – including opinions on the functional equivalence and safety of modified EndoWrists – that are far outside his expertise as an antitrust professor. These unqualified opinions should also be precluded.[2]

## II. FACTUAL BACKGROUND

Prof. Elhauge is a professor at Harvard Law School and president of Legal Economics, LLC, an economic expert consulting firm. *Id.* Ex. 1 at ¶¶ 6–8. He has a bachelor's degree in biochemical engineering. He did not major in economics and has no post-graduate education in economics. *Id.* at Exhibit A, p. 224. Plaintiffs retained him to opine on the merits of their antitrust claims and on potential damages for those claims. *Id.* at ¶ 5. Prof. Elhauge provides separate estimates for damages associated with EndoWrists and damages associated with service of the da Vinci system.

With respect to Prof. Elhauge's damages estimates for EndoWrists, Prof. Elhauge relies on four key assumptions. First, he assumes that Intuitive would have dropped its EndoWrist pricing to all customers by 20%. *Id.* ¶ 397. He claims this reduction finds support in Intuitive's documents, but as

---

[2] For the avoidance of doubt, Intuitive reserves the right to raise additional objections to Prof. Elhauge's testimony at a later date. This brief focuses on issues fit for resolution at this stage of the case.

described further below, the documents he cites offer no such support.  Second, he makes the counterfactual assumption that Intuitive would have raised use limits on EndoWrists to 20 in the but-for world, *id*. ¶ 405, even though Prof. Elhauge does not have the technical, safety, or regulatory expertise to assert that such limits would have been either feasible or permitted by FDA, and no record evidence supports that assumption either.  Third, he makes the counterfactual assumption that third parties would have entered the marketplace by May 2017 in one of his scenarios, even though in the actual world Rebotix did not begin offering modification of EndoWrists in the U.S. until July 2018.  *Id*. ¶ 179 n.436, ¶ 403.  Fourth, he speculates that the third parties would have modified use counters on X/Xi EndoWrists even though no third party has successfully offered a process to do so.  *Id*. at Table 7, ¶¶ 309, 402; *id.* Ex. 5 ¶ 248.

With respect to his damages estimates for service of the da Vinci system, Prof. Elhauge relies on three key assumptions.  First, he assumes that third parties would have provided service starting in May 2017 in one of his scenarios, even though in the actual world only one third party (Restore) offered such service, and it did not do so until 2019.  *Id.* ¶ 415.  Second, he assumes that third parties would have provided service on X/Xi systems in the but-for world, even though **no one** has **ever** claimed to have such capability in the actual world.  *Id.* at Table 8, ¶ 312; *see also id.* Ex. 5 ¶ 259.  Third, he assumes that Intuitive would have dropped its pricing for **all** service on the da Vinci system by 12% in the but-for world, even though only Intuitive is able to provide much of the critical service on a system.  *Id.* Ex. 3 ¶ 474; *id.* Ex. 1 ¶ 368.  Prof. Elhauge assumes that Intuitive would have lowered its pricing in the but-for world not only for service that third parties could potentially provide but also for the service for which Intuitive would (legitimately) have had no competition.  *See* Dkt. No. 69, at 2 (confirming concession by Plaintiffs that Intuitive had no duty to share proprietary technology).  Prof. Elhauge plucks 12% from the air by claiming that Intuitive's margins on service in the but-for world should have matched the margins of another company – Abbott.  Although Prof. Elhauge tries to call Abbott a "yardstick," he admitted in his deposition that he did not have any idea what services are encompassed within the "margin" he relies upon for Abbott, *id.* Ex. 2 at 232:19–233:14, 244:13–18, thus rendering the comparison meaningless.

### III.     ARGUMENT

Expert witness testimony must (1) come from a qualified expert; (2) be helpful to the factfinder; (3) be based on sufficient facts or data; (4) use reliable principles and methods; and (5) reliably apply those principles and methods to the facts of the case.  Fed. R. Evid. 702.  The court's "gatekeeping" role requires evaluating both the reliability of the expert's methods and the connection between their conclusions and the facts on which those conclusions are based.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

#### A.     Prof. Elhauge's Damage Estimates Regarding Modified EndoWrists Are Unreliable.

To support antitrust damages, a plaintiff must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award."  *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015).  In proffering expert testimony to support antitrust damages, the expert must have a basis in the record for the damages estimates and cannot rest damages estimates on unsupported assumptions and unsound extrapolation.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806–07 (9th Cir. 1988); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *15 (S.D.N.Y. Mar. 28, 2014) (excluding expert damages opinion that was "unmoored from record facts and unsupported by any rigorous analysis"); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (excluding expert damages testimony where certain assumptions were "a complete break" with reality).

