ATTACHMENT 27

1

1      UNCERTIFIED-UNEDITED ROUGH DRAFT

2      REPORTER'S NOTE:   THIS TRANSCRIPT IS A ROUGH

3      DRAFT TRANSCRIPT ONLY.  THIS REPORTER HAS NEITHER

4      EDITED NOR PROOFREAD THE TEXT, AND IT IS NOT A

5      CITABLE DOCUMENT.

6

7      REPORTER:        WILLIAM VISCONTI

8            THE VIDEOGRAPHER:   Good morning.

9      We are going on the record at 10:05 on

10     March 17th, 2023.  Please note that this

11     deposition is being conducted virtually

12     quality of recording depends on quality of

13     camera and internet connection of

14     participants.  What is seen from the

15     witness and heard on screen is what will be

16     recorded.  Audio and video recording will

17     continue that place unless all parties

18     agree to off the record.

19            This is media unit 1 of the video

20     deposition of Einer Elhauge in the Matter

21     of da Vinci Robot Surgical Robot Antitrust

22     Litigation filed in the U.S. District

23     Courty for the Northern District of

24     California San Francisco Division.  Case

25      No. 3:1-CV-03825-VC.


                              2

1       UNCERTIFIED-UNEDITED ROUGH DRAFT

2            My name is Michael Barankovich

3       representing Veritext and I'm the

4       videographer.  The court reporter is Bill

5       Visconti from the firm Veritext.  I'm not

6       authorized to administer an oath, I'm not

7       related to any party in action nor am I

8       financially interested in the outcome.

9            All counsel will noted on the

10      stenographic record.  Will the court

11      reporter please swear the witness.

12           E I N E R   E L H A U G E,

13      having been first duly sworn by the Notary Public,

14      was examined and testified as follows:

15      EXAMINATION CONDUCTED BY MS. BASS:

16      Q.    Good morning, Professor Elhauge.

17      My name is Ashley Bass and I represent

18      Intuitive Surgical in this matter.  Can you

19      state you full name for the record?

20      A.    God morning to you as well.  My

21      full name is Einer Richard Elhauge.

22      Q.    Will it work today if I refer to

23      you as Professor Elhauge?

13    really worse or better whether the market

14    perceptions were accurate or not.  That was the

15    response that I intended to have.  So that that

16    price response alone means that there would

17    have been a price cut in the but for world that

18    would have broadly benefitted Intuitive's

19    customers.

20        Q.    What evidence is in the record

21    that Intuitive thought that the third-party

22    rivals provided EndoWrist that were just as

23    good as new EndoWrists?

24        A.    . I can't off the top of my head

25    say which in the report it is but there is a


                          26

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    quote where they looked at the repaireds and

3    often said it was -- it appeared to be I can't

4    remember exactly what the language was, but it

5    indicated in substance it looking like it was

6    just as good.  And for refurbished ones in

7    general they went further and said they were

8    just as good or better.

9         Q.    And that is in reference to

10    potential Intuitive refurbished he EndoWrist,

11    correct?

12      A.    The latter quote, yes.  There was

13   another one I noticed reviewing in my reports

14   where they were talking directly about the

15   repaired EndoWrists and concluded in substance

16   they were just as good.

17      Q.    If we come across that in the

18   course of the questioning today, can you point

19   that document out to me when you discuss it in

20   your report?

21      A.    Sure.

22      Q.    Is it relevant to your opinion

23   whether the EndoWrist sold by third-parties are

24   as safe as new EndoWrists?

25         MR. SNYDER:   Objection to the form.


27

1      UNCERTIFIED-UNEDITED ROUGH DRAFT

2      A.    I would say for my predictions

3   about what would happen what matters is the

4   market perception, the evidence indicates that

5   the perception of market participants was that

6   they were as safe and there is evidence to

7   support that that indicates if anything they

8   were in fact safer.  None of my opinions

9   depends upon my own opinion about whether they

10   are safer or not.  I'm not making a medical

11   other engineering opinion about that.  I'm

12   basing my predictions upon market perceptions.

13          And then to the extent that we get

14   to procompetitive justifications, that's more

15   about the defense expert argument that the

16   perceptions of the participants were wrong.  He

17   is saying and in fact he says concludes that

18   the repaired EndoWrists were less safe.  On

19   that point I'm simply pointing out that there

20   is a lot of evidence that he ignored that

21   indicates that they were as safe, but

22   ultimately the burden of proof is on the

23   defense on that issue.

24          So all I do is point out what the

25   evidence is on that, but my opinions are


                              28

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2   ultimately rest on that conclusion because even

3   if you thought there was some safety concerns

4   we could rely on the incentives of hospitals to

5   only use a repaired EndoWrist if they thought

6   they were safety justified.

7        Q.    So is it relevant to your opinions

8   whether hospital viewed EndoWrist sold by

9   third-parties is the same as new EndoWrists?

10       A.    Yes, yes.  I do cite in reliant

11    part on evidence from the hospitals that they

12    didn't discern any difference between the

13    repaired EndoWrist and the new EndoWrists.  And

14    found them to be as safe.

15         Q.    You cite evidence from certain

16    hospitals; correct?

17         A.    There are a number of hospitals.

18    Also there is statistical evidence some of them

19    relying upon reviewing at least one that I can

20    recall rely on reis view of the numbers.  There

21    is also I think statistics themselves on

22    adverse events and there is also evidence that

23    the hospitals asked Intuitive whether they had

24    any evidence that there viable product were

25    less safe and Intuitive was unable to produce

29

UNCERTIFIED-UNEDITED ROUGH DRAFT

2    such a document.

3         Q.    Is it relevant to your opinion

4    whether doctors viewed EndoWrists sold by

5    third-parties as the same as Intuitive's

6    EndoWrist?

7         A.    Yes, I rely on evidence that they

8    in fact did.

9         Q.    From certain doctors, correct?

10         A.    Well the doctors that actually

6   that I used would 20 percent for the mix of new

7   and used EndoWrists and also that as part of

8   the extended use program they lowered the per

9   use price for certain categories of EndoWrists

10   because of competitive pressure was one of the

11   reasons that they cited for why they did that.

12        Q.    Was that competitive pressure that

13   they indicates was from the third-parties?

14        A.    The documents themselves don't

15   explicitly say that, but the timing I think

16   makes it clear that it must have been that and

17   that Dr. Smith's alternative hypothesis that

18   involves competition with laparoscopic surgery

19   doesn't make much sense because laparoscopic

20   surgery had been around for decades before and

21   also was declining over the proceeding years

22   before they introduce the extended use program.

23        Q.    But the documents do explicitly

24   reference laparoscopic surgery, correct?

25            MR. SNYDER:   Objection.


39

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        A.    It generally talks about

3   competitive pressure was any recollection.

4        Q.    Do you recall what the total sales

5   were of the third-party resettle EndoWrists in

6    the actual world?

7        A.    Total sales by the rival

8    repairers, I don't have that number memorized

9    off hand, no.

10       Q.    Do you know if more or less than a

11   million dollars?

12       A.    I don't know the number offhand.

13   I guess the percentage I calculated in market

14   share, so it must be in the backup there, but I

15   can't recall.

16       Q.    Is it relevant to your opinion

17   whether hospitals viewed EndoWrist sold by

18   third-parties as being the same as Intuitive's

19   EndoWrists and my question there is we talked

20   about doctors and my I want to talk about

21   hospitals as well?

22       A.    Yes, I think the he had indicate

23   that they did think that they yes just as good.

24   All the evidence seems consistent with that

25   that I saw and we have the revealed preference


                        40

1            UNCERTIFIED-UNEDITED ROUGH DRAFT

2    the fact that they -- many of them in fact did

3    use third-party repaired EndoWrists repaired

4    even with the restraints on their choices.

