# ATTACHMENT 58

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN FRANCISCO DIVISION
                CASE NO.: 3:21-cv-03825-VC
 3
 4
    IN RE: DA VINCI SURGICAL ROBOT
 5  ANTITRUST LITIGATION,
 6
      _____/
 7
 8      DEPOSITION OF:   SANDRA SOSA-GUERRERO
 9      DATE:            Friday, September 23, 2022
10      TIME:            9:00 a.m. - 4:54 p.m.
11
        PLACE:           BUCKNER + MILES
12                       2020 Salzedo Street
                         Suite 302
13                       Coral Gables, Florida 33134
14
15      STENOGRAPHICALLY
        REPORTED BY:     VANESSA OBAS, RPR
16
17
18
19
20
21
22
23
24
25
```

Page 1

```
 1    the Larkin School of Nursing, am I right that you were
 2    the chief executive officer of the Larkin Community
 3    Hospital?
 4         A.   Yes.
 5         Q.   And you had been in that role for -- since
 6    2010?
 7         A.   Yes.
 8         Q.   And so is it -- is it true that the two
 9    complaints you just mentioned were filed at a time when
10    you were the CEO of Larkin?
11         A.   Yes.
12         Q.   Okay.  If I use the word "Larkin" today, can we
13    agree that I'm talking about the hospital?
14         A.   Absolutely.  Okay.
15         Q.   And I understand that -- when you were the CEO
16    of Larkin, did it have two different hospital campuses?
17         A.   At one point, it did.
18         Q.   Okay.  What point are you thinking of?
19         A.   I believe it was -- we purchased -- I don't
20    remember, but I think it was 2016 that we acquired Palm
21    Springs.
22         Q.   Okay.  Prior to purchasing Palm Springs in
23    around 2016, did Larkin have only one hospital campus?
24         A.   Yes.
25         Q.   And where was that?
```

1     A.    It's 7031 Southwest 62nd Avenue, South Miami,
2  Florida 33143.
3     Q.    Okay.  And then after Larkin purchased Palm
4  Springs, it continued to have the South Florida -- South
5  Miami campus you just mentioned?
6     A.    Yes.
7     Q.    Okay.  You also said to prepare for today, you
8  met with your attorneys.  Are you talking about
9  Mr. Corrigan and Mr. Love?
10    A.    I am.
11    Q.    Okay.  Was anyone else involved in that
12 meeting?
13    A.    Yes.  There was someone on the phone, but I
14 don't remember his name.
15    Q.    Was -- well, let me -- I'll ask you a question.
16    A.    Okay.
17    Q.    I'll help you with questions.
18    A.    Okay.  Help me with questions.
19    Q.    The person -- was there one person on the
20 phone?
21    A.    Yes.
22    Q.    Did you understand that person to be an
23 attorney?
24    A.    Yes.
25    Q.    And was that person an attorney with -- with a

Page 12

1    Q.   And do you see a list they price for each of
2    the two surgical systems?
3    A.   Yes.
4    Q.   And do you see that each one, there was a
5    discount listed; correct?
6    A.   Yes.
7    Q.   So the discount on the da Vinci Si-R was
8    $323,500; correct?
9    A.   Yes.
10   Q.   And the discount on the Xi was 150,000;
11   correct?
12   A.   Yes.
13   Q.   And the total discounts that -- that Intuitive
14   was offering was $473,500; correct?
15   A.   Yes.
16   Q.   Did you understand at the time that da Vinci --
17   that Larkin leased the two robotic surgical systems from
18   Intuitive that the lease was -- that Intuitive had
19   offered discounts to Larkin?
20   A.   Everybody uses -- gives us discounts.  This is
21   normal and standard in the community.
22   Q.   Did you -- do you have a recollection of asking
23   Intuitive for more discounts than what's listed here?
24   A.   I'm sure that people that negotiated this asked
25   for the most, because they're very aggressive, but

Page 100

