ATTACHMENT 64

**From:** Dwyer Margaret <Margaret.Dwyer@franciscanalliance.org>

**To:** "andy.stoner@intusurg.com" <andy.stoner@intusurg.com>

**Cc:** Downes Pat <Pat.Downes@franciscanalliance.org>, Coram Stephanie <Stephanie.Coram@franciscanalliance.org>, Conner Daniel <Daniel.Conner@franciscanalliance.org>, Schimmel Judith <Judith.Schimmel@franciscanalliance.org>, Waninger Karen F <Karen.Waninger@franciscanalliance.org>, Nichols Rick <Rick.Nichols@franciscanalliance.org>

**Subject:** Intuitive Surgical/Franciscan Alliance - Master Sales, Use, License, and Service Agreement

**Date:** Fri, 24 Jul 2020 18:46:38 -0500

**Importance:** Normal

**Attachments:** Intuitive-Franciscan-Master_Agmt_(Dwyer_REDLINE_07-24-20).docx

---

Andy:


My name is Margaret Dwyer and I am a Contract Specialist at Franciscan Alliance.  I am assisting Judy Schimmel and our attorney with this contract matter.  Attached the Master Sales, Use, License, and Service Agreement containing our proposed revisions.  Please review and let us know your thoughts.  We also need the following information:


1. the system move form referenced in Section 3.5 and Exhibit D (it was not attached to the draft contract we received for review); and


2. rebate language added to the contract for our review (we want this contract to include rebates).


Thank you.


Margaret


**Margaret Dwyer, MBA | Contract Specialist**
**Office of Legal and Regulatory Affairs**
**FRANCISCAN ALLIANCE, INC.**
*Inspiring Health*

**1500 Albany Street | Beech Grove, IN  46107**
**(317) 782-6247 | margaret.dwyer@franciscanalliance.org | www.franciscanhealth.org**

**Exhibit**
**Defs 0004**

CONFIDENTIAL

FRANCISCAN-00052149

## MASTER SALES, USE, LICENSE, AND SERVICE AGREEMENT

Agreement No.: _____

This Master Sales, Use, License, and Service Agreement ("Master Agreement") is dated August _____ 2020 (the "Effective Date") and is between **Intuitive Surgical, Inc.**, a Delaware corporation ("Intuitive"), located at 1020 Kifer Road, Sunnyvale, California 94086, and **Franciscan Alliance, Inc.** with offices located at 1515 Dragoon Trail Mishawaka, IL 465441500 Albany Street, Beech Grove, Indiana 46107 ("Organization") on behalf of the Eligible Buyers (defined below).

**The parties agree as follows:**

**1.    Introduction**

Organization agrees that each Participant will be bound to the terms and conditions of this Master Agreement as evidenced by a signed Transaction Agreement (defined below). Upon the signing by a Participant of a Transaction Agreement, the Participant agrees to purchase the Hardware and license the Software and Documentation from Intuitive, and Intuitive agrees to respectively sell and license the same to Participant, as well as provide Service for the System all according to the terms and conditions of this Master Agreement and the Transaction Agreement.

**2.    Definitions**

2.1    **"Acceptance"** means Participant's acceptance of the System as specified in the Transaction Agreement, or Lease Agreement.

2.2    **"Delivery Date"** means the estimated scheduled date for delivery of the System to Participant specified in the Transaction Agreement, or Lease Agreement.

2.3    **"Participant"** means Organization and any party that is part of, affiliated with, owned by, or controlled by the Organization and may purchase or lease under this Master Agreement. A list of Participants is attached, made a part hereof, and marked as Exhibit A to this Master Agreement.

2.4    **"Instruments and Accessories"** means those instruments or accessories made or approved by Intuitive for use with the System.

2.5    **"Proctoring"** means the assistance, coaching, or surgical training provided by a surgeon (the "Proctor") who is familiar with the System to another surgeon (the "Proctee") on how to perform a particular surgical procedure (or procedures) using the System.

2.6    **"Services"** means the support and maintenance of the System described in Section 5 for the Service fees designated in the Transaction Agreement.

2.7    **"System"** means the items comprising the da Vinci® Surgical System specified in the Transaction Agreement consisting of certain hardware components ("Hardware"), software program elements ("Software") and related manuals, labeling, instructions for use, notifications or other documentation ("Documentation"), that Participant may receive, purchase and license under this Master Agreement and the associated Transaction Agreement. If Participant purchases multiple Systems under this Master Agreement and an associated Transaction Agreement, all references to "System" or "System(s)" apply to each System sold and licensed. Each System purchased is a separate transaction to be delivered, accepted, and paid for separately.

2.8    **"Taxes"** means any taxes, levies, or similar governmental charges, now in force or enacted in the future, and however designated, including related penalties and interest, imposed by any governmental authority on, or measured by, the activities described.

2.9    **"Transaction Agreement"** means a separate agreement executed between Intuitive and a Participant detailing the terms of a transaction and binding the Participant to the terms of this Master Agreement and the Transaction Agreement. An example of a Transaction Agreement is attached as Exhibit B.

Franciscan Alliance:
Rev date: 31Oct2019
MA-_____

CONFIDENTIAL                                                  FRANCISCAN-00052150

2.9 "**Lease Agreement**" means a separate agreement executed between Intuitive and a Participant detailing the terms of a transaction and binding the Participant to the terms of this Master Agreement and the Lease Agreement. An example of a Lease Agreement is attached as Exhibit C.

2.9~~10~~ "**Participant's Access Requirements**" means any reasonably applicable requirements designated by Participant that Intuitive personnel must meet to gain access to Participant's facility. Such requirements may include, but are not limited to, compliance with Participant's site policies and vendor credentialing requirements, such as vaccination, immunization, background investigation, training, hospital orientation, and liability insurance coverage.

2.11 "**Procedures by 3DS Annual Subscription**" means the Subscription Service offered by Intuitive for use with the daVinci® Skills Simulator. The da Vinci® Skills Simulator Procedures by 3DS Annual Subscription is governed by the terms of Exhibit ~~D~~C to this Master Agreement.

2.12 "**Reprocess" or "Reprocessing**" means Participant's process for cleaning, disinfection, and sterilization of Instruments and Accessories, including testing to validate cleaning, disinfection and sterilization process as may be required by applicable law and/or regulation.

3. **System Delivery, Use, Relocation and Disposal**

3.1 **Delivery and Installation.** Subject to credit approval of Participant by Intuitive, Intuitive will use commercially reasonable efforts to deliver the System on or before the Delivery Date. Each of Intuitive and Participant will provide the other party with thirty (30) days' notice, or if the applicable Transaction Agreement is executed within thirty (30) days before the Delivery Date, a reasonable advance notice of any change in the Delivery Date. Participant will fully cooperate with Intuitive to permit Intuitive to install the System. Intuitive will use commercially reasonable efforts to install the System in an efficient and expeditious manner. Participant will also provide Intuitive with information, consultation, and advice reasonably necessary to permit installation.

3.2 **Delivery Terms.** Intuitive will deliver the System to Participant's designated location noted as the "Ship-to" in the Transaction Agreement using a carrier selected by Intuitive. Fees for shipping the System will be specified in the Transaction Agreement. Risk of loss or damage to the System passes to the Participant upon delivery of the System to Participant. Title to the System passes to the Participant upon Acceptance.

3.3 **On-Site Support.** At no charge to Participant, Intuitive will provide periodic on-site support to Participant's designated personnel on the proper operation and upkeep of the System in order for Participant to operate the System as further described in Section 3.4. To clarify, this support includes, but is not necessarily limited to, training on draping the System for use in surgery, proper attachment of Instruments and Accessories, and cleaning of parts of the System and the Instruments and Accessories. The cleaning to be performed regularly by Participant is described in the Documentation.

3.4 **Use of System.** Participant will ensure the proper use of the System consistent with the Documentation, and Participant will ensure the proper management and supervision of the System. Participant will not~~, nor will Participant permit any third party to,~~ modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. Prohibited actions include, but are not limited to: (1) adding or subtracting any Participant or third party equipment, hardware, firmware, or software to or from the System, or (2) reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software as originally provided to Participant as part of the System without Intuitive's express written permission. Participant will ensure that the System is moved and operated only by trained personnel in accordance with the Documentation and Intuitive's instructions. If Participant fails to comply with the requirements of this Section 3.4, Intuitive may terminate the associated Transaction Agreement immediately upon written notice, and any warranties applicable to the System will become void.

3.5 **Relocation of System.** Prior to relocating a System from a Participant's facility to another Participant's facility, Participant and Intuitive must sign a System Move Letter or Assignment and Assumption agreement the forms of which are attached hereto, made a part hereof, and marked as Exhibit D to this Agreement.

> **Commented [FA1]:** FRANCISCAN ALLIANCE: Please send us this form so we can review it.

3.6 **Reprocess and Disposal.** Participant is responsible for properly Reprocessing and/or disposing of all medical instruments, devices, and systems related to the operation and function of the System, including Instruments and

Accessories, in accordance with the Documentation and the then current local environmental and safety laws and standards.

**4.     Software License and Restrictions**

Software embedded within the System is provided under license and is not sold to Participant.  Subject to the terms and conditions of this Master Agreement, Intuitive grants to Participant a non-exclusive, non-transferable, fully paid, restricted use license to use the Software solely as incorporated in the System in machine-executable object code form and solely in connection with the operation of the System as described in the Documentation.  Participant must not use, copy, modify, or transfer the Software or any copy thereof, in whole or in part, except as expressly provided in this Master Agreement.  In addition, Participant must not reverse engineer, decompile, disassemble, attempt to derive the source code for, or otherwise manipulate the Software, except that manipulation of the Software is permitted if, and then only to the extent that, the foregoing prohibition on manipulation is required to be modified by applicable law. In that case, Participant must first request from Intuitive the information to be sought from the Software, and Intuitive may, in its discretion, provide information to Participant under good faith restrictions and impose reasonable conditions on use of the Software.  The structure and organization of the Software are valuable trade secrets of Intuitive and Participant will protect the Software as Intuitive's Proprietary Information (as defined in Section 13).  Intuitive reserves all rights to the Software not expressly granted to Participant. Some components of the Software may be provided to you under a separate license, at no additional fee, such as an open source license. In the event of a conflict between this Agreement and any such separate license, the separate license will prevail with respect to the component that is the subject of such separate license.

**5.     Services**

5.1     **Services Included.**  If Participant is current in payment to Intuitive of the Service fees specified in the Transaction Agreement, Intuitive, directly or through one of its designated service providers, will provide Services to Participant as listed below. Intuitive will use parts sourced by Intuitive, which may, at Intuitive's discretion, include reconditioned parts, ("Equivalent to New" or "ETN").  ETN parts are components, assemblies, or partial products which have had prior usage, but have been inspected, reworked, and tested as required so that their function, performance, and appearance will be essentially equivalent to that of new parts.  Regardless of whether parts are new or ETN, Intuitive's appropriate warranties under Section 10.1(A) apply.

Intuitive will:
(A)     Adjust parts on the System from time to time;
(B)     Replace defective or malfunctioning System parts (excludes Instruments and Accessories; and any items contained in the Instrument Starter Kit, Camera Starter Kit, and Training Instrument Starter Kit set forth in the Transaction Agreement);
(C)     Repair System operational malfunctions;
(D)     Replace and install Software, Hardware, and mechanical equipment for safety and reliability;
(E)     Provide twenty four (24) hours per day, seven (7) days per week (24 x 7) telephone support by qualified service personnel;
(F)     Provide and install Software upgrades for feature enhancements. Software upgrades and Service with respect to additional equipment not included on the Transaction Agreement may be subject to separate terms to be agreed upon by the parties;
(G)     Provide preferred pricing and next day service repairs or replacement due to accidental damage, caused by Organization or its Participant, on endoscopes and camera heads;
(H)     Respond to Participant's request for Services described in Section 5.1(B)-(C) during normal business hours as promptly as is reasonable after Intuitive's receipt of Participant's request, but not later than twenty-four (24) hours after Intuitive's receipt; and
(I)     Perform System preventative maintenance inspections as necessary to maintain factory specifications.
(J)     Provide on-site visits for support of advanced training of Participant's personnel on sterile Reprocessing process.
(K)     When the system is connected to OnSite®, remotely monitor system to diagnose potential issues and proactively dispatch a Field Service Engineer to make repairs when needed.
(L)     Provide access to the da Vinci Surgery Customer Portal.

5.2     **Limitations on Services.**

CONFIDENTIAL                                                                                        FRANCISCAN-00052152

(A)     **General**.  Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician or an individual approved by Intuitive or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of unauthorized repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration, or misuse of the System, or negligence or recklessness on the part of Participant.

(B)     **Cleaning**.  Regular daily cleaning of the System as described in the Documentation is not included in the Services.

(C)     **Additional Equipment**.  Intuitive's Services obligations do not include the provision to Participant of any hardware developed by Intuitive that is not contained in the initial System purchased by Participant, and which Intuitive offers as a separate product or for an additional fee.

(D)     **Time and Materials**.  If the System needs repair or maintenance services due to any of the circumstances described in Section 5.2(A)-(B) above, Intuitive may, at its sole election, provide repair services at Participant's expense and at Intuitive's then current time and material rates.  Intuitive is not obligated to provide Services on any System for which any applicable warranty has been voided, or for which the performance of Services is otherwise excused by the terms of this Master Agreement or the associated Transaction Agreement.

(E)     **Unauthorized Instruments and Accessories**.  The System is designed for use only with the Instruments and Accessories.  If Participant uses the System with any surgical instrument or accessory not made or approved by Intuitive, Intuitive may discontinue Services, and any warranties applicable to any Services provided prior to any discontinuance will be void.

5.3     **Participant's Obligations.**

(A)     **Notice, Access, and Cooperation**.  Participant will notify Intuitive or Intuitive's designated service provider of any requests for Services.  Participant will fully cooperate with and assist Intuitive in the provision of Services.

