# ATTACHMENT 74

**From:** Jody Szatkiewicz <Jody.Szatkiewicz@intusurg.com>
**To:** "ssosag@larkinhospital.com" <ssosag@larkinhospital.com>, "mearly@larkinhospital.com" <mearly@larkinhospital.com>
**Cc:** Michael Pennie <Mike.Pennie@intusurg.com>, Jason Fromer <Jason.Fromer@intusurg.com>, Eduardo Vazquez <Eddie.vazquez@intusurg.com>
**Subject:** daVinci Follow Up
**Date:** Tue, 23 May 2017 17:53:37 -0500
**Importance:** Normal
**Attachments:** Larkin_Community_Hospital,_FL_82989_SD_5-22-17.pdf; Larkin_Community_Hospital,_FL_82994_SD_5-22-17.pdf; 1_Lease_T&C.docx; 1_ULSA_T&C.docx; Larkin_Implemention_Plan.docx

---

Good Evening Sandy and Mark,

Thank you for your time today to review Larkin Community Hospital's goal around launching your robotics program. We look forward to partnering with you and providing the full array of resources the Intuitive Surgical Ecosystem has to offer to ensure a successful program. As we just discussed, on top of all of the capital discounts, I gained approval to offer additional cost savings by means of lowering the interest rate to 3% on the FMV Lease. This is an additional savings of $4,220.44/month or $253,226.40 over the life of the lease, you will not find a more competitive rate anywhere in the market. Below is the breakdown of the new monthly payment options:

| ISI FMV lease at 3% | | | |
|---|---|---|---|
| System | Cost | 36 mos. | 60 mos. |
| Xi | 1,750,000.00 | 41,611.90 | 28,744.94 |
| Si- R | 876,500.00 | 20,841.62 | 14,397.11 |

There are quite a few attachments on this email and they are as follows:

1. Xi – initial stocking order
2. Si-R initial stocking order
3. **Agnostic Lease T & C's, <u>please get this to your legal dept to begin redlining asap</u>**
4. **Agnostic ULSA T & C's, <u>please get this to your legal dept to begin redlining asap</u>**
5. Implementation Timeline for rollout

Important actions/timelines to meet your goals to keep top of mind:

**June 15th – 1st cases**
**June 9th – Delivery of the Si-R and Xi Systems**
**May 31st – Executed Contracts**

Mike Pennie has reached out to Hary and scheduled to review your Sterile Processing Equipment along with room setup for the 2 systems. We should have clarity on everything by our meeting on Thursday. Please call my cell phone with any questions 954-554-8855.

All the best,



DEFENDANT'S
EXHIBIT
26
VO

CONFIDENTIAL

LARKIN-00009051

**Jody J. Szatkiewicz**
Area Sales Manager
Intuitive Surgical, Inc - da Vinci Surgical Systems
Mobile: 954-554-8855
Jody.Szatkiewicz@intusurg.com
Visit: www.davincisurgery.com and www.davincistories.com

CONFIDENTIAL

LARKIN-00009052

 

Intuitive Surgical, Inc.
1266 Kifer Road
Sunnyvale, CA 94086
800-876-1310

*Taking surgical precision beyond the limits of the human hand™*

## Quote Details / Company Information

| Quote Details | | Company Information | |
|---|---|---|---|
| Quote ID | 82989.0 | Hospital Name | Larkin Community Hospital |
| Quote Date | 5/22/2017 | NS ID / IDN Affiliation | 11353/Larkin Community Hospital |
| Valid Until | 6/15/2017 | Address | 7031 SW 62nd Ave |
| Sales Rep | Eduardo Vazquez | City, State, Zip | Miami, FL, 33143-4701 |
| Phone Number | 1(305) 510-5774 | Contact Name | |
| Email | Eddie.vazquez@intusurg.com | Telephone | |

### Please Fax all Purchase Orders to: 408-523-2377

### Items

| Part Number | Qty | Item | Uses | Units | Price | Subtotal |
|---|---|---|---|---|---|---|
| **Single-Site** | | | | | | |
| 478115 | 2 | 5mm Single-Site® Wristed Needle Driver | 10 | 1 | $2,800.00 | $5,600.00 |
| 478093 | 2 | 5mm Single-Site® Fenestrated Bipolar Forceps 6 Units/Box | 1 | 6 | $1,800.00 | $3,600.00 |
| 478090 | 2 | 5mm Single-Site® Permanent Cautery Hook | 10 | 1 | $1,500.00 | $3,000.00 |
| 478062 | 2 | 5x300mm Single-Site® Curved Cannula Camera Left | - | 1 | $1,500.00 | $3,000.00 |
| 478263 | 2 | 8mm Single-Site® Camera Cannula | - | 1 | $1,500.00 | $3,000.00 |
| 478065 | 3 | Single-Site® Port 10 Units/Box | 1 | 10 | $1,500.00 | $4,500.00 |
| 478071 | 2 | 5x250mm Single-Site® Curved Cannula Camera Right | - | 1 | $1,500.00 | $3,000.00 |
| 478072 | 2 | 5x250mm Single-Site® Curved Cannula Camera Left | - | 1 | $1,500.00 | $3,000.00 |
| 478061 | 2 | 5x300mm Single-Site® Curved Cannula Camera Right | - | 1 | $1,500.00 | $3,000.00 |
| 478058 | 2 | 5mm Single-Site® Fundus Grasper | 10 | 1 | $1,300.00 | $2,600.00 |
| 428076 | 2 | 10mm Single-Site® Accessory Cannula | - | 1 | $900.00 | $1,800.00 |
| 428064 | 2 | 5X300 Single-Site® Flexible Blunt Obturator | - | 1 | $600.00 | $1,200.00 |
| 428074 | 2 | 5X250mm Single-Site® Flexible Blunt Obturator | - | 1 | $600.00 | $1,200.00 |
| 478008 | 2 | 8mm Single-Site® Blunt Obturator | - | 1 | $600.00 | $1,200.00 |
| 478054 | 2 | 5mm Single-Site® Suction Irrigator | 20 | 1 | $600.00 | $1,200.00 |
| 428084 | 2 | 10mm Single-Site® Blunt Obturator | - | 1 | $550.00 | $1,100.00 |
| 478161 | 5 | Single-Site® Universal Seal 10 Units/Box | 1 | 10 | $150.00 | $750.00 |
| **8MM Endowrist Instruments** | | | | | | |
| 470179 | 3 | Hot Shears™ Monopolar Curved Scissors | 10 | 1 | $3,200.00 | $9,600.00 |
| 470205 | 3 | Fenestrated Bipolar Forceps | 10 | 1 | $2,700.00 | $8,100.00 |
| 470296 | 3 | Large SutureCut™ Needle Driver | 10 | 1 | $2,400.00 | $7,200.00 |
| 470207 | 3 | Tenaculum Forceps | 10 | 1 | $2,200.00 | $6,600.00 |
| 470006 | 3 | Large Needle Driver | 10 | 1 | $2,200.00 | $6,600.00 |
| 470093 | 3 | ProGrasp™ Forceps | 10 | 1 | $2,200.00 | $6,600.00 |
| **8MM - 12MM Disposable Accessory** | | | | | | |
| 400180 | 3 | Tip Cover Accessory - 10 Units/Box (used with Monopolar Curved Scissors) | 1 | 10 | $200.00 | $600.00 |
| 470361 | 5 | 5mm - 8mm Universal Seal  10 Units/Box | 1 | 10 | $180.00 | $900.00 |
| 470357 | 5 | 8mm Bladeless Obturator  6 Units/Box | 1 | 6 | $150.00 | $750.00 |
| **Cables** | | | | | | |
| 470383 | 5 | Monopolar Energy Instrument Cord | - | 1 | $270.00 | $1,350.00 |
| 470384 | 5 | Bipolar Energy Instrument Cord | - | 1 | $270.00 | $1,350.00 |
| **Reusable System Accessory** | | | | | | |
| 381216 | 4 | da Vinci® Instrument Release Kit (IRK) English | - | 1 | $0.00 | $0.00 |
| **Disposable System Accessory** | | | | | | |
| 470015 | 5 | Arm Drape 20 Units/Box | 1 | 20 | $1,040.00 | $5,200.00 |
| 470341 | 5 | Column Drape 20 Units/Box | 1 | 20 | $360.00 | $1,800.00 |
| **Advanced Instruments** | | | | | | |
| 480322 | 5 | Vessel Sealer  6 Units/Box | 1 | 6 | $3,570.00 | $17,850.00 |
| **Total** | | | | | | **$117,250.00** |

1 / 2

CONFIDENTIAL

Terms and Conditions

**1) System Terms and Conditions:**

1.1 A signed Sales, License, and Service Agreement ("SLSA") or equivalent is required prior to shipment of the System(s). All site modifications and preparation are the Customer's responsibility and are to be completed to the specification given by Intuitive Surgical prior to the installation date. Delivery is subject to credit approval. Payment terms are net 30 days from Intuitive Surgical's invoice date. Each System includes the patient side cart, vision cart, and surgeon console(s). System enhancements required to support new features may be purchased at Intuitive Surgical's then current list price. The price of the da Vinci® Surgical System includes the initial installation of the System at Customer's facility and a one (1) year warranty for manufacture defect. All taxes and shipping charges are the responsibility of the Customer and will be added to the invoice, as appropriate.

1.2 Intuitive makes no representation with regard to Certificate of Need requirements for this purchase. It is your (the Customer's) responsibility to determine whether this purchase complies with your State's Certificate of Need laws and what Certificate of Need filing, if any, needs to be made with regard to this purchase.

1.3 Customer acknowledges that the cleaning and sterilization equipment, not provided by Intuitive, is required to appropriately reprocess da Vinci instruments and endoscopes. Please refer to the Reprocessing Instructions Part #557085.   Customer is responsible for ensuring that its' cleaning and sterilization program comply with all health and safety requirements.

**2) System Upgrade Terms and Conditions:**

2.1 A signed Purchase Order and/or an addendum to the existing Sales, License, and Service Agreement ("SLSA") is required prior to shipment of the System upgrade. All site modifications and preparation are the Customer's responsibility and are to be completed with the specification given by Intuitive Surgical prior to the installation date.

2.2 Payment terms are net 30 days from Intuitive Surgical's invoice date. The price includes: the System upgrade, the initial installation at Customer's facility and a one (1) year warranty for manufacture defect. All taxes and shipping charges are the responsibility of the Customer and will be added to the invoice, as appropriate. Delivery is subject to credit approval and inventory availability. Standard shipping terms are FCA from Intuitive Surgical™ warehouse.  A $9.95 handling charge will be applied for any shipments using a customer designated carrier.

