# ATTACHMENT 84

SONYA D. WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Lead Case No.: 3:21-cv-03825-AMO-LB<br><br>**REPLY IN SUPPORT OF MOTION OF INTUITIVE SURGICAL, INC. TO EXCLUDE TESTIMONY OF EINER ELHAUGE**<br><br>Hearing To Be Renoticed<br>Hearing Place: Courtroom 10<br><br>Judge: The Honorable Araceli Martínez-Olguín |

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................................1

II.  ARGUMENT .........................................................................................................................2

   A.   Prof. Elhauge's Damage Estimates Regarding Modified EndoWrists Are Unreliable. ...................................................................................................................2

   B.   Prof. Elhauge's Da Vinci Service Damages Are Unreliable. ...............................8

   C.   Prof. Elhauge's Opinions in Areas Where He Is Unqualified Should Be Stricken. ............9

III. CONCLUSION ....................................................................................................................10

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amer. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................................................. 2, 8

*AMX Corp. v. Pilote Films*,
  2007 WL 2428940 (N.D. Tex. Aug. 27, 2007) .......................................................................... 9

*Avila v. Willits Env't Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ..................................................................................................... 2

*Bonds v. Dautovic*,
  2011 WL 13228307 (S.D. Iowa Feb. 7, 2011) .......................................................................... 9

*Cal. Inst. Tech. v. Broadcom Ltd.*,
  2020 WL 10054680 (C.D. Cal. July 17, 2020) ....................................................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ..................................................................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ........................................................................................................ 1, 2, 3

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ........................................................................... 2

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ................................................................................................... 8

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................................................... 9

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ................................................................................................. 2, 7

*Oracle Amer., Inc. v. Hewlett Packard Enter. Co.*,
  2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ........................................................................ 10

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
  254 F. 3d 706 (8th Cir. 2001) ................................................................................................. 10

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................................................. 3, 4

I.      INTRODUCTION

In its motion to exclude the testimony of plaintiffs' damages expert, Prof. Einer Elhauge (Dkt. No. 126) ("Mot."), Intuitive demonstrated, *first*, that Prof. Elhauge's modified EndoWrist damages are unreliable.  He does not have a reliable basis to assume that in the but-for world, Intuitive would have reduced EndoWrist pricing by 20% and would have increased EndoWrist use limits to 20, resulting in an effective 55% discount.  Nor does Prof. Elhauge have a reliable basis to assume that in the but-for world third parties would have modified EndoWrists as early as May 21, 2017 or that third parties would have modified X/Xi EndoWrists.  *Second*, Intuitive demonstrated that Prof. Elhauge's da Vinci service damages are also unreliable.  He fails to account for the fact that third parties could only provide certain limited types of da Vinci service in the but-for world.  And he uses an unreliable comparator to assume that Intuitive would drop its service prices 12% across the board, including for service only Intuitive could perform (the vast majority of service).  *Third*, Prof. Elhauge offered opinions in his report that are outside his expertise.

Plaintiffs' opposition (Dkt. No. 164) ("Opp.") fails to meet their burden to demonstrate that Prof. Elhauge's opinions pass muster under *Daubert*.  Prof. Elhauge's alleged status as "a leading antitrust scholar" (Opp. at 1) does not entitle him to offer opinions in this case based on unfounded assumptions about a but-for world that are contradicted by the record in the real world.

Plaintiffs fail to grapple with the key point underlying all of Intuitive's criticisms of Prof. Elhauge's damages opinions.  Prof. Elhauge assumes that so long as there was "some" – *i.e.*, any – interest among hospitals in the offerings of third parties, that alone would have operated as a huge competitive restraint on Intuitive in the but-for world, leading Intuitive to lower its prices for EndoWrists by effectively 55% and its prices for service by 12% across the board.  Plaintiffs have no answer for the fact that Prof. Elhauge treats this like an on-off switch: so long as any competition at all exists in the but-for world, Prof. Elhauge assumes it causes Intuitive to lower its prices on *all* products for *all* customers by these very substantial amounts.  Prof. Elhauge did nothing to assess what competitive impact third parties would have actually had in the but-for world.  As such, he has no basis for the hyper-aggressive assumptions he makes about how Intuitive would have responded.  This issue alone requires that all of Prof. Elhauge's damages estimates be stricken.

