# ATTACHMENT 90

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   FOR THE NORTHERN DISTRICT OF CALIFORNIA
 4   Case No. 3:21-cv-03825-VC
 5   ----------------------------------x
 6   IN RE: DA VINCI SURGICAL ROBOT LITIGATION,
 7   _____
 8   THIS DOCUMENT RELATES TO:
 9   ALL CASES
10   ----------------------------------x
11               November 1, 2022
12                 12:45 p.m.
13            HIGHLY CONFIDENTIAL
14            Videotaped deposition of IMRON
15   ZAFAR, pursuant to subpoena, before Jineen
16   Pavesi, a Registered Professional
17   Reporter, Registered Merit Reporter,
18   Certified Realtime Reporter and Notary
19   Public of the State of New York, via Zoom,
20   with all other parties in person at Cohen
21   Milstein, 88 Pine Street, New York, New
22   York.
23
24
25
```

```
                                                         Page 2
 1
 2   A P P E A R A N C E S :
 3   COHEN MILSTEIN SELLERS & TOLL PLLC
     88 Pine Street, 14th Floor
 4   New York, New York 10005
           Attorneys for Plaintiffs and Proposed
 5         Class
     BY:   CHRISTOPHER BATEMAN, ESQ.
 6         cbateman@cohenmilstein.com
 7
     HALEY GUILIANO LLP
 8   116 West Hubbard, Unit 20
     Chicago, Illinois 60654
 9         Attorneys for Surgical Instrument
           Service Company
10   BY:   DONNY SAMPORNA, ESQ.
           donny.sampora@ghlaw.com
11              (via telephone)
12
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13   One Manhattan West
     New York, New York 10001
14         Attorneys for Intuitive Surgical,
           Inc.
15   BY:   DOUGLAS DeBAUGH, ESQ.
           douglas.debaugh@skadden.com
16
17   DEUTSCHE BANK AG
     FILIALE NEW YORK LITIGATION & REGULATORY
18   ENFORCEMENT
     1 Columbus Circle
19   New York, New York
           Attorneys for Witness
20   BY:   SARAH SCHOENBACK, ESQ.
21
     ALSO PRESENT:
22   ANTON EVANGELISTA, The Video Technician
23
24
25
```

Page 11

1              ZAFAR
2  this meeting today.
3       Q.      Again, without getting into the
4  contents of what you discussed, did you
5  review any documents in preparation for
6  the deposition that refreshed your
7  recollection of events?
8       A.      I personally did not review any
9  documents.
10              The only thing I did was I
11 looked at my log of research reports in
12 terms of getting the information to my
13 attorney, but, no, I did not read any
14 documents, no.
15      Q.      Who is your current employer?
16      A.      Deutsche Bank.
17      Q.      What is Deutsche Bank?
18      A.      Deutsche Bank is a global
19 investment bank with businesses across the
20 board in financial services.
21              I work in the equity research
22 division, so I provide institutional
23 investors with investment research on
24 publicly-traded companies and, you know,
25 markets in which these public companies

1                    ZAFAR
2    compete.
3              I focus specifically on medical
4    technology, as I mentioned earlier.
5         Q.    What was the last part, you
6    focus on --
7         A.    Medical technology, medical
8    devices, supplies, equipment.
9         Q.    What's your title at Deutsche
10   Bank currently?
11        A.    I am an equity research analyst
12   with the corporate title of
13   vice-president.
14        Q.    How long have you held that
15   position?
16        A.    My current position at Deutsche
17   Bank?
18        Q.    Yes.
19        A.    You know, I'm going to --  I
20   can give you rough date ranges, but I
21   don't remember exact dates off the top of
22   my head to be honest.
23              But I believe I just
24   celebrated, if I'm not mistaken, my third
25   anniversary at DB.

Page 48

1           ZAFAR
2  supply chain executives in connection with
3  this report?
4           MR. DeBAUGH:  Objection to
5  form.
6      A.      Yes.
7      Q.      Did you talk to Restore
8  Robotics in connection with this report,
9  in research for the report?
10     A.      Yes.
11     Q.      Did you talk to Intuitive
12 personnel as part of researching this
13 report?
14     A.      What I recall is asking a
15 question about this issue on one of the
16 public conference calls.
17              To the extent I had a
18 one-on-one private conversation with them
19 beyond that, I don't recall to be honest.
20     Q.      If you go to page 5 of the
21 report, this is the one titled "FDA and
22 Patient Safety Considerations."
23              First paragraph says, "Safety
24 concerns unlikely to be an impediment.
25 The key fundamental argument we've heard

1                   ZAFAR
2    paragraph 1, it says, "Our February 3rd
3    downgrade was predicated on our belief
4    that refurbished Da Vinci instruments pose
5    a material and increasing risk to
6    Intuitive's INA segment growth over the
7    next couple of years.  Not surprisingly,
8    push-back has centered largely around two
9    points," and there are two points under
10   that.
11              The push-back, what was the
12   push-back that is referred to here?
13        A.    The push-back, I don't recall
14   what that specifically refers to, because
15   in this context -- yeah, I don't remember
16   specifically.
17        Q.    Do you remember who pushed
18   back?
19        A.    That's the question, I don't
20   remember if this was in the context of
21   investors or, you know, companies,
22   doctors, whatever, I don't remember the
23   context of that, to be honest.
