Samuel Maida (SBN 333835)
HAUSFELD LLP
600 Montgomery Street, Suite 3200 San Francisco, CA 94111
Tel: 415-633-1908
Fax: 415-358-4980
Email: smaida@hausfeld.com

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
Email: jdominguez@cohenmilstein.com

Jeffrey J. Corrigan (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@srkattorneys.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISON

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION | Lead Case No: 3:21-CV-03825-AMO-LB |
| | **PLAINTIFFS' NOTICE OF MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |
| | Hearing Date: October 10, 2024 Time: 2:00 PM Courtroom: 10 - 19th Floor Judge: Hon. Araceli Martínez-Olguín |

# TABLE OF CONTENTS

I.      Introduction and Factual Background ................................................................................. 2

II.     Legal Standard ..................................................................................................................... 4

III.    Argument ............................................................................................................................. 4

      A.      Plaintiffs Satisfy Rule 23(a). ................................................................................... 4

            1.      The Proposed Class Is Sufficiently Numerous. ........................................... 4

            2.      There Are Questions of Law or Fact Common to Class Members. ............... 5

            3.      Plaintiffs' Claims Are Typical of Class Members' Claims. ........................ 5

            4.      Plaintiffs and Counsel Adequately Represent the Class. ............................ 6

      B.      Plaintiffs Satisfy Rule 23(b)(3). .............................................................................. 7

            1.      Common Questions Predominate Over Any Individual Issues. ................... 7

            2.      A Class Action Is Superior to Individual Actions. ................................... 23

      C.      Plaintiffs Satisfy Rule 23(b)(2). ............................................................................ 24

IV.     Conclusion ......................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. B. v. Haw. State Dep't of Educ.*,
   30 F.4th 828 (9th Cir. 2022) ....................................................................................5

*Alcantar v. Hobart Serv.*,
   800 F.3d 1047 (9th Cir. 2015) ..................................................................................5

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997).............................................................................................4, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).......................................................................................2, 4, 8

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946)...............................................................................................22

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ................................................................................24

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ...................................................8, 13, 14, 17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).................................................................................................22

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
   411 F.3d 1030 (9th Cir. 2005) ................................................................................22

*Cung Le v. Zuffa, LLC*,
   2023 WL 5085064 (D. Nev. Aug. 9, 2023) ..........................................4, 8, 13, 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)................................................................................................7

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020)........................................................................5, 6

*In re Google Play Store Antitrust Litig.*,
   2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ...............................................8, 24

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..................................................................................5

*In re High-Tech Emp. Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013)............................................................................8

*In re High-Tech Emp. Antitrust Litig.,*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................6, 14

*Just Film, Inc. v. Buono,*
  847 F.3d 1108 (9th Cir. 2017) .........................................................................5

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.,*
  609 F. Supp. 3d 942 (N.D. Cal. 2022) ..............................................................6

*In re Lidoderm Antitrust Litig.,*
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .......................................14, 17, 20, 22

*Lytle v. Nutramax Lab'ys*, Inc.,
  99 F.4th 557, 572 (9th Cir. 2024) ...................................................................8

*Nevarez v. Forty Niners Football Co.,*
  LLC, 326 F.R.D. 562 (N.D. Cal. 2018) ..........................................................23, 24

*In re Nexium Antitrust Litig.,*
  777 F.3d 9 (1st Cir. 2015).......................................................................14, 17, 20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
  31 F.4th 651 (9th Cir 2022) (en banc) ...................................................... *passim*

*In re Online DVD-Rental Antitrust Litig.,*
  779 F.3d 934 (9th Cir. 2015) ...........................................................................6

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) .........................................................................25

*Pecover v. Elec. Arts Inc.,*
  2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ...................................................6

*Ruiz Torres v. Mercer Canyons, Inc.,*
  835 F.3d 1125 (9th Cir. 2016) .......................................................................14

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
  559 U.S. 393 (2010)........................................................................................4

*Simon & Simon, PC v. Align Tech., Inc.,*
  2023 WL 8261297 (N.D. Cal. Nov. 29, 2023) .........................................4, 15, 22

*Smith v. City of Oakland,*
  339 F.R.D. 131 (N.D. Cal. 2021).....................................................................5

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016)...........................................................................3, 8, 15

*In re Visa Check/Mastermoney Antitrust Litig.,*
  192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd sub nom*, 280 F.3d 124 (2d Cir. 2001) ........11

*Wolin v. Jaguar Land Rover N. Am.*,
    617 F.3d 1168 (9th Cir. 2010) ......................................................................................23, 24

*Wortman v. Air N.Z.*,
    326 F.R.D. 549 (N.D. Cal. 2018) ..............................................................................................4

**Other Authorities**

Federal Rule of Civil Procedure 23 ...................................................................... *passim*

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 10, 2024, or as soon thereafter as the matter may be heard by the Honorable Araceli Martínez-Olguín in Courtroom 10 - 19th Floor, of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Larkin Community Hospital ("Larkin"), Franciscan Alliance, Inc. ("Franciscan") and King County Public Hospital District No. 1, d/b/a Valley Medical Center ("Valley Medical") (collectively, "Plaintiffs") will and hereby do move, pursuant to Federal Rule of Civil Procedure 23, for an order certifying this action as a class action with a proposed class (the "Class") defined as:

> All entities that purchased da Vinci service and EndoWrists from Intuitive in the United States at any time from May 21, 2017, to December 31, 2021.[1]

Plaintiffs also will move the Court to appoint them as Class Representatives, and appoint Cohen Milstein Sellers & Toll PLLC, Hausfeld LLP, and Spector Roseman & Kodroff, P.C. ("Class Counsel") as Co-Lead Class Counsel. This Motion is based on this Notice and Motion, the below Memorandum of Points and Authorities, the Declaration of Manuel J. Dominguez and exhibits thereto, the pleadings and records on file herein, and such other evidence and arguments as may be presented to the Court prior to or at the hearing of this Motion.

## STATEMENT OF ISSUES TO BE DECIDED

The issues for this Court to decide are: (1) whether the Court should certify the Class pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), or both; (2) whether the Court should appoint Plaintiffs as Class Representatives; and (3) whether the Court should appoint Cohen Milstein Sellers & Toll PLLC, Hausfeld LLP, and Spector Roseman & Kodroff, P.C. as Co-Lead Class Counsel.

---

[1] Plaintiffs have set the end of the "Class Period"—which defines the entities that are members of the Class—based on the available data. *See infra* note 8. In contrast, the "Damages Period"— which defines the damages that the Class seeks—continues to accrue until trial. The Class excludes Defendant, its officers, subsidiaries, and affiliates, and government entities.

## I.     INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs seek certification of a Class of health care providers that purchased EndoWrists and service for the da Vinci surgical robots that they leased or purchased from Defendant Intuitive Surgical, Inc. ("Intuitive"). As the Court is aware, three markets are at issue in this case: for minimally invasive surgical robots ("Robots"), for EndoWrists, and for da Vinci service. Intuitive's fundamental business model is to weaponize its near-total monopoly in the first market (for Robots) to exploit its customers in the second and third markets. Specifically, Intuitive forces all its customers to purchase EndoWrists and da Vinci service from Intuitive—and Intuitive only—if they want da Vinci Robots.

The blanket nature of Intuitive's conduct makes this case particularly well suited for class adjudication. Intuitive effects its anticompetitive ties through contract language it imposes on all its customers, enforces them through technological measures it incorporates into all its products, and charges all EndoWrist and service customers essentially the same inflated prices. Intuitive's Robot penetration rate among the country's top 100 hospitals is 100%, meaning that none of its customers can avoid Intuitive's ties and all of them would benefit from competitive pressure brought to bear by independent repair companies ("IRCs") that would force Intuitive to lower its prices. All of this is established by common evidence. Likewise, each defense Intuitive has articulated to date—including its purported "safety" justification—turns on a common set of facts, and as such presents questions that are necessarily common across all Class members.

To warrant class certification, Plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and either Rule 23(b)(2) or 23(b)(3). *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir 2022) (en banc). Plaintiffs satisfy the Rule 23(a) requirements—numerosity, commonality, typicality, and adequacy—as well as those under Rule 23(b)(2) (for class-wide injunctive relief) and 23(b)(3) (for class-wide monetary relief).

Class certification under Rule 23(b)(3) generally turns on whether common issues predominate over individual issues. Two doctrines are crucial in this regard. First, plaintiffs need not *prevail* on any common issues at the class certification stage, but need only to present common evidence *capable of* proving their claims on a class-wide basis. *Id.* at 667-68; *see also Amgen Inc.*

*v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013). Second, the question is whether common issues predominate in the case *as a whole*, not as to each element of plaintiffs' claims. *Olean*, 31 F.4th at 668-69; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016).

Even so, Plaintiffs satisfy predominance as to each of the elements of their claims. First, the fundamental question whether Intuitive *violated* the antitrust laws raises common issues that predominate over any individual issues. They include how to define the relevant markets, whether Intuitive has market power in those markets, whether it tied the purchase of EndoWrists and da Vinci service to the da Vinci, whether its conduct caused anticompetitive harm in the relevant markets as a whole, and whether its conduct had any procompetitive effects. None of these issues entails individual inquiries, because (1) the same proof will resolve all Class members' claims, and (2) Intuitive imposed its unlawful restraints uniformly on all Class members through contractual provisions and technological enforcement mechanisms.

Second, the next element for liability—antitrust *injury or impact*—also can be established with common evidence. Plaintiffs have common evidence capable of showing widespread harm to all Class members—often called *common impact*. Indeed, this Court has already concluded that Prof. Elhauge's proposed common evidence of class-wide harm is reliable in rejecting Intuitive's *Daubert* challenge at summary judgment. *See* Dkt. 231 ("*Daubert* Op."). For example, the Court found reliable Prof. Elhauge's "market-wide impact theory" that Intuitive would have "lowered EndoWrist prices and/or increased their artificially suppressed use limits for all customers" if not for the challenged conduct. *See* Dkt. 232 ("SJ Op.") at 27; *Daubert* Op. at 18-19. The jury thus could rely on Prof. Elhauge's testimony to conclude that *all Class members* were injured by paying artificially-inflated prices for EndoWrists. Applying methodologies this Court has already found reliable, Prof. Elhauge confirms that Plaintiffs' common evidence is *capable of* demonstrating class-wide injury. *See* Ex. 1 (Elhauge Class Rep.) § VIII.[2] When such common evidence of widespread harm is reliable, common issues predominate and certification under Rule 23(b)(3) is appropriate. *Olean*, 31 F.4th at 679-80; *see also Tyson Foods*, 577 U.S. at 453-54.

---

[2] All cited exhibits are attached to the Declaration of Manuel J. Dominguez, filed herewith.

Third, Plaintiffs, through their expert, also can calculate damages on a class-wide basis. *See* Ex. 1 (Elhauge Class Rep.) ¶ 842 & Table 9.

Courts regularly certify antitrust actions for class treatment, as they frequently involve predominantly common issues. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust laws."); *Wortman v. Air N.Z.*, 326 F.R.D. 549, 558 (N.D. Cal. 2018) (same).[3]

Accordingly, the Court should grant Plaintiffs' motion for certification and appointment of Class Counsel.

## II.   LEGAL STANDARD

Plaintiffs must satisfy Rule 23 by a preponderance of the evidence. *Olean*, 31 F.4th at 663-65. This entails meeting the requirements of Rule 23(a) and one of the provisions of Rule 23(b). *Id*. If plaintiffs satisfy Rule 23, certification is mandatory, as is appointment of class counsel. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 401 (2010); Fed. R. Civ. P. 23(g)(1). Merits questions may be considered at class certification to the extent—and only to the extent—they are relevant in determining whether Rule 23's prerequisites are satisfied. *Amgen*, 568 U.S. at 466; *Olean*, 31 F.4th at 667-68.

## III.   ARGUMENT

The Court should certify the Class because Plaintiffs satisfy the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as the requirements of Rule 23(b)(3) (predominance and superiority) and Rule 23(b)(2) (indivisibility).

A.      Plaintiffs Satisfy Rule 23(a).

1.      The Proposed Class Is Sufficiently Numerous.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ P. 23(a)(1).[4] Courts routinely find classes are numerous if they contain

---

[3] *See also Simon & Simon, PC v. Align Tech., Inc.*, 2023 WL 8261297 (N.D. Cal. Nov. 29, 2023) (certifying class in monopolization case); and *Cung Le v. Zuffa, LLC*, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) (same for monopsony case).

[4] The question is not "whether joinder is a literal impossibility," but "whether joinder of all class

more than forty members. *Smith v. City of Oakland*, 339 F.R.D. 131, 138 (N.D. Cal. 2021). Here, the Class contains thousands of members. Dkt. 74 ("Answer") ¶ 41. The Class is numerous.

2.     <u>There Are Questions of Law or Fact Common to Class Members.</u>

Rule 23(a)(2) requires questions of law or fact common to the class. Commonality is satisfied by a single issue of law or fact that will be resolved favorably or unfavorably on a class-wide basis. *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart v. Dukes*, 564 U.S. 338 (2011). "The Supreme Court has observed that antitrust cases 'readily' meet" not just commonality, but the more demanding "predominance requirement," because "the underlying purpose of antitrust, to 'safeguard general competitive conditions, rather than to protect specific competitors,'" means that "[t]he violation turns on *defendants'* conduct and intent along with the effect on the market, *not* on individual class members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (quoting *Amchem*, 521 U.S. at 625 and *Alaska Airlines v. United Airlines*, 948 F.2d 536, 540 (9th Cir. 1991)). That is true here, where common issues include how to define the relevant markets, whether Intuitive has power in those markets, whether Intuitive engaged in anticompetitive conduct, and whether that conduct violated federal antitrust law. Further, when common issues predominate over individual issues, as required by Rule 23(b)(3), plaintiffs satisfy commonality, so Plaintiffs further rely on their discussion of predominance, *infra* Section III.B.1, to satisfy Rule 23(a)(2).

3.     <u>Plaintiffs' Claims Are Typical of Class Members' Claims.</u>

Rule 23(a)(3) requires that the representative parties' claims or defenses are typical of the class claims or defenses. Fed. R. Civ. P. 23(a)(3). The claims of the class representative and the class need not be identical, but merely "reasonably coextensive." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) ("The requirement is permissive, such that 'representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'"); *Glumetza*, 336 F.R.D. at 481 (quoting *Wolin v. Jaguar Land Rover*

---

members is 'practicable'—*i.e.*, 'reasonably capable of being accomplished.'" *A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022).

*N. Am.*, 617 F.3d 1168, 1175 (9th Cir. 2010)). Differences in the "'factual scenarios resulting in a claim of the same nature as other class members do[] not defeat typicality;'" what matters is "whether specific differences identified by defendants are *material* to the claims at issue and the legal theories underpinning" the proposed class. *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 961 (N.D. Cal. 2022) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011)). In antitrust cases, typicality is often straightforward, because "named plaintiffs cannot prove their own claims without proving those of the class"—in other words, "both named plaintiffs and the purported class, to succeed on the merits, must show that the [challenged conduct] at issue had an anticompetitive effect on the market and that they suffered damages." *Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *12 (N.D. Cal. Dec. 21, 2010) (collecting cases).

Here, Plaintiffs and all Class members (1) challenge Intuitive's unlawful restraints in the aftermarkets for EndoWrist repair and replacement and da Vinci service, (2) purchased EndoWrists and da Vinci service from Intuitive during the Class Period, and (3) allege the same injury, *i.e.*, they paid more for EndoWrists and da Vinci service than they would have absent Intuitive's anticompetitive conduct. *See* Ex. 1 (Elhauge Class Rep.) § VII & Exhibits C, F, & H thereto (showing damages for Plaintiffs and the Class). Plaintiffs' claims are typical.

### 4.   Plaintiffs and Counsel Adequately Represent the Class.

Rule 23 requires that class representatives and class counsel fairly and adequately represent the class. *See* Fed. R. Civ. P. 23(a)(4), 23(g). Adequacy is satisfied if the named plaintiffs and their counsel (1) have no conflicts of interest with the absent class members, and (2) will prosecute the action vigorously. *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1181 (N.D. Cal. 2013) (citing *Hanlon*, 150 F.3d at 1021). Both requirements are satisfied here.

*First*, as to conflicts, only those that are fundamental and certain—not minor or speculative—can defeat adequacy. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (citing William B. Rubenstein et al., *Newberg on Class Actions* § 3.58 (5th ed. 2011)); *Glumetza*, 336 F.R.D. at 482 (citing *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)). Here, Plaintiffs and the other Class members share an interest in proving that (a) Intuitive

violated the antitrust laws, and (b) they paid more for EndoWrists and da Vinci service than they would have but for that anticompetitive conduct. Plaintiffs and Class Counsel have no conflicts with the Class.

*Second*, the Plaintiffs and Class Counsel have vigorously prosecuted this case on behalf of the Class for the last three years and will continue to do so. Each Plaintiff has produced thousands of documents, had several employees sit for depositions, and worked actively with Class Counsel. Consistent with Rule 23(g), Plaintiffs retained highly experienced counsel with success in antitrust class actions, as recognized by the order appointing them as Interim Co-Lead Counsel. *See* Dkt. 54; *see also* Dkt. 50 at 4-12 (underlying motion, describing Class Counsel's qualifications). As the Court found there, "the materials filed with the proposal [for appointment of interim counsel] indicate that [Class Counsel] have performed substantial work on behalf of the potential class, facilitated the consolidation of separate actions on behalf of the plaintiffs, and have the knowledge, experience, and resources necessary to effectively represent the potential class." Dkt. 54 at 1-2. That is all the more true today, as Class Counsel have vigorously prosecuted this litigation since their appointment as Interim Co-Lead Counsel, including by successfully surviving summary judgment and *Daubert* challenges.

Plaintiffs and Class Counsel are adequate.

B.    Plaintiffs Satisfy Rule 23(b)(3).

Plaintiffs also must satisfy one of the Rule 23(b) bases for certification. *Olean*, 31 F.4th at 663-64. Here, Plaintiffs satisfy both Rule 23(b)(3) and, as discussed below, Rule 23(b)(2). The Rule 23(b)(3) requirements are predominance and superiority.

1.    Common Questions Predominate Over Any Individual Issues.

Predominance requires showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Olean*, 31 F.4th at 663; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The question is "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664. Here, Plaintiffs must prove: (i) an antitrust violation; (ii) a resulting

1    "antitrust injury" or "impact;" and (iii) measurable class-wide damages. *Olean*, 31 F.4th at 666

2    (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101-02 (9th Cir. 1999));

3    *see also In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *8 (N.D. Cal. Nov. 28,

4    2022). The issue is whether Plaintiffs have common evidence capable of proving their claims, not

5    whether they should prevail on that evidence. *Olean*, 31 F.4th at 667-68; *see also Lytle v. Nutramax

6    Lab'ys*, Inc., 99 F.4th 557, 572 (9th Cir. 2024). Further, predominance is assessed for the case *as

7    a whole*, not as to each element of their claims. *Olean*, 31 F.4th at 668-69; *see also Tyson Foods*,

8    577 U.S. at 456-60; *Amgen*, 568 U.S. at 468-69; *Google Play*, 2022 WL 17252587, at *12 ("[E]ven

9    if just one common question predominates, 'the action may be considered proper under Rule

10   23(b)(3) even though other important matters will have to be tried separately.'" (quoting *In re

11   Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 557–58 (9th Cir. 2019) (en banc))); *In re High-

12   Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565 (N.D. Cal. 2013).

13          Plaintiffs have adduced common evidence capable of proving a violation, resulting

14   antitrust injury or impact, and class-wide damages.

15                          a.      *Common Evidence of a Violation.*

16          Whether Intuitive violated the antitrust laws necessarily will be decided predominantly by

17   common issues, including: (i) whether Intuitive had market power in the relevant markets; (ii)

18   whether it engaged in the alleged conduct; (iii) whether its conduct had anticompetitive effects;

19   and (iv) whether Intuitive can identify any procompetitive effects. These issues are common

20   because each Class member would rely on the same evidence to prove (or disprove) each of their

21   elements. *Cf. Tyson Foods*, 577 U.S. at 456-58 (evidence of hours worked presented dispositive,

22   class-wide inquiry in wage-and-hour suit); *Amgen*, 568 U.S. at 467-68 (similar for evidence of

23   materiality in securities suit); *see also Le*, 2023 WL 5085064, at *27 (applying this logic to

24   evidence of violation in antitrust class action); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820,

25   846-48 (D.N.J. 2015) (same). Predominance is satisfied because the common issue of the antitrust

26   violation is the crux of this action. *Olean*, 31 F.4th at 667-68; *accord Lytle*, 99 F.4th at 572.

27          (i)     **Whether Intuitive Dominates the Relevant Markets**. Plaintiffs will rely entirely on

28

common evidence to establish (to the extent not already established[5]) the existence of the relevant markets and Intuitive's domination of them. For example, with respect to the Robots market, common evidence establishes that minimally invasive robotic surgery (1) differs from open surgery, which involves large incisions to give the surgeon a full view of the organs and structures involved; (2) differs from other forms of minimally invasive surgery, such as laparoscopy; and (3) is believed by patients and doctors to offer benefits, such as less pain, shorter recovery, fewer complications, better outcomes, and access to hard-to-reach places. *See, e.g.*, Ex. 1 (Elhauge Class Rep.) ¶¶ 15-24; *see also id.* ¶¶ 80-141. Common evidence also demonstrates that Intuitive and other industry participants do not treat Robots as competing with traditional procedures, and that alternatives do not constrain Robot prices to competitive levels. *Id.* §§ II.B.2-6. Intuitive has enjoyed a near-total monopoly (99.5-99.6% market shares) in the Robot market since the introduction of its da Vinci in 2000. *See id.* ¶¶ 163-231. Intuitive's monopoly power over Robots is confirmed by class-wide evidence of high barriers to entry, and direct evidence of its power to raise prices and exclude rivals. *Id.* § II.C. Plaintiffs will similarly use common evidence to establish the existence of the da Vinci service market and Intuitive's monopoly power therein. *See id.* §§ II.F-G.

(ii) ***Whether Intuitive Engaged in the Alleged Conduct***. Common evidence will also determine whether Intuitive foreclosed competition in the EndoWrist and da Vinci service markets. Purchasing or leasing a da Vinci is only the beginning of the business relationship between Intuitive and its hospital customers. Separate from Robots, Intuitive also manufactures and sells surgical instruments—known as "EndoWrists"—required for using the da Vinci. *See, e.g.*, Ex. 2 (Vavoso (*Rebotix*) Dep.) at 50:20-51:9; *see also* Ex. 1 (Elhauge Class Rep.) ¶¶ 40-46, 235-273; Ex. 3 (Intuitive-00000129) (Instrument Catalog). Intuitive requires all customers to purchase new EndoWrists from Intuitive—and only Intuitive—for as long as they operate their Robots. *See, e.g.*, Ex. 4 (Intuitive-00595673) at -673 to -675, at -682. To force customers to continually purchase

---

[5] The Court already granted summary judgment to Plaintiffs on the existence of the EndoWrist market and Intuitive's monopoly power therein, based on evidence common to the Class. SJ Op. at 16-21.

new EndoWrists more frequently than necessary, throughout the entire Class Period Intuitive's contracts with all customers prohibited third-party repair of EndoWrists, and Intuitive set an arbitrarily low limit on the number of times its EndoWrists could be used by any customer, typically just 10. Ex. 5 (Rubach Rep.) ¶ 30. Intuitive's marketing department sets these use limits, *see* Ex. 6 (McGrogan 30(b)(6) Dep.) 35:5-20, 36:15-23, to achieve "the gross margin and price desired" as part of the company's plan to "derive its revenues from [these] high margin . . . instruments." Ex. 4 (Intuitive-00595673), at -675 & and -682. The use limits do not truly measure how often an EndoWrist can be used effectively. *See* Ex. 7 (Parnell Rep.) ¶¶ 217-264. Nor are they a safety feature required by the FDA, *see* Ex. 8 (Intuitive-00214241) ("FDA does not require nor limit the number of uses for [EndoWrist] instruments,"), ████████████████████████████

████████████████████, *see, e.g.*, Ex. 9 (Intuitive-00019774) at -775; Ex. 10 (Intuitive-00032950) at 951.

      Intuitive's alleged conduct unlawfully foreclosed IRCs from competing in the EndoWrist repair and replacement market. *See* Ex. 1 (Elhauge Class Rep.) § IV. As a result, Intuitive has maintained a nearly 100% share of that market. *Id.* Table 2. The evidence of Intuitive's conduct in the market is common to the claims of all Class members.

      The evidence that Intuitive's anticompetitive conduct affected the da Vinci service market is also common to all Class members. The operation of the da Vinci requires, in addition to EndoWrists, regular maintenance and servicing. *See* Ex. 1 (Elhauge Class Rep.) § II.F.1. Intuitive's contracts with all its U.S. customers prohibited obtaining da Vinci Robot servicing from IRCs, requiring customers to obtain service from Intuitive. *Id.* §§ III.A.1, B & C; Ex. 11 (Intuitive-00067540) at -540–42 (Sec. 3.2 & 5.2(A)). Notwithstanding technological obstacles, IRCs can perform certain maintenance and repair services on the da Vinci and have successfully done so. *See* Ex. 1 (Elhauge Class Rep.) ¶ 49; Ex. 12 (Parker (*Restore*) Dep.) 185:04-185:20. Restore, an IRC, offered da Vinci repair services at substantially lower prices than those Intuitive charged. Ex. 1 (Elhauge Class Rep.) ¶¶ 671, 823. (Service plans from Intuitive started at approximately ██████ per year per Robot. *Id.* § VIII.E.1.i(1).) However, Intuitive's anticompetitive conduct in this market limited Restore to no more than a 0.14% share of the da Vinci Service Market. *Id.* ¶ 399.

Intuitive does not sell replacement parts for the da Vinci separately from service and installation. *See* Ex. 13 (Rosa (*Restore*) Dep.) at 24:5-23.

Notably, the evidence of a violation in this case is uniquely common—and therefore suitable for class-wide resolution—because Intuitive applied uniform anticompetitive policies on Class members. Intuitive has conceded that *every* contract with *every* Class member included the contractual prohibitions on EndoWrist repair and replacement and da Vinci servicing by third parties. Answer ¶¶ 3-4, 13, 17, 20, 59, 73, 82, 107; Ex. 1 (Elhauge Class Rep.) ¶¶ 421-430; Ex. 2 (Vavoso (*Rebotix*) Dep.) 194:7-199:2; *see, e.g.*, Ex. 14 (FRANCISCAN-00056314) at 315-320; Ex. 15 (LARKIN-00025488) at 489-491; Ex. 16 (VMC-00020652) at 653-656; *see also In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 88 (E.D.N.Y. 2000), *aff'd sub nom*, 280 F.3d 124 (2d Cir. 2001) (determining existence of a tying arrangement based on express contractual provisions is readily susceptible to class-wide adjudication). In every sales and lease agreement ("SLSA") with its customers, Intuitive likewise prohibited the use of EndoWrists beyond the maximum number. *See, e.g.*, Ex. 11 (Intuitive-00067540) at -540-42; *see also* Answer ¶¶ 3-4, 13, 17, 20, 59, 73, 82, 107; Ex. 2 (Vavoso (*Rebotix*) Dep.) 198:24-199:2 (Intuitive executive could not ███████████████████████████████████████████████████████); Ex. 17 (Smith Rep.) ¶ 84(a) ("provisions concerning the use of the system and instruments have been included in the agreements since 1999"). All SLSAs further prohibit hospitals from ███████████ ████████████████████████████████████████████████████████████ *See* Ex. 2 (Vavoso (*Rebotix*) Dep.) 197:19-23; *see also* Answer ¶¶ 4, 59, 73, 107; Ex. 18 (Mohr 30(b)(6) Dep.) 57:25-58:3. If a customer violated these provisions, the SLSA provided that Intuitive could cease servicing the da Vinci, cancel its warranty, terminate the contract, and withhold the sale of EndoWrists and replacement parts. *See* Ex. 1 (Elhauge Class Rep.) ¶ 422; *see, e.g.,* Ex. 11 (Intuitive-00067540) at -540–42.

It is true that, in March 2023, Intuitive for the first time issued a statement claiming it would not enforce its contractual prohibitions on EndoWrist repairs by IRCs that obtained a 510(k) clearance. Ex. 19 (Rosa Dep.) 152:4-155:11. But the uniform language in the Intuitive contracts cited above makes no such distinction, instead prohibiting all third-party repair regardless of

regulatory status. Nor does this statement purport to change Intuitive's prohibition on rival servicing of da Vincis. Moreover, while the parties may dispute the meaning of this policy (announced after settlements with Restore and Rebotix ███████████████████████) and the extent to which it deviates from the existing contracts and past enforcement, *see* Dkt. 169 at 12, for the purposes of this motion, there is no dispute that this newly announced policy purports to be uniformly applicable to all Class members.

Just as with EndoWrists, Intuitive contractually prohibits its customers from engaging IRCs to service, repair, or maintain their da Vincis, again at the risk of termination of their warranty and rejection of service calls. *See* Ex. 1 (Elhauge Class Rep.) ¶¶ 421-422 & nn. 951-952; Answer ¶¶ 3, 13, 17, 20, 59, 73. The SLSAs warn that "Intuitive does not have an obligation to provide Services . . . on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician or an individual approved by Intuitive." *See* Ex. 11 (Intuitive-00067540) at -541; *see also* Ex. 14 (FRANCISCAN-00056314) at -317 (same). Intuitive's contractual prohibition on third-party da Vinci repair was standard throughout, and for many years before, the Class Period. *See* Ex. 20 (Bair (*Rebotix*) Dep.) 99:24-100:8; Ex. 18 (Mohr 30(b)(6) Dep.) 57:20-24; *see also* Ex. 2 (Vavoso (*Rebotix*) Dep.) 194:16-195:11 (Intuitive executive was not ████████████████████████████████████████████ (emphasis added)).

Intuitive has also reinforced its contractual restraints on EndoWrist usage through technological means applicable to all Class members. *First*, every EndoWrist contains a computer chip that prevents use of the instrument for more than a set number of procedures. *See, e.g.*, Ex. 21 (Intuitive Surgical Form 10-K, FY2020), at 7. This memory chip communicates with the Robot to count the number of times it is *attached* to the Robot. *See* Ex. 5 (Rubach Rep.) ¶¶ 18, 30-32; Ex. 1 (Elhauge Class Rep.) ¶ 46; Ex. 7 (Parnell Rep.) ¶ 262. The chip does not account for how long, strenuous, or complex the usage is, *see* Ex. 7 (Parnell Rep.) ¶¶ 223-232; Ex. 5 (Rubach Rep.) ¶ 30, or even whether the EndoWrist has been damaged through mishandling or misuse. Ex. 7 (Parnell Rep.) ¶¶ 233-249. Once the "use" counter reaches its programmed limit, the EndoWrist

becomes useless and requires replacement. *See* Ex. 2 (Vavoso (*Rebotix*) Dep.) 202:24-203:9. This is true even if an experienced surgeon determines that an EndoWrist could function safely beyond 10 attachments. Ex. 5 (Rubach Rep.) ¶¶ 31, 35.

Intuitive also consistently cracked down on IRC EndoWrist repair and da Vinci service when customers used them. IRCs like Restore and Rebotix threatened Intuitive's business model by allowing hospitals to bypass the arbitrary use counter, tune up the EndoWrists they owned, and use them to the full extent of their clinically useful lives. *See* Ex. 1 (Elhauge Class Rep.) ¶¶ 448-450; Ex. 7 (Parnell Rep.) ¶¶ 77-90, 92-101 (describing the Rebotix repair process). When customers used repaired EndoWrists, exceeded the contractual limit on EndoWrist uses, or used IRC da Vinci service, Intuitive responded by threatening to (1) void the warranty on da Vinci(s), (2) withhold all service, and (3) withhold all EndoWrists. Ex. 1 (Elhauge Class Rep.) § III.A.1-4. Intuitive's policy was to send a threatening form letter to each customer it believed breached the SLSA by using EndoWrists beyond the programmed use limit. Ex. 2 (Vavoso (*Rebotix*) Dep.) 221:8-12; *see also id.* at 213:24-215:21, 219:10-224:19; Ex. 22 (Bair (*Restore*) Dep.) 23:22-25:13.

(iii) ***Whether Intuitive's Alleged Conduct Had Anticompetitive Effects.*** As Prof. Elhauge explains in his class certification report, the inquiry into whether Intuitive's conduct is anticompetitive—and thus violates the Sherman Act—is by its nature market-wide. Ex. 1 (Elhauge Class Rep.) ¶¶ 11, 77, 163, 357, 398, 418-19, 445-46, 447, 510, 517, 548, 549, 565, 567, 584, 585, 612, 648, 668, 683. The issue of anticompetitive effects in the market as a whole—like market definition, market power, and anticompetitive conduct—does not vary by Class member. *Castro*, 134 F. Supp. 3d at 846-49; *see also Le*, 2023 WL 5085064, at *40. For this reason, whether Intuitive imposed its tie or exclusive dealing provision on a particular absent Class member, for example, has no special significance for purposes of *that* Class member's assertion of an antitrust violation. What matters is whether Intuitive engaged in anticompetitive conduct with a sufficient share of the market to increase its market power and cause overall anticompetitive effects.

(iv) ***Whether Intuitive's Conduct Is Justified By Any Procompetitive Effects.*** Whether Intuitive violated the antitrust laws presents a common issue for the further reason that Intuitive's defenses, which include that these restraints were purportedly justified by safety considerations,

will also turn on evidence common to the class. *See* Dkt. 153 (Intuitive's summary judgment motion), at 22-23; Ex. 1 (Elhauge Class Rep.) ¶ 683.

\* \* \*

Thus, whether Intuitive violated the antitrust laws is a common issue, which suffices to establish predominance.

b.   *Common Impact: Common Evidence Capable of Showing Class-wide Harm.*

Plaintiffs also have common evidence capable of proving common impact to Class members from Intuitive's anticompetitive conduct. To establish antitrust liability, Plaintiffs must show not just an antitrust violation but also that it caused antitrust injury. Payment of a single overcharge suffices. *Olean*, 31 F.4th at 662 (assessing for common impact whether plaintiffs offered common evidence capable of showing class members paid "*an* overcharge" because of an alleged antitrust violation (emphasis added)); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage."); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at \*21 (N.D. Cal. Feb. 21, 2017) (plaintiffs "need only suffer damage on one purchase to be injured"); *Castro*, 134 F. Supp. at 847 (same).

Antitrust injury is a common issue—and plaintiffs establish "common impact"—if they offer common evidence capable of showing that the challenged conduct caused harm that is widespread across class members. *Olean*, 31 F.4th at 676 (court should assess whether plaintiffs are "capable of showing class-wide impact, not to reach a conclusion on the merits of the[ir] claims"); *id.* at 669 (class may include more than a *de minimis* number of uninjured class members and still be certified if common questions predominate over individual ones); *Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (impact is common unless the class is "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct") (cleaned up); *High-Tech*, 985 F. Supp. 2d at 1192 ("widespread" harm suffices); *Castro*, 134 F. Supp. 3d at 847 ("occasional outliers do[] not defeat predominance of common issues of antitrust impact").

14

Here, as described in more detail below, Prof. Elhauge draws on common evidence and standard economic theory to explain how Intuitive's restraints on EndoWrist repair and third-party da Vinci service harmed all Class members, including by artificially inflating Intuitive's prices for EndoWrists and da Vinci service, and artificially suppressing the number of times EndoWrists may be used. Ex. 1 (Elhauge Class Rep.) § VIII. The Court has found that Prof. Elhauge is qualified to offer his opinions and that those opinions provide a reliable way to calculate Class damages. Daubert Op. at 16-22. In denying Intuitive's summary judgment motion, the Court concluded that a reasonable jury could accept Prof. Elhauge's "market-wide impact theory" with respect to EndoWrists, which shows that Intuitive's anticompetitive conduct injured "all customers." SJ Op. at 27; Ex. 1 (Elhauge Class Rep.) § VI.A-D. Similarly, with respect to Plaintiffs' da Vinci service claims, the Court found that "Prof. Elhauge . . . offers a reliable damages calculation showing significant overcharges for each named Plaintiff and the purported class." SJ Op. at 29.

Thus, this Court has already determined that Plaintiffs can proffer sufficient reliable evidence to establish common impact and predominance. Once a court determines that common evidence is admissible, so that a "reasonable juror" could rely on it to decide for plaintiffs, the issue is common for purposes of predominance under Rule 23(b)(3). *Tyson Foods*, 577 U.S. at 459; *see also Olean*, 31 F.4th at 678 ("Provided that the evidence is admissible and, after rigorous review, determined to be capable of establishing antitrust impact on a class-wide basis, it is for the jury, not the court, to decide the persuasiveness of [Plaintiffs'] evidence in light of 'common sense and empirical evidence.'"); *id.* at 667-68 & n.11; *Simon & Simon*, 2023 WL 8261297, at *3 (if expert opinions are "reliable and capable of providing class-wide answers to the questions central to the plaintiffs' claims," opposing arguments for why expert's "models are flawed. . . 'may appropriately be considered by the trier of fact,' but they 'do not rise to a level that would require denial of certification'") (citations omitted)).

Each of the Court's conclusions in denying Intuitive's *Daubert* challenge to Prof. Elhauge's impact opinions suffices for common impact. These include Prof. Elhauge's analysis of antitrust impact from inflated EndoWrist prices, from arbitrary EndoWrist use limits, and from inflated da Vinci service prices. Prof. Elhauge has provided additional analyses showing that each

of these measures of antitrust impact can establish class-wide impact. Ex. 1 (Elhauge Class Rep.) § VIII. Such analyses establish common impact for two reasons, each alone establishing predominance under binding precedent: (1) Prof. Elhauge offers evidence capable of proving injury to the entire Class and, in the alternative, all but a tiny percentage of the Class, and (2) if the Court or jury were to find against Plaintiffs on one or more of their theories of injury, Prof. Elhauge can identify uninjured Class members so that they can be excluded from the Class, excluded from a subclass, or denied any recovery, and he can calculate class-wide damages based on only those theories that succeed.

**Common Impact: Widespread Harm to Class Members**. The majority in *Olean* held that there is no threshold percentage of uninjured class members above which common issues cannot predominate. 31 F.4th at 669. And even the dissent conceded that common impact can be satisfied—and common issues can predominate—if only a *de minimis* percentage of class members is uninjured. *Id*. at 692. It cited precedents suggesting that 5 or 6% of a class is *de minimis* for this purpose and does not defeat certification. *Id*. As explained below, Prof. Elhauge demonstrates impact to 100% of the Class and, even if the finder of fact were to reject one or more of Plaintiffs' theories of harm, there still will be impact to the vast majority (generally over 99%) of the Class, with any uninjured Class members presenting no individualized issues, as they are mechanically identifiable and can be excluded from the Class. *See* Ex. 1 (Elhauge Class Rep.) § VIII.

**Common Impact: Common Methodology for Identifying Potentially Uninjured Class Members**. As noted above, *Olean* rejected the call for a general rule that certification is inappropriate if more than a *de minimis* percentage of Class members is uninjured. 31 F.4th at 669. The relevant inquiry, rather, is whether issues about injury would cause individual issues to predominate over common ones. *Id*. So long as any uninjured class members can be identified in a mechanical fashion that eliminates the need for individualized inquiry into antitrust impact and provides the Court the ability to exclude them from the class or from any recovery, individual issues do not predominate. *Id*.; *see also id*. at 690 (dissent) (worrying that identifying uninjured class members could give rise to individual issues if they cannot be identified "mechanically").

In this case, Prof. Elhauge's methodology identifies each Class member that was injured under any findings the fact-finder might make. (Moreover, "uninjured" Class members in this case generally would be "uninjured" merely because they did not purchase the relevant products during the relevant period found by the fact-finder—a fact that is readily discernible from Intuitive's sales data—not because they were unharmed on relevant purchases.) As a result, this case is starkly different from antitrust cases where courts have denied certification because there were questions about whether large numbers of class members who made relevant purchases during the class period were injured, and about the feasibility of isolating and excluding those class members so as to avoid the need for individualized mini-trials. *Cf. id.* at 691 (dissent). In short, all potentially uninjured Class members can be identified "mechanically," *id.* at 690 (dissent), and so pose no risk of individual issues predominating.

**Common Impact: Specific Methodologies.** Prof. Elhauge employs the following specific methodologies, each of which are based on evidence common to the Class, to show common impact.

<u>Inflated EndoWrist Prices</u>. This Court found reliable, admissible, and even conservative, Prof. Elhauge's opinion that Intuitive would have charged 20% less for its EndoWrists to "all customers" if not for the challenged conduct. SJ Op. at 27; Daubert Op. at 18-19. By definition, all Class members purchased EndoWrists. It follows that common evidence can establish that all Class members paid at least one overcharge to Intuitive because of the challenged conduct. That suffices to establish common impact, that is, that common evidence is *capable of* proving widespread antitrust injury across Class members. *Olean*, 31 F.4th at 667-68; *Nexium*, 777 F.3d at 27 (payment of single overcharge suffices for antitrust impact); *Castro*, 134 F. Supp. 3d at 847 (same); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *21 (same).

Prof. Elhauge has since performed additional analyses to confirm common impact based on EndoWrist purchases. Ex. 1 (Elhauge Class Rep.) §§ VIII.A-C. First, Prof. Elhauge shows that Intuitive ███████████████████████████████████████████████████████████████████ *Id.* ¶ 308, 863; *see also* Ex. 23 (Intuitive-00203904) at 3905 ("███████████████████████████████████████████████████████████████████

1

2 ████████████ ”). The implication is that any non-trivial decrease in price in the "but-for world"

3 (*i.e.*, without the challenged conduct) would demonstrate that all Class members were harmed. Ex.

4 1 (Elhauge Class Rep.) ¶¶ 864-864. Intuitive's former CFO testified, "███████████

5 ████████████████████████████ *See* Ex. 18

6 (Mohr 30(b)(6) Dep. 19:23-20:12); *see also, e.g.*, Ex. 24 (Intuitive-00279923) & Ex. 25 (Intuitive-

7 00279958) (instrument catalogs with list prices and uniform use limits applicable to all customers).

8 Indeed, the price paid by Class members on their EndoWrist purchases from Intuitive equaled list

9 price in ██ of their transactions, with the average discount amounting to only ███ and the

10 largest class member discount being just ███ *See* Ex. 1 (Elhauge Class Rep.) ¶¶ 864-865; *see*

11 *also id.* § VIII.A.1.[6] As Prof. Elhauge shows, ████████████████████████

12 ████████████ *Id.* ¶¶ 864-865 That means that even if Intuitive would have charged

13 20% less only off its list prices, not off its discounted prices, in the but-for world, every Class

14 member suffered antitrust injury. *Id.* ¶ 865.

15 Second, Prof. Elhauge demonstrates that common impact exists after accounting for the

16 discounts and rebates that Intuitive provided on EndoWrist purchases. As Prof. Elhauge explains,

17 there is no reason to believe that Class members who received discounts and rebates in the "actual"

18 world (with Intuitive's anticompetitive conduct) would not have received those same discounts

19 and rebates in the so-called "but-for world" (without Intuitive's anticompetitive conduct). *See id.*

20 ¶¶ 874-879.

21 But even if one assumed otherwise, common impact still would exist, as no Class member

22 received combined discounts and rebates exceeding ███ far less than the 20% overcharge

23 suffered (with the largest contractual rebate rate offered by Intuitive being only █, and the

24 weighted average rebate across all Class members being only ██). *Id.* ¶ 872. These conclusions

25

26 [6] Intuitive's own expert, Dr. Smith, similarly observed that "when looking across all of Intuitive's
instruments sold during 2021, on average, 96 percent of customers paid the same price for the
27 specific instrument" and that "prices for particular instruments generally show limited variation
across customers during a given year." Ex. 17 (Smith Rep.) ¶ 143; *see also* Ex. 1 (Elhauge Class
28 Rep.) ¶ 866.

are consistent with an analysis by Intuitive's own economic expert and are further confirmed by a regression analysis conducted by Prof. Elhauge. *Id*. ¶¶ 866-869. The regression demonstrates that the characteristics of individual Class members had at most a trivial effect on variations in EndoWrist prices, confirming that all Class members suffered injury in purchasing EndoWrists. *Id*. ¶¶ 868-869. *See Olean*, 31 F. 4th at 676 (regression analyses can suffice to establish common impact).

*Analysis Based on Alternative Findings of Fact.* As with all aspects of Prof. Elhauge's Class impact analysis, his methodology for assessing harm to Class members from inflated EndoWrist prices allows him to analyze impact to the Class using common evidence under any set of factual findings, even if the finder of fact rejects one or more of Plaintiffs' theories of harm. As noted above, Prof. Elhauge's methodology mechanically identifies each Class member injured under any possible trial outcome, such that these Class members can be excluded from the Class as needed without creating predominant individualized issues. *Olean*, 31 F.4th at 690 (dissent).

For example, Prof. Elhauge's methodology can model impact to the Class from EndoWrist price inflation under multiple, hypothetical dates for entry of competition in the but-for world. This Court has already deemed reliable and admissible Prof. Elhauge's opinion that there is evidence that third parties would have modified EndoWrists as early as May 21, 2017. *Daubert* Op. at 20-21. If Intuitive had faced such competition by May 21, 2017, the best evidence is that Intuitive would have charged *all* its customers 20% less for EndoWrists if not for its anticompetitive conduct. Ex. 1 (Elhauge Class Rep.) ¶¶ 880-883 & Tbl. 12. That means common evidence can show impact to 100% of Class members. *Id*.

But Prof. Elhauge's model establishes common impact from EndoWrist price inflation just as easily when assuming alternative entry dates in the but-for world. Even using later entry dates, Prof. Elhauge's model demonstrates harm to all or virtually all Class members from EndoWrist price inflation, with any uninjured Class members being uninjured simply because they did not purchase EndoWrists within the later-starting time period. And Prof. Elhauge can mechanically identify each such uninjured Class member, enabling the Court to exclude them from the Class or to allocate them no recovery. For example, using the alternative entry date of May 31, 2017, Prof.

Elhauge finds injury to 100% of Class members. *Id*. ¶ 884 & Tbl. 13. Assuming, even less plausibly, that, without the challenged restraints, competition would not have begun in the EndoWrist market until July 11, 2018, Prof. Elhauge's analysis shows injury to 99.2% of Class members, with all uninjured Class members being mechanically identifiable. *Id*. ¶ 885 & Tbl. 14.

Prof. Elhauge's impact model—both for EndoWrists and for da Vinci service—can account in this same manner for all other possible findings of fact the jury could make, even if it were to reject aspects of Plaintiffs' theories of harm. In each case, Prof. Elhauge can, through application of mechanical formulas, identify exactly which Class members were harmed and which were not, guaranteeing that individualized issues related to impact will not predominate. *See id.* at ¶¶ 11(I), 861, 884-886, 889-894, 897-900, 928-929, 932.

*EndoWrist Use Limits*. Prof. Elhauge performed a similar analysis of the effects of Intuitive's anticompetitive use limits on EndoWrists. Again, this Court has already concluded that Prof. Elhauge has offered a reliable and admissible opinion that use limits would have been 20 (or higher) in the but-for world rather than 10. *Daubert* Op. at 19-20. Applying that methodology, Prof. Elhauge finds that all Class members were injured by use-limit suppression based on "but-for" entry of competition by May 21, 2017. Ex. 1 (Elhauge Class Rep.) ¶¶ 888-890 & Tbl. 15. Here too, Prof. Elhauge's model can just as mechanically analyze, and establish common impact under, alternative findings of fact, identifying exactly which Class members were injured or uninjured. *Id.* ¶¶ 891-894.

*Combined Effects of Inflated Prices and Use Limits on EndoWrists*. As noted above, a Class member suffered antitrust injury if it paid a single overcharge to Intuitive. *See, e.g.*, *Nexium*, 777 F.3d at 27; *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *21. It follows that paying an overcharge on an EndoWrist based on an inflated price *or* a suppressed use limit suffices for injury. Ex. 1 (Elhauge Class Rep.) ¶ 895. This Court concluded that Prof. Elhauge offered a reliable and admissible opinion on the combined effects of the two forms of harm. *Daubert* Op. at 20. Prof. Elhauge has calculated the percentage of Class members that suffered impact by paying at least one overcharge based on the combined effects. Ex. 1 (Elhauge Class Rep.) ¶¶ 895-897 & Tbl. 17. He can mechanically identify any uninjured Class members for exclusion from the Class or

recovery—including under any alternative factual finding, such as different but-for entry dates. *Id.* ¶¶ 897-900. For example, Prof. Elhauge finds that, assuming that use limits would have increased to 20 or more in the but-for world, at least 99% of the Class was harmed from the combination of inflated EndoWrist prices and suppressed use limits under any of the above but-for world entry dates. *Id.* ¶ 897 & Tbl. 17.

*Overcharges on Da Vinci Service*. Prof. Elhauge has performed a rigorous analysis of common impact for purchases of da Vinci service as well, based on the same methodology that this Court already found "offers a reliable damages calculation showing significant overcharges for each named Plaintiff and the purported class." SJ Op. at 29; Ex. 1 (Elhauge Class Rep.) ¶¶ 902-929. Prof. Elhauge opines that, assuming but-for rival entry by May 2017, all Class members would have paid less on their purchases of da Vinci service if not for the challenged conduct. *Id.* at ¶¶ 923-925. That view is premised in part on his finding that Intuitive would have offered the same customer-specific service discounts in the "but-for world" (i.e., without its challenged conduct). *Id.* ¶ 923. But here too, Prof. Elhauge's da Vinci service impact model can easily account for and establish common impact under alternative factual findings, including alternative entry dates and hypothetical scenarios (which are contrary to the evidence and economic theory) where service discounts are not offered in the but-for world. As noted above, Prof. Elhauge's model can mechanically identify each Class member that was not harmed under such conditions, such that they can be excluded from the Class as necessary. *Id.* ¶¶ 926-929.

*Overall Analysis of Common Impact*. The ultimate relevant issue is whether Plaintiffs' common evidence is capable of proving impact from overcharges on EndoWrist prices, suppressed EndoWrist use limits, ***or*** inflated da Vinci services prices, where payment of a single overcharge constitutes impact. Using the methodologies discussed above, Prof. Elhauge finds that all Class members paid at least one overcharge on EndoWrists or da Vinci service, assuming but-for rival entry by May 2017. Ex. 1 Elhauge Class Rep. ¶¶ 930-931, Tbls. 26, 27 & 28. As previously stated, Prof. Elhauge's methodology is also capable of establishing common impact under alternative findings of fact. *Id.* ¶ 932.

1       <u>*Common Impact Remains After Factoring in da Vinci Pricing*</u>. Prof. Elhauge also employs

2   common evidence and economic theory to show that the savings Class members would receive on

3   EndoWrists and da Vinci service in the but-for world would not (as Intuitive's expert has claimed)

4   be offset by reduced discounting on da Vincis. Ex. 1 Elhauge Class Rep. ¶¶ 933-935. In fact, ███

5   ████████████████████████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████. *Id.* ¶ 934. Thus,

7   there is no reason to think that Intuitive would have reduced da Vinci discounts in the but-for

8   world, meaning that discounts on the da Vinci do not affect the Class impact analysis. *Id.* ¶ 935.

9              c.    *Class-wide Damages.*

10       Courts routinely certify classes if plaintiffs provide a reliable means of calculating damages

11   on a class-wide basis. *See, e.g., Lytle*, 99 F.4th at 576-80; *Le*, 2023 WL 5085064, at *43; *Simon*

12   *and Simon*, 2023 WL 8261297, at *2-*3. Once plaintiffs have established an antitrust violation

13   and antitrust injury, courts impose a forgiving standard on plaintiffs, requiring only a reasonable

14   estimate of the amount of damages they have suffered. *See Comcast Corp. v. Behrend*, 569 U.S.

15   27, 35 (2013) (if plaintiffs "prevail on their claims," damages "[c]alculations need not be exact"

16   (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).[7] Their

17   reasoning has been that any difficulty in calculating damages is the fault of the defendant for

18   distorting the market through its anticompetitive conduct. *See Bigelow v. RKO Radio Pictures,*

19   *Inc.*, 327 U.S. 251, 264 (1946).

20       Here, Prof. Elhauge has calculated class-wide damages using the same methodologies

21   already upheld by the Court against Intuitive's *Daubert* and summary judgment challenges. *See*

22   Ex. 1 (Elhauge Class Rep.) § VII. Again, his methods allow him to calculate class-wide damages

23   regardless of the fact-finder's conclusions, with total damages ranging up to $2.3995 billion

---

24   [7] *See also Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1045

25   (9th Cir. 2005), *vacated on other grounds and remanded sub nom. Weyerhaeuser Co. v. Ross-*
   *Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ("In antitrust cases, we accept a degree of

26   uncertainty when evaluating damages awards because of the inherent difficulty of ascertaining
   business damages when [t]he vagaries of the marketplace usually deny us sure knowledge of what

27   [a] plaintiff's situation would have been in the absence of the defendant's antitrust violation."

28   (citation omitted)); *In re: Lidoderm Antitrust Litig.*, 2017 WL 679367, at *24-*25 & n.34.

through December 31, 2021. Ex. 1 (Elhauge Class Rep.) ¶ 842 & Tbl. 9.[8] That renders damages a class-wide issue, reinforcing the predominance of common issues in this litigation.[9]

### 2. A Class Action Is Superior to Individual Actions.

Rule 23(b) "provides four factors that a court must consider in determining whether a class action is superior to other methods of adjudication." *Nevarez v. Forty Niners Football Co.*, LLC, 326 F.R.D. 562, 589 (N.D. Cal. 2018). Those factors are: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy.'" *Wolin*, 617 F.3d at 1175 (quoting 7A Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed. 2005)); *see also Amchem*, 521 U.S. at 615 ("In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"). Courts find this requirement satisfied where "there is a substantial body of common evidence that could be presented by the proposed class on the elements of [plaintiffs']

---

[8] As noted above, *see supra* note 1, damages will continue to accrue throughout this litigation. But Plaintiffs have defined the Class Period—which defines membership in the Class—to end in 2021 because determination of *membership* in the Class requires full EndoWrist and da Vinci service sales data. Intuitive had not produced post-2021 EndoWrist data until Friday, May 24, 2024, when Intuitive provided 6.4 gigabytes of incomplete and corrupted data. Intuitive has not, to date, corrected the issues with that data that Plaintiffs have identified, meaning that this post-2021 data could not be appropriately analyzed in advance of this filing.

[9] Prof. Elhauge is not the only expert to estimate large damages here. In fact, Intuitive's economic expert, Dr. Smith, spent the last 22 pages of his merits report, *see* Ex. 17 (Smith Rep.) ¶¶ 236-269 making various criticisms, several of which have since been rejected by the Court, of Prof. Elhauge's damages estimates, such that Dr. Smith found damages for each of the Plaintiffs [Valley Medical ($74,174), Franciscan ($951,313) and Larkin ($195,437)], and just under $420 million in Class-wide damages, *see id.*, Table 5.

antitrust . . . claims." *Google Play*, 2022 WL 17252587, at *15; *see also Cathode Ray*, 2022 WL 4596621, at *7; *see supra* Section III.A.2 (commonality is satisfied here).

That logic applies here. No Class member has demonstrated any interest in individually controlling this litigation, which is unsurprising given the high cost of pursuing these claims on an individual basis. *See Wolin*, 617 F.3d at 1175 ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."); *Nevarez*, 326 F.R.D. at 590. Nor is any litigation underway by or against any Class members related to the claims at issue here. *Cf.* Fed. R. Civ. P. 23(b)(3)(B). All parties will benefit from the concentration of litigation in this forum, where Intuitive, along with much of the relevant evidence and many of the key witnesses, is located. *See, e.g.*, *Nevarez*, 326 F.R.D. at 590. And there are no difficulties to managing a class action given the common legal and factual questions that predominate over any individualized inquiries. *Cf. Cathode Ray*, 2022 WL 4596621, at *7 (concluding antitrust plaintiffs had "satisfied the superiority requirement under Rule 23(b)(3)" in part because of "the Court's conclusion that common issues predominate"). At any rate, there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

### C.    Plaintiffs Satisfy Rule 23(b)(2).

Rule 23(b)(2) requires indivisibility—that the relief sought cannot be divided among class members. *Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted). Here, Plaintiffs seek injunctive relief that should be granted or denied for all Class members. As discussed above, whether Intuitive's conduct is anticompetitive requires a market-wide analysis. It either achieved power in the relevant markets through anticompetitive conduct or it did not. Its conduct toward any Class member is no more relevant to that Class member's claims than it is to the claims of all other Class members.

The same is true for the relief Plaintiffs seek. For the Court to give meaningful injunctive relief to Plaintiffs, it would have to halt Intuitive's exclusionary behavior as a whole. Once freed

1  from Intuitive's anticompetitive practices, competition across the market would drive down prices

2  to the benefit of all Intuitive customers—the Class members. That market-wide relief cannot be

3  meaningfully subdivided among Class members.

4        Rule 23(b)(2)'s requirements are "unquestionably satisfied" where, as here, "members of

5  a putative class seek uniform injunctive or declaratory relief from policies or practices that are

6  generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)

7  (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)).

8  **IV.   CONCLUSION**

9        For these reasons, Plaintiffs respectfully request that the Court certify the Class, appoint

10  the class representatives, and appoint Class Counsel.

11  Dated: June 6, 2024            Respectfully submitted,

12

13                                    /s/Manuel J. Dominguez

Jeffrey J. Corrigan (*pro hac vice*)      Manuel J. Dominguez (*pro hac vice*)

14  Jeffrey L. Spector (*pro hac vice*)       COHEN MILSTEIN SELLERS &
Icee N. Etheridge (*pro hac vice*)       TOLL PLLC

15  SPECTOR ROSEMAN & KODROFF, P.C.   11780 U.S. Highway One, Suite N500
2001 Market Street, Suite 3420       Palm Beach Gardens, FL 33408

16  Philadelphia, PA 19103           Tel: 561-515-2604
Tel: 215-496-0300              Fax: 561-515-1401

17  Fax: 215-496-6611              Email: jdominguez@cohenmilstein.com
Email: jcorrigan@srkattorneys.com

18         jspector@srkattorneys.com

19         ietheridge@srkattorneys.com

20  Gary I. Smith, Jr. (SBN 344865)      Benjamin D. Brown (SBN 202545)
Samuel Maida (SBN 333835)        Daniel McCuaig (*pro hac vice*)

21  HAUSFELD LLP               Zachary R. Glubiak (*pro hac vice*)
600 Montgomery Street, Suite       COHEN MILSTEIN SELLERS &

22  3200 San Francisco, CA 94111      TOLL PLLC
Tel: 415-633-1908             1100 New York Ave., Suite 500

23  Fax: 415-358-4980            Washington, DC 20005
Email: gsmith@hausfeld.com       Tel: 202-408-4600

24        smaida@hausfeld.com       Fax: 202-408-4699

25                            Email: bbrown@cohenmilstein.com

26                                dmccuaig@cohenmilstein.com

27                                zglubiak@cohenmilstein.com

28

Jeannine M. Kenney (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-3271
Email: jkenney@hausfeld.com

Reena A. Gambhir (*pro hac vice*)
HAUSFELD LLP
888 16th St NW
Washington, DC 20006
Tel: 202-540-7145
Fax: 202-540-7201
Email: rgambhir@hausfeld.com

Christopher J. Bateman (*pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: 212-838-7797
Fax: 212-838-7745
Email: cbateman@cohenmilstein.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Michael J. Boni
Joshua D. Snyder (*pro hac vice*)
John E. Sindoni (*pro hac vice*)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
Email: mboni@bonizack.com
        jsnyder@bonizack.com
        jsindoni@bonizack.com

*Counsel for Plaintiffs and the Proposed Class*