# EXHIBIT 19

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

------------------------------------------------------x

IN RE DA VINCI SURGICAL ROBOT        Lead Case No.
ANTITRUST LITIGATION,                3:21-cv-03825-VC

------------------------------------------------------

THIS DOCUMENT RELATES TO:
ALL CASES
------------------------------------------------------x
SURGICAL INSTRUMENT SERVICE          Case No.
COMPANY, INC.,                       3:21-cv-03496-VC

            Plaintiff,
vs.
INTUITIVE SURGICAL, INC.,
            Defendant.
------------------------------------------------------x

   REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
                    DAVID ROSA
                Monday, May 1, 2023

Reported By: Lynne Ledanois, CSR 6811
Job No. 5892696

1   remanufactured instruments was involved in adverse
2   events.
3   BY MR. CORRIGAN:
4       Q    Did Intuitive ever test the reset
5   EndoWrists that were -- well, did Intuitive ever
6   test the EndoWrists that were repaired or reset by
7   Rebotix?
8       A    I don't know.
9       Q    Why would not -- why wouldn't have
10  Intuitive tested those repaired or reset EndoWrists?
11           MR. RUBY:  Object to the form of the
12  question.
13           THE WITNESS:  So I guess it always depends
14  on to what end and what problem are you trying to
15  solve by that testing.
16           We had our extensive testing internally
17  that we had relied on for many years and the agency,
18  the FDA knew about.  So if we didn't test them, I'm
19  not sure; if we did, I'm not sure.
20  BY MR. CORRIGAN:
21      Q    Let's look at Paragraph 45 of your
22  declaration, please.  And first sentence, "To avoid
23  any possibility of confusion, Intuitive has made
24  clear that use of an FDA-cleared remanufactured
25  EndoWrist does not reach any customer's contract or

Page 152

1   otherwise subject a customer to adverse action from
2   Intuitive.  Below is the statement on our website,"
3   and then you set out the statement there.
4        What is the date on this statement?  Not
5   your statement in the declaration but the Intuitive
6   statement starting on the bottom of Page 10, what is
7   the date on that?
8        A    If it's not in here, I don't know the exact
9   date.  There's one date at the bottom of -- the
10  beginning of the last paragraph of the statement that
11  says it's March 1st.  So I would think that this would
12  be right around that date, that time frame.
13       Q    Now, in Paragraph 46 it says -- you say,
14  "This statement accurately reflects Intuitive's
15  current policy towards the activities of EndoWrist
16  remanufacturers."
17       So this is a statement of its current
18  policy; correct?
19       A    Correct.
20       Q    What was Intuitive's policy in this regard
21  before this statement comes out in and around early
22  March of 2023?
23       A    You know, when I think about our
24  conversations, I don't know that we had a clear sort
25  of agreed-to policy within the company.  So I'm

Page 153

1    actually not sure if I could have said here is our
2    policy for our cleared instruments.
3         Q    When did Intuitive --
4              MR. RUBY:  Excuse me, I'm sorry, counsel.
5    If you -- in answering these questions, if an answer
6    would require you to divulge privileged or
7    confidential communications with lawyers, please
8    don't answer the question, say it requires a
9    privileged conversation and then I may or may not
10   have something to say.
11             THE WITNESS:  Okay.
12             MR. RUBY:  Excuse me.  Please go ahead.
13   BY MR. CORRIGAN:
14        Q    When did Intuitive first determine that
15   use of an FDA-cleared remanufactured EndoWrist does
16   not breach any customer's contract?
17        A    I don't -- I actually don't know because to
18   my knowledge, I believe it's the first time an
19   instrument was cleared by the FDA for use with the
20   system that wasn't manufactured by Intuitive.
21        Q    When did Intuitive first post this
22   information for its customers that's in this letter
23   or this statement?
24        A    Again, I'm assuming -- not knowing the exact
25   date, I think it's around that March date.

1       Q    Has Intuitive inserted the language in
2   this statement into its SLSA contracts?
3       A    I'm not sure.
4       Q    If they haven't, why not?
5       A    I don't know.  I wasn't part of that
6   interaction with our teams there, so I'm not sure why
7   they have haven't if it's not in there.
8       Q    You mentioned before you weren't sure if
9   there was a clear policy before this statement came
10  out; right?
11      A    I think that's true.  To the best of my
12  knowledge, I don't remember seeing and sort of saying,
13  this is our policy for cleared instruments.
14      Q    And what caused this change in policy for
15  Intuitive?
16      A    One is that that cleared instrument from --
17  you know, was out there, so I think we wanted to
18  clarify for our customers that, hey, if it's indeed
19  cleared through the proper regulatory agency, FDA or
20  otherwise, that it is not going to violate the terms
21  of your agreement.  So I think it was in that time
22  frame.
23      Q    So if one of these companies had gotten
24  510(k) clearance say several years ago, you're
25  saying that Intuitive would have changed its policy

Page 155

1  then?
2      A    Speculation obviously, but we would have
3  certainly had to clarify it and if it's cleared by the
4  FDA, I would think we would have come up with the same
5  answer.
6      Q    What commitment do customers and rivals
7  have that Intuitive's current policy on 510(k)
8  instruments won't change?
9      A    I don't know that there's anything
10 specifically spelled out anywhere that said this has
11 to be the policy of Intuitive.
12     Q    Now, in the sentence at the start of
13 Paragraph 45 we talked about a minute ago, you say,
14 "to avoid any possibility of confusion."
15          Why do you think there might be confusion
16 on this subject?
17          MR. RUBY:  Object to the form of the
18 question.  You may answer.
19          THE WITNESS:  To me there is a potential
20 confusion between an FDA-cleared device or a not
21 cleared device by the FDA.
22 BY MR. CORRIGAN:
23     Q    Do you think there might be some confusion
24 caused by Intuitive's years' long litigation between
25 Restore and Rebotix during which this was not

1    intuitive's position?
2            MR. RUBY:  Object to the form of the
3    question.  You may go ahead and answer if you can.
4            THE WITNESS:  I think it's hard for me to
5    say whether or not customers are aware of those
6    cases and would have confusion.  I just really don't
7    know.
8    BY MR. CORRIGAN:
9        Q   Now, this new policy issued you think in
10   early March was certainly issued after the
11   settlements in the Restore and Rebotix cases; right?
12       A   I don't know the timing exactly.
13       Q   If I represented to you that the Restore
14   settlement was in January of 2023 and the Rebotix
15   settlement was in October 2022, it would be fair to
16   say that this statement came out after those
17   settlements; correct?
18       A   Again, assuming that March 8 is about right,
19   then yes.
20       Q   Are you familiar with the terms of those
21   settlements?
22       A   Some, not in any sort of level of detail.
23       Q   And both of those settlements were reached
24   as those cases approached trial; correct?
25       A   I guess I don't know how close we were to