UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION**

Case No. 21-cv-03825-AMO

**ORDER GRANTING CLASS CERTIFICATION**

Re: Dkt. No. 267

This is a putative antitrust class action related to surgical robots, their instruments, and whether the robot's manufacturer has engaged in anticompetitive conduct. This is one of two related cases before the Court alleging anticompetitive conduct by Defendant Intuitive Surgical, Inc. ("Intuitive").[1] The two cases involve similar antitrust claims – this case is brought by customers, and the other case is brought by a competitor. Plaintiffs' motion to certify the class was heard before this Court on January 23, 2025. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, and good cause appearing, the Court hereby **GRANTS** Plaintiffs' motion, for the following reasons.

## I.    BACKGROUND

Intuitive manufactures the sophisticated da Vinci surgical robot system for minimally-invasive soft tissue ("MIST") surgery. Named Plaintiffs Larkin Community Hospital, Franciscan

---

[1] The related case is *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, N.D. Cal. Case No. 3:21-cv-03496-AMO. Intuitive prevailed at trial in that case. At the time of writing, Surgical Instrument Service Company's appeal remains pending before the United States Court of Appeals for the Ninth Circuit. *See Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, 9th Cir. Case No. 25-1372.

United States District Court
Northern District of California

Alliance, Inc., and King County Public Hospital District No. 1 (dba Valley Medical Center) (together "Hospital Plaintiffs") collectively seek certification of a class of health care providers that purchased EndoWrists and service for the da Vinci surgical robots that they leased or purchased from Intuitive.  ECF 267.  Hospital Plaintiffs seek certification on all of their causes of action, including tying, exclusive dealing, and monopolization related to Intuitive's aftermarket maintenance service ("service") of the da Vinci robot (Am. Compl. (ECF 52, "FAC") ¶¶ 173-85), as well as tying, exclusive dealing, and monopolization related to the EndoWrist instruments that attach to the robot (*id.*, ¶¶ 186-97).

Hospital Plaintiffs now move for an order certifying this action as a class action with a proposed class (the "Class") defined as:

> All entities that purchased da Vinci service and EndoWrists from Intuitive in the United States at any time from May 21, 2017, to December 31, 2021.

Mot. (ECF 267) at 1; *see also* FAC ¶ 163.  The proposed Class excludes "government entities." Mot. at 1 n.1.

On March 31, 2025, the Court issued its order regarding the parties' cross-motions for summary judgment.  *See* ECF 232.  For purposes of this Order, the Court assumes familiarity with the Order re Cross Motions for Summary Judgment, the facts recited therein, as well as the Court's subsequent orders in the case.

## II.    DISCUSSION

For Hospital Plaintiffs to obtain class certification, they "must make two showings." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc).  First, they must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) of the Federal Rules of Civil Procedure:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Second, they "must show that the class fits into one of three categories" under Rule 23(b). *Olean*, 31 F.4th at 663.

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Courts "must take the substantive allegations of the complaint as true" but "need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010) (citation omitted).

### A. Rule 23(a)

The Court considers the Rule 23(a) elements in turn.

#### 1. Numerosity

The class here "is so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "[C]ourts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members." *Hilario v. Allstate Ins. Co.*, 642 F. Supp. 3d 1048, 1059 (N.D. Cal. 2022), aff'd, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024) (citations omitted). Intuitive does not dispute numerosity. Indeed, Intuitive admits in its Answer that the Class contains thousands of members. Answer ¶ 41 (ECF 74). The Class is sufficiently numerous.

#### 2. Commonality

"Commonality" is a shorthand way of describing Rule 23's requirement that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common contention need not be one that will be answered, on the merits, in favor of the class. It only must be of such

United States District Court
Northern District of California

a nature that it is capable of classwide resolution." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (citation and quotation omitted). "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 546 U.S. 338, 359 (2011) (internal citation omitted). Where questions common to class members present significant issues that can be resolved in a single adjudication, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Amchem*, 521 U.S. at 623 (quotation marks and citation omitted). However, the common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The inquiry turns on whether "the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (emphasis in original). Courts consider whether a plaintiff has demonstrated that "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof," or if "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453.

Here, commonality is readily satisfied. The focus of the case is on Intuitive's alleged anticompetitive conduct, along with its conduct's effect on the market, not its impact on individual class members. Hospital Plaintiffs rely on common evidence to prove their claims, substantially relying on the expert opinions of Prof. Einer Elhauge. *See* Dominguez Decl., Ex. 1 (ECF 267-1, "Elhauge Class Rep.").[2] Prof. Elhauge's opinions bear on common questions related to how to define the relevant markets and whether Intuitive has power in those markets. Common questions of law similarly apply across the board to Intuitive's antitrust liability, including whether Intuitive engaged in anticompetitive conduct, and whether that conduct ultimately violated federal antitrust law. The Court finds that, for purposes of the commonality assessment, the common contentions regarding Intuitive's market-wide conduct, including threshold questions of market definitions, are

---

[2] The Court earlier denied Intuitive's motion to exclude the expert testimony of Prof. Elhauge. *See* Order re: Mots. Exclude Expert Witnesses (ECF 231) at 15-22.

capable of resolution "in one stroke." *Dukes*, 564 U.S. at 350. Thus, for purposes of the Rule 23(a) analysis, this element is satisfied.

Intuitive raises several arguments challenging the Hospital Plaintiffs ability to show commonality. Because its arguments related to commonality and predominance rest on similar evidentiary and analytical grounds, the Court elects to consider those arguments within the predominance analysis below.

### 3. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citation and quotation omitted).

Intuitive opposes typicality on the final point – that the putative class representatives are each subject to unique defenses which threaten to become the focus of the litigation. The Court considers the typicality challenges Intuitive advances against each named Plaintiff in turn before turning to Intuitive's catchall challenge against all three.

### a. Valley Medical

Intuitive argues the certification motion's exclusion of "government entities" from the proposed Class requires exclusion of Plaintiff Valley Medical, leaving this putative class representative's claims atypical. Opp. at 21. Hospital Plaintiffs counter that Intuitive deliberately misreads the term "government entities" because that term is plainly defined in the Elhauge reports in a way that includes Valley Medical. *See* Reply at 10. The Court agrees with Hospital

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Plaintiffs.  Intuitive's effort to problematize the government purchaser exclusion requires

2  ignorance of Prof. Elhauge's explicit description of the excluded government hospitals as

3  "military or veterans' hospitals."  *See* Elhauge Class Report ¶ 860.  Though Valley Medical may

4  be a government entity in a broad sense, it is not a government hospital as considered within the

5  context of this case.  Further, any potential ambiguity in Plaintiffs' class definition can be clarified

6  to include Valley Medical.  *See, e.g.*, *Dekker v. Vivint Solar, Inc.*, 2022 WL 829382, at *9 (N.D.

7  Cal. 2022) (revising proposed class definition to be "slightly more precise" before certifying

8  class); *cf. Olean*, 31 F.4th at n.14 (approving judicial practice of "refining the class definition" to

9  achieve greater precision).  Therefore, Valley Medical need not face exclusion and its claims

10  remain substantially identical to those of other class members to support typicality.

**b.  Larkin**

12  Intuitive avers that Larkin is not a typical class member because it released its claims

13  against Intuitive.  An email chain exhibit submitted in support of Intuitive's Opposition shows that

14  Larkin and Intuitive negotiated a lease buyout for two surgical robots in early 2024.  *See* Widman

15  Decl., Ex. 1.  As part of that buyout arrangement, Larkin sent an email of terms to Intuitive to

16  settle amounts owed to the robot manufacturer.  *Id.*  In language proposed by Larkin, the

17  settlement resolved "all pending disagreements and claims between" Larkin and Intuitive, who

18  released each other "from all claims, liabilities and obligations of any kind."  *Id.*, Ex. 1 at 1.

19  Hospital Plaintiffs respond that the full context of the months-long email chain

20  demonstrates that the parties never discussed a release of Larkin's long-pending antitrust claims

21  against Intuitive.  *See* Reply at 11.[3]  Moreover, Hospital Plaintiffs argue that Intuitive waived this

22  argument by failing to raise this particular release for at least six months before filing its

23  Opposition brief, despite the parties being heavily engaged in the instant litigation during the

24  relevant period.  *Id.*

---

[3] Larkin's Chief Financial Officer, Mark Early, submitted a declaration in support of Hospital Plaintiffs' Reply brief to demonstrate that he did not intend for the release to apply to this lawsuit. *See* Early Decl. (ECF 296-7).  Intuitive objected to the submission of this declaration.  ECF 298. The Court SUSTAINS Intuitive's objection and declines to consider the declaration.

1    Hospital Plaintiffs have the better argument.  Intuitive knew of the purported release in

2    February 2024.  Widman Decl., Ex. 1.  However, Intuitive made no effort to raise release as a

3    defense until its opposition brief in the instant motion.  Intuitive thus waived release as an

4    affirmative defense by failing to timely assert it.  *See In re Cellular 101, Inc.*, 539 F.3d 1150, 1155

5    (9th Cir. 2008) (holding that a defendant's failure to promptly assert a release defense, even if

6    agreement reached after the initial pleading stage, rendered the release defense waived).  Because

7    Intuitive has waived the release defense, the purported release does not render Larkin atypical.

8    c.    **Franciscan**

9    Intuitive argues that Franciscan is not typical of the class because, contrary to the

10    allegations of anticompetitive tying imposed on hospitals, Franciscan objected to a key term that

11    the Hospital Plaintiffs challenge and was able to negotiate a contract without that term.  *See* Bass

12    Decl., Ex. 23 at -151 (proposing revision to delete provision that would have prohibited it from

13    permitting an unauthorized third party to modify or alter its da Vinci system or instruments,

14    including EndoWrists); Ex. 24 at -315 (final version omitting the clause).  Intuitive advances that

15    this presents a unique defense to Franciscan's claims that make it untypical of the putative class:

16    Franciscan's success in rejecting a purportedly anticompetitive contract provision undercuts the

17    notion that Franciscan was unlawfully coerced into agreeing to any of the challenged contract

18    terms.

19    Hospital Plaintiffs argue that Intuitive overstates the effect of the contract negotiations

20    because Intuitive refused to strike provisions that would have permitted Franciscan to use third-

21    party EndoWrist repairs.  *See* Glubiak Decl., Ex. 7 at -318 ("If Participant uses the System with

22    any surgical instrument or accessory not made or approved by Intuitive, Intuitive may discontinue

23    Services, and any warranties applicable to any Services provided prior to any discontinuance will

24    be void."); *id.* ("Any other use [of Instruments and Accessories] is prohibited, whether before or

25    after the Instrument or Accessory's license expiration, including repair, refurbishment, or

26    reconditioning not approved by Intuitive.").  Indeed, Intuitive admitted in its answer that "the

27    SLSA [Sales, License and Service Agreement] between Intuitive and Franciscan prohibits

28    Franciscan from engaging any unauthorized third party to service its da Vincis and from engaging

7

any unauthorized third party to repair, refurbish, or recondition EndoWrists at any time."  Answer (ECF 74) ¶ 17.  Intuitive's prohibition on third-party repair of EndoWrists applied to every class member regardless of the discrete clause that Intuitive contends was omitted from Franciscan's agreement.  *See* Answer ¶¶ 3-4, 13, 17, 20, 59, 73, 82, 107; Elhauge Class Rep. ¶¶ 421-430; Glubiak Decl., Ex. 8 (Vavoso Dep.) 194:7-199:2; Glubiak Decl., Ex. 7 at -315-320; Glubiak Decl., Ex. 9 at -489-491; Ex. 10 at -653-656.  Franciscan's claims are thus typical of the rest of the Class.

### d.    Purported "lack of interest"

Finally, Intuitive asserts that the named Plaintiffs' "lack of interest in third-party EndoWrists and service" can defeat typicality.  Opp. at 22.  While Hospital Plaintiffs' claims are premised on an anticipated demand from hospitals for remanufactured EndoWrists and da Vinci service that would have forced Intuitive to make downward adjustments to its prices in a but-for world, Intuitive posits that the Hospital Plaintiffs themselves demonstrate a reluctance to use the remanufactured EndoWrists and third-party servicing.  Such reluctance would leave Hospital Plaintiffs' claims untypical of the class.  Intuitive avers that the question of each Plaintiff's interest in such products and services would require individualized assessments, including each hospital's process for evaluating non-price considerations, such as safety and regulatory requirements, as well as its risk tolerance.

The Court's Order re Summary Judgment already credited the evidence that "[h]ospital demand" for EndoWrist repair was "monumental," and that "the Hospital Plaintiffs have testified they are interested in utilizing repaired EndoWrists, but they have not sought to utilize such services because of contractual barriers imposed by Intuitive."  Order (ECF 204) at 4, 27.  Indeed, the Court already rejected Intuitive's argument that Plaintiffs failed to establish their interest in purchasing remanufactured EndoWrists and third-party servicing.  *Id.* at 26-27, 29-30.

Further, Plaintiffs' class-wide evidence of demand "sufficient to force Intuitive to make substantial and universal downward adjustments in its prices" does not turn on any single hospital's interest in third-party EndoWrist repair or robot service.  Opp. at 22.  Rather, Hospital Plaintiffs present evidence that Intuitive's conduct impacted all Class members, even those that

United States District Court
Northern District of California

would not use third-party repair companies, on the basis that competition would have forced Intuitive to lower all its prices.  *See, e.g.*, Elhauge Class Rep. §§ II.D, II.F.

Intuitive's attempt to present individualized defenses falls flat where Plaintiffs have presented sufficient evidence of market wide impact to proceed against Intuitive's allegedly anticompetitive practices.  The purported "lack of interest" does not render these Hospital Plaintiffs' claims untypical, and Hospital Plaintiffs satisfy the typicality element overall.

### 4. Adequacy

To meet the Rule 23(a)(4) requirement of adequacy, "the plaintiff must show that (1) the named plaintiff and her counsel do not have conflicts of interests with other class members," and that (2) the named plaintiff and plaintiffs' counsel "will prosecute the action vigorously on behalf of the class, which includes a showing that class counsel is competent and qualified."  *Hilario v. Allstate Ins. Co.*, 642 F. Supp. 3d 1048, 1062 (N.D. Cal. 2022), *aff'd*, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024) (citation omitted).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted).

Intuitive argues that Hospital Plaintiffs are not adequate representatives on the basis that there exists a conflict of interest between the Hospital Plaintiffs and other members of the putative class.  *See* Opp. at 19-20.  Intuitive avers that, as discussed below, even if one assumes some class members would have been better off in Hospital Plaintiffs' but-for world, others would have been worse off because they would have paid more overall for the package of goods and services purchased to run their da Vinci programs.  *Id.*

The Court finds the Class representatives "possess the same interest and suffer[ed] the same [alleged] injury as the class members," indicating that their interests are "aligned."  *See Amchem*, 521 U.S. at 625-26.  Plaintiffs and members of the proposed class share an interest in proving that Intuitive's conduct violated the antitrust laws, and Plaintiffs have diligently litigated this case.  The Court finds any potential conflict among class members remains speculative at this stage.  *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (noting that "this circuit does

not favor denial of class certification on the basis of speculative conflicts"); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015).  Moreover, as explained more fully in the predominance analysis, Initiative's reliance on Hughes's report to conjure a seeming conflict – that some class members would have been better off and thus differently situated than injured class members – is misplaced.  *See, infra,* at 14-19.  Accordingly, the Court finds that the proposed Class Representatives satisfy the adequacy requirement.

Hospital Plaintiffs additionally seek to appoint Spector Roseman and Kodroff, P.C., Hausfeld LLP, and Cohen Milstein Sellers & Toll PLLC as Co-Lead Class Counsel.  The Court previously appointed these firms as Interim Co-Lead Class Counsel finding that they and their respective firms "performed substantial work on behalf of the potential class, facilitated the consolidation of separate actions on behalf of the plaintiffs, and have the knowledge, experience, and resources necessary to effectively represent the potential class."  *See* Order Appointing Interim Co-Lead Class Counsel (ECF 54) at 1-2.  For those same reasons, as well as counsels' diligent litigation of the case thus far, the Court confirms Spector Roseman and Kodroff, P.C., Hausfeld LLP, and Cohen Milstein Sellers & Toll PLLC as Co-Lead Class Counsel.

### B.     Rule 23(b)

Hospital Plaintiffs seek certification under Rule 23(b)(2) and Rule 23(b)(3).  The Court considers the (b)(3) class for damages first to resolve the primary focus of the parties' dispute.

#### 1.     Rule 23(b)(3)

Hospital Plaintiffs assert that the proposed damages class satisfies the Rule 23(b)(3) requirements because common questions relating to antitrust liability, injury, and damages predominate over questions affecting individual class members.  Whether the Rule 23(b)(3) requirements have been satisfied – particularly the requirement of predominance – lies at the heart of Intuitive's challenge to class certification.  The Court considers predominance and superiority in turn.

##### a.     Predominance

In seeking to certify a Rule 23(b)(3) class, plaintiffs must show that the common questions "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

The predominance inquiry, while similar to the commonality requirement, goes further and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "The predominance test of Rule 23(b)(3) is 'far more demanding' than the commonality test under Rule 23(a)(2)." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 607 (N.D. Cal. 2014) (quoting *Amchem Prods.*, 521 U.S. at 624). "[T]o carry their burden of proving that a common question predominates, [plaintiffs] must show that the common question relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665. The Supreme Court has observed that antitrust cases "readily" meet the predominance requirement. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

Intuitive attacks predominance on two main bases. The Court first addresses Intuitive's challenge regarding the sufficiency of Hospital Plaintiffs' predominance showing as to their antitrust causes of action. Then, the Court considers Intuitive's second challenge regarding the application of the statute of limitations to Class members' claims.

### i. Antitrust Claims

The predominance inquiry requires plaintiffs to demonstrate that common questions predominate as to each cause of action for which they seek class certification. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). As directed by the Supreme Court, to determine "whether 'questions of law or fact common to class members predominate' [the Court] begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). As a general matter, "[t]he elements of a claim for [an] antitrust action are (i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation . . . and (iii) measurable damages." *Olean*, 31 F.4th at 665-66 (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101-02 (9th Cir. 1999)). The Court takes up these three elements in turn.

//

//

United States District Court
Northern District of California

1    **Antitrust Violation**

2          Hospital Plaintiffs advance they can satisfy predominance because Intuitive's alleged

3    antitrust violations – tying, exclusive dealing, and monopolization – are the crux of the action.  To

4    establish a Section 1 tying claim, Hospital Plaintiffs must show " 'an agreement by a party to sell

5    one product but only on the condition that the buyer also purchases a different (or tied) product, or

6    at least agrees that he will not purchase that product from any other supplier.' "  *Epic Games, Inc.*

7    *v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023), cert. denied, 144 S. Ct. 681 (2024), and cert.

8    denied, 144 S. Ct. 682 (2024) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S.

9    451, 461 (1992)).  Relatedly, to make out a Section 1 exclusive dealing claim, Hospital Plaintiffs

10    must show "an agreement between a vendor and a buyer that prevents the buyer from purchasing a

11    given good from any other vendor."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*

12    *LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Section 2 monopolization claims require "(1) the

13    possession of monopoly power in the relevant market and (2) the willful acquisition or

14    maintenance of that power as distinguished from growth or development as a consequence of a

15    superior product, business acumen, or historic accident."  *Alaska Airlines v. United Airlines*, 948

16    F.2d 536, 541 (9th Cir. 1991) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S.

17    585, 596 n. 19 (1985)).  Accordingly, it is "the state of the market and defendants' use and

18    maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim."

19    *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

20          To support these various antitrust claims at this class certification stage, Hospital Plaintiffs

21    rely on a report and regression analysis from Prof. Einer Elhauge.  Domingues Decl., Ex. 1 (ECF

22    267-2, "Elhauge Rep.").  Prof. Elhauge's report in support of class certification opines on a range

23    of matters, including the definitions of the relevant antitrust markets (Elhauge Class Rep. §§ II.B ,

24    II.D, II.F), Intuitive's share and power in those markets (*id.*, §§ II.C, II.E, II.G), the hypothetical

25    world that would exist "but-for" Intuitive's allegedly anticompetitive conduct (*id.*, § VI), and the

26    damages incurred by class members based on the overpayment for Intuitive's EndoWrists and da

27    Vinci servicing (*id.*, § VII).  Elhauge states in his class certification report that the inquiry into

28    whether Intuitive's conduct is anticompetitive is market-wide by its nature.  Elhauge Class Rep.

¶¶ 11, 77, 163, 357, 398, 418-19, 445-46, 447, 510, 517, 548, 549, 565, 567, 584, 585, 612, 648, 668, 683.

In support of their Section 1 claims, Hospital Plaintiffs point to the SLSA contracts Intuitive formed with its customers. Every SLSA contract with every Class member prohibited EndoWrist repair and replacement and da Vinci servicing by third parties. Answer ¶¶ 3-4, 13, 17, 20, 59, 73, 82, 107; Elhauge Class Rep. ¶¶ 421-430; Dominguez Decl., Ex. 2 (Vavoso (Rebotix) Dep.) 194:7-199:2; Ex. 14 (FRANCISCAN-00056314) at -315-320; Ex. 15 (LARKIN-00025488) at -489-491; Ex. 16 (VMC-00020652) at -653-656. In every SLSA, Intuitive additionally prohibited the use of EndoWrists beyond their use limits. *See, e.g.*, Dominguez Decl., Ex. 11 (Intuitive-00067540) at -540-42; Ex. 2 (Vavoso (Rebotix) Dep.) 198:24-199:2; *see also* Answer ¶¶ 3-4, 13, 17, 20, 59, 73, 82, 107. Intuitive included in each SLSA the methods by which it would obtain compliance with these terms, including that Intuitive could cease servicing the da Vinci, cancel its warranty, terminate the contract, and withhold the sale of EndoWrists and replacement parts. *See* Elhauge Class Rep. ¶ 422; *see, e.g.*, Dominguez Decl., Ex. 11 (Intuitive-00067540) at -540-42. These contractual restrictions provide common evidence for Hospital Plaintiffs to establish both tying and exclusive dealing related to EndoWrist replacements, as well as tying and exclusive dealing related to robot service.

Regarding Hospital Plaintiffs' Section 2 claim, they present common evidence that Intuitive maintains monopoly power in the relevant markets. Hospital Plaintiffs show, for example, that Intuitive and other industry participants do not consider MIST robots to compete with traditional surgical procedures and that alternative forms of surgery do not constrain Intuitive's robot prices to competitive levels. Elhauge Class Rep. §§ II.B.2-6. They show further that Intuitive has enjoyed a near-complete monopoly (99.5-99.6% market shares) in the MIST robot market since the year 2000, when it first introduced its da Vinci. *See* Elhauge Class Rep. ¶¶ 163-231. Prof Elhauge opines in support of the monopoly claim that Intuitive's monopoly power over MIST robots is shown through class-wide evidence of high barriers to entry and direct evidence of the manufacturer's power to raise prices and exclude rivals. Elhauge Class Rep. §

1  II.C.  Prof. Elhauge's report additionally shows the existence of the da Vinci service market as

2  well as Intuitive's monopoly power therein.  *See* Elhauge Class Rep. §§ II.F-G.

3          The Court finds that common issues and common proof of antitrust violations

4  predominate.

5  **<u>Antitrust Impact</u>**

6          "Antitrust 'impact' – also referred to as antitrust injury – is the 'fact of damage' that results

7  from a violation of the antitrust laws."  *In re Dynamic Random Access Memory (DRAM) Antitrust*

8  *Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006).  To show antitrust

9  impact, plaintiffs "must establish, predominantly with generalized evidence, that all (or nearly all)

10 members of the class suffered damage as a result of Defendants' alleged anti-competitive

11 conduct."  *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013).  "When

12 individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that

13 the court determine whether individualized inquiries about such matters would predominate over

14 common questions."  *Olean*, 31 F.4th at 668.

15         Hospital Plaintiffs aim to establish antitrust injury through the common proof of Prof.

16 Elhauge's opinions.  Prof. Elhauge reports that Intuitive's contractual restraints on EndoWrist

17 repair and third-party da Vinci service harmed all Class members, including by artificially

18 inflating Intuitive's prices for EndoWrists and da Vinci service, and artificially suppressing the

19 number of times EndoWrists may be used.  Elhauge Class Rep. § VIII.  Prof. Elhauge opines that

20 customers would have paid less for both da Vinci service and replacement EndoWrists in the but-

21 for world absent Intuitive's allegedly anticompetitive conduct.  *See* Elhauge Class Rep. ¶¶ 782,

22 825.  Elhauge's Report evidences that Hospital Plaintiffs can make out through common evidence

23 all elements of their antitrust claims, including that because each Class member incurred an

24 overcharge, they can presumably establish antitrust injury.  *See Olean*, 31 F.4th at 670-73

25 (affirming district court's finding of common antitrust impact where plaintiffs offered common

26 evidence capable of showing class members paid "an overcharge"); *see also Hawaii v. Standard*

27 *Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) (holding that a plaintiff suffers antitrust injury at

28 the moment it is overcharged due to the defendant's conduct, and "courts will not go beyond the

United States District Court
Northern District of California

fact of this injury to determine whether the victim of the overcharge has partially recouped . . .”). Moreover, it proves up that the putative class has suffered the type of injury the antitrust laws were intended to prevent and that flows from Intuitive’s purported unlawful acts. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Intuitive, arguing that Hospital Plaintiffs fail to establish antitrust impact, relies on an expert report from Dr. James W. Hughes, Ph.D.  Bass Decl., Ex. 1 (ECF 288-5, “Hughes Rep.”). Dr. Hughes disagrees with the universality of Prof. Elhauge’s analysis and posits that not all customers would pay supracompetitive prices for the total package of the da Vinci system, including the pricing combination of robots, service, and EndoWrist instruments.  *See id.* ¶¶ 14-16, 93-100.  Indeed, Dr. Hughes projects that in the but-for world Intuitive would increase robot prices for some Class members by more than it would reduce prices for EndoWrists and robot service such that some customers would pay more overall, leaving them worse off in the absence of the alleged ties.  *Id.* ¶¶ 14-16, 93-100.

Relying on Dr. Hughes’s report, Intuitive devotes much of its opposition to challenging Hospital Plaintiffs’ showing of common antitrust impact.  *See* Opp. at 8-18.  Primarily, Intuitive argues that where a defendant’s sale of “multiple items to the customer as part of an overall package – such as a machine and consumables used with the machine – injury must be determined by considering the prices of all parts of the package, including goods for which prices might increase in the absence of the challenged arrangement.”  Opp. at 2 (citing *Siegel v. Chicken Delight, Inc.* 448 F.2d 43, 52-53 (9th Cir. 1971) (holding that whether a tie injured the franchisees required an assessment of the cost or value of the products involved free from unlawful tying)).

Intuitive argues, “it is an error of law to assess antitrust injury in a tying case without considering the totality of the price a customer would have paid in the absence of the challenged restraint, including a potentially higher price for the tying product . . . because in the but-for world, where the challenged tying restriction does not exist, a defendant might make different choices as to how to price the tying product.”  Opp. at 9 (citing *Chicken Delight*, 448 F.2d. at 52-53). Intuitive advances that Hospital Plaintiffs fail to provide the necessary analysis of the gross prices paid by customers, including the combination of the da Vinci robots, EndoWrists, and service, and

United States District Court
Northern District of California

1   then finding the net economic harm.  Opp. at 9-10.  In support of this theory, Dr. Hughes

2   determines that, in the but-for world absent the tying arrangement, "(a) a significant number of

3   customers would not have been better off once one takes into account the higher prices they would

4   have had to pay for their robots, (b) some customers would actually have been worse off [because

5   of a loss of price discounts and concessions related to robot acquisitions], and (c) identifying the

6   specific impact on any particular customer requires an individualized analysis."  Opp. at 10 (citing

7   Hughes Rep. ¶¶ 14-16, 65-99).  Given the range of potential damages amounts calculated by Dr.

8   Hughes, Intuitive argues that the damages calculations are too individualized to support

9   predominance.

10          The Court briefly analyzes the battle between these experts to the extent it must resolve

11   factual disputes regarding injury status at this stage.  *See Ellis v. Costco Wholesale Corp.*, 657

12   F.3d 970, 982-83 (9th Cir. 2011) (requiring district courts to "resolve any factual disputes

13   necessary" to determine whether there was common impact to the class).  The Court summarily

14   dispatches two of Intuitive's attacks on Prof. Elhauge's assumptions: a 20% price reduction for

15   EndoWrists in the but-for world and that EndoWrist use limits would have essentially doubled in

16   the but-for world.  Opp. at 16 (citing in part Hughes Rep. ¶¶ 103-04, 111-112, 113-14).  The Court

17   already addressed and rejected those precise contentions regarding Prof. Elhauge's opinion in its

18   Order re Motions to Exclude Expert Witnesses.  *See id.* at 18-19.  Intuitive presents no new

19   evidence to disturb the Court's Order and thus fails to undercut the reliability of Prof. Elhauge's

20   opinion.

21          Intuitive further charges that Prof. Elhauge incorrectly contends that Intuitive lowered Xi

22   da Vinci prices when it introduced Extended Use EndoWrist Instruments in the face of third-party

23   instrument repair.  *See* Opp. at 14 (citing Elhauge Rep. ¶¶ 846, 934).  Intuitive cites Dr. Hughes's

24   report to show that Intuitive increased the price of certain Xi robots in the relevant period.  Opp. at

25   14 (citing Hughes Rep. ¶ 88).  Prof. Elhauge's rebuttal report rebuffs this pricing assessment as

26

27

28

failing to control for inflation.  Glubiak Decl., Ex. 3 ("Elhauge Class Reply") ¶¶ 47-49.[4]  The

Court finds Prof. Elhauge's pricing analysis to be more accurate and agrees that, when controlled

for inflation, Intuitive lowered robot prices in that relevant period.

Hospital Plaintiffs conversely challenge the assumptions underlying Dr. Hughes's

opinions.  For instance, Dr. Hughes's package price calculations assign zero value to hospitals'

used robots that are traded in, treating those transactions as pure "discounts," leading to lower

"actual" prices overall that fail to fully account for the cost to each hospital.  Hughes Rep. ¶ 28.

Following submission of his report in support of Intuitive's Opposition, Hospital Plaintiffs

deposed Dr. Hughes and elicited an admission that he performed no analysis to predict what robot

prices would have been in the but-for world absent Intuitive's challenged conduct.  *See* Glubiak

Decl., Ex. 4 (Hughes Dep.) 168:20-171:14.  Dr. Hughes instead simply assumes that Intuitive

would have eliminated all robot discounts in the but-for world and charged all customers "list

prices" based on the disincentives resulting from untying.  Hughes Rep. ¶ 94.  In the same report,

however, Dr. Hughes repeatedly acknowledges that few customers, if any, ever paid such "list

prices" in the real world.  *Id.* ¶ 94; *see also* ¶¶ 28, 48, Fig. 5.  Dr. Hughes's economic assumption

that Intuitive would have eliminated all discounts in the but-for world fails as illogical and

unsupported where the same incentives or rationales for those discounts would still exist in the

but-for world, including credits for trade-ins, free robot servicing for the first year of robot

ownership, and discounts for volume purchases.  *See* Elhauge Class Reply ¶ 95.  In light of his

defective assumptions, Dr. Hughes's calculations regarding the total price paid by class member

hospitals in the but-for world are rendered untrustworthy.  Not only are these assumptions

---

[4] Intuitive objected to the submission of the Elhauge Class Reply Report.  ECF 298.  The Court permitted Intuitive leave to file a brief in response to that Report.  ECF 311.  The Court ultimately disagrees with Intuitive's contention that the Reply Report contains information presented for the first time, and it finds the Reply Report useful to respond to Dr. Hughes's Report.  The Court accordingly OVERRULES Intuitive's objection.  The Court notes that district courts regularly consider rebuttal reports in support of class certification reply briefs.  *See, e.g.*, *In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2022 WL 1604753, at *8 (N.D. Cal. Jan. 25, 2022) ("A rebuttal expert may cite new evidence and data or introduce new methods of analysis in a rebuttal report so long as the new evidence, data, or method is offered to contradict or rebut the opposing party's expert."); *Olean*, 31 F.4th at 675 (favorably discussing the district court's consideration of an expert rebuttal report).

United States District Court
Northern District of California

1    underlying Dr. Hughes's analysis generally difficult to accept in light of the record, the analysis

2    that results runs headlong against Intuitive's arguments regarding the applicability of *Chicken*

3    *Delight*'s total package assessment.

4          Intuitive's dependence on *Chicken Delight* fundamentally relies on the theory "that a

5    rational economic actor forced to adjust the price for one element of a tied package of products

6    ordinarily will be expected to adjust other elements correspondingly."  Opp. at 13 (citing Hughes

7    ¶¶ 65-92).  In *Chicken Delight*, the defendant argued that the separation of tying from tied goods

8    would result in pricing adjustments that could leave class members unharmed in much the same

9    way that the Single Monopoly Profit theory, raised in both experts' reports, instructs that the

10   adjustment of prices for a tied product would be offset by an increase in price for the tying

11   product.  *Id.*, 448 F.2d at 52.  Elhauge contends that the Single Monopoly Profit theory does not

12   apply in this case.  Elhauge Class Rep. § VI.E, ¶¶ 674-681.  Dr. Hughes seemingly agrees with

13   Elhauge – he too expressly contends that the Single Monopoly Profit theory does not apply in this

14   case.  Hughes Rep. ¶¶ 78-82.  Dr. Hughes argues that Prof. Elhauge's reference to the Single

15   Monopoly Profit theory is irrelevant here because it analyzes the legality of a tie; Dr. Hughes

16   avers that his analysis does not rely on the Single Monopoly Profit theory and instead focuses on

17   analysis of the total price paid by Class member hospitals.  *See id.*  But more importantly, Dr.

18   Hughes's conclusion – that the ties reduced robot prices – at least implicates the Single Monopoly

19   Profit theory, particularly where he provides no alternative theory to explain his predicted

20   offsetting price increase for robots.  *See* Elhauge Class Reply ¶ 68.  While Intuitive and Dr.

21   Hughes aim to distinguish Single Monopoly Profit theory from their theory of Intuitive's total

22   package pricing based on the "basic economic principle" that a price increase of a tying good such

23   as robots would necessarily result from a decrease in the price of a tied service or good such as

24   EndoWrists, they avoid naming this "basic" principle or citing any economic literature in support

25   thereof.  Opp. at 11, 13; *see also id.* at 12 (claiming to rely on "common sense and established

26   economic theory").  If the Court accepts both experts' opinions that Single Monopoly Profit theory

27   does not apply here, then it is left with only one expert whose opinion gives meaningful economic

28   insight regarding pricing in the but-for world – Prof. Elhauge.

The dispute regarding proof of antitrust harm accordingly boils down to a merits question limited to the tying claims, leaving the exclusive dealing and monopolization claims intact and ripe for class-wide assessment.  Plaintiffs need not prevail on their claims as a matter of law at this stage.  *See Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").  Rather, they must demonstrate that a common issue could be resolved in a single stroke.  *See Tyson Foods*, 577 U.S. at 457 (concluding that arguments that an expert study is "unrepresentative or inaccurate" go to the merits and do not defeat class certification).  "In determining whether the "common question" prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."  *Olean*, 31 F.4th at 666-67.

In sum, with the assistance of Prof. Elhauge's opinion, the Hospital Plaintiffs have shown that common issues predominate.  If a jury is persuaded by Hospital Plaintiffs' class-wide evidence at trial, the Class as a whole will win, and if the jury remains unpersuaded, the entire Class will lose.  The Class members' claims are "entirely cohesive" and will "prevail or fail in unison" such that no further inquiry into the merits is appropriate.  *Amgen*, 568 U.S. at 460.  The Court finds that common issues of antitrust impact predominate.

**<u>Antitrust Damages</u>**

Once plaintiffs have established an antitrust violation and antitrust injury, courts require only a reasonable estimate of the amount of damages they have suffered.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (if plaintiffs "prevail on their claims," damages "[c]alculations need not be exact" (citation omitted)).  "To show that common questions regarding damages predominate, Plaintiffs must demonstrate the calculations proposed to determine damages use common evidence."  *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019) (citing *Meijer, Inc. v. Abbot Labs.*, No. C 07-5985 CW, 2008 WL 4065839, at *7 (N.D. Cal. Aug. 27, 2008).

Prof. Elhauge presents a method for calculating class-wide damages.  *See* Elhauge Class Rep. § VII.  Having already found Prof. Elhauge's damages model adequate to survive Intuitive's

*Daubert* challenge, *see* Order re: Mots. Exclude Expert Witnesses (ECF 231) at 15-22, the Court finds that his damages model also meets the standard for Rule 23(b)(3) predominance. *See In re Packaged Seafood Prods.*, 332 F.R.D. at 328 (relying on damages model presented through expert report that survived *Daubert* challenge).

### ii.    Statute of Limitations

Intuitive also argues that Hospital Plaintiffs' Class definition defeats predominance because it improperly sweeps in a large number of hospitals whose claims are barred by the statute of limitations. Opp. at 18-19. The four-year statute of limitations for Hospital Plaintiffs' Sherman Act claims runs from the date of the allegedly anticompetitive contracts. 15 U.S.C. § 15b; *see also Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 693-94 (9th Cir. 1982). Intuitive reasons that, because almost 550 hospitals signed contracts with Intuitive before May 21, 2017, predominance cannot be met because Hospital Plaintiffs "have identified no class-wide proof of conduct after that date that would restart the statute of limitations period for those contracts." Opp. at 3; *see also id.* at 18-19.

First, Intuitive's argument relies on an absence of class-wide proof, but as detailed above, the Court has already found Hospital Plaintiffs present class-wide proof supporting each tying, exclusive dealing, and monopolization claim, including through Prof. Elhauge's opinions. Second and more relevant, the Ninth Circuit has "repeatedly held that acts taken to enforce a contract [are] overt acts that restart[] the statute of limitations." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014); *see also Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986) (holding "that a cause of action accrued each and every time that a tourist was shepherded away from the plaintiff's non-preferred shop because even though the agreement predated the limitations period, the agreement itself did not 'immediately and permanently destroy' plaintiff's business nor did it cause 'irrevocable, immutable, permanent, and final' injury").

Intuitive's attempt to bury its head in the sand in regarding the conduct complained of in this case, which largely postdates the execution of the sales and lease agreements for da Vinci robots, necessarily fails. For example, Hospital Plaintiffs charge that Intuitive engaged in

United States District Court
Northern District of California

1    monopolistic conduct by including the "use counter" in every EndoWrist purchased by every

2    Class member during the limitations period.  *See, e.g.*, Elhauge Class Rep. ¶¶ 45-46; *see also*

3    Dominguez Decl., Ex. 5 (Rubach Rep. (ECF 267-6)) ¶¶ 18, 30-32.  Hospital Plaintiffs further

4    charge that Intuitive acted to exclude independent repair companies ("IRCs") from participating in

5    the EndoWrist or service markets after 2017.  *See, e.g.*, Elhauge Class Rep. ¶¶ 431-436, 474, 560-

6    561.  Importantly, while the antitrust claims at issue rely foundationally on the existence of

7    contracts between hospitals and Intuitive, Hospital Plaintiffs present evidence that not all the harm

8    occurred at the time of the original contracting.  Intuitive's more recent conduct constitutes "overt

9    acts" sufficient to restart the limitations period.  Intuitive's statute of limitations defense does not

10   defeat predominance.

### b.    Superiority

12       Among the other Rule 23(b) elements, plaintiffs must also show that "a class action is

13   superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

14   R. Civ. Proc. 23(b)(3).  The Federal Rules provide four considerations for courts assessing

15   superiority:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of
> the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

22   Fed. R. Civ. Proc. 23(b)(3)(A)-(D).  The superiority requirement "requires the court to focus on

23   the efficiency and economy elements of the class action so that cases allowed under subdivision

24   (b)(3) are those that can be adjudicated most profitably on a representative basis."  *Zinser v.*

25   *Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *as amended*, 273 F.3d 1266 (9th Cir.

26   2001).

27       Intuitive avers that the class mechanism is not superior to individual litigation due to the

28   size of potential damage awards – "[i]ndividual class members have sufficient economic incentive

United States District Court
Northern District of California

1   to bring their claims individually."  Opp. at 23 (citing *Bowerman v. Field Asset Servs., Inc.*, 60

2   F.4th 459, 471 n.8 (9th Cir. 2023)).  The Ninth Circuit acknowledges that substantial damage

3   awards may weigh against the superiority of a class action.  *Bowerman*, 60 F.4th at 471 n.8.

4   Indeed, class members estimate sizeable damages claims: Prof. Elhauge estimates total damages

5   greater than $58,802 for at least 95% of class members, with totals ranging as high as

6   $12,392,910.  *See* Elhauge Class Rep. at Tbl. 28.

7       Hospital Plaintiffs counter that large damage awards do not defeat superiority.  *See* Reply

8   at 19 (citing, e.g., *Brice Yingling v. eBay, Inc.*, 2010 WL 11575128, at *6 (N.D. Cal. July 16,

9   2010) ("The mere fact that some class members may have suffered significant damages does not

10  detract from the overall efficiency and economy of resolving the claims of the entire class in a

11  single action.")).  The Court agrees in light of the efficiency to be gained by resolving the antitrust

12  claims against a single defendant in one action.  Moreover, high litigation costs weigh against the

13  Class members' interests in individually controlling the prosecution of their claims.  *See Wolin v.*

14  *Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an

15  individual basis would be dwarfed by the cost of litigating on an individual basis, this factor

16  weighs in favor of class certification."); *see also* Fed. R. Civ. P. 23(h) (permitting recovery of non-

17  taxable costs in a certified class action).  Hospital Plaintiffs argue that expert costs in a complex

18  antitrust case such as this one favor proceeding via class action because expert costs, which may

19  total millions of dollars, are recoverable in a class action, but they would otherwise wipe out an

20  individual prevailing plaintiff's entire six- or seven-figure damage award.  Reply at 13.  The cost

21  of litigating a complex antitrust case such as this one is clearly significant – the Court recently

22  held a three-week trial in the related antitrust case, *Surgical Instrument Service Co., Inc. v.*

23  *Intuitive Surgical, Inc.* (N.D. Cal. 21-cv-3496), which included testimony of several experts and

24  demonstrated the effort and expense related to prosecuting an antitrust action such as this.  No

25  individual hospital appears interested in taking on the substantial financial burden to pursue an

26  antitrust claim against Intuitive, as demonstrated by the absence of separate lawsuits filed.

27  Further, concentrating the litigation of the claims here in the Northern District of California is

28  favorable because this is Intuitive's home forum, where much of the relevant evidence and many

22

United States District Court
Northern District of California

1    of the key witnesses are located.  The Court finds these economic- and efficiency-based concerns

2    outweigh Class members' interests in pursuing individualized litigation and fail to negate

3    superiority.

4        Finally, there are two disputes regarding the final factor – manageability.  Both disputes

5    are inconsistent with the "well-settled presumption that courts should not refuse to certify a class

6    merely on the basis of manageability concerns."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121,

7    1131 (9th Cir. 2017).  The thrust of the first dispute mirrors Intuitive's contention that

8    individualized inquiries predominate based on the *Chicken Delight* analysis discussed above.  This

9    dispute, including Intuitive's contention that the damages calculations will require individualized

10   assessments, does not render the class unmanageable.

11       The second dispute centers on the "government hospital" exclusion in Hospital Plaintiffs'

12   proposed definition noted in relation to Valley Medical's adequacy, above.  Intuitive argues that

13   there is no single accepted test for evaluating the definition of "government hospital,"

14   necessitating an individualized assessment of whether each putative class member is a government

15   hospital and rendering the class unmanageable.  Further still, Intuitive avers that Hospital

16   Plaintiffs cannot resolve this problem by eliminating the exclusion of state and local government

17   hospitals from the putative class because the Eleventh Amendment prohibits inclusion of state

18   entities in a certified class without their affirmative consent.  Opp at 24 (citing *Walker v. Liggett*

19   *Grp., Inc.*, 982 F. Supp. 1208, 1209-11 (S.D. W.Va. 1997); *In re Auto. Parts Antitrust Litig.*, 2015

20   WL 14047405, at *7 (E.D. Mich. Apr. 30, 2015).

21       Intuitive's argument that the class will be unmanageable because it includes state and local

22   hospitals misapprehends the Class definition, and it ignores the bounds proffered by Hospital

23   Plaintiffs and Prof. Elhauge.  As Intuitive acknowledges, Prof. Elhauge's damages calculations

24   exclude only hospitals run by the Departments of Defense and Veterans Affairs and otherwise

25   include other hospitals that are state and local governmental entities, such as Valley Medical.  *See*

26   Opp. at 23-25.  The exclusion of hospitals run by the Departments of Defense and Veterans

27   Affairs appears to be readily achievable, and Hospital Plaintiffs raise no dispute about refining the

28   class definition to include state and local hospitals more clearly.  The inclusion of those

United States District Court
Northern District of California

1    government-run entities poses no problem for class manageability.

2         On the topic of sovereign immunity, Intuitive misses that sovereign immunity applies only

3    to lawsuits "commenced or prosecuted against" the states.  U.S. Const. amend. XI.  Said another

4    way, the Eleventh Amendment serves as a shield, not as a limit to a government entity's

5    participation in class action litigation as a plaintiff or class member.  *Id.*; *see also California ex*

6    *rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 847 (9th Cir. 2004), *amended on denial of reh'g*, 387

7    F.3d 966 (9th Cir. 2004) (describing sovereign immunity as "protection from being sued").  The

8    Eleventh Amendment does not prevent state or local government entities from participating in a

9    class action.  And even if sovereign immunity had that effect, the opt-out rights provided by Rule

10   23 adequately protect states' entitlement to proceed on their own behalf.  Therefore, contrary to

11   Intuitive's contentions, the government hospitals exclusion does not pose a problem for class

12   manageability.

13        Taking all of these Rule 23(b)(3) factors into account, the Court finds that maintaining this

14   action as a class action would be superior to individual actions.

15        **2.    Rule 23(b)(2)**

16        Hospital Plaintiffs additionally seek to certify a class for injunctive relief under Rule

17   23(b)(2).  Mot. at 24-25.  "Rule 23(b)(2) allows class treatment when 'the party opposing the class

18   has acted or refused to act on grounds that apply generally to the class, so that final injunctive

19   relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Dukes*,

20   564 U.S. at 360 (quoting Fed. R. Civ. P. 23(b)(2)).  "Unlike Rule 23(b)(3), a plaintiff does not

21   need to show predominance of common issues or superiority of class adjudication to certify a Rule

22   23(b)(2) class."  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 587 (N.D. Cal. 2015).  Rather, Rule

23   23(b)(2)'s "requirements are unquestionably satisfied when members of a putative class seek

24   uniform injunctive or declaratory relief from policies or practices that are generally applicable to

25   the class as a whole."  *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

26        Here, whether Intuitive's conduct is anticompetitive requires a market-wide analysis, and if

27   found to be unlawful, any potential injunctive remedy necessary to address such market-wide

28

1    conduct is necessarily indivisible.  Thus, the proposed class satisfies the requirements of Rule

2    23(b)(2).

3          Intuitive argues that the Court should decline to certify Plaintiffs' proposed Class under

4    Rule 23(b)(2).  Several of Intuitive's arguments against a (b)(2) class are derivative – Intuitive

5    argues that a (b)(2) class fails for lack of adequacy and typicality, and Intuitive argues that

6    questions of antitrust impact do not predominate, all of which are dispelled above.  The Court does

7    not rehash its analysis.  Intuitive additionally argues that Plaintiffs have not satisfied Rule 23(b)(2)

8    because they provide no specificity as to the injunctive relief they seek.  Opp. at 25 (citing *N.*

9    *Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1114 (D. Utah 2023) (denying

10   certification where plaintiff's motion lacked "any 'reasonably particular detail' as to the injunctive

11   relief sought")).    But Plaintiffs are not required to specify the injunctive relief they will

12   ultimately seek.  *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019)).  The

13   specificity required by Rule 23(b)(2)

> ordinarily will be satisfied when plaintiffs have described the
> general contours of an injunction that would provide relief to the
> whole class, that is more specific than a bare injunction to follow the
> law, and that can be given greater substance and specificity at an
> appropriate stage in the litigation through fact-finding, negotiations,
> and expert testimony.

18   *Id.* at 972 (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).  The "general

19   contours of an injunction" sought here may include a prohibition on the enforcement of portions of

20   Intuitive's contracts that implicate unlawful tying or exclusive dealing for EndoWrists and service.

21   That level of specificity is sufficient at this stage.  "A more specific injunction will depend on

22   further fact-finding and what claims the plaintiffs actually prove through further litigation."

23   *Snyder*, 922 F.3d at 972.  Therefore, to the extent that Hospital Plaintiffs seek to certify a Rule

24   23(b)(2) class for injunctive relief only, the Court GRANTS the motion for class certification.

25   //

26   //

27   //

28   //

1

**III.    CONCLUSION**

2          For the foregoing reasons, the Court hereby **GRANTS** Hospital Plaintiffs' motion to

3    certify a class action.  The Court defines the Class to include

4                    All entities that purchased da Vinci service and EndoWrists from
                     Intuitive in the United States at any time from May 21, 2017, to
5                    December 31, 2021.

6    Hospitals run by the Departments of Defense and Veterans Affairs are excluded from the Class.

7

8          **IT IS SO ORDERED.**

9    Dated: March 31, 2025

10

11                                                    _____

12                                                    **ARACELI MARTÍNEZ-OLGUÍN**
                                                      **United States District Judge**
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California