# ATTACHMENT 1

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: swinner@cov.com

Ashley E. Bass (*pro hac vice*)
Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 Tenth Street NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 6291
Email: abass@cov.com
Email: alazerow@cov.com

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.: 3:21-cv- 03825-AMO-LB<br><br>**OPPOSITION OF DEFENDANT INTUITIVE SURGICAL, INC. TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: October 10, 2024<br>Hearing Time: 2:00pm PST<br>Place: Courtroom 10<br><br>Judge: The Honorable Araceli Martínez-Olguín |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

    A.    The Proposed Class ................................................................................... 4

    B.    Class Member Purchases from Intuitive ................................................... 4

    C.    Plaintiffs' Expert Report ............................................................................ 6

ARGUMENT ....................................................................................................................... 7

  I.    PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE. ................................. 8

    A.    Prof. Elhauge Analyzes the Wrong Question on Impact. ......................... 8

    B.    Prof. Elhauge's Opinions About EndoWrist and Service Prices Are Insufficient to Carry Plaintiffs' Burden of Proof on Those Elements. ................. 15

    C.    Application of the Statute of Limitations Defeats Predominance. ........... 18

  II.    PLAINTIFFS CANNOT ESTABLISH ADEQUACY ........................................ 19

  III.    PLAINTIFFS CANNOT ESTABLISH TYPICALITY .................................... 20

    A.    Valley Medical Is Not a Member of the Class ....................................... 21

    B.    Larkin Has Released Its Claims. ............................................................. 21

    C.    Franciscan Had the Ability to Avoid the Challenged Contract Terms. ............. 22

    D.    All Named Plaintiffs Lacked Interest in Third-Party EndoWrists and Service .............................................................................................. 22

  IV.    PLAINTIFFS CANNOT ESTABLISH SUPERIORITY. ................................. 23

  V.    PLAINTIFFS HAVE IDENTIFIED NO MANAGEABLE WAY TO EXCLUDE GOVERNMENT ENTITIES FROM THE CLASS. ..................................... 23

  VI.    INJUNCTIVE RELIEF "RESPECTING THE CLASS AS A WHOLE" WOULD NOT BE APPROPRIATE. ................................................................. 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                        Page(s)

*AdTrader, Inc. v. Google LLC*,
    2020 WL 1922579 (N.D. Cal. Mar. 24, 2020)........................................................................20

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007).............................................................................16, 19, 20

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
    688 F.2d 689 (9th Cir. 1982).......................................................................................18, 19

*In re Auto. Parts Antitrust Litig.*,
    2015 WL 14047405 (E.D. Mich. Apr. 30, 2015).......................................................24, 25

*Bowerman v. Field Asset Servs., Inc.*,
    60 F.4th 459 (9th Cir. 2023)..............................................................................................23

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017)...........................................................................................23

*Brown v. Am. Airlines, Inc.*,
    285 F.R.D. 546 (C.D. Cal. 2011).......................................................................................20

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................................1, 7, 10

*Consolidate Fiberglass Prod. Co. v. Gemini Ins. Co.*,
    2011 WL 13180451 (S.D. Cal. Feb. 4, 2011)....................................................................25

*Contos v. Wells Fargo Escrow Co.*,
    2010 WL 2679886 (W.D. Wash. July 1, 2010)..................................................................19

*CSE Safeguard Ins. Co. v. Hyundai Motor Am.*,
    2024 WL 1832423 (C.D. Cal. Jan. 12, 2024).....................................................................19

*Deschutes River All. v. Portland Gen. Elec. Co.*,
    1 F.4th 1153 (9th Cir. 2021)........................................................................................17, 24

*Easton v. Wells Fargo & Co.*,
    2023 WL 6194043 (C.D. Cal. Aug. 18, 2023)...................................................................22

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989).............................................................................................18

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)...................................................................................7, 15, 19

ii

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ........................................................................20, 23

*In re High-Tech Emp. Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013) .....................................................................1, 17

*Krehl v. Baskin-Robbins Ice Cream Co.*,
   78 F.R.D. 108 (C.D. Cal. 1978) ......................................................................11, 15

*Kypta v. McDonald's Corp.*,
   671 F.2d 1282 (11th Cir. 1982) ...........................................................................11

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ...............................................................................9

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) ...............................................................................10

*Maddock v. KB Homes, Inc.*,
   248 F.R.D. 229 (C.D. Cal. 2007) ..........................................................................23

*Martino v. McDonald's Sys., Inc.*,
   86 F.R.D. 145 (N.D. Ill. 1980) .............................................................................11

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ................................................................................25

*Metromedia Broad. Corp. v. MGM/UA Ent. Co.*,
   611 F. Supp. 415 (C.D. Cal. 1985) .........................................................................9

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
   2023 WL 8936389 (D. Utah Dec. 27, 2023)...........................................15, 20, 25

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir.) (en banc), *cert. denied*, 143 S. Ct. 424 (2022)............1, 7, 8, 15, 17

*Phillips v. Klassen*,
   502 F.2d 362 (D.C. Cir. 1974) ..............................................................................20

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ............................................................................19

*Ryan v. Microsoft Corp.*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ..................................................................18

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ................................................................................21

*In re SFPP Right-of-Way Claims*,
   2017 WL 2378363 (C.D. Cal. May 23, 2017) .......................................................23

iii

*Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*,
　　2008 WL 3833577 (D.N.J. Aug. 13, 2008) ...................................................................9

*Shelton v. Ohio State Univ. Med. Ctr.*,
　　2007 WL 756702 (S.D. Ohio Mar. 8, 2007)................................................................24

*Siegel v. Chicken Delight, Inc.*,
　　448 F.2d 43 (9th Cir. 1971) ...........................................2, 8, 9, 10, 11, 12, 13, 18

*Simon v. AT&T Corp.*,
　　2001 WL 34135273 (C.D. Cal. Jan. 26, 2001) ....................................................11, 15

*True Health Chiropractic, Inc. v. McKesson Corp.*,
　　896 F.3d 923 (9th Cir. 2018) .......................................................................................18

*Walker v. Liggett Grp., Inc.*,
　　982 F. Supp. 1208 (S.D. W. Va. 1997)....................................................................24, 25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
　　401 U.S. 321 (1971).......................................................................................................18

*Zinser v. Accufix Rsch. Inst., Inc.*,
　　253 F.3d 1180 (9th Cir.), *as amended*, 273 F.3d 1266 (9th Cir. 2001) ...........................23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .........................................................1, 2, 3, 7, 8, 13, 16, 17, 18, 19, 20, 23, 15

# INTRODUCTION

Rule 23 requires a district court to perform a "'rigorous analysis'" of the record to determine whether plaintiffs satisfy all four elements of Rule 23(a) and all elements of the relevant subdivision of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). Plaintiffs cannot satisfy their burden of proof with mere argument or with *ipse dixit* pronouncements from an expert, even if some opinions of that expert have been determined by the Court to be admissible. *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 n.9 (9th Cir.) (en banc), *cert. denied*, 143 S. Ct. 424 (2022). Rather, Plaintiffs must provide evidence on each element of Rule 23, and the Court must weigh that evidence, along with contrary evidence supplied by the defendant, to determine whether each and every element of Rule 23 is satisfied. *Id.* at 666. Plaintiffs' motion here fails on multiple grounds.

*First*, Plaintiffs do not offer common evidence that would meet the Ninth Circuit's standard for demonstrating antitrust injury in a case of this kind. A plaintiff's inability to provide common proof that permits injury to be established on a class-wide basis without the need for individualized inquiry is the most common failing that leads to denial of class certification, especially in antitrust cases. *See, e.g.*, *Comcast*, 569 U.S. at 35-36; *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (collecting cases). The Supreme Court has stressed that this class-wide proof must address the question of injury in a manner consistent with the law applicable to the legal theory on which Plaintiffs' claims are based. *Comcast*, 569 U.S. at 35-37. Plaintiffs have not satisfied this requirement here, relying solely on an approach that not only ignores the governing law, but has been rejected by the Ninth Circuit.

All of Plaintiffs' claims in this case rest on a common underlying theory: that Intuitive has monopoly power in an alleged "market" for minimally invasive surgical robots that it leverages to force customers to purchase only from Intuitive certain surgical instruments (EndoWrists) used with the robots and service for the robots. Significantly, Plaintiffs do not claim that the monopoly they allege Intuitive has in the "market" for robots is unlawful; rather, their claims – and the alleged injuries to the class – stem solely from the alleged *use* of this power in way that, Plaintiffs assert, has caused class members to pay more than they would have otherwise for EndoWrists and service.

The Ninth Circuit has held that when a defendant facing such a claim sells multiple items to the customer as part of an overall *package* – such as a machine and consumables used with the machine – injury must be determined by considering the prices of all parts of the package, including goods for which prices might *increase* in the absence of the challenged arrangement. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir. 1971). Plaintiffs must thus demonstrate that they can show, through common proof, not just that Intuitive would have charged lower prices for EndoWrists and for service in the "but-for" world, but also that class members would have paid a lower *net* price for the *entire* package they needed to operate a da Vinci surgical program, including the robots as well as the EndoWrists and service. Proving the "but-for" price for the full package is a difficult challenge under any circumstances, but it is particularly so here, where Intuitive negotiates individual pricing with each customer. In this situation, where pricing of the package as a whole is not uniform, there is no way to determine which class members actually suffered injury without hospital-by-hospital inquiries.

Plaintiffs have made no effort to develop and present proof that purports to apply this test on a class-wide basis. Plaintiffs' expert has opined that every putative class member paid higher prices for EndoWrists and da Vinci service than it would have done in the absence of the challenged conduct. But that does not answer the pertinent question. To ascertain whether a challenged "arrangement" caused antitrust injury, all of "the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained." *Id.* Neither Plaintiffs nor their expert have offered any methodology, based on common evidence, that would establish what each customer would have paid in the "but-for" world for the *total price* charged for the entire package of products and services needed to operate a da Vinci surgical program, including the da Vinci robot itself.

Intuitive's expert *has* analyzed this question. And he has done so accepting, *arguendo*, Plaintiffs' expert's opinions about reduced prices of EndoWrists and service in the "but-for" world. His analysis demonstrates that, even if one accepts those opinions as correct, many class members would *not* have been better off in the "but-for" world and many would have been *worse* off. Making those determinations requires individualized analysis of each class member's circumstances. Courts do not hesitate to deny class certification in such situations because (1) predominance under Rule 23(b)(3) cannot be shown where proof of injury presents individual questions that cannot be answered in one

2

stroke; and (2) adequacy of representation under Rule 23(a) cannot be found where an intractable conflict exists between "winners" and "losers" in the but-for world.  *See* Parts I.A-B and II below.

*Second*, Plaintiffs' class definition sweeps in a large number of hospitals whose claims are barred by the statute of limitations, which in this case bars claims earlier than May 21, 2017.  In the Ninth Circuit, if claims are based on contracts, as they are here, the statute of limitations begins to run from the time of contracting.  Simply performing a contract after execution does not restart the limitations period. Plaintiffs' expert treats as class members almost 550 hospitals that signed contracts with Intuitive before May 21, 2017, and they have identified no class-wide proof of conduct after that date that would restart the statute of limitations period for those contracts.  Moreover, although many of those customers also bought additional robots after that date, Plaintiffs have identified no method for determining which EndoWrists were bought for use with the older robots (and must hence be excluded) and which were used with the newer ones.  Plaintiffs' motion is totally silent on this problem.  *See* Part I.C below.

*Third*, the three named plaintiffs cannot satisfy the Rule 23(a) typicality requirement.  One plaintiff is not a member of the class at all; one has released its claims; and the third was able to negotiate away a key contract provision that Plaintiffs claim was "forced" on customers.  *See* Part III.

*Fourth*, an intractable manageability issue arises from the exclusion in Plaintiffs' class definition of "government entities."  This exclusion is necessary because of restrictions on the participation of government entities in private class actions.  But Plaintiffs offer no methodology for identifying which potential class members are "government entities" under applicable state and local laws.  Again, Plaintiffs' motion is totally silent on this problem, even though one of the named plaintiffs, King County Public Hospital District No. 1, DBA Valley Medical Center ("Valley Medical"), has admitted in numerous filings in this case that it is itself a government entity.  *See* Part V below.

Plaintiffs' motion fails to satisfy other requirements for class certification as well, including the superiority requirement of Rule 23(b)(3) and the separate requirements of Rule 23(b)(2) for any injunctive relief class.  *See* Parts IV and VI.  Each of the flaws set out herein is independently sufficient to preclude class certification in this case.

## FACTUAL BACKGROUND

### A. The Proposed Class

Plaintiffs seek to certify a class of thousands of entities that "purchased da Vinci service and EndoWrists from Intuitive in the United States at any time from May 21, 2017 to December 31, 2021." Mot. at 1, 5. "Government entities" are excluded from the class. *Id.* at 1. The proposed class would include both hospitals and outpatient surgery facilities that conduct robotic-assisted surgeries. Ex. 1 ¶ 22.[1] These entities vary in size, geographic location, and the nature and scope of their robotic surgery programs. *Id.* ¶¶ 22-23. Many hospitals are government owned; others are not. *Id.* ¶ 141. Some have large robotic surgical programs, with multiple da Vinci robots performing a wide variety of procedures in multiple locations. *Id.* ¶ 23. Others have only one or two da Vinci robots used for a narrow range of procedures. *Id.* The heterogeneity of Intuitive's customers and their robotic surgery programs creates similar heterogeneity in the contractual arrangements between Intuitive and its customers.

### B. Class Member Purchases from Intuitive

Intuitive's discussions with hospitals that want to operate a robotic surgery program routinely begin with extensive presentations on the costs and benefits of making da Vinci surgeries available. Ex. 3 ¶ 14.[2] The cost analysis these highly sophisticated customers perform includes not only the significant investment in the robot itself but also the ongoing costs for EndoWrists, accessories, and service to operate the da Vinci. *Id.* The pricing for two of these items – EndoWrists and service – are challenged in this lawsuit; the rest are not.

Although Intuitive has a list price for each da Vinci robot, customers acquire robots at different prices, generally ranging from $████ to $████. Ex. 1 at fig. 5; Ex. 2 at 64. The different prices customers pay reflect individualized negotiations, as Intuitive offers discounts off list price based on a variety of customer-specific factors, including the model type, geography, the number of robots the

---

[1] "Ex. __" refers to exhibits appended to the Declaration of Ashley Bass, submitted herewith. Ex. 1 is the expert report of Intuitive's expert, Dr. Hughes. "Elhauge Rep." refers to the expert report of Professor Einer Elhauge submitted by Plaintiffs in support of their Motion. ECF No. 267-2.

[2] This brief uses "robot" or "robotic platform" interchangeably to refer to the hardware components that a hospital must have to perform a robotic-assisted surgery, including the surgeon console, the patient-side cart, and the vision center. A surgeon controls the "robot" at all times during a procedure.

4

customer has purchased, the overall business relationship between Intuitive and the customer, and the customer's planned usage of the robot(s), among other factors. *See* Ex. 2 at 64; Ex. 4 at -053. For example, one named plaintiff, Franciscan Alliance ("Franciscan") received better pricing by purchasing five systems at the same time. Ex. 8 at 37:9-38:25.

In these negotiations, both sides are aware of – and discuss with one another – the expected total financial picture – both costs and benefits – of running a da Vinci program, given the customer's expected use of its robot. Ex. 3 ¶ 14; Ex. 6 at 56:15–58:9. Thus, for example, when Franciscan considered purchasing a da Vinci, it compared the costs of equipment, service, disposables, and instruments against the projected volume of surgeries and insurance reimbursement over five years. Ex. 5 at 105:18-106:2, 106:23-107:9. Other hospitals conducted similar analyses. *See, e.g.*, Ex. 7 at -682 (Intuitive email providing information to assist a customer in comparing capital equipment, service, training, and instrument costs and robot trade-in values). This is a critical element of the negotiation, as other anticipated purchases the customer will make in order to operate the robot as planned, including (among other things) EndoWrists and service, affect the price Intuitive is willing to offer and the customer is willing to pay for an expensive new robot. Ex. 1 ¶ 39. Ultimately, the pricing Intuitive offers, and the customer is prepared to accept, is based on the ***total*** amount the parties expect the customer to pay to establish and operate its da Vinci surgical program, including the cost of the da Vinci robotic platform, service, and instruments and accessories. *Id.* ¶¶ 34-39. Given the highly customer-specific nature of these negotiations, the total prices hospitals pay for the "combination of products and services varies widely by hospital." Elhauge Rep. ¶ 207.

In order to meet customers' individual needs, Intuitive offers customers the ability to acquire a robot in a number of ways, including an outright purchase, a lease with a traditional fixed-payment, or a lease with usage-based pricing. *See* Ex. 2 at 64. Customers take advantage of all of these options. For example, Franciscan and Valley Medical benefitted from substantial discounts when they purchased their robots outright. Franciscan received over $1 million in concessions when it purchased five Xi robots at once in 2016. Ex. 8 at 37:9-38:25. Valley Medical received a $200,000 discount off the Xi list price, discounts on another piece of equipment and for its annual service plans, and the right to trade in an existing robot for $250,000 toward the purchase of a new one. Ex. 9 at 106:2-107:9, 118:6–120:12;

5

Ex. 1 at ¶ 61.  For its part, Larkin Community Hospital ("Larkin") leased its robots with a traditional fixed-payment lease agreement.  Exs. 10 at -351, 11 at -371.  Larkin received hundreds of thousands of dollars in discounts and a reduction in the leases' interest rates.  Ex. 12 at 100:4-15; Ex. 13 at -051; Ex. 1 ¶ 54.

These arrangements represent just a few of the ways in which hospitals negotiate package deals reflecting the combined costs of da Vinci robot acquisition, service, instruments, and other components. In addition, many customers have increasingly been leasing their robots through usage-based pricing agreements with Intuitive.  Usage-based pricing accounted for 14% of total da Vinci placements in 2021; they accounted for over 25% of total placements in 2023.  Elhauge Rep. ¶ 910; Ex. 2 at 77 (355 of 1,370 total systems placed in 2023).  As of December 31, 2023, Intuitive had 1,023 usage-based pricing arrangements with customers.  Ex. 2 at 77.  This approach permits a customer to pay nothing upfront and instead pay a per-use fee each time the da Vinci is used for surgery.  Ex. 14 at 22:2–9.  Negotiations around usage-based packages are highly individualized, reflecting the customer's expected types and volume of procedures.  Elhauge Rep. ¶ 911 & n.2080 ("per-use price" reflects the prices of the robot and service divided by the number of anticipated procedures).  Depending on the package, instruments and service may be purchased separately or may be included in the per-use fee.  Ex. 15 at -446; Elhauge Rep. ¶ 912.

### C.  Plaintiffs' Expert Report

Plaintiffs' motion relies heavily on a new report from their expert, Prof. Einer Elhauge, who assumes, as he did in his prior reports, that, absent the challenged contract terms, Intuitive's prices for both EndoWrists and service, including offerings that no one but Intuitive can provide, would be lower across the board.  Elhauge Rep. ¶¶ 782, 825.  With the exception of Part I.B below, Intuitive's arguments in this Opposition ***take as a given*** these opinions from Prof. Elhauge.  This Opposition instead focuses primarily on critical analyses that Prof. Elhauge failed to perform for purposes of his report in support of class certification.

Intuitive's expert, Dr. Hughes, has identified gaps in Prof. Elhauge's analysis that are critical to class certification questions, including Prof. Elhauge's failure to evaluate what class members would have paid on a package basis in his but-for world for their purchases from Intuitive, considering the

impact on prices for robots as well as those for EndoWrists and service. Dr. Hughes demonstrates that, even accepting the but-for world Prof. Elhauge posits, Plaintiffs cannot establish class-wide antitrust impact through common evidence in this case given the individualized contractual negotiations that would have occurred in the but-for world with each class member. Ex. 1 ¶¶ 14-16, 93-100. He demonstrates why Intuitive would adjust robot prices in Prof. Elhauge's but-for world and how such adjustments would cause many customers (such as those with relatively small procedure volumes) to be worse off on a net basis even if others might be better off. *Id.* Finally, he confirms that Prof. Elhauge does not identify or isolate government entities or those who purchased or leased their da Vinci robotic platforms(s) outside the statute of limitations period. *Id.* ¶¶ 18, 141-44.

## ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. "[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23," which "'does not set forth a mere pleading standard.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Plaintiffs must "actually *prove*" that their proposed class satisfies each of the Rule's requirements. *Olean*, 31 F.4th at 664. Certification is proper only if the Court is satisfied, after a "'rigorous analysis,'" that all of the applicable Rule 23 requirements "'have been satisfied.'" *Comcast*, 569 U.S. at 33. "In many cases, 'that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Dukes*, 564 U.S. at 351). In such a situation, "a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981 (emphasis in original).

"Rigorous analysis" also requires going beyond admissibility findings, including under *Daubert*, to judge "the persuasiveness of the evidence presented." *Id.* at 982. Indeed, "[c]ourts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23." *Olean*, 31 F.4th at 666 n.9 (collecting cases). Thus, contrary to Plaintiffs' suggestion (Mot. at 15), it is error for a court at class certification "to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible." *Ellis*, 657 F.3d at 982.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE.

Under Rule 23(b)(3), a plaintiff in an antitrust action must present evidence of class-wide antitrust impact, showing that common questions on impact predominate over any individualized inquiry. *See Olean*, 31 F.4th at 663-66.  Plaintiffs have failed to do so here.

### A.  Prof. Elhauge Analyzes the Wrong Question on Impact.

In *Chicken Delight*, the Ninth Circuit set forth the standard for establishing antitrust impact in a case, like this one, based on a "tying" theory – *i.e.*, that the defendant used its alleged market power for a highly desirable product (here, the da Vinci robot) to force customers to purchase other products from it. *Chicken Delight*, 448 F.2d at 52.  *Chicken Delight* involved a contractual requirement that franchisees purchase equipment, food items, and packaging exclusively from Chicken Delight as a condition of obtaining a license to the Chicken Delight trademark.  The district court held that plaintiff established antitrust impact solely by showing that there was an "overcharge" on the "tied" equipment, food, and packaging compared to what customers would have paid in a competitive market.  *Id.*

The Ninth Circuit reversed, holding that the district court erred as a matter of law in assessing antitrust impact by considering only the asserted "overcharge" on the tied products and not considering what Chicken Delight would have charged for the tying product (the trademark) in the absence of the contractual arrangement.  As the Ninth Circuit explained:

> Clayton Act recovery is available only where actual injury has been suffered.  The question here is whether the plaintiffs have suffered injury by virtue of the unlawful arrangement to which they were subjected.  That arrangement of necessity involved both tying and tied products.  To ascertain whether an unlawful arrangement for the sale of products has caused injury to the purchaser, the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained.

*Id.* (internal citations omitted).  Although Chicken Delight had provided the trademark license free of charge as part of the challenged contractual arrangement, it was not clear that it would have done so in the absence of that arrangement.  *See id.*  The Ninth Circuit thus remanded for a determination "as to the value of both tying and tied products, free from the tying arrangement."  *Id.* at 53.

As the Ninth Circuit subsequently explained, *Chicken Delight* was an application of the general rule that "[a]n antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it

8

because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367, 1370–74 (9th Cir. 1986). In other words,

> [T]o put the plaintiffs [in *Chicken Delight*] into the position they would have been, absent the illegal tie, the overcharges on the tied items should have been reduced by the amount plaintiffs would have paid for the license in the absence of the unlawful restraint. This court's decision was simply a recognition of the fact that if the defendant had not required the purchase of the equipment and supplies, it would have (legally) charged plaintiffs for the right to use the trademark . . . [W]e directed that the plaintiffs' damage award be reduced by the amount plaintiffs would have paid for the use of the trademark, in the absence of the antitrust violation.

*Id.* at 1370.

Thus, in this circuit, it is an error of law to assess antitrust injury in a tying case without considering the ***totality*** of the price a customer would have paid in the absence of the challenged restraint, including a potentially ***higher*** price for the tying product.[3] This is because in the but-for world, where the challenged tying restriction does not exist, a defendant might make different choices as to how to price the tying product. *Chicken Delight*, 448 F.2d. at 52-53; *see also Metromedia Broad. Corp. v. MGM/UA Ent. Co.*, 611 F. Supp. 415, 426 (C.D. Cal. 1985) ("Simply to show that a noncompetitive price has been paid for the product which is tied is not enough."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 358b (5th ed. 2023) ("[A]n increasing number of courts have held that the purchaser has not been injured in fact … unless it shows that the combined payments for both tying and tied products exceeds their combined fair market value.") (excerpt included in Ex. 25).

Here, Plaintiffs have offered exactly the same kind of analysis that the Ninth Circuit found inadequate in *Chicken Delight*.[4] Their expert offers an opinion on what the price of the allegedly tied products (EndoWrists and service) would have been in the absence of the challenged restraints. But he stops there. Plaintiffs have not provided the Court with any analysis of the ***total*** prices customers would

---

[3] The Ninth Circuit is not alone in requiring injury in a case like this to be assessed on a "package" basis. *See Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*, 2008 WL 3833577, at *6 n.7 (D.N.J. Aug. 13, 2008) (collecting cases showing the 5th, 7th, 9th, and 11th Circuits define antitrust injury this way).

[4] The Court's finding that robots and EndoWrists "occupy separate markets," ECF 287 at 6, has no bearing on this issue. *Chicken Delight* did not turn on which "markets" the tied items were sold in. What matters for purposes of the issue addressed here is that a customer needs to purchase both products, so it is necessary to evaluate the impact on the prices of both in the but-for world.

9

have paid in the "but-for world" for both the tying and tied products, as the Ninth Circuit requires. This would have required Plaintiffs to provide the Court with a rigorous evaluation of what class members would have paid for their da Vinci robots as well as for EndoWrists and service had the challenged restraints not existed. Plaintiffs and their expert have not analyzed that question and thus have no evidence, much less common evidence, of the *net* economic harm that the Ninth Circuit requires them to show. Rather, like the plaintiffs in *Chicken Delight*, Plaintiffs rely solely on their expert's assertion that there was an "overcharge" on the tied products, ignoring any impact on da Vinci robot prices.

Failure to even attempt to conform their analysis to the legal standard applicable in this case is alone fatal to Plaintiffs' class certification motion. *See Comcast*, 569 U.S. at 38 (certification improper where plaintiffs' model for proving injury and damages did not match their theory of liability). Not only have Plaintiffs ignored the controlling standard they must meet to demonstrate antitrust impact, they have made no attempt to show that such an assessment could be made with common evidence across the class. *See Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) (if "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person . . . , common questions do not predominate").

Dr. Hughes *has* analyzed that question in the context of the but-for world posited by Prof. Elhauge and determined that (a) a significant number of customers would *not* have been better off once one takes into account the higher prices they would have had to pay for their robots, (b) some customers would actually have been *worse* off, and (c) identifying the specific impact on any particular customer requires an individualized analysis. Ex. 1 ¶¶ 14-16, 65-99. Dr. Hughes shows, with an individual analysis of specific examples, that some customers would be worse off with the loss of discounts and concessions achieved in connection with their robot acquisitions. *Id.* ¶¶ 93-97 & tbl. 1. In fact, Dr. Hughes demonstrates that the individual damages amounts Prof. Elhauge assigns to over 25% of class members are substantially below the discounts customers typically receive in acquiring just one robot – suggesting that the loss of those discounts would result in many class members paying more for the total package of da Vinci products and services in Plaintiffs' but-for world. *Id.* ¶ 97. The impact is even greater for customers that would have purchased two robots in the class period. *Id.*

Facing similar fact patterns, courts in the Ninth Circuit have often found class certification inappropriate in cases that are subject to the *Chicken Delight* standard, because proof of the "injury in fact" element of the antitrust claim presents individual questions concerning the net economic impact of the tying arrangement on the full package purchased by each customer. *See, e.g.*, *Simon v. AT&T Corp.*, 2001 WL 34135273, at \*9 (C.D. Cal. Jan. 26, 2001) (denying class certification in tying case); *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 121 (C.D. Cal. 1978) (rejecting class certification in part in tying case where common issues did not predominate because applying *Chicken Delight* would require plaintiffs "to show that the total price charged for the entire package was noncompetitive").[5] The same conclusion applies here.

Plaintiffs attempt to avoid this fatal flaw with three sentences in their Motion, citing to three paragraphs that appear at the end of Prof. Elhauge's report. Plaintiffs make no effort to distinguish *Chicken Delight* and its progeny; they simply argue that it should not be necessary to consider the "but-for" price of da Vinci robots because, they say, Intuitive would not have "reduced discounting" on da Vinci robots for **anyone** in the but-for world. Mot. at 22. Plaintiffs claim that Prof. Elhauge demonstrates this through "common evidence and economic theory." *Id.* He does nothing of the kind. Prof. Elhauge undertakes no economic analysis at all in support of this assertion, which flatly defies the most fundamental economic principles. Prof. Elhauge assumes that Intuitive would continue to wield monopoly power over da Vinci robots in the but-for world. Ex. 17 at 41:12-42:4. Given that assumption, there is no reason to believe that Intuitive – the alleged monopolist – would dramatically cut its prices for EndoWrists and service without any effort to make up the difference in the prices for robots, for which Prof. Elhauge says they would have no competition at all.

Prof. Elhauge's own writings confirm that, in his but-for world, Intuitive would have been expected to increase robot prices. Long before he was involved in this case, Prof. Elhauge co-authored a treatise with two respected antitrust commentators, Philip Areeda and Herbert Hovenkamp. Although

---

[5] *See also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1283 n.2, 1286 (11th Cir. 1982) (affirming summary judgment and denial of class certification for failure to show that entire package was noncompetitive in tying case); *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 149 (N.D. Ill. 1980) (denying class certification in part where individualized inquiry was required to determine the terms that would have been available in the but-for world absent the tie).

11

he cites other parts of that book in his report in this case, he ignores the part discussing the analysis mandated by *Chicken Delight* to establish injury in a case like this. According to Prof. Elhauge's book, "in most cases a premium price on the tied product must be accompanied by a reduction in the price of the tying product." Ex. 16 at 413. As a result, the book goes on to say, the *Chicken Delight* court "held that the tied buyer is injured in fact only when it is forced to pay above-market prices for the sum of tying and tied products." *Id.* at 414. Thus, at least when he was not serving as a litigation expert, Prof. Elhauge has acknowledged that a plaintiff "who cannot show increased prices or lower quality in either product ***and in the package*** has not suffered injury." *Id.* (emphasis added).[6]

Prof. Elhauge's core merits opinions in this case reinforce these principles. He opines that Intuitive had "monopoly power" over his defined market of MIST robots during the class period and thus it is likely "Intuitive has the power to charge prices that are substantially above competitive levels." Elhauge Rep. ¶¶ 163, 180.[7] Prof. Elhauge supports his conclusion that Intuitive has monopoly power for robots by pointing to evidence that Intuitive charges different customers different prices. *Id.* ¶¶ 206-07. As a result, he admits that the total price for the "combination of products and services varies widely by hospital." *Id.* ¶ 207. In his deposition, Prof. Elhauge confirmed that in his but-for world, Intuitive would continue to have monopoly power over robots and that customers would continue to view the da Vinci as a "must-have product with 100% penetration among leading hospitals." Ex. 17 at 41:12-42:4, 45:11-46:1. If one accepts these conclusions as true (as this Opposition does for purposes of evaluating class certification), both common sense and established economic theory confirm that in Plaintiffs' but-for world, Intuitive not only ***could*** have adjusted prices for the da Vinci robots, it surely ***would*** have

---

[6] Prof. Elhauge refers to the arrangement in this case as a "price discrimination" tie. Elhauge Rep. ¶¶ 208-09. The current edition of the Areeda treatise explains that it is typical in that kind of arrangement for a seller to offer "a 'fixed,' or durable, product at a price that is lower than the freestanding price it could otherwise charge." Ex. 25 ¶ 1711b.

[7] Plaintiffs' claims rest on the proposition that Intuitive has monopoly power in a market for MIST robots. At trial, Intuitive expects to vigorously contest that proposition. But for purposes of this Opposition, Intuitive instead focuses on the fact that if such monopoly power did exist, as Prof. Elhauge asserts, it would result in pricing changes for da Vinci robots in the but-for world. Similarly, although Prof. Elhauge's class report repeats all of his merits opinions, Intuitive's response here (and Dr. Hughes' report) focuses on issues that bear directly on class certification. Intuitive reserves the right to offer any additional opinions from its experts that may be warranted at the appropriate time.

done so. Ex. 1 ¶¶ 64-92. The net impact of these adjustments on customers requires individualized analysis on a customer-by-customer basis. *Id.* ¶¶ 93-99.

Prof. Elhauge tries to evade this inevitable result of his own opinions, not by offering any rigorous economic analysis of robot prices in the but-for world, but rather by simply asserting that Intuitive would not have raised the pricing of its robots ***for anyone, ever*** in the but-for world. Indeed, he testified that he did no analysis of what the net effect would be in the but-for world if robot prices were higher because he believed such an analysis was "irrelevant." Ex. 17 at 144:20–145:13. He claims to base this assertion on (a) "theoretical" considerations and (b) "empirical evidence." Ex. 17 at 50:11-51:6; Elhauge Rep. ¶ 846. But he can identify no accepted economic theory for the former, and on the latter, he is demonstrably wrong on the facts.

*First*, Prof. Elhauge asserts that Intuitive could not raise robot prices in the but-for world based on a "theoretical" five-factor test he created to establish prerequisites for finding that the pricing of a tying product could be lower in the but-for world; three of his factors, he claims, are absent here. Elhauge Rep. ¶ 675; Ex. 17 at 50:11-51:6. Prof. Elhauge cites no economic literature for his five-factor test; instead, he cites only two of his own ***legal*** publications. Elhauge Rep. ¶ 675 n.1555. Nor was he able to point to any supporting economic literature in his deposition. Ex. 17 at 142:4-20. Unsurprisingly, no published case has ever applied Prof. Elhauge's five-factor test, which is inconsistent with the basic economic principle that *Chicken Delight* recognizes – and which the Ninth Circuit therefore ***requires*** to be considered – *i.e.*, that a rational economic actor forced to adjust the price for one element of a tied package of products ordinarily will be expected to adjust other elements correspondingly. Ex. 1 ¶¶ 65-92.[8]

---

[8] Prof. Elhauge claims he presents his theoretical five-factor test to rebut Intuitive's supposed reliance on the "Single Monopoly Profit" theory in responding to Plaintiffs' claims on the merits. Elhauge Rep. ¶¶ 674-75; *see also* Ex. 17 at 140:6-15 ("The five factors are ones that disprove the Single Monopoly Profit Theory…."). Intuitive's experts have never relied on that theory. Moreover, as Dr. Hughes explains, the theory – which is premised on the notion that a firm with a monopoly in one product cannot increase its monopoly profits by leveraging itself into a second monopoly in another product – is simply irrelevant at this stage, because the key class certification question is not whether Intuitive could have achieved the same overall profits in the but-for world, but rather whether ***every individual buyer*** would have paid lower total prices and so be better off. Ex. 1 ¶ 82; *see generally* ¶¶ 72-83. Even Prof. Elhauge has admitted that "one could imagine scenarios where some consumers wouldn't be harmed" by (continued…)

*Second*, Prof. Elhauge claims that "empirical evidence" supports his conclusion that Intuitive would not raise robot pricing in the but-for world.  Ex. 17 at 50:11-51:6.  The only purported evidence Plaintiffs point to is Prof. Elhauge's assertion that Intuitive lowered Xi da Vinci prices on average in 2020 when Intuitive introduced Extended Use Instruments for Xi systems.  Mot. at 22.  This, they argue, shows that when Intuitive "effectively reduced per-use prices for many Xi EndoWrists through the Extended Use Program in response to competition, Intuitive also lowered Xi da Vinci prices."  *Id.*  But Prof. Elhauge is actually ***wrong*** in saying that Intuitive lowered Xi da Vinci prices when it introduced Extended Use Instruments.  He did no analysis of the data to support this assertion.  Ex. 17 at 53:8-17; Elhauge Rep. ¶¶ 846, 934; Ex. 1 ¶¶ 85-86.  Dr. Hughes ***has*** calculated average prices of da Vinci robots and found that they actually ***increased*** after the Extended Use Instruments were introduced.  For example, the average price of the Xi Single Console model increased from $▮▮▮▮ in 2020 to $▮▮▮▮ in 2021, and the average price of the Xi Dual Console model increased from $▮▮▮▮ in 2020 to $▮▮▮▮ in 2021.  Ex. 1 ¶ 88.  Thus, the only "evidence" that Prof. Elhauge claims underpins his ability to assert that Intuitive would not raise robot pricing in the but-for world shows the ***opposite*** of what he claims.[9]

Even leaving that aside, Prof. Elhauge misses the point entirely:  When Intuitive introduced Extended Use Instruments, it charged ***more*** – not less – for those instruments, and Intuitive's overall revenue and profit increased after their introduction.  Ex. 1 ¶¶ 89 & n.137; 114 n.186.  Nothing about this episode, no matter how interpreted, would support the conclusion that, if Intuitive had the monopoly power for robots that Prof. Elhauge posits, Intuitive would passively accept an over $2 billion ***reduction*** in revenues for service and instruments without any effort to make it up through other portions of the

the alleged tying arrangement even if one were to conclude that "consumers overall are harmed").  Ex. 17 at 132:4-21.

[9] Prof. Elhauge offers generalized assertions that Intuitive has historically lowered robot prices when it lowered EndoWrist and service prices.  *See, e.g.*, Elhauge Rep. ¶¶ 846, 943.  But he offers no actual analysis of the data to demonstrate this; instead, he only cites what appears to be an impressionistic reaction to tables in Dr. Smith's merits report – which he misconstrues, as Dr. Hughes' analysis of the underlying data makes clear.  Ex. 1 ¶¶ 85-88, 92.  Similarly unsupported is Prof. Elhauge's speculation that Intuitive might have lowered robot prices in the but-for world because hospitals would view service as a partial substitute for robots.  Elhauge Rep. ¶ 680; Ex. 17 at 76:19-77:22.  In addition to being unsupported by any actual evidence, this speculation makes no economic sense.  Ex. 1 ¶ 81.

14

package purchased by customers, including robots.  Thus, even if it were true, Prof. Elhauge's "observation" about pricing in 2020 would be irrelevant in pricing for robots in the but-for world he posits.  *Id.* ¶ 89 & n.137.[10]

The Ninth Circuit has made clear that proof of antitrust impact in a case like this must take into account the ***full*** impact of pricing on class members.  Analysis of the contract a hospital would have negotiated with Intuitive in the but-for world, and whether that hospital can demonstrate a net injury requires judging "evidence that varies from member to member," which would overwhelm common issues and render class certification "inappropriate under Rule 23(b)(3)."  *Olean*, 31 F.4th at 663, 669; *see also Simon*, 2001 WL 34135273, at *9-10; *Krehl*, 78 F.R.D. at 121; *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 2023 WL 8936389, at *12–13 (D. Utah Dec. 27, 2023) (declining certification when "a wide variety of different types of purchasers – with varying degrees of bargaining power, distinct product needs, and preferences" negotiated individually to purchase products "in unique configurations").

## B.  Prof. Elhauge's Opinions About EndoWrist and Service Prices Are Insufficient to Carry Plaintiffs' Burden of Proof on Those Elements.

As shown above, even accepting Prof. Elhauge's testimony about the "but-for" prices of EndoWrists and service, Plaintiffs are still unable to demonstrate class-wide impact through common proof, as they are, at best, able to answer only a part of the question.  In fact, Prof. Elhauge's testimony on pricing of EndoWrists and service is insufficient under Rule 23 to answer even that part of the question.  Prof. Elhauge's recent deposition testimony – which was not available to the Court when it made its *Daubert* ruling – makes this particularly clear.

Prof. Elhauge has performed no analysis to address the evidence demonstrating that there was little demand for remanufactured EndoWrists, including because of the uncertainty of their FDA regulatory status.  *See, e.g.*, Ex. 18 at 57:13–58:13 (Larkin doctor referring to remanufactured

---

[10] Plaintiffs may try to argue that whether Intuitive would have charged everyone the same prices for robots in the but-for world as it charged in the actual world is a "factual dispute."  As the Ninth Circuit has made clear, a district court ***must*** "resolve any factual disputes necessary" to determine whether there was common impact to the class, including any related "battle of the experts."  *See Ellis*, 657 F.3d at 982-83; *see also Olean*, 31 F.4th at 666 & n.9.

INTUITIVE SURGICAL, INC.'S OPPOSITION TO                    Case No. 3:21-cv-03825-AMO-LB
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

instruments as "shady").  Rather, Prof. Elhauge simply **_assumes_** that in the but-for world: (a) EndoWrist prices would have been 20% lower and use limits would have been at least 20, resulting in an effective 55% price discount on EndoWrists; and (b) service prices would have been 12% lower.  Elhauge Rep. ¶¶ 821, 825.

Prof. Elhauge bases his EndoWrist pricing assumption on a single document about a potential Intuitive refurbishment program that never came to fruition.  That document does not itself support his assumption, which is inconsistent with the record and with basic economic principles.  *See* Ex. 1 ¶¶ 103-04, 111-12.  This assumption-based approach fails the rigor required by Rule 23.  *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165–66, 173 (C.D. Cal. 2007) (denying certification where plaintiff's expert created a but-for world based not on "meaningful market analysis" but on defendant's internal documents, the probative value of which he did not investigate but "merely assumes").[11]  The same is true of Prof. Elhauge's assumption that EndoWrist use limits would have essentially doubled in the but-for world, which not only ignores the absence of FDA clearance for any such increase, but is based on no economic analysis and relies on a speculative interpretation of a few documents that do not actually support the assumption.  *See* Ex. 1 ¶¶ 113-14.

Fundamentally, Prof. Elhauge's assumption makes no economic sense.  As Dr. Hughes has demonstrated, it would be economically irrational for Intuitive to lower its EndoWrist prices in Plaintiffs' and Prof. Elhauge's but-for world.  Under the competitive pressure that Prof. Elhauge posits, Intuitive would have been better off simply accepting the loss of sales and market share, rather than reducing prices to the level he assumes.  Ex. 1 ¶¶ 103-04.  Prof. Elhauge believes Intuitive would be a rational economic actor, Ex. 17 at 73:17-74:3, yet he offers no explanation for why Intuitive would not have pursued the economically rational option here.

---

[11] Prof. Elhauge's new regression model offers nothing meaningful to the issues here.  Prof. Elhauge claims his regression "confirms that customer-specific factors explain hardly any of the variation in prices" in EndoWrists.  Elhauge Rep. ¶ 869.  In fact, the model mostly just confirms that there historically has not been much variation in EndoWrist pricing, as the variation has instead been concentrated in other parts of the package, such as the robots and service.  Ex. 1 ¶¶ 28, 33, 117.  (He offers no regression model for service prices, which *have* varied significantly.)  His EndoWrist regression model says nothing about what prices Intuitive would have charged for anything in the but-for world.  *Id.* ¶¶ 116-20.

Prof. Elhauge's analysis of service pricing in his but-for world is similarly flawed. In the actual world, only one third party offered any kind of service for da Vinci robots, and the service it could offer was extremely limited, given that critical elements of da Vinci service require proprietary tools that only Intuitive possesses. Ex. 1 ¶¶ 124-25, 140 & n.231. Professor Elhauge nonetheless assumes that hospitals would have paid less for *all* service in the but-for world, regardless of whether competition for the sort of service the customer needed existed – an irrational assumption that lacks any explanation. *Id.* ¶¶ 121-25. Prof. Elhauge also ignores evidence from the plaintiffs about their lack of interest in third party service. *See, e.g.*, Ex. 19 at 55:12–57:12 (Larkin: "I would never have approved that, no."); *see also* Ex. 20 at 39:14–17 (Valley: never "considered using a third party to service any of the da Vinci robots"); Ex. 21 at 26:2–8 (Franciscan: representative could not recall having ever negotiating service agreements with third parties). This further confirms that Prof. Elhauge's assumed price drop would have been irrational. Ex. 1 ¶¶ 17(b), 123.

Intuitive understands that the Court has ruled that Prof. Elhauge's testimony on these points is admissible. ECF No. 231 at 22. Intuitive reiterates its objections to the admissibility of that testimony and reserves the right to appeal that evidentiary ruling. But *admissibility* of expert testimony does not determine whether that testimony is adequate to satisfy a plaintiff's burden under Rule 23. *Olean*, 31 F.4th at 666 n.9; *High-Tech Emp. Antitrust Litig.*, 289 F.R.D. at 582, 586 (admissible expert testimony insufficient to establish class-wide impact).[12] At this stage, the Court must consider whether Prof. Elhauge's opinions, even if admissible, are sufficient to show that the proposed class suffered common injury when weighed against the *full* evidentiary record, including Dr. Hughes' opinions.

The insufficiency of Prof. Elhauge's opinions are particularly clear now that he has admitted that he believes Intuitive would have monopoly power in the but-for world, not just for robots, but also for EndoWrists and service. Ex. 17 at 41:12-42:4. He makes no attempt to reconcile this opinion with his assertion that Intuitive would have dropped its EndoWrist and service pricing dramatically across the board to all customers, even for sales for which it would have no competition whatsoever. For this

---

[12] To the extent the Court considered this expert testimony in denying Intuitive's motion for summary judgment, that would not pre-determine its adequacy to satisfy Plaintiffs' burden under Rule 23. The Court did not grant summary judgment *for Plaintiffs* on these issues; nor would the evidentiary record have permitted such a ruling.

17

additional reason, Plaintiffs have failed to satisfy their obligation to demonstrate that class-wide impact – in this instance even the initial step for what *Chicken Delight* dictates must be a multi-step analysis – can be determined on a class-wide basis through common proof.

### C. Application of the Statute of Limitations Defeats Predominance.

Plaintiffs also cannot establish predominance because application of the statute of limitations to class members' claims will require extensive individualized inquiries.[13]  "Generally, a cause of action accrues and the statute begins to run when [the] defendant commits [the] act that injures" the claimant. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  In this case, the four-year statute of limitations for Plaintiffs' Sherman Act claims runs from the date of the allegedly anticompetitive contracts.  *See Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 693-94 (9th Cir. 1982) (barring tying claim where tying contract was entered into more than four years prior to the action).

The Ninth Circuit has made clear that simply maintaining and performing an allegedly anticompetitive contract is not an overt act giving rise to new claims.  *See Aurora*, 688 F.2d at 694; *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations."); *see also Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015) ("Maintaining and reaffirming prior agreements do not suffice to show an overt act.").  The statute of limitations thus begins to run in this case from the date each class member entered into its contract with Intuitive to obtain its da Vinci robot, as that is the agreement through which Plaintiffs claim that "Intuitive effects its anticompetitive ties."  Mot. at 2.  Plaintiffs filed their complaint on May 20, 2021. ECF No. 1.  Thus, any class members' claims are time-barred if they are based on contracts entered into before May 21, 2017.

This creates individualized issues for two groups of class members.  *First*, the claims of customers who contracted with Intuitive exclusively before the class period are time-barred because the allegedly anticompetitive contracts fall outside the statute of limitations.  Eighty nine class members are

---

[13] Rule 23 factors such as typicality and predominance must consider affirmative defenses as well as the elements of the claims.  *See, e.g.*, *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("Defenses that must be litigated on an individual basis can defeat class certification.").

in this group.  Ex. 1 ¶ 147(a).  Plaintiffs have no evidence that Intuitive committed any class-wide overt acts that would re-start the statute of limitations for all of those customers.  *See Aurora*, 688 F.2d at 694. The handful of communications Intuitive sent to customers about remanufactured EndoWrists or third-party service (Elhauge Rep. ¶ 252 n.582) would not qualify.  Even if these communications constituted overt acts, which they did not, there is no evidence that class members in general received them.  An individualized inquiry would be necessary to determine whether the statute of limitations was re-started as to each class member's claim.

*Second*, 443 customers entered into contracts for separate robot acquisitions both before and after May 21, 2017.  Ex. 1 ¶ 147(b).  Those customers will hold some claims that are time-barred and (possibly) some that are not.  For those customers, it will be necessary to determinate which of their EndoWrist purchases were for use in the older robot(s) – for which any claim would be time-barred – and which, if any, are for the newer robot(s).  Intuitive's transaction data does not address that question, *id.* ¶ 146, and Plaintiffs have not identified any manageable method for doing so.

Given the need for extensive individualized analysis of these issues, applying the statute of limitations to class members' claims defeats predominance.  *See CSE Safeguard Ins. Co. v. Hyundai Motor Am.*, 2024 WL 1832423, at *5 (C.D. Cal. Jan. 12, 2024) (finding that a high number of "multifarious claim-specific" statute of limitations affirmative defense weighs strongly against predominance); *Contos v. Wells Fargo Escrow Co.*, 2010 WL 2679886, at *6–7 (W.D. Wash. July 1, 2010) (predominance not satisfied in part because "the Court would need to undertake individualized factual inquiries to determine whether [the] claims are barred by the statute of limitations").

## II.   PLAINTIFFS CANNOT ESTABLISH ADEQUACY.

Rule 23(a)(4) requires a showing that the representative parties "will fairly and adequately protect the interest of the class."  This requires inquiry into whether the named plaintiffs "have any conflicts of interest with other class members."  *Ellis*, 657 F.3d at 985.  Class representatives cannot establish adequacy when they "claim to have been harmed by the same conduct that benefited" other putative class members.  *Allied Orthopedic*, 247 F.R.D. at 177; *see Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280-81 (11th Cir. 2000) (plaintiffs could not adequately represent class that included those

who benefited from the challenged agreements as well as those who claimed harm from them).[14]

A conflict of interest within the class exists here because, as described above, even if one assumes some class members would have been better off in Plaintiffs' but-for world, others would have been worse off, because they would have paid more ***overall*** for the package of goods and services purchased to run their da Vinci programs. Ex. 1 ¶¶ 15-16, 93-99. Moreover, given that in the but-for world Plaintiffs themselves posit, Intuitive would rationally eliminate or reduce special offers for robot prices, this would likely cause some customers to lose their ability to afford a da Vinci surgical program at all, to the detriment of both themselves and their patients. *Id.* ¶¶ 96, 99.[15]

There is thus an intractable conflict in the class between (a) class members that would have been better off in the but-for world because the lower prices they would pay for EndoWrists and service would outweigh the increased costs of their robots and (b) those that would have been worse off because their net price for the package would have been higher or they could not afford a da Vinci system at all. This is the paradigmatic intra-class conflict that prevents class certification. *See Allied*, 247 F.R.D. at 177 (class including members with opposing interests or who benefit from the same acts alleged to be harmful to other members cannot be certified) (citing *Pickett*, 209 F.3d at 1280).

## III.    PLAINTIFFS CANNOT ESTABLISH TYPICALITY.

Claims or defenses of the named plaintiffs must be "typical" of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Class certification should not be granted if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation omitted). One of the

---

[14] *See also Phillips v. Klassen*, 502 F.2d 362, 366-67 (D.C. Cir. 1974) (plaintiffs could not represent class of employees where the conduct injured some employees and benefitted others); *N. Brevard Cnty. Hosp. Dist.*, 2023 WL 8936389, at *8 (denying class certification in tying case involving medical products and observing that the plaintiff would have "difficulty establishing adequacy because the proposed class is beset with winners and losers"); *AdTrader, Inc. v. Google LLC*, 2020 WL 1922579, at *7 (N.D. Cal. Mar. 24, 2020) (no adequacy where substantial evidence showed plaintiff "benefited from … the same conduct that is alleged to have harmed members of the proposed classes"); *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 557-58 (C.D. Cal. 2011) (no adequacy where some putative class members benefitted financially from the policy challenged by plaintiff).

[15] "With patients and doctors demanding robotic options, hospitals are compelled either to offer them or to forego significant business." Consolidated Am. Class Action Compl. (ECF No. 52) ¶ 30.

proposed class representatives is not in the class; one has released its claim against Intuitive; the third cannot establish a claim under the theory proposed for the class.  At a minimum, there are unique issues and defenses relating to the named plaintiffs' claims that will become a significant focus of any trial.

### A.  Valley Medical Is Not a Member of the Class.

Plaintiffs' class definition has an exclusion for "government entities."  Mot. at 1 n.1.  Plaintiff Valley Medical has repeatedly identified itself in this litigation as a "governmental entity."  *See* ECF No. 35 at 18; ECF No. 262 at 9.  It is by definition therefore not a class member, and so cannot serve as a class representative.  *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) ("A named plaintiff must be a member of the class she seeks to represent.").  Plaintiffs' motion offers no answer to this; if they try to offer one on Reply, it will at a minimum require extensive analysis of Valley Medical's individual circumstances.  Indeed, as shown in Section V below, the necessary exclusion for government entities creates substantial problems for certification more generally.

### B.  Larkin Has Released Its Claims.

Larkin is also not a typical class member, as it owed a large debt to Intuitive that it chose to settle in return for a comprehensive release of all claims.  In 2017, Larkin decided to acquire two da Vinci robots in hopes of developing a new robotic surgical program for which it had recruited two surgeons.  Ex. 22 at 92:25-93:24.  Larkin's program was not successful.  *Id.* at 132:13-133:3.  Larkin did not pay Intuitive for instruments and accessories it purchased, defaulted on its leases, and owed Intuitive almost $850,000 by March 2020.  Declaration of Fredrik Widman ("Widman Dec.") ¶ 2.  Intuitive sued for and the parties agreed on a payment plan.  *Id.*  But Larkin defaulted a second time.  *Id.* ¶ 3.  In February 2024, Larkin and Intuitive entered into a settlement agreement pursuant to which Larkin agreed to pay Intuitive almost $         in settlement of the amounts still owed.  *Id.*  In language proposed by Larkin, the settlement resolved "all pending disagreements and claims between" Larkin and Intuitive, who released each other "from all claims, liabilities and obligations of any kind."  *Id.* Ex. 1 at 1.  There was no carve-out for Larkin's claims in this litigation.  *Id.*  Larkin has thus settled its claims against Intuitive.  Even if Larkin were now to argue that it did not intend to release its claims in this case, that issue would be unique to Larkin and would preoccupy Larkin at the trial, compromising its ability to represent the class.  This issue renders Larkin both atypical and inadequate as a class representative.  *See, e.g.*, *Easton*

21

*v. Wells Fargo & Co.*, 2023 WL 6194043, at *8 (C.D. Cal. Aug. 18, 2023) (named plaintiff was not an adequate representative because she "released her claims under previous settlements, and therefore cannot advocate for or protect the interests of the class").

### C. Franciscan Had the Ability to Avoid the Challenged Contract Terms.

Plaintiffs assert that "Intuitive effects its anticompetitive ties through contract language it imposes on all its customers." Mot. at 2. But Franciscan objected to a key term Plaintiffs challenge and was able to negotiate a contract ***without*** that term. *See* Ex. 23 at -151 (proposing revision to delete provision that would have prohibited it from permitting an unauthorized third party to modify or alter its da Vinci system or instruments, including EndoWrists); Ex. 24 at -315 (final version omitting the clause). That provides Intuitive a unique defense to Franciscan's claims: Franciscan's success in rejecting a purportedly anticompetitive contract provision undercuts the notion that Franciscan was unlawfully coerced into agreeing to any of the challenged contract terms. Its claims are not "typical" of those asserted for the class.

### D. All Named Plaintiffs Lacked Interest in Third-Party EndoWrists and Service.

The named plaintiffs' claims are also not typical due to the named plaintiffs' lack of interest in third-party EndoWrists and service. None of the three named plaintiffs used modified EndoWrists or third-party service. To the contrary, the record shows that these three plaintiffs had significant concerns about remanufactured EndoWrists, including because of the uncertainty of their FDA regulatory status, and had no interest in using third parties for service. *See* p. 17 above. While the Court did not find this a sufficient basis to grant summary judgment against Plaintiffs (ECF No. 232 at 26-27), it is nonetheless going to be an important issue at trial. Given that Plaintiffs' claims are premised on the notion that there would have been huge demand from hospitals for remanufactured EndoWrists and da Vinci service, sufficient to force Intuitive to make substantial and universal downward adjustments in its prices, the fact that the named plaintiffs themselves were reluctant to use these products and services renders their claims not typical of the purported claims of the class. This question could be resolved as to each Plaintiff only by close examination of evidence relating to that Plaintiff – including its process for evaluating non-price considerations, such as safety and regulatory requirements, and its risk tolerance where such issues were open to question (as was clearly the case here). Typicality is not satisfied where

22

there will be a need to focus on such plaintiff-specific issues. *Hanon*, 976 F.2d at 508.

## IV.    PLAINTIFFS CANNOT ESTABLISH SUPERIORITY.

Plaintiffs also cannot demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating [this] controversy." Fed. R. Civ. P. 23(b)(3). The superiority requirement "requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *as amended*, 273 F.3d 1266 (9th Cir. 2001). This is not a "small dollar" case where superiority is apparent. As in *Zinser*, class members hold sizeable asserted damages claims: Prof. Elhauge estimates total damages greater than $58,802 for at least 95 percent of class members, with totals ranging as high as $12,392,910. *Compare* Elhauge Rep. at tbl. 28 *with Zinser*, 253 F.3d at 1190–91 (finding no persuasive evidence of superiority where each plaintiff's claim was valued at $50,000 or more). Individual class members have sufficient economic incentive to bring their claims individually. *See Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 471 n.8 (9th Cir. 2023). This is particularly important where, as here, class adjudication would be unmanageable because each class member would need to individually litigate "numerous and substantial separate issues." *Zinser*, 253 F.3d at 1192; *see also Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 248 (C.D. Cal. 2007) ("The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action.").

## V.    PLAINTIFFS HAVE IDENTIFIED NO MANAGEABLE WAY TO EXCLUDE GOVERNMENT ENTITIES FROM THE CLASS.

Plaintiffs' (necessary) exclusion of "government entities" from their proposed class (Mot. at 1 n.1) precludes certification because Plaintiffs have identified no method to identify the Intuitive customers that are government entities, thus rendering the class unmanageable. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127–28 (9th Cir. 2017) (administrative burdens of a class action impact "the manageability criterion of the superiority requirement" of Rule 23(b)(3)); *In re SFPP Right-of-Way Claims*, 2017 WL 2378363, at *14 (C.D. Cal. May 23, 2017) (refusing to certify class where membership turned on individualized, threshold legal determinations).

Even though Plaintiffs' class definition has an exclusion for **all** "government entities," Prof. Elhauge, at counsel's instruction, excluded from his analysis only hospitals run by the Departments of Defense and Veterans Affairs. Ex. 17 at 107:20-108:12. For example, although named plaintiff Valley Medical has admitted repeatedly in this litigation that it is a "governmental entity" (ECF No. 35 at 18; ECF No. 262 at 9), Prof. Elhauge did not exclude Valley Medical from his damages calculations. Elhauge Rep. at tbl. 9. Like Valley Medical, many hospitals Plaintiffs currently treat as included in the class are government entities, such as Ohio State University Hospital and University Health in San Antonio, Texas. Ex. 1 ¶¶ 141-43; *see Shelton v. Ohio State Univ. Med. Ctr.*, 2007 WL 756702, at *1 (S.D. Ohio Mar. 8, 2007) ("The Ohio State University Medical Center is an arm of the State of Ohio[.]"); *About University Health*, www.universityhealth.com/about-us ("Doing business today as University Health . . . we are a separate governmental entity and a political subdivision of the State of Texas.").

Hundreds of hospitals in the United States are considered government entities, but there is no single accepted test for evaluating that status, much less determining it readily. Ex. 1 ¶¶ 142-44. It is not feasible to analyze the websites, public statements, chartering documents, statutes, and other sources that might establish the status of each of those entities, particularly when there will likely be discrepancies in potential data sources.[16]

Plaintiffs could not solve this problem by eliminating the exclusion of state and local government hospitals. The exclusion is necessary because the Eleventh Amendment does not permit a federal court to include state entities in a certified class without their affirmative consent, and many state and local governments are in any event precluded by law from participating in a class action in which they would be represented by private counsel. *Walker v. Liggett Grp., Inc.*, 982 F. Supp. 1208, 1209–11 (S.D. W. Va. 1997); *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *7 (E.D. Mich. Apr. 30, 2015); *see Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1160 (9th Cir. 2021) (state hospitals

---

[16] Although the American Hospital Association categorizes hospitals as government- or non-government controlled entities, Dr. Hughes has identified discrepancies between AHA categorizations and hospitals' own information. Ex. 1 ¶¶ 143-44.

1
2
3
4

covered by Eleventh Amendment).[17]  This problem cannot be solved through reliance on the Rule 23 opt-out process – these considerations preclude government entities, including many government-owned hospitals, from being included within the definition of a certified class.  *Walker*, 982 F. Supp. at 1211; *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *6.

## VI.    INJUNCTIVE RELIEF "RESPECTING THE CLASS AS A WHOLE" WOULD NOT BE APPROPRIATE.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

The Court should also decline to certify Plaintiffs' proposed class under Rule 23(b)(2).  *First*, Plaintiffs' failure to establish the adequacy and typicality prerequisites of Rule 23(a), as shown above, precludes certification of any class.  *Second*, for many of the same reasons discussed in Sections I.A and II above, antitrust impact suffered by class members turns on the individual negotiations and terms of each contract.  Not all class members would benefit from injunctive relief that barred the challenged contract terms, and some would actually be harmed.  As a result, Plaintiffs cannot show that injunctive relief "is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); *see also, e.g.*, *Consolidate Fiberglass Prod. Co. v. Gemini Ins. Co.*, 2011 WL 13180451, at *5 (S.D. Cal. Feb. 4, 2011) (plaintiffs are not entitled to indivisible relief when the issue of whether contract terms are lawful "may require individualized inquiries into the circumstances surrounding each contract").  *Finally*, Plaintiffs have not satisfied Rule 23(b)(2) because they provide no specificity as to the injunctive relief they seek.  *See N. Brevard Cnty. Hosp. Dist.*, 2023 WL 8936389, at *15 (denying certification where plaintiff's motion lacked "any 'reasonably particular detail' as to the injunctive relief sought").

### CONCLUSION

20
21

For the reasons set forth above, the Court should deny Plaintiffs' motion for class certification.

22
23
24
25
26
27
28

---

[17] Among other things, in many states only the Attorney General may represent state entities.  *See, e.g.*, Cal. Gov't Code §§ 11040, 11042; Minn. Stat. § 8.06; Tex. Gov't Code § 402.0212. Sorting through the whole list of class members to determine which ones are subject to these or other restrictions limiting their ability to participate in a private class action, represented by private counsel, would require the Court to analyze and apply the laws of all 50 states.  *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("Because the law of multiple jurisdictions applies . . . variances in state law overwhelm common issues and preclude predominance for a single nationwide class.").

Dated:  August 2, 2024                    By: */s/ Sonya D. Winner*

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLING LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Ashley E. Bass (*pro hac vice*)
Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 Tenth Street NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 6291
Email: abass@cov.com
Email: alazerow@cov.com

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

INTUITIVE SURGICAL, INC.'S OPPOSITION TO                    Case No. 3:21-cv-03825-AMO-LB
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Allen Ruby (SBN 47109)
allen@allenruby.com
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*