# ATTACHMENT 3

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION | **Case No. 3:21-cv-03825** |

## EXPERT REBUTTAL REPORT OF
## JAMES W. HUGHES, PH.D.

### AUGUST 2, 2024

### HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## CONTENTS

I.  Introduction ............................................................................................................. 1

    I.A.  Qualifications ................................................................................................. 1

    I.B.  Assignment ..................................................................................................... 2

    I.C.  Allegations in this Case .................................................................................. 2

    I.D.  Summary of Opinions .................................................................................... 3

II.  Background ............................................................................................................. 8

    II.A.  Intuitive and the da Vinci Surgical Program ................................................ 8

        II.A.1.  Intuitive's Customers ....................................................................... 9

        II.A.2.  Components Required for Operating a da Vinci Surgical Program .......... 11

    II.B.  Hospitals and Intuitive Consider the Total Cost of Offering Robotic-Assisted Soft Tissue Surgery ....................................................................................................... 23

    II.C.  Intuitive Offers a Number of Different Pricing Models to Hospitals Who Want to Offer Robotic-Assisted Soft Tissue Surgery ..................................................... 29

        II.C.1.  Purchases ....................................................................................... 30

        II.C.2.  Leasing Arrangements .................................................................... 30

        II.C.3.  Accelerated Minimally Invasive Surgery Program ("AMP") ............ 31

    II.D.  Intuitive Negotiates the Structure and Pricing Based on the Needs of Each Customer ................................................................................................................. 32

    II.E.  Named Plaintiffs .......................................................................................... 35

        II.E.1.  Larkin Community Hospital ........................................................... 35

        II.E.2.  Franciscan Alliance, Inc. ................................................................ 37

        II.E.3.  Valley Medical Center .................................................................... 39

III.  Professor Elhauge Has Not Properly Analyzed Whether the Challenged Arrangement Caused Injury to Class Members .................................................................... 43

    III.A.  Professor Elhauge Is Wrong to Focus Only on EndoWrist and Service Pricing ..... 44

    III.B.  Assessing Injury in the But-For World Would Require Individualized Inquiry ...... 57

IV.  Even Focusing Only on EndoWrists, Professor Elhauge Assumes—Rather than Demonstrates—Injury Across the Class .............................................................. 67

    IV.A.  Professor Elhauge Fails to Show that Demand for Third-Party Remanufactured EndoWrists Would Have Been Sufficient to Compel Intuitive to Reduce Its EndoWrist Prices ........................................................................................................ 68

    IV.B.  Empirical Evidence Shows that Few Customers Have Taken Up Remanufactured Instruments ............................................................................................................... 72

    IV.C.  Professor Elhauge's Analysis Depends on Prices Decreasing to Levels that Are Unsupported and Inconsistent with Economic Reasoning ....................................... 77

IV.D.   Professor Elhauge's EndoWrist Pricing Regression Is Irrelevant to the Question of Class-wide Injury ...................................................................................79

**V.    Professor Elhauge's Claim that Prices Across All System Service Would Have Been 12 Percent Lower in a But-For World Has No Economic Basis ...................................82**

V.A.    Customers Must Continue to Purchase Proprietary Service from Intuitive in Any But-For World Suggested by Plaintiffs, and Intuitive Would Have Been Incentivized to Offer Different Prices for Proprietary and Non-Proprietary Services ...................................................................................................................84

V.B.    Intuitive's Service Plans Are Cost-Saving for Numerous Customers, Even if One Assumes Price Reductions on Time and Materials ...................................88

V.C.    Because Customers Choose System Servicing Options Based on Factors in Addition to Expected Costs, More Offerings from Third Parties Does Not Imply that There Would Be Sufficient Demand to Induce Intuitive to Change Its Pricing Model ...................................................................................................................94

**VI.   Professor Elhauge Includes in the Proposed Class Entities that Are Designated as Public or Government-Controlled ...................................................................97**

**VII.  Professor Elhauge Includes Class Members that Acquired Da Vinci Surgical Robots Prior to the Class Period.........................................................................100**

**Appendix A : Curriculum Vitae .......................................................................104**

**Appendix B : List of Recent Testimony .........................................................116**

**Appendix C : Materials Considered................................................................118**

**Appendix D : Supplemental Tables .................................................................126**

**Appendix E : Supplemental Figures for Robots .............................................129**

**Appendix F : Supplemental Figures for System Service................................133**

Figure 1: Annual Number of Da Vinci Procedures in the U.S., 2000–2023 ................................. 9

Figure 2: Number of Hospitals with One or More Active Da Vinci Robots, 2012–2023 ........... 10

Figure 3: U.S. Da Vinci Robot Placements by Model, 2015–2023................................................ 13

Figure 4: U.S. Incremental Da Vinci Robot Purchases and Leases, 2015–2023......................... 14

Figure 5: Incremental Purchase Prices, Da Vinci Xi Robot with a Single Console, 2015–2023 . 16

Figure 6: Instrument Sales for Da Vinci X/Xi and S/Si Robots, 2012–2023 .............................. 17

Figure 7: Share of Instruments Sales by Category, 2012–2023..................................................... 19

Figure 8: Da Vinci Service Plan Options in 2019......................................................................... 20

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Figure 9: Number of Da Vinci Surgical Robots by Type of Service Revenue, 2012–2022 ......... 21

Figure 10: Range of Annual Prices for DV Complete Care, Da Vinci Xi, 2015–2021 ............... 22

Figure 11: Expected Lifetime Margin .......................................................................................... 26

Figure 12: Dimensions of Lifetime Margin ................................................................................. 27

Figure 13: Baseline Lifetime Value for Example Hospital .......................................................... 28

Figure 14: Pricing Scenarios and Their Implications on Lifetime Value ..................................... 28

Figure 15: Volume of Da Vinci Procedures by Procedure Type—Larkin, 2015–2023 .............. 37

Figure 16: Volume of Da Vinci Procedures by Procedure Type—Franciscan, 2012–2023 ......... 39

Figure 17: Volume of Da Vinci Procedures by Procedure Type—Valley Medical, 2012–2023 . 43

Figure 18: Number of Customers Purchasing Remanufactured EndoWrists from Third Parties
and Customers Purchasing New EndoWrists from Intuitive in the U.S., 2018–2021 ................. 73

Figure 19: Intuitive's Monthly Net Sales of 8mm Monopolar Curved Scissors on S/Si Platforms
(January 2021–March 2024) ........................................................................................................ 75

Figure 20: Average Net Price Paid for S/Si Monopolar Curved Scissors (January 2021–March
2024) ............................................................................................................................................ 76

Figure 21: Incremental Purchase Prices, Da Vinci Si Robot with a Single Console, 2015–2018
..................................................................................................................................................... 130

Figure 22: Incremental Purchase Prices, Da Vinci X Robot with a Single Console, 2017–2023
..................................................................................................................................................... 131

Figure 23: Incremental Purchase Prices, Da Vinci Xi Robot with Dual Consoles, 2015–2023 . 132

Figure 24: Range of Annual Prices for DV Complete Care—Da Vinci S, 2012–2017.............. 133

Figure 25: Range of Annual Prices for DV Complete Care—Da Vinci Si, 2012–2021 ............ 134

Figure 26: Range of Annual Prices for DV Complete Care—Da Vinci X, 2018–2021 ............. 135


Table 1: Package Pricing Analysis for Six Customers ................................................................. 63

Table 2: Expected System Service Costs Under Time & Materials, DV Complete Care, and Time
& Materials with Assumed Price Reductions for ███████████████ and ███████████
███████████ .......................................................................................................................... 92

Table 3: Package Pricing Analysis Based on Contracted Price for the But-For Robot Price..... 126

Table 4: New and Remanufactured EndoWrist Sales in the U.S., 2018–2021........................... 128

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# I.     INTRODUCTION

## I.A.     QUALIFICATIONS

1.  I am the Thomas Sowell Professor Emeritus of Economics at Bates College. I specialize in the fields of Industrial Organization, Law and Economics, Health Economics, Environmental Economics, and Labor Economics. I earned my M.A. in Economics from Boston University in 1978, and my Ph.D. in Economics from the University of Michigan in 1987. I joined the faculty of Amherst College in 1987 and the faculty of Bates College in 1992. In 2005, I was named the Thomas Sowell Professor of Economics at Bates College. In 2020, I was granted emeritus status upon my retirement from the College.

2.  I have experience in the economic analysis of class certification issues, damages, and calculating economic harm in antitrust actions, with a particular focus on life sciences and healthcare matters. I have testified and offered reports on hospital pricing in the State of Maine. I have testified and/or offered reports in matters involving the prescription pharmaceuticals Actos, Avandia, Cardizem CD, Celexa and Lexapro, Cipro, EpiPen, Exforge, Intuniv, Lamictal, Lidoderm, Lipitor, Loestrin, Namenda, Neurontin, Nexium, Niaspan, Opana, Procardia XL, Provigil, Restasis, Rezulin, Risperdal, Skelaxin, Thalomid and Revlimid, Tracleer, Truvada, Xyrem, and Zetia. I have offered reports and testimony in cases involving pharmacy retail pricing. I have also analyzed issues of injury and damages in multiple pharmaceutical average wholesale price ("AWP") litigation cases. I submitted reports in AWP actions in the states of Alabama, Connecticut, Illinois, Montana, Nevada, New Jersey, and similar relator actions in Florida. Further, I have testified in a class certification matter involving the pharmacy benefit manager Medco Health Systems.

3.  My curriculum vitae is attached as **Appendix A**, and a list of recent cases in which I have testified is attached as **Appendix B**. I am being compensated at my usual rate of $1,150 per hour for work conducted in this matter. Research and analysis for this report was also performed by Brattle Group personnel under my direction and guidance. My compensation in this matter is not

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

contingent on the nature of my findings or on the outcome of this litigation, and I have no financial interest in the outcome of this litigation.

### I.B.    ASSIGNMENT

4.  I have been asked by counsel for Intuitive Surgical, Inc. ("Intuitive") to review and analyze, from an economic perspective, certain aspects of the June 6, 2024 expert report of Professor Einer Elhauge submitted by Plaintiffs in support of their motion for class certification.[1] Specifically, I have been asked to evaluate Professor Elhauge's statements and conclusions relating to the question of injury resulting from the challenged conduct, including his opinions concerning class-wide injury and damages. By not addressing other aspects of Professor Elhauge's expert report, I should not be understood to agree with his other opinions.

5.  A list of the materials that I considered in forming my opinions in this Report is provided in **Appendix C**.

6.  My work in this matter is ongoing. I reserve the right to supplement my analyses and conclusions should any additional information be provided to me after the submission of this Report.

### I.C.    ALLEGATIONS IN THIS CASE

7.  I understand that Plaintiffs assert that Intuitive has entered into allegedly anticompetitive contractual arrangements with its customers based on allegations that Intuitive has tied the purchase or lease of a da Vinci robot to the customer's agreement to purchase replacement EndoWrists and system service from Intuitive.[2] Specifically, Intuitive has allegedly "instituted and enforced restraints that a) prohibit da Vinci buyers and lessees from using IRCs [independent

---

[1]   Class Certification Expert Report of Professor Einer Elhauge, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, June 6, 2024.
Professor Elhauge submitted a corrected report on July 13, 2024. References in my Report are to his corrected report. *See* Corrected Class Certification Expert Report of Professor Einer Elhauge, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, July 13, 2024 ("Elhauge Class Report").

[2]   Consolidated Amended Class Action Complaint, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, September 10, 2021 ("Amended Complaint"), ¶¶ 3–4.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

repair companies] to service the da Vinci or to repair EndoWrists, b) require da Vinci buyers and lessees to buy replacement EndoWrists from Intuitive instead of allowing them to be repaired, and c) artificially suppress the number of times a buyer/lessee can use an EndoWrist."[3] Plaintiffs claim that but-for the contractual arrangement, all or virtually all putative class members would have paid less for EndoWrists and service in the absence of the challenged contractual arrangement.[4]

8.   Plaintiffs' proposed class is defined as:

   "All entities that purchased da Vinci service and EndoWrists from Intuitive in the United States at any time from May 1, 2017, to December 31, 2021."[5]

9.   Plaintiffs propose to exclude "government entities" from the class.[6]


### I.D.    SUMMARY OF OPINIONS

10.  I find that the fundamental issues of injury and damages to members of the proposed class cannot be evaluated on a class-wide basis, and that a substantial number of the proposed members of the class have not suffered any economic injury from the alleged contractual arrangement that Plaintiffs challenge, even assuming the truth of Plaintiffs' allegations.

11.  For purposes of this analysis, I have been asked to assume as given Professor Elhauge's conclusions that there is a relevant market for minimally invasive soft-tissue ("MIST") surgical robots and that Intuitive has monopoly power in that market. I have not been asked to analyze such questions, and none of my opinions in this Report require them to be rejected. I have assumed the truth of Plaintiffs' allegations, and I am not expressing an opinion that the allegations are in any way valid.

---

[3]   Elhauge Class Report, ¶ 3.

[4]   Amended Complaint, ¶¶ 6, 8.

[5]   Plaintiffs' Notice of Motion for Class Certification and Memorandum of Points and Authorities, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, June 6, 2024, p. 1, fn. 1.

[6]   Plaintiffs' Notice of Motion for Class Certification and Memorandum of Points and Authorities, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, June 6, 2024, p. 1, fn. 1.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

12. For my analyses provided in Section III of this Report, I have been asked to assume the accuracy of certain other opinions Professor Elhauge has offered concerning pricing of EndoWrists and da Vinci service in the but-for world. I have also evaluated the validity of those conclusions and disagree with them, as explained in Sections IV and V below.

13. A summary of my conclusions, and the bases for them is as follows:

14. Professor Elhauge has not demonstrated that there is common evidence to establish that each class member suffered injury from the alleged anticompetitive conduct. Professor Elhauge's analysis, which focuses only on the price of EndoWrists and system service in the but-for world, even if accepted as correct, cannot demonstrate that class members suffered injury from the alleged anticompetitive conduct. His analysis ignores that the putative class members purchase a package of goods from Intuitive, which includes the da Vinci robot, EndoWrists, additional instruments and accessories, and system service. Reducing pricing on certain components of Intuitive's package of products in the but-for world, such as EndoWrists and system service, as Professor Elhauge posits would lead Intuitive to adjust its pricing on other components, such as da Vinci surgical robots,[7] where Professor Elhauge assumes Intuitive is the only manufacturer in the but-for world. Professor Elhauge's assumption that Intuitive would not adjust the pricing of other components that customers must purchase from Intuitive to operate the system, such as the robot, makes no economic sense and is in fact contrary to the academic literature. Nor has Professor Elhauge accounted for the fact that no common data exists to assess package pricing in the but-for world, given that the prices that Intuitive charges for certain components like robots are the result of individualized contractual negotiations with customers and vary widely as a result. Determining what such pricing would have been in the but-for world would require an individualized assessment, customer by customer, of how these contractual negotiations would lead to different results in the but-for world. Thus, Professor Elhauge has not demonstrated class-wide injury in this case through common evidence.

---

[7] Throughout this report, I use the term "robot" and "system" interchangeably to denote the part of Intuitive's portfolio that Intuitive and hospitals view as capital expenditures, which include the console where the surgeon sits during a procedure, the patient side table and cart that includes the arms that the surgeon controls to perform surgery, and the vision cart. "Robot" and "system" in this Report do not include instruments such as EndoWrists, accessories, or service.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

15. Moreover, consistent with predictions from the academic literature, in a but-for world without the contractual arrangement, it would be expected that some class members would be better off on an overall basis, some would be about the same, and some would be worse off. For example, hospitals that conducted a lower volume of da Vinci surgeries and consequently purchased relatively few EndoWrists would be expected to be worse off in the but-for world if Intuitive were to increase the net price of the da Vinci robot to those customers. These hospitals would be worse off because any savings that Professor Elhauge finds for such a customer for EndoWrists and system service due to their low purchase volume would likely be less than any increased price the customer would have to pay on its da Vinci robot in the but-for world. And, of course, the opposite could be true. Hospitals that conducted a higher volume of da Vinci surgeries and thus purchased a relatively large number of EndoWrists would be expected to be better off in the but-for world even if Intuitive were to reduce the discounts on the da Vinci robot to those customers. These hospitals would be better off because the larger savings that Professor Elhauge finds for such a customer as to EndoWrists and system service due to its high purchase volume would likely be more than any increased price the customer would have to pay on its da Vinci robot in the but-for world.

16. I have demonstrated below examples of such likely effects on actual putative class members. Under reasonable assumptions about Intuitive's discounting practices for the da Vinci robot in the but-for world, the $███ in concessions for one robot acquisition could have entirely wiped out the damages calculated by Professor Elhauge for over 25 percent of proposed class members and, in many cases, they would have been worse off in the but-for world. The $███ in concessions for two systems would eliminate damages for more than half of proposed class members. These examples demonstrate that under reasonable assumptions about robot discounting in the but-for world, a large share of the class would have no injury. As I further show, an assessment of potential injury on a package basis in this case would require an individualized analysis to determine which hospitals would have been better off without the tying arrangement, which would have been worse off, and which would not have been injured either way.

17. My opinions above accept at face value the assumptions underlying Professor Elhauge's assertion that EndoWrists and system service would be priced lower in the but-for world.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

However, it is also my opinion that these assumptions are not supported by the record or economic theory:

a.  For EndoWrists, Professor Elhauge assumes Intuitive would lower EndoWrist prices by 20 percent or more across *all* EndoWrists in a but-for world without Intuitive's contractual restraints, regardless of the number of customers that would purchase remanufactured EndoWrists. There is no economic reason why Intuitive would take such price action in the but-for world on EndoWrists. Here, the evidence indicates that numerous hospitals likely would continue to purchase EndoWrists from Intuitive even in the absence of the contractual arrangement. In addition, empirical evidence of sales of remanufactured EndoWrists indicates that few customers made such purchases. Thus, there is no economic reason to believe that demand for remanufactured EndoWrists in the but-for world would be large enough to elicit the large, across-the-board price decrease that Professor Elhauge posits.

b.  For system service, Professor Elhauge assumes that third-party service providers would lead Intuitive to lower its servicing prices by 12 percent in the but-for world, regardless of whether such service providers could match the scope and quality of Intuitive's services. But it is undisputed that third-party providers cannot provide the same range of services as Intuitive at any price, because third parties are unable to perform proprietary services that are critical to operating a da Vinci surgical program. Most hospitals purchase service packages including both proprietary and non-proprietary services. Third-party service providers cannot match such offerings at any price. Yet, Professor Elhauge posits that Intuitive would drop its service prices by 12 percent both for proprietary and non-proprietary service. There is no economic reason why Intuitive would have done so, even crediting Professor Elhauge's assertion that Intuitive charged the same hourly rate historically for both proprietary and non-proprietary service. Thus, there is no economic reason to believe that demand for the limited non-proprietary service that third parties could provide would be a sufficient competitive threat to elicit the large, across-the board price decreases on system service in the but-for world that Professor Elhauge posits.

18.  In addition, I find that Professor Elhauge has not properly excluded all government entities from his analyses as required by the class definition in this case, nor has he set forth a methodology for applying the exclusion with common evidence. Instead, Professor Elhauge followed an

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

instruction from Plaintiffs' counsel to exclude only military and veterans' hospitals.[8] For example, Professor Elhauge has included in the proposed class Named Plaintiff Valley Medical Center, even though that Plaintiff has admitted in this litigation that it is a government entity. However, I am not aware of any common evidence that would allow Plaintiffs to identify all hospitals that are government entities. As I discuss in more detail in Section VI, even data provided by the American Hospital Association ("AHA") is imperfect and would not permit Professor Elhauge to identify government entities without extensive individualized inquiries about each hospital so characterized by the AHA. These are issues Professor Elhauge ignores in his analysis.

19.  In addition, Professor Elhauge includes in the proposed class customers that purchased or leased da Vinci robots before May 21, 2017, which I understand from counsel is relevant to whether the putative class members' claims are timely under the relevant statute of limitations.

   a.  Professor Elhauge includes in the proposed class at least 89 customers that only acquired their da Vinci robots before May 21, 2017 and did not enter into contracts to acquire new da Vinci robots after that date.[9]

   b.  Professor Elhauge includes in the proposed class at least 443 customers that acquired at least one da Vinci robot before May 21, 2017 and at least one robot of the same model after that date.[10] It is not possible to determine from Intuitive's transactions data which EndoWrists were used with which systems because instrument sales are assigned to a customer, not a specific system.

---

[8]  Elhauge (7/24/2024) Dep. Tr. 107:20–108:12 ("Q. Other than military or veterans hospitals, did you exclude anyone else on the basis of this government entity's exclusion in the class definition? A. No, my understanding from plaintiffs' counsel is by 'government entities' they meant military or veterans hospitals. Q. So the – basically, the plaintiffs' counsel instructed you that 'government entities' meant military or veterans hospitals, and you took that instruction and only based your analyses off of excluding military and veterans hospitals; is that correct? A. Yes, I'm relying on their definition of the class.").

[9]  *See* Elhauge EW Damages by System Purchase Date Workpaper.

[10]  *See* Elhauge EW Damages by System Purchase Date Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## II.    BACKGROUND

### II.A.    INTUITIVE AND THE DA VINCI SURGICAL PROGRAM

20. Since releasing the first da Vinci in 1998, Intuitive has launched six additional system models: the S in 2006, the Si in 2009, the Xi in 2014, the X in 2017, the SP in 2018, and da Vinci 5 in 2024, each offering additional features or value.[11] Figure 1 shows the growth in da Vinci procedures in the U.S. since its launch in 1998. The volume of da Vinci procedures has grown from "several thousand" in 2001[12] to over 1.5 million in 2023 and is used for a variety of procedure types including urology, gynecology, and general surgery.[13] The vertical lines in the figure correspond to the year when subsequent generations of the da Vinci Surgical System were released.

---

[11] "Sustainability Report 2020," Intuitive Surgical, Inc., 2020, pp. 6-7, accessed July 2024, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/2020-intuitive-sustainability-report.pdf. *See also* "Intuitive Announces FDA Clearance of Fifth-Generation Robotic System, da Vinci 5," Intuitive Surgical, Inc., March 14, 2024, accessed July 2024, https://isrg.intuitive.com/news-releases/news-release-details/intuitive-announces-fda-clearance-fifth-generation-robotic.

[12] Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2001, p. 3.

[13] Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 71.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 1: ANNUAL NUMBER OF DA VINCI PROCEDURES IN THE U.S., 2000–2023**



Sources and Notes:

– dV Procedures, 2000: Estimated based on language in Intuitive's 10-K Reports describing the number of procedures performed.

– dV Procedures, 2001–2004: Linearly interpolated based on the estimates used for 2000 and 2005.

– dV Procedures, 2005–2009: Estimated by assuming that the ratio of U.S to worldwide procedures would be equal to the ratio of U.S. to worldwide procedures in 2010.

– dV Procedures, 2010–2023: Intuitive's Annual 10-K Reports.

– dV System Launches: "Sustainability Report 2020," Intuitive Surgical, Inc., 2020, pp. 6–7, accessed July 2024, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/2020-intuitive-sustainability-report.pdf.

II.A.1.    Intuitive's Customers

21. The growth in procedure volume has been in part driven by the increase in hospitals with one or more da Vinci robots.[14] Figure 2 shows the growth since 2012 in the number of hospitals with at least one active system.[15]

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 2: NUMBER OF HOSPITALS WITH ONE OR MORE ACTIVE DA VINCI ROBOTS, 2012–2023**



Sources and Notes:

– Intuitive dV Procedure Data, filtered to U.S. hospitals.
– Unique hospitals are identified based on the "accountid" field.
– An "active da Vinci system" refers to a system that performed at least one da Vinci surgery in the calendar year.

22. Intuitive serves a diverse range of customers.[16] For example, as of 2022, approximately 17.5 percent of customers are standalone healthcare facilities.[17] At least 30 percent of customers are ambulatory surgery centers.[18] These customers also differ substantially in their size. For

---

[14] As a shorthand, I use the term "hospital" to refer to both general acute care hospitals as well as ambulatory surgery centers that own or lease a da Vinci surgical robot.

[15] An "active system" refers to a system that performed at least one da Vinci surgery in the calendar year.

[16] Where possible, I have merged in hospital characteristics from the American Hospital Association's Annual Survey of Hospitals to describe Intuitive customers. *See* Hospital Descriptives Workpaper.

[17] *See* Hospital Descriptives Workpaper, *mhsmemb* tab.

[18] *See* Hospital Descriptives Workpaper, *ambshos* tab.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

example, some have as few as eight hospital beds and others as many as 1,892.[19] Their reported capital expenses range from \$16,262 to \$679,742,216.[20] While most customers are located in a metropolitan statistical area, approximately 10 percent are located in a micro or rural core-based statistical area.[21]

23. Intuitive's customers vary in the size and scope of their robotic surgery programs. For example, in 2021, the number of surgical robots active for a given hospital ranged from one to 16.[22] In the same year, the volume of da Vinci surgeries performed at a given hospital was as few as one and as high as 4,211.[23] More than half of hospitals with seven or more da Vinci systems performed 30 or more types of surgeries, such as hysterectomies, cholecystectomies, and bariatric surgeries. In contrast, approximately half of hospitals with one or two da Vinci systems performed fewer than 12 types of surgeries.[24]

### II.A.2.    Components Required for Operating a da Vinci Surgical Program

24. Each da Vinci robot sold can be operated only if accompanied by components enabling different types of robotic-assisted soft tissue surgery. Each of these components falls into one of three categories: **system** or **robot**, which consists of the patient-side cart, surgeon console, and the vision cart; **instruments and accessories ("I&A")**, which consists of various limited-use parts for specific procedures, such as EndoWrist instruments, Advanced Instruments, and various other items; and **system service**, which ensures that the system meets the required specifications for surgery and addresses technical problems that may arise. I describe each of these components in more detail below.

---

[19]  *See* Hospital Descriptives Workpaper, *Non-Categorical Stats* tab.

[20]  *See* Hospital Descriptives Workpaper, *Non-Categorical Stats* tab.

[21]  *See* Hospital Descriptives Workpaper, *cbsatype* tab.

[22]  *See* Procedures Analysis Workpaper.

[23]  *See* Procedures Analysis Workpaper.

[24]  *See* Procedures Analysis Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## II.A.2.a.    System (Surgical Robot)

25. The system or robot denotes the patient-side cart, surgeon console, and vision cart. These components have been improved and updated with the introduction of each new da Vinci model.

26. Figure 3 shows annual robot placements for da Vinci S/Si and X/Xi systems.[25] Robot placements reflect new robot acquisitions by hospitals through lease or purchase. As of 2015, more than 80 percent of new placements were for da Vinci X/Xi robots rather than da Vinci S/Si robots.

---

[25] Specifically, the figure plots the number of incremental robot placements. Incremental robot placements refer to new robot sales or leases. *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, July 9, 2021, p. 2.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER



FIGURE 3: U.S. DA VINCI ROBOT PLACEMENTS BY MODEL, 2015–2023

Sources and Notes:

–   Intuitive Systems Data, filtered to incremental S/Si/X/Xi U.S. robot and upgrade placements from 2015 or later with non-zero, non-missing quantities and, for robot purchases, with positive revenue.

–   Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

27.   As Intuitive continued to innovate on the elements of its da Vinci offerings, it also worked to innovate new pricing and leasing options to expand access to the da Vinci by making the robot more affordable for new customers. These options included leasing arrangements and usage-based pricing with little to no upfront payment for the robot. Figure 4 shows the number of incremental robot purchases as compared to leases between 2015 and 2023. In 2015, new robots were more likely to be acquired via purchase as compared to lease. Between 2015 and 2019, the number of new leases and purchases both continued to grow, with leases growing at a faster rate than purchases. In 2020, when robot purchases declined, leases continued to grow and made up

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

the majority of new robot placements between 2020 and 2023. In Section II.C below, I discuss more details about Intuitive's leasing and pay per procedure programs.

FIGURE 4: U.S. INCREMENTAL DA VINCI ROBOT PURCHASES AND LEASES, 2015–2023



Sources and Notes:

– Intuitive Systems Data, filtered to incremental S/Si/X/Xi U.S. robot and upgrade placements from 2015 or later with non-zero, non-missing quantities and, for robot purchases, with positive revenue.

– Incremental robot leases include operating leases, which include AMP or pay per procedure leases, sales-type leases, and loaner-to-lease conversions.

– Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

28. Within a given year, the purchase price of a robot can vary substantially given the customer-specific discounts hospitals receive on robots, as Professor Elhauge recognizes in his report.[26] To

---

[26]  Elhauge Class Report, ¶ 206.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

illustrate, Figure 5 plots the purchase price for incremental robot purchases over time for the da Vinci Xi robot with a single console, which had the highest volume of transactions during the class period.[27] The prices shown reflect Intuitive's revenues after accounting for trade-in credits and other discounts, such as price reductions negotiated in master purchase agreements.[28] The solid line on the figure reflects Intuitive's suggested, or list, price.[29] This figure shows that there is a large range in transacted prices even in the same calendar quarter.

---

[27] I understand that Plaintiffs define the class period as May 21, 2017 through December 31, 2021. Plaintiffs' Notice of Motion for Class Certification and Memorandum of Points and Authorities, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No: 3:21-CV-03825, June 6, 2024, p. 1.

*See* Appendix E for the corresponding charts for other da Vinci system models including the da Vinci Si system with a single console and da Vinci Xi system with dual consoles.

[28] *See* for example "Purchasing Agreement between ████████████████ and Intuitive Surgical, Inc.," June 5, 2017, Intuitive-00284617, at -654 to -655. *See also* "Transaction Agreement Between Purchaser and Vendor between ████████ and Intuitive," September 30, 2021, Intuitive-01969948.

[29] List prices come from "pricing approval" spreadsheets from Intuitive; for example, *see* "System Pricing Approval Datasheet," February 2019, Intuitive-00000228.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 5: INCREMENTAL PURCHASE PRICES, DA VINCI XI ROBOT WITH A SINGLE CONSOLE, 2015–2023**



Sources and Notes:

– "Purchase Price" as reflected in the Total System Revenue USD field of the Intuitive Systems Data, filtered to U.S. robot and upgrade purchases from 2015 or later with non-zero, non-missing quantities with positive revenue. Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

– Total System Revenue USD provides total revenue net of discounts, rebates, credits, etc. *See* "Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 23, 2022, pp.1–2.

– List Price as reported in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020).

– The series begins in 2015 because the first incremental purchase of a da Vinci Xi Single robot in the Intuitive Systems Data occurs in 2015.

*II.A.2.b.    Instruments & Accessories*

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

29. I&A is the term used to categorize the specialized instruments or accessories required to perform each robotic-assisted soft tissue surgery in conjunction with the system detailed above. Typically, these I&A components have a limited number of uses and include the various models of EndoWrist instruments as well as other instruments and accessories. These instruments and accessories have often been updated with each successive model, and instruments designed for some models, such as S/Si or X/Xi, are not compatible with earlier or later models.[30] As shown in Figure 6, instrument sales trended towards X/Xi as more hospitals acquired or upgraded to da Vinci X/Xi systems and da Vinci procedures shifted to da Vinci X/Xi models.

**FIGURE 6: INSTRUMENT SALES FOR DA VINCI X/XI AND S/SI ROBOTS, 2012–2023**



Sources and Notes:
– Intuitive I&A Data.
– "Net sales" is the actual revenue recognized for each transaction, calculated as gross sales less discounts. *See* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, July 9, 2021, p. 5. *See also* "Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions," *Rebotix Repair LLC v. Intuitive Surgical, Inc.,* Case No. 8:20, July 10, 2021, p. 3.
– Filtered to include U.S. sales only and exclude training instruments and instruments with sales quantity equal to zero.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

30.   As robotic-assisted soft tissue surgery has expanded into different procedure types, most notably general surgery including colorectal surgery, bariatrics, and cholecystectomies, the share of instrument revenue has increasingly shifted toward Advanced Instruments.[31] Advanced Instruments are different from EndoWrists; among other differences, most of these instruments do not have use counters, so they would not be subject to the competition allegedly at issue in this case—the modification of use counters by third parties to permit additional uses. Intuitive is the only manufacturer of Advanced Instruments.[32] Figure 7 shows the trends in sales of Advanced Instruments and EndoWrist instruments as well as the share of I&A sales from Advanced Instruments, EndoWrist instruments, and other instruments[33] over time. Advanced Instruments has grown as a share of I&A revenue while the share has decreased for EndoWrist instruments.

---

[30]   Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, p. 52.

[31]   Intuitive Surgical, Inc, "Q4'21 Reporting Package," January 2022, Intuitive-01265649, at -652; Intuitive Surgical, Inc. "Q2'21 Reporting Package," July 2021, Intuitive-01265354, at -357. Advanced Instruments or Advanced Tech refer to instruments such as vessel sealers and staplers, which are often sold as single-use devices. *See* Intuitive Surgical, Inc., "Da Vinci S and Da Vinci Si Instrument & Accessory Catalog," February 2017, Intuitive-00210972, at -982 as an example of a single-use Advanced Instrument.

[32]   Advanced Instruments are not included in the list of instruments third parties were willing to remanufacture, and Professor Elhauge does not calculate damages for these instruments. *See* SIS000047, at -047–048, REBOTIX162208, at -212, Restore-00002260, at -063–065, and Elhauge Class Report, Exhibit D.

[33]   Examples of "Other Instruments" include 5mm EndoWrist instruments and suction irrigator for single site.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER



**FIGURE 7: SHARE OF INSTRUMENTS SALES BY CATEGORY, 2012–2023**

Sources and Notes:
– Intuitive I&A Data.
– "Net sales" is the actual revenue recognized for each transaction, calculated as gross sales less discounts. *See* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, July 9, 2021, p. 5. *See also* "Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions," *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, Case No. 8:20, July 10, 2021, p. 3.
– Filtered to include U.S. sales only for S/Si and X/Xi platforms and exclude training instruments and instruments with sales quantity equal to zero.
– Advanced Instruments identified as instruments ever sold in "Box" units.
– EndoWrists identified based on Elhauge Class Report, Exhibit D.

## II.A.2.c.    System Service

31. System service includes routine maintenance and the replacement of essential parts, software updates, and various other repairs for the system. Customers can purchase these services from Intuitive on an as-needed basis, with "time and materials" ("T&M") pricing. But relatively few do so, as Intuitive offers these services through several different plans designed to meet the various needs of the customer. Figure 8 presents an Intuitive table highlighting the various da Vinci service plan offerings as of 2019.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 8: DA VINCI SERVICE PLAN OPTIONS IN 2019**



Source: "da Vinci Servicing Price Comparison for ███████████████," Intuitive-00156880.

32. Most customers choose to purchase one of Intuitive's service plans and do not incur any T&M costs. Figure 9 shows the number of da Vinci systems in each year that incur payments ascribed to service or lease contracts and those that likely do not, either only incurring T&M costs or payments ascribed to other types of non-contract servicing. In every year, the share of systems making payments on service or operating lease contracts exceeds 95 percent.[34]

---

[34] *See* System Service Revenue Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 9: NUMBER OF DA VINCI SURGICAL ROBOTS BY TYPE OF SERVICE REVENUE, 2012–2022**



Sources and Notes:

– Intuitive-02072148, filtered to U.S. transactions using company code = 3000 in 2012 and company code = 2000 in other years. Filtered to da Vinci system observations using patterns from Contract Serial Number and Product Platform. *See* System Servicing Revenue Workpaper for details.

– Intuitive-02072148 includes the following lines of servicing revenue: "Service Contracts," "First Year Warranty," "AMP," "Operating Lease," "T&M," "Advanced Exchange," "Rev Adjustments," and "Returns"." For a given year, the "Service Contract or Lease" group includes systems with positive service revenue in one of the following revenue lines: "Service Contracts," "First Year Warranty," "AMP," or "Operating Lease;" the "T&M Only" includes da Vinci systems with positive "T&M" service revenue that do not fall into the "Service Contract or Lease" category. "Other Revenue Only" includes all other da Vinci systems with positive "Total Servicing Revenue."

33.  Pricing for service contracts—even for the same system model, type of plan, and start year—varies across customers. For example, Figure 10 shows the annual service contract price by year for dV Complete Care contracts for the da Vinci Xi, the most common service contract for the model with the highest number of purchases and leases during the class period.[35] The figure illustrates the variability in pricing across customers and deviation from Intuitive's list prices, which are depicted as a solid line for single console and dashed line for dual consoles.[36] A customer may negotiate a lower price for the robot in exchange for agreeing to pay more than the

---

[35]  *See* Appendix F for the corresponding charts for other da Vinci models.

[36]  List prices come from "pricing approval" spreadsheets from Intuitive; for example, *see* "System Pricing Approval Datasheet," February 2019, Intuitive-00000228.

suggested, or list price, for service, which is an example of Intuitive's efforts to adapt the structure and pricing to meet customer needs.[37]

**FIGURE 10: RANGE OF ANNUAL PRICES FOR DV COMPLETE CARE, DA VINCI XI, 2015–2021**



Sources and Notes:

– Annual price from Intuitive-02072147 and Intuitive-00695236.

– Filtered to U.S. using "s_org" = 2000, and DV Complete Care service contracts. Removed service plans that are less than 1 year in duration, contracts for a given system that are later updated in the same calendar year, and service plans with "NFHU" (not for human use) in the description field or material number. *See* System Service Contracts Workpaper for details.

– List Price as reported for dV Complete Care in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020). 2021 list prices are assumed to be the same as 2020 list prices.

---

[37] For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮ was able to purchase an Xi Single Console robot in 2015 for $▮▮▮▮ ($▮▮▮▮ less than list price) and agreed to pay $▮▮▮▮ annually for service ($▮▮▮▮ more than list price). Intuitive-01682609 at pp. 9 and 17; Intuitive-00000265.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## II.B.    HOSPITALS AND INTUITIVE CONSIDER THE TOTAL COST OF OFFERING ROBOTIC-ASSISTED SOFT TISSUE SURGERY

34. A hospital's expected total cost of offering robotic-assisted soft tissue surgery is a key factor for Intuitive when negotiating prices with customers and for hospitals making decisions about their robotic surgery programs.[38] One important measure Intuitive considers is lifetime margin, which reflects the expected amount that a customer will spend on its entire da Vinci surgery program over a designated period, which is typically five to seven years.[39] Spending would encompass payments for the system(s), I&A, and system service during the specified period.[40]

35. When deciding whether to invest and/or grow their robotic surgery programs, hospitals and surgery centers consider the expected revenues and costs associated with running such a program.[41] Examples of factors that affect expected revenues include volume of da Vinci

---

[38] *See* Declaration of David Rosa, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, No. 3:21-cv-03825 ("Rosa Declaration"), ¶ 14.

[39] Nick Alter, Marie Laure Le Goff Basan, Nick Santore, "Utilization-Based Contracting," December 2020, Intuitive-01180433, at -435 ("Lifetime Margin = System Margin + Service Margin + I&A Margin over [5-7] years.").

[40] *Id*.

[41] For example, Judy Schimmel of Franciscan noted that Franciscan's procurement process of a new da Vinci system required a return on investment analysis including cost of equipment, instrumentation costs, and projected volume. *See* Schimmel 30(b)(1)  (9/22/2022) Dep. Tr. 103:21–106:2 ("Q. So could you please walk me through before Franciscan had the master agreement, what would the procurement process be for a hospital that wanted to purchase a da Vinci robot? A. So speaking from my director days, we would identify a need for procuring either a robot or a second robot. We would have to have a request that, and have documentation for reasoning, for needing a robot or a second robot; that, in turn, requests would be taken forward and our finance department would assist in developing a return on investment and a portfolio pro forma so that we could make the presentation to our corporate senior leaders for the funding…Q. So then you mentioned that the request goes forward to the finance department who helps develop an ROI portfolio. What's included in the ROI portfolio? A. Typically cost of equipment, all service costs, disposable costs, instrumentation costs. So the entire start-up costs. And then volume, projected volume, reimbursement, and that carries out to five years, usually."). Mark Early of Larkin noted that before making a new acquisition of a da Vinci system, Larkin had to review the impact of the acquisition on its financial ratios. *See* Early (10/6/2022) Dep. Tr. 39:19–40:1 ("Q. What did you mean by "This is going to impact our ratios"? A. When we do an acquisition, we have to look at the impact those acquisitions may have on our financial state. And it's in our bond covenants and other items that specifically what I was talking about here. When I talk about ratios, I talk about our hospital's financial ratios.").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

surgeries, types of surgeries, the share of patients covered by different types of health insurance (or "payer mix"), and reimbursement rates.[42] With regards to the expected costs of the program, hospitals consider the total cost across the da Vinci program at its facilities including the costs of

---

[42] For example, ███████████ had discussions with Intuitive about expected volumes of procedures and types of surgeries in anticipation of purchasing a da Vinci X. ██████'s Robotic Reinvestment 5-Year Proforma, drafted by Intuitive to assist ██████ in evaluating the possible purchase, includes a business plan detail that shows the expected number and type of procedures ██████ planned to perform, as well as the estimated reimbursement for each procedure, which factored in ██████'s estimated 80 percent% commercial payor mix. *See* Josh Lowe at Intuitive Surgical, Inc., Email Message to ██████████, "da Vinci Pro forma and data," January 17, 2019, Intuitive-00093270; "██████████, Robotic Reinvestment 5-Year Proforma," Intuitive-00093274; "Lease Proposal between ██████████ and Intuitive Surgical, Inc.," January 17, 2019, Intuitive-00093275.

both system service and I&A costs.[43] In addition to expected revenues and costs, hospitals also consider financial or regulatory constraints and requirements.[44]

36. Documents illustrate how Intuitive uses the metrics of lifetime margin when analyzing pricing. Figure 11 and Figure 12 come from an internal Intuitive presentation on pricing to illustrate the parts of lifetime margin. The cube below in Figure 11 represents expected lifetime margin for a given hospital.[45] The lifetime margin has three "major inputs" as shown in Figure 12, which are

---

[43] Rosa Declaration, ¶ 14 ("The hospitals and surgery centers that purchase da Vinci systems are highly sophisticated consumers. A sale of a da Vinci is routinely preceded by extensive presentations on the costs and benefits to the hospital of having a da Vinci available as an alternative modality for performing many types of surgery."). For instance, Named Plaintiff Franciscan noted that it considered "the costs associated with the robot (which includes the costs associated with … servicing the robot and supplying EndoWrists)" when deciding whether to purchase a da Vinci system. Plaintiff Franciscan Alliance, Inc's Amended Objections and Responses to Defendant's Second Set of Interrogatories to Plaintiffs, September 30, 2022, pp. 12-13. As another example, in its discussions about a lease proposal, Intuitive provided ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████ *See* Josh Lowe at Intuitive Surgical, Inc., Email Message to ██████████, "da Vinci Pro forma and data," January 17, 2019, Intuitive-00093270, at -271-272. As another example, in making a da Vinci purchase, Franciscan considered equipment costs, service costs, disposable costs, and instrument costs as compared against volume and reimbursement carried out five years. Schimmel 30(b)(1) (9/22/2022) Dep. Tr. 104:13–106:2 ("Q. So at the first step, identifying the need for a robot, who would identify that need? A. So from my previous experience, it would be myself, Intuitive, physicians looking at our availability of time and the ability to schedule procedures…Q. So then you mentioned that the request goes forward to the finance department who helps develop an ROI portfolio. What's included in the ROI portfolio? A. Typically cost of equipment, all service costs, disposable costs, instrumentation costs. So the entire start-up costs. And then volume, projected volume, reimbursement, and that carries out to five years, usually.").

[44] For example, some states have Certificate of Need ("CON") laws where a healthcare facility would need to obtain approval from a health planning agency (or similar entity) before incurring "major capital expenditures and projects"; *see* "Certificate of Need State Laws," National Conference of State Legislatures, February 6, 2024, accessed July 2024, https://www.ncsl.org/health/certificate-of-need-state-laws. ██████████████ ████████████████████. *See also* Intuitive Surgical, Inc., "Project Metamorphosis", October 15, 2020, Intuitive-00583659, at -660 ██████████████████████████ ██████████████████████████████████").

[45] Intuitive Surgical, Inc., "Pricing," Intuitive-00143920, at -931.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

the I&A standard margin, including procedure mix and discounts, system and service margin, including capital and service pricing, and annual utilization, and procedure term/stickiness, including estimated future procedures, contract term, procedure mix, and sustainable surgeons.[46]

### FIGURE 11: EXPECTED LIFETIME MARGIN



Source: Intuitive Surgical, Inc., "Pricing," Intuitive-00143920, at -931.

---

[46]  Intuitive Surgical, Inc., "Pricing," Intuitive-00143920, at -932.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 12: DIMENSIONS OF LIFETIME MARGIN**



Source: Intuitive Surgical, Inc., "Pricing," Intuitive-00143920, at -932.

37. The concepts in Figure 11 and Figure 12 are applied in another internal presentation where Intuitive compares multiple pricing scenarios on the basis of expected lifetime margin for a hypothetical customer. The customer has a single system and is upgrading from an Si to an Xi and currently doing 208 procedures annually with expected annual growth of 4 percent.[47] The hospital's baseline values across the three dimensions of lifetime margin or value are shown in Figure 13. In the analysis, Intuitive evaluates three alternative pricing scenarios in which it adjusts different dimensions and compares the customer's lifetime value across those scenarios, which are summarized in Figure 14.[48]

---

[47] Intuitive Surgical, Inc, "AMP 2.0 Pilot," Intuitive-00264803, at -825.

[48] The scenarios are: (1) a hospital wanted lower service pricing by $10,000 per year and would agree to expand access to certain procedures with an estimated growth commitment of 10 percent; (2) the hospital expands its number of systems from one Si to a X and Xi and increases its annual number of procedures in exchange for moderate capital concessions;; (3) the hospital receives an I&A discount of 10 percent, allowing it to open access to new procedure types with two X systems and one Xi. *See* Intuitive Surgical, Inc, "AMP 2.0 Pilot," Intuitive-00264803, at -825–829.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 13: BASELINE LIFETIME VALUE FOR EXAMPLE HOSPITAL**



Source: Intuitive Surgical, Inc, "AMP 2.0 Pilot," Intuitive-00264803, at -825.

**FIGURE 14: PRICING SCENARIOS AND THEIR IMPLICATIONS ON LIFETIME VALUE**

## All Scenario Comparison

|  | No Change | Scenario #1 (Service) | Scenario #2 (2:1) | Scenario #3 (3:1) |
|---|---|---|---|---|
| Prospective Procedure Value (I&A + S&S) * Term | *$1,660* * 3.5 | *$1,612* * 3.5 | *$2,718* * 5 | *$2,104* * 5.5 |
|  | $5,810 | $5,642 | $13,590 | $11,572 |
| Committed Procedures (Annual) | 223 | 246 | 550 | 900 |
| Lifetime Value Estimate (Prospective Standard Margin) | $1.30M | $1.39M | $7.48M | $10.42M |

Source: Intuitive Surgical, Inc, "AMP 2.0 Pilot," Intuitive-00264803, at -829.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

38. As another example, Intuitive used the concept of lifetime value in assessing pricing when discussing X System price considerations in an internal presentation. Intuitive included a table of "total lifetime price" varying by the system price, which ranges from $▮▮▮▮▮ to $▮▮▮▮▮▮, and annual number of procedures, which ranges from 200 to 400, which determined expected I&A spending.[49] Intuitive calculated the price per procedure for each combination of system price and procedure volume and compared the per procedure price across those combinations.

39. These examples demonstrate that the pricing Intuitive offers, and pricing the customer is prepared to accept, are both based on the total amount the parties expect the customer to pay to establish and operate its da Vinci surgical program. These amounts include the cost of the da Vinci robot, system service, and I&A.

### II.C. INTUITIVE OFFERS A NUMBER OF DIFFERENT PRICING MODELS TO HOSPITALS WHO WANT TO OFFER ROBOTIC-ASSISTED SOFT TISSUE SURGERY

40. Intuitive offers its da Vinci robots for purchase and, over time, has continued its effort to expand access to da Vinci surgeries through the introduction of additional pricing models, including leasing arrangements[50] and programs like the Accelerated Minimally Invasive Surgery Program ("AMP") that offer usage-based pricing.[51] Intuitive also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is described in more detail in Section II.D.

---

49. Intuitive Surgical, Inc., "Pricing Discussion for da Vinci X," February 23, 2021, Intuitive-00823949, at -039.

50. Intuitive began offering da Vinci System Leasing in 2013. *See* Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2015, p. 38 ("Since 2013, we have entered into sales-type and operating lease arrangements directly with certain qualified customers as a way to offer customers flexibility in how they acquire da Vinci systems and expand da Vinci surgery availability while leveraging our balance sheet.").

51. Intuitive Surgical, Inc., "AMP Uncovered: Accelerated Minimally Invasive Surgery Program by Intuitive," Intuitive-00465646.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### II.C.1.    Purchases

41. Numerous hospitals choose to purchase a system outright, which carries a relatively high upfront cost.[52] Customers may choose to purchase a system outright in order to avoid the "modest premium" (including interest) in lease agreements.[53] Purchasing may be less attractive for other customers facing capital constraints or that wish to reduce the risks associated with a large capital investment. For new placements in the U.S., purchasing had been the most common arrangement through 2019 when leasing arrangements exceeded those of purchasing.[54]

### II.C.2.    Leasing Arrangements

42. Intuitive began to offer leasing arrangements to customers in 2013.[55] Today, the most common arrangements for new system placements are leasing contracts. As shown in Figure 4 above, the share of incremental system placements under leasing arrangements has grown over time and, beginning in 2020, exceeded that of purchases. Leasing contracts can be further categorized into sales-type leases and operating leases.[56]

---

[52] Intuitive Surgical, Inc., "Biomedical Marketing Final Paper", June 11, 2019, Intuitive-00174015, at -026. Intuitive discusses the high upfront cost of the da Vinci system in the context of hospitals with higher reimbursement rates.

[53] Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 66 ("We generally set fixed-payment and usage-based operating lease arrangements' pricing at a modest premium relative to purchased systems reflecting the time value of money and, in the case of usage-based operating lease agreements, the risk that system utilization may fall short of anticipated levels.").

[54] *See* Figure 4.

[55] Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 65 ("Since 2013, we have entered into sales-type and fixed-payment operating lease arrangements directly with certain qualified customers as a way to offer customers flexibility in how they acquire systems and expand their robotic-assisted programs while leveraging our balance sheet.").

[56] *Id.*

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### II.C.3.    Accelerated Minimally Invasive Surgery Program ("AMP")

43.  Intuitive offers a special leasing arrangement, which it calls AMP, designed to address the unique concerns of certain of its hospital customers.[57] One version of the program, called AMP 1.0, allows customers to pay for the da Vinci system and system servicing with per-procedure pricing as they use their system.[58] For a capital-constrained hospital, this program could provide an opportunity to access the da Vinci system without paying the full upfront cost at the time of acquiring the platform and instead pay for the da Vinci as the system is utilized and the hospital earns revenue.[59]

44.  AMP rapidly grew between 2017 and 2023. By 2020, 11 percent of new system placements were leased through the AMP program, rising to 26 percent in 2023.[60] Among all leasing arrangements in 2023, AMP 1.0 makes up 51 percent of new placements.[61]

45.  Intuitive has also developed another version of AMP, called AMP 2.0, which has been used by at least two hospitals.[62] Whereas AMP 1.0 involves per-procedure pricing for the system and

---

[57]  Rosa (in *Restore*) (5/19/2021) Dep. Tr. 25:13-15 ("Q. What is AMP pricing? A. So AMP stands for accelerating minimally invasive program."); 26:8-13 ("Are there any – are there any commonalities between the various versions of AMP? A. Between two versions, there's – there is some commonality in that they're trying to address a certain customer challenge."). *See also* Intuitive Surgical, Inc., "AMP Uncovered", Intuitive-00465646, at -646 ("AMP is designed to meet the specific needs of our customers.").

[58]  Intuitive-00107443, at -446 (referring to AMP 1.0 as involving "Fixed Fee covering Capital and Service Payment"). *See also* Rosa (in *Restore*) (5/19/2021) Dep. Tr. 27:15-21 ("Q. Generally speaking, what were the terms of the first version of AMP? A. So the terms are that for a given procedure on that system under – covered under the AMP contract, there would be a per procedure charge, if you will, that would cover system and service.").

[59]  Rosa (in *Restore*) (5/19/2021) Dep. Tr. 27:1–14 ("Q. So the first version of AMP, that has been deployed? A. Yes. Q. And was it targeted to certain customers, certain kinds of customers? A. Yeah. Generally, yes. Q. And who generally was the target? A. Like customers who were challenged on the -- depending on how they wanted to purchase the system, we're looking to move out of the cap X environment -- the capital expenditure environment and more into the operating income side or the operating expenditure side.").

[60]  *See* System Placements by Transaction Type Workpaper.

[61]  51 percent = 26 percent for AMP / (26 percent for AMP + 22 percent for Operating Lease + 3 percent for Sales-Type Lease). *See* System Placements by Transaction Type Workpaper.

[62]  The two hospitals are ███████████████ and ███████. *See* Intuitive-00004126, at -036.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

system service, AMP 2.0 is focused on usage-based pricing for I&A, including EndoWrists.[63] Under this program, Intuitive and the customer agree on a per-procedure I&A fee at a set price.[64]

46. Similar to AMP, Intuitive has also explored what it calls a "Global Payment" strategy, which would allow for all-inclusive per-procedure pricing that would cover system, service, and I&A expenditures.[65] Pricing under this model could vary by procedure based on I&A utilization or the procedure's reimbursement rate.[66] The lifetime margin under this model could vary widely by customer, depending on their utilization in different procedure categories.[67] In its internal discussions of pricing for this program, Intuitive modeled the all-inclusive price based on revenue from robot lease or purchase, I&A, and system service.[68]

## II.D.   INTUITIVE NEGOTIATES THE STRUCTURE AND PRICING BASED ON THE NEEDS OF EACH CUSTOMER

47. There are multiple ways in which Intuitive tailors pricing to individual customers. This is consistent with its philosophy as described by Nick Santore, Vice President of Commercial Solutions, that is quoted on Intuitive's website on flexible financing options for customers: "It's not a one-size fits all approach. Our ecosystem is designed to provide a customized approach to

---

[63]   Intuitive-00107443 at -446.

[64]   *See* Intuitive-00264803, at -804 ("Solutions: Promote a choreography of instruments used during the procedure plus an incentive discount for using that specific choreography. Establish a set price and cap per procedure."). *See also* Intuitive-00107443, at -446 (referring to AMP 2.0 as involving "Fixed Fee covering Capital, I&A, and Service Payments"). *See also* Rosa (in *Restore*) (5/19/2021) Dep. Tr. 30:15-31:1 ("And so we had proposed a pricing program for two specific procedures that would just charge a single price to a customer for instruments and accessories. So now we're not talking about systems and service. We're talking about instruments and accessories. And so for a given case and procedure type, and for – there was some specific terminology in there in terms of. how many instruments were used. We would charge a single price.").

[65]   Andrew Boxley, Ryan Colwell, Jing Du, "Global Payment Model – Opportunity and Impact," Intuitive Surgical, Inc., January 2, 2020, Intuitive-01182277, at -286 and -289.

[66]   Andrew Boxley, Ryan Colwell, Jing Du, "Global Payment Model – Opportunity and Impact," Intuitive Surgical, Inc., January 2, 2020, Intuitive-01182277, at -292.

[67]   Andrew Boxley, Ryan Colwell, Jing Du, "Global Payment Model – Opportunity and Impact," Intuitive Surgical, Inc., January 2, 2020, Intuitive-01182277, at -298 and -303.

[68]   Andrew Boxley, Ryan Colwell, Jing Du, "Global Payment Model – Opportunity and Impact," Intuitive Surgical, Inc., January 2, 2020, Intuitive-01182277, at -306.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

solving customers' problems when it comes to how they either expand a robotics program or enter into the robotics program."[69] In addition to the pricing models summarized above in Section II.C, Intuitive offers discounts and customized arrangements.[70]

48. As shown in Figure 5 and Figure 10 above,



[71]

49. The volume and types of da Vinci surgeries performed at the hospital affect the number and types of I&A, including EndoWrists, that the hospital is likely to purchase from Intuitive. In addition, the type of surgery determines the reimbursement (or payment) to the hospital for a procedure, which may influence the extent to which hospitals and surgeons will perform da Vinci surgeries over laparoscopic or open surgeries.[72]

50. Similarly, a higher level and longer duration of commitment of the hospital to its robotic surgery program increases the likelihood that a customer will invest to perform more da Vinci surgeries. With more da Vinci surgeries, the customer will continue to purchase more instruments and

---

[69] Flexible Financing for Acquiring Robotic Surgery Technology," Intuitive Surgical, accessed July 2024, https://www.intuitive.com/en-us/about-us/newsroom/flexible-financing-for-acquiring-robotic-surgery-technology.

[70] Elhauge Class Report, ¶ 913 ("annual service contracts and robot purchases sometimes reflected customer-specific discounts from list prices.). *See also* Elhauge Class Report, ¶ 206 and Figure 9 (reflecting the different prices at which customers purchase robots.). *See also* "Discounting Principles," Intuitive-00372053 at -053.

[71] *See* "Discounting Principles," Intuitive-00372053 at -053.

[72] Andrew Boxley, Ryan Colwell, and Jing Du, "Global Payment Model – Opportunity and Impact," January 2, 2020, Intuitive-01182277, at -298.

system service, which increase the expected total revenue from the robot acquisition to Intuitive and potentially justify a steeper discount.[73] In other words, Intuitive would be incentivized to provide greater discounts because of the potential to increase the volume of da Vinci surgeries and total revenue from a robotic surgery program at the hospital.

51. ███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████[74]
████ acquired at least seven robots, two da Vinci Xi Single Console systems and five da Vinci Xi Dual Console systems, between the fourth quarter of 2014 and the third quarter of 2019.[75] Since the third quarter of 2019, ████ acquired four additional da Vinci Xi robots ████
███████████████████████████████████████████████
███████████████████████████[76]

52. In 2020, ████ ███████████████████████████████
███████████████████████████████████████████████
████.[77] ███████████████████████████████████████
████████.

---

[73] "Discounting Principles", Intuitive-00372053, at -053.

[74] 

[75] *See* ████ System Acquisitions Workpaper.

[76] "Master Lease Agreement," July 15, 2019, Intuitive-01837384, at -416. *See also* "True Lease Schedule #02-4 between Intuitive Surgical, Inc. and ███████████████," June 18, 2021, Intuitive-01951989, at -991; "True Lease Schedule No. 3 between Intuitive Surgical, Inc. and ██████████████," September 30, 2019, Intuitive-01848966, at -967–968. *See also* ████████ Acquisitions Workpaper.

[77] "True Lease Schedule #02-1 between Intuitive Surgical, Inc. and ██████████," December 31, 2020, Intuitive-01926834, at -834 and -836. ███████████████████████

II.E.    NAMED PLAINTIFFS

II.E.1.    Larkin Community Hospital

53. Plaintiff Larkin Community Hospital ("Larkin") is a "Florida corporation" with its "principal place of business" in Miami, Florida;[78] it operates Larkin Health System, which has a hospital in South Miami—Larkin Hospital South Miami—and another hospital in Hialeah—Larkin Hospital Palm Springs.[79] Larkin leased two da Vinci robots, an Xi and an Si, from Intuitive in June 2017.[80] Larkin's senior leadership, including the CEO and CFO, made the decision to lease two da Vinci surgical platforms with input from physicians practicing at Larkin.[81]

54. As a result of its negotiations with Intuitive, Larkin received discounts worth several hundred thousand dollars on the leasing of the Si and Xi systems and a 72-month lease on one of the platforms.[82] Larkin's lease encompassed the acquisition of the two da Vinci systems as well as one year of the dV Complete Care Plan and a number of I&A included in the "Accessory Starter

---

[78] Amended Complaint, ¶ 10.

[79] Larkin Health System, accessed July 2024, https://larkinhealth.com/en/locations/.

[80] "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," June 9, 2017, Intuitive-00300421, at -434 and -439. S*ee also* Amended Complaint, ¶ 11.

[81] Early (10/6/2022) Dep. Tr. 189:7-12 ("Q. Who -- who at -- who at Larkin, to your knowledge, made the decision to actually purchase the two Da Vinci Surgical Systems? A. Well, that would have come from our -- our senior leadership, that I would be involved with our CEO and our other leaders."); 193:25-194:10 ("Q. Thinking back before the, Larkin purchased the Da Vinci Surgical Systems, did you tell Ms. Sosa-Guerrero that Larkin should not purchase those -- the robots? A. No, not that I can recall. Again, I, if the physicians were -- if the physicians were not going to use it, of course that would have been no. But the physicians were going to come. And I don't think anybody would have planned on acquiring that equipment if the expectation wasn't that physicians would use -- utilize that equipment.").

[82] Sosa-Guerrero (9/23/2022) Dep. Tr. 100:13-15 ("Q. And the total discounts that -- that Intuitive was offering was $473,500; correct? A. Yes"); Sosa-Guerrero (9/23/2022) Dep. Tr. 105:4-10 ("Q. "And the short answer is, yes, we can do a 72-month lease." Do you see that? A. Yes. Q. Okay. And, in fact, on the Xi, am I right that there was a 72 lease – 72-month lease done? A. Right."). S*ee also* Mark Early at Larkin Community Hospital, Email Message to A. Fessenden at Larkin Community Hospital, "FW: daVinci Follow Up," May 23, 2017, LARKIN-00009092, at -092; "Use, License & Service Agreement," June 9, 2017, Intuitive-00300421, at -434 (72-month term).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Kit," "Camera Starter Kit," and "Training Instrument Starter Kit," and the system and the first twelve months of service were included in the periodic lease payments.[83] Larkin paid $22,657 per month for both leases in the initial years.[84] The hospital was able to lease the systems with no down payment and with lower initial lease payments that would increase after the first twelve months.[85]

55.    Figure 15 shows the types of procedures performed via robotic-assisted surgery at Larkin. The majority of da Vinci surgeries were gynecological. In the year with the highest volume of da Vinci surgeries, 2018, 514 out of 592 (or 86.8 percent) procedures were in gynecology, with hysterectomies as the most common gynecological procedure. Other types of da Vinci surgeries performed at Larkin include urology, which were mostly prostatectomies, and general surgery, such as cholecystectomies, hernias, or bariatric surgery).

---

[83]    "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," LARKIN-00025488, at -489 and -496–498. See also "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," June 9, 2017, Intuitive-00300421, at -422 and -429–431.

[84]    Sosa-Guerrero (9/23/2022) Dep. Ex. 36, at -758 (LARKIN-00021756 at -758) (pro forma for agreement noting "There are on average 32 Robotic cases per month, and the lease payment for both leases is $22,657, so and average of $712/per case.").

[85]    "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," June 9, 2017, Intuitive-00300421, at -434 and -439.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 15: VOLUME OF DA VINCI PROCEDURES BY PROCEDURE TYPE—LARKIN, 2015–2023**



Sources and Notes:

– Intuitive dV Procedure Data.

## II.E.2.    Franciscan Alliance, Inc.

56. Plaintiff Franciscan Alliance, Inc. ("Franciscan") operates a healthcare system with thirteen hospital campuses in Indiana, Illinois, and Michigan.[86] After requests from several gynecology surgeons, Franciscan Lafayette campus purchased its first da Vinci in 2009.[87] Between 2015 and

---

[86]  Amended Complaint ¶ 14.

[87]  Schimmel 30(b)(1) (9/22/2022) Dep. Tr. 25:23–26:16 ("Q. When did the Lafayette location of Franciscan start using da Vinci surgical systems for surgeries? A. 2009. Q. And why did Franciscan Lafayette first start using the da Vinci machines? …[A.] We had GYN physicians make the request. …Q. And why did they say they wanted the da Vinci surgical robots available for their use? …[A.] I don't remember. ….Q. Do you remember the names of the GYN surgeons who made that request? A. I do. Dr. McKweg, Dr. Wickert, Dr. Harrison were top three.").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

2021, Franciscan acquired twelve da Vinci systems across eight of its campuses, all of which remained in use through at least September 2022. [88]

57. In 2016, Franciscan negotiated with Intuitive for the purchase of five da Vinci systems together.[89] This package consisted of four Xi Single Console systems and one Xi Dual Console system, along with the "da Vinci Xi Table Motion Upgrade" for each of them, the "da Vinci Xi Skills Simulator" for four of them, and included one year of the dV Complete Care Plan in the system purchase price.[90] Franciscan saved $1.07 million in total off the list prices of the five systems.[91] In 2020, Franciscan entered into a master agreement with Intuitive that allowed them to negotiate a better price and to simplify the purchasing process.[92]

58. Figure 16 shows the types of procedures performed via robotic-assisted surgery at Franciscan. Da Vinci surgeries at Franciscan included general surgery, gynecology, urology, and thoracic. The volume of general surgery surpassed gynecological procedures in 2020. Within general surgery, Franciscan performed procedures such as cholecystectomies, colon resections, and

---

[88]  *See* Franciscan Systems Acquisitions Workpaper. *See also* Plaintiff Franciscan Alliance, Inc.'s Amended Objections and Responses to Defendant's Second Set of Interrogatories, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, September 30, 2022, pp. 13–14.

[89]  Sampson (11/3/2022) Dep. Tr. 37:9–14 ("Okay. And then flipping to the next page. At the top it says, "By purchasing these 5 systems together we'll save $1.07 million." Do you see that? A. Correct. Q. And is that accurate? A. To my knowledge, that's accurate."). S*ee also* Sampson (11/3/2022) Dep. Ex. 186, at -007 (FRANCISCAN-00054004, at -007).

[90]  "Sales, License and Service Agreement between Intuitive Surgical, Inc. and Franciscan Alliance, Inc.," September 13, 2016, FRANCISCAN-00053994, at -996–997.

[91]  Sampson (11/3/2022) Dep. Tr. 37:17-19 ("Q. Okay. So it's correct that Franciscan ultimately saved 1.07 million on this purchase? A. Yes, as far as we were concerned.").

[92]  Schimmel 30(b)(1) (9/22/2022) Dep. Tr. 80:21–81:13 ("In 2020, Franciscan negotiated a master agreement with Intuitive Surgical; is that right? A. Yes. Q. Why did Franciscan decide to negotiate that master agreement? A. We needed terms and conditions to govern our purchases for capital equipment, as well as products and establish a standard transaction agreement. Q. And why did you need that? A. So we didn't have to do a review every single time we made a purchase. Q. The master agreement simplified the purchasing process; is that fair? A. From a capital standpoint, yes. Q. Did Franciscan obtain better prices through this master's agreement, as well? A. Pricing was negotiated, yes."). *See also* "Master Sales, License, and Service Agreement" between Intuitive Surgical, Inc. and Franciscan Alliance, Inc, September 28, 2020, FRANCISCAN-00000398.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

hernia surgeries; the volume of general surgery procedures performed using the da Vinci machine at Franciscan grew 248 percent between 2017 and 2023.[93]

**FIGURE 16: VOLUME OF DA VINCI PROCEDURES BY PROCEDURE TYPE—FRANCISCAN, 2012–2023**



Sources and Notes:

– Intuitive dV Procedure Data.

## II.E.3.    Valley Medical Center

59. Plaintiff King County Public Hospital District No. 1, DBA Valley Medical Center ("Valley Medical"), is a government entity located in Renton, Washington.[94] In Washington, public

---

[93]  *See* Procedures Analysis Workpaper.

[94]  Amended Complaint, ¶ 18. Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, August 4, 2021, at 18. *See also* Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, May 23, 2024, at p. 9.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

hospital districts like Valley Medical are "government entities established by Washington state statute."[95] Nearly one-half of Washington's 90 hospitals are part of public hospital districts.[96]

60. Valley Medical has operated a da Vinci surgical program since at least 2006 utilizing S, Si, and Xi systems.[97] Valley first purchased a da Vinci model S in 2009, and later upgraded to a model Si.[98]

61. Several Valley Medical surgeons, including the chairman of its surgery department, advocated for the upgrade to an Xi model because the advances in technology had improved greatly.[99] Before Valley Medical upgraded to an Xi system in 2018, their Si system was one of the oldest in the state.[100] Over the course of negotiations, Intuitive offered Valley Medical discounts

---

[95] "What's a Public Hospital District?," Valley Medical Center, accessed July 2024, https://www.valleymed.org/about-us/whats-a-public-hospital-district; s*ee also* Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, May 23, 2024, p. 9.

[96] "What's a Public Hospital District?," Valley Medical Center, accessed July 2024, https://www.valleymed.org/about-us/whats-a-public-hospital-district.

[97] Amended Complaint, ¶ 19. *See also* Letter from Nick Santore to Valley Medical Center, May 4, 2009, Intuitive-01296112.

[98] Letter from Nick Santore to Valley Medical Center, May 4, 2009, Intuitive-01296112.

[99] Burke (9/27/2022) Dep. Tr. 59:5–13 ("Q. You said earlier that you were advocating for the purchase of an Xi; correct? A. Yes. Q. Why did you want the hospital to purchase an Xi? A. At that time, I thought that the advances in the technology had improved enough to warrant another robot, plus we had -- our Si was probably the oldest one in the State of Washington."); 15:5–13 (explaining Dr. Burke's tenure as chairman of Valley's department of surgery). *See also* Wagner (10/11/2022) Dep. Tr. 44:15–45:2 ("And what was the nature of that discussion? A. The nature of that discussion primarily was with surgeons, they were under the – under – we had an understanding that the Si robot was nearing end of life, reported to us that it was one of the oldest in the state, in fact, I seem to recall that they had shared with us – they, meaning da Vinci, that it was one of the oldest on the West Coast, and there was a need and a desire from surgeons to want to use the Xi robot, and so we had ongoing discussions about – when I first started, about where we were at and where we wanted to go in the next year or two.").

[100] Wagner (10/11/2022) Dep. Tr. 44:15–25 ("Q. And what was the nature of that discussion? A. The nature of that discussion primarily was with surgeons, they were under the -- under -- we had an understanding that the Si robot was nearing end of life, reported to us that it was one of the oldest in the state, in fact, I seem to recall that they had shared with us -- they, meaning da Vinci, that it was one of the oldest on the West Coast, and there was need and a desire from surgeons to want to use the Xi robot, and so we had ongoing discussions…").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

between $175,000 to $249,000 on the $1.9 million system.[101] Valley Medical ultimately secured a $200,000 discount on the Xi system, no-cost training programs, and a $5,000 per year price reduction on its Xi service plan.[102] The hospital's benchmarking service indicated the system discount was "the highest discount we have seen for similar purchases."[103] Intuitive also assured Valley Medical it could trade in its existing Si system for $250,000 toward the purchase of another system within twelve months.[104]

---

[101] Wagner (10/11/2022) Dep. Tr. 103:14–104:25 ("Q. Mr. Wagner, do you recall we looked at a Defendant's Exhibit 111, which was an earlier quote that included a discount of $175,000 per purchase – A. Yes. Q. – of the Xi robot if northwestern proceeded. Do you remember that? A. I remember a quote that had that listed yes. And now the discount is $200,000 if both hospitals proceed; is that fair? A. That's what's written here, yes…Q. So, at this point, the discount on the table was $249,000 if both Valley and NW moved forward with the robot; is that fair. A. That's what's written here."); 118:6–119:7 ("Q. This is the sales, license, and service agreement for the purchase of the Xi robot; is that right? A. Yes…. Q. So "Pricing," it indicates the price for the Xi robot was $1.7 million. Do you see that? A. Yes. Q. So, at this point, from the initial quote that you had received earlier in 2018 to now, the price had dropped by $200,000; is that right? A. I believe so.").

[102] Wagner (10/11/2022) Dep. Tr. 118:20–119:25 (…Q. So "Pricing," it indicates the price for the Xi robot was $1.7 million. Do you see that? A. Yes. Q. So, at this point, from the initial quote that you had received earlier in 2018 to now, the price had dropped by $200,000; is that right? A. I believe so…Q. The – the last quote we looked at, which was Defendant's Exhibit 56, had indicated or quoted a price of $154,000 for service in years two through five. Do you have any recollection of how the price was reduced another $5,000 a year since that last quote? A. I don't recall."). *See also* Wagner (10/11/2022) Dep. Ex. 113, Jodi Johnson at Valley Medical Center, Email Message to John Tull at Intuitive Surgical, "RE: Valley da Vinci Executable SLSA for 8.31," August 31, 2018, VMC-00020652, at -661. Wagner (10/11/2022) Dep. Ex. 111, John Wagner at Valley Medical Center, Email Message to Lindy Dillingham and Jodi Johnson at Valley Medical Center, "Fwd: Valley da Vinci Xi proposals," August 3, 2018, VMC-00025583.

[103] Wagner (10/11/2022) Dep. Ex. 56, John Wagner at Valley Medical Center, Email Message to Michael Burke at Valley Medical Center, "FW: any updates on the robot?," August 23, 2018, VMC-00015998, at -999. *See also* Wagner (10/11/2022) Dep. Tr. 109:4–110:2 ("This appears to be a document provided by ECRI; is that fair? A. That's what's listed – is listed, yes. Q. And this ECRI is the benchmarking service that we are discussing earlier today; is that right? A. Yes…Q. So ECRI is saying that the deal on the table from Intuitive is the highest discount that they have seen for the Xi robot; is that right? A. That's what's listed here, yes.").

[104] Wagner (10/11/2022) Dep. Ex. 56, John Wagner at Valley Medical Center, Email Message to Michael Burke at Valley Medical Center, "FW: any updates on the robot?," August 23, 2018, at -043. *See* Wagner (10/11/2022) Dep. Tr. 106:24–107:9 ("Q. And then, under "Additional

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

62. Valley Medical exercised its trade-in option in 2019 when it purchased a second da Vinci Xi for $1,450,000, the discounted price negotiated on its first Xi less the Si trade-in value, plus $4,000 for delivery, a service agreement priced at $154,000 per year for each year 2–5 (the first year was included at no additional cost), and no-cost training programs and tickets to a robotic surgery conference.[105] As of 2021, Valley Medical operates two Xi platforms.[106]

63. Figure 17 shows the types of procedures performed via robotic-assisted surgery at Valley Medical. Types of procedures include general surgery, gynecology, and urology. Between 2012 and 2016, gynecology was the largest category of da Vinci surgeries performed at Valley Medical. Beginning in 2017, general surgery became the largest category and has grown to 66.3 percent of da Vinci surgeries at Valley Medical in 2021. Within general surgery, Valley Medical performed primarily hernia surgeries; growth in da Vinci performed general surgeries at Valley Medical has grown 161 percent from 2017 to 2023.[107]

---

Information," it reads (as read): This quote will have a $250,000 Si trade value lock for 12 months. Do you see that? A. Yes. Q So, consistent with what you said earlier, Mr. Wagner, does that mean that if Valley went to trade in its Si within the next 12 months, they would receive a $250,000 discount? A. I believe that's what this states."). *See also* Wagner (10/11/2022) Dep. Ex. 113, Jodi Johnson at Valley Medical Center, Email Message to John Tull at Intuitive Surgical, "RE: Valley da Vinci Executable SLSA for 8.31," August 31, 2018, VMC-00020652, at -662.

[105] Wagner (10/11/2022) Dep. Ex. 115, Jodi Johnson at Valley Medical Center, Email Message to Lindy Dillingham, John Wagner, Stephanie Lilje at Valley Medical Center, "FW: Quotes and Addendum to SLSA INTUITIVE SURGICAL DA VINCI," September 10, 2019, VMC-00018344, at -353.

[106] Amended Complaint, ¶ 19.

[107] *See* Procedures Analysis Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER



FIGURE 17: VOLUME OF DA VINCI PROCEDURES BY PROCEDURE TYPE—VALLEY MEDICAL, 2012–2023

Sources and Notes:

–   Intuitive dV Procedure Data.

## III.   PROFESSOR ELHAUGE HAS NOT PROPERLY ANALYZED WHETHER THE CHALLENGED ARRANGEMENT CAUSED INJURY TO CLASS MEMBERS

64.  Professor Elhauge assumes class-wide injury in this case based on his assertion that the prices for EndoWrists and system service would have been uniformly lower in the but-for world in the absence of Intuitive's contractual arrangements. In so doing, Professor Elhauge claims that Intuitive would not have changed its pricing practices in the but-for world on the other components that Intuitive sells to customers, such as the da Vinci robot. He makes this claim even though he asserts that Intuitive would effectively be the only seller of such surgical robots and would have monopoly power over surgical robots in the but-for world. As I demonstrate below, his assumptions are contrary to economic logic and contrary to the established academic literature on tying. In addition, as I discuss below, assessing whether any putative class member would have been injured in the but-for world requires individualized analyses.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### III.A.    PROFESSOR ELHAUGE IS WRONG TO FOCUS ONLY ON ENDOWRIST AND SERVICE PRICING

65.  Professor Elhauge assumes, without any basis, that Intuitive's prices on all components other than EndoWrists and system servicing would **_remain the same_** in the but-for world. This assertion does not make economic sense. As described above, Intuitive, sells a package of goods to customers that permit operation of a da Vinci surgical program. The customer needs all of these components to operate a robotic surgery program, and unsurprisingly, Intuitive and customers do not consider the pricing of each component of the package in a vacuum.[108] In fact, the ongoing revenue provided by components like EndoWrists and system service provide Intuitive with powerful incentives to offer discounts and financing options on its robot, especially where it expects the robot to be heavily utilized. These robot discounts, which can be quite significant, enable many customers to have access to a technology that they might otherwise not be able to afford. In Professor Elhauge's but-for world where Intuitive is compelled to offer EndoWrists and service at the steep discounts Professor Elhauge posits, the incentives for Intuitive to continue to offer discounts and financing on the other components, including robots, would be severely dampened. Yet, Professor Elhauge fails to analyze any potential changes in pricing, discounting, or marketing on any component of the da Vinci system besides EndoWrists and system service, including components that third parties cannot provide such as the robot and Advanced Instruments.[109]

66.  A proper analysis of the but-for world must consider the price of each component of the overall package, and in particular how the price of each component would change for a given customer. If Intuitive were forced to reduce pricing on EndoWrists and servicing in the but-for world as Professor Elhauge asserts, there is no economic reason to think Intuitive would continue to offer the da Vinci robot and certain other components such as Advanced Instruments, which third parties are not able to provide in any form, at the same price as observed in the actual world. Instead, in many situations Intuitive would no longer have the incentive to offer the same level of discounts on the robot and other components, and the effective amount paid by a customer could increase as a result.

---

[108]  _See_ Sections II.B–II.D above.
[109]  _See_ Section II.A.2.b above for a description of Advanced Instruments.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

67. As discussed in more detail below, the academic literature supports the notion that in
determining the injury to a customer from an asserted anticompetitive tie, it is necessary to
consider the price of the entire package of goods to the customer in the but-for world. Indeed, the
academic literature reflects that a monopolist engaging in an alleged tying arrangement will
likely charge less for the tying product (here for example, the da Vinci robot) given that the
asserted monopolist is supposedly charging higher prices for the tied products (here, EndoWrists
and service). Thus, in a but-for world without the contractual tie, it is possible, and in many
circumstances likely, that the asserted monopolist would charge more for the tying product than
it did under the contractual arrangement. As a result, any assessment of injury from the tie must
consider what the customer would have paid for both the tying and tied products in the but-for
world.

68. Professor Elhauge himself recognized in his prior writings:

> "[I]n most cases a premium price on the tied product must be accompanied by a
> reduction in the price of the tying product."[110]

> Thus, "the tied buyer is injured in fact only when it is forced to pay above-market
> prices for the sum of the tying and tied products."[111]

> "[D]amages arise when the combination price exceeds the sum of individual
> prices that would prevail absent the tie."[112]

69. The academic literature further reflects that in analyzing what a customer would have paid for
the package of goods in the but-for world, the removal of the asserted contractual tying

---

[110] Phillip E. Areeda, Herbert Hovenkamp, and Einer Elhauge et al., *Antitrust Law: An Analysis
of Antitrust Principles and Their Application*, Vol. X, 2nd Ed. (2004), ¶ 1769, at p. 413.

[111] Phillip E. Areeda, Herbert Hovenkamp, and Einer Elhauge et al., *Antitrust Law: An Analysis
of Antitrust Principles and Their Application*, Vol. X, 2nd Ed., (2004), ¶ 1769, at p. 414.

[112] Phillip E. Areeda, Herbert Hovenkamp, and Einer Elhauge et al., *Antitrust Law: An Analysis
of Antitrust Principles and Their Application*, Vol. X, 2nd Ed., (2004), ¶ 1769, at p. 415.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

arrangement in the but-for world often make some customers better off and others worse off, while some customers would be neither and would simply pay the same amount.

70. Professor Hovenkamp presents the example of a hypothetical copy machine monopolist engaged in a tying arrangement where there is varied intensity of usage by purchasers of copy machines and supplies. Low-intensity users would be made worse off by removing the tying arrangement, as they can no longer purchase the machine due to a higher price. As he explains:

> " …a price discrimination tie-in produces both beneficiaries and victims. The beneficiaries are the customers that would not have purchased the defendant's product at the non-discriminatory profit-maximizing price but are now able to obtain the tying product at a lower price because of the tie-in. The victims are the customers that could have bought the tying product at its nondiscriminatory profit-maximizing price without the tie-in, but that must pay more as a result of the tie-in."[113]

Thus, when the tie is removed and the price returns to the non-discriminatory profit-maximizing price, some purchasers are made worse off by no longer being able to purchase the product or paying more for the product.[114]

---

[113] Herbert Hovenkamp, "Tying Arrangements and Class Actions," *Vanderbilt Law Review* 36 (1983): 261–262. *See also id*. at p. 245 ("Obviously, high intensity users suffer the greatest harm, because the seller is obtaining the highest rate of return from them, and if the seller were not engaging in the tying arrangement they probably could obtain the machine and supplies at a lower aggregate price. Some low intensity users actually benefit from the tie-in because the price discrimination scheme enables them to obtain the machine"); *id*. at 259 ("[A] tie-in that facilitates price discrimination generally produces one set of gainers and one set of losers. Gainers tend to be low volume users of the defendant's products, and losers tend to be high volume users.").

[114] *See also* Erik Hovenkamp and Herbert Hovenkamp, "Tying Arrangements," in Roger D. Blair and D. Daniel Sokol, eds., *The Oxford Handbook of International Antitrust Economics* 2 (Oxford, 2015), 335–336 ("[S]ome consumers benefit from tying while others are injured by it…[W]e can divide consumers into three groups: low medium and high intensity. Low-intensity consumers are those with relatively low demand who are unwilling to pay the higher tying good price that arises under separate provision. They purchase the goods only under tying and are thus clearly benefitted by the tie.").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

71. Professors Abbott and Wright likewise explain that:

> "Tying may allow for price discrimination, resulting in higher prices for some consumers than would prevail absent a tie, but lower prices for others. Even in the simplest examples, without price discrimination, tying may either raise or lower prices to customers and raise or lower output."[115]

72. In particular, Professors Abbott and Wright observe that, as a result of a tying strategy, a firm is able to reach certain customers who otherwise would not be served. They continue:

> "…price discrimination, such as through metering, can allow markets to be served that would not be served under a single price monopoly. For example, light and heavy users of printers may both be served if they can buy a manufacturer's printer at a low price and its ink cartridges at a price above marginal cost."[116]

73. Furthermore, and of particular relevance here,[117] it is well-recognized that when R&D expenditures for the tying product are substantial, the incentive to reduce the price of the tying product to increase sales of the tied product are even greater. As Professors Erik Hovenkamp and Herbert Hovenkamp have written:

---

[115] Alden Abbott and Joshua D. Wright, "Antitrust Analysis of Tying Arrangements and Exclusive Dealing," in *George Mason Law & Economics Research Paper No. 08-37, Antitrust Law and Economics* (2008): 188–189.

[116] Alden Abbott and Joshua D. Wright, "Antitrust Analysis of Tying Arrangements and Exclusive Dealing," in *George Mason Law & Economics Research Paper No. 08-37, Antitrust Law and Economics*, (2008): 189.

[117] Intuitive incurs substantial R&D investments. Intuitive's reported annual R&D expenditures have grown from $11.1 million in 1999 to $999.8 million in 2023. *See* Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2001, p. 21; Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 75.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"If fixed costs are substantial, as they often are for manufactured products and particularly for those with a significant R & D component, then the output increase that results from tying will likely produce a lower profit-maximizing price quite aside from the pricing shift to the tied product. The output impact on the tied product is more ambiguous. On the one hand, high-intensity users consume less of the tied product because they pay more for it under tying. On the other hand, low-intensity users would not be in the market at all under separate provision."[118]

74. Professor Elhauge offers this same opinion, namely that variable proportion tying arrangements result in lower tying product prices accompanying tied products priced at a premium, in a book coauthored with Professors Areeda and Hovenkamp.

75. Professor Elhauge and his coauthors write,

"…tied product premiums are often offset by tying-product discounts below the price that would have prevailed without tying;"[119]

and,

"While the output effects of price discrimination generally are indeterminate, intensity-of-use discrimination is likely to be procompetitive, for it benefits the low-volume user who gets access to the defendant's tying product at relatively low prices. Variable-proportion price discrimination permits sellers to bring

---

[118] Erik Hovenkamp and Herbert Hovenkamp, "Tying Arrangements," in Roger D. Blair and D. Daniel Sokol, eds., *Oxford Handbook of International Antitrust Economics* (Oxford, 2015), at p. 337.

[119] Phillip Areeda, Herbert Hovenkamp and Einer Elhauge, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* Volume X, 2d ed., (Aspen Publishers, 2004), ¶ 1769, at p. 415.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

marginal buyers into the market without giving up higher returns to other buyers who are willing to pay more."[120]

Professor Elhauge's opinion in the book he wrote as an academic, rather than as a litigation expert, is that removing the tie would result in an increase in the price of the tying product, in this case, the robotic platform. In other words, Professor Elhauge and his coauthors offer an opinion regarding pricing of the tying product in their book that is the exact opposite of what he assumes would happen in this case. Rather than the price of the robotic platform rising to the profit-maximizing untied monopoly price if the tie is removed, Professor Elhauge is assuming here that Intuitive would do nothing at all to respond to this alleged new competitive threat from remanufactured EndoWrists and the provision of certain types of system service by third parties.

76. These quotations demonstrate that it is uncontroversial in the academic literature that in the absence of the tying arrangement, a defendant would be expected to raise the price of or reduce discounts on the tying product. As a result, there will be differential effects on purchasers in the but-for world. In particular, low intensity users of the tied products would be expected to pay higher prices on a package basis or they might choose not to purchase the tying product at all given the increase in price on the tying product.

77. Contrary to economic logic and this established body of academic literature, including statements from Professor Elhauge himself, Professor Elhauge offers two arguments in this case as to why Intuitive would not increase prices of the other components of the da Vinci package in the but-for world if faced with the steep prices declines on EndoWrists and system service that he posits. First, he claims that such an argument rests on the so-called "Single Monopoly Profit theory," a theory he claims does not apply in this case. Second, he claims that empirical evidence supports that Intuitive would lower robot prices in the but-for world. Specifically, he claims that when Intuitive introduced its Extended Use Instruments, which lowered the per-use price for such instruments, Intuitive lowered the price of its da Vinci robots. Professor Elhauge asserts that

---

[120] Phillip Areeda, Herbert Hovenkamp and Einer Elhauge, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* Volume X, 2d ed., (Aspen Publishers, 2004), ¶ 1769, at p. 418.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Intuitive "reduced real prices" for da Vinci instruments and servicing between 2018 and 2021 and "could not have compensated by increasing prices for S/Si robots because there were no meaningful sales" of S/Si robots during that period.[121] According to Professor Elhauge, "recent declines" in Intuitive's prices of EndoWrist and system service "have coincided with *decreases*, not increases, in da Vinci robot pricing."[122] As I explain below, Professor Elhauge's arguments are inaccurate and irrelevant for purposes of the specific question here—i.e., whether class-wide injury can be evaluated through common evidence, without the need for individualized analysis.

78.  First, Professor Elhauge claims that Intuitive has previously argued in this case that it could earn exactly the same profit with higher system prices and no tying arrangement as it earned with the tying arrangement. He claims this means that Intuitive must be invoking the "Single Monopoly Profit" theory, which he describes as holding that a firm with a monopoly in one product cannot increase its monopoly profits by using tying to leverage itself into a second monopoly in another product.[123] My opinions do not rest on the Single Monopoly Profit theory, nor do I believe that Intuitive's counsel or other experts have invoked such a theory. In any event, Professor Elhauge's statements in his Class Report on the theory are irrelevant.

79.  Professor Elhauge claims that the Single Monopoly Profit theory is not applicable in this case, citing to his own writings. In essence, Professor Elhauge's writings state that the Single Monopoly Profit theory should only be valid to find a tie lawful if a rigid set of five factors is satisfied. He claims that three of those factors are not met in this case, including (1) a fixed ratio in the use of the tying and tied product; (2) a fixed competitiveness of the tied market; and (3) a fixed competitiveness of the tying market. Because Professor Elhauge claims that these three factors in the test that he created are not satisfied in this case, he thus concludes that Intuitive would take no action whatsoever to change its prices, discounts, or marketing strategies in the but-for world on the components that only Intuitive sells.

---

121  Elhauge Class Report, ¶ 846.a.

122  *Id*.

123  Einer Elhauge, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," *Harvard Law Review* 123, No. 2 (2009): 397–481.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

80. Professor Elhauge's invocation of the Single Monopoly Profit Theory is irrelevant for a number of reasons. First, his "five-factor test" appears to have been developed for purposes of determining when the Single Monopoly Profit Theory is appropriately used to determine whether a particular tie is legal. His test appears to focus on the question of which ties he views as being unlawful, rather than the separate question of whether a tying arrangement causes consistent, class-wide injury. Indeed, the academic literature set forth above reflects that tying arrangements can have differential effects on customers, both positive and negative. Even Professor Elhauge has recognized this in his own prior writings, which state: "Even when products are not used exactly in fixed proportions, tied-product premiums are often offset by tying-product discounts below the price that would have prevailed without tying. . . ."[124]

81. In addition, in his discussion about the Single Monopoly Profit theory, Professor Elhauge poses that because system service is a "partial substitute" for robots, lower pricing on system service would also reduce robot pricing.[125] This assertion is purely theoretical,[126] and he provides no insight as to whether this assertion even matters for the question of class-wide injury. As I have explained at length above, there is no single robot "price," as each sale is extensively negotiated. Professor Elhauge does not explain exactly how lower service prices would affect these sales negotiations, nor does he offer the opinion that lower service prices would lower the price of every or nearly every robot. While system service might extend the life of an installed robot, Professor Elhauge cannot speak as to how much the robot life might be extended, nor whether the extension would be long enough and affect enough robots to elicit the robot price reductions he hypothesizes. Also, service on an S/Si system is no substitute at all for the more advanced technology embodied in the X/Xi or 5 series. So Intuitive would have no incentive, contrary to

---

[124] Phillip Areeda, Herbert Hovenkamp and Einer Elhauge, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* Volume X, 2d ed., (Aspen Publishers, 2004), ¶ 1769, at p. 415.

[125] Elhauge Class Report, ¶ 680.

[126] I note that arguing that robots and servicing are "partial substitutes" contradicts much of Professor Elhauge's opinion where he acknowledges, correctly, that robots and servicing are complementary goods. *See* Elhauge Class Report, ¶¶ 848-850. When two goods are complements, a decrease in the price of, say, servicing will *increase* the demand for robots and potentially increase the robot price if the increase in demand is large enough, all else equal. *See* Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, Eighth Edition (New Jersey: Pearson Education, Inc., 2013), p. 24.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

his claim, to reduce the price of more advanced systems to hospitals considering upgrades. Finally, even if his "partial substitution" argument were correct, it does not resolve the fundamental problem with his opinion, namely that removing the alleged tie would still leave some members of the proposed class worse off. In short, simply raising the idea that service might be a possible "partial substitute" for robots does absolutely nothing to demonstrate that the concept is in fact real, and if so, that it matters to the question of class-wide injury. With no evidence, his "partial substitute" claim does nothing to advance his claim of class-wide injury.

82. Second, and relatedly, whether or not the Single Monopoly Profit Theory is valid or not in this case is irrelevant. It is irrelevant because *whether Intuitive's profit is higher, lower or the same in the but for world—the question that the Single Monopoly Theory addresses—has absolutely no bearing on the question of injury. The only relevant question here is whether or not buyers would all have been better off in the but for world.* In a situation like the current one, where the tied EndoWrist product is used in variable proportions with the tying robot product, it is clear from both the record and the academic literature that some buyers will in fact be worse off in the but-for world without the tying arrangement.

83. Assume that Plaintiffs' allegation that Intuitive was able to increase its profits by "leveraging" its alleged monopoly in MIST surgical robots into a second monopoly in EndoWrists is true. Then it will choose prices for the tying and tied goods that maximize joint profits. According to the literature, the chosen price of the tying good would be lower than the profit-maximizing monopoly price absent the tie, as it is beneficial to the monopolist to sell more units of the tying good to induce additional sales of the supra-competitively priced tied good.[127] Conversely, the chosen price of the tied good would be higher than the competitive price absent the tie. If the tying arrangement is ended, the monopolist reverts to the profit-maximizing monopoly price on the tying good without the tie—a price that is higher than the profit-maximizing price of the tying good with the tie. The higher price for the tying good and lower price for the tied good creates three groups of customers: those that are worse off because the customer sees an increase in price of the tying product but does not consume much of the lower-priced tied product; those

---

[127] Einer Elhauge, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," *Harvard Law Review* 123 (2009): 410–412.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

that are better off because the customer consumes a larger volume of the tied product and enjoys its savings; and those that are neither better off nor worse off. When there is significant variation in intensity of usage, as is the case here, which customers are in which group can only be determined through individualized inquiry.

84. This is not a question that Professor Elhauge has addressed at all, let alone demonstrated that there would be common evidence on these issues in the but-for world. This individualized inquiry becomes both more necessary and more complex when one considers that Intuitive and its customers separately negotiate each robot acquisition. As shown in Figure 5 and Figure 10, there is no single price for a robot or service plan.[128] Determining the result of each such negotiations in Professor Elhauge's but-for world cannot be done using common proof.

85. Professor Elhauge's other argument is that it is appropriate to assume Intuitive would not raise robot prices based on empirical evidence in the report. Specifically, he claims that Intuitive lowered the prices of its da Vinci Xi robots when it implemented the Extended Use Program in October 2020. More generally, Professor Elhauge also claims that prices of EndoWrists, system service, and robots have declined and that, between 2018–2021, Intuitive "could not have been compensated" by higher prices for S/Si robots.[129] He offers these conclusions based on his interpretation of Dr. Smith's figures.[130] His assertion is both inaccurate and irrelevant.

86. Specifically, instead of conducting his own analysis using Intuitive's systems transactions data, Professor Elhauge cites to "Dr. Smith's own data" in his assertion that "when Intuitive's Extended Use Program responded to competitive pressure by lowering the per-use price for Xi EndoWrists, Intuitive *lowered* (not raised) both the real and nominal price of the Xi da Vinci

---

[128]  Indeed, in his Class Report, Professor Elhauge writes that, "Intuitive does charge different customers different prices for da Vinci robot," that, "there was widespread variation in the prices that Intuitive charged different customers for the Xi robot, and that "[s]imilar price dispersion exists for da Vinci robot models." *See* Elhauge Class Report, ¶ 206. With respect to service plan pricing, Professor Elhauge describes the " ███████████████ " Intuitive offered to some customers, ███████████████████████████████████████████ ███████████████████████████████████████████████████ *See* Elhauge Class Report, ¶¶ 915–916.

[129]  Elhauge Class Report, ¶ 846.a.

[130]  Elhauge Class Report, ¶ 934.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

robot from 2020-2021, and made no significant increase in the real or nominal price for da Vinci servicing."[131] However, for the purpose of analyzing net prices at which customers acquire the robots as part of the da Vinci package, Professor Elhauge uses the wrong metric because Dr. Smith's analysis excludes transactions that involve system trade-ins and system upgrades.[132] Trade-ins and upgrades are key ways in which Intuitive can adjust its pricing of surgical robots to accommodate customers' needs. Thus, a proper analysis of the relationship between trends in prices across components of the da Vinci package would include these transactions.

87.  More generally, it must be emphasized that trends in the *average* system price are of no use whatsoever in evaluating injury in a situation like the present where each sale or lease is the result of detailed negotiation over the mix and pricing of the various system components. This applies not only to Professor Elhauge's claims about the trend in average prices of the Xi robot specifically but also with regards to trends in average prices of EndoWrists, system service, and da Vinci robots. In Professor Elhauge's but-for world of lower EndoWrist and system service pricing, each of these negotiations would have to be reimagined in light of the changed circumstances to determine whether any buyer was in fact injured or not. Trends in the average price do not inform these but-for negotiations at all.

88.  Regardless, when I analyzed the trends in Intuitive's robot prices using the company's system transactions data across all U.S. sales including trade-ins and upgrades, I do not find that Intuitive's average price decreased after October 2020. The average price of the Xi Single Console model increased from $█████ in 2020 to $█████ in 2021. Similarly, the average price of the Xi Dual Console model increased from $█████ in 2020 to $█████ in 2021.[133] As reflected in Figure 5, there is a high degree of variation in prices where, in the same quarter, a

---

[131]  Elhauge Class Report, ¶ 934 (emphasis in original). *See also* Elhauge (7/24/2024) Dep. Tr. 53:8–17 ("Q. But in 846a(i), you're making the point that when Intuitive introduced its X/Xi extended-use instruments in 2020 to 2021, it did not raise Xi robot prices, but rather lowered them. For the portion that sentence that says it did not raise Xi robot prices, but rather lowered them, what are you relying upon? A. For that I was relying on Dr. Smith's own data, as this paragraph says.").

[132]  Amended Expert Rebuttal Report of Loren K. Smith, *In Re: Da Vinci Surgical Robots Antitrust Litigation*, Case No. 3:21-cv-03825, February 10, 2023, Appendix A, ¶ 12.

[133]  *See* System Prices before and after EUP Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

robot may be sold for $███████ or nearly $███████. Moreover, because each transaction is heavily negotiated between the customer and Intuitive,[134] the timing of sales may be irregular and depend on both market and customer factors. Thus, when analyzing the trend in prices, it would be appropriate to look over longer time periods because of noise from the individual negotiations rather than focus on only two years (2020 and 2021) as Professor Elhauge did.[135] Between 2019 and 2023, there is no evidence that average robot prices decreased in the years after the Extended Use Program began in October 2020. In fact, the difference in average robot prices from January 2019 to September 2020 and from October 2020 through December 2023 shows a slight increase in average prices over time.[136]

89.   Even if Intuitive had lowered the average cost of the da Vinci X/Xi platform in 2020, which it did not, Intuitive's revenue and income data over this period undercuts Professor Elhauge's claims. As reported in Intuitive's Form 10-K filings, Intuitive's overall revenue and net income increased between 2020 and 2021 specifically, and also over the longer time period, 2019 through 2023.[137] Given that Intuitive's income and profits were rising steadily during this period, Intuitive was not faced with the situation that Professor Elhauge posits—i.e., lower across-the-board revenue from EndoWrist sales and da Vinci service. Professor Elhauge entirely fails to take this into account when asserting that Intuitive's but-for world pricing for robots would follow the same pattern as robot pricing after introduction of the Extended Use Program.

---

[134]   *See* Sections II.B–II.D. *See also* Section II.E for examples of negotiations between Intuitive and the Named Plaintiffs.

[135]   Elhauge Class Report, ¶ 934.

[136]   The average system price between January 2019 and September 2020 was $███████, as compared to $███████ on average between October 2020 and the end of 2023. *See* System Prices before and after EUP Workpaper.

[137]   Intuitive's overall revenue increased from $4.36 billion in 2020 to $5.71 billion in 2021 and its net income increased from $1.06 billion in 2020 to $1.70 billion in 2021. Over a five-year period of 2019 through 2023, Intuitive's revenue rose from $4.48 billion in 2019 to $7.12 billion in 2023 and net income from $1.38 billion to $1.82 billion. *See* Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 75; Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2021, p. 68; Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, p. 55.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

90. In fact, while on one hand, Professor Elhauge claims that the Extended Use Program was in response to "competitive pressure" from third parties,[138] he also asserts that Intuitive's contractual arrangements successfully stopped third parties from competing in sales of remanufactured EndoWrists.[139] If Intuitive had stopped third parties from competing, as Professor Elhauge asserts, then any per-use price reduction from the Extended Use Program would not have been to respond to competitive pressure from third parties. An alternative, and I believe more likely explanation for the Extended Use Program was to enhance sales by making the da Vinci system more affordable for additional types of surgeries.

91. Professor Elhauge's opinion regarding Intuitive's response, or as he claims, lack of response to any new competitive threat regarding EndoWrists and servicing is illogical, irrelevant, and contrary to the record in this matter. It defies economic logic to claim that a firm selling a variety of components for a single robotic program—the robot, various types of I&A, and system service—would hold all other prices constant in response to a competitive threat to a single component. The record clearly shows that Intuitive is constantly innovating and implementing new pricing practices across all components, including the robotic platform where, according to Professor Elhauge, it faces no viable competitive threat.[140] In addition to conventional sales and leases of the robot, Intuitive places robot systems on a per-procedure price and has other ways of placing robots with hospitals at greatly reduced or even zero capital cost.[141] These new pricing strategies allow Intuitive to expand its sales to new, marginal customers, provide enhanced value to existing customers and to increase the customers' profitability. If Intuitive displays such pricing flexibility and innovation on robot systems facing no competition, why would it not deploy all pricing tools across components available to it when faced with an actual competitive threat from third-party remanufactured EndoWrists and system service as Professor Elhauge claims? And, to the extent that Intuitive would have monopoly power in all three of his posited markets in the but-for world—which are robots, EndoWrists, and system service—as Professor

---

138  Elhauge Class Report, ¶ 606.

139  Elhauge Class Report, ¶ 465. *See also* Elhauge Class Report, fn. 1382.

140  *See* Section II.A above.

141  *See* Sections II.C and II.D above.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Elhauge has stated,[142] there is no reason why Intuitive would not continue to develop pricing arrangements that balance customer needs—such as those described in Section II.D—and its financial objectives.

92. Moreover, as discussed above, Professor Elhauge's claims regarding empirical evidence that Intuitive would not have increased its robot prices are inaccurate. Contrary to his assertion that the average price of robots have decreased, the average price of da Vinci Xi robots—which had the highest sales among Intuitive's robots during the class period—have increased between 2020 and 2023. In addition, Intuitive's aggregate revenues and net income have continued to grow over the period with the introduction of the Extended Use Program such that there would be no need to increase robot prices.

### III.B.    ASSESSING INJURY IN THE BUT-FOR WORLD WOULD REQUIRE INDIVIDUALIZED INQUIRY

93. If Intuitive were to decrease discounts and concessions on the price of the da Vinci robot and components that third parties cannot provide in the actual world or Professor Elhauge's but-for world in response to Professor Elhauge's envisioned decreases in EndoWrist or servicing prices, then many hospitals would be worse off in his but-for-world.[143] As discussed above, the relevant analysis is not the cost of specific components, but of the package as a whole.

---

[142] Elhauge (7/24/2024) Dep. Tr. 41:12–42:4 ("Q. In the but-for world, you conclude that Intuitive would still have monopoly power in your defined relevant market; correct? A. Yes. Well, in all three, I guess. There's three relevant markets. They have monopoly power in all three. Q. What three relevant markets are you referencing? A. The market for MIST surgery robots, the market for EndoWrist repair and replacement, and the da Vinci service market. Q. In the but-for world, it's your conclusion that Intuitive would have monopoly power in each of those three relevant markets? A. Yes.").

[143] Numerous studies find that tying arrangements or their removal do not have identical effects on all purchasers. On the contrary, in a situation as in this matter where the tied product is used in variable proportions to the tying product, some purchasers are better off with the tying arrangement while others are worse off. The situations of these two groups are reversed if an existing tying arrangement is removed. *See*, for example, Erik Hovenkamp and Herbert Hovenkamp, "Tying Arrangements," in Roger D. Blair and D. Daniel Sokol, eds., *Oxford Handbook of International Antitrust Economics* (Oxford, 2015), at p. 335; John H. Matheson, "Class Action Tying Cases: A Framework for Certification," *Northwestern University Law*

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

94. To illustrate this point, Table 1 presents the actual amount spent on each major component during the class period by six hospitals. I chose the first three hospitals in the table because they incurred the median spending amount on systems, system servicing, and EndoWrists, respectively, across Intuitive's customers during the class period. In other words, I did not know the identity of the hospitals or their spending before doing the analysis, but chose them because those hospitals happened to be the hospitals with median spending on robots, system service, and EndoWrists during the class period. The other three hospitals I analyzed are the Named Plaintiffs. The table shows each hospital's expenditure on system platforms, servicing, and I&A, where spending on EndoWrists, Advanced Instruments, and other I&A are reported separately. In Table 1, I have included a potential but-for world with Professor Elhauge's asserted 20 percent decrease in EndoWrist prices and his 12 percent decrease in system servicing prices.

    a. In the table, the percentage increase in expenditure on the robot(s) is chosen so that prices in the but-for world match the list price before applying discounts or other concessions such as trade-in credits.[144] In other words, for this analysis, I assume that Intuitive did not offer concessions off the list price for the robot. To the extent that some customers would have not acquired a da Vinci at all or would not have upgraded their systems without the concessions, the transactions might not have been completed. And for those customers, they would be worse off in the but-for world without the revenues from da Vinci surgeries that were

---

*Review* 76, No.6 (1982), at p. 887; Herbert Hovenkamp, "Tying Arrangements and Class Actions," *Vanderbilt Law Review* 36 (1983) at p. 216 states "[Certain] tie-ins…injure one set of customers while they benefit another set. These kinds of tying arrangements may or may not be socially injurious. *They are not suitable for class action treatment unless the customers injured by the arrangement are somehow distinguishable from the customers that the tie-in benefits* [emphasis added]." *See also*, *id.* at pp. 218, 227, 238-239 and 261.

[144] I conducted a similar analysis in which I assume that the but-for expenditures on the robot match the customers' contract prices rather than list price. *See* Appendix D and Table 3. "List" price is the suggested price that Intuitive assigns each da Vinci model as reflected in Intuitive-00000210, System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020); "Contracted" price and transacted price are prices that I observe in Intuitive's Systems Data for each customer. *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, p. 1; Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses, pp.1–2.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

performed and without the benefits to doctors and patients that Plaintiffs readily acknowledge that the da Vinci delivers. Whether or not the transaction would have been completed or whether Intuitive would have offered concessions depends on individual factors in negotiation, as described in Section II.D.

b.  For Advanced Instruments, the table reflects a five percent increase in prices. A one-time five percent increase would be a reasonable increment by which Intuitive might increase instrument prices. For example, when Intuitive introduced a new X/Xi 8mm vessel sealer extend in 2018 and phased out the prior X/Xi 8mm vessel sealer in 2020, the price of the new vessel sealer was approximately five percent higher than that of the prior vessel sealer.[145]

c.  For purposes of simplification, Table 1 assumes no changes in any of the other elements of the package that Intuitive provides to customers, such as accessories or training. My findings may be understated for that reason.

95.  For five of the six hospitals in Table 1, the elimination of Intuitive's concessions on prices for the robot(s), together with only a modest increase in price of Advanced Instruments, would result in higher total pricing on the package, making them worse off in the but-for world than the actual world. However, since prices are ultimately determined through negotiation, the but-for transacted prices for each customer would be expected to differ from one another such that an evaluation of actual injury, accounting for pricing across the entire da Vinci package, including the robot, system service, and EndoWrists, rather than separate components, would require an individualized inquiry.

a.  ███████████████████) spent the median amount on EndoWrists during the class period, approximately $██████. If in the but-for world, Intuitive did not offer concessions to ███████ on its robot purchases and instead charged list price, ██████ would have been worse off. With the increase in price of the robot and a five-percent increase in the

---

[145]  *See* 8mm Vessel Sealers Price per Use Workpaper. Intuitive introduced the new X/Xi 8mm vessel sealer extend (part number: 480422) in 2018, and the prior X/Xi 8mm vessel sealer (part number: 480322) phased out in 2020. *See also* Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2018, p. 47.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

prices of Advanced Instruments, ███████ would have paid $██████ more in the but-for world than in the actual world.[146]

b.  ████████████████████████████ spent the median amount on servicing, approximately $██████ during the class period. The loss of discounts on its Xi robot, along with a five-percent increase in the prices of Advanced Instruments, would have resulted in ██████ paying more than $██████ for the total package in Professor Elhauge's but-for world than ██████ paid in the actual world.[147]

c.  ████████████████████████████ spent the median amount on surgical robots during the class period, approximately $████████. The loss of discounts on the price of its robot, paired with a five-percent increase in Advanced Instruments, would have resulted in ██████ paying $██████ more in Professor Elhauge's but-for world than it did in the actual world.[148]

---

[146] ████████████████ contract for the Xi robot that ██████████' acquired in 2021 reflects a negotiated a price of $██████. In addition, ██████████ received additional concessions including $██████ for the first-year service warranty, $██████ in training credits, $██████ in proctoring credits, and $██████ in trade-in credits, and free delivery, though some of these concessions appear to have been recognized as part of other transactions included in the same contract. *See* Intuitive-01966314. ████████ contract for its 2018 Xi robot acquisition reflected a negotiated a price of $██████ as well as additional concessions including $██████ for the first-year service warranty, $██████ in trade-in credits, and a $██████ rebate. *See* Intuitive-01793814.

[147] ████████████████████████████ received $██████ in trade-in credits and first-year servicing valued at $██████ at no additional charge when it purchased its da Vinci Xi Single Console robot on October 31, 2021, which largely account for the difference between the contracted value ($██████) and realized system revenue ($██████) for this robot; *see* Intuitive Systems Data. *See also* "Sales, License and Service Agreement.", October 31, 2021, Intuitive-01974040, at pp. 10–11.

[148] Intuitive offered ██████ $██████ in trade-in credits, included first-year servicing at no additional charge, and waived the delivery fee for ██████ single console da Vinci Xi robot, purchased on August 28, 2018. These concessions largely account for the difference between the contracted price ($██████) and realized system revenue ($██████); *see* Intuitive Systems Data. ██████ contracted price also reflects a $██████ discount relative to the list price for a da Vinci Xi systems. *See also* "Transaction Agreement between ████████████████," August 28, 2018, Intuitive-00931801, at -801–802. For the list price the da Vinci Xi system, *see* "System Pricing Approval Datasheet," February 2020, Intuitive-00000233.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

d.  Larkin received more than several hundred thousand dollars in discounts and concessions on the two robots it leased in 2017.[149] The loss of those discounts and concessions in the but-for world would not be as much as Professor Elhauge's asserted discounts on EndoWrists and service, and thus Larkin would still be better off in the but-for world by $39,031.[150]

e.  Valley Medical's robot purchase agreements included more than $850,000 in concessions and discounts. If these concessions were no longer offered in the but-for world and the prices of Advanced Instruments increased by 5 percent, Valley Medical would have been worse off by nearly $200,000.[151]

f.  Franciscan purchased seven da Vinci robots during the class period. If it had paid list price for these systems and five percent more for their Advanced Instrument purchases in the but-

---

[149]  Larkin's contracted price was $850,000 for the recertified Si robot and $1,750,000 for the Xi robot that it leased in 2017. *See* Intuitive Systems Data. As noted in Section II.E.1, Ms. Sosa-Guerrero has testified that Larkin received even larger discounts. For this analysis, I apply the same approach for Larkin as for the other five hospitals in Table 1 and use Intuitive's Systems Data to calculate the actual expenditure on the robot and Intuitive's System Pricing Approval Datasheets to determine robot list price.

In addition, Intuitive offered one year system service at no additional charge and waived the delivery fee on one system. *See* "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," June 9, 2017, Intuitive-00300421 at -434.

[150]  *See* "Use, License & Service Agreement between Intuitive Surgical, Inc. and Larkin Community Hospital," June 9, 2017, Intuitive-00300421, at -434 and -439 for additional details about Larkin's contract.

[151]  Valley Medical Center received $250,000 in trade-in credits and first-year servicing valued at $154,000 at no additional charge when they purchased their da Vinci Xi single console system on September 4, 2019, which largely account for the difference between the contracted value ($1,700,000) and realized system revenue ($1,347,451) for this system. *See* Intuitive-00313873, at -874–876; *see also* Intuitive Systems Data. They also received first-year servicing valued at $149,000 at no additional charge when they purchased their da Vinci Xi single console system on September 15, 2018, which account for the difference between the contracted value ($1,700,000) and realized system revenue ($1,578,347) for this system. *See* "Sales, License and Service Agreement between Intuitive Surgical, Inc. and Valley Medical Center," August 31, 2018, Intuitive-00306656, at -665; *see also* Intuitive Systems Data.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

for world, then Franciscan would have paid nearly $300,000 more in the but-for world than in the actual world.[152]

---

[152] In one of its acquisitions, Franciscan Alliance received $150,000 in trade-in credits and first-year servicing valued at $139,000 at no additional charge when it purchased its da Vinci Xi Single Console robot on September 25, 2020, which largely account for the difference between the contracted value ($1,700,000) and realized system revenue ($1,372,593) for this robot; s*ee* Intuitive Systems Data. *See also* "Transaction Agreement Between Participant and Intuitive Surgical Inc.", September 25, 2020, FRANCISCAN-00001920, at -920–922.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### TABLE 1: PACKAGE PRICING ANALYSIS FOR SIX CUSTOMERS

| | Actual [A] | % Change [B] | But-For [C] | Difference [D]=[A]-[C] |
|---|---|---|---|---|
| ████████████████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| ██████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| ██████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Larkin Community Hospital - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Valley Medical Center - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Franciscan - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Sources and Notes:

– [1][A]: Intuitive Systems Data, Total System Revenue (USD), which is total revenue net of discounts, rebates, credits, etc. For leased systems, this field is empty. In such cases, I use the Revenue SAP Amount, which is "the amount of revenue recognized for the system after allocation among different obligations in the contract." *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc.,* Case No. 5:19-cv-55, July 9, 2021, p. 1 and Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses, pp.1–2.

– [2][A]: Intuitive-02072148, Total Servicing Revenue.

– [3][A]: Intuitive I&A data, EndoWrists identified based on Elhauge Class Report, Exhibit D.

– [4][A]: Intuitive I&A data, Advanced Instruments refer to instruments ever sold in "Box" units.

– [5][A]: Intuitive I&A data, filtered to exclude those instruments included in [3] or [4].

– [6] = [1] + [2] + [3] + [4] + [5]

– [1][B]: [D]/[A]

– [2][B]: Set to equal the 12 percent Service price discount Professor Elhauge asserts in his damages analysis. *See* Elhauge Class Report, ¶ 825.

– [3][B]: Set to equal the 20 percent EndoWrist price discount Professor Elhauge asserts in his damages analysis. *See* Elhauge Class Report, ¶ 782.

– [4][B]: Set to reflect a five percent increase in the price of Advanced EndoWrists.

– [5][B]: Set to reflect no price for other I&A.

– [1][C]: List price (or "suggested price") as reflected in the Systems Pricing Approval Datasheets Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020) for standard system sales or operating lease transactions. For the operating lease buy-out and trade repurchase transactions, I used Intuitive Systems Data, Total Contract Amount (Functional), which is the price reflected in the customer contract. *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc.,* Case No. 5:19-cv-55, July 9, 2021, p. 1.

96.   These examples demonstrate that if Intuitive were to change its pricing strategy and offer fewer discounts on some components of the package the customer needed in the but-for world, injury would differ across class member—not just in amount, but also in direction, as the net effects could be positive, negative, or neutral. Some customers might be better off, but others—such as five of the hospitals in the table above—likely would have been worse off in the but-for world. If Intuitive were to decrease EndoWrist and service prices and increase robot prices in the but-for world, then hospitals that perform a large number of procedures would likely benefit from the lower EndoWrist prices, whereas hospitals that perform fewer surgeries would likely be worse off because they would have to pay more for the da Vinci robot than they saved through lower prices for EndoWrists and service. In some cases, the price of the robot could be so prohibitively high such that these hospitals would not be able to afford the da Vinci at all, which would also leave them, and their patients, worse off. Determining which class members fall in each group is a matter for individualized inquiry.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

97. Looking at Professor Elhauge's calculations with the foregoing considerations in mind, I would expect that a large share of hospitals in Plaintiffs' proposed class are uninjured. Intuitive has historically offered substantial concessions on list prices, especially on robots, to many customers; the examples in Table 1 are not outliers. For each hospital in the table, the robot list prices were between ██████ percent greater than the actual prices for its acquired robot(s) during the class period. In other words, the actual prices paid for the robots were ██████ percent lower than the list prices.[153] The average list price during the class period is approximately $██████ ██████[154] If Intuitive offered 22 percent off the list price, the customer would have received $██████ in concessions on the average purchase; if the customer acquired two robots under the same terms, then its total concessions would have been $██████.[155] Professor Elhauge claims that, assuming but-for entry on May 21, 2017, approximately 25 percent of the proposed class incurred damages of $██████ or less, and half of the proposed class has damages of $██████ or less.[156] Notably, loss of the concessions for one robot acquisition at $██████ would result in over 25 percent of proposed class members paying more for the package, and the loss of concessions for two systems at $██████ would result in more than half of proposed class members paying more for the package. This demonstrates that under reasonable assumptions about robot discounting in the but-for world, a large share of the class would likely have no injury, and determining which class members might have injury would require individualized analyses.

98. Professor Elhauge claims that Intuitive would not have been able to "compensate[]" for decreases in EndoWrist and system service pricing by increasing prices for S/Si robots during the

---

[153] For example, for ██████████, its actual prices on robots were ██████ lower than the list prices, where 0.22 = $██████████. Among the six hospitals, the median amount by which actual prices are lower than list prices is ██████. *See* Package Pricing Analysis Workpaper.

[154] *See* Package Pricing Analysis Workpaper. Because the majority of S/Si systems sold during the class period are sold well below their list price, I use the contracted price for S/Si systems and for any other systems for which I cannot identify the list price. ██████████████ ██████ or ██████.

[155] $██████ x 2 = $██████.

[156] Elhauge Class Report, Table 28.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

class period because few S/Si robots were transacted after 2018.[157]  His claim does not make economic sense for at least two reasons. First, in a but-for world without the contractual restraints at issue, the price of the S/Si robot would have been adjusted at the time of the purchase or lease, and there is no reason why Intuitive would only adjust concessions for robots after May 21, 2017, a date that is an artifact of the case rather than a date of significance to Intuitive's business. Second, one of the ways in which Intuitive adjusts pricing is through trade-in credits. Thus, even if customers do not acquire S/Si robots, the trade-in credit offered for such robots likely would differ in the but-for world. Customers that delay trading in their S/Si robots for a da Vinci X/Xi robot likely would be worse off in the but-for world given the advantages of X/Xi over S/Si, such as "broader anatomical access" that enables surgeons to perform a wide range of procedures.[158]

99.  In addition, if faced with lower service prices and EndoWrist prices in the but-for world, the lower discounts Intuitive would be expected to provide on robot prices would likely result in some customers being unable to afford to purchase or lease a da Vinci. Professor Elhauge has not analyzed how the challenged arrangement would affect pricing across customers, nor the potential effect on customers' decisions to acquire a da Vinci robot. As shown in Intuitive's systems transactions data, 1,096 hospitals purchased new or additional robots, 1,088 hospitals leased new or additional robots, and 1,151 hospitals upgraded from S/Si to X/Xi models during the class period.[159] Professor Elhauge has not analyzed which of these customers would not have acquired a new robot or upgraded to the X/Xi model if Intuitive changed its pricing strategy on robots. Indeed, one of the aims of Intuitive's pricing strategy—as exemplified when Intuitive began offering inhouse leasing—has been to meet customers' needs and thereby increase access to the benefits of da Vinci surgery to a wider range of customers.[160] Customers that would have

---

[157]  Elhauge Class Report, ¶ 846.a.

[158]  "Da Vinci Xi," accessed July 2024, https://www.intuitive.com/en-us/products-and-services/da-vinci/xi.

[159]  Some of these leases were leased through the AMP program. *See* Incremental Systems Tabulations Workpaper.

[160]  Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 65 ("Since 2013, we have entered into sales-type and fixed-payment operating lease arrangements directly with certain qualified customers as a way to offer customers flexibility

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

been unable to acquire or upgrade in a but-for world would not have earned the revenue they would have received from performing da Vinci procedures and thus might not have recruited or retained surgeons who used the da Vinci robot;[161] it is likely that most, if not all, such customers would be worse off than in the actual world, because of the lost revenue opportunity.

## IV. EVEN FOCUSING ONLY ON ENDOWRISTS, PROFESSOR ELHAUGE ASSUMES—RATHER THAN DEMONSTRATES—INJURY ACROSS THE CLASS

100. In the previous section, I accepted Professor Elhauge's but-for world price reductions at face value and explained that: (a) Intuitive likely would alter its pricing strategy on components of the package that only it can provide in such a way that many customers would be worse off and many would suffer no injury in the but-for world; and (b) identifying the class members who would actually be better off in the but-for world would require inquiries into each potential class member's individual circumstances and relationship with Intuitive. For purposes of that analysis, I accepted that Professor Elhauge's conclusions about EndoWrist pricing in the but-for world were supportable. In this section, I explain why it is my opinion that those conclusions are not supported on this record—and, in particular, why they make no economic sense.

101. Professor Elhauge fails to show that demand for third-party remanufactured EndoWrists would be sufficient to motivate Intuitive to decrease the price of all EndoWrists as he claims. If

---

in how they acquire systems and expand their robotic-assisted programs while leveraging our balance sheet."). *See also* Section II.D above.

This is consistent with the discussion in Tirole (2005) that a tying arrangement could "avoid[] excluding" certain customer groups and thereby "raise[] economic efficiency" when customers have differing willingness to pay. *See* Jean Tirole, "The Analysis of Tying Cases: A Primer," *Competition Policy International* 1, No. 1 (2005): 16 ("Similarly, suppose that some consumers use M on a stand-alone basis while others use M in combination with C or C'. Under unbundling, the producer of M is forced to charge a single price for M, even though the two groups' willingness to pay may be quite distinct. For example, if consumers without demand for the complementary product have a low willingness to pay for M, the producer of M may end up charging a high price for M and prevent them from consuming. By contrast, a tie enables the producer of M to charge a low price for the basic good and a high price for the combination, which avoids excluding the first group and raises economic efficiency.").

[161] Elhauge Class Report, ¶¶ 81-83, 91-96.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Intuitive were to leave its prices unchanged, only those customers who would purchase remanufactured EndoWrists from third parties would be injured, and Professor Elhauge has not shown that there is common evidence available to identify which customers those are. Moreover, he provides no economic basis to believe that Intuitive would have dropped its prices across all EndoWrists in the but-for world, and indeed, neither the record evidence nor basic economic principles support this conclusion. Indeed, Professor Elhauge has opined that in the but-for world, Intuitive would continue to have monopoly power in EndoWrists as well as in robots and service.[162] His conclusion that Intuitive would have lowered EndoWrist pricing so significantly across the board to all customers is inconsistent as a matter of economic logic with his opinion that Intuitive would have had monopoly power in EndoWrists in the but-for world.

IV.A.    PROFESSOR ELHAUGE FAILS TO SHOW THAT DEMAND FOR THIRD-PARTY REMANUFACTURED ENDOWRISTS WOULD HAVE BEEN SUFFICIENT TO COMPEL INTUITIVE TO REDUCE ITS ENDOWRIST PRICES

102. Professor Elhauge claims that, in the but-for world, "competitive pressure" from third-party sales of remanufactured EndoWrists would have forced Intuitive to lower the prices of all its EndoWrists by at least 20 percent.[163] His assumption that Intuitive would lower all of its own EndoWrist prices is critical to establishing class-wide injury because it allows him to avoid determining which hospitals, if any, would have purchased from third parties and which would

---

[162] Elhauge (7/24/2024) Dep. Tr. 41:12–42:4 ("Q. In the but-for world, you conclude that Intuitive would still have monopoly power in your defined relevant market; correct? A. Yes. Well, in all three, I guess. There's three relevant markets. They have monopoly power in all three. Q. What three relevant markets are you referencing? A. The market for MIST surgery robots, the market for EndoWrist repair and replacement, and the da Vinci service market. Q. In the but-for world, it's your conclusion that Intuitive would have monopoly power in each of those three relevant markets? A. Yes.").

[163] As I discuss in this section, Professor Elhauge's "Use Limit Suppression" and "Combined" damages calculations assume two sizeable price reductions due to the competitive influence of third-party sales in the but-for world: a 20 percent reduction in all its EndoWrist prices and an additional reduction in the price per-use of EndoWrists from extending their number of uses. The combination of both reductions amounts to an effective price decrease of about 56.5 percent assumed in Professor Elhauge's damages for class period starting May 21, 2017 (56.5 percent = $2,162,464,731 / $3,827,112,956). *See* Elhauge Class Report Backup, IS28 Damages Estimation v22, tab "Table 7."

have continued to purchase from Intuitive.[164] On the other hand, if Intuitive maintained some or all of its EndoWrist prices, Professor Elhauge would need to identify which hospitals were likely to purchase third-party remanufactured EndoWrists, and he has offered no common evidence that would indicate which hospitals, if any, would purchase third-party remanufactured EndoWrists and to what extent.

103. From an economic perspective, determining whether Intuitive would have reduced all its EndoWrist prices by 20 percent requires an analysis of the demand for third-party remanufactured EndoWrists across hospitals. Without considerable levels of demand for remanufactured EndoWrists, Intuitive would be unlikely to reduce its instrument prices at all, let alone by Professor Elhauge's asserted levels. While Professor Elhauge does not attempt to model demand for third-party remanufactured EndoWrists in his but-for world, he cites to estimates that rivals offering third-party EndoWrists could capture as much as 10 to 15 percent of EndoWrist sales.[165] As I discuss in more detail below, these estimates are likely overstated given that the record indicates that hospital preferences towards considering remanufactured EndoWrists were varied, and the number of hospitals expressing interest was limited. However, even if third parties would capture 10 to 15 percent of EndoWrist sales in the but-for world, this would still be insufficient to induce Intuitive to cut all its EndoWrist prices by 20 percent, as Professor Elhauge asserts. Instead, Intuitive would economically be better off to cede those customers and to sell the remaining 85 to 90 percent of EndoWrists at full price.

104. For example, in 2018, Intuitive sold around $800 million in EndoWrists.[166] Professor Elhauge claims that, in the but-for world, Intuitive would have reduced the prices of these EndoWrists by 20 percent. Even if it sold the same volume of EndoWrists and did not lose any sales to third parties, which Professor Elhauge argues is unlikely, its net sales would be reduced to $640 million.[167] If some customers were to purchase from third parties, its net sales would be even less. On the other hand, if Intuitive left its prices the same and ceded the 15 percent of sales that Professor Elhauge claims third parties would be likely to capture, Intuitive's net sales would be

---

[164] Elhauge Class Report, ¶ 782.

[165] Elhauge Class Report, ¶ 790.

[166] *See* Instrument Sales by Year Workpaper.

[167] $800 million * (1 – 0.2) = $640 million.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

$680 million. [168] Even under the assumption that third parties could capture 10 to 15 percent of EndoWrist sales, Intuitive would earn higher net sales by holding its prices steady and ceding its most price sensitive customers to third parties than if it was to discount its prices on EndoWrists across all customers. Moreover, as the portion of the market remaining to Intuitive would be less price sensitive by definition, it would be unsurprising to see Intuitive raise new EndoWrist prices for some of its customers. [169] In Professor Elhauge's opinion, Intuitive would still possess monopoly power for EndoWrists in the but-for world [170] and it would have the ability to do this if his opinion is correct.

105. Documents and testimony indicate that numerous customers would be reluctant to use third-party remanufactured instruments. Hospital representatives, including those of the Named Plaintiffs, have expressed concerns regarding the use of remanufactured EndoWrists.

    a. In particular, numerous witnesses for the Named Plaintiffs testified that their hospital would not use remanufactured EndoWrists if FDA clearance were required for such modification.

        i. Franciscan's director of capital equipment, John Sampson, noted that patient safety and FDA clearance were important factors that the technology assessment committee would consider when deciding whether to purchase a clinical device. [171] Similarly, Judy

---

[168] $800 million * (1 − 0.15) = $680 million.

[169] Studies have observed that, in the pharmaceutical industry, the price of branded drugs may increase with generic entry because branded manufacturers are able to earn higher profits by selling to customers that prefer branded drugs and are less price sensitive than by decreasing its prices to compete with generic drugs. For example, *see* Henry G. Grabowski and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics* 35, No. 2 (1992): 331–350; Richard G. Frank and David S. Salkever, "Pricing, Patent Loss and the Market for Pharmaceuticals," *Southern Economic Journal* 59, No. 2 (1992): 165–179.

[170] Elhauge (7/24/2024) Dep. Tr. 41:12–42:4 ("Q. In the but-for world, you conclude that Intuitive would still have monopoly power in your defined relevant market; correct? A. Yes. Well, in all three, I guess. There's three relevant markets. They have monopoly power in all three. Q. What three relevant markets are you referencing? A. The market for MIST surgery robots, the market for EndoWrist repair and replacement, and the da Vinci service market. Q. In the but-for world, it's your conclusion that Intuitive would have monopoly power in each of those three relevant markets? A. Yes.").

[171] Sampson (11/3/2022) Dep. Tr. 93:8–17 ("If physicians on the technology assessment committee said that a given device was unsafe, would Franciscan still purchase that device?

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Schimmel of Franciscan indicated that Franciscan would not purchase a remanufactured single-use device if it lacked FDA clearance and FDA clearance were required.[172]

ii. The CFO of Larkin, Mark Early, confirmed that Larkin has a policy that a medical device that has not been cleared by the FDA should not be used in his hospital.[173]

iii. Valley Medical's supply chain director, Rick Teal, explained that "[a]s a practice… if the FDA requires a device to be cleared… we would purchase a cleared device."[174]

b. Surgeons, specifically those who work for the Named Plaintiffs, have expressed concerns about using instruments that circumvent Intuitive's use counters, especially those without FDA clearance.

i. In his testimony, Larkin surgeon Dr. Estape explained that resetting the use counter on an EndoWrist "didn't seem like a very up-and-up program," a company offering the service had "no appropriate answer … as to how they would get around the FDA," and he was "not willing to do something that's not FDA approved."[175]

---

A. Not to my knowledge. Q. Does the committee consider whether a given medical device has FDA clearance? A. Yes, they do. Q. Is that an important factor in assessing medical devices? A. For equipment, yes.").

[172] Schimmel 30(b)(6) (11/16/2022) Dep. Tr. 51:24–52:8 ("Q. So for example, if a device is single use but has been remanufactured to be reused and the single use device required FDA clearance, would Franciscan purchase the remanufactured device if it lacked FDA clearance?. . .THE WITNESS: We would not purchase a device that wasn't FDA cleared, that we were aware of.").

[173] Early (10/6/2022) Dep. Tr. 58:13–18 ("Q. And am I right that -- does Lar- -- does Larkin have a policy that a medical device that has not been cleared by the FDA should not be used by the hospital? . . . A. To the best of my knowledge, yes.").

[174] Teal 30(b)(6) (11/18/2022) Dep. Tr. 37:11–25 ("Q. If not a policy, are you aware of any rule or procedure at Valley that if a medical device requires FDA clearance, that it have such clearance before the hospital purchases it? A. As a practice we would – if the FDA requires a device to be cleared, we would – we would purchase a cleared device, if that's the question. Q. It – your word is better than mine, so it is a practice at Valley that if a device requires FDA clearance, that it be cleared before it be purchased? A. Correct.").

[175] Estape (10/22/2022) Dep. Tr. 57:18–58:7 ("Q. What do you remember about the meeting? A. Well, a company comes in and says that it can wipe out the number of uses on an instrument that's FDA cleared for only ten uses, I thought that was a pretty interesting meeting. Q. Why was it interesting to you? A. Well, you know, everything that we do in medicine is for safety, you know, and certain things are cleared only by the FDA, and it just seemed like a -- for – I'll just use the word shady, a very shady meeting where, you know, oh, I can take this and I

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ii. Franciscan's former chief of surgery and current physician, Dr. John Francis, said that he would not be willing to "use an EndoWrist with a circumvented use counter on a patient" because going beyond the "normal number of uses" for the instrument "does not guarantee or in any way imply the instrument will continue to work as designed."[176]

### IV.B.    EMPIRICAL EVIDENCE SHOWS THAT FEW CUSTOMERS HAVE TAKEN UP REMANUFACTURED INSTRUMENTS

106. As shown in Figure 18, very few Intuitive customers purchased any remanufactured EndoWrists from third parties.[177] In the figure, the height of the bar reflects the number of customers that bought EndoWrists in a given year. The dark area of the bar represents the number of customers that purchased one or more remanufactured EndoWrists from a third party during the year, and

---

can wipe off the uses for this instrument and you can keep using it forever. It just didn't seem -- you know, it didn't seem like a very up-and-up program. I've never heard of that before."); 58:14–20 ("Q. Did the topic of FDA come up, to your recollection, during that meeting? A. Yes. Q. What was the discussion you recall about the FDA? A. There was no appropriate answer from the company as to how they would get around the FDA."); 59:8–22 ("Q. Would you be willing to use an instrument from a company that has wiped the uses from an EndoWrist? A. You know, I would have to have a long discussion with the company to see if this is allowed, to see how they're going to get around doing that. It just doesn't seem -- I mean, if – I would have to leave that at a much higher level where I'm at. It would surely improve the cost efficiency of doing the instruments by letting it go longer, but I'm not willing to do something that's not FDA approved because, you know, anything that happens to the patient, they're going to come down on me for having used equipment that was not FDA approved at that time.").

[176] Francis (10/14/2022) Dep. Tr. 23:22–24:23 ("Q. Would you be willing to use an EndoWrist with a circumvented use counter on a patient? A. No. Q. Why not? A. From what I understand, the number on a repeated use instrument is placed there within a recommendation based on somebody, whether it was the engineers or elsewhere, that stated that was a normal number of uses that would basically give you normal use of the instrument. To go beyond that does not guarantee or in any way imply the instrument will continue to work as designed. And for one, I do not – I do not like inefficiency. So to have to switch out an instrument that's malfunctioning or not working properly or slowing me down in some way really grates at my performance of operations. Q. If Franciscan were to tell you that its hospitals would be stocking EndoWrists that had reset use counters, how would you react? A. I – I would ask specifically if Intuitive had okayed this and what their engineers were saying about it because they're the ones who designed the instrument to begin with.").

[177] *See* Table 4 in Appendix D for a summary of the number of customers that purchased new and remanufactured EndoWrists for the da Vinci S/Si and X/Xi between 2018 and 2021 and the total sales in USD associated with those purchases.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

the light area is the number of customers that only purchased EndoWrists from Intuitive. In each year from 2018 through 2021, the number of customers making purchases of remanufactured EndoWrists is less than 2 percent.[178]

**FIGURE 18: NUMBER OF CUSTOMERS PURCHASING REMANUFACTURED ENDOWRISTS FROM THIRD PARTIES AND CUSTOMERS PURCHASING NEW ENDOWRISTS FROM INTUITIVE IN THE U.S., 2018–2021**



Sources and Notes:
- EndoWrists identified based on Elhauge Class Report, Exhibit D.
- Third-party customers identified using third-party transactions data (SIS048255, Restore-00055935, Restore-00055937, and REBOTIX175326), after excluding Rebotix sales to SIS or Restore.
- Intuitive customers identified using "customer" variable in Intuitive I&A Data.

107. The limited response by hospitals to third-party offerings does not appear to be solely due to the contractual restrictions. In November 2022, Iconocare announced that it received FDA clearance for a single reset of the S/Si monopolar curved scissors ("MCS"), which is the first

---

[178] *See* New and Remanufactured EW Sales Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

remanufactured EndoWrist to be cleared by the FDA.[179] Intuitive released a public statement on its website that it would not "void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who choose to use a remanufactured instrument that is compliant with a 510(k) clearance or its equivalent with the FDA.[180] Despite the fact that customers did not need to be concerned that Intuitive would enforce the contractual clauses if those customers chose to work with Iconocare's Si MCS, there appears to have been no switching by hospitals to any product offering by either Iconocare or any affiliate company. I am not aware of any evidence of any sales or other transactions of Iconocare's FDA-cleared remanufactured Si MCS.

108. Figure 19 shows the trend in Intuitive's MCS sales on S/Si platforms between January 2021 and January 2024 as a percentage of its January 2021 sales, as well as the corresponding trends for all other S/Si EndoWrist sales and all other S/Si instrument sales. Since the trend in Intuitive's MCS sales tracks with the corresponding trends in non-MCS S/Si EndoWrists and instruments, there does not appear to be a drop in Intuitive's Si MCS sales—beyond the existing downward trend as customers shift away from S/Si to X/Xi systems and instruments—after Iconocare's November 2022 announcement.

---

[179] "FDA Clearance to Reprocess Da Vinci Robotic Instruments Could Present Hospitals with Substantial Savings," PRWeb press release, November 2, 2022, accessed July 2024, https://www.prweb.com/releases/fda-clearance-to-reprocess-da-vinci-robotic-instruments-could-present-hospitals-with-substantial-savings-824988437.html.

[180] "Statement on usage limits and use of remanufactured EndoWrist instruments," Intuitive, accessed July 2024, https://www.intuitive.com/en-us/products-and-services/da-vinci/instruments.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 19: INTUITIVE'S MONTHLY NET SALES OF 8MM MONOPOLAR CURVED SCISSORS ON S/SI PLATFORMS (JANUARY 2021–MARCH 2024)**



Sources and Notes:

– Intuitive I&A Data, filtered to U.S. sales of S/Si Monopolar Curved Scissors (Base Material Number = 420179), excluding training instruments and instruments with sales quantity equal to zero.

– EndoWrists identified based on Elhauge Class Report, Exhibit D.

109.    In addition, as shown in Figure 20 below, Intuitive did not decrease prices for S/Si MCS instruments during this period. If Intuitive had anticipated a competitive threat from Iconocare's remanufactured S/Si MCS, then one might have expected to see a decrease in price around the time of clearance or launch. Instead, Figure 20 confirms that Intuitive made no pricing response.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER



**FIGURE 20: AVERAGE NET PRICE PAID FOR S/SI MONOPOLAR CURVED SCISSORS (JANUARY 2021–MARCH 2024)**



Sources and Notes: Intuitive I&A Data.

– Filtered to purchases of S/Si Monopolar Curved Scissors (Base Material Number = 420179), excluding rebates, training instruments, instruments returned after partial use, and instruments with sales quantity equal to zero.

– Net price calculated by the sum of net sales divided by the sum of sales quantity across all transactions in each month.

110. In summary, Professor Elhauge has not addressed how variation in customer demand for remanufactured EndoWrists would affect Intuitive's incentives to reduce its EndoWrist prices across all customers, if at all. Without such a universal price decrease, there is no common evidence to determine which of Intuitive's customers, if any, would have suffered injury.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

IV.C.    PROFESSOR ELHAUGE'S ANALYSIS DEPENDS ON PRICES
DECREASING TO LEVELS THAT ARE UNSUPPORTED AND
INCONSISTENT WITH ECONOMIC REASONING

111.    To justify the size of his asserted but-for world price reduction, Professor Elhauge selectively
points to an internal Intuitive slide deck about Project Dragon, a program Intuitive considered
but ultimately did not pursue, which explored offering refurbished instruments at a discount of
up to 20% when compared with prices for new ones.[181] He claims that Intuitive abandoned the
program because, he claims with no evidence, it had succeeded in suppressing third-party
competition by other means.[182]

112.    As described in testimony from Intuitive employees, Project Dragon was not implemented
because it was not economically viable and was cost prohibitive. For example, employee
testimony indicates that the cost of refurbishing instruments to the standards that Intuitive
deemed appropriate for surgery would be close to the cost of manufacturing a new instrument.[183]
Thus, Intuitive made the business decision not to pursue the program. Professor Elhauge asserts

---

[181]  Elhauge Class Report, ¶ 781, citing to Intuitive-00103456, at -458.

[182]  Elhauge Class Report, ¶¶ 609, 615, 620.

[183]  Morales 30(b)(1) (11/9/2022) Dep. Tr 235:21–236:18 ("So not only are you going to spend,
you know, a ton of money, you know, $3 million to – in terms of investment, you gotta be –
you gotta be able to recover that three million, and you never do. And, not only do you not
recover it, but it's actually more expensive…When you remanufacture, actually you're
starting at the end of the line, you're disassembling you're coming this way, and then you're
reassembling again, so the cost in –in – in instruments was labor, it wasn't necessarily the
material costs…this was, you know, somewhat, you know, cost prohibitive because you had
to deassemble and reassemble yet again and you had to go through all the same testing
processes and you needed sterilization and reprocessing capabilities, so remanufacturing of
instruments is just – it's just – it just didn't make any sense.") *See also* Morales 30(b)(1)
(11/9/2022) Dep. Tr. 172:23–173:20 ("I think Project Dragon was a program or initiative to
explore the feasibility of being able to perform refurbishment on instruments, and, at the end
of the day we went through all of this work and – exploration, you know, the goal was to
provide, you know, a lower cost, and – and then be able to pass that, you know, savings on to
the – to the – to the customer, and also have a financial impact internally…at the end of the
day, it didn't make sense, it didn't make financial sense…"). *See also* Goodson 30(b)(1) Dep.
Tr. 73:6–74:10 "Q. The project was never implemented, correct? A. Correct. Q. Why is that?
A. The requirement for demonstrating the reliability of the instruments repeatedly over life
and the cost associated with replacing the parts to achieve that reliability and building a
business became cost prohibitive for pursuing the project. Q. Cost prohibitive, correct? A.
Yes…").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

that Intuitive's costs of refurbishment would have decreased as Intuitive increased its volumes of refurbished instruments; aside from such a conclusion being well outside his expertise, he provides no support for where such economies of scale would arise—and certainly no support that would undercut Intuitive's business judgment about the viability of this program.

113. In addition, Professor Elhauge asserts that Intuitive's use limits were artificially suppressed and calculates additional EndoWrist damages to account for a but-for world in which Intuitive is compelled to increase or entirely eliminate its EndoWrists use limits.[184] He considers several potential scenarios by which Intuitive could increase use limits in the but-for world, this includes varying: the start date of the use-limit increases; the specific instrument models affected by the increase; and the number of uses the use limits are increased to.[185]

114. Professor Elhauge never explains or provides evidence that Intuitive would have been technologically able to expand the uses in the but-for-world on all the EndoWrist models he includes. More fundamentally, he states that his use suppression damages "assume that the price charged per EndoWrist by Intuitive is no different in the but-for world."[186] In doing so, he assumes that prices per-use would go down by significant amounts, thus creating his damages.[187] There is no economic reason to assume that in these scenarios Intuitive would maintain the same price per instrument in the but-for world as in the actual world. This is particularly true if there are no use limits because Professor Elhauge assumes that Intuitive would remain the only manufacturer of new EndoWrists and would be selling many fewer instruments; indeed, it is

---

[184]  Elhauge Class Report, ¶ 798 ("…unrestrained rival repair of EndoWrists would have created competitive pressure on Intuitive to raise or eliminate the use limits on its EndoWrists in the but-for world.").

[185]  *See* Elhauge Class Report, Section VII.A.

[186]  *See* Elhauge Class Report, ¶ 799. In contrast with Professor Elhauge's assumption that instrument prices would not change with an increase in use limits, the price of the extended-use instruments generally increased. *See* Intuitive-00679280.

[187]  *See* Elhauge Class Report, ¶¶ 801–803 for his damages calculation. As I discuss above, when he combines these damages with those from his "inflated EndoWrist" scenarios, Professor Elhauge assumes two sizeable price reductions due to the competitive influence of third-party sales in the but-for world, amounting to about an overall price decrease of about 56.5 percent. *See* fn. 163 above for the calculation of 56.5 percent.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

likely the case that the elimination of the use limits would eliminate third party remanufacturers or greatly reduce the scope of their services.

115.    Similar to his "inflated EndoWrist" damages, Professor Elhauge's "Use Suppression" and "Combined" damages scenarios do not establish injury. If use limits were increased or eliminated in the but-for world, Intuitive could change the price of EndoWrists such that the per-use price rises, stays the same, or decreases. In the first two cases, there is no injury, and in fact, class members are worse off if the per-use price rises. Whether Intuitive were to reduce its per-use prices would be determined by the degree to which hospitals view third-party remanufactured EndoWrists as substitutes for new EndoWrists. As discussed in Section IV.A above, Professor Elhauge has not shown that hospital demand would be sufficient to induce Intuitive to reduce its prices by 20 percent, let alone by the 56.5 percent implied by the damages he puts forth due to the combination of "inflated EndoWrist prices and suppressed EndoWrist use." And, again, this is inconsistent with his opinion that Intuitive would have monopoly power over EndoWrists in the but-for world.

## IV.D.    PROFESSOR ELHAUGE'S ENDOWRIST PRICING REGRESSION IS IRRELEVANT TO THE QUESTION OF CLASS-WIDE INJURY

116.    Professor Elhauge claims that his regression analysis shows that customer-specific pricing with respect to EndoWrists "is relatively unimportant."[188] His conclusion is based on a comparison of the R-squared statistic across three regressions. The first regression correlates the price at which an EndoWrist was sold based on the instrument model, year when the transaction was completed, and indicators for four EndoWrist instruments whose instrument prices were lowered after the introduction of the Extended Use Program. The second and third regressions add customer-related characteristics to the first regression; specifically, the second regression adds controls for the customer's total sales volume for EndoWrists during the year and sales volume for the specific transactions, and the third regression includes customer-specific fixed effects. Professor Elhauge observes that the R-squared statistic is approximately the same across all three regressions leading him to conclude that "customer-specific factors explain hardly any of the

---

[188]  Elhauge Class Report, ¶ 868.

price variation" in EndoWrist sales.[189] As I explain in more detail below, Professor Elhauge's regression analysis, taken at face value, is irrelevant for several reasons. In addition, his interpretation and presentation of his regression results are contrary to accepted econometric practice.

117. First, Professor Elhauge's regression results tell us nothing new. Professor Elhauge maintains that most customers pay the list price for a given EndoWrist instrument. Given that fact, it is not surprising that Professor Elhauge finds that a regression correlating the price of an EndoWrist sale based on list price or based on the instrument model[190] captures most of the differences in the transacted prices across EndoWrist sales. However, this result is irrelevant to the question of class-wide injury because, as I explained in Section III, injury depends on the total amount that would have been paid by each customer in the but-for world across all components of the package the customer needs to purchase. Professor Elhauge's regression analysis does not model EndoWrist pricing in the but-for world, much less the total value for all needed elements of the da Vinci Surgical package.

118. Second, Professor Elhauge's presentation and assessment of the regression results do not meet accepted standards in the economics profession. In over forty years of economics teaching and research I have *never* seen anyone present *only* the R-squared statistic of their regression. The R-squared statistic presented by Professor Elhauge will rise or fall with the addition or removal of *any* additional variable, regardless of whether it is related to the question at hand or not. So for his "regression analysis" to rely solely on changes in the R-squared statistic as he adds or removes variables is statistically meaningless. One could add a variable to any of his regressions reporting, say, the annual rainfall in Nebraska by year and the R-squared he reports would likely rise. Similarly, removing any variable from any of his regressions, relevant or not, would likely cause his reported R-squared to fall. Hence comparing these R-squared statistics does not provide a valid basis for his conclusions. As stated in a well-regarded introductory econometrics

---

[189] *Id*.

[190] List prices typically remain the same for a given instrument model with the exception of four EndoWrists after the introduction of the Extended Use Program. *See* "Extended Use Program, New pricing and uses," Intuitive-00679280, at -280.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

textbook, the R-squared statistic does not inform "whether one variable or several variables should be added to a model."[191]

119. Rather than relying solely on the R-squared statistic, economic researchers will instead examine the regression coefficients and their standard errors and discuss whether the size, sign and statistical significance of those coefficients support or refute the researcher's hypothesis.[192] Professor Elhauge does none of this. If he had, he would find that his own regression results do not show that customer-specific factors have no effect at all on the purchase price of EndoWrists. Accepting Professor Elhauge's regressions as is, ignoring the problems noted above, I note that his regression results show that many customer-specific fixed effect coefficients are positive or negative and statistically different from zero at the standard five percent level—at face value, this result suggests that there are in fact differences across customers in the amounts that they paid for EndoWrists holding constant the instrument model, time period, and other characteristics included in his regressions.[193] This observation undermines, rather than supports, Professor Elhauge's conclusions. Even if one were to ignore the numerous flaws in his regression analysis, it would not resolve the fundamental problems with his analysis. First, Intuitive and its customers negotiate "package pricing" for all system components rather than

---

[191] *See* Jeffrey Wooldridge, *Introductory Econometrics*, 4th Edition (Mason: South-Western, 2009), p. 81 ("An important fact about $R^2$ is that it never decreases, and it usually increases when another independent variable is added to a regression. This algebraic fact follows because, by definition, the sum of squared residuals never increases when additional regressors are added to the model. For example, the last digit of one's social security number has nothing to do with one's hourly wage, but adding this digit to a wage equation will increase the $R^2$ (by a little, at least). The fact that $R^2$ never decreases when *any* variable is added to a regression makes it a poor tool for deciding whether one variable or several variables should be added to a model. The factor that should determine whether an explanatory variable belongs in a model is whether the explanatory variable has a nonzero partial effect on y in the *population*.").

[192] *See* Jeffrey Wooldridge, *Introductory Econometrics*, 4th Edition (Mason: South-Western, 2009), p. 155 ("Naturally, the estimated OLS coefficients should always be reported. For the key variables in an analysis, you should *interpret* the estimated coefficients (which often requires knowing the units of measurement of the variables). For example, is an estimate an elasticity, or does it have some other interpretation that needs explanation? The economic and practical importance of the estimates of the key variables should be discussed. The standard errors should always be included along with the estimated coefficients.").

[193] For example, *see* Elhauge Class Report Backup, IS68 EndoWrist Price Regressions v13xxC.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

solely EndoWrists as suggested by his regression. Second, removing the contractual arrangements in his but-for world will leave some customers better off and some worse off. His regression does nothing to determine which customers belong in which group. It is these considerations that appear most likely to drive injury determinations for each customer in the but-for world.

120. Finally, even for the purpose of modeling EndoWrist pricing, which is inadequate to address class-wide injury, Professor Elhauge does not properly model EndoWrist pricing net of rebates because rebates are paid as a lump sum by quarter and would not be reflected in the transacted prices in Professor Elhauge's regression analysis.[194]

## V.    PROFESSOR ELHAUGE'S CLAIM THAT PRICES ACROSS ALL SYSTEM SERVICE WOULD HAVE BEEN 12 PERCENT LOWER IN A BUT-FOR WORLD HAS NO ECONOMIC BASIS

121. In Section III of this report, I accepted for purposes of the analysis Professor Elhauge's conclusions about reductions in EndoWrist and service pricing in the but-for world. I further demonstrated that, even accepting those conclusions, actual effects on customers in the but-for world would require individualized analysis, with the results showing harm to some, benefits to others, and no injury to the remainder. In Section IV above, I demonstrated why Professor Elhauge's conclusions about EndoWrist pricing in the but-for world are in fact not supported by either the record or economic theory. I now turn to his conclusions about pricing for system service. Again, Professor Elhauge's conclusions are inconsistent with economic theory and are not supported by the factual record.

122. Professor Elhauge has not shown empirical evidence of whether and, if so, for what services class members would take up third-party servicing offerings in the but-for world. Instead, he assumes that, in the but-for world, third parties—starting with Restore—would have performed system service and thereby would have "created competitive pressure requiring Intuitive to lower

---

[194] *See* Elhauge Class Report Backup, IS68 EndoWrist Price Regressions v13xx. *See also* Elhauge Class Report Backup, IS68 EndoWrist Price Regression v11xx.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

its own prices for da Vinci service."[195] Specifically, he claims Intuitive would respond by uniformly lowering the price for all system services, regardless of whether the service is "contestable" (non-proprietary) or "incontestable" (proprietary).[196] He claims that he does not need to adjust for contestable and incontestable services because he is "unaware of any evidence that Intuitive actually raised the price of incontestable service in response to rival entry offering contestable services in 2019" and because Intuitive currently has a single hourly rate for services on a time and materials ("T&M") basis without distinguishing between these types of services.[197]

123. Professor Elhauge's assumptions are inconsistent with economic principles and the record. From an economic perspective, Intuitive would not have lowered its prices across all system services because there is no reason to believe that the limited offerings that third parties like Restore would have been able to provide in the but-for world would put sufficient "competitive pressure" on Intuitive. There are at least three reasons why Intuitive would not have dropped prices by 12 percent on system service across the board:

a. There are necessary and proprietary services that Intuitive offers and that third parties cannot perform. These services are identifiable from non-proprietary services. Based on economic principles, Intuitive would have been incentivized to increase its prices on proprietary services and decrease its prices on non-proprietary services in the but-for world, which would allow it to earn higher revenues compared with a scenario in which it decreased prices for all services. Customers that used a higher proportion of proprietary services to non-proprietary services likely would thus have been worse off in the but-for world.

b. The majority of Intuitive's customers are enrolled in a comprehensive service plan that covers both proprietary and non-proprietary services at no additional charge. It bears emphasizing that third-party servicing organizations cannot offer services plans of the same scope at *any* price. For numerous customers, Intuitive's service plan at its actual price was cost-saving relative to T&M, even after applying a 12 percent reduction (or more) in T&M prices for non-proprietary services. There is no economic reason why Intuitive would have

---

[195] Elhauge Class Report, ¶ 824.

[196] Elhauge Class Report, ¶ 825. *See also* Elhauge Class Report, ¶¶ 830–833.

[197] Elhauge Class Report, ¶¶ 831–832.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

changed its pricing on service plans, and many customers would have continued to purchase Intuitive's service plans. An individualized inquiry into customers' servicing needs and usage between proprietary and non-proprietary services would be required to determine which customers would have chosen Intuitive's service plan and were thereby unharmed.

c.   In addition to costs, customers consider other factors in their decisions with regards to system servicing options.[198] For example, customers may differ in their risk preferences, where a comprehensive service plan like dV Complete Care can be viewed as an insurance plan that guarantees clinical uptime and insulates the customer from potentially costly system repairs, and/or customers' preferences for service quality as captured by access to Intuitive's helpline and committed response time. Thus, the degree to which customers would be willing to take up system service from third parties may have been so small such that a pricing strategy to reduce prices across all system service and customers would not have made sense for Intuitive.

## V.A.    CUSTOMERS MUST CONTINUE TO PURCHASE PROPRIETARY SERVICE FROM INTUITIVE IN ANY BUT-FOR WORLD SUGGESTED BY PLAINTIFFS, AND INTUITIVE WOULD HAVE BEEN INCENTIVIZED TO OFFER DIFFERENT PRICES FOR PROPRIETARY AND NON-PROPRIETARY SERVICES

124.   As described in the record, there are system services that only Intuitive can perform, and hospitals depend on Intuitive for these services to operate the da Vinci robot.[199] These proprietary services include software updates and key aspects of preventative maintenance, including reviewing system logs and grip calibration checks.[200] Furthermore, there has been no

---

[198] *See* Section V.C below.

[199]   Declaration of Ronald Bair, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, April 13, 2023 ("Bair Declaration"), ¶¶ 7, 8, 11.

[200]   Bair Declaration, ¶ 7. *See also* Gordon (in *Restore*) (5/13/2021) Dep. Ex. 7, Bruce McDaniel at Restore, Email Message to Cliff Parker and Mills Vautrot at Restore, "PM_Schedule_ISI_Confidential," January 21, 2019, pp. 3, 6. *See also* Gordon (in *Restore*) (5/13/2021) Dep. Tr. 205:25-206:9 ("Q. Okay. 'Upload and review system logs,' the description says…could you do --…-- that without the laptop? A: You could not. You're correct. I missed that one."); Gordon (in *Restore*) (5/13/2021) Dep. Tr. 209:21-24 ("Q. Okay.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

suggestion that the existence of this proprietary service is anticompetitive, or that this proprietary technology would be released to competitors in the but-for world.[201] Thus, hospitals would be expected to engage with Intuitive for proprietary services, regardless of the non-proprietary services third parties try to offer.

125. Professor Elhauge claims that his damages analysis does not need to "adjust" for proprietary and non-proprietary services because Intuitive has not made such a distinction in the past nor did it increase price for proprietary service when Restore began offering non-proprietary services in 2019.[202] Evidence shows that Restore served two hospital systems, or 10 hospitals, out of 2,042 hospitals among Intuitive's customers.[203] Professor Elhauge does not provide an economic basis for why Intuitive would change its entire pricing model across thousands of hospitals for 0.5 percent of customers that used Restore's limited service offering. Instead, if Intuitive were to

---

You said that G, IV.G, the M.T.M. Grip Calculation [sic] Checks could not be performed without the laptop; right? A. Not that I know of.") *See also* Gordon (in *Restore*) (5/13/2021) Dep. Tr. 64:4–24 ("Q. What proprietary information did you have access to? A. Drawings, processes, clinical data I'm assuming, test data, programs – MATLAB, yeah. That's about it...Q. Okay. And what did you have in mind when you said you had access to test data that is proprietary information? A. Test data, I'm guessing on the MATLAB read-outs, the test data you have, the results."); Gordon (in *Restore*) (5/13/2021) Dep. Tr. 140:13–141:6 ("Q. Okay. Were you – when you were working for Restore, would you have been able to provide software updates for the da Vinci robots? A. No. Not at all. Q. No? Why not? A. Because I didn't have the software on the computer…"); Gordon (in *Restore*) (5/13/2021) Dep. Tr. 229:6–22 ("Okay. Preventative Maintenance Limitations, do you see that section of the report? A. I do…Q. Do you see that? What does that mean? A. The things I had marked, sign cycle, the actual arm tests, updating the P.M. counters, those things can't be done without software. Q. The Intuitive software; right? A. Correct. The MATLAB on the F.E. laptop.").

[201] I understand that Plaintiffs do not challenge Intuitive's refusal to share its proprietary software. *See* Order Re: Cross Motions for Summary Judgment, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, March 31, 2024, at p. 29 (citing Order Denying Motion to Dismiss, at 2).

[202] Elhauge Class Report, ¶¶ 831–832.

[203] *See* Restore-00055935, filtered to transactions with repair in the Memo or Item fields and excluding transactions for the Neptune Rover or for an instrument or accessory and Restore-00055937, filtered to PM, and Robot Repair in the Service Type field and excluding transactions for the Neptune Rover. I count the number of hospitals by the number of unique names in the Ship To Address 1 field. For the number of Intuitive customers in 2019, *see* Procedures Analysis Workpaper, tab "Hospitals Table."

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

continue charging the same rate for proprietary and non-proprietary services, as Professor Elhauge assumes, it is more likely Intuitive would not reduce prices.

126. As I discussed in Section III.A regarding findings from the academic literature on tying and bundling, the likely effect of removing a tie is that the price of the tying product will go up while the price of the tied product—assuming it faces greater competition if customers' demand for the product by an entrant is high—will go down.[204] A similar result would occur in the context of system service if Intuitive faced the choice of either (a) reducing its system service price across all types of service or (b) "unbundling" proprietary and non-proprietary services and allowing the prices to differ between the two types of service. Since proprietary services are identifiable, Intuitive would have been incentivized to set a higher price for its proprietary services to the extent that hospitals would have sought third parties for non-proprietary services, if at all.

127. Without a price decrease across all system service, injury will vary across class members and require individualized inquiry to identify those who are better off, worse off, or unharmed in the but-for world as to service pricing. Specifically, customers that use more proprietary service likely would be worse off in the but-for world if the price of proprietary service increases while customers that use more non-proprietary service could be better off if the price of non-proprietary service decreases. Given that all customers need to engage with Intuitive on proprietary services such as software updates, it is unclear which customers would use a sufficient amount of non-proprietary services such that they would benefit from reduced prices on those services in the but-for world, but I would expect this would be a small number of customers given the record evidence in this case. An individualized inquiry into the historical and projected utilization of servicing, which depends on utilization of the da Vinci, would be required to determine which customers would be expected to be better or worse off.

128. Professor Elhauge claims that this distinction between proprietary and non-proprietary services does not matter because his benchmark (Abbott Laboratories' EBIT margin) already reflects a

---

[204] *See* Section III.A above.

mix of such services.[205] However, Abbott's EBIT margin is not an appropriate benchmark because Abbott and Intuitive have very different business models. Abbott has a broad portfolio of medical devices including those for diagnosis and treatment of cardiovascular diseases—such as electrophysiology devices and heart failure monitoring and management devices, diabetes care products, and neuromodulation devices for the management of chronic pain and movement disorders.[206] Many of these devices serve the purposes of monitoring—such as continuous glucose monitoring technology—or are implantable—such as a pacemaker—and the services required for such devices differ from that of capital equipment such as Intuitive's da Vinci robot. Abbott's EBIT margin for service would be an average across a myriad of devices that require different skills for service and face different competitive conditions in comparison with Intuitive, whose business is primarily focused on the da Vinci.

129. Moreover, the companies differ significantly in terms of size and sources of revenue. In 2021, Abbott's total company revenue was $43.1 billion and reported in four sales categories: Established Pharmaceutical Products ($4.7 billion), Nutritionals ($8.3 billion), Diagnostics ($15.5 billion), Medical Devices ($14.5 billion), and Other ($0.05 billion).[207] In contrast, Intuitive's total company revenue was $5.7 billion—which is only 13 percent of Abbott's—and reported in three categories: Instruments and accessories ($3.1 billion), Systems ($1.7 billion), and Services ($0.9 billion).[208] Abbott does not report its servicing revenue in its public filings. Based on an industry report that Professor Elhauge relied on for Abbott's revenue in Medical

---

[205] Elhauge Class Report, ¶ 673 ("The difference in profit margins is thus unlikely to reflect the existence of proprietary tools, which exist both in this service market and the yardstick service markets, but rather likely reflects the extensive anticompetitive restraints imposed by Intuitive on the da Vinci service market.").

[206] *See* "Abbott's Medical Devices", https://www.abbott.com/content/dam/corp/abbott/en-us/abbottcorpnews/pdf/Medical-Devices-Fact-Sheet.pdf, accessed July 2024.

[207] Abbott Laboratories, Form 10-K for the Fiscal Year Ended December 31, 2023, at p. 51. In 2023, Abbott's total company revenue was $40.1 billion and reported in four sales categories: Established Pharmaceutical Products ($5.1 billion), Nutritionals ($8.2 billion), Diagnostics ($10.0 billion), Medical Devices ($16.9 billion), and Other ($0.01 billion).

[208] Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, at p. 76. In 2023, Intuitive's total company revenue was $7.1 billion—which is 18% of Abbott's—and reported in three categories: Instruments and accessories ($4.3 billion), Systems ($1.7 billion), and Services ($1.2 billion).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Equipment Repair & Maintenance Services, Abbott's servicing revenue was $454 million in 2021, which is less than half of Intuitive's servicing revenue in the same year at $916 million.[209]

130.  Setting aside whether Abbott's EBIT margin is an appropriate benchmark, Professor Elhauge's claim is irrelevant to the question of class-wide injury. The relevant question for class is whether Intuitive would impose a uniform price reduction across all types of system service when there are identifiable proprietary and non-proprietary services. As explained above, economic principles, academic literature, and examples[210] from the record of contemplated pricing strategies by Intuitive indicate that a uniform price reduction across all system services would not occur.

### V.B.  INTUITIVE'S SERVICE PLANS ARE COST-SAVING FOR NUMEROUS CUSTOMERS, EVEN IF ONE ASSUMES PRICE REDUCTIONS ON TIME AND MATERIALS

131.  Contemporaneous documents show that, for numerous hospitals, purchasing Intuitive's service plan was a lower cost option than forgoing a service plan and paying on a T&M basis.[211] Furthermore, as I show in more detail below, Intuitive's service plans still would have been lower cost than T&M even with the discounts Professor Elhauge proposes, or greater. Thus, even if Intuitive did not change its service-plan prices, numerous customers likely would have

---

[209]  According to IBISWorld's 2023 report, Abbott's servicing revenue in 2023 remained at $454.0 million. In 2023, Intuitive's servicing revenue was $1,167.8 million.

For Abbott's servicing revenue in 2021 and 2023, *see* "Medical Equipment Repair & Maintenance Services in the US," Industry Report OD4964, IBISWorld, November 2023, at p. 55. For Intuitive's servicing revenue in 2021 and 2023, *see* Intuitive Surgical, Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, at p. 76.

[210]  *See* Section II.C.

[211]  *See* "da Vinci Servicing Price Comparison for ███████████████," Intuitive-00283721. *See also* Matt Davis at Intuitive Surgical, Inc., Email Message to Crescencio Meneses at Intuitive Surgical, Inc., "RE: ███████████ Service Agreement – Svc History," May 2, 2019, Intuitive-00283720.  *See also* "da Vinci Servicing Price Comparison for ███████████," Intuitive-00156880. *See also* Matt Davis at Intuitive Surgical, Inc., Email Message to Crescencio Meneses at Intuitive Surgical, Inc., "RE: Contract renewal," April 12, 2019, Intuitive-00156878 at -878. (These documents contain and refer to service pricing analyses that Intuitive conducts for customers comparing the costs of different service plans as well as servicing on a T&M basis.)

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

continued to purchase Intuitive's service plans. Moreover, Intuitive's service plans encompass proprietary and non-proprietary services such that customers would not need to seek multiple service providers or, in some cases, pay incremental charges for service. These customers would be uninjured class members, and an individualized inquiry into each customer's past and expected servicing history and system utilization would be required to assess which customers would find it, in fact, advantageous to stay on Intuitive's service plan.

132. When hospitals consider service plan renewal, they compare across various service plan options. In making the assessment, many hospitals request and consider comparative analyses from Intuitive.[212] To illustrate, Table 2 uses Intuitive's models that compare system servicing options available to two hospitals, ▮▮▮▮▮▮▮▮▮▮ with a da Vinci Xi 4 arm ("▮▮▮▮") and ▮▮▮▮▮▮▮▮▮▮ with a da Vinci Si 4 arm ("▮▮▮▮"). Among the Intuitive pricing documents that I have seen in the record, the annual service revenue for these customers is closest to the median single-year service revenue and median annual average service revenue, respectively, across Intuitive's customers.[213] Both hospitals were enrolled in dV Complete Care during the class period.[214]

133. For both hospitals, dV Complete Care was expected to be less expensive than T&M based on the hospitals' historical servicing records. Columns [A] and [E] of Table 2 show the amounts that the

---

[212] *See* Matt Davis at Intuitive Surgical, Inc., Email Message to Crescencio Meneses at Intuitive Surgical, Inc., "RE: Contract renewal," April 12, 2019, Intuitive-00156878; "da Vinci Servicing Price Comparison for ▮▮▮▮▮▮▮▮," Intuitive-00156880; Matt Davis at Intuitive Surgical, Inc., Email Message to Chad Conover, Nolan Comstock, Salome Roe at Intuitive Surgical, Inc., "RE: [EXTERNAL] Repair cost," September 27, 2019, Intuitive-00284534, at -534; "da Vinci Servicing Price Comparison for ▮▮▮▮ ▮▮▮▮▮▮," Intuitive-00284537; Connie Hernandez Flores at Intuitive Surgical, Inc., Email Message to Matt Davis, Crescencio Meneses, and David Lloyd at Intuitive Surgical, Inc., "RE: daVinci Surgical System SH2038 – Service History," March 26, 2019, Intuitive-00283691, at -691; "da Vinci Servicing Price Comparison for ▮▮▮▮▮▮▮ ▮▮▮▮," Intuitive-00283695.

[213] *See* Service Comparison Median Hospitals Workpaper. ▮▮▮▮▮▮ was in the 48th percentile for single year service revenue (in 2018), and ▮▮▮▮▮▮ was in the 46th percentile for annual average service revenue over the class period.

[214] *See* "Contract Details," May 24, 2021, Intuitive-00695236, rows 624, 2317, 7668, 11296 (▮▮▮▮) and rows 4781, 10833, 12900 (▮▮▮▮).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

hospitals would have been expected to pay on a T&M basis,[215] and columns [B] and [F] show the amounts that the hospitals actually paid on dV Complete Care.

   a.  For ███████, expected servicing costs under T&M would have been $██████ compared with $█████ on dV Complete Care[216]; in other words, T&M costs would have needed to fall by 23.5 percent to match the expected cost of dV Complete Care, nearly double Professor Elhauge's proposed 12 percent price decrease.

   b.  For ███████, expected servicing costs under T&M and dV Complete Care were $█████9 and $█████, respectively, where the largest driver of T&M costs was the materials category. T&M costs would have needed to decrease by 26.5 percent to match the expected cost of dV Complete Care, which is more than double Professor Elhauge's proposed price decrease of 12 percent.

134.  In Professor Elhauge's but-for world, third parties would have performed non-proprietary services on da Vinci systems. I analyze an alternative scenario in which the costs of proprietary services remained the same and the costs of non-proprietary services would have decreased.[217] I

---

215  The categories of services on a T&M basis in these analyses are: Labor and Travel, which consists of the hourly rates for service technicians; Materials, which encompasses the cost of replacement of various system components; dVSTAT, which is Intuitive's premium technical support service, including remote system manipulation and troubleshooting; Preventive Maintenance, which includes routine servicing of the robot; Software Updates, which update the system software with new features; Advanced Exchange, which is the replacement of endoscopes, camera heads, or the da Vinci Skills Simulator due to accidental damage; Expedited Parts, which covers faster shipping speeds; and Sterile Reprocessing, which includes training of hospital personnel on reprocessing and handling of instruments and accessories. *See* "Sales, License, and Service Agreement between Intuitive Surgical, Inc. and Valley Medical Center," August 31, 2018, Intuitive-00306656, at -668–669.

216  Customers on dV Complete Care may still incur some T&M costs for repairs or parts replacement not covered under the service contract, such as damage due to "negligence or recklessness" by the customer. *See* "Sales, License, and Service Agreement between Intuitive Surgical, Inc. and ████████████████████████", December 28, 2016, Intuitive-00005135, at -137.

217  For the analysis, I assume that proprietary services include Preventative Maintenance, software updates, dVSTAT, and Advanced Exchange. I assume that Labor and Travel, Materials, Expedited Parts, and Sterile Reprocessing are non-proprietary services, although these categories also often include services that utilize proprietary software or hardware.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

calculate the reduction in the prices of non-proprietary services that would have equalized servicing costs between dV Complete Care and this alternative scenario.

a.  For ██████████, the costs of proprietary services already exceeded the cost of dV Complete Care at $██████, compared with $██████. Thus, even if a third party would provide the non-proprietary services for free, the hospital's total expenditure would still exceed the cost of dV Complete Care. In this alternative scenario, it would have been cost saving for ████ to continue using dV Complete Care.

b.  For ██████████, the cost of proprietary services on a T&M basis, at $██████, is a little more than half the cost of dV Complete Care, at $██████, and so the cost of non-proprietary services would have needed to decline by ████ percent to align with the cost of servicing under dV Complete Care. This reduction in price exceeds that of Professor Elhauge's asserted 12 percent decrease in system service prices. Notably, the cost of materials was fully covered by dV Complete Care as part of the service plan package, and by electing for T&M rather than dV Complete Care, ██████████ may be exposed to greater risk of high materials costs.

---

As discussed above, software updates and key aspects of Preventative Maintenance involve proprietary technology or tools. *See* Section V.A above. dVSTAT is Intuitive's technical support with remote system manipulation capabilities, and I am not aware that third parties have this capability. *See* Intuitive-00306656 at -668. Similarly, for Advanced Exchange, I am not aware that third parties offer or would offer such service for endoscopes, camera heads, or the da Vinci Skills Simulator. *See also* Intuitive-00306656 at -669.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**TABLE 2: EXPECTED SYSTEM SERVICE COSTS UNDER TIME & MATERIALS, DV COMPLETE CARE, AND TIME & MATERIALS WITH ASSUMED PRICE REDUCTIONS FOR ▮▮▮▮ AND ▮▮▮▮ AND SPECIALTY HOSPITAL**



Sources and Notes: * Covered as part of service plan

- [A] and [B]: "da Vinci Servicing Price Comparison for ▮▮▮▮▮▮▮▮," Intuitive-00283721.
- [E] and [F]: "da Vinci Servicing Price Comparison for ▮▮▮▮▮▮▮▮," Intuitive-00156880.
- [3]: = [1] + [2].
- [5]: = [3] x [4].
- [6][C]–[9][C] and [6][G]–[9][G]: Assumed to equal the corresponding entries in [6][A]–[9][A] and [6][E]–[9][E], respectively.
- [10]: = Sum of [6]–[9].
- [11][C]-[14][C] and [11][G]–[14][G]: = [A] x (1-[D]) and [E] x (1 – [H]) respectively for the corresponding row.
- [15]: = Sum of [11]–[14].
- [16]: = [5] + [10] + [15].

135. Although these calculations will vary from customer to customer depending on individual factors relative to past and future system utilization and servicing history, the examples in Table 2

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

indicate that some customers would face higher servicing costs in a but-for world if they were to give up their service plan in favor of T&M. Instead, these customers likely would have chosen Intuitive's service plans even at Intuitive's actual world prices. The example hospitals do not appear to be outliers; among 12 additional documents of the same service comparison analysis corresponding to 44 customers that I reviewed, there were at least 31 customers for which servicing costs on one of Intuitive's service plans would be lower than that of T&M, often by 12 percent or more.[218] Customers that remained on Intuitive's service plans would be unharmed, assuming that Intuitive does not offer fewer discounts on its service plan prices. This analysis does not account for the fact that a comparison of rival "service contracts" to Intuitive's own estimates of the cost of preventative maintenance on a T&M basis suggests third-party plans are more expensive than Intuitive's prices on a per-visit basis.[219]

---



[218] For all the servicing comparison analyses I reviewed, *see* "da Vinci Servicing Price Comparison" workbooks, Intuitive-00059480; Intuitive-00059494; Intuitive-00283678; Intuitive-00283695; Intuitive-00283802; Intuitive-00283931; Intuitive-00284537; Intuitive-00308602; Intuitive-00439498; Intuitive-00926630; Intuitive-00926632; Intuitive-00926986. Of the hospitals included in these analyses, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ had options for servicing plans that were cheaper than T&M.

[219] The Preventative Maintenance estimate for ████████████████████████ over 24 months of service (from April 12, 2017 to April 12, 2019) was $█████, which, according to records in the hidden tab titled "Report_Orders_Data," encompassed at least five recorded Preventative Maintenance visits during this timeframe. *See* "da Vinci Servicing Price Comparison for ████████████████████████," Intuitive-00156880, sheet "Multi Comp 2 Yr 20190412103317" and hidden tab "Report_Orders_Data". This amounts to $████ per visit, as compared to Restore's price of $46,000 for three visits, or $15,333 per visit. *See* Elhauge Class Report, ¶ 922. Restore reportedly offered a $████ annual contract to some customers, a significantly higher price than Intuitive's $████ average annual price. *See also* Elhauge Class Report, fn. 2116 and 2117.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

136. Given higher expected costs of T&M as seen in the documents, it is not surprising that Intuitive's servicing data shows that the vast majority of Intuitive's customers selected into a comprehensive service plan throughout the class period. As I discussed in Section II.A.2.c, at least 95 percent of systems are on a service plan in any given year, and at least 91 percent[220] of those on a service plan have dV Complete Care in any given year, which covers features such as parts exchange, software updates, labor and travel and system inspection.[221]

V.C.    BECAUSE CUSTOMERS CHOOSE SYSTEM SERVICING OPTIONS BASED ON FACTORS IN ADDITION TO EXPECTED COSTS, MORE OFFERINGS FROM THIRD PARTIES DOES NOT IMPLY THAT THERE WOULD BE SUFFICIENT DEMAND TO INDUCE INTUITIVE TO CHANGE ITS PRICING MODEL

137. Section V.B above highlighted examples showing that Intuitive's service plans helped numerous customers to save on costs relative to T&M, even if one assumes that T&M prices would have been substantially lower in the but-for world. As I discuss in more detail below, it is also the case that customers choose system servicing options based on factors in addition to costs. These facts indicate that third-party T&M prices are unlikely to constrain pricing of Intuitive's service plans, and there is no economic basis for Professor Elhauge's assumption of a uniform 12 percent service price decrease. Instead, an individualized inquiry is required to determine which, if any, customers would not have purchased a service plan from Intuitive and thus would be potentially injured in the but-for world. Indeed, the Named Plaintiffs did not purchase system service from Restore, and testimony from hospital staff reflects a lack of interest in third-party service.[222]

---

[220] *See* System Service Contracts Workpaper. *See also* System Service Revenue Workpaper.

[221] *See* Figure 8 above.

[222] Gonzalez 30(b)(6) (10/17/2022) Dep. Tr. 55:12–57:12 ("Q. Was there ever a time when Larkin did not have -- did not have a maintenance agreement with Intuitive that Larkin had the da Vincis serviced by Intuitive? A. Not to my knowledge. Q. I'm only talking about the time when you were there, obviously. I'm not asking you to talk about other times. A. No, no. I meant without my approval, I – no, I would never have approved that, no. Q. Why not? A. Because these robots are extremely delicate, and as I stated earlier, this is not the first time this arm had broken. So, essentially, a repetitive occurrence with that particular robot. …Q. Was there ever a time where you looked into having the da Vincis service by someone other than Intuitive? A. Not that I recall. …Q. As the director of -- of surgery, would you have

138. As seen in Intuitive's documents that compare servicing options for individual customers, customers did not always choose the lowest cost option and might decide on a more comprehensive plan despite higher costs. For example, in 2018, ███████████████ ████████████████ had three da Vinci Si systems with dV Complete Care service contracts running from April 1, 2018 through March 31, 2021. Across the three systems, the contract value was $██████ while the T&M value was $██████, which is $█████ lower than the contract value.[223] For two of the three systems, T&M was approximately ███████████ less expensive than dV Complete Care.[224] Even so, ██████████ remained enrolled on dV Complete Care. As another example, ████████████████████████████████ had one da Vinci Si 4-arm system on dV Complete Care that it acquired in July 2012 and was enrolled on dV Complete Care from June 29, 2013 through June 28, 2017.[225] Although dV Essential or dV Partnership would have been expected to yield lower costs than dV Complete Care by as much as $█████ over a three-year period,[226] ██████ chose a more comprehensive plan and, in 2018, upgraded to dV Premium Care for two years before reverting to dV Complete Care.[227]

139. One reason why customers may choose Intuitive's service plan over T&M is to insure against unexpected repair costs and interruptions in the operating room, as lost surgical revenue from system downtime may outweigh potential cost savings from foregoing a service plan. Intuitive's

---

approved the use of someone other than Intuitive to service the robot? A. No."); Thomas (11/10/2022) Dep. Tr. 39:14–17 ("Q. To your knowledge, has -- has Valley ever considered using a third party to service any of the da Vinci robots? A. No.").

[223] *See* "da Vinci Servicing Price Comparison for ██████████████████████," Intuitive-00283678, sheet "Multi Comp 1 Yr 20190322112643." *See also* Matt Davis at Intuitive Surgical, Inc., Email Message to Daniel Biggerstaff at Intuitive Surgical, Inc., "RE: Service Contract Info for ██████████████," March 22, 2019, Intuitive-00283676.

[224] For one system, a da Vinci Si 3 Arm, T&M costs were $█████ compared to ███████ for dV Complete Care. For the other system, a da Vinci Si 4 Arm, T&M costs were $██████████ compared to $██████ for dV Complete Care.

[225] *See* "da Vinci Service Contract Details for ██████████████," Intuitive-00926986, sheet "Multi Comp 3 Yr 20170530134735."

[226] The total estimated cost for dV Essential HU over 36 months of service was $████████, while the cost of dV Complete Care was $████████ over the same period, a difference of ███████. *See* "da Vinci Service Contract Details for ██████████████████," Intuitive-00926986, sheet "Multi Comp 3 Yr 20170530134735."

[227] "Service Contract Details," Intuitive-00695236 (see entries where "Your Ref." is SH1378).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

service plan includes guaranteed response times of 24 hours for dV Partnership and dV Complete Care and 12 hours for dV Premium Care, clinical uptime guarantee ranging from 95 percent to 99 percent, parts exchange, and its Advanced Exchange Program,[228] most of which is typically provided at no additional cost.[229] Third parties are unable to offer comparable service plans because they cannot provide key services, such as software updates or remote servicing via dVSTAT.[230] How a hospital weighs costs versus risk or service quality largely depends on which hospital function holds the greatest decision making authority. Supply chain decision makers may be most interested in cost savings as they balance a hospital's budget. Clinical staff may be most concerned with patient safety and surgical quality. Operations staff may be focused on guaranteed uptime and servicing reliability to ensure hospital logistics run smoothly and avoid costly surprises. Determining which of these holds the greatest influence requires individualized inquiry into a hospital's management structure.

140. Despite Plaintiffs' claims that there are services that third parties can do and that there was demand from customers for those third-party services,[231] only a handful of hospitals took up system service from Restore, and with negative results.[232] Intuitive's Senior Director of Services Innovation & Product Management, Ronald Bair, described multiple instances of "inept servicing efforts by a third party" of da Vinci systems at Baylor Scott & White and Ardent

---

[228] *See* Figure 8 above.

[229] *See e.g.* "da Vinci Servicing Price Comparison for ███████████████████████," Intuitive-00156880. Note that Advanced Exchange, which largely relates to replacement of vision/endoscope components due to accidental damage, sometimes does incur additional costs even on comprehensive plans. *See also* "Sales, License, and Service Agreement between Intuitive Surgical, Inc. and ████████████████," August 31, 2018, Intuitive-00306656, at -658 and -669.

[230] Intuitive technical support staff are able to resolve some technical support calls through remote access without the need for an Intuitive technician onsite. *See* "dVSTAT Da Vinci Surgery Technical Assistance Team," Intuitive Surgical, Inc., accessed July 2024, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/dvstat-flyer-1018782rd-1018.pdf.

[231] Elhauge Class Report, ¶ 550. *See also* Elhauge Class Report, ¶ 570.
Elhauge points to Hillcrest as an example of a customer who "planned to use Restore for the repairs that it could perform and Intuitive for the rest." *See* Elhauge Class Report, ¶ 570.

[232] *See* Restore-00055935. *See also* Restore-00055937. *See also* Bair Declaration, ¶¶ 10–16, 18. I am not aware of another third party besides Restore that offered system service during the class period.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Health. [233]  For example, an Intuitive field service engineer discovered that the battery box seal in an Si system at Baylor Irving had been broken.[234] This compromised "its [the Si system's] calibration, and potentially the system's battery backup for safe completion of a da Vinci surgery or extraction of the instruments from the patient in the event of a power loss," which could directly affect the safety of the patient.[235] A similar issue was discovered in a Patient Side Cart at Hillcrest Medical Center, where its "battery calibration seal was broken."[236] This also could have risked patient safety as it could have impaired the function of ensuring that "the da Vinci does not lose power" in case of a power loss during surgery.[237] These severe quality issues are yet another reason why third-party offerings would be unlikely to constrain pricing of Intuitive's service plans, and why an individualized inquiry would be needed to determine which, if any, customers would be inclined to forego a service plan and thus be potentially injured in the but-for world.

## VI.    PROFESSOR ELHAUGE INCLUDES IN THE PROPOSED CLASS ENTITIES THAT ARE DESIGNATED AS PUBLIC OR GOVERNMENT-CONTROLLED

141.  The class definition excludes government entities.[238] Hundreds of hospitals in the United States are characterized as government entities. For example, the US Department of Health and Human Services reported 681 U.S. hospitals enrolled in Medicare in 2022 as "government controlled."[239] The Kaiser Family Foundation reported that, according to data from the American

---

[233]  Bair Declaration, ¶¶ 10–16, 18.

[234]  Bair Declaration, ¶ 15.

[235]  Bair Declaration, ¶ 15.

[236]  Bair Declaration, ¶ 18.

[237]  *Id.*

[238]  Amended Complaint, ¶163.

[239]  W. Pete Welch, Lanlan Xu, Nancy De Lew, Benjamin D. Sommers, "Ownership of Hospitals: An Analysis of Newly-Released Federal Data & A Method for Assessing Common Owner," U.S. Office of Health Policy, August 2023, accessed July 2024, https://aspe.hhs.gov/sites/default/files/documents/582de65f285646af741e14f82b6df1f6/hospital-ownership-data-brief.pdf, pp. 4 and 10.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Hospital Association ("AHA"), 923 hospitals in 2022 were state/local government owned.[240] In this case, Named Plaintiff Valley Medical has indicated that it is a "government entity."[241] This is consistent with statements on its website that it is a government entity.[242]

142. Professor Elhauge has included in his class all entities—other than federal government hospitals like military and Veterans Affairs hospitals—that purchased EndoWrists and/or da Vinci service.[243] Thus, for example, he includes in the proposed class the one entity that has admitted to being a government entity in this litigation, Valley Medical. More fundamentally, Professor Elhauge has not offered a methodology based on common evidence to identify government entities. Instead, he follows an instruction from Plaintiffs' counsel to exclude military and veterans' hospitals.[244]

143. Professor Elhauge has not identified common evidence that would allow Plaintiffs to identify all hospitals that are government entities, nor am I aware of any such evidence. I am aware of one source of data from the AHA that appears to report information about the public or private status of the hospital. However, the AHA data is imperfect and would not permit Professor Elhauge to identify government entities without extensive individualized inquiries about each hospital so

---

[240] "Hospitals by Ownership Type," Kaiser Family Foundation, accessed July 2024, https://www.kff.org/other/state-indicator/hospitals-by-ownership/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[241] Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, May 23, 2024, at p. 9.

[242] In Washington, public hospital districts like Valley Medical are "governmental entities established by Washington state statute. "What's a Public Hospital District?," Valley Medical Center, accessed July 2024, https://www.valleymed.org/about-us/whats-a-public-hospital-district.

[243] Professor Elhauge assigns alleged damages amounts to each hospital that he believes are in the proposed class with the exception of military and veterans' hospitals. *See* Elhauge Class Report Backup, IS28 Damages Estimation v22.

[244] Elhauge (7/24/2024) Dep. Tr. 107:20–108:12 ("Q. Other than military or veterans hospitals, did you exclude anyone else on the basis of this government entity's exclusion in the class definition? A. No, my understanding from plaintiffs' counsel is by 'government entities' they meant military or veterans hospitals. Q. So the – basically, the plaintiffs' counsel instructed you that 'government entities' meant military or veterans hospitals, and you took that instruction and only based your analyses off of excluding military and veterans hospitals; is that correct? A. Yes, I'm relying on their definition of the class.").

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

characterized by the AHA. Although that data categorizes hospitals between government and non-government controlled entities,[245] I have identified a number of discrepancies between the assigned category in the AHA data and other information available from the hospitals themselves. For example, as of 2018, UT Health East Texas has been jointly owned by the public UT System and Ardent Health Services, a private entity,[246] but individual hospitals within this system differ in how they describe their ownership status in the AHA data. For example, the University of Texas ("UT") Health North Campus Tyler appears as state-owned in the AHA data,[247] whereas other UT Health East Texas hospitals such as UT Health Tyler, UT Health Athens, UT Health Carthage, UT Health Henderson, UT Health Pittsburg, UT Health Quitman, and UT Health Jacksonville appear as investor-owned in the AHA data.[248] As another example,

---

[245] Specifically, AHA uses the term "control code" and defines it as the "type of authority responsible for establishing policy concerning overall operation of the hospital." *See* AHA Data & Insights, 2022, "AHA Annual Survey Database Reference Guide, Fiscal Year 2022," American Health Association, p. 19. *See also* AHA Data & Insights, 2022, "AHA Annual Survey Database Reference Guide, Fiscal Year 2022," American Health Association, p. 133 ("Control/Ownership type: The type of organization responsible for establishing policy concerning the overall operation of the hospital. The three major categories are government (including federal, state, and local); nongovernment (nonprofit); and investor-owner (for-profit).")

[246] "Ardent Health Services and The University of Texas System Finalize Agreement to form UT Health East Texas," UT Health East Texas press release, March 1, 2018, on the UT Health East Texas website, accessed July 2024, https://uthealtheasttexas.com/news/ardent-health-services-and-university-texas-system-finalize-agreement-form-ut-health-east-texas, at p. 1.

[247] In the AHA data, UT Health North Campus Tyler has a control code value of 12 (CNTRL = "12"). This control code falls in the "Government, Nonfederal" category, specifically referring to state-ownership. *See* AHA Data & Insights, 2022, "AHA Annual Survey Database," American Health Association, row 4966. *See also* AHA Data & Insights, 2022, "AHA Annual Survey Database, Appendix A - Control Code Descriptions," American Health Association. AHA Annual Survey Database, Appendix A - Control Code Descriptions, specifies the description and categorization of each hospital control number.

[248] In the AHA data, UT Health Tyler, UT Health Athens, UT Health Carthage, UT Health Henderson, UT Health Pittsburg, UT Health Quitman, and UT Health Jacksonville have control code values of 31, 32, or 33 (CNTRL = "31", "32", or "33"). These control codes fall into the investor-owned control category, specifically referring to individual investor-ownership (31), partnership investor-ownership (32) and corporation investor-ownership (33). *See* AHA Data & Insights, 2022, "AHA Annual Survey Database," American Health Association, row 4436, 4451, 4617, 4830, 4920, 4922, and 4859. *See also* AHA Data &

---

the University of California San Francisco Medical Center is listed as a "[n]on-government, not-for-profit" hospital in the AHA data while, in a 2014 press release, its then CEO Mark R. Laret described it as a "public hospital."[249]

144. It took my team a substantial amount of time to research just these examples of discrepancies between the AHA classification system and information from the hospitals. I am not aware of any way, other than such individualized inquiries, to identify government entities to exclude them from the proposed class.

## VII.    PROFESSOR ELHAUGE INCLUDES CLASS MEMBERS THAT ACQUIRED DA VINCI SURGICAL ROBOTS PRIOR TO THE CLASS PERIOD

145. Professor Elhauge does not identify class members that acquired at least one system on or after May 21, 2017, and his proposed class includes customers that only acquired da Vinci systems before May 21, 2017.[250] In addition, even among class members that acquired a da Vinci system

---

Insights, 2022, "AHA Annual Survey Database, Appendix A - Control Code Descriptions," American Health Association. AHA Annual Survey Database, Appendix A - Control Code Descriptions, specifies the description and categorization of each hospital control number. *See also* "Ardent Health Services and The University of Texas System Finalize Agreement to form UT Health East Texas," UT Health East Texas, accessed July 2024, https://uthealtheasttexas.com/news/ardent-health-services-and-university-texas-system-finalize-agreement-form-ut-health-east-texas, at p. 1. *See also* "Locations," UT Health East Texas, accessed July 2024, https://uthealtheasttexas.com/news/ardent-health-services-and-university-texas-system-finalize-agreement-form-ut-health-east-texas.

[249] See American Health Association, 2022, "Annual Survey of Hospitals." *See also* "UCSF Medical Center Opens $1.5 Billion, "Next Generation" Hospital Complex at Mission Bay Campus on Feb. 1, 2015", University of California San Francisco, accessed July 2024, https://www.ucsf.edu/news/2014/11/121086/ucsf-medical-center-opens-15-billion-next-generation-hospital-complex-mission. *See also* AHA Data & Insights, 2022, "AHA Annual Survey Database," American Health Association, row 5740. *See also* AHA Data & Insights, 2022, "AHA Annual Survey Database, Appendix A - Control Code Descriptions," American Health Association. AHA Annual Survey Database, Appendix A - Control Code Descriptions, specifies the description and categorization of each hospital control number. In the AHA data, University of California San Francisco Medical Center (UCSF Medical Center) has a control code value of 23 (CNTRL = "23"). This control code falls in the nongovernment and not-for-profit category, specifically referring to "other not-for-profit" ownership.

[250] *See* Elhauge Class Report, ¶ 5. *See also* Elhauge EW Damages by System Purchase Date Workpaper.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

during the class period, Professor Elhauge has not offered a methodology to link EndoWrist purchases to system sales or leases to distinguish between EndoWrists used with systems acquired during the class period and EndoWrists used with systems that were acquired prior to the class period; doing so would be a large and individualized undertaking.

146.   Because Intuitive's I&A data records the sale of an instrument to a customer rather than a specific da Vinci Surgical System,[251] EndoWrists cannot be directly linked to the system with which they were used using Intuitive's transactions data and to do so would require an individualized inquiry into each system.[252] Even correctly linking a customer's system purchases with its EndoWrist purchases is not feasible with Intuitive's transactions data:

   a.   The customer ID associated with a system acquisition in Intuitive's systems transactions data may not map to the customer where the da Vinci system is placed. For leases in particular, the transaction is listed under a customer ID associated with the leasing entity—such as "Intuitive Surgical Leasing" or "DLL Financial Services, Inc."—regardless of which hospital is leasing the system. For example, Larkin leased two da Vinci systems in June of 2017, and because the transactions are assigned to a leasing customer ID, Larkin's customer ID is not associated with any system acquisitions during the class period. I am not able to identify system acquisitions for 595 customer IDs included in Professor Elhauge's EndoWrist damages calculations.[253] This could happen if, for example, a customer only ever leased a da Vinci system.[254]

   b.   The customer ID associated with I&A spending may not represent the hospital where the EndoWrist instrument was used in surgery; instead, it may correspond to another hospital

---

[251]   Intuitive I&A Data. *See also* "Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions," *Rebotix Repair LLC v. Intuitive Surgical, Inc.,* Case No. 8:20, July 10, 2021, pp. 2–3.

[252]   I understand that Intuitive maintains logs that show which instruments were used with which robot. Those logs are not in the record, and I have not reviewed them. I would expect that it would require extensive individualized analysis on an EndoWrist-by-EndoWrist basis to try to segregate the EndoWrists used with robots acquired before the class period.

[253]   *See* Elhauge EW Damages by System Purchase Date Workpaper.

[254]   This could also happen for a small number of Account IDs (also called Net Suite IDs) in the systems transactions data that do not map to one and only one customer ID in Professor Elhauge's damages.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

within the same integrated delivery network or health system.[255] As an example, EndoWrists sales for hospitals in the ███████████████████████ integrated delivery network are recorded under a single customer ID associated with the names "██████████████ █████" or "██████████████████████████████" while the instruments appear to be shipped to hospitals in the network including ████████████████████████████ ██████████████████, and ████████████████████████████.[256]

147.  Among the customers for which I can link between the systems and I&A datasets, the results indicate that:

a.  89 customers did not acquire a da Vinci system during the class period, and Professor Elhauge allocates more than $47 million in damages to these customers;[257]

b.  443 customers acquired da Vinci systems of the same model before and during the class period such that EndoWrists used with the system(s) purchased before the class period and those used with the system(s) purchased during the class period are not distinguishable using Intuitive's I&A transactions data, and Professor Elhauge allocates more than $857 million in damages to these customers;[258]

---

[255] "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, July 9, 2021, p. 4 ("Some customers also make bulk purchases to a particular facility that are distributed amongst their network."). *See also* Elhauge Class Report, ¶ 873.

[256] *See* Intuitive I&A Data. Hospitals "████████████████████████" and "████████ ████████████████" listed under "████████████████████████████" IDN. *See* Intuitive dV Procedure Data.

[257] *See* Elhauge EW Damages by System Purchase Date Workpaper. These damages are allocated based on the combined price and use-limit effect Professor Elhauge calculates for the period between May 21, 2021 and December 31, 2021 by customers.

[258] Of the $857 million in Professor Elhauge's damages calculations ascribed to these customers, $138 million in damages are associated with EndoWrist purchases for a da Vinci system not purchased during the class period. I am able to distinguish Professor Elhauge's damages for those systems because they are of a different model than the systems that customers acquired both before and during the class period.

*See* Elhauge EW Damages by System Purchase Date Workpaper. These damages are allocated based on the combined price and use-limit effect Professor Elhauge calculates for the period between May 21, 2021 and December 31, 2021 by customers.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 2nd day of August, 2024, at Fredericksburg, Texas.

James W. Hughes, Ph.D.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**APPENDIX A**: CURRICULUM VITAE

| | |
|---|---|
| **NAME:** | <div align="center">**James W. Hughes**</div> |

| | |
|---|---|
| **DEGREES:** | Ph.D., Economics, The University of Michigan, 1987 |
| | M.A., Economics, Boston University, 1978 |
| | A.B., International and Comparative Studies, Boston University, 1977, *summa cum laude*, with distinction |

| | |
|---|---|
| **FIELDS:** | Industrial Organization and Antitrust Policy; Law and Economics; Health Economics; Environmental Economics; Labor Economics |
| | *Thesis: The Economics of Medical Malpractice Reform* |

| | |
|---|---|
| **ACADEMIC POSITIONS:** | BATES COLLEGE, Lewiston, ME, 2020-. |
| | Thomas Sowell Professor of Economics, Emeritus |
| | |
| | BATES COLLEGE, Lewiston, ME, 2005-2020. |
| | Thomas Sowell Professor of Economics |
| | |
| | BATES COLLEGE, Lewiston, ME, 2004-2005. |
| | Professor of Economics |
| | |
| | BATES COLLEGE, Lewiston, ME, 1999-2006. |
| | Chair, Department of Economics |
| | |
| | BATES COLLEGE, Lewiston, ME, 1997-2004. |
| | Associate Professor of Economics |
| | |
| | BATES COLLEGE, Lewiston, ME, 1992-1997. |
| | Assistant Professor of Economics |
| | |
| | AMHERST COLLEGE, Amherst, MA, 1987-1992. |
| | Assistant Professor of Economics |

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

STATE UNIVERSITY OF NEW YORK AT ALBANY, Albany, NY, 1986-1987.

Assistant Professor of Economics

**ARTICLES IN REFEREED JOURNALS:**

"Human Trafficking in Southeast Asia: Results from a Pilot Project Vietnam," with Ngan Dinh, Conor Hughes and Margaret Maurer-Fazio, *Journal of Human Trafficking,*

https://www.tandfonline.com/eprint/QFZUWKSXCVJINNI3MBKI/full?target=10.1080/23322705.2019.1650527

"Finding the Lost Jockeys," (with Debra Barbezat), *Historical Methods: A Journal of Quantitative and Interdisciplinary History,* v. 47, n. 1, 2014, pp. 19-30.

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), *International Journal of Manpower,* v. 31 n. 2, 2010, pp. 138-162 [also cited as IZA Discussion Paper #4148, April 2009].

"An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China," (with M. Maurer-Fazio and Dandan Zhang), in Gender, China, and the World Trade Organization, Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield, eds., (London and New York, Routledge, Taylor and Francis Group, 2009) pp. 157-185.

"海纳百川：民族、性别、婚姻、地区等因素对中国城市地区劳动参与 的作用和影响," (with M. Maurer-Fazio and Dandan Zhang), (An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China,"), in Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield edited 中国经济转型与女性经济学 (China's Economic Transition and Feminist Economics) Beijing: Economic Science Press, 2009, pp.130-157.

"An Ocean Formed From One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage and Location on Labor Force Participation in Urban China, (with M. Maurer-Fazio and D. Zhang), *Feminist Economics,* v. 13, n. 3-4, July/October, 2007, pp. 159-187.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"Salary Structure Effects and the Gender Pay Gap in Academia," (with D. Barbezat), *Research in Higher Education*, v. 46, n 6, September, 2005.

"The Effect of Market Liberalization on the Relative Earnings of Chinese Women," (with M. Maurer-Fazio) *Journal of Comparative Economics*, v 30, n 4, pp. 709-731, December, 2002 [also cited as William Davidson Working Paper No. 460].

"An Analysis of the Effects of Marital Status, Educational Attainment, and Occupation on the Size and Composition of Urban China's Gender Wage Differentials," (with M. Maurer-Fazio) *Pacific Economic Review*, v. 7, n. 1, pp. 137-156, February, 2002.

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), *Contemporary Economic Policy,* v. 19, n. 4, October, 2001, pp 409-423.

"Health Consequences of Smoking and Its Regulation," (with Michael Moore), *Frontiers in Health Policy* v. 4, 2001 pp.31-76  [also cited as NBER Working Paper #7979, October, 2000]

"Accounting for Censoring in Duration Data: An Application to Estimating the Effect of Tort Reforms on the Length of Time to Resolution of Medical Malpractice Claims" (with E. Savoca), *Journal of Applied Statistics* v. 26, n. 2, February, 1999, pp. 219-228

"Allocation of litigation costs--American and English rules," (with Edward Snyder), *The New Palgrave Dictionary of Economics and the Law*, Peter Newman, editor, (London, The Macmillan Press), July, 1998.

"Wal-Mart and Maine: The Effect on Employment and Wages," (with B. Ketchum), *Maine Business Indicators*, v. 42 n.2, Summer, 1997.

"The Effect of Legal Reforms on the Longevity of Personal Injury Claims," (with E. Savoca), *International Review of Law and Economics*, v 17, pp. 261-273, June, 1997.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"Basing Point Pricing and the German Steel Cartel: A Look at the 'New Competitive' Theory," (with Daniel Barbezat), *The Journal of Economic History*, March, 1996, pp. 215-222.

"Litigation Under the English and American Rules: Theory and Evidence," (with E. Snyder), *The Journal of Law and Economics,* April, 1995, p.225-250.

"Barriers to the Establishment of New Drug Treatment Facilities," (with F. Porell and H. Pollakowski),  *NIDA Services Research  Monograph: Access and Financing in Drug Abuse Services* (Gabrielle Denmead and Beatrice A. Rouse, eds.), no. 2, (1994).

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (with E. Snyder), *Journal of Law, Economics, and Organization*, Fall, 1990, pp. 345-380.

"Sex Discrimination in Labor Markets: The Role of Statistical Evidence--Comment," (with Debra Barbezat), *The American Economic Review*, March, 1990, pp. 277-286.

The Effect of Medical Malpractice Reform Laws on Claim Disposition," *International Review of Law and Economics*,  June, 1989, pp. 57-78.

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn From Claims Data?" (with E. Snyder), *Journal of  Business and Economic Statistics*, October, 1989, pp. 423-431.

"Evaluating Medical Malpractice Reforms," (with E. Snyder),  *Contemporary Policy Issues*, April, 1989, pp. 83-98.

| | |
|---|---|
| **EDITED VOLUMES AND CONFERENCE PROCEEDINGS:** | "Economic Reforms, Gender, and Changing Patterns of Labor Force Participation in Urban and Rural China," (with James W. Hughes and Zhang Dandan) in *Conference Proceedings of the 2005 CES International Conference on Sustainable Growth in China*, Chongqing, China. 2005. Volume I-B, pp. 502-510. |

"Risk Aversion and the Allocation of Legal Costs," (with G. Woglom), in David A. Anderson, ed., *DISPUTE RESOLUTION: Bridging the Settlement Gap*, (Greenwich, CT  JAI Press, 1996)*.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**MONOGRAPHS:** *Cost Estimates for Expanded Substance Abuse Benefits for Medicaid-Eligible Pregnant Women* (with M.J. Larson, G. Ritter, P. McQuide, C. Horgan), Institute for Health Policy, The Heller School, Brandeis University, 1993

*Socioeconomic Effects of Reducing Emissions of Chlorofluorocarbons (CFCs) in the OECD*, Environment Directorate, Organization for Economic Cooperation and Development, Paris, France (1983).

*Information Disclosure*, President's Regulatory Council, Washington, DC (1982).

**BOOK REVIEWS:** *Insuring Medical Malpractice*, by Frank Sloan, Randall Bovbjerg, and Penny Githens, and *Medical Malpractice on Trial*, by Paul Weiler, reviewed in *Journal of Policy Analysis and Management*, v. 12, n. 2, Spring, 1993, pp. 396-399.

*Medicare's New Hospital Payment System*, by Louise Russell, reviewed in *Eastern Economic Journal*.

**WORKING PAPERS:** "The Role of Productivity in the Demise of the African-American Jockey in 19th Century Thoroughbred Racing," with Conor Hughes [*in progress*].

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), National Bureau of Economic Research Working Paper #9229, October, 2002, revised 2011.

**COURSES TAUGHT:** Six Beverages That Changed the World

Economics of Intellectual Property

Law and Economics

Labor Economics

Economic Statistics

Intermediate Microeconomic Theory

Principles of Microeconomics

The Economics of Women, Men, and Work

Environmental and Natural Resource Economics

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Sustaining the Masses: Economic Development and Environmental Protection in the People's Republic of China

Health Economics

Environmental Issues in Economic Development

Earth Under Siege: Global Warming and Atmospheric Change

Principles of Macroeconomics

Property, Liberty, and Law

Industrial Organization and Antitrust Policy

Business and Government

**PRESENTATIONS:** "The Role of Productivity in the Demise of the African-American Jockey in 19th Century Thoroughbred Racing—Preliminary Findings," Maine Economics Conference, Colby College, April 29, 2017

"Estimating Human Trafficking in Asia Using Household Survey Results," International Atlantic Economic Society Conference, Berlin, Germany, March 23, 2017.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Forum for Economists International, Amsterdam, The Netherlands, May 30-June 1, 2015.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Economics Department Seminar Series, The University of Maine, September 9, 2014.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Maine Economics Conference, Colby College, April 26, 2014.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Public Works in Progress Lecture, Harward Center for Community Engagement, Bates College, April 30, 2014.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Phillips Lecture, Bates College, January 13, 2014.

"What Will Be Our Legacy: Hi-Tech and High Debt?"  2013 Reunion Lecture, Bates College, June 8, 2013.

"Finding the Lost Jockeys," Third International Conference on Sport and Society, Cambridge University, Cambridge, England, July 23-25, 2012.

"A Comparison of Reform-Era Labor Force Participation Rates of China and Han Majority" (with M. Maurer-Fazio and Dandan Zhang), Workshop on "Economy and Society Development in China and the World", Beijing October 13 and 14, 2011, hosted by: Institute of Ethnology and Anthropology Chinese Academy of Social Sciences.

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), American Economics Association Annual Meeting, Denver, CO, January, 2011.

"The Economic Status of China's Ethnic Minorities," (with M. Maurer-Fazio), Western Economics Association Pacific Rim Conference, Hong Kong SAR, China, January, 2005.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Applied Microeconomics and Economic and Legal Organization, Graduate School of Business, University of Chicago, October, 2002.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Annual Meeting of the Pharmaceutical Economics and Policy Council, Washington, DC, January 2002.

"The Gender Wage Gap in Urban China: The Effects of Institutional Change," (with M. Maurer-Fazio), Allied Social Sciences Association, Boston, MA  January, 2000.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), Western Economics Association Meetings, San Diego, CA  July, 1999.

"The Economics of the 'Loser-Pays' Rule," Edward T. Gignoux Inn of Court, Portland, Maine, February 12, 1997.

Keynote Address, Matriculation Dinner for the Class of 1999, Bates College, September 5, 1995.

Breckenridge Lecture, "Is the English Rule Really Cheaper?" Colby College, April 26, 1995.

"Can the English Rule Cure the Ills of Medical Malpractice?" presented to the Androscoggin County Medical Society, March 16, 1995.

"What Blue Cross Knows Can Hurt You:  Ethical Dilemmas in Private Medical Insurance," TGIF Lecture, Muskie Archives, March 3, 1995.

"Female Academics:  Mobility and the Returns to Seniority," Annual Meetings of the Southern Economics Association, Orlando, FL, November 20, 1994.

Breckenridge Lecture, "Economics of the English Rule," Colby College, April 20, 1994.

"Health Care Reform and Medical Malpractice: Smoke or Fire?" TGIF Lecture, Muskie Archives, March 4, 1994.

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meetings of The American Economics Association, Boston, Massachusetts, January 5, 1994.

"Marketable Permits for Chlorofluorocarbon Regulation," Colby College, October, 1993.

"Litigation Under the English and American Rules: Theory and Evidence," Research Seminar in Law and Economics, Harvard Law School, April 7, 1993.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meeting of the American Law and Economics Association, Yale University, May 1, 1992.

"NIMBY and the Location of Drug Treatment Facilities," National Institute on Drug Abuse, July, 1991.

American Bar Association, "Litigation, Justice, and the Public Good," San Diego, CA  April 25-27, 1991.

"Contingent Fees, Litigation, and the Quantity of Litigation," Annual Meeting of the Law and Society Association, May 31, 1990, Berkeley, CA

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," Annual Meeting of the Law and Society Association, Madison, WI, June 1, 1989.

"Controlling for Sample Selection in the Analysis of Closed Claim Data," Annual Meetings of the Western Economics Association, Vancouver, BC, Canada, July, 1988.

"Medical Malpractice Reforms and the Resolution of Claims," Annual Meetings of the Eastern Economics Association, Arlington, VA  March, 1987.

"Is the Sample of Litigated Claims Random?  Preliminary Results of a Trivariate Probit Estimator," Annual Meetings of the Eastern Economics Association, Baltimore, MD, March, 1986.

**PROFESSIONAL SERVICE**    Referee for: *Journal of Comparative Economics, Journal of Law and Economics, International Review of Law and Economics, Economic Inquiry, Journal of Risk and Insurance, Journal of Law, Economics, and Organization, Journal of Policy Analysis and Management, Behavioral Science and the Law, Social Sciences Quarterly.*

Reviewer for the National Science Foundation.

**GRANTS AND**    "The Vietnam Migration and Human Trafficking Household Survey, Pilot

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**AWARDS:**  Project," Bates Faculty Development Fund Grant, Bates College, 2012-2013.

The Vietnam Migration and Human Trafficking Household Survey, Pilot Project," PEAP Grant, The Harward Center for Community Engagement, Bates College, 2012-2013.

Phillips Faculty Fellowship, Bates College, 2012-2013.

"The 'Dis-Integration' of American Horse Racing," Bates College Faculty Development Fund Grant, 2010-2011.

Kroepsch Award for Excellence in Teaching, 2009-2010, Bates College.

"Inspirational Hall of Fame," Alfond Youth Center, Waterville, Maine, May, 2005.

Paganucci Award for Outstanding Community Service, Alfond Youth Center, Waterville, Maine, 2004.

Joint Student-Faculty Research Grant (with D. Barsky, '03), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Curriculum Development Grant (with M. Maurer-Fazio and S. Yang), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Mellon Summer Research Apprenticeship, Bates College, 2000.

Mellon Summer Research Apprenticeship, Bates College, 1998

The President's Fund for Faculty and Curricular Development, Bates College, 1997-1998.

Curricular Development Grant, Otis Fund, Bates College, 1997.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Mellon Summer Research Apprenticeship, Bates College, 1996.

Kroepsch Award for Excellence in Teaching, 1994-1995, Bates College.

Amherst College Research Award (1991-1992) to examine the effect of no-fault medical malpractice insurance on the size of awards, the number of claims, and the number of medical injuries.

Post-Doctoral Research Fellow in the Economics of Mental Health, Brandeis University, Florence Heller School for Advanced Studies in Social Welfare, 1990-1991.

Research grant from The Robert Wood Johnson Foundation Medical Malpractice Program (1987-1988) to examine the long-term effects of medical malpractice reform legislation on the size, frequency, and disposition of medical malpractice claims.

Miner D. Crary Fellow, Amherst College, 1988-1989.

**NON-ACADEMIC POSITIONS:**

LITIGATION CONSULTANT, 1990-

Economic expert for antitrust, regulation, and discrimination litigation. Retained on several cases involving the pharmaceutical industry, the prescription benefit manager industry, the environmental control industry, the synthetic rubber industry, nutritional supplement industry, the hospital industry, the automobile insurance industry, the sardine market, retail automobile sales, the retail gasoline market, school photography, musical instruments, airline transportation, and sex discrimination.

BRANDEIS INSTITUTE FOR HEALTH POLICY, Waltham, MA 1992-1993

Co-Author of a report on the residential housing market in the San Francisco-Oakland Bay Area, and the effect on property values resulting from locating residential drug treatment facilities in that market. Co-Author of a study of the effects on Medicaid expenditures of extending coverage for outpatient and residential drug treatment to pregnant drug users.

THE RAND CORPORATION, Santa Monica, CA  1985-1986.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Consultant on a study of the European chlorofluorocarbon industry for the U.S. Environmental Protection Agency.  Examined the effect of proposed regulations on competition within the European chemical industry.

ORGANIZATION FOR ECONOMIC COOPERATION AND
        DEVELOPMENT, Paris, France, 1982-1983

Author of a report to the Environment Directorate on the socioeconomic implications of chlorofluorocarbon emissions and their control in the OECD nations.  Report assessed progress in controlling emissions and quantifies the potential economic effects of further emissions reductions.

SRI INTERNATIONAL, Menlo Park, CA  1981.

Consultant to the Regulatory Analysis and Management Program.  Project included construction of a programming model to assist petroleum refineries in finding the least cost method of reducing emissions of volatile organic chemicals.  Author of a manual on the use of information disclosure in regulatory reform for the President's Regulatory Council.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
        Washington, DC, 1978-1980.

Economist in the Office of Pesticides and Toxic Substances.  Authored several reports on the effects of regulating toxic chemicals through the use of marketable rights.  Responsible for economic analyses of proposed regulations to limit uses of chlorofluorocarbons and asbestos.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**APPENDIX B**: LIST OF RECENT TESTIMONY

<div align="center">

**James W. Hughes**

**Experience as Testifying Expert Since 2019**

</div>

**In Re: Generic Pharmaceuticals Pricing Antitrust Litigation, In Re: Clomipramine Cases**, **U.S. District Court E.D. Pa.,** MDL No. 2724, 16-MD-2724, 16-CM-27242;

**In Re: Generic Pharmaceuticals Pricing Antitrust Litigation, In Re: Clobetasol Cases**, **U.S. District Court E.D. Pa.,** MDL No. 2724, 16-MD-2724, 16-CB-27242;

**Mayor and City Council of Baltimore v. Purdue Pharma L.P. et al.**, **Circuit Court of Maryland for Baltimore City**, Case No. 24C18000515;

**In Re: Actos End-Payor Antitrust Litigation, U.S. District Court S.D.N.Y.,** Master File No. 1:13-cv-09244-RA-SDA;

**In Re: Avandia Marketing, Sales Practices and Products Liability Litigation, U.S. District Court E.D. Pa.,** MDL No. 1871;

**Cynthia Russo et al. v. Walgreen Co., U.S. District Court, N.D. IL, Eastern Division, CIVIL NO. 1:17-CV-02246;**

**In Re: Lipitor Antitrust Litigation, (U.S. District Court, N.J.), MDL No. 2332, Master Docket No., 3: 12-cv-2389 (PGS/DEA);**

**In Re: Xyrem (Sodium Oxybate) Litigation, (N.D. Ca.), No. 5:20-md-02966-LHK;**

**Peter Staley, et al., v. Gilead Sciences, Inc., et al., U.S. District Court N.D. Ca., Case No. 3:19-cv-02573-EMC**

**State of Washington v. McKesson Corporation et al., Superior Court of the State of Washington, King County,** No. 19-2-06975-9 SEA

**Painters and Allied Trades District Council 82 Health Care Fund et al. v. Takeda Pharmaceutical Company Limited et al., U.S. District Court, C.D. Ca.,** Case No.: 2:17-cv-07223-SVW-AS

**County of Bexar v. Purdue Pharma L.P., et al., 152nd Judicial District, Harris County Texas,** MDL No. 18-0358

**County of Dallas v. Purdue Pharma L.P., et al., 116th Judicial District, Dallas County Texas,** MDL No. 2018-77098

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**In Re: Namenda Indirect Purchaser Antitrust Litigation,** U.S. District Court, S.D.N.Y., No. **15-cv-06549**

**City of Huntington v. Amerisource Bergen et al.,** U.S. District Court, S.D.W.Va., Civil **Action No. 3:17-01362**

**In Re: Zetia (Ezetimibe) Antitrust Litigation,** U.S. District Court, E.D.Va., Norfolk **Division, Civil Action No. 18-md-2836-RBS-DEM**

**In Re: Opana ER Antitrust Litigation,** U.S. District Court, N.D. IL, Eastern Division, MDL No. 2580, Lead Case 14-cv-10150.

**In Re: National Prescription Opiate Litigation,** U.S. District Court, N.D. Ohio, Eastern **Division,** No. 18-op-45090.

**In Re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation,** U.S. District **Court E.D.N.Y.,** No. 18-md-2819 (NG) (LB)

**In re EpiPen (EPINEPHRINE INJECTION, USP) Marketing, Sales Practices, and Antitrust Litigation,** Civil Action No. 2:17-md-02785-DDC-TJJ, MDL No. 2785 (D. Kan.)

**In re: Intuniv Antitrust Litigation,** U.S District Court MA, Lead case no. 1:16-cv-12396-ADB

**In re: Loestrin 24 Antitrust Litigation** U.S. District Court RI, MDL No. 2472

**In re: Niaspan Antitrust Litigation,** U.S. District Court E.D. Pa., Master Docket No. 2460

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**APPENDIX C**: MATERIALS CONSIDERED

**APPENDIX C**
**Materials Considered**

Bates-Stamped Documents

[1] FRANCISCAN-00000398
[2] FRANCISCAN-00001920
[3] FRANCISCAN-00053994
[4] Intuitive-00000210
[5] Intuitive-00000211
[6] Intuitive-00000212
[7] Intuitive-00000213
[8] Intuitive-00000214
[9] Intuitive-00000215
[10] Intuitive-00000216
[11] Intuitive-00000217
[12] Intuitive-00000218
[13] Intuitive-00000219
[14] Intuitive-00000220
[15] Intuitive-00000221
[16] Intuitive-00000222
[17] Intuitive-00000223
[18] Intuitive-00000224
[19] Intuitive-00000225
[20] Intuitive-00000226
[21] Intuitive-00000227
[22] Intuitive-00000228
[23] Intuitive-00000229
[24] Intuitive-00000230
[25] Intuitive-00000231
[26] Intuitive-00000232
[27] Intuitive-00000233
[28] Intuitive-00000234
[29] Intuitive-00000235
[30] Intuitive-00000261
[31] Intuitive-00000262
[32] Intuitive-00000263
[33] Intuitive-00000264
[34] Intuitive-00000265
[35] Intuitive-00000266
[36] Intuitive-00000267
[37] Intuitive-00000268
[38] Intuitive-00000269
[39] Intuitive-00000270
[40] Intuitive-00000271
[41] Intuitive-00000272
[42] Intuitive-00000273
[43] Intuitive-00000274
[44] Intuitive-00000275
[45] Intuitive-00000316
[46] Intuitive-00004126
[47] Intuitive-00004810
[48] Intuitive-00005135
[49] Intuitive-00059480
[50] Intuitive-00059494
[51] Intuitive-00093270
[52] Intuitive-00093274
[53] Intuitive-00093275
[54] Intuitive-00103456
[55] Intuitive-00107443
[56] Intuitive-00143920

[57] Intuitive-00156878
[58] Intuitive-00156880
[59] Intuitive-00174015
[60] Intuitive-00210972
[61] Intuitive-00264803
[62] Intuitive-00283676
[63] Intuitive-00283678
[64] Intuitive-00283691
[65] Intuitive-00283695
[66] Intuitive-00283720
[67] Intuitive-00283721
[68] Intuitive-00283802
[69] Intuitive-00283931
[70] Intuitive-00284534
[71] Intuitive-00284537
[72] Intuitive-00284617
[73] Intuitive-00300421
[74] Intuitive-00306656
[75] Intuitive-00308602
[76] Intuitive-00313873
[77] Intuitive-00372053
[78] Intuitive-00439498
[79] Intuitive-00465646
[80] Intuitive-00583659
[81] Intuitive-00595406
[82] Intuitive-00595407
[83] Intuitive-00595408
[84] Intuitive-00595409
[85] Intuitive-00595410
[86] Intuitive-00595411
[87] Intuitive-00595412
[88] Intuitive-00595413
[89] Intuitive-00595414
[90] Intuitive-00595415
[91] Intuitive-00595416
[92] Intuitive-00595417
[93] Intuitive-00595418
[94] Intuitive-00595419
[95] Intuitive-00595420
[96] Intuitive-00595421
[97] Intuitive-00595422
[98] Intuitive-00595423
[99] Intuitive-00595424
[100] Intuitive-00595425
[101] Intuitive-00595426
[102] Intuitive-00595427
[103] Intuitive-00595428
[104] Intuitive-00595429
[105] Intuitive-00595430
[106] Intuitive-00595431
[107] Intuitive-00595432
[108] Intuitive-00595433
[109] Intuitive-00595434
[110] Intuitive-00595435

[111] Intuitive-00595436
[112] Intuitive-00595438
[113] Intuitive-00595439
[114] Intuitive-00595440
[115] Intuitive-00595441
[116] Intuitive-00595442
[117] Intuitive-00595443
[118] Intuitive-00595444
[119] Intuitive-00595445
[120] Intuitive-00595446
[121] Intuitive-00595447
[122] Intuitive-00595448
[123] Intuitive-00595449
[124] Intuitive-00595450
[125] Intuitive-00595451
[126] Intuitive-00595452
[127] Intuitive-00595453
[128] Intuitive-00595454
[129] Intuitive-00595455
[130] Intuitive-00595456
[131] Intuitive-00595457
[132] Intuitive-00595458
[133] Intuitive-00595459
[134] Intuitive-00595460
[135] Intuitive-00595461
[136] Intuitive-00595462
[137] Intuitive-00595463
[138] Intuitive-00679280
[139] Intuitive-00695144
[140] Intuitive-00695232
[141] Intuitive-00695233
[142] Intuitive-00695234
[143] Intuitive-00695236
[144] Intuitive-00701322
[145] Intuitive-00706090
[146] Intuitive-00706097
[147] Intuitive-00823949
[148] Intuitive-00849019
[149] Intuitive-00926630
[150] Intuitive-00926632
[151] Intuitive-00926986
[152] Intuitive-00931801
[153] Intuitive-01180433
[154] Intuitive-01182277
[155] Intuitive-01265354
[156] Intuitive-01265649
[157] Intuitive-01296112
[158] Intuitive-01682609
[159] Intuitive-01793814
[160] Intuitive-01837384
[161] Intuitive-01848966
[162] Intuitive-01926834
[163] Intuitive-01951989
[164] Intuitive-01969948
[165] Intuitive-01974040
[166] Intuitive-02072147
[167] Intuitive-02072148
[168] Intuitive-02072162

[169] Intuitive-02072163
[170] Intuitive-02072164
[171] Intuitive-02072165
[172] Intuitive-02072166
[173] Intuitive-02072167
[174] Intuitive-02072168
[175] Intuitive-02072169
[176] Intuitive-02072170
[177] Intuitive-02072171
[178] Intuitive-02072172
[179] Intuitive-02072173
[180] Intuitive-02072174
[181] Intuitive-02072175
[182] Intuitive-02072176
[183] Intuitive-02072178
[184] Intuitive-02072179
[185] Intuitive-02072180
[186] Intuitive-02072181
[187] Intuitive-02072182
[188] Intuitive-02072183
[189] Intuitive-02072184
[190] Intuitive-02072185
[191] Intuitive-02072186
[192] Intuitive-02072187
[193] Intuitive-02072189
[194] Intuitive-02072190
[195] Intuitive-02072191
[196] Intuitive-02072192
[197] Intuitive-02072193
[198] LARKIN-00009051
[199] LARKIN-00009092
[200] LARKIN-00025488
[201] REBOTIX162208
[202] REBOTIX175326
[203] Restore-00002260
[204] Restore-00055935
[205] Restore-00055937
[206] SIS000047
[207] SIS048255

## Case Documents

[208] Consolidated Amended Class Action Complaint, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, September 10, 2021

[209] Declaration of David Rosa, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, April 13, 2023

[210] Declaration of Ronald Bair, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, April 13, 2023

[211] Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, *Rebotix Repair LLC v. Intuitive Surgical, Inc* ., Case No. 8:20-cv-2274, July 10, 2021

[212] Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc* ., Case No. 5:19-cv-55, July 9, 2021

[213] Intuitive's Responses to Plaintiffs' Follow-Up Data Questions on Intuitive's Initial Responses, *In re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, November 15, 2022

[214] Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, December 23, 2022

[215] Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, August 4, 2021

[216] Joint Case Management Statement, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, May 23, 2024

[217] Order Re: Cross Motions for Summary Judgment, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, March 31, 2024

[218] Plaintiff Franciscan Alliance, Inc's Amended Objections and Responses to Defendant's Second Set of Interrogatories to Plaintiffs, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Lead Case No. 3.21-cv-03825, September 30, 2022

[219] Plaintiffs' Notice of Motion for Class Certification and Memorandum of Points and Authorities, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, June 6, 2024

[220] Questions Regarding Intuitive's Data Produced and Question Responses of 1/31/2023, *In re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, February 10, 2023

[221] Responses to Class Plaintiffs' Data Questions for Intuitive, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, December 9, 2022

---

**Depositions**

[222] Michael Burke Deposition Transcript and Exhibits, September 27, 2022
[223] Mark Early Deposition Transcript and Exhibits, October 6, 2022
[224] Einer Elhauge Deposition Transcript and Exhibits, July 24, 2024
[225] Ricardo Estape Deposition Transcript and Exhibits, October 22, 2022
[226] John Francis Deposition Transcript and Exhibits, October 14, 2022
[227] Jose Carlos Gonzalez 30(b)(6) Deposition Transcript and Exhibits, October 17, 2022
[228] Nickola "Nicky" Goodson 30(b)(1) Deposition Transcript and Exhibits, October 27, 2022
[229] West Gordon *(in Restore)* Deposition Transcript and Exhibits, May 13, 2021
[230] Colin Morales 30(b)(1) Deposition Transcript and Exhibits, November 9, 2022
[231] David Rosa *(in Restore)* Deposition Transcript and Exhibits, May 19, 2021
[232] John Sampson Deposition Transcript and Exhibits, November 3, 2022
[233] Judith Schimmel 30(b)(1) Deposition Transcript and Exhibits, September 22, 2022
[234] Judith Schimmel 30(b)(6) Deposition Transcript and Exhibits, November 16, 2022
[235] Sandra Sosa-Guerrero Deposition Transcript and Exhibits, September 23, 2022
[236] Rick Teal 30(b)(6) Deposition Transcript and Exhibits, November 18, 2022
[237] Todd Thomas Deposition Transcript and Exhibits, November 10, 2022
[238] John Wagner Deposition Transcript and Exhibits, October 11, 2022

---

**Expert Reports**

[239] Amended Expert Rebuttal Report of Loren K. Smith, *In Re: Da Vinci Surgical Robots Antitrust Litigation* , Case No. 3:21-cv-03825, February 10, 2023, Appendix A

[240] Expert Class Certification Report of Professor Einer Elhauge, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, June 6, 2024 and materials cited therein

[241] Corrected Expert Class Certification Report of Professor Einer Elhauge, *In Re: Da Vinci Surgical Robot Antitrust Litigation* , Case No. 3:21-cv-03825, July 13, 2024 and materials cited therein

---

**Form 10-K**

[242] Abbott Laboratories Form 10-K 2023
[243] Intuitive Form 10-K 2000
[244] Intuitive Form 10-K 2001
[245] Intuitive Form 10-K 2002
[246] Intuitive Form 10-K 2003
[247] Intuitive Form 10-K 2004
[248] Intuitive Form 10-K 2005
[249] Intuitive Form 10-K 2006
[250] Intuitive Form 10-K 2007
[251] Intuitive Form 10-K 2008
[252] Intuitive Form 10-K 2009
[253] Intuitive Form 10-K 2010
[254] Intuitive Form 10-K 2011
[255] Intuitive Form 10-K 2012
[256] Intuitive Form 10-K 2013
[257] Intuitive Form 10-K 2014
[258] Intuitive Form 10-K 2015
[259] Intuitive Form 10-K 2016

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[260] Intuitive Form 10-K 2017
[261] Intuitive Form 10-K 2018
[262] Intuitive Form 10-K 2019
[263] Intuitive Form 10-K 2020
[264] Intuitive Form 10-K 2021
[265] Intuitive Form 10-K 2022
[266] Intuitive Form 10-K 2023

Literature and Textbooks

[267] Abbott, Alden and Joshua D. Wright, "Antitrust Analysis of Tying Arrangements and Exclusive Dealing," in George Mason Law & Economics Research Paper No. 08-37, *Antitrust Law and Economics* (2008): 183–212
[268] Areeda, Phillip E., Herbert Hovenkamp, and Einer Elhauge et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Vol. X, 2nd Ed. (2004)
[269] Elhauge, Einer, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," *Harvard Law Review* 123, No. 2 (2009): 397–481
[270] Frank, Richard G. and David S. Salkever, "Pricing, Patent Loss and the Market for Pharmaceuticals," *Southern Economic Journal* 59, No. 2 (1992): 165–179
[271] Grabowski, Henry G. and John M. Verson, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics* 35, No. 2 (1992): 331-350
[272] Hovenkamp, Erik and Herbert Hovenkamp, "Tying Arrangements," in Roger D. Blair and D. Daniel Sokol, eds., *The Oxford Handbook of International Antitrust Economics* 2 (Oxford, 2015)
[273] Hovenkamp, Herbert, "Tying Arrangements and Class Actions," *Vanderbilt Law Review* 36 (1983): 213–262
[274] Matheson, John H.,"Class Action Tying Cases: A Framework for Certification," *Northwestern University Law Review* 76, No.6 (1982), 855-891
[275] Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, Eighth Edition (New Jersey: Pearson Education, Inc., 2013)
[276] Tirole, Jean, "The Analysis of Tying Cases: A Primer," *Competition Policy International* 1, No. 1 (2005)
[277] Woolridge, Jeffrey, *Introductory Econometrics*, 4th Edition (Mason: South-Western, 2009)

Publicly Available Documents

[278] AHA Data & Insights, 2022, "AHA Annual Survey Database Reference Guide, Fiscal Year 2022," American Health Association, accessed July 2024
[279] AHA Data & Insights, 2022, "AHA Annual Survey Database, Appendix A - Control Code Descriptions," American Health Association, accessed July 2024
[280] AHA Data & Insights, 2022, "AHA Annual Survey Database," American Health Association, accessed July 2024
[281] Federal Aviation Administration, "TWO-LETTER STATE AND TERRITORY ABBREVIATIONS," accessed July 2024, https://www.faa.gov/air_traffic/publications/atpubs/cnt_html/appendix_a.html
[282] Google, "Google Maps Geocoding API," accessed July 2024, via Google
[283] IBISWorld, November 2023, "Medical Equipment Repair & Maintenance Services in the US," accessed July 2024
[284] Intuitive Surgical, Inc., 2020, "Sustainability Report 2020," accessed July 2024, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/2020-intuitive-sustainability-report.pdf
[285] W. Pete Welch, Lanlan Xu, Nancy De Lew, Benjamin D. Sommers, "Ownership of Hospitals: An Analysis of Newly-Released Federal Data & A Method for Assessing Common Owner," U.S. Office of Health Policy, August 2023, accessed July 2024 https://aspe.hhs.gov/sites/default/files/documents/582de65f285646af741e14f82b6df1f6/hospital-ownership-data-brief.pdf

Websites

[286] "Ardent Health Services and The University of Texas System Finalize Agreement to form UT Health East Texas," UT Health East Texas, accessed July 2024, https://uthealtheasttexas.com/news/ardent-health-services-and-university-texas-system-finalize-agreement-form-ut-health-east-texas
[287] "Abbott's Medical Devices", https://www.abbott.com/content/dam/corp/abbott/en-us/abbottcorpnews/pdf/Medical-Devices-Fact-Sheet.pdf, accessed July 2024

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[288] "Certificate of Need State Laws," National Conference of State Legislatures, February 6, 2024, accessed July 2024, https://www.ncsl.org/health/certificate-of-need-state-laws

[289] "Da Vinci Xi," accessed July 2024, https://www.intuitive.com/en-us/products-and-services/da-vinci/xi

[290] "Does UT Tyler Health Science Center's deal with private equity shield doctors from malpractice suits?," Texas Tribune, accessed July 2024, https://www.texastribune.org/2024/02/23/university-texas-tyler-texas-private-equity-malpractice/

[291] "dVSTAT Da Vinci Surgery Technical Assistance Team," Intuitive Surgical, Inc., accessed July 2024, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/dvstat-flyer-1018782rd-1018.pdf

[292] "FDA Clearance to Reprocess Da Vinci Robotic Instruments Could Present Hospitals with Substantial Savings," PRWeb press release, November 2, 2022, accessed July 2024, https://www.prweb.com/releases/fda-clearance-to-reprocess-da-vinci-robotic-instruments-could-present-hospitals-with-substantial-savings-824988437.html

[293] "Flexible Financing for Acquiring Robotic Surgery Technology," Intuitive Surgical, accessed July 2024, https://www.intuitive.com/en-us/about-us/newsroom/flexible-financing-for-acquiring-robotic-surgery-technology

[294] "Hospitals by Ownership Type," Kaiser Family Foundation, accessed July 2024, https://www.kff.org/other/state-indicator/hospitals-by-ownership/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

[295] "Intuitive Announces FDA Clearance of Fifth-Generation Robotic System, da Vinci 5," Intuitive Surgical, Inc., March 14, 2024, accessed July 2024, https://isrg.intuitive.com/news-releases/news-release-details/intuitive-announces-fda-clearance-fifth-generation-robotic

[296] "Locations", UT Health East Texas, accessed July 2024, https://uthealtheasttexas.com/news/ardent-health-services-and-university-texas-system-finalize-agreement-form-ut-health-east-texas

[297] "Our Model", ████████████, accessed July 2024.

[298] "Statement on usage limits and use of remanufactured EndoWrist instruments," Intuitive, accessed July 2024, https://www.intuitive.com/en-us/products-and-services/da-vinci/instruments

[299] "UCSF Medical Center Opens $1.5 Billion, "Next Generation" Hospital Complex at Mission Bay Campus on Feb. 1, 2015", University of California San Francisco, accessed July 2024, https://www.ucsf.edu/news/2014/11/121086/ucsf-medical-center-opens-15-billion-next-generation-hospital-complex-mission

[300] "What is ████████████?", ████████████, accessed July 2024, ████████████

[301] "What's a Public Hospital District?," Valley Medical Center, accessed July 2024, https://www.valleymed.org/about-us/whats-a-public-hospital-district

[302] Larkin Health System, accessed July 2024, https://larkinhealth.com/en/locations/.

# APPENDIX D: SUPPLEMENTAL TABLES

**TABLE 3: PACKAGE PRICING ANALYSIS BASED ON CONTRACTED PRICE FOR THE BUT-FOR ROBOT PRICE**

| | Actual [A] | % Change [B] | But-For [C] | Difference [D]=[A]-[C] |
|---|---|---|---|---|
| ████████████████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| ████████████████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| ████████████████████ | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Larkin Community Hospital - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Valley Medical Center - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |
| *Franciscan - Named Plaintiff* | | | | |
| [1] Robot | | | | |
| [2] Servicing | | | | |
| [3] EndoWrists | | | | |
| [4] Advanced Instruments | | | | |
| [5] Other I&A | | | | |
| [6] Total | | | | |

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Sources and Notes:

– [1][A]: Intuitive Systems Data, Total System Revenue (USD), which is total revenue net of discounts, rebates, credits, etc. For leased systems, this field is empty. In such cases, I use the Revenue SAP Amount, which is "the amount of revenue recognized for the system after allocation among different obligations in the contract." *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc.,* Case No. 5:19-cv-55, July 9, 2021, p. 1 and Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses, pp.1–2.

– [2][A]: Intuitive-02072148, Total Servicing Revenue.

– [3][A]: Intuitive I&A data, EndoWrists identified based on Elhauge Class Report, Exhibit D.

– [4][A]: Intuitive I&A data, Advanced Instruments refer to instruments ever sold in "Box" units.

– [5][A]: Intuitive I&A data, filtered to exclude those instruments included in [3] or [4].

– [6] = [1] + [2] + [3] + [4] + [5]

– [1][B]: [D]/[A]

– [2][B]: Set to equal the 12 percent Service price discount Professor Elhauge asserts in his damages analysis. *See* Elhauge Class Report, ¶ 825.

– [3][B]: Set to equal the 20 percent EndoWrist price discount Professor Elhauge asserts in his damages analysis. *See* Elhauge Class Report, ¶ 782.

– [4][B]: Set to reflect a five percent increase in the price of Advanced EndoWrists.

– [5][B]: Set to reflect no price for other I&A.

– [1][C]: Intuitive Systems Data, Total Contract Amount (Functional), which is the price paid in the contract. *See* Intuitive Surgical, Inc. Responses to Restore's Data Questions, *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, p. 1.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### TABLE 4: NEW AND REMANUFACTURED ENDOWRIST SALES IN THE U.S., 2018–2021

| | 2018 [A] | 2019 [B] | 2020 [C] | 2021 [D] |
|---|---|---|---|---|
| *Total Customers* | | | | |
| [1] Customers of Third Parties who Purchased One or More Remanufactured EndoWrists | 3 | 39 | 10 | 1 |
| [2] Customers IDs who Purchased S/Si or X/Xi EndoWrists from Intuitive | 1,896 | 2,026 | 2,114 | 2,231 |
| [3]   Customers IDs who Purchased One or More S/Si EndoWrists from Intuitive | 1,492 | 1,384 | 1,056 | 774 |
| [4]   Customers IDs who Purchased One or More X/Xi EndoWrists from Intuitive | 1,181 | 1,496 | 1,807 | 2,096 |
| [5] Ratio of Customers who Purchased Remanufactured EndoWrists to Customer IDs who Purchased EndoWrists from Intuitive | 0.158% | 1.925% | 0.473% | 0.045% |
| [6]   Ratio of Customers who Purchased Remanufactured EndoWrists to Customer IDs who Purchased One or More S/Si EndoWrists from Intuitive | 0.201% | 2.818% | 0.947% | 0.129% |
| *Total Sales* | | | | |
| [7] Customers of Third Parties who Purchased One or More Remanufactured EndoWrists | $24,250 | $573,472 | $130,308 | $7,375 |
| [8] Customers IDs who Purchased S/Si or X/Xi EndoWrists from Intuitive | $802,690,474 | $897,336,060 | $872,524,354 | $950,227,701 |
| [9]   Customers IDs who Purchased One or More S/Si EndoWrists from Intuitive | $348,187,266 | $253,589,513 | $130,237,431 | $56,224,284 |
| [10]   Customers IDs who Purchased One or More X/Xi EndoWrists from Intuitive | $454,503,208 | $643,746,547 | $742,286,923 | $894,003,417 |
| [11] Ratio of Sales from Customers who Purchased Remanufactured EndoWrists to Customer IDs who Purchased EndoWrists from Intuitive | 0.003% | 0.064% | 0.015% | 0.001% |
| [12]   Ratio of Sales from Customers who Purchased Remanufactured EndoWrists to Customer IDs who Purchased One or More S/Si EndoWrists from Intuitive | 0.007% | 0.226% | 0.100% | 0.013% |

Sources and Notes:

– EndoWrists identified based on Elhauge Class Report, Exhibit D.

– Third-party customers identified using third-party transactions data (SIS048255, Restore-00055935, Restore-00055937, and REBOTIX175326), after excluding Rebotix sales to SIS or Restore.

– [1]: Total unique customers purchasing remanufactured EndoWrists.

– [2]: Unique counts of Customer ID by Year, Intuitive I&A data, filtered to include only EndoWrists.

– [3]: Unique counts of Customer ID by Year, Intuitive I&A data, filtered to include only S/Si EndoWrists.

– [4]: Unique counts of Customer ID by Year, Intuitive I&A data, filtered to include only X/Xi EndoWrists.

– [5]: [1]/[2], and [6]: [1]/[3].

– [7]: Total net sales to customers purchasing remanufactured EndoWrists.

– [8]: "Net Sales" by "Year," Intuitive I&A data, filtered to include only EndoWrists.

– [9]: "Net Sales" by "Year," Intuitive I&A data, filtered to include only S/Si EndoWrists.

– [10]: "Net Sales" by "Year," Intuitive I&A data, filtered to include only X/Xi EndoWrists.

– [11]: [7]/[8], and [12]: [7]/[9].

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**APPENDIX E**: SUPPLEMENTAL FIGURES FOR ROBOTS

148. Figure 21, Figure 22, and Figure 23 plot purchase price for incremental purchases over time separately for various models of the da Vinci robots. The prices shown reflect revenues after accounting for trade-in credits and other discounts, such as price reductions negotiated in master purchase agreements.[259] Each scatterplot also shows Intuitive's suggested (or list) price.[260] The figures show that there are large differences between the maximum and minimum transacted price even in the same calendar quarter.

---

[259] *See* Purchase Agreement between ▬▬▬▬▬ and Intuitive (Intuitive-00284617), pp. 38–39. *See also* "Transaction Agreement Between Purchaser and Vendor between ▬▬▬▬▬ and Intuitive," June 5, 2017, Intuitive-01969948.

[260] List prices come from "pricing approval" spreadsheets from Intuitive; for example, *see* "System Pricing Approval Datasheet," February 2019, Intuitive-00000228 for a pricing approval sheet in February 2019.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 21: INCREMENTAL PURCHASE PRICES, DA VINCI SI ROBOT WITH A SINGLE CONSOLE, 2015–2018**



Sources and Notes:

– "Purchase Price" as reflected in the Total System Revenue USD field of the Intuitive Systems Data, filtered to U.S. robot and upgrade purchases from 2015 or later with non-zero, non-missing quantities, and positive revenue. Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

– Total System Revenue USD provides total revenue net of discounts, rebates, credits, etc. *See* "Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses," *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, December 23, 2022, pp.1–2.

– List Price as reported in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020).

– The series begins in 2015 because the first incremental purchase of a da Vinci Si robot occurs in 2015.

– The series ends in 2018 because the data does not show any incremental purchases of da Vinci Si robots in the U.S. after 2018.

**FIGURE 22: INCREMENTAL PURCHASE PRICES, DA VINCI X ROBOT WITH A SINGLE CONSOLE, 2017–2023**



Sources and Notes:

– "Purchase Price" as reflected in the Total System Revenue USD field of the Intuitive Systems Data, filtered to U.S. robot and upgrade purchases from 2015 or later with non-zero, non-missing quantities, and positive revenue. Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

– Total System Revenue USD provides total revenue net of discounts, rebates, credits, etc. *See* "Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses," *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, December 23, 2022, pp.1–2.

– List Price as reported in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020).

– The series begins in 2017 because the first incremental purchase of a da Vinci X robot in the data occurs in 2017.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 23: INCREMENTAL PURCHASE PRICES, DA VINCI XI ROBOT WITH DUAL CONSOLES, 2015–2023**



Sources and Notes:

–   "Purchase Price" as reflected in the Total System Revenue USD field of the Intuitive Systems Data, filtered to U.S. robot and upgrade purchases from 2015 or later with non-zero, non-missing quantities, and positive revenue. Incremental transactions are identified using Intuitive's data responses, which specify which transaction categories are incremental and non-incremental. *See* "Responses to Class Plaintiffs' Data Questions for Intuitive," *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case No. 3:21-cv-03825, December 9, 2022, pp. 3–6. *See also* "Intuitive Surgical, Inc.'s Responses to Restore's Data Questions," *Restore Robotics LLC v. Intuitive Surgical, Inc*., Case No. 5:19-cv-55, July 9, 2021, pp. 2–3.

–   Total System Revenue USD provides total revenue net of discounts, rebates, credits, etc. *See* "Intuitive's Responses to Plaintiffs' Second Follow-Up Data Questions on Intuitive's Responses," *In Re: Da Vinci Surgical Robot Antitrust Litigation,* Case No. 3:21-cv-03825, December 23, 2022, pp.1–2.

–   List Price as reported in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020).

–   The series begins in 2015 because the first incremental purchase of a da Vinci Xi Dual robot in the data occurs in 2015.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**APPENDIX F**: SUPPLEMENTAL FIGURES FOR SYSTEM SERVICE

149. Figure 24, Figure 25, and Figure 26 show the annual sales contract price by year for dV Complete Care contracts for the da Vinci S, Si, and X, respectively, reflecting the variability in pricing within a single service plan type.

FIGURE 24: RANGE OF ANNUAL PRICES FOR DV COMPLETE CARE—DA VINCI S, 2012–2017



Sources and Notes:

- Annual price from Intuitive-02072147 and Intuitive-00695236.
- Filtered to U.S. using "s_org" = 2000, and DV Complete Care service contracts. Removed service plans that are less than 1 year in duration, contracts for a given system that are later updated in the same calendar year, and service plans with "NFHU" (not for human use) in the description field or material number. *See* System Service Contracts Workpaper for details.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 25: RANGE OF ANNUAL PRICES FOR DV COMPLETE CARE—DA VINCI SI, 2012–2021**



Sources and Notes:

– Annual price from Intuitive-02072147 and Intuitive-00695236.

– Filtered to U.S. using "s_org" = 2000, and DV Complete Care service contracts. Removed service plans that are less than 1 year in duration, contracts for a given system that are later updated in the same calendar year, and service plans with "NFHU" (not for human use) in the description field or material number. *See* System Service Contracts Workpaper for details.

– List Price as reported for dV Complete Care in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020). 2021 list prices are assumed to be the same as 2020 list prices.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**FIGURE 26: RANGE OF ANNUAL PRICES FOR DV COMPLETE CARE—DA VINCI X, 2018–2021**



Sources and Notes:

– Annual price from Intuitive-02072147 and Intuitive-00695236.

– Filtered to U.S. using "s_org" = 2000, and DV Complete Care service contracts. Removed service plans that are less than 1 year in duration, contracts for a given system that are later updated in the same calendar year, and service plans with "NFHU" (not for human use) in the description field or material number. *See* System Service Contracts Workpaper for details.

– List Price as reported for dV Complete Care in the following System Pricing Approval Datasheets: Intuitive-00000261 (June 2014), Intuitive-00000265 (March 2015), Intuitive-00000271 (March 2016), Intuitive-00000210 (February 2017), Intuitive-00000218 (January 2018), Intuitive-00000228 (February 2019), and Intuitive-00000233 (February 2020). 2021 list prices are assumed to be the same as 2020 list prices.