##### 1.     Prof. Elhauge Does Not Have A Reliable Basis To Assume That Intuitive Would Have Reduced EndoWrist Pricing By 20% In The But-For World.

Prof. Elhauge does not have a reliable basis to assert that Intuitive would have reduced its EndoWrist pricing for all customers and for all products by 20% in the but-for world.  Prof. Elhauge plucks this number from a handful of old Intuitive documents about a never-adopted proposal to develop an internal program to refurbish EndoWrists.  Bass Dec. Ex. 1 ¶ 396.  The figure Prof. Elhauge cites appears as a "proposed" discount that would be applied in some foreign markets for refurbished instruments.  As part of the program that was being considered, Intuitive would collect used EndoWrists

from hospitals, replace the worn parts (for which wear-and-tear had led to the original use limits), and resell the EndoWrists. *See id.* Ex. 5 ¶ 192 & n.455.  Ultimately, Intuitive did not pursue the program because the extent of refurbishment and part replacement needed to return the instruments to like-new condition was more expensive than simply selling a new EndoWrist. *Id*. Ex. 6 at 73:6–74:10.  This rendered moot any discussion of an appropriate discount in the price for refurbished EndoWrists.

For his damages estimate, Prof. Elhauge relies on an internal company presentation about the potential program to claim that Intuitive would have lowered its pricing on all EndoWrists (new and refurbished) based on a statement in the presentation notes that "[a] 20% discount is proposed."  Dec. Ex. 1, ¶¶ 352, 396 (citing Intuitive-00104183 at -185).  This is essentially his only source for his critical assumption that "to the extent that buyers in the but-for world would have purchased a blend of new and repaired EndoWrists from Intuitive, a conservative measure is that they would have paid a 20% discount."  *Id.* ¶ 397.[3]

Setting aside that Prof. Elhauge has no rational basis to claim that Intuitive would have pursued a refurbishment program in the but-for world, given that the program was abandoned in the actual world for being too costly, Prof. Elhauge has no basis for his claim that the program provides a rationale for him to assume that Intuitive would have dropped its prices 20% for all EndoWrists in the but-for world. *Id.* Ex. 2 at 201:6-210:8.  Prof. Elhauge assumed that his 20% discount would apply to *all* U.S. customers across the board.  *Id.* at 202:14–19, 205:3–8.  But the document Prof. Elhauge points to is flatly inconsistent with any such assumption.  As reflected below, the document states that a 20%

---

[3] Prof. Elhauge also cites to an earlier presentation that included three options for pricing of 25%, 30% or 40% discounts off list price, *id.* ¶ 394, but Prof. Elhauge confirmed in his deposition that the presentation with the 20% discount was later in time and the source for his 20% number. *Id.* Ex. 2 at 203:18–205:11.

discount was contemplated in Germany and France, but *not* in the U.S., where it was contemplated that pricing solutions to hospitals would vary:

**Regional Marketing & Sales Strategies**
- Dragon will be positioned as a program that strengthens customers' robotic program and their relationship with Intuitive—cost constraints do not have to be a barrier to partnership
- Details, tactics and package may vary by region with samples below

| | Germany | France | US |
|---|---|---|---|
| Discount | 20% | 20% | Enterprise solutions will vary:<br>• Could be flat procedure pricing<br>• Could help enable lower system or service prices |
| Volume Requirements | Yes-but threshold will be set to be achievable for many hospital types | | |

*Id.* Ex. 9 (Elhauge Dep. Ex. 293, Intuitive-00104183, at -201).

In his deposition, Prof. Elhauge admitted that the author had not in fact listed 20% as a contemplated discount in the U.S. and that the statement in the last column meant that "agreements with different enterprises could vary." *Id.* at 207:19–24, 210:5–8 (discussing *id.* Ex. 9 at -201). His report offers nothing – not even anything as attenuated as his original sourcing – to fill that gap.

In short, the only record source Prof. Elhauge points to for his critical 20% number is not only irrelevant to the point for which he uses it, the document itself on its face does not contemplate the number applying to the population to which he applies it. Prof. Elhauge simply has no basis to assert that Intuitive would have discounted all EndoWrists to all customers by 20% in the but-for world. *See In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *16 (excluding damages expert opinion "rest[ing] on layers of assumptions, many of which are untethered to the real world or at odds with the facts" and criticizing "the sheer length of [the expert's] chain of shaky inferences").

**2.   Prof. Elhauge Does Not Have A Reliable Basis To Assume That EndoWrist Use Limits Would Have Been Increased to 20 In The But-For World.**

Prof. Elhauge also does not have a reliable basis for his assumption that use limits on EndoWrists would have been increased to 20 in the but-for world. Bass Dec. Ex. 1 ¶ 405. Prof. Elhauge speculates that this could have occurred in two ways in the but-for world: first, if the use limits were illegal restraints, those use limits would never have existed in the but-for world; alternatively, he

assumes third parties would have created competitive pressure on Intuitive to raise or eliminate use limits.  *Id.*  Again, Prof. Elhauge has no basis for these assumptions.

Prof. Elhauge cites no evidence to support his suggestion that use limits – which even Plaintiffs' technical expert implicitly concedes are needed at *some* level, *id.* Ex. 7 ¶¶ 250–251 – would not have existed at all in the but-for world.  Importantly, Prof. Elhauge ignores the role of the FDA in ensuring the safety and reliability of medical devices and the fact that it cleared Intuitive's EndoWrists with their existing use limits.  Prof. Elhauge is not himself an expert on the safety and reliability of use limits for new or modified EndoWrists.  *Id.* Ex. 2 at 170:23–171:3, 182:3–24; *see also id.* at 46:19–47:8.  Nor is he an expert on FDA clearance for modified instruments.  *Id.* at 56:4–57:9; 64:22–65:7; 85:5–8.  He has no expertise that would allow him to speculate that use limits on EndoWrists could simply be eliminated.

Prof. Elhauge's alternative assumption that use limits would have been doubled to 20 in the but-for world also finds no reliable basis in the record.  Historically, most of Intuitive's FDA-cleared instruments have had 10 uses.  *See id.* Ex. 1 ¶ 360.  FDA later gave Intuitive clearance for its Extended Lives Program to extend the allowed uses for certain X/Xi instruments to 12 to 18 uses, based on years of product improvements and based on extensive testing of the improved instruments.  *Id.* Ex. 5 ¶ 205. Even then, FDA did not clear those products for 20 uses.

Ignoring this evidence, Prof. Elhauge bases his assumption that use limits could increase to 20 for all S/Si and all X/Xi instruments largely on a single Intuitive employee's "guess" in an email from the early stages of Intuitive's Extended Use program.  *Id.* Ex. 1 ¶¶ 360, 405.[4]  Prof. Elhauge ignores the fact that after that "guess," the testing data validated extending the uses on certain of the X/Xi instruments for only 12 to 18 lives, which is what the FDA then cleared.  *See id.* ¶ 360, Table 4. Prof. Elhauge offers no basis for relying on this employee's early "guess" about certain X/Xi instruments in

---

[4] Specifically, a June 2019 email thread about the Extended Uses program, where Nicky Goodson asked Grant Duque "how many lives do we anticipate the instruments completely failing[?]" to which he responded "[m]y guess:  Prograsp, Cadiere:  mid- 20's, MSCND: low 20's, FBF & LND – high teens." Bass Dec. Ex. 4 at -917.

lieu of the actual facts of what then happened – and he certainly offers no basis for extending that "guess" to S/Si instruments the guess was not even addressing. Prof. Elhauge is not helped by his assertion that "[o]ther sources like Rebotix and Deutsche Bank have indicated that 29–59 uses was feasible." *Id.* ¶ 405. He cites no evidence that Rebotix – which abandoned its effort to obtain 510(k) clearance after FDA questioned, *inter alia*, the adequacy of its safety testing – was able to guarantee reliable performance from instruments with higher uses; nor does he offer any basis for concluding that "Deutsche Bank" is a reliable source on this question. *See id.* Ex. 2 at 44:23–47:8, 180:21–181:2; *id.* Ex. 8 ¶¶ 107–09.[5]

In sum, Prof. Elhauge's calculation of damages based on an assumption that use limits would have been 20 in the but-for world is not tethered to the facts of this case; it is a complete invention on his part that cannot support an expert opinion. *See Marion Healthcare LLC v. S. Illinois Healthcare*, 2020 WL 1527771, at *7 (S.D. Ill. Mar. 31, 2020), *aff'd*, 41 F.4th 787 (7th Cir. 2022) (excluding economist's testimony and damages models because they were "unhinged from the facts" and "based on a series of [the expert's] own assumptions").

### 3. Professor Elhauge's Combined Price And Use Limit Effect Is Unreliable.

Prof. Elhauge also calculates EndoWrist damages assuming that Intuitive would have *both* lowered its prices *and* raised its use limits. Bass Dec. Ex. 1 § VII.A.3. Because his damages estimates rely upon both of the unsupported assumptions addressed above, they contain all of the same problems. And they have yet another problem: combining Professor Elhauge's two effects leads to an effective discount of over 55%, which is even higher than the average 45% discount he says that third-party companies were offering. *Id.* Ex. 5 ¶ 252 & Table 3. He offers no economic explanation for why Intuitive would price *even lower* than these companies. Indeed, the section of his report computing combined price-effect and use-effect damages contains no citations at all. *Id.* Ex. 1 ¶¶ 409–11.

---

[5] Prof. Elhauge also relies on an Intuitive "Strategic Pricing" document referring to "EUI of 40-100 [Extended Use Instrument] lives." *Id.* Ex. 1 ¶ 361 n.863 (alteration in original); *see also id.* ¶ 405. But he admitted in his deposition that he had no understanding of the context of the document, or even the identity of its author. *Id.* Ex. 2 at 177:18–180:1.

### 4. Prof. Elhauge Does Not Have A Reliable Basis To Assume That Third Parties Would Have Modified EndoWrists As Early As May 21, 2017.

Prof. Elhauge also does not have a reliable basis to assert that the third parties would have modified EndoWrists in the but-for world as early as May 21, 2017. In the actual world, Rebotix did not begin selling modified EndoWrists in the U.S. until July 2018; Restore did not begin operating as a distributor for Rebotix until July 2018; and SIS did not begin selling modified EndoWrists until June 2019. *Id.* ¶ 305. And once Rebotix and Restore stopped doing business together, Restore did not begin selling modified EndoWrists directly until March 2019. *Id.* Despite these facts, Prof. Elhauge speculates that in the but-for world, third parties would have begun selling modified EndoWrists at some point before May 2017. Prof. Elhauge has no basis for this assumption.

With respect to Rebotix, Prof. Elhauge cites nothing from the record indicating that Rebotix would have made the decision to enter the marketplace more than a year before it actually entered. Prof. Elhauge appears to be making the assertion (unsupported by record evidence) that in the absence of Intuitive's contractual restrictions, Rebotix necessarily would have entered the marketplace earlier. This is pure speculation on Prof. Elhauge's part. He cites no contemporaneous Rebotix documents or testimony that would support this assertion, and he ignores that Rebotix tried to seek FDA clearance in 2014 but failed to receive it. *See id.* ¶¶ 304–307; Ex. 8, ¶¶ 102–109.

With respect to Restore and SIS, Prof. Elhauge asserts that "[i]f Intuitive had not been artificially restraining the volume of EndoWrist repairs, it is likely that SIS and Restore would have heard about, and entered, the market earlier." *Id.* Ex. 1 ¶ 308. This is pure "*ipse dixit*," not reliable expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In his deposition, Prof. Elhauge provided more "*ipse dixit*" testimony, asserting that Restore would have entered earlier because "obviously" if Rebotix had entered earlier "they [Restore] would have heard about this earlier that is just likely they would have entered earlier." Bass Dec. Ex. 2 at 160:16–161:13. And with respect to SIS, Prof. Elhauge could only refer to testimony from SIS personnel that they would have been "interested" in earlier entry had they heard about the opportunity – not evidence that SIS would have heard about the market opportunity, or actually entered, earlier. *Id.* at 161:20–162:16. Prof. Elhauge has provided no

basis whatsoever in the record for his assumption that the third parties would have entered the marketplace any sooner than they actually did.

        **5.**        **Prof. Elhauge Does Not Have A Reliable Basis To Assume That Third Parties Would Have Modified X/Xi EndoWrists In The But-For World.**

Prof. Elhauge also has no reliable basis for his inclusion in his damages model of X/Xi EndoWrist units. He assumes that the third parties could have developed a method to modify X/Xi EndoWrists to circumvent the use counter nearly six years ago. *Id.* Ex. 1 ¶ 309. This input leads to a significant amount of Prof. Elhauge's damages. *See id.* ¶ 411. But there is no evidence that even today a third-party company has a fully developed process to successfully modify an X/Xi EndoWrist to extend the number of uses beyond those cleared by the FDA.

Prof. Elhauge admitted in his deposition that he is not an expert on the technical requirements to develop a process to extend the number of uses for X/Xi EndoWrists; nor is he an expert on the encryption details. *Id.* Ex. 2 at 110:21–111:20. He has no understanding of why third parties have struggled in their efforts to develop a successful method to extend the number of uses of X/Xi EndoWrists. *Id.* at 121:6–23. Nor does Prof. Elhauge point to any record evidence indicating that the third parties could have developed an X/Xi process sooner. The only thing he points to is a statement from Restore that it needed more money to develop such a process. *Id.* Ex. 1 ¶ 309 (citing May Dep. at 75:16–76:1). But Prof. Elhauge has no idea what Restore would have done with more money or whether it would have been successful in figuring out how to reset X/Xi EndoWrists. *Id.* Ex. 2 at 120:17–121:17.

At bottom, Prof. Elhauge is simply offering his unsupported assumption that in the but-for world third parties would have developed the technology needed to make a commercial offering to extend the number of uses of X/Xi EndoWrists, even though no one has successfully done so in the real world. He has neither the expertise nor the record support needed to support this opinion. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973–74 (C.D. Cal. 2012) (expert damage estimates not grounded in the real world are "so incomplete as to be inadmissible as irrelevant." ) (quoting *Hemmings v. Tidyman's*

*Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)); *McGlinchy*, 845 F.2d at 806–07 (affirming exclusion of two expert damages estimates that "ha[d] scant basis in the record . . . rest[ing] on unsupported assumptions and unsound extrapolation").

### B. Professor Elhauge's Da Vinci Service Damages Are Unreliable.

In the actual world, only one third party ever offered any kind of service for da Vinci systems, and only for the S/Si system. The amount of money Restore earned providing service was minimal. Bass Dec. Ex. 3 ¶ 469, n.974. This is not surprising, given that critical elements of da Vinci service require proprietary tools that only Intuitive possesses. *Id.* Ex. 1 ¶ 368. Despite these facts, Prof. Elhauge estimates that hospitals would have paid less for **all** service in the but-for world and estimates hundreds of millions of dollars in damages. Similar to his EndoWrist damages estimate, he does not model how many customers would have actually purchased service from third parties in the but-for world. *Id.* Ex. 2 at 249:17–22. Rather, he simply assumes that because at least **one** firm would have provided **some** service, the resulting competitive pressure would have forced Intuitive to drop its pricing across the board for **all** service – including service no one else could offer. *Id.* at 242:9–243:9. This assumption is fatally flawed and unsupported.

*First*, Prof. Elhauge fails to account for the fact that third parties could only provide certain limited types of da Vinci service.[6] He concedes that without access to Intuitive's proprietary toolkit, Restore could not offer the "full range" of functions necessary to service a da Vinci system. *Id.* Ex. 1 ¶¶ 223, 311. Yet this distinction disappears in his damages analysis, which assumes that Intuitive would have decreased prices across the board, even for aspects of da Vinci service that only Intuitive could provide. His sole basis for this leap is that for the less than 2% of its customers on a "time and materials" plan, Intuitive charged the same hourly rate for service that only Intuitive could provide as well as for service that the third parties could potentially provide. *Id.* ¶ 414, n.973; *id.* Ex. 5 ¶ 258.

---

[6] He also fails to account for the fact that for a significant portion of the period for which he calculates damages there is no evidence that any third party was prepared to offer any service at all. He simply assumes that third parties would have provided service on the da Vinci system starting in May 2017, even though no third party offered such service until Restore began doing so in 2019. *Id.* Ex. 1 ¶ 415.

Prof. Elhauge provides no explanation as to why Intuitive would drop its pricing on service for which it faced no competition, and his assumption that it would do so makes no analytical sense.[7]

***Second***, Prof. Elhauge has provided an unreliable comparator to measure his estimate of what Intuitive would have charged for service in the but-for world. He asserts that, but-for Intuitive's conduct, third parties would have provided competitive da Vinci servicing, forcing Intuitive to lower its prices. He uses Abbott Laboratories as his comparator to quantify this effect, assuming that Intuitive's margins would have decreased to match Abbott's. *Id.* ¶¶ 413–16; *see also id.* Ex. 3 ¶ 474. Even if there were a rational reason to assume Intuitive would have changed its prices on service in the but-for world, Prof. Elhauge offers no reliable basis to assume that Intuitive's margin would have equaled Abbott's margin. His sole basis for using Abbott is that the company is "a leading medical device OEM" and "closest to Intuitive in size." *Id.* ¶ 366 & n.880, ¶ 413. But he does not address the many differences between the companies. For instance, Abbott's total revenue is nearly eight times as large as Intuitive's, and it makes completely different devices. *Id.* Ex. 5 ¶ 263 & nn.674–75. Nor was Prof. Elhauge able to identify what kinds of service only Abbott can provide and what kinds are offered by competitors. *Id.* Ex. 2 at 232: 19–233:14. He thus had no basis to assess, for example, the impact the relative proportion of each may have on Abbott's margins. Given "the absence of any meaningful economic similarity" between the two companies and between the measurement method used to compare them, Abbott is an inappropriate comparator. *William Inglis & Sons Baking Co. v. Cont'l Baking*, 942 F.2d 1332, 1341 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds,* 981 F.2d 1023 (9th Cir. 1992); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 974–76.

---

[7] Professor Elhauge's opening report states "it is not clear at this stage whether da Vinci's use of proprietary tools to exclude some forms of rival servicing had a legitimate rationale or was a technological tie that itself imposed an anticompetitive restraint on rival competition," *id.* Ex. 1 ¶ 225, ignoring that Plaintiffs have "expressly disclaim[ed]" any such claim. *See* Order on Motion to Dismiss, ECF No. 69, at 2. Rightly so, as that exact claim has already been rejected in the related *Restore* litigation. *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2019 WL 8063989, at *7–8 (N.D. Fla. Sept. 16, 2019).

### C. Prof. Elhauge's Opinions In Areas Where He Is Unqualified Should Be Stricken.

Courts routinely exclude expert testimony where the expert's opinion falls outside his or her relevant discipline. *See, e.g.*, *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011). And, the "opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, at *5–6 (S.D. Cal. May 20, 2020) (quoting *Stone Brewing Co., LLC v. MillerCoors LLC*, 2020 WL 907060, at *4 (S.D. Cal. Feb. 25, 2020)), *aff'd*, 9 F.4th 1102 (9th Cir. 2021). Prof. Elhauge does not have (or claim) expertise to offer opinions on (a) FDA clearance issues, (b) the safety of EndoWrists, (c) the functionality of EndoWrists, (d) conclusions regarding hospital motivation and intent and (e) conclusions regarding Intuitive's motivation and intent. This includes, for example:

- FDA clearance issues: "Resetting the use counter constitutes a repair because it creates a well-functioning EndoWrist with additional uses." Bass Dec. Ex. 1 ¶ 262. And, the third parties would have continued operating in the but-for world even if FDA clearance was required until the FDA took action. *Id.* ¶¶ 285–86. Further, "FDA clearance [for EndoWrist resets] may not have been necessary in the first place." *Id.* ¶ 282. Further, "if FDA clearance were ultimately found to be necessary, IRCs could have obtained it in the but-for world," *id.* ¶ 282, an opinion that Plaintiffs' own regulatory expert does not offer.
- Safety of EndoWrists that have been modified to allow use beyond their original approved uses: Evidence supports that "third-party IRCs, in general, do not represent any safety/quality issues." *Id.* ¶ 380. And, "the use counter limit . . . did not appear to solve any safety issues." *Id.* ¶ 384.
- The functionality of EndoWrists: "[R]epaired EndoWrists are functionally equivalent to new EndoWrist replacements." *Id.* ¶ 157. And, "EndoWrist repairs can also extend the useful life of existing EndoWrist owned by a hospital in a way that can put off the need to replace them with new EndoWrists." *Id.*
- Hospital motivation and intent: "Hospital Perceptions About Repaired EndoWrists Did Not Cause the Exclusion of Third-Party Repair Companies." *Id.* § IV.C.2. And, "Hospital Perceptions About Third-Party da Vinci Service Did Not Cause the Exclusion of Third-Party IRCs." *Id.* § V.D.1.
- Intuitive's motivation and intent: "Intuitive reinforced its other exclusionary restraints by setting use limits on EndoWrists artificially low." *Id.* ¶ 340. And, "the use limit is itself an anticompetitive restraint that would not exist in the but-for world," *id.* ¶¶ 358–59, and "it is reasonable to expect that Intuitive would have taken more significant action with regard to use limits" in the but-for world, *id.* ¶ 361.

## **CONCLUSION**

For the reasons herein, the Court should exclude Prof. Elhauge's damages estimates, and his opinions where he exceeds his expertise, including on (a) FDA clearance issues, (b) the safety of EndoWrists, (c) the functionality of EndoWrists, (d) conclusions regarding hospital motivation and intent and (e) conclusions regarding Intuitive's motivation and intent.

DATED:  March 23, 2023                                  By:  */s/ Kathryn E. Cahoy*
                                                                            KATHRYN E. CAHOY

                                                                          *Attorney for Intuitive Surgical, Inc.*

*Additional Counsel for Intuitive Surgical, Inc.*

| | |
|---|---|
| ALLEN RUBY (SBN 47109) <br> allen@allenruby.com <br> ALLEN RUBY, ATTORNEY AT LAW <br> 15559 Union Ave. #138 <br> Los Gatos, CA 95032 <br> Tel: (408) 477-9690 | KATHRYN E. CAHOY (SBN 298777) <br> Email: kcahoy@cov.com <br> COVINGTON & BURLING LLP <br> 3000 El Camino Real <br> 5 Palo Alto Square, 10th Floor <br> Palo Alto, CA 94306-2112 <br> Telephone: + 1 (650) 632-4700 <br> Facsimile: + 1 (650) 632-4800 |
| KAREN HOFFMAN LENT (*Pro Hac Vice*) <br> Email: karen.lent@skadden.com <br> MICHAEL H. MENITOVE (*Pro Hac Vice*) <br> Email: michael.menitove@skadden.com <br> SKADDEN, ARPS, SLATE, <br> MEAGHER & FLOM LLP <br> One Manhattan West <br> New York, NY 10001 <br> Telephone: (212) 735-3000 <br> Facsimile: (212) 735-2040 | SONYA WINNER (SBN 200348) <br> Email: swinner@cov.com <br> CORTLIN H. LANNIN (SBN 266488) <br> Email: clannin@cov.com <br> ISAAC D. CHAPUT (SBN 326923) <br> Email: ichaput@cov.com <br> COVINGTON & BURLING LLP <br> Salesforce Tower <br> 415 Mission Street, Suite 5400 <br> San Francisco, California 94105-2533 <br> Telephone: + 1 (415) 591-6000 <br> Facsimile: + 1 (415) 591-6091 |
| | ANDREW LAZEROW (*Pro Hac Vice*) <br> Email: alazerow@cov.com <br> ASHLEY E. BASS (*Pro Hac Vice*) <br> Email: abass@cov.com <br> JOHN KENDRICK (*Pro Hac Vice*) <br> Email: jkendrick@cov.com <br> COVINGTON & BURLING LLP <br> One City Center 850 Tenth Street NW |

Washington DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291