5      Q.    You use the term many being do you

6    know how many hospitals used services from the

7    third-party companies?

8      A.    I don't have the number of

9    hospitals offhand.  But it would be all the

10   customers of SIS, Restore and Robotix.  Over

11   the years when they were it in the market which

12   I think were 2018 to 2021.

13     Q.    Do you recall how many third-party

14   EndoWrists were sold to hospitals during that

15   time period?

16     A.    I don't know that number.

17     Q.    You discuss a little bit today you

18   think the record reflects that the instruments

19   sold by the third-parties were just as good as

20   new instruments.  Are you relying on any expert

21   testimony in the case to reach that opinion?

22     A.    So my opinion again to be precise

23   is that the evidence indicates that market

24   participants thought they were just as good.

25   Which is relevant factor my market analysis as

41

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2    an economist.  I also conclude that the

3    evidence was consistent with that view.  There

4    is lot of evidence to support it but there is

5    conflicting testimony by expert witnesses or

6    defense expects take one side and Plaintiffs

7    experts take the other side.

8           I cite what they say, but the

9    evidence of the Plaintiffs' expert offer and

10   what the defense experts offer I myself do not

11   ultimately resolve that issue, because that is

12   in their field of expertise, not mine.  For me

13   it suffices what the market participants

14   thought and that whether you thought they were

15   just as good or not the rest of my opinions

16   would hold, but there is a lot of evidence it

17   seems to me to indicate they were just as good

18   if not better.

19      Q.    You're not relying on any opinion

20   testimony for example for Dr. Parnell on this

21   point; is that correct?

22           MR. SNYDER:   Objection to the form.

23      A.    I do cite Dr. Parnell for various

24   points.  To the extent there is conflict

25   between his views and the views of the defense


42

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    experts I'm saying that I was relying on

3    Dr. Parnell regarding the defense experts.

4    they all indicated that the perception was that

5    they were just as good if not better.

6        Q.    Who said if not better?

7        A.    Well, if not better was I think

8    Intuitive itself said about its refurbished

9    EndoWrists and I think also evidence indicated

10   by Dr. Parnell that in fact the repaired

11   EndoWrists were more reliable than new row

12   EndoWrists and that consistent with statistics

13   that indicate there is more adverse events

14   associated with the new EndoWrists and in fact

15   none that I could find associated with the

16   repaired EndoWrists.

17       Q.    So is it your understanding that

18   Dr. Parnell is offering an opinion in this case

19   regarding the relative adverst events between

20   third-party EndoWrists and new EndoWrists?

21           MR. SNYDER:   Objection to the form.

22       A.    I think there are numbers that he

23   cites that I quote in my rebuttal report that

24   would support that conclusion.

25       Q.    Other than Dr. Parnell, is there


44

UNCERTIFIED-UNEDITED ROUGH DRAFT

2    anything else that you're using to support the

3    notion that third-party EndoWrists were better

4    than new EndoWrists?

5         A.    Well, it is hard to remember

6    everything in 400 pages of reports here.  But

7    there is statistics that there is less adverse

8    events, there is Dr. Parnell's testimony which

9    -- also just the description of the process

10   that there is huge amount of testing that to

11   make sure that the repaired EndoWrists are

12   working probably and Dr. Parnell pointed out

13   that they don't actually do that kind of test

14   for new EndoWrists before they release it.  So

15   with that and there are some -- there are some

16   documents that say they are as good or better.

17        Q.    During the course of today, if you

18   come across think documents as we are look

19   through your report that EndoWrist reset by

20   third-party are better, I would like if you to

21   point that out?

22        A.    Okay.

23        Q.    You said in your prior there was a

24   huge amount of testing that was done on the

25   third-party sold EndoWrists, what is your basis

45

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    for that statement?

3        A.    So what I quote in my report I

4    think it is in the section on the safety

5    justifications claimed by the Defendant.  By

6    test I should be careful, I'm not saying that

7    Intuitive ever tested whether the third-party

8    devices were safe.  In fact remarkably they

9    never tested before they imposed these

10    restraints.  I'm saying the third-party

11    companies themselves tested the particular

12    instruments they were working on to make sure

13    everything worked beforehand and also put them

14    through their paces to make sure they worked

15    after all the repairs.  And that is describe in

16    some details.  I have a couple of very long

17    footnotes and also Dr. Parnell goes through

18    that process in some detail and I cite in the

19    procompetitive justification section of my

20    report exactly where Dr. Parnell goes through

21    that.

22        Q.    Did you review those testing

23    materials that you're referencing?

24        A.    Review the testing materials?

25        Q.    Yes.

46

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2       A.     I'm not sure what you mean by

3   testing materials.

4       Q.     Did you review any tests that were

5   conducted by the third-parties regarding the

6   EndoWrists that they sold?

7       A.     I reviewed their -- the process,

8   the testimony was about a description of the

9   process that they used to test it.  So that

10  what I'm talking about, they did all of these

11  tests to make sure that it in fact would work.

12  And it was interesting that Dr. Parnell pointed

13  out that they actually don't do all that

14  testing for new EndoWrists which seems

15  consistent with statistics that actually the

16  new EndoWrist have more adverse events

17  associate with them then the repaired

18  EndoWrists.

19      Q.     Do you consider yourself an expert

20  on assessing the reasonableness of the testing

21  that was conducted by the third-parties to

22  ensure the safety and reliability of their

23  product?

24      A.     No, I'm not an engineering expert.

25  I'm simply responding to Dr. Smith who his

47

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2    opinion that they were less safe was based on

3    the erroneous assumption they didn't do any

4    such testing to make sure that the products

5    worked well.  And so in part of rebutting him I

6    point out there is all of this evidence.  But

7    I'm not an engineering expert so I'm not

8    opining on issue of engineering.

9        Q.    Are you aware of who Dr. Howe is?

10       A.    Yes.

11       Q.    Who is Dr. Howe?

12       A.    He is the defense expert in this

13   case.

14       Q.    He is a mechanical engineer,

15   correct?

16       A.    Yes, I believe so.

17       Q.    Did you review his expert report?

18       A.    I did, yes.

19       Q.    Are you aware that he disagrees

20   with Dr. Parnell regarding adequacy of the test

21   that was conducted by, for example, Robotix for

22   its product?

23       A.    Yes, I reviewed that and I discuss

24   it in my rebuttal report.  I think Dr. Parnell

25   pointed out that Dr. Howe in fact had he said

25      Q.    You don't consider yourself of FDA


                        56

1            UNCERTIFIED-UNEDITED ROUGH DRAFT

2      regulations, correct?

3      A.    Correct.

4      Q.    You're not a FDA expert, correct?

5      A.    Yes.

6      Q.    You never worked at FDA?

7      A.    I have not.

8      Q.    You have no specialized expertise

9      in analyzing FDA regulations correct?

10     A.    Credit.

11     Q.    You have no experience applying

12     FDA regulations to medical devices; correct?

13     A.    Well, in my role as a health well

14     policy professor I have examined certain issues

15     regarding FDA regulation of medical devices.

16     But I'm not offering any opinions in this case

17     as a regulatory expert.

18     Q.    Are you offering any opinions in

19     this case as to whether FDA -- sorry -- let me

20     start over.

21           Are you offering an opinions in

22     this case as to whether FDA clearance was

23     required for the instruments sold by the

24    third-parties?

25         MR. SNYDER:   Objection to the form.


                          57

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2         A.    No, I note the conflict an opinion

3    among the experts, Plaintiff expert versus

4    defense expert view whether it is actually

5    required.  As I indicated in my report and in

6    my testimony just now I'm relying on the market

7    participants perception about whether it was

8    required which is all that matters for the

9    market effects that I'm opining on.

10        Q.    Are you offering any opinion if

11   FDA clearance was required how long it would

12   have taken companies to accomplish that in the

13   but for world?

14        A.    I'm opining that they could have

15   achieved it earlier in the but for world and

16   would have had incentive to do so.  I don't

17   opine on particular dates in which they would

18   have obtained that FDA clearance.

19        Q.    So you're opining that they would

20   have an incentive to seek FDA clearance earlier

21   if FDA clearance was required, is that right?

22        A.    No, I'm staying if there weren't

23   the restraints they would have had incentives

24    to apply for FDA clearance earlier.  They would

25    have entered the market anywhere given the


58

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    evidence that market participants were not shy

3    about entering the market without advance FDA

4    clearance, but they would have had incentives

5    to apply for FDA clearance from the get go

6    before EndoWrist repairs.

7            I guess I'm relying on the fact

8    that the service, I'm relying on the fact that

9    there seems to be a consensus among the

10    regulatory experts for the Plaintiffs and

11    Defendants that no FDA clearance was required

12    to provide the service.

13        Q.    Are you an offering in expert that

14    if FDA clearance was required in the but for

15    world not only would these companies have had

16    the incentive to seek it, that the companies

17    would have received FDA clearance?

18        A.    Yes, I think the evidence indicate

19    the they would have.  The one firm to pursue it

20    contained the 510(K) FDA clearance.

21        Q.    You understand that that was

22    clearance for one instrument, correct?

21   where -- whichever the rival was that was

22   prying to process it, said there was all kinds

23   of crazy testing and crazing questions --

24   questions that may no sense I think was the

25   lapsing that he used that made him think that


64

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2   perhaps Intuitive was interfering with the

3   process.  So in that deposition maybe there was

4   e-mails that were exhibits to that deposition,

5   but I'm not recalling them offhand.

6          Q.    We will get to that in a minute,

7   that is again about Iconocare.  Did you review

8   any correspondence that the FDA September to

9   Robotix regarding the FDA's per seed

10   deficiencies in Robotix's application to the

11   FDA?

12          A.    I don't recall anything that I

13   characterize as about the perceived

14   deficiencies.

15          Q.    Do you understand that Robotix did

16   not achieve clearance on any of its instruments

17   from the FDA; correct?

18          A.    My understanding there hasn't been

19   a decision a that clearance is even required

20    and it has no adverse decision that had been

21    reached as to any Robotix instrument.

22        Q.    Are you offering an expert opinion

23    as to whether or not Robotix can lawfully sell

24    its products without FDA clearance?

25        A.    No, as I said I'm not opining on


                           65

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    the regulatory expert question.  I'm opining on

3    what market participants perceived to be the

4    case and their willingness to enter in advance

5    of receiving a decision on FDA clearance and

6    the likelihood that they would apply earlier

7    for it in the but for world.

8         Q.    One point just to follow up on

9    earlier you said there were many hospitals that

10    were willing to purchase the products sold by

11    the third-parties without FDA clearance and I

12    think we talked about that earlier, do you know

13    the number of hospitals that were willing to

14    purchase?

15            MR. SNYDER:   Objection to the form.

16        A.    I don't recall the number offhand,

17    but I'm sure you could find it from the back

18    up.  Whoever the customers are of these

19    third-party repair parties.

20      Q.   Do you review testimony from

21   market participants that indicated that they

22   would not be willing to use instruments from

23   third-parties that did not have FDA clearance?

24      A.   There was that testimony that I

25   just heard that they would be.  So there was

66

UNCERTIFIED-UNEDITED ROUGH DRAFT

2   some testimony that suggested the abstract,

3   they wouldn't want to deal with something that

4   didn't have FDA clearance.   But that of course

5   the way the question was asked assumed that FDA

6   clearance was in fact required.  Which begs the

7   case of this question about whether or not they

8   would not use a product or service before any

9   decision had been made about whether FDA was

10   required or not.

11      Q.   So radio he view in testimony from

12   hospital that indicate they would not be

13   willing to use EndoWrist from the third-parties

14   unless those entities received FDA clearance?

15      A.   All the stuff that Dr. Smith cite

16   to support that I reviewed and discussed in my

17   rebuttal report report.  As I said before I

18   think there was some that sort of abstractly

10    been able to achieve FDA clearance and to

11    achieve it earlier and that they would have

12    operated in the meantime before obtaining FDA

13    clearance.

14        Q.    So currently only one instrument

15    has received FDA clearance by the

16    third-parties, correct?

17        A.    Correct.

18        Q.    So what is the basis of your

19    opinion that the third-parties would of

20    received FDA clearance on other instruments?

21        A.    I didn't see any evidence to

22    indicate that that there was -- I mean if you

23    could validate your process for one instrument

24    it seemed to me that you could validate your

25    process for other instruments as well.  I


85

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    didn't see anything to indicate that

3    differences among the instruments would affect

4    the ability to get 510(K) clearance.

5        Q.    I think he we established this

6    earlier you're not an expert on when the FDA

7    grants 510(K) clearance, correct?

8        A.    I am not.

9        Q.    Have you reviewed any information

10   that would be submitted to FDA with respect to

11   instruments other than the one that that has

12   received 510(K) clearance?

13        A.    I haven't, I'm just relying on the

14   general testimony and evidence from the parties

15   that they were willing to apply for all of it

16   and I didn't see any signs that they -- there

17   was a thought there was going to be a

18   difference.

19        Q.    Robotix applied for FDA clearance

20   but then withdrew its application shall

21   correct?

22        A.    I don't have any recollection of

23   that.

24        Q.    It we were discussing earlier that

25   Robotix had interactions with the FDA, correct?


                          86

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        A.    Yes.

3        Q.    Do you think that have the

4   expertise to opine that if one EndoWrist from

5   the third-parties has received clearance from

6   the FDA that necessary the FDA would issue

7   clearances for all other Si and Xi EndoWrists

8   from the third-parties?

25    Q.    No one has -- none of the


110

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    third-parties have sold an X/Xi instrument

3    where the usage counter has been reset?

4         A.    I think that is correct, yes.

5         Q.    You understand that the

6    third-parties did sell certain EndoWrists where

7    the usage counter had been reset for S/Si

8    instruments, correct?

9              MR. SNYDER:   Objection to the form,

10             I don't think they sold the instrument, I

11             think they sewed the repairs to the

12             instruments.  I don't think they physically

13             tea took possession of the S/Sis and resold

14             them.  I think that is what the repair was.

15        Q.    So you you understand that the

16   activities of the third-parties involved

17   modifying the usage counter on S/Si

18   instruments; is that right?

19        A.    That is one of the activities they

20   engaged in, yes.

21        Q.    Do you consider yourself to be an

22   expert on the technical and the of the

23   third-parties to develop a process to modify

24    the usage counter for X/Xi instruments?

25         A.    I'm not a technical expert.  I


111

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    side evidence to indicate they thought they

3    could and had in fact say they have developed a

4    method for doing so even though it is not

5    commercially available yet.  So I think that's

6    all evidence -- at in the end all I say enough

7    evidence to make it a reasonable scenario to

8    check for damages and I leave resolution of

9    that issue to the factfinder yes.

10        Q.    You're not an expert on the

11   encryption of the X/Xi devices correct?

12        A.    I myself am not an expert on that

13   topic.  I'm relying on evidence from the

14   parties that indicate that they thought that

15   they could and in fact overcome the issue and I

16   believe there is also an engineering expert who

17   I believe his name is Humphrey who gave

18   testimony that it is just a matter of time it

19   could have been done any time in the last five

20   years if I recall correctly.

21        Q.    Are you relying on Mr. Humphrey

22   for your opinions regard whether X/Xi reset

23   instruments would have been available in the

24   but for world?

25   A.   I'm relying on him for the notion


112

1   UNCERTIFIED-UNEDITED ROUGH DRAFT

2   that there is sufficient evidence they could

3   have done so in the but for world to make it

4   reasonable to calculate damages based on that

5   scenario.  As he said in paragraph 417 I say

6   that but I also make clear clear that aim moot

7   offering a PowerPoint that rivals definitely

8   would have developed an ability to repair X/Xi

9   EndoWrist models in the but for world.  So I

10   model both the scenario where they would have

11   been able and where they won have been able to.

12   I merely include Mr. Hum free's analysis among

13   many other pieces of evidence that suggests

14   that they would have been able to do so.  But I

15   leave ultimately the fact actual us resolution

16   to that and believe Mr. Humphrey testimony to

17   the factfinder.

18   Q.   Mr. Humphrey is not an expert in

19   this case; correct?

20   A.   No, he is an expert in the SIS

21   case.

22   Q.   You reviewed Mr. Humphrey's expert

20    testified maybe third, fourth quarter of 2023,

21    do you recall that testimony?

22          A.    I do not.

23          Q.    What is your opinion as to why

24    that date would have been earlier in the but

25    for world if they even made that date?


                        120

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2          A.    Because they would have invested

3    more in developing the ability to do so if they

4    didn't have the restraints.  They entered with

5    the easiest one, the S/Si repairs.  And they

6    were totally driven out of the market.

7    Intuitive's enforcement of its restraints was

8    extremely successful and worked with every

9    single hospital.  So it would have been futile

10   to spend a lot of money to develop this in a

11   world with restraints.  But without the

12   restraints there is lot of money to be made,

13   hundreds of millions of dollars according to

14   estimates of some of the IRCs.  So there would

15   have been a lot more incentive to invest

16   earlier to develop this technology.

17         Q.    How much money do they need to

18   develop the technology?

19      A.    I don't know exactly how much they

20   need to develop it.  But one of them I guess

21   already has developed it.

22      Q.    If Restore needs more money to

23   develop the technology, what are they going to

24   use the money for?

25      A.    What are they going to use the mop


                          121

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2   for?

3      Q.    Yes.

4      A.    To develop the technology.  I'm

5   not sure that I understand the question.

6      Q.    My question to you is what is your

7   understanding of what they need to do in order

8   to develop the technology are what will they

9   use the money for?

10      A.    I'm not a technical expert.  What

11   technically they need to do.  Just that Robotix

12   was able to do it so it is not a insuperable

13   task.  And that they express great confidence

14   that they would be able to do so.  As say the

15   only rethey haven't don't so for because it is

16   futile until they get some relief from the

17   Intuitive blocks.

18      Q.    So your testimony the only reason

19    that resort hasn't developed X/Xi reset process

20    so far is because it is futile?

21        A.    I think there is evidence to

22    indicate that's the case of the that that they

23    would have in the but for world.  Again as I

24    explicit here many times and paragraph 417, I'm

25    not offering an opinion that they definitely


122

1            UNCERTIFIED-UNEDITED ROUGH DRAFT

2    would have done so.  I'm leaving resolution of

3    that dispute to the factfinder I simply say

4    there is all of this evidence to indicate they

5    could have.  Makes are that makes a reasonable

6    to calculate damage under consider scenario

7    where they would have.

8        Q.    Did you speak to anyone at Restore

9    to know what the status was of their ability to

10    develop a process to reset X/Xi EndoWrist?

11        A.    I have not.

12        Q.    Do you know if they are actively

13    work on attempt to develop a process to reset

14    X/Xi instruments?

15        A.    I do not.

16        Q.    And X/Xi instruments entered the

17    marketplace in 2014, correct?

160

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    2017?

3        A.    Well for Restore as paragraph 409

4    A notes they testified that the business was

5    delayed because they were counting on revenue

6    to grow their business.  So you have direct

7    testimony from them that the challenged

8    restraints delayed their entry and I also cite

9    to paragraph 163 of my original report.

10       Q.    Apologies, what paragraph did you

11   say you're referencing?

12       A.    163 in the initial corrected

13   report.

14       Q.    But what was original one that you

15   were saying, was it in your reply report?

16       A.    In the rebuttal report, yes, in

17   paragraph 409 A I reference a fact that there

18   is a lots economic inference but confirmed by

19   the fact there is testimony from these

20   third-party repair companies that the challenge

21   restraints delayed their entry.  And in support

22   of that I note that May from Restore said that

23   the restraints were delaying the their growing

24   of their business and particularly develop the

25   Xi.

1      UNCERTIFIED-UNEDITED ROUGH DRAFT

2              And in paragraph 163 I note

3      other evidence to that same affect that they

4      were planning to offer the full range of S/Si

5      and X/Xi instruments if they didn't have these

6      restraints.

7              And then in paragraph 409 E

8      I note that they became interested really when

9      they heard about this possibility from Robotix,

10      but obviously if Robotix and Stryker had

11      entered earlier they would have heard about

12      this earlier that is just likely they would

13      have entered earlier.

14      Q.    You understand to Restore didn't

15      exist as a company until 2018?

16              MR. SNYDER:   Objection to the form.

17      A.    I don't know in this particular

18      incarnation or name, but there was a predecessor

19      business as I recall.

20      Q.    What about SIS, what evidence are

21      you relying on for the notion that SIS would

22      have entered in May of 2017?

23      A.    In addition to just economics

24      incentives that are rational, they did testify

25      that although they learned about it from

162

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2    Robotix if they would have been interested in

3    entering in 2016 if they just heard about the

4    opportunity then.  So there been entry SIS

5    would have been interested and would have heard

6    about it and then they would have been

7    interested in entering earlier.

8          Q.    So you're evidence is that SIS

9    would have entered in May of 2017 is that they

10   would have been interested in doing so earlier

11   if they had heard about it earlier?

12         A.    Yes.  And also that they

13   themselves estimated that they could make 250

14   to 350 million a year from entering.  So they

15   would have had plenty of opportunity to do so.

16   Plenty of incentive I should say to do so.

17         Q.    Are you offering the opinion that

18   SIS would entered as distributor or selling its

19   own services?

20         A.    I'm offering a particular opinion

21   about which way they could have done so.  As I

22   said several times, I'm just saying that one

23   reasonable scenario is that there would have

24   been entry in May, 2017 by one or more of these

25    firms or could be other firms as well.  And I'm


163

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    leaving that up to the factfinder, but I think

3    there is at least enough evidence from this to

4    think it is reasonable to supposed that it

5    would have happened and thus make it

6    reasonable to calculate damages that would

7    ensue if the factfinder believes or concludes

8    that entry would have occurred by May of 2017.

9         Q.    SIS didn't hear about Robotix's

10   EndoWrist business until 2019; is that correct?

11        A.    I'm not exactly sure.  It could

12   2018, 2019.  I'm not positive about the year.

13        Q.    When we were talking about Stryker

14   a second ago, do you recall reviewing testimony

15   from Stryker in this case regarding its reasons

16   for not going forward with the deal with

17   Robotix?

18        A.    I recall testimony, I can't

19   remember whether it was from Stryker or

20   somebody else about why Stryker didn't go ahead

21   with the deal.

22        Q.    Do you recall that there was

23   testimony from Stryker that Stryker's quality

24   system and regulatory count two not let Stryker

22   were feasible.  Hospitals had concluded as well

23   that use limits could be raised without

24   compromising functionality.  And so therefore

25   20 seemed a conservative low estimate.


170

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2             And there was also evidence that

3   the actual use limits were arbitrary that were

4   being imposed.  That they with weren't really

5   connected to where wear or tear, although not

6   mentioned here, I think I talk about it

7   elsewhere in my report, that Dr. Parnell's

8   opinion points out that the use limits didn't

9   make much sense in terms of wear or tear

10   because the use limit applied whether or not

11   something was torn and even if it was torn you

12   would be within use limit, but also in terms of

13   just wear, if you really want to measure the

14   amount of time that the device was used.  And

15   they could have done that and in fact they are

16   tracking the time of usage but that is not what

17   the limit is based upon.

18             So are all reasons why one would

19   think that you would use it more than the

20   actual use limits and that given this evidence

21   summarized in paragraph 450 at least 20 seems

22   conservatively possible.

23        Q.    You're not an expert on the safety

24   of EndoWrist, are you?

25        A.    I am not a safety expert, no.  I'm


                           171

1           UNCERTIFIED-UNEDITED ROUGH DRAFT

2    relying on the views here of market participants

3    and independent industry analysts.

4         Q.    Are you asserting an opinion in

5    this case that Intuitive should have gone about

6    addressing the safety of the EndoWrist in a

7    different way?

8         A.    I think there is evidence to

9    indicate that the use limit was not safety,

10   just the ones it shows were not safety

11   justified in fact the he deliberately could the

12   did the not test higher because the use limits

13   were set by the marketing department of

14   Intuitive and this they could have, they

15   acknowledged they could have tested more

16   instruments, they could have tested them

17   further, they could have extended it from these

18   13 Xi's or to all the Xi's to S and Si's and

19   they could have done all of this earlier as

20   well, but they chose not to do so.  The only

21   thing they did test, they found that in fact

22   they could raise the use limit.

23          So I think it is reasonable to

24   assume had they tested more and earlier, they

25   would have concluded that they could raise the

172

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2   use limit on more devices and raised them

3   earlier.

4          Q.    So going back to your opinion that

5   use limits might not exist in the but for

6   world, are you opining that Intuitive should

7   have just allowed surgeons to make the decision

8   as to when to stop using an EndoWrist?

9          A.    I'm not offering an opinion about

10   what they normatively should do.  I'm saying

11   that one of the challenges in this case is to

12   the use limits themselves.  So if the

13   factfinder agrees with that challenge that the

14   use limits did not have an procompetitive

15   justification to offset the anticompetitive

16   effect and that they were unlawful as a result,

17   then by definition the but for world does not

18   include unlawful activity.  So there would be

19   no use limits in the but for world and in that

18    is?

19        A.    Do I recall what it is?

20        Q.    Yes.

21        A.    It's a document that says

22    paragraph 360 to 361 of my original report.  I

23    can't remember the Bates number.

24        Q.    In what context was that statement

25    made?


177

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2        A.    I don't recallment document is

3    cited in footnote 863 of my initial report.

4        Q.    Do you recall reviewing any

5    testimony in the case regarding the document

6    that you cited?

7        A.    I do not recall, no.

8            MS. BASS:  I think we are up to

9        exhibit 295.  Is that right.

10           MR. SNYDER:  It sounds the right.

11           MS. BASS:  I could like to

12        introduce tab 125 as Exhibit 295.

13           (^ Exname ^  Exhibit  for

14        identification, .)

15           MS. BASS:  For the record Exhibit

16        2945 IS a document Bates numbered

17        Intuitive-01190868.

18      Q.    Professor Elhauge, this is a

19    document that you're citing when you say that

20    Intuitive did an internal analysis indicating

21    that it could safely -- sorry let me reread the

22    sentence to make sure I get it right.

23          "Intuitive's analysis even

24    contemplated use limits of 40 to 100."

25      A.    I'm just getting the document.


                          178

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2    Exhibit 295. Yes.

3      Q.    So what is this document?

4      A.    It's a document about strategic

5    pricing and what challenges they face and how

6    what questions they need to answer in order to

7    figure out how to set their strategic pricing.

8      Q.    Do you know who authored the

9    document?

10      A.    I don't know.

11      Q.    As I mention earlier do you recall

12    if you read any testimony in the case about the

13    document?

14      A.    I don't recall.

15      Q.    So you're referencing the line

16    here where it says "EU I of 40 to 100 lives

17    would require a chain in how we sell/manage

18    instruments."  Is that right?

19        A.    That and further down under the

20    details questions question 2 they say "how we

21    would incorporate consignment of the

22    instruments into AMP if EUI have 40 to 100

23    lives."

24        Q.    So is this, you think this is

25    evidence that Intuitive believed that it could


179

1            UNCERTIFIED-UNEDITED ROUGH DRAFT

2    extend the lives of its products to 40 to 100?

3        A.    I said they are thinking that

4    that's a possibility.  My conservative

5    assumption is at least 20.  But I think if in

6    your internal analysis you take them seriously

7    the possibility of that use could be extended

8    to 40 to 100, that does support the assumption

9    that is it quite conservative they could

10    increase it to at least 20.

11        Q.    But you have no idea what context

12    what this document was created in, correct?

13        A.    I think on its own it pretty

14    clearly indicates that it is a strategic

15    pricing document and they're thinking about the

16    impact of more uss on the product.

17          So, I think that's enough to make

18    it useful for the conclusion that I'm trying

19    drawing from it.

20          Q.    Is do you know if the person who

21    drafted a document called strategic pricing had

22    any input from Intuitive's regulatory or

23    technical staff as to whether such lives would

24    even be possible?

25          A.    I don't know they asked those


180

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2    people or not.

3          Q.    We talked about Deutsche Bank

4    earlier, do you consider Deutsche Bank to be a

5    authoritative source as to how many uses would

6    be feasible of an EndoWrist?

7          A.    I think they are, as I said

8    before, a good pragmatic independent analyst.

9    They are just trying to make judgements where

10    investments should be made based upon what they

11    think is possible.  So they would investigate

12    the issue and they could be a good neutral

13    assessor of what from a business perspective

14    people would have thought was possible at the

15    time.

16      Q.    Do you know if the information in

17   the Deutsche Bank report would have come from

18   the third-parties?

19      A.    The information -- whether that --

20   where they got it from?

21      Q.    Let me back up I will ask a more

22   precise question.  You say "Other sources like

23   Robotix and Deutsche Bank have indicated that

24   29 to 59 uses was feasible." I'm asking you if

25   you know where the 29 to 59 uses in the


181

1      UNCERTIFIED-UNEDITED ROUGH DRAFT

2   Deutsche Bank report would have come from?

3      A.    29 to 59 I thought was the Robotix

4   figure.

5      Q.    I'm quoting from are paragraph 450

6   B.  In your rebuttal report.

7      A.    450 B.

8      Q.    Your rebuttal report paragraph 450

9   subsection B as in boy.

10      A.    Yes, but other source look Robotix

11   and Deutsche Bank indicate this whole range

12   being if you actually look at paragraph 301 in

13   the same report it separates them out rather

14   than putting them together and I point out that

15   Robotix found 59 uses was feasible where as

16    Deutsche Bank found that 39 to 48 uses were

17    feasible.  When I put them together I say 29 to

18    59 because Deutsche Bank range is within the

19    Robotix range.  But Deutsche Bank actually

20    found a more narrow of 39 to 48 uses was

21    feasible.

22        Q.    A.m. asking you do you have a

23    understand where that information would have

24    come from from Deutsche Bank?

25        A.    I don't know where they got the


182

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    information from.

3        Q.    I think we covered this earlier

4    but just to confirm.  You're not offering any

5    sort of opinions in this case about the safety

6    and reliability of medical devices, correct?

7        A.    Well the opinions I'm offering are

8    limited I think to what the market perception

9    was about whether these repaired devices were

10   safe and whether the use limits were necessary.

11   So market perception and to the extent that the

12   defense economics expert is getting into the

13   issue by claiming that the evidence shows one

14   thing, I do point out there is lot of evidence

15    that the defense expert is ignoring on the

16    topic.

17         I don't resolve the issue, but I

18    am offering the critique that if the economic

19    experts are going to be resolving safety issues

20    that the defense expert has ignored a lot of

21    evidence on the safety issue.  But with those

22    exceptions otherwise, I leave it up to the

23    factfinder to conclude whether or not they were

24    safe or not.

25         Q.    You've never designed a safety


183

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    program for a medical device, correct?

3         A.    Correct.

4         Q.    Did you review the testing

5    materials for Intuitive's S/Si instruments?

6         A.    The safety materials, what do you

7    mean by that?

8         Q.    The safety testing materials, all

9    the testing that Intuitive did to ensure the

10    safety of S/Si instruments?

11         A.    I looked at some of the safety, I

12    don't know whether he saw all the safety

13    testing information.  But I look at some of it

14    to extent that it is cited in my report.

7   the but for rival shares in part influenced by

8   the price that Intuitive would pick.  And so

9   I'm just conservatively concluding, well,

10   there would have been at least a 20 percent

11   price cut based on Intuitive's own assessment

12   of the rival competitive threat.

13        Q.    Assume in the but for world that

14   the demand for reset EndoWrist in these

15   third-party was only equivalent to $2 million,

16   there is no more from from hospitals no no more

17   doing it beyond the 2 million dollars.  Are you

18   offering the opinion that Intuitive still would

19   have cut its prices to EndoWrist by 20 percent

20   across the but for world?

21        A.    I don't know I don't have any

22   evidence to support that assumes.  But again I

23   don't think you can except from the time out

24   from what their price would have been of the it

25   seems to me that the evidence indicates not


200

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2   only there was a lot more interest in the rival

3   product, but Intuitive must have thought there

4   was more interest in the product because they

5   themselves planned to respond to it with a 20

6     percent price cut.

7         Q.    I want you to assume for me in the

8     but for world there is very limited interest

9     from hospitals in using EndoWrist from the

10    third-parties.  Again, the maximum amount that

11    would be purchased from the third-parties is

12    $2 million.  Every knows it including

13    Intuitive?

14        A.    So it is capped for some reason?

15        Q.    Yes.  If that were the case and

16    the third-parties only garnered that limited

17    amount of sales, do you believe that Intuitive

18    would have lowered its price a cross the but

19    for world by 20 percent?

20            MR. SNYDER:   Objection.

21        A.    I think hypothetical is

22    inconsistent at the time with all the facts in

23    the case including Intuitive's own analysis if

24    you're going to high policies there is some

25    sort of cap what rivals can sell, then


                          201

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2     Intuitive would not incentive to lower the

3     price by 20 percent.

4         A.    If the cap is no more than

5     $2 million in sales in the market.

6       Q.      You mentioned this earlier, I

7    think you're using the Project Dragon document

8    as a basis for your asserted 20 percent price

9    discount; is that right?

10      A.      Yes.

11      Q.      Just so to make sure that I have

12    your assumptions correct, you're assuming in

13    the but for world that you're 20 periods of

14    time price reduction would apply to both Si and

15    Xi instruments; is that right?

16      A.      Well I have alternative scenarios.

17    So I present both to the factfinder.  I think

18    it is between I think they would have lowered

19    them across both.

20      Q.      So the for Project Dragon the 20

21    percent number that you point to do you have a

22    understanding of whether the discount would

23    have applied for example like a in all

24    geographic territories, was it worldwide, what

25    was Intuitive contemplating?


                          202

1           UNCERTIFIED-UNEDITED ROUGH DRAFT

2       A.      They have a very firm what they

3    wall a one tries strategy, they over offer one

4    price through the United States for EndoWrist

5   they could have offered the same pry throughout

6   United States.

7       Q.   Foreman Project Dragon were they

8   considering implementing it in foreign

9   countries, in the U.S., what was geographic

10   reasonable of Project Dragon?

11       A.   I think were contemplating doing

12   in both U.S. and Europe if I recall correctly

13   at least within the United States.

14       Q.   Is the 20 percent number that

15   you're pointing to, is it your understanding

16   that that that would have been a worldwide

17   discount across the but for world?

18       A.   I think it would have at least

19   been the U.S. discount.  I'm not sure whether

20   they charged the same price in foreign

21   countries or not.

22       Q.   Did you see any document indicates

23   that Intuitive was not contemplating a 20

24   percent price reduction in the U.S.?

25       A.   No.


203

1       UNCERTIFIED-UNEDITED ROUGH DRAFT

2       Q.   So if you could look at your

3   opening report at 394, please.

4       A.   Okay.

5      Q.    So about halfway down in that

6    paragraph you say "Indeed in May, 2017 when

7    Intuitive considered competitive responses to

8    the expected entry of rivalry repaired EndoWrists

9    in the actual world even with the advantages of

10   it's restraints, Intuitive internally proposed

11   offering repaired EndoWrists at a discount of

12   25 to 40 percent off the actual price it

13   offered new EndoWrists."  Do you see that?

14      A.    Yes.

15      Q.    So that is in May of of 2017,

16   correct?

17      A.    Yes.

18      Q.    If you look a little bit further

19   over on paragraph 396 here you say in response

20   to expected rival repair competition, Intuitive

21   made another proposal to offer even with a

22   challenged restate goes a mix knew and repaired

23   EndoWrists at a 20 percent discount from its

24   price of new EndoWrists."  Do you see that?

25      A.    Yes.


                          204

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2      Q.    Then you cite to the footnote 946

3    where you cite Scoville Exhibit 1.  Is that

4    right?

5         A.    Yes as well as there is another

6    document.

7         Q.    Yes.  So we have already

8    introduced Scoville Exhibit 1 today as

9    Exhibit 293.  So could you take a look at that.

10    Do you have that one up?

11         A.    Yes.

12         Q.    So you can see from the front of

13    this it says Instrument Refurbishing Project

14    Dragon July 12th, 2017; correct?

15         A.    I don't see the date, where do you

16    see the day.

17         Q.    Are you on Exhibit 293?

18         A.    Yes.  The first page being okay,

19    yes, okay it says July 12th, 2017.

20         Q.    So, you will recall that the first

21    document that you mentioned was the 25 to 40

22    percent number was in May of 2017, correct?

23         A.    Yes.

24         Q.    Now, we move forward a few months

25    to July of 2017; correct?


                        205

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2         A.    Yes.

3         Q.    Is it your understanding I think I

4    said that earlier that the 20 percent discount

5    that you're contemplating would have been

6    provided kind of across the but for world to

7    all customers?

8        A.    Yes.

9        Q.    I think you cited to page 185 of

10   the document, Bates number 185?

11       A.    That is one of the pages, yes.

12       Q.    Let's go to that page of the in

13   the note here it says 20 percent discount is

14   proposed, do you see that?

15       A.    Yes.

16       Q.    Turn to the next page the title

17   here is a niche boutique refurbishing program.

18   Did you take this title into account when

19   considering that the discount that you think

20   would have been offered through medical device

21   would apply for all customers?

22       A.    I took a the whole document into

23   accountment I don't think this indicates I

24   wouldn't have applied it to any hospital that

25   wanted to buy under it.


                              206

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        Q.    So what was your understanding of

3    what miss Scoville meant in this document when

4    she said that it was a niche boutique

5    refurbishing program?

6        A.    I'm not what those phrases mean in

7    this context.

8        Q.    But you assumed that the

9    refurbished instruments would have been

10   available under the program to all purchases at

11   a discount being correct?

12       A.    I thought compared to the 25, 40

13   percent did he say you count this was a more

14   conservative one to use so I used this one.

15       Q.    You said you took the whole

16   document into account in reaching your

17   conclusions; correct?

18       A.    Yes.

19       Q.    Can you turn to document with the

20   Bates number ending in the same document, 201,

21   please.

22       A.    Okay.

23       Q.    So this slides regional marketing

24   and sales strategies, do you see that?

25       A.    Yes.


207

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        Q.    You see there is columns for

3    Germany, France, and the U.S., do you see that?

4         A.   I have to expand it so I can see

5    it.

6              MR. SNYDER:   It is very small on

7         mine.

8         A.   Okay, yes, Germany, France and

9    U.S.

10        Q.   You see there is a row on the left

11   that says discount.  Do you see that?

12        A.   Yes.

13        Q.   You see it says Germany 20

14   percent, correct?

15        A.   Yes.

16        Q.   And you see it says France 20

17   percent, correct?

18        A.   Yes.

19        Q.   Under U.S. it does not say 20

20   percent, does it?

21        A.   No it doesn't say 20 percent, no.

22        Q.   It says enterprise solutions will

23   vary, correct?

24        A.   Yes.

25        Q.   It says at the time the top here

208

1    UNCERTIFIED-UNEDITED ROUGH DRAFT

2      measure to me.

3          Q.    You understand that this

4      document is later in time than the document

5      that you just referenced, correct?

6          A.    Yes.

7          Q.    You understand that the document

8      does not use 20 percent, correct?

9          A.    It does use --

10         Q.      -- for the U.S.

11         A.      It doesn't say it in this

12     particular page that it would be 20 percent.

13     But the thrust of it that's what the overall

14     economic impact is.  And I think other parts of

15     the page suggest that I think it is same

16     economic impact.  Just on this particular page

17     they are talking about potential user, there

18     are back up slides potentially having a

19     different strategy in the U.S. on the

20     specifics.  I don't think that alters the

21     overall thrust of what sort of discount they

22     thought would be appropriate at that time.

23         Q.    They could have put 20 percent

24     here, correct?

25         A.    They could have, yes.

1    UNCERTIFIED-UNEDITED ROUGH DRAFT

2        Q.    And they did not, correct?

3        A.    On that page, they did not.  Under

4    the U.S. column.

5        Q.    Do you understand what it means

6    when it says enterprise solutions?

7        A.    I think it means the agreements

8    with different enterprises could vary.

9        Q.    So that means they this weren't

10   contemplate on applying any price across the

11   but for world in the U.S., correct?

12            MR. SNYDER:  Fox.

13       A.    Well, you mean the options here

14   the first one says it is going to be -- they

15   may have a different solution of the flat

16   procedure pricing they may charge per use per

17   procedure rather than charge per EndoWrist and

18   cap the usage.

19       Q.    That is under the volume

20   requirements row, correct?

21       A.    It is all one merged box it seems

22   to me, they merged what was divided up as a

23   volume of premise discounts in the Germany and

24   France in this proposal, the U.S. they just

25   combined it all together.  They said instead of

211

18    using two different points of how to get there?

19        A.    Well, in terms of the but for

20    price affect I'm relying on Abbott benchmark.

21    And Abbott as I point out has a mix of

22    contestable and incontestable, so that is

23    another reason why I would apply across the but

24    for world.

25            If we are just talking about, this


232

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    goes to the issue of with services do you apply

3    the discount to.  So I have two different

4    theories for saying the discount applies to all -- I

5    guess it's three theories, it applies to all

6    the services.  One is that the benchmark itself

7    an Abbott benchmark that has contestable and

8    incontestable sales.  The other possibilities

9    that even with the Abbott discount only applies

10    to contestable sales.  There is a charge for

11    the same service fee for both contestable and

12    incontestable so it would apply across the but

13    for world.  And then finally there is a

14    rationale by which the factfinder might

15    conclude that the fact that the technological

16    tie was illegal and therefore all the sales

17    would have been contestable in the but for

18    world.

19         Q.    For Abbott you said it had a mix

20    of contestable and incontestable services is

21    that right?

22         A.    Yes.

23         Q.    What is the incontestable service

24    for Abbott?

25         A.    I don't know if it's broken down


233

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    what exactly the incontestable services are,

3    but I think I point out there is evidence that

4    for every OEM there are certain things they

5    could do that rivals cannot do.  Let me see if

6    he can find exactly where I say that.

7              I point out that Abbott has a mix

8    of contestable and incontestable servicing in

9    paragraph 464 of my rebuttal report.

10   Unfortunately I didn't include the citation to

11    where I said that in my initial report.

12         Q.    You doesn't recall what the

13   incontestable services that Abbott can provide?

14         A.    No.

15         Q.    You said it is not unusual that

16   OEM goes are provide service that third-party

17    Rye party entities cannot, correct?

18        Q.    Did you examine the record with

19    respect to how Restore performed with the one

20    customer where it did perform service?

21        A.    I'm not sure it's true there is

22    only one customer, so I don't want to agree to

23    that.  But I did look at evidence on the

24    quality of service that they provided.

25        Q.    What was conclusion?


234

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        A.    That there no evidence to indicate

3    it was not as good a quality of service within

4    the scope of what they were able to do with

5    without the proprietary software.

6        Q.    Let's take a look at tab 75.

7    Which we will mark as the next exhibit.

8            (^ Exname ^  Exhibit  for

9        identification, .)

10       Q.    I believe it is 296?

11           MR. SNYDER:   That's what I have.

12           MS. BASS:   For the record this is

13       Intuitive-00008958 and we're marking this

14       as Defendants' Exhibit 286.

15       Q.    Feel free to take the time to

13   rival competition, whether it is safe or not.

14   Where as the hospital incentives are only to

15   not use rivals if they are unsafe.

16       Q.    Let me kind of go back to one of

17   questions that I asked earlier just to make

18   sure that I understand it.

19           Did you examine the record to

20   understand how Restore performed at Baylor

21   Scott & White.  We know they would performed

22   service for Baylor Scott & White, so did you

23   look at the record how things went with that

24   entity?

25       A.    I had my staff look at that and I


242

1           UNCERTIFIED-UNEDITED ROUGH DRAFT

2   think the best evidence that we ended up having

3   on that was evidence provided by Dr. Parnell.

4       Q.    Again, let's set aside the

5   technological tie claim.  Assume the jury don't

6   believe it.  You're still offering the opinion

7   that in the but for world that -- let me take a

8   step back.

9           Assuming no technological tie,

10   there is only a limited amount of service that

11   a third-party entity can performed in the but

12   for world, correct?

13   A.   Yes.

14   Q.   But you're assuming that the fact

15   that the third-party entities could potentially

16   perform service in the but for world would have

17   a price affect across what you call

18   incontestable and contestable service, correct?

19   A.   Either there is two vehicles to

20   get to that.  One is that it is going to lower

21   contestable sales and the incontestable sales

22   will have the is same price affect because they

23   price the same across them, Intuitive does.

24   The other is that really the 14

25   percent comes from Abbott.  And Abbott as an


243

1   UNCERTIFIED-UNEDITED ROUGH DRAFT

2   OEM also has a mixture of contestable and

3   incontestable sales.  So that the 14 percent

4   already takes into account the fact that rivals

5   are only able to constrain contestable sales if

6   you think they're price definitely.  So that

7   either way you get to the same conclusion that

8   14 percent is a good conservative estimate of

9   the price affect.

10   Q.   What is the size of Abbott

11   compared to Intuitive?

12        A.    The exact size I don't know.   But

13    I do conclude and Dr. Smith does not dispute

14    that Abbott the medical device OEM and the firm

15    most similar to Intuitive in terms of size in

16    in medical equipment repair and maintenance

17    service industry.  So their size may be

18    different but they are the most similar in the

19    same category to Intuitive.

20        Q.    In what areas does Abbott provide

21    service?

22        A.    In the medical equipment area.

23    Variety of medical equipment.

24        Q.    What type of medical equipment did

25    they provide service?


                            244

1          UNCERTIFIED-UNEDITED ROUGH DRAFT

2        A.    They have, let's see, I'd have to

3    check to confirm.  At least according to

4    Dr. Smith they have devices for the treatment

5    of cardiovascular disease, diabetes and

6    advancement of chronic pain and movement

7    disorders.

8        Q.    What was last one?

9        A.    Movement disorders.  These are I

10    guess neuromodulation devices that help manage

11   pain and I guess it must be spasms is my

12   inference.

13        Q.    What service does Abbott form in

14   each of those four categories?

15        A.    I don't know the technical details

16   of what kind of service they are providing in

17   terms of repairing or maintaining those

18   devices.

19        Q.    How many service technicians does

20   Abbott have?

21        A.    I don't know.

22        Q.    Do you know how many hospitals

23   Abbott services?

24        A.    I don't offhand number number of

25   hospitals they service.


                              245

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2        Q.    We talked about this a earlier,

3   you said you have a statement that Abbott

4   performs contestable and incontestable demand.

5   Do you recall examining the question of whether

6   incontestable services Abbott provides?

7             MR. SNYDER:   Objection.

8        A.    There is some support for the

9   overall population, but what the specific

10   services are, I don't recall anything on that.

9   the hypothetical of the service he that only

10   Intuitive could do in the but for world,

11   correct?

12       A.   In your hypothetical, yes.

13       Q.   So under the hypothetical where

14   there is certain services in the but for world

15   that only Intuitive can perform, you're

16   offering the opinion that Intuitive would drop

17   its prices on those services; is that right?

18       A.   Yes.  To observe the uniformity of

19   pricing for service.

20       Q.   In the but for world you think

21   that Intuitive would preserve the uniformity of

22   pricing preserve?

23       A.   It would do it in but for world as

24   well.

25       Q.   And your basis for that is because


249

1       UNCERTIFIED-UNEDITED ROUGH DRAFT

2   in the actual world, assuming that there is a

3   very small amount of services done on time and

4   material basis, Intuitive charges the same

5   hourly rate for those services it can perform

6   and services that others can perform, is that

7   the basis?

8       A.   Yes, they have this one rate

9   policy.

10      Q.    You think that Intuitive would

11   maintain that policy in the but for world?

12      A.    Yes I think whatever the rationale

13   for having that policy would continue to apply.

14   So I think and settle any evidence to the

15   contrary this he would maintain in in the but

16   for world.

17      Q.    Do you model how many customers

18   would be willing to use third-party service in

19   the but for world?

20      A.    I don't have a particular

21   percentage that would use it I'm relying on

22   price affect on Intuitive's own pricing.

23      Q.    So have you then considered the

24   issue of technicians, right, so have you

25   considered how the third-parties would agree to


250

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2   some sort of a sufficient scale in the but for

3   world?

4      A.    Like any company you have to grow

5   by hiring or training employees.

6      Q.    So is it your assumption that the

7   third-parties would keep hiring people from

2    section is my recollection.  But that I -- in

3    terms of output.

4         MS. BASS:   Let's being off the

5    record.

6         THE VIDEOGRAPHER:   The time is now

7    6:44 going off the record off the video

8    record.

9         (Recess taken)

10         THE VIDEOGRAPHER:   The time is now

11    7:05 back on the video record.

12    BY MS. BASS:

13    Q.    Professor Elhauge, I think we

14    talked about earlier today that you haven't

15    modeled was would be thought as kind of a

16    foreclosure percentage in this case; is that

17    right?

18    A.    No, the foreclosure percentage is

19    100 percent, I calculate that.

20    Q.    Have you it calculated which of

21    the hospitals you think would have purchased

22    from the third-parties in the but for world?

23    A.    I miss that question.

24    Q.    Have you calculated what

25    percentage of hospitals you think would have

263

1         UNCERTIFIED-UNEDITED ROUGH DRAFT

2    purchased from the third-parties in the but for

3    world?

4        A.    That is the but for market share,

5    that not the foreclosure share.  The foreclosure

6    share is a 100 percent and proper economic

7    methodology does not subtract from the

8    foreclosure share hospitals that would have

9    purchased from Intuitive in the but for world.

10   So it applies whether or not the hospital would

11   have bought from arrival in the but for world.

12       Q.    It is based off of your view that

13   even if a hospital would haven't ever purchased

14   from one of the third-parties, that the

15   hospital still foreclosed; correct?

16       A.    Yes, it still foreclosed because

17   its choice was foreclose and still leads to

18   adverse price affects that that hospital

19   suffers.

20       Q.    Can choice be foreclosed for

21   something that there is no demand for?

22       A.    Well if there is no demand by

23   anybody -- I mean -- the rationale for treating

24   foreclose is actually the best way to test that

25   is not to speculative arguments about what they

1        UNCERTIFIED-UNEDITED ROUGH DRAFT

2    would have done, but allowing a free market to

3    have them choose whether or not to go with the

4    rival.

5            But the threshold test that I do

6    apply is that some buyers want to purchase the

7    products un/PWURD.  There is some demand at

8    least for it.

9        Q.    You haven't attempted to measure

10    what the system demand would be, correct?

11        A.    There is some demand for the rival

12    product, so the choses are being restrained at

13    are in all the hospitals.  They are not free to

14    choose it and at lead to a price affect that

15    applies to all hospitals whether or not they

16    would bought from Intuitive in the but for

17    world.

18        Q.    You haven't made a attempt to

19    quantify what you mean by some hospitals that

20    would have purchased from the third-parties in

21    the but for world, correct?

22        A.    No, I show there is a range of

23    projections.  They all indicate substance sales

24    would be made by rivals.  But what the precise

25    percentage does not matter for my analysis

1       UNCERTIFIED-UNEDITED ROUGH DRAFT

2   because it is based upon a price affect, a

3   conservative measure of the price affect which

4   is the price affect even if the hospital

5   continued to purchase from Intuitive.

6       Q.    When you say estimate, those are

7   the one that we already covered today based off

8   Intuitive's own internal programs and the one

9   from Deutsche Bank and the one from Stryker;

10   correct?

11       A.    In terms of the but for share, in

12   in terms of price affect it is the Intuitive

13   Project Dragon estimates.

14       Q.    But you use the word substantial I

15   think in your prior answer regarding what you

16   think the third-parties would have been able to

17   garner in terms of share and I want to make

18   sure that I understand what you're referring to

19   when you said they are substantial estimates

20   and I wanted to make sure that's the --

21       A.    There is progressions that

22   indicate some substantial sharing would go to

23   rivals including by Stryker, by Intuitive and I

24   think you're right there was a industry analyst

25   maybe it was Deutsche Bank.  There is also the

269

1       UNCERTIFIED-UNEDITED ROUGH DRAFT

2    going to have a safety affect, it's not going

3    to have the anticompetitive affect it's just

4    not going to have not affect.

5            So to bother use the contracts

6    and the restraints and spend a lot of effort

7    enforcing them they have to think the

8    restraints were altering hospital choices.

9       Q.    Have you calculated a but for

10    market share for the third-parties?

11       A.    No, as I say in the report I

12    haven't calculated a precise but for market

13    share.  It's enough it seems from all the

14    projections it would be substantial.

15       Q.    Those are the projections that we

16    were just discussing?

17       A.    Yes apartment other evidence that

18    indicate that a significant number of hospitals

19    would choose to buy from rivals at a lower

20    price.

21       Q.    Whatever that evidence is would be

22    cited in your reports?

23       A.    Yes.

24       Q.    So you indicated earlier in one of

25    your responses that, I think you think of this