```
 1    Jorge Isaac to you and Mark Early; correct?
 2        A.   Yes.
 3        Q.   And you write, "Sandy, see notes below for
 4    lease equipment -- lease of equipment pending review of
 5    licensing agreement, will follow later.  Da Vinci lease
 6    equipment."
 7             Did you see that?
 8        A.   Yes.
 9        Q.   And then, am I right, below that Mr. Isaac
10    provides some comments on the lease that was under
11    review from Intuitive; correct?
12        A.   Yes.
13        Q.   And if you look at the next page, you'll see
14    that you actually made the request to him.
15             You say, "Jorge, I need for you to look over
16    these documents for legality.  See below."
17             Did you see that?
18        A.   Yes.
19        Q.   And at this time, Mr. Isaac was an outside --
20    was at a law firm?
21        A.   Yes.
22        Q.   It was a law firm that Larkin used for legal
23    services?
24        A.   Yes.
25        Q.   And was Mr. Isaac one of the regular attorneys
```

Page 111

1    that you-all used?
2        A.   Yes.
3        Q.   And so your goal was to get his review of the
4    lease; correct?
5        A.   Yes.
6        Q.   And he provided various comments; correct?
7        A.   Yes.
8        Q.   And do you know whether any of these comments,
9    any of these proposed changes were made in the lease?
10       A.   I'm not sure if they were made.
11       Q.   Okay.  Did you personally have any comments on
12   the lease?
13       A.   No.  I don't know enough to -- to -- to get
14   involved with leases.  I usually give it to the lawyers
15   for legality.  I give it to Mark for the numbers.  And
16   then I give it to the operators for the operators -- I
17   mean, they give me information, but --
18       Q.   Right.
19            Did you ask Mr. Early to review the numbers
20   around the lease and the -- the lease for the surgical
21   robotic systems?
22       A.   Yes.
23       Q.   Do you recall what, if anything, he told you
24   about the numbers that he was seeing?
25       A.   Accountants don't like to buy anything.  So he

Page 112

1    told me, "Don't buy this."
2            So I said, "If I want to service, I have to buy
3    it."  So that's usually how our conversations went.
4        Q.   Okay.  Do you have a recollection of that
5    conversation around the robots?
6        A.   Yes.
7        Q.   Okay.  And did he provide any specific comments
8    about the numbers -- after you told him that wasn't
9    going to happen, that you were -- would need to provide
10   this service, did he then provide any specifics around
11   the numbers?
12       A.   He looked at them but didn't say anything to
13   discourage me from signing it.  And I -- if I believe
14   correctly, he signed this contract.  I don't know if I
15   signed this contract.
16       Q.   If you just wait around long enough, you'll
17   find out.  I promise.
18       A.   Yeah.  Yeah.  I don't remember.
19       Q.   You can put that one aside.
20       A.   Lots of e-mails.  That's why I don't really
21   like e-mails.
22            (Defendant's Exhibit Number 29,
23       LARKIN-00009238-00009243, was marked for
24       Identification.)
25

1  BY MR. LAZEROW:
2      Q.   I've now handed you what's been marked for
3  identification purposes as Defendant's Exhibit 29.  It's
4  Bates-labeled Larkin 9238 through 9243.
5           If you look at the very top of the first page,
6  you'll see there's an e-mail from Jody at Intuitive
7  Surgical to yourself and others dated June 2nd, 2017.
8           Do you see that?
9      A.   Yes.
10     Q.   Okay.  And this is an e-mail you received from
11 someone at Intuitive Surgical on June 2nd, 2017, with
12 the subject "da Vinci follow-up Larkin"; correct?
13          Is that correct?
14     A.   Yes.
15     Q.   Okay.  If you go to the second page, you'll see
16 an e-mail -- it's on the second page, not the back page.
17     A.   Okay.
18     Q.   There you go.
19          Do you see an e-mail from yourself right in the
20 middle, May 21st, 2017, at 4:32 p.m.?
21     A.   Yes.
22     Q.   And this is -- should look familiar.  It says
23 "See below from our attorney"?
24     A.   Where's the note?
25     Q.   And then that's the notes in the lease.  Do you

Page 114

1  see that?
2      A.  Yes.
3      Q.  Okay.  And then you'll -- if you go up in time,
4  you'll see the person from Intuitive writes:
5          "Afternoon, Jorge.
6          "Thanks for sending over the lease agreement
7  redlines.
8          "Would you be able to get me the redlines of
9  the use licensing agreement TNCs today?"
10         Do you see that?
11     A.  Yes.
12     Q.  Okay.  And then if you go here -- go to the
13 next e-mail in time, other way -- this way, towards the
14 first page.
15     A.  Towards the first page?
16     Q.  Yeah.
17     A.  Okay.
18     Q.  There's an e-mail you'll see from Jorge Isaac
19 at 2:30 p.m. on June 2nd, 2017, to Intuitive, copying
20 yourself.
21         Do you see that?
22     A.  Yes, uh-huh.
23     Q.  And he writes, "No redline in the licensing
24 agreement from my end."
25         Do you see that?

Page 115

1    A.    Yes.
2    Q.    So Mr. Isaac did not have any comments on the
3    licensing agreement; correct?
4    A.    That's right.
5    Q.    Did you have any comments on the licensing
6    agreement?
7    A.    I'm not an expert on licensing agreement, so I
8    depend on these people.
9    Q.    Okay.  So you did not make any comments on the
10   licensing agreement?
11   A.    I didn't make any comments.
12   Q.    Okay.  Did Mr. Early make any comments on the
13   licensing agreement?
14   A.    I wouldn't know.
15   Q.    Okay.  Did anyone -- do you know whether anyone
16   at Larkin provided comments on the licensing agreement?
17   A.    It would just be Mark, the lawyer, and us.
18   Q.    Okay.
19   A.    We didn't dilute it at that point, because we
20   wanted to get it going quickly.
21   Q.    Did Mr. -- was -- did anyone send the draft of
22   the licensing agreement to Mr. Gonzalez?
23   A.    I don't think so.
24   Q.    Okay.  So you -- sitting here today, you don't
25   have a recollection if Mr. Gonzalez provided comments on

Page 116

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF MIAMI-DADE:

I, VANESSA OBAS, RPR, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of SANDRA SOSA-GUERRERO; that a review of the transcript was requested; and that the foregoing transcript, pages 7 through 260, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 7th day of October, 2022.

*[signature]*

VANESSA OBAS, RPR

Page 262