(B)     **Clinical Liaison**.  Participant will designate one of its employees, agents, or representatives as a "Clinical Liaison."  The Clinical Liaison will be the point of contact with Intuitive for installation, Services, use of the System, and other related issues.  Nothing in this Section 5.3 authorizes Participant or the Clinical Liaison to perform Services or to perform any act otherwise prohibited by this Master Agreement or an associated Transaction Agreement.

6.     **Training**

Intuitive offers training to surgical personnel on the use and operation of the System. At Participant's request, at mutually agreed times and at  mutually agreed locations, Intuitive will provide training in the use of the System to Participant's surgical personnel in accordance with the terms specified in the Transaction Agreement.

7.     **Proctoring**

At Participant's request, and upon Participant's issuance of a purchase order, Intuitive will arrange for Proctoring at Participant's location in accordance with the terms specified in the Transaction Agreement. Each Proctor is an independent contractor, is not an agent or employee of Intuitive, and is not authorized to act on behalf of, or legally bind, Intuitive. Intuitive is not responsible for Proctoring services provided by Proctors. The decision to utilize a Proctor is solely that of the Participant. Participant is responsible for ensuring that each Proctor meets Participant's credentialing requirements.

8.     **Instruments and Accessories**

Instruments and Accessories will be made available to Participant from Intuitive pursuant to separate orders placed by Participant to Intuitive from time to time in accordance with the terms and conditions contained in the then current Instrument and Accessory Catalog.  Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System.  Participant is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after

CONFIDENTIAL                                                                         FRANCISCAN-00052153

the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation.  This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.  Participant may purchase Instruments and Accessories for the purpose of Participant's Reprocessing requirements.  The cost of Instruments and Accessories used in Participant's Reprocessing, including Instrument and Accessories used or involved in destructive testing, will be the responsibility of the Participant.  Participant may contact Intuitive's Participant Support Department if, during the Reprocessing, Participant experiences results unacceptable under applicable law and/or regulation. Intuitive will provide commercially reasonable assistance in such investigations and remediation efforts but shall not be obligated to conduct or pay for such studies or provide materials at no cost or reduced cost as a condition of purchase or continued use.

**9.**   **Pricing and Payment Terms**

    9.1   **System.**

        (A)   **Price.**  Participant will pay to Intuitive the price specified in the Transaction Agreement for the System acquired under the Transaction Agreement according to the payment terms in the Transaction Agreement. The issuance of a purchase order by Participant is for the convenience of the Participant solely; therefore, whether or not Participant issues a purchase order does not affect Participant's commitment to acquire and pay for the System under this Master Agreement and the associated Transaction Agreement. ~~If the System is being leased then the Participant will pay the "Periodical Lease Payments" as indicated in the Lease Agreement for the lease of the System. At the termination of the Lease Agreement, the terms and conditions applicable to end of lease options are set forth in the Lease Agreement.~~

        (B)   **Payment Terms.** Payment terms for the purchase of the System will be specified in the Transaction Agreement.

        (C)   **Security Interest.** Intuitive will retain a security interest in the System until payment of the full System purchase price has been received by Intuitive.  Participant will perform all acts Intuitive reasonably determines are necessary or appropriate to perfect and maintain the security interest.  If Participant defaults in its payments for the System, Intuitive has the right, without liability to Participant, to reclaim the System.

    9.2   **Services.**

        (A)   **Price.**  Participant will pay for the Services at the price specified in the Transaction Agreement.  The issuance of a purchase order by Participant is for the convenience of the Participant solely; therefore, whether or not Participant issues a purchase order does not affect Participant's commitment to pay for Services under this Master Agreement and the associated Transaction Agreement during the Initial Term (as defined in Section 14). ~~If the System is being leased, then either (i) the price of annual Services is included in the "Periodical Lease Payments" amount as indicated in the Lease Agreement; or (ii) the price of annual Services is not included in the Periodical Lease Payments, and Participant may pay for the Services separately at the price specified in the Lease Agreement. If, after the term of the lease, Participant purchases the System from Intuitive under the applicable terms and conditions of the Lease Agreement, Participant will pay for the Services at the price specified in the Lease Agreement.~~ The issuance of a purchase order by Participant is for the convenience of Participant solely; therefore, whether or not Participant issues a purchase order does not affect Participant's commitment to pay for Services under this Agreement during the Initial Term (as defined in Section 14).

        (B)   **Payment Terms**.  Payment terms for the purchase of Services will be specified in the Transaction Agreement. ~~If the System is being leased and unless as otherwise indicated in the Lease Agreement, Intuitive will deliver to Participant an invoice for the annual Services fee thirty (30) days prior to the first anniversary of Acceptance and each subsequent anniversary of Acceptance throughout the Initial Term of the Agreement.~~ Participant will pay the invoice for Services not later than ~~thirty (30)~~forty-five (45) days after the date of invoice. In the event Participant requires a purchase order to be referenced on a Service invoice to facilitate payment, Participant will provide Intuitive with a purchase order number sixty (60) days prior to each anniversary of Acceptance. ~~Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable~~

CONFIDENTIAL            FRANCISCAN-00052154

~~law, whichever is lower.~~ After the Initial Term of the Agreement, and subject to mutual written agreement, annual Services may be renewed at ~~Intuitive's then current list~~ prices~~.~~ no more than the lesser of the following amounts:

    (a)    three percent (3.0%) of the prices due for the preceding Initial Term or renewal Services term; or

    (b)    the increase in the Consumer Price Index for All Urban Consumers (CPI-U) for the preceding Initial Term or renewal Services term.

9.3    **Funding Entity.**

A funding entity ("Funding Entity") may provide the funding for Participant to purchase the System defined herein, provided however, Participant remains responsible for payment in full according to the terms of this Master Agreement and the associated Transaction Agreement if Funding Entity fails to pay.  A Funding Entity will have no rights or obligations whatsoever under this Master Agreement or the associated Transaction Agreement, except as specified in this Master Agreement or the associated Transaction Agreement. Participant acknowledges and agrees that once Acceptance has occurred and title of the System has passed to the Participant, if Participant subsequently enters into an arrangement with a Funding Entity, then Participant will enter into an agreement ~~(such as a sale and lease-back agreement)~~ directly with the Funding Entity that does not involve Intuitive.  Intuitive will not reverse the sale of the System to Participant in order to sell it to another entity, including but not limited to a Funding Entity.

9.4    **Taxes.**

Participant will be deemed to be Taxable until such time as ~~customer~~Organization provides the Intuitive tax department with the appropriate, fully executed tax exemption certificate as directed below: Attn: Tax Department, Intuitive Surgical, Inc., 1020 Kifer Road, Sunnyvale, CA 94086; fax number: 408-523-1390; email at TaxEmail@intusurg.com.

9.5    **Organization's Guarantee.**

Organization hereby guarantees to and for the benefit of Intuitive the full and timely performance of the payment obligations of each Participant under this Master Agreement and each associated Transaction Agreement when and if such obligations become due according to the terms of this Master Agreement and associated Transaction Agreement (each an "Obligation"). Organization's guarantee under this Section 9.5 with respect to each Obligation shall continue in full force and effect until each such Obligation has been discharged.

**10.**    **Warranty and Disclaimer**

10.1    **System Warranty.**

    (A)    Intuitive warrants to Participant that:

        (1)    the System as delivered will be free and clear of all liens and encumbrances (except as otherwise specified in this Master Agreement and the associated Transaction Agreement), and

        (2)    for the period specified in the Transaction Agreement~~, or the Lease Agreement ,~~ will be free from defects in material and workmanship and will conform in all material respects to the Documentation when used in accordance with the Documentation and Intuitive's instructions.

    (B)    Intuitive's obligations under this Section 10.1 are limited to the repair (as further described in Section 5.I(B)-(C)) or, at Intuitive's option, replacement of all or part of the System.

    (C)    This warranty is void with respect to any claims:

        (1)    due to any installation, repair, adjustment, modification, disassembly, alteration, reconfiguration, addition to, subtraction from, or misuse of the System by Participant or any third party without the express written permission of Intuitive; or

CONFIDENTIAL        FRANCISCAN-00052155

(2)    to the extent  Participant has not operated, repaired, or maintained the System in accordance with the Documentation or any reasonable handling, maintenance, or operating instructions supplied by Intuitive; or

(3)    to the extent  Participant has used the System with surgical instruments or accessories that are not Instruments or Accessories ~~approved by Intuitive~~; or

(4)    to the extent Participant or Participant's employee, agent, or contractor has subjected the System to unusual physical or electric stress, misuse, abuse, negligence, or accident.

(D)    The foregoing expresses Participant's ~~sole and exclusive~~ remedy, and Intuitive's ~~sole and exclusive~~ liability, for any breach of warranty with respect to the System by Intuitive.

10.2    **Services Warranty.**  Intuitive warrants that the Services will be performed consistent with generally accepted industry standards. If Intuitive breaches this warranty, Participant's ~~sole and exclusive~~ remedy will be to require Intuitive to re-perform the Services.

10.3    **Virus Warranty.**  Intuitive warrants that the System, including open source code required to operate the System, does not contain any software "viruses" or "key lock" mechanisms and that none will be introduced into the System by Intuitive or its successors.  Intuitive agrees to maintain the System, at no additional charge to Organization, so it is compatible with current, supported third-party operating systems, third-party software needed to operate the System, and the workstation components of the System are compatible with Intuitive-approved off-the-shelf anti-virus products.  Support upgrades and maintenance required to maintain this compatibility will be provided at no additional charge to Organization with a service or maintenance agreement with Intuitive.  Organization will purchase and install suitable anti-virus software on its workstations.  For these purposes, "viruses" means any computer viruses, bugs, Trojan horses, worms, "easter egg," time bombs, traps, access codes, key locks, encoded or embedded serial number, timeout or any similar or dissimilar disabling device or characteristic in the source codes of the System or elsewhere, or other contaminants in any computer code which:

(a)    are designed to disrupt, disable, harm or otherwise impede in any manner, including aesthetical disruptions or distortion, the operation of the System;

(b)    would disable the System or impair in any way its operation based on the payment or non-payment of any fees due, elapsing of a period of time, exceeding an authorized number of copies or use sessions, advancement to a particular date or other numeral; or

(c)    would permit Intuitive to access the System after the termination of this Master Agreement to cause such disablement or impairment or any other similar harmful, malicious or hidden procedures, routines or mechanisms which would cause such programs to cease functioning or to damage or corrupt data, storage media, programs, equipment or communications, or otherwise interfere with operations.

10.4    **Critical Security Release, Update, and Upgrade Warranty.**  Intuitive warrants that it will provide to Organization a release, update, or upgrade to critical security vulnerabilities found in the System immediately, but in no case later than sixty (60) days after the date of such release, update, or upgrade.  Within 180 days of the general release of software updates or upgrades from any third party software vendor (operating system, database, etc.) used by Intuitive's solution, Intuitive will make available a release of its software compatible with such third party software.  Support updates or upgrades and maintenance required to maintain the above compatibility with be provided at no additional charge to Organization with a service or maintenance agreement with Intuitive.

10.3~~5~~    **No Other Warranties. INTUITIVE MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SYSTEM OR SERVICES PROVIDED HEREUNDER AND THIS TRANSACTION, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND NON-INFRINGEMENT.  SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF IMPLIED WARRANTIES; THEREFORE, THE ABOVE LIMITATION WILL APPLY ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

CONFIDENTIAL

FRANCISCAN-00052156

**11.    Indemnification**

11.1    **Intuitive's Indemnification Obligations.**

(A)    **Intellectual Property Indemnification.** Intuitive will indemnify ~~Participant~~Organization against all liabilities, expenses, or damages in connection with any third party claim that the System infringes any third party patent, trade secret, or copyright. If ~~Participant~~Organization is enjoined from the use of the System due to any such third party claim, Intuitive will promptly, at its option and expense, either (1) substitute the System or any part thereof with non-infringing material that will perform substantially in accordance with the Documentation; or (2) obtain the right of ~~Participant~~Organization to continue to use the System; or (3) remove the System and refund to ~~Participant~~Organization the purchase price of the System less reasonable depreciation.

(B)    <u>Intellectual Property</u> **Indemnification Limitations.** Intuitive has no obligation under this Section 11.1 to the extent any claim of infringement is based upon or arises out of: (1) any modification to the System if the modification was not made directly by Intuitive or through its designated service provider; or (2) the use or combination of the System with any hardware, software, products, data or other materials not specified, provided or approved by Intuitive.

(C)    **THE PROVISIONS OF THIS SECTION 11 STATE THE SOLE AND EXCLUSIVE OBLIGATIONS OF INTUITIVE FOR ANY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT.**

11.2    **~~Participant~~Organization's Indemnification Obligations.** Intuitive will not be liable for, and ~~Participant~~Organization will indemnify and hold Intuitive harmless from and against, any claims or damages caused by ~~Participant~~Organization's failure to comply with the requirements of Sections 3.4 (Use of System) or 3.6 (Reprocess and Disposal).

11.3    **Claim Notification Requirement.** A party's indemnification obligations under this Section 11 will not apply unless the indemnified party promptly notifies the indemnifying party of the claim as soon as the indemnified party became aware of it. The indemnifying party will have the right to control the defense or settlement of any claim at its cost and with its choice of counsel. The indemnified party will provide all reasonable cooperation to assist the indemnifying party in the defense or settlement of the claim.

<u>11.4</u>    <u>**Intuitive's Indemnification Obligations.**  Intuitive will indemnify and hold Organization and each of its Participants, officers, employees, directors, subcontractors, agents and representatives harmless from and against any and all claims, losses, costs, damages, or expenses, including reasonable attorneys' fees, that arise out of any defect in the System or arise out of any actions or omissions by Intuitive, or any of its officers, employees, directors, agents or representatives, which arise out of its performance of this Agreement or breach of this Agreement. Organization will give Intuitive prompt written notice of such claim, suit, or proceeding.</u>

**12.    Limitation of Liability**

Except for a breach of the obligations in Sections 3.4 (Use of System), 4 (Software License and Restrictions), 8 (Instruments and Accessories), 9 (Pricing and Payment Terms), the indemnification obligations of Section 11, 13 (Proprietary Information), to the extent permitted by applicable law, each of Participant's and Intuitive's aggregate liability to the other for claims relating to this Master Agreement and associated Transaction Agreement, whether for breach in contract or tort (including negligence), is limited to an amount equal to the sum of amounts paid or payable by Participant under the associated Transaction Agreement ~~or Lease Agreement~~ for the activity (such as procurement of the System, Service, or training) giving rise to the claim. Except for a breach of the obligations in Sections 3.4, 4, 8, or 11, 13, no party will be liable for any indirect, punitive, special, incidental, or consequential damages in connection with or arising out of this Master Agreement or any Transaction Agreement (including loss of business, revenue, profits, use, data, or other economic advantage, even if that party has been advised of the possibility of damages. Some jurisdictions do not allow the limitation of liability for incidental or consequential damages; therefore in those jurisdictions, the foregoing limitation of liability applies only to the extent permitted by law.

**13.    Proprietary Information**

CONFIDENTIAL                                                        FRANCISCAN-00052157

"Proprietary Information" includes, but is not limited to, all non-public information (1) of the disclosing party ("Disclosing Party") that relates to past, present, or future research, development, or business activities or the results of those activities and (ii) that the Disclosing Party has received from others and is obligated to treat as confidential and proprietary.  In addition, Intuitive's Proprietary Information includes the terms and conditions of this Master Agreement and any associated Transaction Agreement and all information derivable from the System, but excluding information that can be learned simply through observation of the System and its operation.  Proprietary Information does not include information previously known by the receiving party ("Receiving Party") as demonstrated by the Receiving Party's contemporaneous written records, or information publicly disclosed without breach of an obligation of confidentiality, either before or after the Receiving Party's receipt of the information.  The Receiving Party will hold all Proprietary Information of the Disclosing Party in strict confidence and must not use for any purpose, or disclose to any third party, any Proprietary Information, except (1) as expressly authorized in this Master Agreement or any associated Transaction Agreement or in writing by the Disclosing Party, and (2) as required by law or by court order.  Notwithstanding any provision of this Agreement, the Receiving Party shall be permitted to disclose the Disclosing Party's Confidential Information solely to the extent that such disclosure is required by law or by order of any court or governmental authority, provided, however, that the Receiving Party, as permitted by law, shall first have given advance notice to the Disclosing Party, so as to permit the Disclosing Party as owner of the information an opportunity to review such information for confidentiality and privilege preservation and/or to attempt to obtain a protective order or similar administrative or legal remedy requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued or for such other legal requirement, and that the Receiving Party shall cooperate with the Disclosing Party in such efforts.  The Receiving Party will use the same degree of care to protect the Proprietary Information as Receiving Party uses to protect its own information of like kind, but not less than all reasonable steps to maintain the confidentiality of the Proprietary Information.

**14.**     **Term**

14.1     The term of this Master Agreement will commence on the Effective Date and will continue for so long as any Transaction Agreement or Lease Agreement remains in effect. The Initial Term for each Transaction Agreement or Lease Agreement will be specified in such Transaction Agreement, or Lease Agreement.

14.2     **Termination and Survival**. Either Organization or Intuitive may terminate this Master Agreement if the other party breaches a material term or condition of this Master Agreement and fails to cure the breach following thirty (30) days' written notice from the non-breaching party. Either Participant or Intuitive may terminate its associated Transaction Agreement or Lease Agreement if the other party breaches a material term or condition of the Transaction Agreement or Lease Agreement or any term or condition of this Master Agreement incorporated by reference in the Transaction Agreement or Lease Agreement and fails to cure the breach following thirty (30) days' written notice from the non-breaching party. Sections 3.4, 3.6, 4, 9.1, 9.3, 11, 12, 13, 14.2, 15, and any other provision which by its nature will survive, will remain in effect notwithstanding the expiration or termination of this Master Agreement or associated Transaction Agreement, or Lease Agreement.

**15.**     **Miscellaneous**

15.1     **Assignment**.  This Master Agreement and each Transaction Agreement or Lease Agreement entered into under this Master Agreement will be binding upon the permitted successors and assigns of the parties. No party may assign this Master Agreement or any Transaction Agreement or Lease Agreement entered into under this Master Agreement without the prior written consent of the other party to such agreement, except pursuant to a transfer of all or substantially all of a party's assets and business relating to the subject of this Master Agreement or the Transaction Agreement or Lease Agreement as the case may be, whether by merger, re-organization, sale of assets, sale of stock, or otherwise.  Participant may not assign or transfer the Software license granted to it under this Master Agreement to any third party without Intuitive's prior written consent.  Any attempt by either party to assign this Master Agreement or any Transaction Agreement or Lease Agreement entered into under this Master Agreement or any rights or duties thereunder contrary to the foregoing provision is void.  Intuitive consents to Participant's assignment of its payment obligations under this Master Agreement and associated Transaction Agreement or Lease Agreement to a Funding Entity as part of Participant's financing arrangement with the Funding Entity. If Participant assigns its payment obligations under this Master Agreement and the associated Transaction Agreement or Lease Agreement to a Funding Entity, Participant retains its right to all benefits under this Master Agreement and the associated Transaction Agreement or Lease Agreement, including without limitation all warranties, representations, and indemnification provided by Intuitive, and may independently enforce any obligation, warranty, or representation, including without limitation Intuitive's obligations under Section 5 (Services).This Master Agreement will be binding upon and will inure to the benefit of Organization and Intuitive

CONFIDENTIAL                                                                                FRANCISCAN-00052158

and their successors and permitted assigns.  Neither party may assign this Master Agreement without the prior written consent of the other party which will not be unreasonably withheld or delayed, provided that:

(a) either party may assign its rights or obligations to a parent corporation or a subsidiary in which the assigning party holds a fifty percent (50%) or greater ownership interest without the consent of the other party; and

(b) either party may assign its rights and obligations hereunder in connection with any transaction involving the sale or transfer of all or substantially all of its assets without the consent of the other party, provided that the assignee agrees in writing to assume the assignor's obligations hereunder and has at least substantially the same or greater ability to perform the assignor's obligations hereunder.

Any attempted assignment in violation of this provision will be void and will constitute a material breach of this Master Agreement.

15.2 **Costs.**  Except as otherwise specifically provided herein, each party will bear its own costs and expenses incurred in connection with the performance of its obligations hereunder.

15.3 **Debarment**.  Intuitive warrants and represents that individuals of its organization involved in providing Services under  any Transaction Agreement ~~or Lease Agreement~~ have not been convicted of any criminal offense relating to health care and are not debarred, excluded, or otherwise ineligible for participation in any federal or state health care program.  If at any time before completion of any Transaction Agreement~~, or Lease Agreement,~~ Intuitive or any individual in its organization involved in providing Services under such Transaction Agreement ~~or Lease Agreement~~ is so convicted or is debarred, excluded or otherwise determined to be ineligible, Intuitive will notify the  Participant that is a party to such Transaction Agreement ~~or Lease Agreement~~ in writing, the individual will immediately cease providing Services under the Transaction Agreement~~, or Lease Agreement,~~ and Intuitive will replace the individual with a replacement employee reasonably suitable to the  Participant~~, and, if it is Intuitive, this breach will be considered a material breach of the Transaction Agreement by Intuitive~~.

15.4 **Federal Audit**.  Until the expiration of four (4) years after furnishing Services under any Transaction Agreement, Intuitive will make available upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon request of the U.S. Comptroller General, or any of their duly authorized representatives, this Master Agreement and the associated Transaction Agreement and the books, documents, and records of Intuitive that are necessary to certify the nature and extent of costs for which the  Participant that is a party to such Transaction Agreement ~~or Lease Agreement~~ may properly seek reimbursement.  If Intuitive carries out any of the duties of this Master Agreement or a Transaction Agreement ~~or Lease Agreement~~ through a subcontract with a value or cost of ten thousand dollars ($10,000.00) or more over a twelve (12) month period, the subcontract will contain a clause to the effect that until the expiration of four (4) years after furnishing of services under the subcontract, the subcontracting party will make available, upon written request of the Secretary, or upon request of the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, and the books, documents, and records of the organization that are necessary to verify the nature and extent of the costs. Intuitive will promptly notify Participant of any requests for information made under this provision.

15.5 **Force Majeure**.  No party will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond that party's control including, but not limited to, acts of terrorism, fire, flood, earthquake, war, riots, labor disputes, shortage of components, or any governmental law, order, regulation, or ordinance.

15.6 **Insurance**.  Intuitive has obtained, and will maintain throughout the term of each Transaction Agreement, (i) ~~C~~commercial ~~G~~general ~~L~~liability ~~I~~insurance including coverage for contractual liability, product liability, personal injury and bodily injury in an amount not less than $1,000,000 per occurrence/$3,000,000 aggregate (or as may be aggregated by the excess liability policy on the ~~G~~general ~~L~~liability policy); or (ii) a self-insurance program of equivalent protection.  Intuitive will furnish the  Participant with a certificate of insurance evidencing the coverage as outlined above, or comparable evidence of self-insurance, on  Participant's request.  Intuitive carries, and will continue to carry, ~~W~~workers' ~~C~~compensation ~~I~~insurance as required by law and include a waiver of subrogation.

15.7 **Interpretation**.  Headings used in this Master Agreement and each Transaction Agreement ~~or Lease Agreement~~ are provided for convenience only and do not in any way affect the meaning or interpretation thereof.  The terms "sale", "purchase", "acquire", "procure" and variations of such terms, as used in this Master Agreement or any

CONFIDENTIAL

FRANCISCAN-00052159

Transaction Agreement or Lease Agreement with respect to the System, do not imply that the Software and Documentation aspect of the System are sold or purchased; the Software and Documentation are licensed under this Master Agreement and only the Hardware is sold, or leased, as the case may be. Neither party is the drafter of this Master Agreement or any Transaction Agreement, or Lease Agreement. Accordingly, the language of this Master Agreement and each Transaction Agreement or Lease Agreement will not be construed for or against any party.

15.8    **Notices.**  Any notices given under this Master Agreement or any associated Transaction Agreement or Lease Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile. Any notices under this Master Agreement must be sent to Intuitive or the Organization at the address shown in the preamble above, or in the case of Participant at the address shown in the preamble of the applicable Transaction Agreement or Lease Agreement, in any such case to the Contracts Dept/General Counsel's office. Any party may change its address for receipt of notices by giving the other parties notice of the new address. All notices under this Master Agreement will be given in writing and will be sent by certified mail, return receipt requested, or by prepaid overnight courier such that proof of delivery will be obtained, and will be addressed as set forth below or to such other address as may be specified in a prior written notice to the other party:

    If to Organization:

    Franciscan Alliance, Inc.
    ATTN:  Contract Specialist
    1500 Albany Street
    Beech Grove, Indiana  46107

    If to Intuitive:

    Intuitive Surgical, Inc.
    ATTN:  Legal or Contracts Dept.
    1020 Kifer Road
    Sunnyvale, California 94086

    Neither party will be allowed to refuse acceptance of delivery of any such notice.  Refusal to accept delivery will be deemed as receipt of notice.

15.9    **Relationship of the Parties**.  The relationship between Organization and any Participant on the one hand, and Intuitive on the other hand, is one of contract, and they are not, and will not be construed as partners, joint venturers, or agent and principal.  Neither Organization nor any Participant is authorized to act for, or on behalf of, Intuitive, and Intuitive is not authorized to act for, or on behalf of, Organization or any Participant.

15.10   **Severability**.  If any provision of this Master Agreement or associated Transaction Agreement or Lease Agreement is held by a court of competent jurisdiction to be invalid, then that provision will not affect the validity of the remaining provisions of the Master Agreement or associated Transaction Agreement, or Lease Agreement, and the parties will substitute a valid provision for the invalid provision that most closely approximates the intent and economic effect of the invalid provision.

15.11   **Access to Participant's Facilities.**  Intuitive agrees that any Intuitive personnel who routinely provide Services at Participant's facilities will use commercially reasonable efforts to comply with Participant's Access Requirements, provided that Participant provides Participant's Access Requirements in writing prior to execution of a Transaction Agreement, or Lease Agreement. Participant's need for Service may be unplanned and urgent with patient safety at stake. Therefore, if Participant denies access to its facilities to any Intuitive personnel for performance of Services (Section 5) or warranty (Section 10) obligations in connection with a surgical procedure because such personnel have not met  Participant's Access Requirements, Intuitive's Services and warranty obligations in this Agreement will be suspended during such denial of access, provided that Intuitive uses commercially reasonable efforts to find replacement Intuitive personnel who comply with  Participant's Access Requirements.  Participant will indemnify and hold harmless Intuitive from any losses, claims, liabilities or causes of action arising from such denial of access.

15.12  **Data Use.**   Participant agrees that Intuitive and its affiliates within the Intuitive Surgical group of companies (collectively, "Intuitive") may collect data relating to the use of Intuitive products ("Data").  In some instances Data may be communicated via data gathering or transmission technology to Intuitive.  In other instances, Intuitive may require Participant and Participant agrees to provide Data to Intuitive.  Such Data may be used for a variety of purposes, including, but not limited to (1) providing support and preventative maintenance of Intuitive products, (2) improving Intuitive products or services, (3) ensuring compliance with applicable laws and regulations, (4) providing a general resource for Intuitive's research and business development, and (5) relationship management, including but not limited to a) proctoring and other activities, b) procedure reporting, and c) customer efficiency and cost saving.  Intuitive does not intend to collect protected health information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or analogous foreign patient privacy laws or regulations, as may be amended from time to time.  In the event any Data communicated to Intuitive identifies an entity or individual, Intuitive will not share such Data with any third parties without the entity's or individual's consent, unless required by law or regulatory authorities.  Intuitive will at all times comply with the Business Associate Agreement between the parties which is attached hereto, made a part hereof, and marked as Exhibit E to this Master Agreement.

15.13  **Waivers**. No waiver of any right by either party under this Master Agreement or associated Transaction Agreement or Lease Agreement will be of any effect unless the waiver is in writing and signed by the waiving party.  Any purported waiver not consistent with the foregoing is void.

15.14  **Counterparts**.  This Master Agreement and any associated Transaction Agreement or Lease Agreement may be executed by facsimiledigitally scanned signed documents (e.g. Adobe PDF files) sent via e-mail, or in multiple copies, each of which is an original, and all of which taken together will constitute one single agreement.

15.15  **Entire Agreement; Amendment**.  Excluding the following Service Agreements between the parties dated September 30, 2019 which are not subject to the provisions of this Master Agreement, Tthis Master Agreement is the entire agreement between Intuitive and Organization and supersedes any other prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter herein, pricing, and the applicable terms.:

| TITLE | QUOTE NO. | LOCATION | SYSTEM SERIAL NO. | SERVICE TERM PERIOD |
|---|---|---|---|---|
| Service Agreement | 4008290 | Franciscan Health Olympia Fields | SK0410 | 06/24/19 to 12/22/21 |
| Service Agreement | 4008291 | Franciscan Health Dyer | SH0170 | 11/23/19 to 12/22/21 |
| Service Agreement | 4008312 | Franciscan Health Dyer | SK0932 | 09/23/19 to 12/22/21 |
| Service Agreement | 4008313 | Franciscan Health Crawfordsville | SH0169 | 11/23/19 to 12/22/21 |
| Service Agreement | 4008314 | Franciscan Health Michigan City | SK0931 | 09/23/19 to 12/22/21 |
| Service Agreement | 4008315 | Franciscan Health Lafayette East | SK0174 | 10/02/19 to 12/22/21 |
| Service Agreement | 4008316 | Franciscan Health Lafayette East | SK0930 | 09/22/19 to 12/22/21 |
| Service Agreement | 4008317 | Franciscan Health Crown Point | SK0929 | 09/30/19 to 12/22/21 |
| Service Agreement | 4008318 | Franciscan Health Crown Point | SH0551 | 11/29/18 to 12/22/21 |

Excluding the above listed Service Agreements between the parties dated September 30, 2019 which are not subject to the provisions of this Master Agreement, Eeach Transaction Agreement or Lease Agreement is the entire agreement between Intuitive and the Participant that is party to such Transaction Agreement or Lease Agreement and supersedes any other prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter therein, pricing, and the applicable terms.

CONFIDENTIAL                                                                          FRANCISCAN-00052161

Any terms or conditions in any Participant's (or as applicable, Funding Entity's) purchase order that are different from, inconsistent with, or in addition to, the terms and conditions of this Master Agreement and any associated Transaction Agreement or Lease Agreement will be void and of no effect, unless otherwise mutually agreed to in writing by Intuitive and such  Participant.  This Master Agreement and any Transaction Agreement may be amended only in writing, signed by the parties to any such agreement.  Any purported oral modification intended to amend the terms and conditions of this Master Agreement or any Transaction Agreement is void.

**BOTH PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS MASTER AGREEMENT AND EXECUTE THIS MASTER AGREEMENT AS OF THE EFFECTIVE DATE.**

ACCEPTED BY:                                        ACCEPTED BY:

**INTUITIVE SURGICAL, INC.**                        **FRANCISCAN ALLIANCE, INC.**

By: _____                         By: _____

Name: _____                       Name: _____

Title: _____                      Title: _____

Date: _____                       E-mail: _____

                                                     Phone: _____

                                                     Date: _____

CONFIDENTIAL                          FRANCISCAN-00052162

# EXHIBIT A

**List of Organization's Participants**

| | |
|---|---|
| Franciscan Health Crown Point<br>1201 South Main Street<br>Crown Point, IN  46307 | Franciscan Health Carmel<br>North Meridian Medical Pavilion<br>12188 North Meridian Street, Building B<br>Carmel, IN  46032 |
| Franciscan Health Michigan City<br>3500 Franciscan Way<br>Michigan City, IN  46360 | Franciscan Health Indianapolis<br>8111 South Emerson Avenue<br>Indianapolis, IN  46237 |
| Franciscan Health Dyer<br>24 Joliet Street<br>Dyer, IN  46311-1799 | Franciscan Health Mooresville<br>1201 Hadley Road<br>Mooresville, IN  46158 |
| Franciscan Health Hammond<br>5454 Hohman Avenue<br>Hammond, IN  46320 | Franciscan Health Olympia Fields<br>20201 South Crawford Avenue<br>Olympia Fields, IL  60461 |
| Franciscan Health Munster<br>701 Superior Avenue<br>Munster, IN  46321 | Franciscan Physician Network<br>1515 Dragoon Trail<br>Mishawaka, IN 46544 |
| Franciscan Health Crawfordsville<br>1710 Lafayette Road<br>Crawfordsville, IN  47933 | Franciscan WorkingWells<br>1515 Dragoon Trail<br>Mishawaka, IN 46544 |
| Franciscan Health Lafayette Central<br>1501 Hartford Street<br>Lafayette, IN  47904 | Alverno Clinical Laboratories, LLC<br>2434 Interstate Plaza Drive<br>Hammond, IN  46324 |
| Franciscan Health Lafayette East<br>1701 South Creasy Lane<br>Lafayette, IN 47905 | Specialty Physicians of Illinois, LLC<br>3700 West 203rd Street<br>Olympia Fields, IL 60461 |
| Franciscan Health Rensselaer<br>1104 East Grace Street<br>Rensselaer, IN  47978 | |

CONFIDENTIAL

FRANCISCAN-00052163

# EXHIBIT B

SAMPLE

Transaction Agreement
Between
Eligible Buyer
and
Intuitive Surgical Inc.

Agreement No.: _____

This Transaction Agreement (the "Transaction Agreement") dated _____ (the "Effective Date") is entered into by and between **Intuitive Surgical, Inc.,** a Delaware corporation, with its principal place of business located at 1020 Kifer Road, Sunnyvale, CA 94086 ("Intuitive") and Franciscan Alliance, Inc., d/b/a Franciscan Health _____ with offices located at _____ ("Eligible Buyer").

## RECITALS

A.      Intuitive and Franciscan Alliance, Inc. ("Organization") entered into a Master Sales, License and Service Agreement dated August _____ 2020 ("Master Agreement") for the sale of Intuitive products and services;

B.      Eligible Buyer wishes to purchase a System and Service and agrees to be bound to the terms and conditions of the Master Agreement which is incorporated herein by reference and made a part of this Transaction Agreement.

C.      Intuitive and Eligible Buyer hereby agree to the provisions of this Transaction Agreement which sets forth the terms of payment and provision of System and Service to be sold to Eligible Buyer.

The parties therefore agree as follows:

1.      **Defined Terms.** Capitalized terms used but not defined herein have the meanings assigned to them in the Master Agreement.

2.      **Products and Price.** The products to be provided under this Transaction Agreement are as listed below.

| System Type | Quantity | Delivery Date* | Price | Delivery Charge | Annual Service Fees |
|---|---|---|---|---|---|
| System description | 1 | ddMONyyyy | $x,xxx,xxx.xx | $xx,xxx.xx | First Year of Initial Term: **Included in System purchase price** Subsequent Years (2-5) of the Initial Term: $xxx,xxx.xx per year |

* The Delivery Date is an estimated "on or before" delivery date to Eligible Buyer's designated location (see "Ship-to" below).

Intuitive makes no representation with regard to Certificate of Need requirements for this purchase. It is Eligible Buyer's responsibility to determine whether this purchase complies with Eligible Buyer's State Certificate of Need law and what Certificate of Need filing, if any, needs to be made with regard to this purchase.

Subject to availability, any Instruments or Accessories provided to Lessee, as set forth in this section 2, are subject to the Terms of the *da Vinci EndoWrist Instrument & Accessory Catalog* as if such Terms were contained in this Agreement. Delivery charges will be *Pre-Pay & Add*. If this section 2 includes Instruments or Accessories, they will be shipped FCA Intuitive's warehouse. If Single Site Instruments are listed, they will be delivered upon Lessee's completion of the advanced instrument training verification.

3.      **Acceptance.**  The System is deemed accepted by Eligible Buyer upon delivery to Eligible Buyer's designated location ("Acceptance").

4.      **Payment Terms.**

---

Franciscan Alliance:
Rev date: 31Oct2019
MA-_____
Intuitive Proprietary Information                          Page 15 of 37

4.1    **System.** Eligible Buyer will pay the invoiced amount not later than ~~thirty (30)~~forty-five (45) days after the date of invoice. ~~Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.~~ Upon Acceptance, Intuitive will deliver an invoice to Eligible Buyer for amounts due under this Transaction Agreement for the System. Eligible Buyer will pay the invoiced amount as specified in the Transaction Agreement. ~~Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.~~

4.2    **Service.** Intuitive will deliver to Eligible Buyer an invoice for the annual Services fee ~~thirty (30)~~forty-five (45) days prior to the first anniversary of Acceptance and each subsequent anniversary of Acceptance throughout the Initial Term of this Transaction Agreement. Eligible Buyer will pay the invoice for Services not later than ~~thirty (30)~~forty-five (45) days after the date of invoice.  In the event Eligible Buyer requires a purchase order to be referenced on a Service invoice to facilitate payment, Eligible Buyer will provide Intuitive with a purchase order sixty (60) days prior to each anniversary of Acceptance. ~~Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.~~  After the Initial Term of this Transaction Agreement, and subject to mutual written agreement, annual Services may be renewed at ~~Intuitive's then current list price.~~ no more than the lesser of the following amounts:

    (a)    three percent (3.0%) of the prices due for the preceding Initial Term or renewal Services term; or

    (b)    the increase in the Consumer Price Index for All Urban Consumers (CPI-U) for the preceding Initial Term or renewal Services term.

5.    **Term.** The initial term of this Transaction Agreement will commence as of the Effective Date and will continue until the fifth (5th) anniversary of Acceptance ("Initial Term") unless earlier terminated as provided in this Transaction Agreement. Thereafter, this Transaction Agreement may be renewed for successive one (1) year terms ("Renewal Term(s)") upon mutual written agreement of the parties.

6.    **The "Ship-To" information for Eligible Buyer is:**

The **"Bill-To"** information for Eligible Buyer is:

*Eligible Buyer's PO Number:*

7.    **Taxes.**  Eligible Buyer will be deemed to be Taxable until such time as ~~customer~~Organization provides the Intuitive tax department with the appropriate, fully executed tax exemption certificate as directed below: Attn: Tax Department, Intuitive Surgical, Inc., 1020 Kifer Road, Sunnyvale, CA 94086; fax number: 408-523-1390; email at TaxEmail@intusurg.com.

8.    ~~**Training.**  As of the Effective Date, the price for training (based on a porcine model) is three thousand dollars ($3,000) per surgeon or physician's assistant. The payment terms for training are net thirty (30) days from the date of Intuitive's invoice. This pricing will remain in effect during the first year of the Initial Term.  Thereafter, training will be made available to Eligible Buyer at Intuitive's then current list price for training.~~

~~9~~8.    **Proctoring.**  As of the Effective Date, the rate for Proctor's services is three thousand dollars ($3,000) per day.  The payment terms for Proctoring are net thirty (30) days from the date of Intuitive's invoice.  This pricing will remain in effect during the first year of the Initial Term.  Thereafter, Proctoring will be made available to Eligible Buyer at Intuitive's then current list price for Proctoring.

~~10~~9.    Except as specifically provided herein, all of the terms and conditions of the Master Agreement as they are incorporated by reference into this Transaction Agreement shall remain in full force and effect.  In the event of a conflict or inconsistency between

---

Franciscan Alliance:
Rev date: ~~31Oct~~2019
MA-_____

CONFIDENTIAL                                       FRANCISCAN-00052165

the terms and conditions contained in this Transaction Agreement and the Master Agreement, the provisions ~~herein~~in the Master Agreement will prevail.

**IN WITNESS WHEREOF**, the parties have caused this Transaction Agreement to be executed by their duly authorized representatives.

**IF THIS AGREEMENT IS NOT SIGNED BY BOTH PARTIES AND RETURNED TO INTUITIVE ON OR BEFORE _____, THE TERMS WILL BE SUBJECT TO CHANGE.**

**INTUITIVE SURGICAL, INC.**                     ~~ELIGIBLE BUYER~~**FRANCISCAN ALLIANCE, INC., D/B/A FRANCISCAN HEALTH** _____

By: _____                     By: _____

Name: _____                     Name: _____

Title: _____                     Title: _____

Date: _____                     ~~E-mail:~~ _____

                                                                           Date: _____

---

CONFIDENTIAL                                                                          FRANCISCAN-00052166

**EXHIBIT C**

SAMPLE

**LEASE AGREEMENT**

Contract Number: MA-_____ (CLM-_____)

This Lease Agreement ("Lease Agreement") is dated _____ and is made and entered into between **Intuitive Surgical, Inc.**, a Delaware corporation, located at 1020 Kifer Road, Sunnyvale, California 94086 ("**Lessor**" or "**Intuitive**"); and

**Lessee:**
**Registered Address:**

RECITALS

A.   Intuitive and _____ ("Organization") entered into a Master Sales, Use, License and Service Agreement dated _____ ("Master Agreement") for the lease of Intuitive products and services;

B.   Lessee wishes to lease a System and Service and agrees to be bound to the terms and conditions of the Master Agreement, which is incorporated herein by reference and made a part of this Lease Agreement, including the "Standard Terms and Conditions of Leasing."

C.   Intuitive and Lessee hereby agree to the provisions of this Lease Agreement, which sets forth the terms of payment and provision of System and Service to be sold to Lessee.

The parties therefore agree as follows:

1.   Defined Terms. Capitalized terms used but not defined herein have the meanings assigned to them in the Master Agreement. The _____ Lessor and the Lessee are referred to as the "Parties" collectively, or "Party" individually.

2.   Delivery Date. The estimated delivery date for the System is _____ ("**Delivery Date**"). The Delivery Date is an estimated "on or  before" delivery date to Lessee's designated location (see "Ship-to" below).

3.   Acceptance. The System is deemed accepted by Lessee upon delivery to Lessee's designated location ("Acceptance"). An example of Acceptance Document is hereto attached as Annex 1 to the Lease Agreement.

4.   The "Ship-To" information for Lessee is:

5.   The "Bill-To" information for Lessee is:

Lessee's PO Number: _____

6.   Taxes and Costs.

   6.1   Lessee will be deemed to be Taxable until such time as customer provides the Intuitive tax department with the appropriate, fully executed tax exemption certificate as directed below: Attn: Tax Department, Intuitive Surgical, Inc., 1020 Kifer Road, Sunnyvale, CA 94086; fax number: 408-523-1390; email at TaxEmail@intusurg.com.

CONFIDENTIAL                                                                    FRANCISCAN-00052167

6.2     Lessee is responsible for all license and registration fees, and all sales, use, property, stamp and other taxes and charges relating in any manner to the System or this Agreement, except the Medical Device Excise Tax.

7.     Term. The initial term of this Lease Agreement will commence as of the Effective Date and will continue until the x (xth) month anniversary of Acceptance ("Initial Term") unless earlier terminated as provided in this Lease Agreement. Thereafter, this Lease Agreement may be renewed for successive one (1) year terms ("Renewal Term(s)") upon mutual written agreement of the parties.

8.     Training. As of the Effective Date, the price for training (based on a porcine model) is three thousand dollars ($3,000.00) per surgeon or physician's assistant. The payment terms for training are net thirty (30) days from the date of Intuitive's invoice. This pricing will remain in effect during the first year of the Initial Term. Thereafter, training will be made available to Lessee at Intuitive's then current list price for training.

9.     Proctoring. As of the Effective Date, the rate for Proctor's services is three thousand dollars ($3,000.00) per day. The payment terms for Proctoring are net thirty (30) days from the date of Intuitive's invoice. This pricing will remain in effect during the first year of the Initial Term. Thereafter, Proctoring will be made available to Lessee at Intuitive's then current list price for Proctoring.

10.    Products and Price. The products to be provided under this Lease Agreement are as listed below.

| Qty. | Included in Periodical Lease Payment | Not included in Periodical Lease Payment | Equipment Description | Price |
|---|---|---|---|---|
| | ☐ | ☐ | System Type: | $ |
| | ☐ | ☐ | Service during the first twelve months of the Lease Period | $ |
| | ☐ | ☐ | Service beginning on the thirteenth month of the Lease Period, or if Lessee purchases the Equipment; see Special Conditions | $ / per year |
| | ☐ | ☐ | System delivery fee: | $ |
| | ☐ | ☐ | Other: | $ |

Intuitive makes no representation with regard to Certificate of Need requirements for this Lease.  It is Lessee's responsibility to determine whether this transaction complies with Lessee's State Certificate of Need law and what Certificate of Need filing, if any, needs to be made with regard to this transaction.

Subject to availability, any Instruments or Accessories provided to Lessee, as set forth in this section 10, are subject to the Terms of the *da Vinci EndoWrist Instrument & Accessory Catalog* as if such Terms were contained in this Agreement. Delivery charges will be *Pre-Pay & Add*. If this section 10 includes Instruments or Accessories, they will be shipped FCA Intuitive's warehouse. If Single Site Instruments are listed, they will be delivered upon Lessee's completion of the advanced instrument training verification.

Lessee will pay to Intuitive all fees for the purchase of Systems, Instruments, Accessories, Service or other fees that are not included in the Periodical Lease Payment, as such fees are further detailed in the Lease Agreement, and not later than thirty (30) days after the date of Intuitive's invoice.

11.    Lease Conditions.

| Lease Conditions | | | |
|---|---|---|---|
| **Lease Period** | _____ Months. The Lease Period may be extended in accordance with the Lease Agreement. | | |
| **Commencement Date** | This Lease Agreement will commence on the date of Acceptance specified in the Acceptance Document. | | |
| **Interest Rate** | ____% | | |
| **Periodical Lease Payments** | Months 1-____ $____ per month Months____ ____ $____ per month | No. of periodical Lease Payments _____ | ☒ Monthly payments |

CONFIDENTIAL                                                                              FRANCISCAN-00052168

|  |  |  |  |
|---|---|---|---|
|  | Lessee agrees and acknowledges payments due herein shall not be excused by any contingencies including, but not limited to, Lessee's internal practices, policies, or any state approvals. | (subject to extension of Lease Period) |  |
|  | ☐ The first Periodical Lease Payment is due on Commencement Date. Thereafter, each subsequent Periodical Lease Payment is due on the corresponding day of each month, as applicable, of the Lease Period (payments in advance). | | |
|  | ☐ The first Periodical Lease Payment is due one month after the Commencement Date. Thereafter, each subsequent payment is due on the corresponding day of each month of the Lease Period (payments in arrears). | | |
| **Deposit** | $_____ | The Deposit, if any, is due on the Commencement Date | |
| **Balloon Payment** | $_____ | The Balloon Payment, if any, is due on the last day of the Lease Period. | |
| **End of Lease Options** | ☐ End of Lease option A applies (see 13.1 of Standard Terms and Conditions) ☐ End of Lease option B applies (see 13.2 of Standard Terms and Conditions) ☐ See Special Conditions below | | |
| **Funding Amount** | Original Equipment Cost (OEC): $_____ | Down-Payment from Lessee to Lessor: $_____ | Funding Amount: $_____ |

| **Direct Debit** |
|---|
| Notwithstanding the agreed due date of the periodical Lease Payments, the Lessor will be authorized to deduct the Periodical Lease Payments from the Lessee's bank account on the following dates: (i) on the fifth (5th) calendar day of the month, if the Commencement Date is before the eleventh (11th) calendar day of the month; (ii) on the fifteenth (15th) calendar day of the month, if the Commencement Date is before the twenty-first (21st) calendar day of the month; or (iii) on the twenty-fifth (25th) calendar day, if the Commencement Date is between the twenty-first (21st) calendar day and the end of the month. The Lessee is required to have sufficient funds in its account during the period in which a withdrawal is scheduled and will notify the Lessor in case of any changes of its accounts details. The Lessee hereby authorizes the Lessor, to collect all payments to be made by the Lessee by direct debit from the following bank account: |

| Bank : | | Bank Account no.: | |
|---|---|---|---|
| Name of signatory: | | Must be signed by duly authorized representative of Lessee | |

| **Special Conditions** |
|---|
|  |

All amounts are denominated in USD and net of taxes, any applicable taxes will be for the account of the Lessee. Where the terms of this Lease Agreement are inconsistent with the Special Conditions above, if any, the Special Conditions prevail. The Standard Terms and Conditions of Leasing attached hereto are hereby incorporated to and form an integral part of this Agreement. All references to this Agreement will include the terms and conditions set out herein, in the Annexes and the Standard Terms and Conditions of Leasing. By signing this Lease Agreement, Lessee agrees to be bound by and undertakes to comply with all the terms and conditions set out in this Lease Agreement.

**BOTH PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT AND EXECUTE THIS AGREEMENT AS OF THE EFFECTIVE DATE. IF THIS AGREEMENT IS NOT SIGNED BY BOTH PARTIES AND RETURNED TO INTUITIVE ON OR BEFORE _____, THE TERMS WILL BE SUBJECT TO CHANGE.**

CONFIDENTIAL                                          FRANCISCAN-00052169

ACCEPTED BY:
INTUITIVE SURGICAL, INC.

By:_____

Name:_____

Title:_____

Date:_____

ACCEPTED BY:
SIGNED FOR AND ON BEHALF OF LESSEE

By:_____

Name:_____

Title:_____

Date:_____

CONFIDENTIAL                        FRANCISCAN-00052170

## EXHIBIT C (con't)

### Standard Terms and Conditions of Leasing

**1.    DEFINITIONS**

Terms not herein defined will have the meanings set out in the Lease Agreement, unless the context otherwise requires.

**"Acceptance"** means the Equipment is deemed accepted by Lessee upon delivery to Lessee's designated location as evidenced by Lessee's execution of an acceptance letter, a form of which is attached hereto as Annex 1.

**"Lease Agreement"** means the agreement between the Lessor and the Lessee for the lease of the Equipment from the Lessor to the Lessee, including the Annexes thereto, incorporating these Standard Terms and Conditions.

**"Event of Default"** means an event specified under Clause 14 of these Terms and Conditions.

**"Equipment"** means the equipment specified in the Lease Agreement and any part thereof including, without limitation, all component parts and all software.

**"Guarantee"** means the documents executed by the Guarantor(s) in favor of the Lessor in respect of the obligations of the Lessee under the Lease Agreement.

**"Guarantor"** means the person(s) named as guarantor(s), if any, in the Guarantee.

**"Lease Payment"** means the payment of rent for the lease of the Equipment, owed by the Lessee to the Lessor under the Lease Agreement, including but not limited to the periodical installments and the Balloon Payment.

**"Obligors"** mean the Lessee, and the Guarantor, if any, and **"Obligor"** means each or any of the Obligors as the context requires.

**"Termination Sum"** means the aggregate of:

(i)    all Lease Payment due and payable under the Lease Agreement;

(ii)    an amount equal to one-hundred-ten per cent (110%) of all Lease Payments yet to fall due under the Lease Agreement discounted by the contract interest rate inherent in the Lease Agreement; and

(iii)    all other sums due and payable under the Lease Agreement (including, without limitation, Default Interest, costs and expenses related to or connected with the termination of the Lease Agreement and any sum recoverable from the Lessee).

**"Total Loss"** includes any actual, constructive, or agreed total loss, theft, damage beyond repair, taking back of the Equipment (or any part thereof) by the owner of the Equipment pursuant to a right incorporated in the Lease Agreement for the sale of the Equipment and any seizure or confiscation of the Equipment.

**2.    RENTAL, SELECTION AND DELIVERY OF EQUIPMENT**

(a)    The Lessor agrees to rent to the Lessee and the Lessee agrees to rent from the Lessor the Equipment on the terms and conditions as set out in the Lease Agreement.

(b)    The Lessee has chosen the Equipment and agreed with the Lessor upon the terms of delivery of the Equipment.

(c)    Upon delivery, the Lessee will immediately inspect the Equipment, ensure that the Equipment is in good and working order and condition, and issue and deliver the duly signed and dated Acceptance Letter set out in Annex 1 of the Lease Agreement to the Lessor.

**3.    LEASE AND OTHER PAYMENTS**

(a)    The Lessee will pay (i) to the Lessor the Lease Payment and all other payments on the dates and in the manner specified in the Lease Agreement, and (ii) any taxes, rates, registration charges or other outgoings in respect of the Equipment.

(b)    If the Lessee fails to pay any amount payable by it under the Lease Agreement on its due date, it will pay to the Lessor interest on the overdue amount ("Default Interest") from and excluding such due date up to and including the date of actual payment. Default Interest will be twelve per cent (12%) per annum, or the maximum rate allowed by the applicable law, whichever is lower, and will be calculated on a daily basis. Default Interest not paid when due will be compounded and Default Interest will be payable thereon. Default Interest will be immediately payable by the Lessee on demand by the Lessor.

(c)    The Lessee will pay all payments when due under the Lease Agreement notwithstanding that the Equipment are unusable for any reason at any time during the Lease Period, and the Lessor will not be liable to provide the Lessee with any replacement equipment.

(d)    The Lessor will have a right to set-off in respect of any payments, charges or other sums due or prematurely due and payable, and the Lessee agrees to waive any legal defense against such set-off. The Lessee will have no right of set-off in respect of any

CONFIDENTIAL                                        FRANCISCAN-00052171

payments, charges or other sums due or claimed to be due to the Lessee from the Lessor hereunder or under any other agreement between the Parties.

(e)      Lessee agrees that Lessee's obligation and duty to pay all sums due and to become due pursuant to this Agreement will be absolute and unconditional and are not subject to any defense, counterclaim, setoff or recoupment by reason of any past, present, or future claims which lessee may have against Lessor or any other person. Additionally, Lessee will not assert against any assignee of this Agreement any defense, counterclaim, setoff or recoupment by reason of any past, present, or future claims which Lessee may have against Lessor.

**4.      LOCATION, USE AND MAINTENANCE OF THE EQUIPMENT**

(a)      The Equipment will be kept at the Location as set out in the Lease Agreement and will not be removed without the prior written consent of the Lessor.

**5.      OWNERSHIP PLATES, INSPECTION AND TESTING**

(a)      The Lessor may at any time during the Lease Period require inspection of the Equipment. For such purpose, the Lessee will ensure that the Lessor and its authorized representatives have access to the Equipment and the premises at which the Equipment is located and to the records (including books of accounts) relating to the Equipment, during normal business hours. The Lessee will keep proper accounts of all its dealings in relation to the Equipment and deliver to the Lessor any such records when requested by the Lessor.

**6.      PROHIBITION AGAINST DEALING WITH EQUIPMENT**

(a)      The Lessee will not (i) sell, transfer, lease, sub-lease or otherwise dispose of the Equipment (ii) create or permit to subsist any security interest on the Equipment (iii) affix the Equipment to any premises in such a manner as to make it a part of such premises (iv) represent itself to be, hold itself out as being or suffer or permit anything to be done whereby it may be reputed to be, the owner of the Equipment and/or (v) alter or modify or permit any alteration of the Equipment, without the Lessor's prior written consent.

(b)      The Lessee will notify the Lessor immediately of any enforcement of any security interest created by it and/or any landlord of the premises on or in which the Equipment is located or the appointment of any receiver of all or part of the assets of the Lessee.

**7.      REPRESENTATIONS AND WARRANTIES**

(a)      The Lessee represents and warrants to the Lessor that: (i) it has the power to enter into and perform, and has taken all necessary action to authorize the entry into and performance of the Lease Agreement and the transactions contemplated by the Lease Agreement; and (ii) all information supplied by it or on its behalf to the Lessor in connection with the Lease Agreement and any Guarantee (as the case may be) are true and accurate as at the date at which it is stated to be given.

**8.      TOTAL LOSS AND INSURANCE**

(a)      The Lessee will bear the risks related to a Total Loss of the Equipment after delivery. If a Total Loss occurs with respect to the Equipment, Lessee will promptly notify Lessor thereof. On the Lease Payment date following such notice, Lessee will pay to Lessor an amount equal to the Termination Sum plus a sum equal to the calculated residual value at the time of expiration of the Lease Period, if any. Upon the making of such payment by Lessee, the payment obligation for such Equipment will cease, the Lease Agreement as to such Equipment will terminate and, except in the case of a Total Loss, Lessor will be entitled to recover possession at Lessee's expense in accordance with Clause 12 below. *Provided* that Lessor has received all payments to be made by the Lessee under this Lease Agreement, the Lessee will be entitled to the proceeds of any recovery in respect of that Equipment from insurance or otherwise.

(b)      If not agreed otherwise in writing, the Lessee will at its own expense insure the Equipment on a policy and terms with such insurers as may be approved by the Lessor and will keep this insurance coverage in place until the Equipment is returned to the Lessor or the title has been transferred to the Lessee.

(c)      The Lessee hereby irrevocably appoints the Lessor as its attorney to recover in its and the Lessee's name any claim for loss of or damage to the Equipment under any insurance or otherwise and to give effectual releases and receipts therefor. The proceeds of the insurances will be paid to the Lessor and applied towards satisfaction of all amounts owing by the Lessee to the Lessor under the Lease Agreement.

(d)      If the Lessee fails to comply with this Clause 8 the Lessor may (but is not obligated to do so), at the expense of the Lessee, effect any insurance, and all costs and expenses incurred in so doing will be repaid to the Lessor by the Lessee on demand.

**9.      SECURITY DEPOSIT**

CONFIDENTIAL                                                          FRANCISCAN-00052172

(a)        The Lessee will, in order to secure and guarantee performance of the obligations under this Lease Agreement, pay the Deposit as set out in the Lease Agreement upon commencement of this Lease Agreement. No interest will accrue on the Deposit.

(b)        The Lessor will, if the Lessee will have fully performed all obligations under this Lease Agreement, return the Deposit to the Lessee upon the expiration of the Lease Period.

(c)        In the event the Lessee fails to perform any of its obligations under this Lease Agreement, the Lessor may apply the Deposit to the payment of any liabilities owed by the Lessee to the Lessor under this Lease Agreement, including, without limitation, delayed Lease Payments.

(d)        If the Lessor applies the Deposit pursuant to (c) above, the Lessee will immediately restore the Deposit and pay to the Lessor the interest accrued on such delayed payment as set forth in Clause 3(d) hereof until the date of such restoration.

**10.        SECURITY AND GUARANTEE**

(a)        At the request of the Lessor, the Lessee will, immediately upon execution of this Lease Agreement, provide the Lessor with guarantees and/or securities in the form and substance approved by the Lessor.

(b)        Following the execution of this Lease Agreement, the Lessor may request (additional) securities and guarantees from the Lessee as necessary from time to time in the event of a material adverse change in the credit status of any Obligor or a decrease in value of the securities. Upon such request, the Lessee will immediately provide the Lessor with additional securities and guarantees at its own expense to the extent satisfactory to the Lessor.

c)        There will be no division or allocation among any guarantees and/or securities provided to the Lessor in accordance with or relating to this Lease Agreement. The Lessor will be entitled to the full satisfaction of its claim, from any proceeds that may be derived under the enforcement of the guarantee and/or securities or sale thereof.

**11.        OWNERSHIP IN THE EQUIPMENT**

The Lessor will be the sole legal and beneficial owner of the Equipment and the Lessee will not do or permit to be done anything that could prejudice the rights of the Lessor in respect of the Equipment. During the Lease Period ownership in the Equipment will not for any reason pass to the Lessee.

**12.        RETURN OF EQUIPMENT**

(a)        In the event that the Lease Agreement is terminated for any reason other than by reason of a Total Loss, the Lessee will, at its own risk, cost and expense, immediately (i) return the Equipment to the Lessor or its designated agent, by delivering the Equipment to such address as the Lessor may require or (ii) allow the Lessor access to pick up the Equipment. The Lessee will return the Equipment to the Lessor, free and clear of any security interest and in good working condition without any damage or fault which would affect the value of the Equipment or its operation (reasonable wear and tear excepted) together with all licenses, certificates and other documents relating to the Equipment.

(b)        If upon return the Equipment is not in the condition stated in Clause 12(a) above, the Lessor may at its own discretion cause such repair works as it deems necessary to be carried out by a provider of its choice. All costs and expenses in connection with such repairs will be paid by the Lessee.

**13.        END OF LEASE OPTIONS**

13.1        OPTION A

(a)        *Provided* that the Lessee has fulfilled all its obligations under this Lease Agreement and paid the Balloon Payment, if any, in full, title to the Equipment will pass to the Lessee on an "as is where is" basis without any warranties whatsoever given by the Lessor, upon expiry of the Lease Period.

(b)        The Lessee may request the Lessor to re-lease all (but not part thereof) of the Equipment to the Lessee after the expiry of the Lease Period, *provided* that the Lessee's financial situation has not deteriorated and that the Lessee has duly fulfilled its obligations under this Lease Agreement. The new Lease Payments to be stipulated for the period covered by the lease renewal will be calculated on the basis of an amount that is at least equal to the Balloon Payment. If the Lessee wishes to renew the Lease Agreement, it will notify the Lessor in writing no less than ninety (90) days prior to the expiry of the Lease Period. If the Lessor does not confirm acceptance of the Lessee's request within four (4) weeks, it is deemed to have been declined. In case the Lessor refuses such request, the Lessee continues to be obliged to make the Balloon Payment in the manner and on the date as specified in the Lease Agreement.

13.2        OPTION B

*Provided* that no Event of Default has occurred at the expiry of the Lease Period, the Lessee may, by giving the Lessor no less than 90 days prior to the expiry of the Lease Period written notice, exercise one of the options below. If the Lessee does not notify Lessor

CONFIDENTIAL                                                                     FRANCISCAN-00052173

within this period, the Lease Agreement will be automatically renewed for a period of one (1) month at any one time, unless either Party gives notice to the other party no less than two (2) weeks prior to the expiry of the respective renewal period of its desire to terminate the Lease Agreement. Unless otherwise agreed between the Parties, the Lessee will in such case return the Equipment to the Lessor in accordance with Clause 12 hereof.

(a)     The Lessee may request the Lessor to sell all (but not part thereof) of the Equipment to the Lessee after the expiry of the Lease Period and the Lessor will meet such request *provided* that the Lessee has fulfilled all its obligations under this Lease Agreement. The purchase price of the Equipment will be an amount equal to the fair market value, as determined by the Lessor, at its sole discretion. Upon payment of the purchase price, title to the Equipment will pass to the Lessee on an "as is where is" basis without any warranties whatsoever given by the Lessor. If no sale can be achieved, the Lessee will return the Equipment to the Lessor immediately upon the expiry of the Lease Period in accordance with Clause 12 hereof.

(b)     The Lessee may request the Lessor to re-lease all (but not part thereof) of the Equipment to the Lessee after expiry of the Lease Period, *provided* that, that the Lessee's financial situation has not deteriorated and that the Lessee has duly fulfilled its obligations under this Lease Agreement. If the Lessor does not confirm acceptance of the Lessee's request within four (4) weeks, it is deemed to have been declined. The Lease Payments and the Lease Period of the re-lease will be determined between the Parties hereto at the time of re-lease. If the Lessor refuses such request, the Lessee will return the Equipment to the Lessor immediately upon the expiry of the Lease Period in accordance with Clause 12 hereof.

**14.     EVENT OF DEFAULT**

Each of the events set out in this Clause 14 is an Event of Default. Upon the occurrence of an Event of Default, the Lessor may by written notice to the Lessee terminate the Lease Agreement, which will take effect in accordance with its terms.

(a)     An Obligor does not pay on the due date any amount payable by it under the Lease Agreement or any Guarantee in the prescribed manner.

(b)     An Obligor does not comply with any term of the Lease Agreement, any Guarantee, any Sales/Use, License and Service Agreement between Lessor and Lessee, or any other similar agreement governing the use of the Equipment.

(c)     Any representation made or repeated by an Obligor in the Lease Agreement or any Guarantee is proved to be incorrect in any material respect when made or deemed to be repeated.

(d)     Any of the indebtedness of an Obligor is not paid when due, becomes prematurely due and payable, is placed on demand, or is cancelled or suspended as a result of an Event of Default.

(e)     Any Obligor is unable to pay its debts as they fall due, admits its inability to pay its debts as they fall due, or is otherwise deemed for the purposes of any law to be insolvent, suspends making payments on any of its debts or announces an intention to do so, or (by reason of actual or anticipated financial difficulties) begins negotiations with any creditor for the rescheduling of any of its indebtedness.

(f)     Any step is taken with a view to a moratorium, rehabilitation or composition with any of an Obligor's creditors, a meeting of its shareholders, directors or other officers is convened for the purpose of considering any resolution for, to petition for or to file documents with a court or any registrar for, its winding-up, bankruptcy, dissolution or judicial management or any such resolution is passed or any person petitions for or files documents for the same, an order for its bankruptcy, winding-up, judicial management or dissolution is made or any other analogous step or procedure is taken in any jurisdiction.

(g)     Any provisional attachment, attachment, sequestration, distress, execution or analogous event affects any asset(s) of an Obligor and is not discharged within 14 days.

(h)     Where the Obligor is an individual, the Obligor dies, becomes partly or wholly incapacitated.

(i)     It is or becomes unlawful for an Obligor to perform any of its obligations under the Lease Agreement or any Guarantee, or the Lease Agreement or any Guarantee is not effective in accordance with its terms or is alleged by an Obligor to be ineffective in accordance with its terms for any reason.

(j)     An event or series of events occur which, in the opinion of the Lessor, is likely to result in a Total Loss.

(k)     The Lessee abandons the Equipment or does anything which, in the opinion of the Lessor, prejudices the rights of the Lessor in or over the Equipment.

(l)     There is, in the Lessor's opinion, a material change in the shareholding of a corporate Obligor or any person, or group of persons acting in concert, acquires control of a corporate Obligor.

(m)     An event or series of events occur which, in the opinion of the Lessor, have or are likely to have a material adverse effect on the financial condition of any Obligor.

**15.     TERMINATION**

CONFIDENTIAL                                                                 FRANCISCAN-00052174

(a)      After execution of the Lease Agreement, the Lessee will, except as set out in Clause 15(f), not be entitled to cancel or terminate the Lease Agreement before expiration of the Lease Period.

(b)      Any termination of the Lease Agreement and any delivery of the Equipment by the Lessee to the Lessor will be without prejudice to any right or claim the Lessor may have against the Lessee under the Lease Agreement (including, without limitation, for arrears in Lease Payment, other sums payable by the Lessee under the Lease Agreement and damages for breach of the Lease Agreement).

(c)      Where the Lease Agreement is terminated due to an Event of Default, the Lessee will pay to the Lessor the Termination Sum.

(d)      Until the Lessor has received the Termination Sum in full, all obligations of the Lessee under the Lease Agreement will continue and the Lessee will continue to pay the Lease Payment notwithstanding any repossession of the Equipment by the Lessor.

(e)      Upon termination of the Lease Agreement, the Lessor will without prejudice to any other rights which it may have, have the right to repossess the Equipment and for this purpose to enter the land, building or premises at which the Equipment are located and the Lessee will give access to or procure that the Lessor or its agents be given access to the land, building or premises for this purpose.

(f)      During the Lease Period, *provided* that no Event of Default has occurred and the Lessee has duly performed all of its obligations under this Lease Agreement and all other Lease Agreements between the Lessee and the Lessor, the Lessee may by written notice to the Lessor request to early terminate the Lease Agreement. On the Lease Payment date following such notice, Lessee will pay to Lessor an amount equal to the Termination Sum. Upon the making of such payment by Lessee, the payment obligation for such Equipment will cease and the Lease Agreement as to such Equipment will terminate. The Lessee will in such case return the Equipment to the Lessor in accordance with Clause 12 hereof.

**16.      SUBMISSION OF MATERIALS**

Upon request by the Lessor for the purpose of credit preservation, the Lessee will immediately provide overall outstanding liabilities of the Lessee, credit status of the Lessee and the Guarantor, and information regarding status of securities to the Lessor, and cooperate with the Lessor for any investigations thereon. At Lessor's request, the Lessee is required to provide a copy of its year-end financial statements as soon as possible and not later than two (2) months from the end of the financial year. The Lessee will immediately notify the Lessor of any material change or any suspected material change in the status of credit or securities of the Lessee or the Guarantor.

**17.      TAXES AND COSTS**

(a)      Lessee is responsible for all license and registration fees, and all sales, use, property, stamp and other taxes and charges relating in any manner to the Equipment or this Lease Agreement, except the Medical Device Excise Tax.

(b)      All payments by the Lessee under the Lease Agreement will be made free and clear of and without any deduction for or on account of any taxes and withholding taxes, except to the extent that the Lessee is required by law to make payment subject to taxes. If any amounts in respect of tax or any other deduction must be made from any amounts payable by the Lessee to the Lessor under the Lease Agreement, the Lessee will pay such additional amounts as may be necessary to ensure that the Lessor receives a net amount equal to the full amount which it would have received had the payment not been made subject to tax or the deduction.

(c)      The Lessee will bear the costs for the protection or exercise of the Lessor's rights, or the protection, collection or disposition of securities including but not limited to the stamp duty, the expense for sending demand or notice to the Lessee, the expenses for registration, change and cancellation of security interest, and all legal fees which Lessor may incur in connection with the enforcement of this Lease Agreement.

(d)      Unless otherwise provided, this Lease Agreement is entered into with the assumption that Lessor is the owner of the Equipment for income tax purposes and is entitled to certain federal and state tax benefits available to the owner of equipment (collectively "Tax Benefits"), including without limitation, accelerated cost recovery deductions and deductions for interest incurred by Lessor to finance the purchase of the Equipment, available under the Code. Lessee represent, warrant, and covenant to Lessor that (a) unless Lessee has provided Lessor with a 501(c)(3) letter indicating that Lessee is tax exempt, then Lessee is not a tax exempt entity (as defined in Section 168(h) of the Code, (b) Lessee will use the Equipment solely within the United States, and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for any tax purposes. If, because of any act or omission by Lessee, or any party acting through Lessee, or the breach or the inaccuracy of any representation, warranty or covenant made by Lessee in this Agreement, Lessor reasonably determine that Lessor cannot claim, are not allowed to claim, lose, or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment (a "Tax Loss"), then Lessee will, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the term of the Lease Agreement as Lessor would have realized but for such Tax Loss.

**18.    INDEMNITY**

The Lessee will indemnify the Lessor against all damages, claims or liabilities which may be incurred or suffered by the Lessor in connection with: (i) the occurrence of any Event of Default; (ii) any late payment of any sum (including, without limitation, any overdue amount) being received from any source otherwise than on its due date; (iii) Lessee's breach of any law affecting the Equipment, their use, operation or leasing, or the Lease Payment to be paid; (iv) any failure of any Obligor to perform any of its obligations under the Lease Agreement or any Guarantee; (v) the execution or enforcement (including any attempts thereof) of any of the rights, powers, remedies, authorities or discretions vested in the Lessor under or pursuant to the Lease Agreement; (vi) any failure or delay by Lessee in completing the procedure required for importation and providing Equipment; (vii) any loss arising from non-or incomplete performance by Lessee of the Lease Agreement, the delivery and the inspection of the Equipment; or (viii) the early termination of refinancing arrangements caused by the cancellation of this Lease Agreement due to non-delivery of the Equipment.

**19.    FORCE MAJURE**

(a)    Neither Lessor nor Lessee will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond that party's control including, but not limited to, acts of terrorism, acts of God, fire, earthquake, war, the threat of imminent war, riots, or other acts of civil disobedience, insurrection, labor or trade disputes, shortage of components, any governmental law, order, regulation, ordinance or any other supranational legal authority, explosion, storms, floods, lightning, or earthquake.

**20.    UCC FILINGS AND FINANCIAL STATEMENTS.**

Lessee authorizes Lessor to file a financing statement with respect to the Equipment and grants the Lessor the right to sign such financing statement on Lessee's behalf. If Lessor deems it necessary, Lessee agrees to submit financial statements (audited if available) on a quarterly basis.

**21.    UCC ARTICLE 2A PROVISIONS.**

Lessee agrees that this Lease Agreement is a Finance Lease as that term is defined in Article 2A of the Uniform Commercial Code ("UCC"). Lessee waives any and all rights and remedies granted Lessee under Sections 2A-508 2A-522 of the UCC.

**22.    MISCELLANEOUS**

(a)    The Lease Agreement will not be construed to be a purchase or an agreement for the purchase of the Equipment by the Lessee.

(b)    The Lessee may not assign or transfer any of its rights and obligations under the Lease Agreement. The Lessor may at any time without the consent of the Lessee assign or transfer any of its rights and obligations under the Lease Agreement and dispose of its rights and title to the Equipment.

(c)    This Lease Agreement constitutes the entire obligation of the parties hereto and supersedes any prior expressions of intent or understandings with respect to this transaction. Any amendment of this Lease Agreement will be in writing and will be signed by duly authorized representatives of both parties hereto.

(d)    No failure or delay on the part of the Lessor to exercise any right provided for in this Lease Agreement will constitute a waiver of such right or any obligation of the Lessee under this Lease Agreement, nor will any single or partial exercise of any such right preclude any further exercise thereof. No waiver by the Lessor hereunder will be effective unless it is in writing. The rights and remedies provided for in this Lease Agreement are cumulative and not exclusive of any other rights or remedies which the Lessor may otherwise have.

(e)    If any one or more of the provisions of this Lease Agreement or any document executed in connection herewith will be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein will not in any way be affected or impaired thereby.

(f)    The obligations of the Obligors under this Lease Agreement will be joint and severable.

(g)    The Lessee acknowledges and agrees that the sole responsibility for determining the proper treatment of this Lease Agreement for tax purposes rests with the Lessee. The Lessor makes no representations whatsoever as to the proper treatment of this Lease Agreement for tax purposes. The Lessee acknowledges that the Lessor is the legal owner of the Equipment.

(h)    All notices, claims, requests, demands, and other formal communications hereunder will be in writing and will be deemed given at the time of personal delivery or completed facsimile, or, if sent by a reputable overnight courier or registered or certified mail, one business day after such sending.

CONFIDENTIAL

FRANCISCAN-00052176

(i)     The Lessee will notify the Lessor promptly of any changes in company name, registered office, and any other matters which may affect this Lease Agreement.

(j)     This Agreement shall be governed by the laws of the State of California, excluding its conflicts of laws principles. With respect to any legal action or proceeding relating to this Agreement, the parties consent and submit to the exclusive jurisdiction of the Federal and State courts located in Santa Clara County, California, and the parties agree that venue therein is proper.

CONFIDENTIAL

FRANCISCAN-00052177

Annex 1 to the Lease Agreement

---

INTUITIVE

**ACCEPTANCE DOCUMENT**

I, the undersigned, as an authorized representative of the below named hospital, acknowledge that the following product was (check the box below which applies):

☐ Delivered        ☐ Installed

| CUSTOMER |
|---|
|  |

| END USER |
|---|
|  |

| CLM Agreement Number: |  |
|---|---|

| Equipment Description | Serial Number |
|---|---|
|  |  |

| ACCEPTANCE |
|---|
| ACCEPTANCE CRITERIA - PER AGREEMENT: |

Signature:_____   Date:_____

Print Name:_____

Title:_____

**Please email signed acceptance letter to Acceptance@Intusurg.com**

837921-03, Rev F

---

CONFIDENTIAL                                FRANCISCAN-00052178

# EXHIBIT ~~D~~C

**SIMNOW da Vinci® Skills Simulator Agreement**

**1.   Use of Simulator.**   ~~Customer~~Organization will ensure the proper use of the Simulator consistent with the Documentation, and ~~Customer~~Organization will ensure the proper management and supervision of the Simulator. ~~Customer~~Organization will not, nor will ~~Customer~~Organization permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the Simulator. Prohibited actions include, but are not limited to: (1) adding or subtracting any ~~Customer~~Organization or third party equipment, hardware, firmware, or software to or from the Simulator, or (2) reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software as originally provided to ~~Customer~~Organization as part of the Simulator without Intuitive's express written permission.

**2.   Data Use.**   ~~Customer~~Organization agrees that Intuitive and its affiliates within the Intuitive Surgical group of companies (collectively, "Intuitive") may collect data relating to the use of Intuitive products ("Data"). In some instances Data may be communicated via data gathering or transmission technology to Intuitive. In other instances, Intuitive may request ~~Customer~~Organization and ~~Customer~~Organization agrees to provide Data to Intuitive. To the extent ~~Customer~~Organization owns such Data, ~~Customer~~Organization authorizes Intuitive to utilize such Data for a variety of purposes, including, but not limited to (1) providing support and preventative maintenance of Intuitive products, (2) improving Intuitive products or services, (3) ensuring compliance with applicable laws and regulations, and (4) providing a general resource for Intuitive's research and business development. Furthermore, to the extent ~~Customer~~Organization owns such Data, ~~Customer~~Organization agrees that Intuitive may share such Data, whether in electronic or written form, with any ~~Customer~~Organization-authorized user of said Intuitive Equipment. Intuitive does not intend to collect protected health information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or analogous foreign patient privacy laws or regulations, as may be amended from time to time. In the event any Data communicated to Intuitive identifies an entity or individual, Intuitive will not share such Data with any third parties without the entity's or individual's consent, unless required by law or regulatory authorities.

**3.   Software License and Restrictions.**   Software embedded within the Simulator is provided under license and is not sold to ~~Customer~~Organization. Subject to the terms and conditions of this SIMNOW da Vinci® Skills Simulator Agreement ("Agreement"), Intuitive grants to ~~Customer~~Organization a non-exclusive, non-transferable, fully paid, restricted use license to use the Software solely as incorporated in the Simulator in machine-executable object code form and solely in connection with the operation of the Simulator as described in the Documentation. ~~Customer~~Organization must not use, copy, modify, or transfer the Software or any copy thereof, in whole or in part, except as expressly provided in this Agreement. In addition, ~~Customer~~Organization must not reverse engineer, decompile, disassemble, attempt to derive the source code for, or otherwise manipulate the Software, except that manipulation of the Software is permitted if, and then only to the extent that, the foregoing prohibition on manipulation is required to be modified by applicable law. In that case, ~~Customer~~Organization must first request from Intuitive the information to be sought from the Software, and Intuitive may, in its discretion, provide information to ~~Customer~~Organization under good faith restrictions and impose reasonable conditions on use of the Software. The structure and organization of the Software are valuable trade secrets of Intuitive and ~~Customer~~Organization will protect the Software as Intuitive's Proprietary Information. Intuitive reserves all rights to the Software not expressly granted to ~~Customer~~Organization.

**4.   Networking Requirements.**   Purchased equipment may require a network connection in order to achieve full functionality. ~~Customer~~Organization acknowledges that when Simulator is in use, ~~Customer~~Organization is responsible for maintaining an active network connection to Intuitive Surgical Simulator infrastructure as specified in the Simulator's network requirements, for the purpose of supporting all services such as, latest simulation updates, OS patches, anti-virus updates, data backup and user account management capabilities. ~~Customer~~Organization is responsible for the security of the Simulator and the security of the internal network to which the Simulator is configured. Intuitive reserves the right to change, add, or remove functionalities or features at any time.

**5.   Information Security.**   ~~Customer~~Organization is responsible for maintaining the confidentiality of its username(s), password(s), account(s), as well as all activities that occur under that account(s) and both the physical and cyber-security of the Simulator.

**6.   Hardware Update.**   Intuitive reserves the right to exchange and update Simulator hardware, as necessary, to maintain full functionality.

**7.   Service.**   Under the terms of this Agreement, ~~Customer~~Organization will receive access to the Intuitive Surgical library of basic, advanced, and procedure skills simulation. In the event of nonpayment, access to the Intuitive Surgical library of basic, advanced, and procedure skills simulation will be suspended. ~~Customer~~Organization will pay the invoiced amount not later than ~~thirty (30)~~forty-five (45) days after the date of invoice. ~~Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.~~

Franciscan Alliance:
Rev date: ~~31Oct2019~~
MA-_____

CONFIDENTIAL                                                                    FRANCISCAN-00052179

**8.  Opt Out.**  At any time during the term of this Agreement, with thirty (30) days prior written notice, ~~Customer~~Organization may opt-out of the Simulator Service. For the avoidance of doubt, ~~Customer~~Organization will not receive a refund of any prepaid, unused Service fees.

**9.  Entire Agreement; Amendment.**  Excluding the Service Agreements between the parties dated September 30, 2019 listed in Section 15.15 ("Entire Agreement; Amendment") of the Master Agreement, ~~T~~this Agreement is the entire agreement between Intuitive and ~~Customer~~Organization and supersedes any other prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter herein, pricing, and the applicable terms. Any terms or conditions in ~~Customer~~Organization's purchase order that are different from, inconsistent with, or in addition to, the terms and conditions of this Agreement will be void and of no effect, unless otherwise mutually agreed to in writing by the parties. This Agreement may be amended only in writing, signed by both parties.  Any purported oral modification intended to amend the terms and conditions of this Agreement is void.

CONFIDENTIAL                    FRANCISCAN-00052180

## EXHIBIT D

### System Move Letter Template / Assignment and Assumption Agreement Template

**Commented [FA2]:** FRANCISCAN ALLIANCE:  Please send us this form so we can review it.

CONFIDENTIAL

FRANCISCAN-00052181

## EXHIBIT E

### Business Associate Agreement

This BUSINESS ASSOCIATE AGREEMENT ("Agreement") is made and entered into for and on behalf of the healthcare entities of Franciscan Alliance, Inc. acting for and on behalf of its corporate partners which are listed in Attachment No. 1, attached hereto (hereinafter collectively referred to as "PROVIDER") and Intuitive Surgical, Inc. ("BUSINESS ASSOCIATE").

### RECITALS

A.   PROVIDER and BUSINESS ASSOCIATE have entered into, and may in the future enter into, one or more underlying contracts or purchase orders ("Underlying Contracts") that will require BUSINESS ASSOCIATE to perform, or assist in the performance of a function or activity, or otherwise provide services of a type for PROVIDER which qualifies BUSINESS ASSOCIATE as a "Business Associate" as that term is defined by the Health Insurance Portability and Accountability Act of 1996 and all such regulations promulgated thereunder ("HIPAA").

B.   BUSINESS ASSOCIATE, in fulfilling its obligations for and on behalf of PROVIDER, shall be expected to create or receive and maintain certain Protected Health Information and other forms of nonpublic personal information, including, but not limited to, social security numbers and other identifying information protected under applicable state law(s) (hereinafter collectively referred to as "PHI") from time to time that is the property of PROVIDER.

C.   PROVIDER and BUSINESS ASSOCIATE desire to enter into this Agreement which shall supplement each of the Underlying Contracts, as required by HIPAA, in order to provide satisfactory assurances to PROVIDER that BUSINESS ASSOCIATE shall maintain appropriate Administrative, Physical and Technical Safeguards to protect the Confidentiality, Integrity and Availability of all such PHI in accordance with  HIPAA as amended, including but not limited to the statutory amendments to HIPAA that were enacted under Title XIII of the American Recovery and Reinvestment Act of 2009 ("ARRA") which is entitled the Health Information Technology for Economic and Clinical Health ("HITECH") Act (hereinafter collectively referred to as "HIPAA") and other applicable requirements discussed herein.  Except as supplemented, the terms of the Underlying Contracts shall continue unchanged and shall apply with full force and effect as to the matters addressed therein.

**NOW THEREFORE, PROVIDER and BUSINESS ASSOCIATE agree as follows:**

1.   **Definitions.**  All capitalized terms and phrases in this Agreement shall have the same meanings as defined by HIPAA and if not otherwise defined therein, shall have their ordinary and customary meaning.

2.   **Restriction on Use and Disclosure of Protected Health Information.**  BUSINESS ASSOCIATE shall not Use or Disclose PHI except as permitted or required by an Underlying Contract, this Agreement, or HIPAA.

3.   **Authorized Uses and Disclosures.**  BUSINESS ASSOCIATE is hereby authorized to Use and Disclose PHI on a "Need to Know" basis, but only in connection with the performance of the particular functions, activities or services set forth in the Underlying Contracts or as otherwise required by PROVIDER, in writing, from time to time.  BUSINESS ASSOCIATE may also Use and Disclose PHI for the proper management and administration of BUSINESS ASSOCIATE to carry out the legal responsibilities of BUSINESS ASSOCIATE; provided (a) the Disclosure is Required by Law; or (b) BUSINESS ASSOCIATE obtains reasonable assurances from the third party to whom the PHI is Disclosed that the PHI will be held confidential and will be Used or further Disclosed only for authorized purposes or as otherwise Required by Law, and the third party agrees to immediately notify the BUSINESS ASSOCIATE if there is any reason to believe the confidentiality of the PHI has been breached.

4.   **BUSINESS ASSOCIATE Obligations.**

(a)   **Compliance; Safeguards.**  BUSINESS ASSOCIATE represents and warrants that BUSINESS ASSOCIATE has or will comply with the HITECH Act amendments to HIPAA on or before the compliance dates established therein. BUSINESS ASSOCIATE shall implement and document  appropriate Administrative, Physical and Technical Safeguards in order to preserve the Confidentiality, Integrity and Availability of all PHI and to prevent any unauthorized Use or Disclosure of PHI, or any Breach or actual Security Incident, or other violation of HIPAA (hereinafter collectively referred to as "Incident") and make all such documentation available to PROVIDER for review upon request.

Franciscan Alliance:
Rev date: 31Oct2019
MA-_____

CONFIDENTIAL                                                                              FRANCISCAN-00052182

(b)     **Reporting.** BUSINESS ASSOCIATE shall report to PROVIDER'S Privacy Officer any Incident that BUSINESS ASSOCIATE has reason to believe has or may have resulted in a breach of the Confidentiality, Integrity or Availability of PHI. BUSINESS ASSOCIATE shall report all Incidents to PROVIDER'S Privacy Officer, not more than twenty-four (24) hours after BUSINESS ASSOCIATE learns of the Incident. Said report shall identify: (i) the known facts and circumstances related to the Incident; (ii) the PHI that is known to be the subject of the Incident; (iii) the persons who are known to have information about the Incident; and (iv) the corrective action that BUSINESS ASSOCIATE took or will take to mitigate any deleterious effects of the Incident and to prevent future Incidents. BUSINESS ASSOCIATE shall submit a written report to PROVIDER for review upon request. Additionally, BUSINESS ASSOCIATE, in its capacity as a "service provider" to PROVIDER under the FTC Red Flags Rule set forth at 16 CFR part 681, as amended, shall report to PROVIDER any suspicious circumstances or "red flags" indicative of actual or possible identity theft or deception as required therein.

(c)     **Agents, Contractors, and Subcontractors.** BUSINESS ASSOCIATE shall ensure that any agent, contractor, or subcontractor, to whom it provides Protected Health Information, agrees, in writing, to the same restrictions and conditions that apply to BUSINESS ASSOCIATE under **this Agreement.**

(d)     **Patient's Access to PHI.** BUSINESS ASSOCIATE shall act in a manner that permits PROVIDER to permit Patient Access to PHI in accordance with HIPAA as amended.

(e)     **Amendment of PHI.** BUSINESS ASSOCIATE shall act in a manner that permits PROVIDER to make amendments to PHI in accordance with HIPAA, as amended.

(f)     **Accounting of Disclosures.** BUSINESS ASSOCIATE shall act in a manner that permits PROVIDER to provide an accounting of Disclosures to Patients in accordance with HIPAA, as amended.

(g)     **Practices, Books and Records.** BUSINESS ASSOCIATE shall make its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by BUSINESS ASSOCIATE on behalf of PROVIDER, available to the Secretary for the purpose of determining PROVIDER'S compliance with the HIPAA, subject to the BUSINESS ASSOCIATE'S professional obligations with respect to such practices, books and records. For purposes of clarity, this provision does not obligate BUSINESS ASSOCIATE to provide any information unrelated to the services provided to PROVIDER by BUSINESS ASSOCIATE pursuant to the Underlying Contracts.

(h)     **Cure of Noncompliance.** If PROVIDER notifies BUSINESS ASSOCIATE of any Incident, or alternatively, if BUSINESS ASSOCIATE notifies PROVIDER of an Incident under Section 4(b) herein, BUSINESS ASSOCIATE shall immediately take all steps necessary to cure any such Incident immediately, notwithstanding PROVIDER'S right to terminate the Underlying Contract(s) and this Agreement under Section 6(a) herein.

(i)     **Mitigation.** BUSINESS ASSOCIATE shall take reasonable steps to mitigate, to the extent practicable, any harmful effect to PHI that is known to BUSINESS ASSOCIATE or communicated to BUSINESS ASSOCIATE by PROVIDER that is the result of any Incident; provided, however, that this provision shall not be deemed to permit or excuse any such violation.

(j)     **Legal Obligations.** In the event BUSINESS ASSOCIATE believes it has a legal obligation to further Disclose any PHI in BUSINESS ASSOCIATE'S possession, including, but not limited to obligations that arise from the issuance of a third party discovery request, subpoena or court order, BUSINESS ASSOCIATE shall notify PROVIDER as soon as reasonably practical after it learns of such obligation, and in any event within a time sufficiently in advance of the proposed release date such that PROVIDER'S rights and interests would not be prejudiced, as to the legal requirement pursuant to which BUSINESS ASSOCIATE believes the PHI must be released. If PROVIDER objects to the release of such PHI, BUSINESS ASSOCIATE shall allow PROVIDER to exercise any legal rights or remedies which either PROVIDER or BUSINESS ASSOCIATE might have with respect to the further Disclosure of PHI.

(k)     **Return or Destruction of the PHI.** Upon the termination of the business relationship between PROVIDER and BUSINESS ASSOCIATE, BUSINESS ASSOCIATE shall return to PROVIDER, or, at PROVIDER'S direction, destroy, all PHI that BUSINESS ASSOCIATE has created or received and maintained or stored in any medium or

CONFIDENTIAL

FRANCISCAN-00052183

storage system, pursuant to the Underlying Contracts, subject to any professional responsibilities of BUSINESS ASSOCIATE to maintain such information, in which event BUSINESS ASSOCIATE shall maintain all such PHI in accordance with its custom and practice with respect thereto.  BUSINESS ASSOCIATE shall complete such return or destruction of PHI (if applicable) as promptly as possible, but not later than thirty (30) days after the effective date of the termination, cancellation, expiration or other conclusion of the Underlying Contracts. BUSINESS ASSOCIATE shall identify any recorded PHI of PROVIDER that is in BUSINESS ASSOCIATE'S possession and which cannot feasibly be returned to PROVIDER or destroyed, and BUSINESS ASSOCIATE shall limit any further Use of that PHI to those purposes that make return or destruction of said PHI infeasible.  Within said thirty (30) days, BUSINESS ASSOCIATE shall certify to PROVIDER, in writing and under oath, (i) that the return of all PHI has been completed; and (ii) that any PHI not returned will be Used or Disclosed by BUSINESS ASSOCIATE only for those purposes which make return of the PHI infeasible or not required.  BUSINESS ASSOCIATE shall remain bound by the provisions of this Agreement, even after termination of any Underlying Contracts, until such time as all PHI has been (i) returned to PROVIDER; (ii) De-Identified; or (iii) otherwise destroyed as provided in this Section; provided that the parties understand and agree that certain unrecorded information cannot be returned, destroyed, or De-Identified, so the BUSINESS ASSOCIATE shall remain bound by the provisions of this Agreement so long as BUSINESS ASSOCIATE possesses the PHI.

5.  **Term of this Agreement.**  This Agreement shall be effective when executed on behalf of both of the parties hereto and shall continue in full force and effect until the effective date of the termination, cancellation, expiration or other conclusion of all Underlying Contracts executed by and between the parties hereto.

6.  **Remedies.**

   (a)  **Termination.**     PROVIDER may terminate the business relationship between PROVIDER and BUSINESS ASSOCIATE, including any Underlying Contracts, agreements, arrangements or understandings, whether or not in writing, upon which the business relationship is based and such other agreements, arrangements or understandings are hereby amended to permit such termination, if PROVIDER determines that BUSINESS ASSOCIATE has violated a material term of this Agreement or HIPAA that cannot otherwise be cured by BUSINESS ASSOCIATE under Section 4(h) herein.  Termination of the business relationship by PROVIDER shall be in addition to and not in place of any other remedies that may be available to PROVIDER.

   (b)  **Injunction.**     Notwithstanding any other rights or remedies provided for in this Agreement, the parties agree that PROVIDER may seek injunctive relief to prevent or stop the unauthorized Use or Disclosure of PHI by BUSINESS ASSOCIATE, or any agent, subcontractor or other third party that received PHI from BUSINESS ASSOCIATE, without the necessity of proving actual damages or the occurrence of an unauthorized Use or Disclosure or other Security Incident.

7.  **Conflicting Laws and Obligations.**  If BUSINESS ASSOCIATE believes that it is unable to comply with any of its obligations under this Agreement due to any conflicting laws, regulations, pronouncements, or ethical obligations, it may seek a determination, or judgment, from a court of competent jurisdiction regarding its ability to comply with such obligations, so long as such actions will not cause PROVIDER to be in violation of HIPAA.

8.  **Notices.**  Any notices required or permitted to be given under this Agreement shall be in writing and shall be personally delivered or sent by certified or registered mail, first class postage prepaid, return receipt requested, or by prepaid overnight delivery service such that proof of delivery will be obtained, and shall be addressed as set forth below or to such other address as may be specified in a prior written notice to the other party:

| If to PROVIDER: | IF to BUSINESS ASSOCIATE: |
|---|---|
| Franciscan Alliance, Inc. | Intuitive Surgical, Inc. |
| ATTN:  Security Officer | ATTN:  Legal or Contracts Dept. |
| 1500 Albany Street | 1020 Kifer Road |
| Beech Grove, Indiana 46107 | Sunnyvale, California 94086 |

Franciscan Alliance:
Rev date: 31Oct2019
MA-_____

CONFIDENTIAL                                                                                          FRANCISCAN-00052184

Such notice shall be deemed to be given on the date it is deposited in the mail as stated above, on the date it is given to the overnight delivery service, or the date it is given personally to the party to whom it is directed.  A notice shall be deemed to have been given personally to a party if it is handed to the representative of the party to whom the notice must be addressed or if left at his or her office located at the street address to which a notice would be mailed.

9.      **Amendment.**  This Agreement may not be changed, modified, or amended except by a written agreement executed by an authorized representative acting on behalf of each of the parties.

10.     **No Waiver.**  No waiver of one or more of the provisions of this Agreement or the failure to enforce any provision of this Agreement by either party shall be construed as a waiver of any subsequent breach of this Agreement, or a waiver of the right at any time thereafter to require strict compliance with all of its terms.

11.     **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between the parties as to the matters contained in it, and supersedes all prior discussions, agreements, and understandings of every kind and nature between them.

12.     **Headings.**  The headings placed before the various paragraphs and subparagraphs of this Agreement are inserted for each of reference only, do not constitute a part of this Agreement, and shall not be used in any way whatsoever in the construction or interpretation of this Agreement.

13.     **Governing Law.**  This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the state of Indiana without reference to the choice of laws principles thereof.

        **IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

**"PROVIDER"**                                          **"BUSINESS ASSOCIATE"**

**Franciscan Alliance, Inc.**                           **Intuitive Surgical, Inc.**

BY: _____        BY: _____

NAME: _____        NAME: _____

ITS: _____        ITS: _____

DATED: _____        DATED: _____

CONFIDENTIAL                                                          FRANCISCAN-00052185

**EXHIBIT E - ATTACHMENT NO. 1**

**LIST OF HEALTH CARE ENTITIES**

| | |
|---|---|
| Franciscan Health Crown Point<br>1201 South Main Street<br>Crown Point, IN  46307 | Franciscan Health Carmel<br>North Meridian Medical Pavilion<br>12188 North Meridian Street, Building B<br>Carmel, IN  46032 |
| Franciscan Health Michigan City<br>3500 Franciscan Way<br>Michigan City, IN  46360 | Franciscan Health Indianapolis<br>8111 South Emerson Avenue<br>Indianapolis, IN  46237 |
| Franciscan Health Dyer<br>24 Joliet Street<br>Dyer, IN  46311-1799 | Franciscan Health Mooresville<br>1201 Hadley Road<br>Mooresville, IN  46158 |
| Franciscan Health Hammond<br>5454 Hohman Avenue<br>Hammond, IN  46320 | Franciscan Health Olympia Fields<br>20201 South Crawford Avenue<br>Olympia Fields, IL  60461 |
| Franciscan Health Munster<br>701 Superior Avenue<br>Munster, IN  46321 | Franciscan Physician Network<br>1515 Dragoon Trail<br>Mishawaka, IN 46544 |
| Franciscan Health Crawfordsville<br>1710 Lafayette Road<br>Crawfordsville, IN  47933 | Franciscan WorkingWells<br>1515 Dragoon Trail<br>Mishawaka, IN 46544 |
| Franciscan Health Lafayette Central<br>1501 Hartford Street<br>Lafayette, IN  47904 | Alverno Clinical Laboratories, LLC<br>2434 Interstate Plaza Drive<br>Hammond, IN  46324 |
| Franciscan Health Lafayette East<br>1701 South Creasy Lane<br>Lafayette, IN 47905 | Specialty Physicians of Illinois, LLC<br>3700 West 203rd Street<br>Olympia Fields, IL 60461 |
| Franciscan Health Rensselaer<br>1104 East Grace Street<br>Rensselaer, IN  47978 | |

Acute-care facilities acquired by Franciscan Alliance, Inc. after the date of this Business Associate Agreement will be considered Franciscan Alliance facilities and/or its corporate partners for purposes of this Business Associate Agreement as of the date of their acquisition by Franciscan Alliance.  For purposes of this Business Associate Agreement, "acquisition" means obtaining 50% or more ownership in said facility.

Non-acute care facilities (clinics, physician offices, etc.) associated with the acute-care facilities will be considered Providers in this Business Associate Agreement and need not be listed individually.

CONFIDENTIAL

FRANCISCAN-00052186