**3) I&A Terms and Conditions:**

3.1 To place an order, please fax Purchase Order to Intuitive Surgical Customer Service at 408-523-2377 or submit through the Global Health Exchange (GHX). Payment Terms Net 30 Days from invoice date. Delivery is subject to credit approval by Intuitive Surgical. Estimated 2-Day standard delivery. Standard shipping terms are FCA from Intuitive Surgical™ warehouse and are subject to inventory availability.  Pricing is subject to applicable shipping costs and taxes. Pricing is subject to change without notice. A $9.95 handling charge will be applied for any shipments using a customer designated carrier.

**4) Return Goods Policy :**

4.1 All returns must be authorized through Intuitive Surgical Customer Service, please call 800-876-1310 to obtain a Return Material Authorization Number (RMA#). All items must be accompanied with  valid RMA# for processing and are requested to be received within 14 days of issuance or the RMA could be subject to cancellation.  Intuitive Surgical will prepay for the return of the defective instruments.   Upon identification of a defective instrument, please call Intuitive Surgical Customer Service within 5 business days. Prior to returning to Intuitive Surgical, items must be cleaned and decontaminated in accordance with the then current local environmental and safety laws and standards. For all excess inventory returns, items are required to be in the original packaging with no markings, seals intact, and to have been purchased within the last 12 months.  Package excess returned inventory in a separate shipping container to prevent damage to original product packaging.

**5) Exchange Goods Policy :**

5.1 Repairs to Endoscope, Camera Head and Skills Simulators may qualify for Intuitive Surgical advanced exchange program. Please contact Customer Service or send email to CustomerSupport-ServiceSupport@intusurg.com to obtain information on our current exchange program.

**6) Credit Policy :**

6.1 Intuitive Surgical will issue credit against original purchase order after full inspection is complete.  Credit for defective returns: Intuitive Surgical will issue credit on products based on failure analysis performed and individual warranty terms. For instruments, credit will be issued for the remaining lives, plus one additional life to compensate for usage at the time the issue was identified. Evidence of negligence, misuse and mishandling will not qualify for credit.  Credit for excess inventory returns:  Excess Inventory returns will be valued at the invoice price less a 15% restocking fee. Original packaging must be unmarked, undamaged and seals intact to qualify for credit. Credit will be issued if the products were shipped less than 12 months prior to return request, the original package is intact and the product is within expiration date. Intuitive Surgical will retain all returned product.

**7) Miscellaneous :**

7.1 Warranty: Warranties are applied for manufacturing defects. Endoscope, Camera, Simulator, and System upgrades – 1 year warranty.  Accessories – 90 day warranty.  Instruments: see above for credit.

7.2 Any term or condition contained in your purchase order or similar forms which is different from, inconsistent with, or in addition to these terms shall be void and of no effect unless agreed to in writing and signed by your authorized representative and authorized representative  of Intuitive Surgical.

The terms and conditions of this quote, including pricing, are confidential and proprietary information of Intuitive Surgical and shall not be disclosed to any third party without the consent of Intuitive Surgical.

For questions please contact Customer Service at 800-876-1310

CONFIDENTIAL

LARKIN-00009054

22 May 2017 - 04:13:22 (-07:00)



Intuitive Surgical, Inc.
1266 Kifer Road
Sunnyvale, CA 94086
800-876-1310

*Taking surgical precision beyond the limits of the human hand™*

| Quote Details | | Company Information | |
|---|---|---|---|
| Quote ID | 82994.0 | Hospital Name | Larkin Hospital |
| Quote Date | 5/22/2017 | NS ID / IDN Affiliation | 11353 |
| Valid Until | 6/15/2017 | Address | 7031 sw 62 ave |
| Sales Rep | Eduardo Vazquez | City, State, Zip | Miami, FL, 33143 |
| Phone Number | 1(305) 510-5774 | Contact Name | |
| Email | Eddie.vazquez@intusurg.com | Telephone | |

Please Fax all Purchase Orders to: 408-523-2377

### Items

| Part Number | Qty | Item | Uses | Units | Price | Subtotal |
|---|---|---|---|---|---|---|
| **8MM Endowrist Instruments** | | | | | | |
| 420179 | 4 | Hot Shears™ Monopolar Curved Scissors(Requires tip cover 400180) | 10 | 1 | $3,200.00 | $12,800.00 |
| 420205 | 4 | Fenestrated Bipolar Forceps | 10 | 1 | $2,700.00 | $10,800.00 |
| 420296 | 4 | Large SutureCut™ Needle Driver | 10 | 1 | $2,400.00 | $9,600.00 |
| 420157 | 4 | Snap-fit™ Scalpel(used with 400152/400158) | 30 | 1 | $2,250.00 | $9,000.00 |
| 420093 | 4 | ProGrasp™ Forceps | 10 | 1 | $2,200.00 | $8,800.00 |
| 420006 | 4 | Large Needle Driver | 10 | 1 | $2,200.00 | $8,800.00 |
| 420207 | 4 | Tenaculum Forceps | 10 | 1 | $2,200.00 | $8,800.00 |
| **8MM - 12MM Reusable Accessory** | | | | | | |
| 420002 | 4 | 8mm Instrument Cannula | - | 1 | $560.00 | $2,240.00 |
| 340084 | 2 | Blade Protector Snap-fit™ | - | 1 | $60.00 | $120.00 |
| **8MM - 12MM Disposable Accessory** | | | | | | |
| 400158 | 5 | Snap-fit™ Paddle Blade 20 Units/Box | 1 | 20 | $900.00 | $4,500.00 |
| 420023 | 6 | 8mm Bladeless Obturator 24 Units/Box | 1 | 24 | $600.00 | $3,600.00 |
| 400180 | 5 | Tip Cover Accessory - 10 Units/Box (used with Monopolar Curved Scissors) | 1 | 10 | $200.00 | $1,000.00 |
| **Vision System/Accessory** | | | | | | |
| 370892 | 1 | 12mm Fluorescence Endoscope 0°(Must Have Upgrade 380993) | - | 1 | $18,800.00 | $18,800.00 |
| **Cables** | | | | | | |
| 371715 | 1 | Energy Activation Cables Valleylab | - | 1 | $950.00 | $950.00 |
| **Advanced Instruments** | | | | | | |
| 410322 | 5 | Endowrist® One™ Vessel Sealer 6 Units/Box | 1 | 6 | $3,570.00 | $17,850.00 |
| **Disposable System Accessory** | | | | | | |
| 420015 | 5 | Instrument Arm Drape 20 Units/Box | 1 | 20 | $900.00 | $4,500.00 |
| 420279 | 5 | Camera Arm Drape 20 Units/Box | 1 | 20 | $840.00 | $4,200.00 |
| 420273 | 5 | Camera Head Drape 20 Units/Box | 1 | 20 | $820.00 | $4,100.00 |
| **Seals** | | | | | | |
| 400077 | 5 | 8mm Cannual Seal 10 Units/Box (8mm Green Seal -Disposable) | 1 | 10 | $150.00 | $750.00 |
| **Total** | | | | | | **$131,210.00** |

### Terms and Conditions

1) System Terms and Conditions:

1.1 A signed Sales, License, and Service Agreement ("SLSA") or equivalent is required prior to shipment of the System(s). All site modifications and preparation are the Customer's responsibility and are to be completed to the specification given by Intuitive Surgical prior to the installation date. Delivery is subject to credit approval. Payment terms are net 30 days from Intuitive Surgical's invoice date. Each System includes the patient side cart, vision cart, and surgeon console(s). System enhancements required to support new features may be purchased at Intuitive Surgical's then current list price. The price of the da Vinci® Surgical System includes the initial installation of the System at Customer's facility and a one (1) year warranty for manufacture defect. All taxes and shipping charges are the responsibility of the Customer and will be added to the invoice, as appropriate.

1.2 Intuitive makes no representation with regard to Certificate of Need requirements for this purchase. It is your (the Customer's) responsibility to determine whether this purchase complies with your State's Certificate of Need laws and what Certificate of Need filing, if any, needs to be made with regard to this purchase.

1.3 Customer acknowledges that the cleaning and sterilization equipment, not provided by Intuitive, is required to appropriately

1 / 2

CONFIDENTIAL

LARKIN-00009055

reprocess da Vinci instruments and endoscopes. Please refer to the Reprocessing Instructions Part #557085.   Customer is responsible for ensuring that its' cleaning and sterilization program comply with all health and safety requirements.

2) System Upgrade Terms and Conditions:

2.1 A signed Purchase Order and/or an addendum to the existing Sales, License, and Service Agreement ("SLSA") is required prior to shipment of the System upgrade. All site modifications and preparation are the Customer's responsibility and are to be completed with the specification given by Intuitive Surgical prior to the installation date.

2.2 Payment terms are net 30 days from Intuitive Surgical's invoice date. The price includes: the System upgrade, the initial installation at Customer's facility and a one (1) year warranty for manufacture defect. All taxes and shipping charges are the responsibility of the Customer and will be added to the invoice, as appropriate. Delivery is subject to credit approval and inventory availability. Standard shipping terms are FCA from Intuitive Surgical™ warehouse.  A $9.95 handling charge will be applied for any shipments using a customer designated carrier.

3) I&A Terms and Conditions:

3.1 To place an order, please fax Purchase Order to Intuitive Surgical Customer Service at 408-523-2377 or submit through the Global Health Exchange (GHX). Payment Terms Net 30 Days from invoice date. Delivery is subject to credit approval by Intuitive Surgical. Estimated 2-Day standard delivery. Standard shipping terms are FCA from Intuitive Surgical™ warehouse and are subject to inventory availability.  Pricing is subject to applicable shipping costs and taxes. Pricing is subject to change without notice. A $9.95 handling charge will be applied for any shipments using a customer designated carrier.

4) Return Goods Policy :

4.1 All returns must be authorized through Intuitive Surgical Customer Service, please call 800-876-1310 to obtain a Return Material Authorization Number (RMA#). All items must be accompanied with  valid RMA# for processing and are requested to be received within 14 days of issuance or the RMA could be subject to cancellation.  Intuitive Surgical will prepay for the return of the defective instruments.   Upon identification of a defective instrument, please call Intuitive Surgical Customer Service within 5 business days. Prior to returning to Intuitive Surgical, items must be cleaned and decontaminated in accordance with the then current local environmental and safety laws and standards. For all excess inventory returns, items are required to be in the original packaging with no markings, seals intact, and to have been purchased within the last 12 months.  Package excess returned inventory in a separate shipping container to prevent damage to original product packaging.

5) Exchange Goods Policy :

5.1 Repairs to Endoscope, Camera Head and Skills Simulators may qualify for Intuitive Surgical advanced exchange program. Please contact Customer Service or send email to CustomerSupport-ServiceSupport@intusurg.com to obtain information on our current exchange program.

6) Credit Policy :

6.1 Intuitive Surgical will issue credit against original purchase order after full inspection is complete.  Credit for defective returns: Intuitive Surgical will issue credit on products based on failure analysis performed and individual warranty terms. For instruments, credit will be issued for the remaining lives, plus one additional life to compensate for usage at the time the issue was identified. Evidence of negligence, misuse and mishandling will not qualify for credit.  Credit for excess inventory returns:  Excess Inventory returns will be valued at the invoice price less a 15% restocking fee. Original packaging must be unmarked, undamaged and seals intact to qualify for credit. Credit will be issued if the products were shipped less than 12 months prior to return request, the original package is intact and the product is within expiration date. Intuitive Surgical will retain all returned product.

7) Miscellaneous :

7.1 Warranty: Warranties are applied for manufacturing defects. Endoscope, Camera, Simulator, and System upgrades – 1 year warranty.  Accessories – 90 day warranty.  Instruments: see above for credit.

7.2 Any term or condition contained in your purchase order or similar forms which is different from, inconsistent with, or in addition to these terms shall be void and of no effect unless agreed to in writing and signed by your authorized representative and authorized representative  of Intuitive Surgical.

The terms and conditions of this quote, including pricing, are confidential and proprietary information of Intuitive Surgical and shall not be disclosed to any third party without the consent of Intuitive Surgical.

For questions please contact Customer Service at 800-876-1310

2 / 2

CONFIDENTIAL

**Standard Terms and Conditions of Leasing**

**1.     DEFINITIONS**

Terms not herein defined will have the meanings set out in the Lease Agreement, unless the context otherwise requires.

"**Acceptance**" means the Equipment is deemed accepted by Lessee upon delivery to Lessee's designated location as evidenced by Lessee's execution of an acceptance letter, a form of which is attached hereto as Annex 1.

"**Lease Agreement**" means the agreement between the Lessor and the Lessee for the lease of the Equipment from the Lessor to the Lessee, including the Annexes thereto, incorporating these Standard Terms and Conditions.

"**Event of Default**" means an event specified under Clause 14 of these Terms and Conditions.

"**Equipment**" means the equipment specified in the Lease Agreement and any part thereof including, without limitation, all component parts and all software.

"**Guarantee**" means the documents executed by the Guarantor(s) in favor of the Lessor in respect of the obligations of the Lessee under the Lease Agreement.

"**Guarantor**" means the person(s) named as guarantor(s), if any, in the Guarantee.

"**Lease Payment**" means the payment of rent for the lease of the Equipment, owed by the Lessee to the Lessor under the Lease Agreement, including but not limited to the periodical installments and the Balloon Payment.

"**Obligors**" mean the Lessee, and the Guarantor, if any, and "**Obligor**" means each or any of the Obligors as the context requires.

"**Termination Sum**" means the aggregate of:

(i)     all Lease Payment due and payable under the Lease Agreement;

(ii)     an amount equal to one-hundred-ten per cent (110%) of all Lease Payments yet to fall due under the Lease Agreement discounted by the contract interest rate inherent in the Lease Agreement; and

(iii)     all other sums due and payable under the Lease Agreement (including without limitation, Default Interest, costs and expenses related to or connected with the termination of the Lease Agreement and any sum otherwise recoverable from the Lessee).

"**Total Loss**" includes any actual, constructive, or agreed total loss, theft, damage beyond repair, taking back of the Equipment (or any part thereof) by the owner of the Equipment pursuant to a right incorporated in the Lease Agreement for the sale of the Equipment and any seizure or confiscation of the Equipment.

**2.     RENTAL, SELECTION AND DELIVERY OF EQUIPMENT**

(a)     The Lessor agrees to rent to the Lessee and the Lessee agrees to rent from the Lessor the Equipment on the terms and conditions as set out in the Lease Agreement.

(b)     The Lessee has chosen the Equipment and agreed with the Lessor upon the terms of delivery of the Equipment.

(c)     Upon delivery, the Lessee will immediately inspect the Equipment, ensure that the Equipment is in good and working order and condition, and issue and deliver the duly signed and dated Acceptance Letter set out in Annex 1 of the Lease Agreement to the Lessor.

**3.     LEASE AND OTHER PAYMENTS**

(a)     The Lessee will pay (i) to the Lessor the Lease Payment and all other payments on the dates and in the manner specified in the Lease Agreement, and (ii) all taxes, rates, registration charges or other outgoings in respect of the Equipment.

(b)     If the Lessee fails to pay any amount payable by it under the Lease Agreement on its due date, it will pay to the Lessor interest on the overdue amount ("Default Interest") from and excluding such due date up to and including the date of actual payment. Default Interest will be twelve per cent (12%) per annum, or the maximum rate allowed by the applicable law, whichever is lower, and will be calculated on a daily basis. Default Interest not paid when due will be compounded and Default Interest will be payable thereon. Default Interest will be immediately payable by the Lessee on demand by the Lessor.

(c)     The Lessee will pay all payments when due under the Lease Agreement notwithstanding that the Equipment are unusable for any reason at any time during the Lease Period, and the Lessor will not be liable to provide the Lessee with any replacement equipment.

(d)     The Lessor will have a right to set-off in respect of any payments, charges or other sums due or prematurely due and payable, and the Lessee agrees to waive any legal defense against such set-off. The Lessee will have no right of set-off in respect of any payments, charges or other sums due or claimed to be due to the Lessee from the Lessor hereunder or under any other agreement between the Parties.

(e)     Lessee agrees that Lessee's obligation and duty to pay all sums due and to become due pursuant to this Agreement will be absolute and unconditional and are not subject to any defense, counterclaim, setoff or recoupment by reason of any past, present, or future claims which lessee may have against Lessor or any other person. Additionally, Lessee will not assert against any assignee of this Agreement any defense, counterclaim, setoff or recoupment by reason of any past, present, or future claims which Lessee may have against Lessor.

**4.     LOCATION, USE AND MAINTENANCE OF THE EQUIPMENT**

(a)     The Equipment will be kept at the Location as set out in the Lease Agreement and will not be removed without the prior written consent of the Lessor.

**5.     OWNERSHIP PLATES, INSPECTION AND TESTING**

(a)     The Lessor may at any time during the Lease Period procure inspection of the Equipment. For such purpose, the Lessee will ensure that the Lessor and its authorized representatives have access to the Equipment and the premises at which the Equipment is located and to the records (including books of accounts) relating to the Equipment, during normal business hours. The Lessee will keep proper accounts of all its dealings in relation to the Equipment and deliver to the Lessor any such records when requested by the Lessor.

**6.     PROHIBITION AGAINST DEALING WITH EQUIPMENT**

(a)     The Lessee will not (i) sell, transfer, lease, sub-lease or otherwise dispose of the Equipment (ii) create or permit to subsist any security interest on the Equipment (iii) affix the Equipment to any premises in such a manner as to make it a part of such premises (iv) represent itself to be, hold itself out as being or suffer or permit anything to be done whereby it may be reputed to be, the owner of the Equipment and/or (v) alter or modify or permit any alteration of the Equipment, without the Lessor's prior written consent.

The Lessee will notify the Lessor immediately of any enforcement of any security interest created by it and/or any landlord of the premises on or in which the Equipment is located or the appointment of any receiver of all or part of the assets of the Lessee.

**7.     REPRESENTATIONS AND WARRANTIES**

(a)     The Lessee represents and warrants to the Lessor that: (i) it has the power to enter into and perform, and has taken all necessary action to authorize the entry into and performance of the Lease Agreement and the transactions contemplated by the Lease Agreement; and (ii) all information supplied by it or on its behalf to the Lessor in connection with the Lease Agreement and any Guarantee (as the case may be) are true and accurate as at the date at which it is stated to be given.

**8.     TOTAL LOSS AND INSURANCE**

(a)     The Lessee will bear the risks related to a Total Loss of the Equipment after delivery. If a Total Loss occurs with respect to the Equipment, Lessee will promptly notify Lessor thereof. On the Lease Payment date following such notice, Lessee will pay to Lessor an amount equal to the Termination Sum plus a sum equal to the calculated residual value at the time of expiration of the Lease Period, if any. Upon the making of such payment by Lessee, the payment obligation for such Equipment will cease, the Lease Agreement as to such Equipment will terminate and, except in the case of a Total Loss, Lessor will be entitled to recover possession at Lessee's expense in accordance with Clause 12 below. Provided that Lessor has received all payments to be made by the Lessee under this Lease Agreement, the Lessee will be entitled to the proceeds of any recovery in respect of that Equipment from insurance or otherwise.

(b)     If not agreed otherwise in writing, the Lessee will at its own expense insure the Equipment on a policy and terms with such insurers as may be approved by the Lessor and will keep this insurance coverage in place until the Equipment is returned to the Lessor or the title has been transferred to the Lessee.

(c)     The Lessee hereby irrevocably appoints the Lessor as its attorney to recover in its and the Lessee's name any claim for loss of or damage to the Equipment under any insurance or otherwise and to give effectual releases and receipts therefor. The proceeds of the insurances will be paid to the Lessor and applied towards satisfaction of all amounts owing by the Lessee to the Lessor under the Lease Agreement.

(d)     If the Lessee fails to comply with this Clause 8 the Lessor may (but is not obligated to do so), at the expense of the Lessee, effect any insurance, and all costs and expenses incurred in so doing will be repaid to the Lessor by the Lessee on demand.

**9.     SECURITY DEPOSIT**

(a)     The Lessee will, in order to secure and guarantee performance of the obligations under this Lease Agreement, pay the Deposit as set out in the Lease

Agreement upon commencement of this Lease Agreement. No interest will accrue on the Deposit.

(b)     The Lessee will, if the Lessee will have fully performed all obligations under this Lease Agreement, return the Deposit to the Lessee upon the expiration of the Lease Period.

(c)     In the event the Lessee fails to perform any of its obligations under this Lease Agreement, the Lessor may apply the Deposit to the payment of any liabilities owed by the Lessee to the Lessor under this Lease Agreement, including, without limitation, delayed Lease Payments.

(d)     If the Lessor applies the Deposit pursuant to (c) above, the Lessee will immediately restore the Deposit and pay to the Lessor the interest accrued on such delayed payment as set forth in Clause 3(d) hereof until the date of such restoration.

**10.     SECURITY AND GUARANTEE**

(a)     At the request of the Lessor, the Lessee will, immediately upon execution of this Lease Agreement, provide the Lessor with guarantees and/or securities in the form and substance approved by the Lessor.

(b)     Following the execution of this Lease Agreement, the Lessor may request (additional) securities and guarantees from the Lessee as necessary from time to time in the event of a material adverse change in the credit status of any Obligor or a decrease in value of the securities. Upon such request, the Lessee will immediately provide the Lessor with additional securities and guarantees at its own expense to the extent satisfactory to the Lessor.

c)     There will be no division or allocation among any guarantees and/or securities provided to the Lessor in accordance with or relating to this Lease Agreement. The Lessor will be entitled to the full satisfaction of its claim, from any proceeds that may be derived under the enforcement of the guarantee and/or securities or sale thereof.

**11.     OWNERSHIP IN THE EQUIPMENT**

The Lessor will be the sole legal and beneficial owner of the Equipment and the Lessee will not do or permit to be done anything that could prejudice the rights of the Lessor in respect of the Equipment. During the Lease Period ownership in the Equipment will not for any reason pass to the Lessee.

**12.     RETURN OF EQUIPMENT**

(a)     In the event that the Lease Agreement is terminated for any reason other than by reason of a Total Loss, the Lessee will, at its own risk, cost and expense, immediately (i) return the Equipment to the Lessor or its designated agent, by delivering the Equipment to such address as the Lessor may require or (ii) allow the Lessor access to pick up the Equipment. The Lessee will return the Equipment to the Lessor, free and clear of any security interest and in good working condition without any damage or fault which would affect the value of the Equipment or its operation (reasonable wear and tear accepted) together with all licenses, certificates and other documents relating to the Equipment.

(b)     If upon return the Equipment is not in the condition stated in Clause 12(a) above, the Lessor may at its own discretion cause such repair works as it deems necessary to be carried out by a provider of its choice. All costs and expenses in connection with such repairs will be paid by the Lessee.

**13.     END OF LEASE OPTIONS**

13.1     OPTION A

(a)     *Provided* that the Lessee has fulfilled all its obligations under this Lease Agreement and paid the Balloon Payment, if any, in full, title to the Equipment will pass to the Lessee on an "as is where is" basis without any warranties whatsoever given by the Lessor, upon expiry of the Lease Period.

(b)     The Lessee may request the Lessor to re-lease all (but not part thereof) of the Equipment to the Lessee after the expiry of the Lease Period, *provided* that the Lessee's financial situation has not deteriorated and that the Lessee has duly fulfilled its obligations under this Lease Agreement. The new Lease Payments to be stipulated over the period covered by the lease renewal will be calculated on the basis of an amount that is at least equal to the Balloon Payment. If the Lessee wishes to renew the Lease Agreement, it will notify the Lessor in writing no less than ninety (90) days prior to the expiry of the Lease Period. If the Lessee does not confirm acceptance of the Lessee's request within four (4) weeks, it is deemed to have been declined. In case the Lessor refuses such request, the Lessee continues to be obliged to make the Balloon Payment in the manner and on the date as specified in the Lease Agreement.

13.2     OPTION B

*Provided* that no Event of Default has occurred at the expiry of the Lease Period, the Lessee may, by giving the Lessor no less than 90 days prior to the expiry of the Lease Period written notice, exercise one of the options below. If the Lessee does not notify Lessor within this period, the Lease Agreement will be automatically renewed for a period of one (1) month at any one time, unless either Party gives notice to the other party no less than two (2) weeks prior to the expiry of the respective renewal period of its desire to terminate the Lease Agreement. Unless otherwise agreed between the Parties, the Lessee will in such case return the Equipment to the Lessor in accordance with Clause 12 hereof.

(a)     The Lessee may request the Lessor to sell all (but not part thereof) of the Equipment to the Lessee after the expiry of the Lease Period and the Lessor will meet such request *provided* that the Lessee has fulfilled all its obligations under this Lease Agreement. The purchase price of the Equipment will be an amount equal to the fair market value, as determined by the Lessor, at its sole discretion. Upon payment of the purchase price, title to the Equipment will pass to the Lessee on an "as is" basis without any warranties whatsoever given by the Lessor. If no sale can be achieved, the Lessee will return the Equipment to the Lessor immediately upon the expiry of the Lease Period in accordance with Clause 12 hereof.

(b)     The Lessee may request the Lessor to re-lease all (but not part thereof) of the Equipment to the Lessee after expiry of the Lease Period, *provided* that, that the Lessee's financial situation has not deteriorated and that the Lessee has duly fulfilled its obligations under this Lease Agreement. If the Lessor does not confirm acceptance of the Lessee's request within four (4) weeks, it is deemed to have been declined. The Lease Payments and the Lease Period of the re-lease will be determined between the Parties hereto at the time of re-lease. If the Lessor refuses such request, the Lessee will return the Equipment to the Lessor immediately upon the expiry of the Lease Period in accordance with Clause 12 hereof.

**14.     EVENT OF DEFAULT**

Each of the events set out in this Clause 14 is an Event of Default. Upon the occurrence of an Event of Default, the Lessor may by written notice to the Lessee terminate the Lease Agreement which will take effect in accordance with its terms.

(a)     An Obligor does not pay by the due date any amount payable by it under the Lease Agreement or any Guarantee in the prescribed manner.

(b)     An Obligor does not comply with any term of the Lease Agreement, any Guarantee, any Sale, Use, License and Service Agreement between Lessor and Lessee, or any other similar agreement governing the use of the Equipment.

(c)     Any representation made or repeated by an Obligor in a Lease Agreement or any Guarantee is proved to be incorrect in any material respect when made or deemed to be repeated.

(d)     Any other indebtedness of an Obligor is not paid when due, becomes prematurely due and payable, is placed on demand, or is cancelled or suspended as a result of an Event of Default.

(e)     Any Obligor is unable to pay its debts as they fall due, admits its inability to pay its debts as they fall due, or is otherwise deemed for the purposes of any law to be insolvent, suspends making payments on any of its debts or announces an intention to do so, or (by reason of actual or anticipated financial difficulties) begins negotiations with any creditor for the rescheduling of any of its indebtedness.

(f)     Any step is taken with a view to a moratorium, rehabilitation or composition with any of an Obligor's creditors, a meeting of its shareholders, directors or other officers is convened for the purpose of considering any resolution for, to petition for or to file documents with a court or any registrar for, its winding-up, bankruptcy, dissolution or judicial management or any such resolution is passed or any person petitions for or files documents for the same, an order for its bankruptcy, winding-up, judicial management or dissolution is made or any other analogous step or procedure is taken in any jurisdiction.

(g)     Any provisional attachment, attachment, sequestration, distress, execution or analogous event affects any asset(s) of an Obligor and is not discharged within 14 days.

(h)     Where the Obligor is an individual, the Obligor dies, becomes partly or wholly incapacitated.

(i)     It is or becomes unlawful for an Obligor to perform any of its obligations under the Lease Agreement or any Guarantee, or the Lease Agreement or any Guarantee is not effective in accordance with its terms or is alleged by an Obligor to be ineffective in accordance with its terms for any reason.

(j)     An event or series of events occur which, in the opinion of the Lessor, is likely to result in a Total Loss.

(k)     The Lessee abandons the Equipment or does anything which, in the opinion of the Lessor, prejudices the rights of the Lessor in or over the Equipment.

(l)     There is, in the Lessor's opinion, a material change in the shareholding of a corporate Obligor or any person, or group of persons acting in concert, acquires control of a corporate Obligor.

(m)     An event or series of events occur which, in the opinion of the Lessor, have or are likely to have a material adverse effect on the financial condition of any Obligor.

**15.     TERMINATION**

(a)     After execution of the Lease Agreement, the Lessee will, except as set out in Clause 15(f), not be entitled to cancel or terminate the Lease Agreement before expiration of the Lease Period.

Intuitive Surgical– Proprietary Information
Lessee name: _____MA-xxx-xxxx (xxxxxx)
Page 2 of 5
17Aug16

(b)     Any termination of the Lease Agreement and any delivery of the Equipment by the Lessee to the Lessor will be without prejudice to any right or claim the Lessor may have against the Lessee under the Lease Agreement (including, without limitation, for arrears in Lease Payment, other sums payable by the Lessee under the Lease Agreement and damages for breach of the Lease Agreement).

(c)     Where the Lease Agreement is terminated due to an Event of Default, the Lessee will pay to the Lessor the Termination Sum.

(d)     Until the Lessor has received the Termination Sum in full, all obligations of the Lessee under the Lease Agreement will continue and the Lessee will continue to pay the Lease Payment notwithstanding any repossession of the Equipment by the Lessor.

(e)     Upon termination of the Lease Agreement, the Lessor will without prejudice to any other rights which it may have, have the right to repossess the Equipment and for this purpose to enter the land, building or premises at which the Equipment are located and the Lessee will give access to or procure that the Lessor or its agents be given access to the land, building or premises for this purpose.

(f)     During the Lease Period, *provided* that no Event of Default has occurred and the Lessee has duly performed all of its obligations under this Lease Agreement and all other Lease Agreements between the Lessee and the Lessor, the Lessee may by written notice to the Lessor request to early terminate the Lease Agreement. On the Lease Payment date following such notice, Lessee will pay to Lessor an amount equal to the Termination Sum. Upon the making of such payment by Lessee, the payment obligation for such Equipment will cease and the Lease Agreement as to such Equipment will terminate. The Lessee will in such case return the Equipment to the Lessor in accordance with Clause 12 hereof.

**16.     SUBMISSION OF MATERIALS**

Upon request by the Lessor for the purpose of credit preservation, the Lessee will immediately provide overall outstanding liabilities of the Lessee, credit status of the Lessee and the Guarantor, and information regarding status of securities to the Lessor, and cooperate with the Lessor for any investigations thereon. At Lessor's request, the Lessee is required to provide a copy of its year-end financial statements as soon as possible and not later than two (2) months from the end of the financial year. The Lessee will immediately notify the Lessor of any material change or any suspected material change in the status of credit or securities of the Lessee or the Guarantor.

**17.     TAXES AND COSTS**

(a)     Lessee is responsible for all license and registration fees, and all sales, use, property, stamp and other taxes and charges relating in any manner to the Equipment or this Lease Agreement, except the Medical Device Excise Tax.

(b)     All payments by the Lessee under the Lease Agreement will be made free and clear of and without any deduction for or on account of any taxes and withholding taxes, except to the extent that the Lessee is required by law to make payment subject to taxes. If any amounts in respect of tax or any other deduction must be made from any amounts payable by the Lessee to the Lessor under the Lease Agreement, the Lessee will pay such additional amount as may be necessary to ensure that the Lessor receives a net amount equal to the full amount which it would have received had the payment not then made subject to tax or the deduction.

(c)     The Lessee will bear the costs for the protection or exercise of the Lessor's rights, or the protection, collection or disposition of securities including but not limited to the stamp duty, the expense for sending demand or notice to the Lessee, the expenses for registration, change and cancellation of security interest, and all legal fees which Lessor may incur in connection with the enforcement of this Lease Agreement.

(d)     Unless otherwise provided, this Lease Agreement is entered into with the assumption that Lessor is the owner of the Equipment for income tax purposes and is entitled to certain federal and state tax benefits available to the owner of equipment (collectively, "Tax Benefits"), including without limitation, accelerated cost recovery deductions and deductions for interest incurred by Lessor to finance the purchase of the Equipment, available under the Code. Lessee represent, warrant, and covenant to Lessor that (a) unless Lessee has provided Lessor with a §(1)(c)(3) letter indicating that Lessee is tax exempt, then Lessee is not a tax exempt entity as defined in Section 168(h) of the Code, (b) Lessee will use the Equipment solely within the United States, and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for any tax purposes. If, because of any act or omission by Lessee, or any party acting through Lessee, or the breach or the inaccuracy of any representation, warranty or covenant made by Lessee in this Agreement, Lessor reasonably determine that Lessor cannot claim, are not allowed to claim, lose, or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment (a "Tax Loss"), then Lessee will, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the term of the Lease Agreement as Lessor would have realized but for such Tax Loss.

**18.     INDEMNITY**

The Lessee will indemnify the Lessor against all damages, claims or liabilities which may be incurred or suffered by the Lessor in connection with: (i) the occurrence of any Event of Default; (ii) any late payment of any sum (including, without limitation, any overdue amount) being received from any source otherwise than on its due date; (iii) Lessee's breach of any law affecting the Equipment, their use, operation or leasing, or the Lease Payment to be paid; (iv) any failure of any Obligor to perform any of its obligations under the Lease Agreement or any Guarantee; (v) the execution or enforcement (including any attempts thereof) of any of the rights, powers, remedies, authorities or discretions vested in the Lessor under or pursuant to the Lease Agreement; (vi) any failure or delay by Lessee in completing the procedure required for importation and providing Equipment; (vii) any loss arising from non-or incomplete performance by Lessee of the Lease Agreement, the delivery and the inspection of the Equipment; or (viii) the early termination of refinancing arrangements caused by the cancellation of this Lease Agreement due to non-delivery of the Equipment.

**19.     FORCE MAJURE**

(a)     Neither Lessor nor Lessee will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond such party's control including, but not limited to, fire, flood, acts of God, fire, earthquake, war, the threat of imminent war, riots, or other acts of civil disobedience, insurrection, labor or trade disputes, shortage of components, any governmental law, order, regulation, ordinance or any other supranational legal authority, explosion, storms, floods, lightning, or earthquake.

**20.     UCC FILINGS AND FINANCIAL STATEMENTS.** Lessee authorizes Lessor to file a financing statement with respect to the Equipment and grants the Lessor the right to sign such financing statement on Lessee's behalf. If Lessor deems it necessary, Lessee agrees to submit financial statements (audited if available) on a quarterly basis.

**21.     UCC-ARTICLE 2A Provisions:** Lessee agrees that this Lease Agreement is a Finance Lease as the term is defined in Article 2A of the Uniform Commercial Code ("UCC"). Lessee waives any and all rights and remedies granted Lessee under Sections 2A-508 2A-522 of the UCC.

**22.     MISCELLANEOUS**

(a)     The Lease Agreement will not be construed to be a purchase or an agreement for the purchase of the Equipment by the Lessee.

(b)     The Lessee may not assign or transfer any of its rights and obligations under the Lease Agreement. The Lessor may at any time without the consent of the Lessee assign or transfer any of its rights and obligations under the Lease Agreement and dispose of its rights and title to the Equipment.

(c)     This Lease Agreement constitutes the entire obligation of the parties hereto and supersedes any prior expressions of intent or understandings with respect to this transaction. Any amendment of this Lease Agreement will be in writing and will be signed by duly authorized representatives of both parties hereto.

(d)     No failure or delay on the part of the Lessor to exercise any right provided for in this Lease Agreement will constitute a waiver of such right or any obligation of the Lessee under this Lease Agreement, nor will any single or partial exercise of any such right preclude any further exercise thereof. No waiver by the Lessor hereunder will be effective unless it is in writing. The rights and remedies provided for in this Lease Agreement are cumulative and not exclusive of any other rights or remedies which the Lessor may otherwise have.

(e)     If any one or more of the provisions of this Lease Agreement or any document executed in connection herewith will be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein will not in any way be affected or impaired thereby.

(f)     The obligations of the Obligors under this Lease Agreement will be joint and several.

(g)     The Lessee acknowledges and agrees that the sole responsibility for determining the proper treatment of this Lease Agreement for tax purposes rests with the Lessee. The Lessor makes no representations whatsoever as to the proper treatment of this Lease Agreement for tax purposes. The Lessee acknowledges that the Lessor is the legal owner of the Equipment.

(h)     All notices, claims, requests, demands, and other formal communications hereunder will be in writing and will be deemed given at the time of personal delivery or completed facsimile, or, if sent by a reputable overnight courier or registered or certified mail, one business day after such sending.

(i)     The Lessee will notify the Lessor promptly of any changes in company name, registered office, and any other matters which may affect this Lease Agreement.

(j)     This Agreement shall be governed by the laws of the State of California, excluding its conflicts of laws principles. With respect to any legal action or proceeding relating to this Agreement, the parties consent and submit to the *exclusive* jurisdiction of the Federal and State courts located in Santa Clara County, California, and the parties agree that venue therein is proper.

Intuitive Surgical– Proprietary Information
Lessee name:_____MA-xxx-xxxx (xxxxxx)
Page 3 of 5
17Aug16

LARKIN-00009059



Intuitive Surgical-- Proprietary Information
Lessee name: _____MA-xxx-xxxx (xxxxxx)
Page 4 of 5
17Aug16

CONFIDENTIAL

LARKIN-00009060

**Annex 1**

ACCEPTANCE DOCUMENT

INTUITIVE
SURGICAL

I, the undersigned, as an authorized representative of the below named hospital, acknowledge that
the following product was (check the box below which applies):

☐ Delivered          ☐ Installed

CUSTOMER

END USER

CLM Agreement Number:

| Equipment Description | Serial Number |
| --- | --- |
| | |

ACCEPTANCE
ACCEPTANCE CRITERIA - PER AGREEMENT:

Signature:_____ Date:_____

Print Name:_____

Title:_____

**Please email signed acceptance letter to Acceptance@Intusurg.com**

83/921-03, Rev F

EXAMPLE

DRAFT

REVIEW

Intuitive Surgical— Proprietary Information
Lessee name: _____MA-xxx-xxxx (xxxxxx)
Page 5 of 5
17Aug16

LARKIN-00009061

# USE, LICENSE & SERVICE AGREEMENT

Agreement No.: MA-

This Use, License & Service Agreement ("Agreement") is dated _____ (the "Effective Date") and is between **Intuitive Surgical, Inc.,** a Delaware corporation ("Intuitive"), located at 1020 Kifer Road, Sunnyvale, California 94086, and _____ located at _____ (collectively "Customer").

**The parties agree as follows:**

1.  **Introduction**
    Customer agrees to obtain and license the Software and Documentation from Intuitive, and Intuitive agrees to respectively provide and license certain software and equipment to Customer, as well as provide Service for the System all according to the terms and conditions of this Agreement. Customer is contemporaneously entering into a lease agreement (the "**Lease Agreement**") dated **[date]** for the lease of the System. The Lease Agreement may also cover other equipment and/or the Services and/or a System delivery fee and/or other fees as further specified in Exhibit A and the Lease Agreement.

2.  **Definitions**
    2.1   **"Acceptance"** means Customer's acceptance of the System as specified in **Exhibit A**.

    2.2   **"Delivery Date"** means the estimated scheduled date for delivery of the System to Customer specified in **Exhibit A**.

    2.3   **"Instruments and Accessories"** means those instruments or accessories made or approved by Intuitive for use with the System.

    2.4   **"Proctoring"** means the assistance, coaching, or surgical training provided by a surgeon (the "Proctor") who is familiar with the System to another surgeon (the "Proctee") on how to perform a particular surgical procedure (or procedures) using the System.

    2.5   **"Services"** means the support and maintenance of the System described in Section 5 for the Service fees designated in the **Lease Agreement**.

    2.6   **"System"** means the items comprising the da Vinci® Surgical System specified in **Exhibit A** consisting of certain hardware components ("Hardware"), software program elements ("Software") and related manuals, labeling, instructions for use, notifications or other documentation ("Documentation"), that Customer may receive, obtain and license under this Agreement. If Customer obtains multiple Systems under this Agreement, all references to "System" or "System(s)" apply to each System obtained and licensed. Each System obtained is a separate transaction to be delivered, and accepted paid for separately.

    2.7   **"Taxes"** means any taxes, levies, or similar governmental charges, now in force or enacted in the future, and however designated, including related penalties and interest, imposed by any governmental authority on, or measured by, the activities described.

    2.8   **"Customer's Access Requirements"** means any reasonably applicable requirements designated by Customer that Intuitive personnel must meet to gain access to Customer's facility. Such requirements may include, but are not limited to, compliance with Customer's site policies and vendor credentialing requirements, such as vaccination, immunization, background investigation, training, hospital orientation, and liability insurance coverage.

    2.9   **"Reprocess" or "Reprocessing"** means Customer's process for cleaning, disinfection, and sterilization of Instruments and Accessories, including testing to validate cleaning, disinfection and sterilization process as may be required by applicable law and/or regulation.

3.  **System Delivery, Use, Disposal**
    3.1   **Delivery and Installation.** Subject to credit approval of Customer by Intuitive, Intuitive will use commercially reasonable efforts to deliver the System on or before the Delivery Date. Each party will provide the other party with thirty (30) days' notice, or if this Agreement is executed within thirty (30) days before the Delivery Date, a reasonable advance notice of any change in the Delivery Date. Customer will fully cooperate with Intuitive to permit Intuitive to install the System. Intuitive will use commercially reasonable efforts to install the System in an efficient and expeditious manner. Customer will also provide Intuitive with information, consultation, and advice reasonably necessary to permit installation.

Intuitive Proprietary Information
MA-xxx-xxxx/ CLM
Customer Name:
Rev Date: 17Aug16
Page **1** of **8**

3.2 **Delivery Terms.** Intuitive will deliver the System to Customer's designated location noted as the "Ship-to" in **Exhibit A** using a carrier selected by Intuitive. Fees for shipping the System are specified in the **Lease Agreement**. Risk of loss or damage to the System passes to the Customer upon delivery of the System to Customer.

3.3 **On-Site Support**. At no charge to Customer, Intuitive will provide periodic on-site support to Customer's designated personnel on the proper operation and upkeep of the System in order for Customer to operate the System as further described in Section 3.4. To clarify, this support includes, but is not necessarily limited to, training on draping the System for use in surgery, proper attachment of Instruments and Accessories, cleaning of parts of the System, the Instruments and Accessories and discussing opportunities to improve cost efficiencies. The cleaning to be performed regularly by Customer is described in the Documentation.

3.4 **Use of System**. Customer will ensure the proper use of the System consistent with the Documentation, and Customer will ensure the proper management and supervision of the System. Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. Prohibited actions include, but are not limited to: (1) adding or subtracting any Customer or third party equipment, hardware, firmware, or software to or from the System, or (2) reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software as originally provided to Customer as part of the System without Intuitive's express written permission. Customer will ensure that the System is moved and operated only by trained personnel in accordance with the Documentation and Intuitive's instructions. If Customer fails to comply with the requirements of this Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

3.5 **Reprocess and Disposal**. Customer is responsible for properly Reprocessing and/or disposing of all medical instruments, devices, and systems related to the operation and function of the System, including Instruments and Accessories, in accordance with the Documentation and the then current local environmental and safety laws and standards.

4. **Software License and Restrictions**

Software embedded within the System is provided under license and is not sold to Customer. Subject to the terms and conditions of this Agreement, Intuitive grants to Customer a non-exclusive, non-transferable, fully paid, restricted use license to use the Software solely as incorporated in the System in machine-executable object code form and solely in connection with the operation of the System as described in the Documentation. Customer must not use, copy, modify, or transfer the Software or any copy thereof, in whole or in part, except as expressly provided in this Agreement. In addition, Customer must not reverse engineer, decompile, disassemble, attempt to derive the source code for, or otherwise manipulate the Software, except that manipulation of the Software is permitted if, and then only to the extent that, the foregoing prohibition on manipulation is required to be modified by applicable law. In that case, Customer must first request from Intuitive the information to be sought from the Software, and Intuitive may, in its discretion, provide information to Customer under good faith restrictions and impose reasonable conditions on use of the Software. The structure and organization of the Software are valuable trade secrets of Intuitive and Customer will protect the Software as Intuitive's Proprietary Information (as defined in Section 13). Intuitive reserves all rights to the Software not expressly granted to Customer.

5. **Services**

5.1 **Services Included**. If Customer is current in payment to Intuitive of the Service fees specified in the **Lease Agreement**, Intuitive, directly or through one of its designated service providers, will provide Services to Customer as listed below. Intuitive will use parts sourced by Intuitive, which may, at Intuitive's discretion, include reconditioned parts, ("Equivalent to New" or "ETN"). ETN parts are components, assemblies, or partial products which have had prior usage, but have been inspected, reworked, and tested as required so that their function, performance, and appearance will be essentially equivalent to that of new parts. Regardless of whether parts are new or ETN, Intuitive's appropriate warranties under Section 10.1(A) apply.

Intuitive will, for the da Vinci Complete Care program:

(A) Adjust parts on the System from time to time;

(B) Replace defective or malfunctioning System parts (excludes Instruments and Accessories; and any items contained in the Instrument Starter Kit, Camera Starter Kit, and Training Instrument Starter Kit set forth in Exhibit A);

(C) Repair System operational malfunctions;

(D) Replace and install Software, Hardware, and mechanical equipment for safety and reliability;

(E) Provide twenty four (24) hours per day, seven (7) days per week (24 x 7) telephone support by qualified service personnel;

(F) Provide and install Software upgrades for feature enhancements. Software upgrades and Service with respect to additional equipment not included on **Exhibit A** may be subject to separate terms to be agreed upon by the parties;

(G) Provide preferred pricing and next day service repairs or replacement due to accidental damage on endoscopes and camera heads;

(H) Respond to Customer's request for Services described in Section 5.1(B)-(C) by phone, e-mail, or an on premise visit, during normal business hours (excluding Intuitive holidays) promptly as is reasonable after Intuitive's receipt of Customer's request, but not later than twenty-four (24) hours after Intuitive's receipt. Normal business hours are

CONFIDENTIAL

LARKIN-00009063

Monday through Friday, 8:00 a.m.- 5:00 p.m. Customer's local time.  Billable rates are applicable for service outside of normal business hours, and for reasons defined below in Section 5.2 (Limitations of Service).

(I)     Perform System preventative maintenance inspections as necessary to maintain factory specifications.

(J)     Provide on-site visits for support of advanced training of Customer's personnel on sterile Reprocessing process.

5.2     **Limitations on Services**.

(A)     **General**. Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician or an individual approved by Intuitive or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of unauthorized repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration, or misuse of the System, or negligence or recklessness on the part of Customer.

(B)     **Cleaning**. Regular daily cleaning of the System as described in the Documentation is not included in the Services.

(C)     **Additional Equipment**. Intuitive's Services obligations do not include the provision to Customer of any hardware developed by Intuitive that is not contained in the initial System obtained by Customer, and which Intuitive offers as a separate product or for an additional fee.

(D)     **Time and Materials**. If the System needs repair or maintenance services due to any of the circumstances described in Section 5.2(A)-(B) above, Intuitive may, at its sole election, provide repair services at Customer's expense and at Intuitive's then current time and material rates. Intuitive is not obligated to provide Services on any System for which any applicable warranty has been voided, or for which the performance of Services is otherwise excused by the terms of this Agreement.

(E)     **Unauthorized Instruments and Accessories**. The System is designed for use only with the Instruments and Accessories. If Customer uses the System with any surgical instrument or accessory not made or approved by Intuitive, Intuitive may discontinue Services, and any warranties applicable to any Services provided prior to any discontinuance will be void.

5.3     **Customer's Obligations.**

(A)     **Notice, Access, and Cooperation**. Customer will notify Intuitive or Intuitive's designated service provider of any requests for Services. Customer will fully cooperate with and assist Intuitive in the provision of Services.

(B)     **Clinical Liaison**. Customer will designate one of its employees, agents, or representatives as a "Clinical Liaison." The Clinical Liaison will be the point of contact with Intuitive for installation, Services, use of the System, and other related issues. Nothing in this Section 5.3 authorizes Customer or the Clinical Liaison to perform Services or to perform any act otherwise prohibited by this Agreement.

6.     **Training**

Intuitive offers training to surgical personnel on the use and operation of the System. At Customer's request, at mutually agreed times and at mutually agreed locations, Intuitive will provide training in the use of the System to Customer's surgical personnel in accordance with the terms specified in **Exhibit A**.

7.     **Proctoring**

At Customer's request, and upon Customer's issuance of a purchase order, Intuitive will arrange for Proctoring at Customer's location in accordance with the terms specified in **Exhibit A**. Each Proctor is an independent contractor, is not an agent or employee of Intuitive, and is not authorized to act on behalf of, or legally bind, Intuitive. Intuitive is not responsible for Proctoring services provided by Proctors. The decision to utilize a Proctor is solely that of the Customer. Customer is responsible for ensuring that each Proctor meets Customer's credentialing requirements.

8.     **Instruments and Accessories.**

Instruments and Accessories will be made available to Customer from Intuitive pursuant to separate orders placed by Customer to Intuitive from time to time in accordance with the terms and conditions contained in the then current Instrument and Accessory Catalog. Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory. Customer may purchase Instruments and Accessories for the purpose of Customer's Reprocessing requirements. The cost of Instruments and Accessories used in Customer's Reprocessing, including Instrument and Accessories used or involved in destructive testing, will be the responsibility of the Customer. Customer may contact Intuitive's Customer Support Department if, during the Reprocessing, Customer experiences results unacceptable under applicable law and/or

CONFIDENTIAL                                                   LARKIN-00009064

regulation. Intuitive will provide commercially reasonable assistance in such investigations and remediation efforts but will not be obligated to conduct or pay for such studies or provide materials at no cost or reduced cost as a condition of purchase or continued use.

**9.      Pricing and Payment Terms**

9.1      **System.**

(A)      **Price.** Customer will pay the "Periodical Lease Payments" amount as indicated in the **Lease Agreement** for the lease of the System. At the termination of the Lease Agreement, the terms and conditions applicable to end of lease options are set forth in the Lease Agreement.

9.2      **Services.**

(A)      **Price.** While the System is being leased by Customer, either (i) the price of annual Services is included in the "Periodical Lease Payments" amount as indicated in the **Lease Agreement**; or (ii) the price of annual Services is not included in the Periodical Lease Payments, and Customer will pay for the Services separately at the price specified in the **Lease Agreement**. If, after the term of the lease, or pursuant to Special Conditions in the Lease Agreement, if any, Customer purchases the System from Intuitive under the applicable terms and conditions of the Lease Agreement, Customer will pay for the Services at the price specified in the Lease Agreement. The issuance of a purchase order by Customer is for the convenience of the Customer solely; therefore, whether or not Customer issues a purchase order does not affect Customer's commitment to pay for Services under this Agreement during the Initial Term (as defined in Section 14).

(B)      **Payment Terms.** Unless as otherwise indicated in **Exhibit A**, Intuitive will deliver to Customer an invoice for the annual Services fee thirty (30) days prior to the first anniversary of Acceptance and each subsequent anniversary of Acceptance throughout the Initial Term of the Agreement. Customer will pay the invoice for Services not later than thirty (30) days after the date of invoice. Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower. After the Initial Term of the Agreement, and subject to mutual written agreement, annual Services may be renewed at Intuitive's then current list price.

9.3      **Taxes.**

Customer will pay, or reimburse Intuitive for, all Taxes, including related penalties or interest resulting from Customer's use of the System under this Agreement.

**10.      Warranty and Disclaimer**

10.1      **System Warranty.**

(A)      Intuitive warrants to Customer that:

(1)      the System as delivered will be free and clear of all liens and encumbrances (except as otherwise specified in this Agreement), and

(2)      for the period specified in **Exhibit A**, will be free from defects in material and workmanship and will conform in all material respects to the Documentation when used in accordance with the Documentation and Intuitive's instructions.

(B)      Intuitive's obligations under this Section 10.1 are limited to the repair (as further described in Section 5.1(B)-(C)) or, at Intuitive's option, replacement of all or part of the System.

(C)      This warranty is void with respect to any claims:

(1)      due to any installation, repair, adjustment, modification, disassembly, alteration, reconfiguration, addition to, subtraction from, or misuse of the System by Customer or any third party without the express written permission of Intuitive; or

(2)      to the extent Customer has not operated, repaired, or maintained the System in accordance with the Documentation or any reasonable handling, maintenance, or operating instructions supplied by Intuitive; or

(3)      to the extent Customer has used the System with surgical instruments or accessories that are not Instruments or Accessories; or

(4)      to the extent Customer or Customer's employee, agent, or contractor has subjected the System to unusual physical or electric stress, misuse, abuse, negligence, or accident.

Intuitive Proprietary Information
MA-xxx-xxxx/ CLM
Customer Name:
Rev Date: 17Aug16
Page **4** of **8**

    (D)    The foregoing expresses Customer's sole and exclusive remedy, and Intuitive's sole and exclusive liability, for any breach of warranty with respect to the System by Intuitive.

10.2    **Services Warranty.** Intuitive warrants that the Services will be performed consistent with generally accepted industry standards. If Intuitive breaches this warranty, Customer's sole and exclusive remedy will be to require Intuitive to re-perform the Services.

10.3    **No Other Warranties. INTUITIVE MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SYSTEM OR SERVICES PROVIDED HEREUNDER AND THIS TRANSACTION, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND NON-INFRINGEMENT. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF IMPLIED WARRANTIES; THEREFORE, THE ABOVE LIMITATION WILL APPLY ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

11.    **Indemnification**

    11.1    **Intuitive's Indemnification Obligations.**

    (A)    **Intellectual Property Indemnification.** Intuitive will indemnify Customer against all liabilities, expenses, or damages in connection with any third party claim that the System infringes any third party patent, trade secret, or copyright. If Customer is enjoined from the use of the System due to any such third party claim, Intuitive will promptly, at its option and expense, either (1) substitute the System or any part thereof with non-infringing material that will perform substantially in accordance with the Documentation; or (2) obtain the right of Customer to continue to use the System; or (3) remove the System.

    (B)    **Indemnification Limitations.** Intuitive has no obligation under this Section 11.1 to the extent any claim of infringement is based upon or arises out of: (1) any modification to the System if the modification was not made directly by Intuitive or through its designated service provider; or (2) the use or combination of the System with any hardware, software, products, data or other materials not specified, provided or approved by Intuitive.

    (C)    **THE PROVISIONS OF THIS SECTION 11 STATE THE SOLE AND EXCLUSIVE OBLIGATIONS OF INTUITIVE FOR ANY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT.**

11.2    **Customer's Indemnification Obligations.** Intuitive will not be liable for, and Customer will indemnify and hold Intuitive harmless from and against, any claims or damages caused by Customer's failure to comply with the requirements of Sections 3.4 (Use of the System) or 3.5 (Disposal).

11.3    **Claim Notification Requirement.** A party's indemnification obligations under this Section 11 will not apply unless the indemnified party promptly notifies the indemnifying party of the claim as soon as the indemnified party became aware of it. The indemnifying party will have the right to control the defense or settlement of any claim at its cost and with its choice of counsel. The indemnified party will provide all reasonable cooperation to assist the indemnifying party in the defense or settlement of the claim.

12.    **Limitation of Liability**

Except for a breach of the obligations in Sections 3.4 (Use of System), 4 (Software License and Restrictions), 8 (Instruments and Accessories), 9 (Pricing and Payment Terms), the indemnification obligations of Section 11, 13 (Proprietary Information), to the extent permitted by applicable law, each party's aggregate liability to the other for claims relating to this Agreement, whether for breach in contract or tort (including negligence), is limited to an amount equal to the sum of amounts paid by Customer under this Agreement for the activity (such as procurement of the System, Service, or training) giving rise to the claim. Except for a breach of the obligations in Sections 3.4, 4, 8, or 13, neither party will be liable for any indirect, punitive, special, incidental, or consequential damages in connection with or arising out of this Agreement (including loss of business, revenue, profits, use, data, or other economic advantage), even if that party has been advised of the possibility of damages. Some jurisdictions do not allow the limitation of liability for incidental or consequential damages; therefore in those jurisdictions, the foregoing limitation of liability applies only to the extent permitted by law.

13.    **Proprietary Information**

"Proprietary Information" includes, but is not limited to, all non-public information (1) of the disclosing party ("Disclosing Party") that relates to past, present, or future research, development, or business activities or the results of those activities and (ii) that the Disclosing Party has received from others and is obligated to treat as confidential and proprietary. In addition, Intuitive's Proprietary Information includes the terms and conditions of this Agreement and all information derivable from the System, but excluding

Intuitive Proprietary Information
MA-xxx-xxxx/ CLM
Customer Name:
Rev Date: 17Aug16
Page **5** of **8**

LARKIN-00009066

information that can be learned simply through observation of the System and its operation. Proprietary Information does not include information previously known by the receiving party ("Receiving Party") as demonstrated by the Receiving Party's contemporaneous written records, or information publicly disclosed without breach of an obligation of confidentiality, either before or after the Receiving Party's receipt of the information. The Receiving Party will hold all Proprietary Information of the Disclosing Party in strict confidence and must not use for any purpose, or disclose to any third party, any Proprietary Information, except (1) as expressly authorized in this Agreement or in writing by the Disclosing Party, and (2) as required by law or by court order. If the Receiving Party is compelled by law to disclose the Proprietary Information of the Disclosing Party, then (1) the Receiving Party must give prior notice to the Disclosing Party so as to permit the Disclosing Party to try to protect its Proprietary Information including attempting to obtain a protective order requiring that the Proprietary Information so disclosed be used only for the purposes for which the order was issued or for other legal requirement and (2) the Receiving Party must cooperate with the Disclosing Party in such efforts. The Receiving Party will use the same degree of care to protect the Proprietary Information as Receiving Party uses to protect its own information of like kind, but not less than all reasonable steps to maintain the confidentiality of the Proprietary Information.

**14.** **Term**

14.1 **Initial Term**. The Initial Term is specified in **Exhibit A**.

14.2 **Termination and Survival**. Either party may terminate this Agreement if the other party breaches a material term or condition of this Agreement and fails to cure the breach following thirty (30) days' written notice from the non-breaching party. Sections 3.4, 3.5, 4, 9.1, 9.3, 11, 12, 13, 14.2, 15, and any other provision which by its nature will survive, will remain in effect notwithstanding the expiration or termination of this Agreement.

**15.** **Miscellaneous**

15.1 **Assignment**. This Agreement will be binding upon the permitted successors and assigns of the parties. Neither party may assign this Agreement without the prior written consent of the other party, except pursuant to a transfer of all or substantially all of a party's assets and business relating to the subject of this Agreement, whether by merger, re-organization, sale of assets, sale of stock, or otherwise. Customer may not assign or transfer the Software license granted to it under this Agreement to any third party without Intuitive's prior written consent. Any attempt by either party to assign this Agreement or any rights or duties hereunder contrary to the foregoing provision is void.

15.2 **Costs**. Except as otherwise specifically provided herein, each party will bear its own costs and expenses incurred in connection with the performance of its obligations hereunder.

15.3 **Debarment**. Intuitive warrants and represents that individuals of its organization involved in providing Services under this Agreement have not been convicted of any criminal offense relating to health care and are not debarred, excluded, or otherwise ineligible for participation in any federal or state health care program. If at any time before completion of this Agreement, Intuitive or any individual in its organization involved in providing Services under this Agreement is so convicted or is debarred, excluded or otherwise determined to be ineligible, Intuitive will notify Customer in writing, the individual will immediately cease providing Services under this Agreement, and Intuitive will replace the individual with a replacement employee reasonably suitable to Customer, and, if it is Intuitive, this breach will be considered a material breach by Intuitive.

15.4 **Federal Audit**. Until the expiration of four (4) years after furnishing Services under this Agreement, Intuitive will make available upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon request of the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement and the books, documents, and records of Intuitive that are necessary to certify the nature and extent of costs for which Customer may properly seek reimbursement. If Intuitive carries out any of the duties of this Agreement through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, the subcontract will contain a clause to the effect that until the expiration of four (4) years after furnishing of services under the subcontract, the subcontracting party will make available, upon written request of the Secretary, or upon request of the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, and the books, documents, and records of the organization that are necessary to verify the nature and extent of the costs. Intuitive will promptly notify Customer of any requests for information made under this provision.

15.5 **Force Majeure**. Neither party will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond that party's control including, but not limited to, acts of terrorism, acts of God, fire, earthquake, war, the threat of imminent war, riots, or other acts of civil disobedience, insurrection, labor or trade disputes, shortage of components, any governmental law, order, regulation, ordinance or any other supranational legal authority, explosion, storms, floods, lightning, or earthquake.

15.6 **Insurance**. Intuitive has obtained, and will maintain throughout the term of the Agreement, (i) Commercial General Liability Insurance including coverage for contractual liability, product liability, personal injury and bodily injury in an amount not less than $1,000,000 per occurrence/$3,000,000 aggregate (or as may be aggregated by the excess liability policy on the

CONFIDENTIAL

LARKIN-00009067

General Liability policy); or (ii) a self-insurance program of equivalent protection. Intuitive will furnish the Customer with a certificate of insurance evidencing the coverage as outlined above, or comparable evidence of self-insurance, on Customer's request. Intuitive carries, and will continue to carry, Workers' Compensation Insurance as required by law.

15.7    **Interpretation**. Headings used in this Agreement are provided for convenience only and do not in any way affect the meaning or interpretation hereof. The terms "sale", "purchase", "acquire", "procure" and variations of such terms, as used in this Agreement with respect to the System, do not imply that the Software and Documentation aspect of the System are sold or purchased; the Software and Documentation are licensed under this Agreement and the Hardware is being leased and may be sold under the Lease Agreement as the case may be. Neither party is the drafter of this Agreement. Accordingly, the language of this Agreement will not be construed for or against either Party.

15.8    **Notices**. Any notices given under this Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile. Any notices under this Agreement must be sent to Intuitive or the Customer at the address shown in the preamble above, in both cases to the Contracts Dept/General Counsel's office. Each party may change its address for receipt of notices by giving the other party notice of the new address.

15.9    **Relationship of the Parties**. The parties' relationship is one of contract, and they are not, and will not be construed as partners, joint venturers, or agent and principal. Neither party is authorized to act for, or on behalf of, the other party.

15.10   **Severability**. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, then that provision will not affect the validity of the remaining provisions of the Agreement, and the parties will substitute a valid provision for the invalid provision that most closely approximates the intent and economic effect of the invalid provision.

15.11   **Access to Customer's Facilities**. Intuitive agrees that any Intuitive personnel who routinely provide Services at Customer's facilities will use commercially reasonable efforts to comply with Customer's Access Requirements, provided that Customer provides Customer's Access Requirements in writing prior to execution of this Agreement. Customer's need for Service may be unplanned and urgent with patient safety at stake. Therefore, if Customer denies access to its facilities to any Intuitive personnel for performance of Services (Section 5) or warranty (Section 10) obligations in connection with a surgical procedure because such personnel have not met Customer's Access Requirements, Intuitive's Services and warranty obligations in this Agreement will be suspended during such denial of access, provided that Intuitive uses commercially reasonable efforts to find replacement Intuitive personnel who comply with Customer's Access Requirements. Customer will indemnify and hold harmless Intuitive from any losses, claims, liabilities or causes of action arising from such denial of access.

15.12   **Data Use**. Customer agrees that Intuitive and its affiliates within the Intuitive Surgical group of companies (collectively, "Intuitive") may collect data relating to the use of Intuitive products ("Data"). In some instances Data may be communicated via data gathering or transmission technology to Intuitive. In other instances, Intuitive may require Customer and Customer agrees to provide Data to Intuitive. Such Data may be used for a variety of purposes, including, but not limited to (1) providing support and preventative maintenance of Intuitive products, (2) improving Intuitive products or services, (3) ensuring compliance with applicable laws and regulations, and (4) providing a general resource for Intuitive's research and business development. Intuitive does not intend to collect protected health information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or analogous foreign patient privacy laws or regulations, as may be amended from time to time. In the event any Data communicated to Intuitive identifies an entity or individual, Intuitive will not share such Data with any third parties without the entity's or individual's consent, unless required by law or regulatory authorities.

15.13   **Waivers**. No waiver of any right by either party under this Agreement will be of any effect unless the waiver is in writing and signed by the waiving party. Any purported waiver not consistent with the foregoing is void.

15.14   **Counterparts**. This Agreement may be executed by facsimile or in multiple copies, each of which is an original, and all of which taken together will constitute one single agreement.

15.15   **Representations and Warranties by Customer**. Customer represents and warrants to Intuitive that: (i) it has the power to enter into and perform, and has taken all necessary action to authorize the entry into and performance of, the Agreement and the transactions contemplated by the Agreement; and (ii) all information supplied by it or on its behalf to Intuitive in connection with the Agreement and any guarantee (as the case may be) are true and accurate as at the date at which it is stated to be given.

15.16   **Entire Agreement; Amendment**. This Agreement is the entire agreement between Intuitive and Customer and supersedes any prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter herein, pricing, and the applicable terms. Any terms or conditions in Customer's

Intuitive Proprietary Information
MA-xxx-xxxx/ CLM
Customer Name:
Rev Date: 17Aug16
Page **7** of **8**

CONFIDENTIAL                                                                                              LARKIN-00009068

purchase order that are different from, inconsistent with, or in addition to, the terms and conditions of this Agreement will be void and of no effect, unless otherwise mutually agreed to in writing by the parties. This Agreement may be amended only in writing, signed by both parties. Any purported oral modification intended to amend the terms and conditions of this Agreement is void.

**BOTH PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT AND EXECUTE THIS AGREEMENT AS OF THE EFFECTIVE DATE.**

**IF THIS AGREEMENT IS NOT SIGNED BY BOTH PARTIES AND RETURNED TO INTUITIVE ON OR BEFORE _____ THE TERMS WILL BE SUBJECT TO CHANGE.**

ACCEPTED BY:                                              ACCEPTED BY:

**Intuitive Surgical, Inc.**

By: _____            By: _____

Name:_____            Name: _____

Title: _____           Title: _____

Date: _____            Date: _____

CONFIDENTIAL                                                                 LARKIN-00009069



## Proposal for Si-R and Xi daVinci Systems

| Item: | Price | Discount | Subtotal |
|---|---|---|---|
| daVinci Si-R with Firefly/VS Upgrade | $1,200,000 | ($323,500) | $876,500 |
| daVinci Xi | $1,900,000 | ($150,000) | $1,750,000 |
| Totals | $3,100,000 | ($473,500) | $2,626,500 |

## Financing Options:

Fair Market Value Purchase Lease Options

| System | Cost | 36 mos | 60 mos |
|---|---|---|---|
| Si-R | 876,500 | 20,841.62 | 14,397.11 |
| Xi | 1,750,000 | 41,611.90 | 28,744.94 |

LARKIN-00009070

Da Vinci Si-R and Xi – Implementation Plan

| Target | Completed | Action Item | Participants | Details |
|--------|-----------|-------------|--------------|---------|
| | | **PHASE I: System Installation, Clinical Preparation and Training Phase** | | |
| GOAL? | | Signed Contract, Delivery, acceptance, and installation of da Vinci Xi system | OR Management, Intuitive Field Engineer | • Deliver and install the Xi system to begin training |
| 5/26 | | SPD walkthrough to confirm compliance with Xi instrumentation | SPD Manager, Robert Campbell-Intuitive | • Ensure no additional equipment (ultrasonic bath, Sterrad) is needed |
| | 5/23 | Determine first surgeons to have Xi access. Include specific case series and build initial stocking order. | Administration, Surgeons, Intuitive | • Determining first surgeons to use the Xi will allow for proper training schedules and appropriate instrumentation ordering |
| 5/26 | | Red-lining process of Sales License and Service Agreement Amendment | Administration, Legal Dept., Intuitive Contracts Team | • Prompts manufacturing of Xi system, identify available Si-R system<br>• Alerts engineering team to hold schedule for installation |
| 5/23 | | 120 Day Implementation Timeline review and agreement | Administration, Surgeons, ISI | • Full agreement on a timeline that will facilitate the utmost safety, clinical excellence, and operational efficiency to rapidly meet planned strategic initiatives |
| 1 Week | 5/29 | Staff / Surgeon Training - Online | OR Staff, Surgeons, Intuitive | • Online Xi training modules completed on da Vinci Online Community and certificates gathered |
| 1 Day | 6/? | DELIVERY DATE | Biomed, ISI Engineer | • Delivery to the loading dock and installation in the OR |
| 1 Day | ? | Robotic Steering Committee Meeting & Da Vinci Xi Implementation Meeting | Steering Committee, OR Admins, dV Surgeons Marketing, Intuitive | • Discuss next 30-90 days of implementation<br>• Assign responsibility/ownership<br>• Preview Genesis Launch expectations |
| 1 Week | 6/? | Inservice Surgeons & Staff on actual da Vinci Xi System | dV Surgeons, OR Staff, Intuitive Clinical Team | • Xi SYSTEM MUST BE INSTALLED PRIOR TO THIS TRAINING<br>• Separate 2-hour inservices for appropriate surgeons and staff leading up to pre-determined initial case series |
| 1 Day | TBD | Build Trays | SPD, Nursing | Work with materials, SPD, and Intuitive to organize and build necessary trays for scopes and instruments for initial cases |
| 1 Day | TBD | Inservice SPD staff on Xi Instrumentation reprocessing | SPD Staff & Manager, Robert Campbell - Intuitive | • Instrumentation cleaning & sterile processing training prior to first cases |
| 1 day | TBD | Dry Run | dV Surgeons, OR Staff, Intuitive Clinical Team | • Go through a start to finish dry run of a surgical procedure to be sure that the hospital has everything to safely complete an Xi case |
| | | **PHASE II: Operational Efficiency** | | |
| 1 Week | 6/? | Begin da Vinci Xi First Access Procedures | dV Surgeons, Intuitive Clinical | • Dr Estape Procedures Booked<br>• Surgeons and procedures |

CONFIDENTIAL

LARKIN-00009071

| | | | Team | scheduled prior to formal Genesis Launch |
|---|---|---|---|---|
| Schedule for 3rd- 4th week of cases | ISI To Cover Cost ($3,000) | XI LAUNCH WITH GENESIS TEAM: Kick-off meeting | Executive Sponsor, Member of Anesthesia, OR Director, dV Surgeons, dV OR Team, SPD, Intuitive | • Xi Launch with GENESIS Team: Expectations outlined for GENESIS implementation and program goals |
| Scheduled for 3rd-4th week of cases | ISI To Cover Cost ($3,000) | XI LAUNCH WITH GENESIS TEAM: On-Site | dV Surgeons, OR Staff, Intuitive | XI Launch with GENESIS Team: Improving the Performance and Efficiency of your da Vinci Surgery Program |
| Scheduled for 3rd-4th week of cases | ISI To Cover Cost ($3,000) | XI LAUNCH WITH GENESIS TEAM: Wrap-up meeting | Executive Sponsor, Member of Anesthesia, OR Director, dV Surgeons, dV OR Team, SPD, Intuitive | • Xi Launch with GENESIS Team: • Faculty and staff review, take-a-ways, and recommendations to implement for program enhancement |
| PHASE II: Strategic Rollout | | | | |
| | TBD | 2nd PILARS Meeting & Da Vinci Xi Implementation Meeting | Steering Committee, OR Admins, dV Surgeons Marketing, Anesthesia, Intuitive | • 30 day progress review • Address outstanding issues. • *** will meet every 90 days in the future for Program Review*** |
| | | Program Expansion | Surgical and Executive Leadership | • Begin to explore the role of robotics other specialites and the resources necessary to make them succesful |
| | November 2017 Foutain Blue Miami | Executive Session | Executive Team Member, Surgeon | • See what best in class robotics looks like in the areas of marketing/ program mgmt / leadership / quality management |

CONFIDENTIAL