1

The so-called "established methodologies" Prof. Elhauge employs to estimate damages (Opp. at 2) involve nothing more than assumptions he makes that generate billions in claimed damages. As shown in further detail below, despite plaintiffs' best efforts, Prof. Elhauge has no reliable basis for his assumptions, rendering his conclusions inadmissible under *Daubert*.

## II.   ARGUMENT

Plaintiffs have not met their burden to establish the admissibility of Prof. Elhauge's opinions. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). Prof. Elhauge's damages estimates lack grounding in the record of this case and are based on "unsupported assumptions and unsound extrapolation." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988); *see also In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *15 (S.D.N.Y. Mar. 28, 2014) (excluding expert damages opinion that was "unmoored from record facts and unsupported by any rigorous analysis"); *Amer. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (granting motion to exclude expert's damages model that "contain[ed] entirely too many assumptions and simplifications that [were] not supported by real-world evidence"). Further, plaintiffs cannot show that Prof. Elhauge is qualified to offer opinions, such as on FDA clearance and instrument safety, that are beyond his expertise. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011).

### A.   Prof. Elhauge's Damage Estimates Regarding Modified EndoWrists Are Unreliable.

In its motion, Intuitive demonstrated that Prof. Elhauge's EndoWrist damages estimates are not based on any reliable methodology but instead on a series of aggressive assumptions unrooted in the record of the case. Mot. at 2–3, 6–9. Plaintiffs devote a significant portion of their brief to claiming that certain methodologies – like a before-and-after approach or a regression – were not available to Prof. Elhauge due to "practical constraints" in this case. *See* Opp. at 4. This misses the point. Regardless of the reason Prof. Elhauge chose not to use an established methodology to estimate damages, the burden remains on plaintiffs and Prof. Elhauge to demonstrate that Prof. Elhauge's "assumptions" approach is reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (An expert "must . . . point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have

followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field."). Plaintiffs fail to do so.

*First*, plaintiffs fail to demonstrate that Prof. Elhauge has a reliable basis to assume that Intuitive would have reduced EndoWrist pricing by 20% in the but-for world. Prof. Elhauge did not base this assumption on anything relating to Intuitive's pricing in the face of third-party competition; rather, he took the 20% figure from a 2017 internal presentation relating to Intuitive's proposed (but never instituted) refurbishment program, "Project Dragon," and assumed Intuitive would provide that discount to all U.S. customers in the but-for world. *See* Mot. at 6-7. In fact, the presentation actually shows that the 20% discount for Project Dragon would *not* apply in the United States and that pricing there would vary customer by customer. *Id.* Plaintiffs' effort to try to resuscitate Prof. Elhauge's reliance on this document asks the Court to pretend that the document says something other than what it says. Plaintiffs assert that references to a 20% discount elsewhere in the presentation suggest that the 20% discount was contemplated across-the-board. Opp. at 6. But the one slide specifying discounts for specific markets clearly shows that the 20% discount would *not* apply to U.S. customers. Bass Dec. Ex. 9 (Dkt. No. 126.10) at -4201; *see also* Bass Dec. Ex. 2 (Dkt. No. 126.3) at 209:23-210:4.[1]

It is odd that plaintiffs claim that *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), supports the reliability of Prof. Elhauge's reliance on this internal Intuitive presentation for his damages estimates, quoting that case for the notion that "internal projections . . . often serve as legitimate bases for expert opinions." Opp. at 5 n.10. In that case, the Third Circuit affirmed the district court's decision striking the plaintiff's damages expert under *Daubert* because the expert did not appropriately explain why an internal business projection supported the expert's damages estimates. As the court explained, "an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *ZF Meritor*, 696 F.3d at 292. The court found the expert failed to do so.

---

[1] Intuitive already explained that the other Project Dragon presentation referring to discounts of 25-40% was authored *before* the main one mentioning the 20% figure. Mot. at 6 n.3. Plaintiffs assert that the 20% must be viewed as conservative relative to the price offered by third parties, but offer no basis to conclude that the EndoWrists those third parties modified had guaranteed reliable and safe performance. Opp. at 6. Indeed, Prof. Elhauge testified that his damages opinions do *not* assume that modified EndoWrists are as safe as new EndoWrists. Bass Supp. Dec. Ex. 10 at 31:8-32:18.

3

*Id.* at 292-93.  That is exactly what has occurred here.  The document Prof. Elhauge relied on to claim that Intuitive would have dropped its prices 20% across the board for all U.S. customers says no such thing.  This leaves Prof. Elhauge with no reliable basis for his 20% assumption.

Even apart from fact that the key source document Prof. Elhauge relies on does not actually say what he claims it says, that document, about a potential program that was never even initiated in the real world, is a remarkably thin reed for an expert opinion about Intuitive's expected price response in a completely different context.  Plaintiffs assert that Project Dragon was "a major initiative extensively developed and seriously considered" and had been determined to be "technically feasible."  Opp. at 5.  These characterizations are beside the point: the critical point is that Intuitive did not pursue Project Dragon because it would not be *financially feasible*.  Plaintiffs offer nothing to explain why discounts that were contemplated for a program that was abandoned as financially infeasible in the real world can indicate how Intuitive would choose to price in the but-for world.  Mot. at 6 (citing Bass Dec. Ex. 6 (Dkt. No. 126.7) at 73:6-74:10).  Plaintiffs' unsupported assertion that Intuitive "shelved the program only after eradicating rival IRCs, determining that (absent such competition) it would be slightly more profitable to continue selling only new EndoWrists at its historical monopoly prices" (Opp. at 5-6) is nothing more than conclusory speculation.  It provides no basis for finding that a discount Intuitive was *thinking about* making *outside the United States* in a *different context* but abandoned because it was financially infeasible provides a reliable basis for measuring how Intuitive would have responded on price to competition from third parties in the but-for world.

*Second*, plaintiffs fail to demonstrate that Prof. Elhauge has a reliable basis to assume that EndoWrist use limits would have been increased to 20 in the but-for world.  Prof. Elhauge speculates that use limits never would have existed in the but-for world and alternatively that third parties would have created competitive pressure causing Intuitive to raise use limits on all EndoWrists to 20.  Mot. at 7–8.  Plaintiffs' scattershot array of assertions do nothing to show that either assumption has a reliable basis in the record.  Opp. at 7-8.  In fact, the on-point record evidence is to the contrary.

Plaintiffs, like Prof. Elhauge, brush aside the evidence in the record that the FDA originally cleared Intuitive's EndoWrists for 10 uses and that, even after years of improvements, the lives could only be extended for some X/Xi instruments to 12-18 uses.  Mot. at 8.  Plaintiffs assert instead that

4

Intuitive did not test these instruments to failure (Opp. at 8), but that clearly misses the point given what the testing data actually shows. Intuitive subjected samples of each Xi instrument model to as many as 22 simulated surgical uses (SSU), and in every case a significant subset of the sample failed *before* reaching the maximum number of cycles for testing. Bass Dec. Ex. 5 (Dkt. No. 126.6) ¶ 197. For instance, of the 22 Xi long tip forceps tested, 5 tested to failure by the 21st testing cycle, leading Intuitive to submit it for clearance to the FDA for 18 uses after applying a standard statistical analysis to these test results. *Id.* Ignoring what the testing data actually showed, plaintiffs double down on Prof. Elhauge's reliance on an email from an Intuitive employee where he posited his "guess" regarding certain usage limits without the benefit of actual data from planned testing that was yet to be completed. Opp. at 8. As Intuitive explained in its opening brief, that "guess" is irrelevant given that Intuitive's testing later validated extensions for only 12 to 18 lives. Mot. at 8. That Prof. Elhauge is willing to put more weight on a "guess" posited *before* testing the instruments than on the test results themselves speaks volumes about his result-oriented approach.

  Plaintiffs also point to Rebotix's advertised assertion that it was able to achieve 29-59 uses for its modified EndoWrists. Opp. at 8. But, as Intuitive pointed out in its motion, Prof. Elhauge cites no evidence that Rebotix – which abandoned its effort to obtain 510(k) clearance after FDA questioned, *inter alia*, the adequacy of its safety testing – was able to guarantee reliable performance from instruments with higher uses. Mot. at 9. Plaintiffs cite no evidence either. Plaintiffs also point to the FDA's clearance of one Iconocare S/Si instrument for one reset of an additional nine lives. Opp. at 8; *see also* Bass. Dec. Ex. 5 ¶ 53. Plaintiffs offer no evidence that those additional nine lives could be applied to *all* other instruments. Indeed, this is what FDA expressly warned Iconocare it could *not* do. Lazerow Dec. in Supp. Trautman Ex. 15 (Dkt. No. 123.16) at -0534. Plaintiffs thus fail to show that Prof. Elhauge has any reliable basis to assume that Intuitive would have increased use limits on all instruments across the board to 20 in the but-for world.[2]

---

[2] Plaintiffs' mention of Prof. Elhauge's alternative scenarios with different permutations of but-for world use limits does not help them. Opp. at 8, n.22. Those permutations are unreliable for the same reasons as his 20-use limit – Prof. Elhauge has no basis to conclude that Intuitive ever could have or would have raised use limits to the numbers he posits for all instruments in the but-for world.

*Third*, plaintiffs fail to demonstrate that Prof. Elhauge's combined price and use limit effect is reliable. Not only is each assumption independently unsound for the reasons just described, but the assumption that Intuitive would have reduced its effective pricing 55% in the but-for world finds no support in the record. All plaintiffs offer is the recycled conclusory argument that Intuitive would have been so affected in the but-for world that it would have had to dramatically drop its prices. *See* Opp. at 9. Plaintiffs argue that "[e]conomics predicts" that one could expect further price lowering in the but-for world because without the restraints, third-party companies would have economies of scale, lower costs, and competition amongst themselves. *Id.* But there is a huge difference between the simple hypothesis that prices would be "lower" in the face of greater competition and Prof. Elhauge's conclusion that the competitive impact would have been so great as to require Intuitive's effective prices to be reduced by more than half. He offers no scientific analysis of supply and demand factors to support this conclusion. And plaintiffs cite no cases for the notion that it is a sound expert methodology to simply invoke the term "economics" to predict billions of dollars in damages based just on the expert's say-so.[3]

*Fourth*, plaintiffs fail to demonstrate that Prof. Elhauge has a reliable basis to assume that third parties would have modified EndoWrists as early as May 21, 2017. Plaintiffs' assertion that Prof. Elhauge cites "extensive evidence predating 2017" of preparedness of Rebotix and Stryker to enter the market is inaccurate. Opp. at 10. Prof. Elhauge's own report acknowledges the various "risk factors" – entirely unrelated to Intuitive – that caused Stryker not to move forward with the acquisition of Rebotix. Indeed, Stryker's deponent testified unequivocally that Stryker's regulatory counsel would not allow Stryker to go forward with the deal unless Rebotix's device had 510(k) clearance, which of course it did not. Bass Supp. Dec. Ex. 11 at 156:7-157:16; *see also* 152:23-153:6. There is no evidence that Stryker would have gone forward with the acquisition of Rebotix in the but-for world given its concern about Rebotix's lack of FDA clearance. And plaintiffs do nothing to address Intuitive's point that Rebotix tried to seek FDA clearance in 2014 but failed to receive it, indicating that Rebotix itself was concerned about its own regulatory pathway. Plaintiffs point to no record evidence that Rebotix would have entered the United States market any earlier than it did. And, plaintiffs' opposition does not even

---

[3] Plaintiffs' reference to Senhance as a benchmark (Opp. at 9) flies in the face of evidence of the differentiated nature of the products. *See* Bass Dec. Ex. 5 ¶¶ 161-163.

attempt to claim that there is record evidence indicating that SIS and Restore would have entered the market in 2017 or that Intuitive somehow impeded their entry.  Plaintiffs' argument comes down to the notion that third parties might have had an economic incentive to enter earlier in the but-for world, but they still offer no evidence that anyone would have entered years earlier than they actually did.  *See McGlinchy*, 845 F.2d at 806-07 (striking damages opinion based on "speculation" and "unsupported assumptions").

*Finally*, plaintiffs fail to demonstrate that Prof. Elhauge has a reliable basis to assume that third parties would have modified X/Xi EndoWrists in the but-for world.  Plaintiffs claim that "Rebotix *has already developed* a way to circumvent the encryption on the X/Xi use counter."  Opp. at 10-11 (emphasis in original).  This is false.  ███████████████████████████████████████ ███████████████████████████████████████████████████ Bass Dec. Ex. 5 ¶ 248, n.639.  ███████████████████████████████ ███████████████████████████████ ███████████████████████ Bass Supp. Dec. Ex. 12 at 38:9-15 (emphasis added).  ███████████████████████ ██████████████ *Id.* at 39:4-10.  ███████████████████ ████████████████████████████████ Bass Supp. Dec. Ex. 13 at 50:6-16.

Plaintiffs, like Prof. Elhauge, speculate about the possibility that Rebotix and Restore might have developed an X/Xi process sooner if they had more money.  Opp. at 11.  But, this is nothing more than an opinion that money fixes all problems.  As Prof. Elhauge has admitted, he is "not a technical expert" and does not know how much money those third parties would need to develop such a process.  Bass Dec. Ex. 2 at 110:21-25, 120:17-121:17.  Ultimately, it is telling that plaintiffs are compelled to characterize Elhauge's opinion as a "*modest* conclusion that IRCs *might* have offered X/Xi EndoWrist repair absent Intuitive's anticompetitive conduct."  Opp. at 11 (emphasis added).  A conclusion about what "might" happen is exactly the kind of vague guesswork, unrooted in record facts, that cannot support damages estimates and must be excluded.  *See McGlinchy*, 845 F.2d at 806–07.

In sum, plaintiffs fail to demonstrate that the assumptions underlying Prof. Elhauge's EndoWrist damages are sufficiently reliable to present to a jury in this case. *See, e.g.*, *Amer. Booksellers*, 135 F. Supp. 2d at 1041-42 (striking damages expert due to too many unsupported assumptions).

## B. Prof. Elhauge's Da Vinci Service Damages Are Unreliable.

In its motion, Intuitive demonstrated that Prof. Elhauge's service damages estimates are not based on any reliable methodology and are based on a series of aggressive assumptions unrooted in the record of the case. Mot. at 12–13. Plaintiffs' minimal response does not undermine this showing.

Importantly, plaintiffs do not and cannot dispute that in the but-for world third parties would only have been able to provide certain limited types of da Vinci service. Indeed, plaintiffs expressly disclaimed at the motion to dismiss stage a claim premised on the notion that Intuitive has any duty to share its proprietary service toolkit with third parties. *See* Order on Mot. to Dismiss (Dkt. No. 69) at 2. In the face of this, plaintiffs continue to claim that it was reasonable for Prof. Elhauge to assume that if Intuitive had more competition on the very limited service items third parties could perform in the but-for world, Intuitive would have dropped its prices on *all* service, including the majority of service that only Intuitive could perform. But plaintiffs, like Prof. Elhauge, point to no record evidence to support this assumption. Plaintiffs point to the fact that when Intuitive has a customer that receives service on a time and materials basis, Intuitive charges that customer the same hourly rate for the portion of its service that is proprietary and the portion of the service that is not. Opp. at 12. But that's only 2% of Intuitive's customers (Mot. at 12), and plaintiffs can point to no evidence that Intuitive would *have* to price uniformly across the board in the but-for world. Plaintiffs, like Prof. Elhauge, provide no explanation as to why Intuitive would drop its pricing on service for which it faced no competition, and such an assumption makes no sense.

Plaintiffs' arguments about Abbott as a comparator are equally unavailing. The "multiple relevant similarities between the two companies" that Prof. Elhauge "notes" are insufficient to establish "meaningful economic similarity." Opp. at 13. Plaintiffs' citation to *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997), does not help them. There, unlike the present case, the comparators were appropriate because of the similarity between the products offered. *Id.* at 1221-22. That is not a claim that Prof. Elhauge can make here. *See* Bass Dec. Ex. 5 ¶ 263 ("Abbott's

8

principal medical devices are for the treatment of cardiovascular diseases, diabetes care products, and neuromodulation devices for the management of chronic pain and movement disorders, while Intuitive's services are limited to its own da Vinci Surgical Systems."). Prof. Elhauge ignores the companies' significant size difference and fundamentally different nature of the products. *See id.* These differences render the purported yardstick analysis woefully deficient. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974-76 (C.D. Cal. 2012) (excluding expert yardstick analysis in case against concert promoters where ticket price comparison to other promoters failed to consider the different artists promoted by defendant and account for promoters' venue sizes).

### C. Prof. Elhauge's Opinions in Areas Where He Is Unqualified Should Be Stricken.

Plaintiffs do not offer serious arguments to rebut Intuitive's showing that Prof. Elhauge opines on issues outside his area of expertise. Opp. at 13-15. While plaintiffs assert that Intuitive's argument is "impermissibly vague" because it is expressed in "ill-defined categories," plaintiffs do not offer any actual explanation of what makes these categories unclear. *Id.* at 13-14. And in fact, Intuitive specifically described the types of opinions subject to exclusion on this basis, including with reference to specific examples. Mot. at 14. Plaintiffs cite no authority that supports their apparent argument that Intuitive should have identified every single quotation where Prof. Elhauge offers an opinion outside his area of expertise in the more than 400 pages of his reports.[4]

Plaintiffs next claim that "much of Prof. Elhauge's discussion concerning these issues simply responds to (or anticipates) opinions offered by Intuitive's own economic expert." Opp. at 14. This argument does not help plaintiffs. If Prof. Elhauge is not qualified to offer an opinion, it does not matter whether he is responding to another expert or not. This motion is not about Intuitive's expert's qualifications, which plaintiffs did not challenge. Moreover, all of the items that Intuitive challenges were presented in Prof. Elhauge's first report (and repeated in his rebuttal report), and thus Prof. Elhauge opined on issues outside his expertise before he had ever seen Dr. Smith's report in this case.

---

[4] Indeed, plaintiffs' cited cases support Intuitive's approach. *See Bonds v. Dautovic*, 2011 WL 13228307, at *4 (S.D. Iowa Feb. 7, 2011) (refusing to exclude categories identified as including "*[a]ny and all* statements, reports, depositions, analysis or opinions given or rendered" by officers) (emphasis added); *AMX Corp. v. Pilote Films*, 2007 WL 2428940, at *2 (N.D. Tex. Aug. 27, 2007) (movant did not identify "any specific opinions or other expert testimony that it seeks to exclude").

Finally, while plaintiffs refer to Prof. Elhauge's reliance on FDA, engineering, and surgeon experts (Opp. at 15), such reliance does not change the fact that he himself posits opinions in these areas as well. He has no experience to allow him to offer an independent opinion on these topics, and to the extent the Court finds these experts' opinions unreliable, Prof. Elhauge's conclusions relying on these opinions must be found inadmissible as well.[5] Ultimately, these are issues on which Prof. Elhauge "sorely lack[s] the education, employment, or other practical personal experiences to testify as an expert," and thus his opinions, like those relating to FDA clearance and EndoWrist safety and functionality, must be excluded. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F. 3d 706, 715 (8th Cir. 2001). Similarly, plaintiffs' claim that Prof. Elhauge's opinions about the motivation and intent of Intuitive and hospitals are "economically relevant observations" does nothing to establish that Prof. Elhauge is qualified to make them. Opp. at 15. Prof. Elhauge offers conclusions about the perceptions he believes hospitals had of EndoWrists (*see, e.g.*, Bass Dec. Ex. 1 ¶¶ 294-95), and he ascribes significant weight to what he deems as Intuitive's motivations (*id.*, ¶¶ 340, 361). This is improper. *See Oracle Amer., Inc. v. Hewlett Packard Enter. Co.*, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (excluding expert opinions about defendants' motives and intent because admitting them would impermissibly "substitut[e] the expert's judgment for the jury's").

### III.    CONCLUSION

For the foregoing reasons and those in Intuitive's motion, the Court should exclude Prof. Elhauge's damages estimates, and his opinions where he exceeds his expertise, including on (a) FDA clearance issues, (b) the safety of EndoWrists, (c) the functionality of EndoWrists, (d) conclusions regarding hospital motivation and intent and (e) conclusions regarding Intuitive's motivation and intent.

DATED: May 11, 2023               By: /s/ Kathryn E. Cahoy
                                       KATHRYN E. CAHOY

                                       *Attorney for Intuitive Surgical, Inc.*

*Additional Counsel for Intuitive Surgical, Inc.*    KATHRYN E. CAHOY (SBN 298777)

---

[5] *See, e.g.*, *Cal. Inst. Tech. v. Broadcom Ltd.*, 2020 WL 10054680, at *28 (C.D. Cal. July 17, 2020) (excluding damages opinion where expert relied on excluded opinions of defendant's technical expert).

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690

KAREN HOFFMAN LENT (*Pro Hac Vice*)
Email: karen.lent@skadden.com
MICHAEL H. MENITOVE (*Pro Hac Vice*)
Email: michael.menitove@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2040

Email: kcahoy@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

SONYA WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

ANDREW LAZEROW (*Pro Hac Vice*)
Email: alazerow@cov.com
ASHLEY E. BASS (*Pro Hac Vice*)
Email: abass@cov.com
JOHN KENDRICK (*Pro Hac Vice*)
Email: jkendrick@cov.com
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291