24        Q.    If you go to paragraph 2 here,
25   it says, "Deeper Dive Into the Threat From

Page 92

1            ZAFAR
2  Refurbished Da Vinci Instruments:  Over
3  the past few weeks we consulted with five
4  regulatory and legal experts to gain
5  further clarity on both the regulatory/FDA
6  and service contract angles."
7            Who were those five experts
8  that you consulted with?
9            MR. DeBAUGH:  Objection.
10     A.     I don't recall off the top of
11 my head; again, we talked to so many
12 consultants all the time, literally
13 hundreds since this was published, I
14 literally don't remember.
15     Q.     And then if you can go to page
16 8, it is a slide that says "510(k)
17 Premarket Notification Does Not Appear
18 Applicable" at the top.
19            It says, "The immediate
20 feedback to our downgrade note was that
21 Restore Robotics is subject to 510(k)
22 approval requirement and that because the
23 company does not have 510(k) clearance, it
24 is therefore in clear violation of FDA
25 regulations."

Page 93

1        ZAFAR
2            Do you remember who provided
3   that feedback that's referenced here?
4       A.      Not specifically, no.
5       Q.      If you go to page 10, the one
6   that says "Regulatory Oversight of
7   Facilities, ISO Certification is the
8   Standard," at the top.
9            If you look at the third
10  paragraph, it says, "We were able to
11  review a third-party ISO certification
12  received by Restore Robotics for the
13  servicing of EndoWrist instruments.  We
14  confirmed that the issuer of this
15  certification, a Germany-based company
16  called DQS MED, is reputable and credible
17  in the Medtech industry."
18            Do you recall how you confirmed
19  that DQS MED was reputable and credible?
20      A.      I don't recall for certain, but
21  my recollection is that it was on the
22  website, these types of documentations are
23  generally publicly-available.
24            But I don't remember with
25  certainty, so I will leave that as my

Page 128

1         ZAFAR
2  question.
3     Q.    Sure.
4           I'm wondering if you've ever
5  evaluated in your personal capacity, or in
6  your capacity as a research analyst at
7  Deutsche Bank, whether a medical device
8  required 510(k) clearance?
9           MS. SCHOENBACH:  Objection,
10 legal conclusion.
11          MR. BATEMAN:  Same objection,
12 vague.
13    A.    I don't remember, because if a
14 product is approved, I already know that
15 it is a 510(k) --  I'm not sure I
16 understand the question.
17    Q.    Let's move on.
18          Counsel for plaintiffs asked
19 you about a company by the name of Restore
20 Robotics, do you recall that?
21    A.    I do.
22    Q.    When did you first learn about
23 Restore Robotics?
24    A.    So in normal course of our jobs
25 we were doing a call with a surgeon about,

Page 148

1               ZAFAR
2    interesting tid bit is not worth violating
3    the law.
4           I do remember being very
5    cautious ahead of that conversation with
6    him, because on one hand it was a
7    potential golden opportunity to get some
8    insight, but I also didn't want to, you
9    know, get insight that I wasn't supposed
10   to know.
11          So I remember approaching that
12   discussion enthusiastically but also very
13   cautiously in terms of, you know, not
14   becoming privy to information that I'm not
15   supposed to be privy to.
16      Q.     How many times did you speak
17   with counsel for Restore Robotics?
18      A.     One, that I remember.
19      Q.     When you spoke with counsel for
20   Restore Robotics, do you know whether or
21   not that Restore had filed a lawsuit
22   against Intuitive?
23      A.     Again, I don't know, I don't
24   remember, I don't remember the sequence.
25      Q.     I am going to show you a

Page 194

1             ZAFAR
2    three, four consultants a week, by
3    consultants I mean surgeons, hospital
4    CEOs.
5             If I said literally hundreds,
6    that might have been a little bit
7    hyperbolic, but suffice it to say it's in
8    the dozens.
9       Q.    My clarification question,
10   Mr. Zafar, is whether or not you were
11   talking to consultants about Intuitive
12   Surgical in this third-party repair issue
13   or consultants in the normal course of
14   your job?
15      A.    In the normal course of my job,
16   sorry for the...
17            Just to clear up the record, if
18   I said hundreds, that was more a figure of
19   speech; if you want -- it was more in the
20   dozens, not hundreds.
21      Q.    Apologies, I don't recall your
22   answer to this earlier.
23            Sitting here today, do you
24   recall the experts that you spoke with in
25   connection with this report?

Page 195

1                       ZAFAR
2        A.      I don't.
3        Q.      Turning to the first bullet,
4    which reads, "On the FDA side, while
5    summing knowledge that applicable
6    regulations are somewhat nebulous, the
7    majority of regulatory experts came to the
8    conclusion that Restore Robotics is not in
9    violation of FDA rules as a third-party
10   service provider of refurbished
11   instruments," do you see this?
12       A.      Yes.
13       Q.      Do you know what information
14   those experts that you spoke with had
15   about Restore Robotics in coming to this
16   determination?
17       A.      I don't remember specifically.
18       Q.      Do you know whether the experts
19   that are referred to in this paragraph had
20   spoken to anyone affiliated with Restore
21   Robotics in coming to their conclusion?
22       A.      I don't know.
23       Q.      Do you know whether the experts
24   referred to in this paragraph had observed
25   the process of EndoWrist, quote, repair

Page 227

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, IMRON ZAFAR, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR