ATTACHMENT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--------------------------------X

IN RE: DA VINCI SURGICAL ROBOT    : Lead Case No.

ANTITRUST LITIGATION              : 3:21-cv-03825-VC

--------------------------------X


Deposition of EINER ELHAUGE

Conducted Remotely

Wednesday, July 24, 2024

10:02 a.m.


Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1        Deposition of EINER ELHAUGE, conducted

2    remotely:

3

4

5

6

7

8

9        Pursuant to Notice, before Matthew Goldstein,

10    RMR, CRR, Notary Public in and for the State of

11    Maryland.

12

13

14

15

16

17

18

19

20

21

22

7/24/2024          In re: Da Vinci Surgical Robot Antitrust Litigation          Einer Elhauge

Page 3

1                    A P P E A R A N C E S

2         ON BEHALF OF THE PLAINTIFFS, LARKIN COMMUNITY

3         HOSPITAL, KALEIDA HEALTH AND THE PROPOSED

4         CLASS:

5         JOSHUA D. SNYDER, ESQUIRE

6         BONI, ZACK & SNYDER LLC

7         15 St. Asaphs Road

8         Bala Cynwyd, Pennsylvania 19004

9         610.822.0200

10

11        and

12

13        JEFFREY J. CORRIGAN, ESQUIRE

14        SPECTOR ROSEMAN & KODROFF, P.C.

15        2001 Market Street

16        Suite 3420

17        Philadelphia, Pennsylvania 19103

18        215.496.0300

19

20

21

22

Page 4

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2           ON BEHALF OF THE PLAINTIFFS, FRANCISCAN

 3           ALLIANCE, INC. AND KING COUNTY PUBLIC

 4           HOSPITAL DISTRICT NO. 1 (DBA VALLEY MEDICAL

 5           CENTER) AND THE PROPOSED CLASS:

 6           CHRISTOPHER J. BATEMAN, ESQUIRE

 7           COHEN MILSTEIN SELLERS & TOLL, PLLC

 8           88 Pine Street

 9           14th Floor

10           New York, New York 10005

11           212.838.7797

12

13           and

14

15           DANIEL MCCUAIG, ESQUIRE

16           COHEN MILSTEIN SELLERS & TOLL, PLLC

17           1100 New York Avenue, N.W.

18           Suite 500, West Tower

19           Washington, D.C. 20005

20           202.408.4600

21

22
```

Page 5

1      A P P E A R A N C E S   C O N T I N U E D

2          ON BEHALF OF THE DEFENDANT, INTUITIVE

3          SURGICAL:

4          ASHLEY E. BASS, ESQUIRE

5          PAUL STRAUCH, ESQUIRE

6          COVINGTON & BURLING, LLP

7          850 Tenth Street,NW

8          One City Center

9          Washington, D.C. 20001

10         202.662.5109

11

12         and

13

14         ON BEHALF OF THE DEFENDANT, INTUITIVE

15         SURGICAL:

16         WILLIAM B. MICHAEL, ESQUIRE

17         DANIEL A. CRANE, ESQUIRE

18         PAUL WEISS

19         1285 Avenue of the Americas

20         New York, New York 10019

21         212.373.3648

22

Page 6

1        A P P E A R A N C E S    C O N T I N U E D

2

3              and

4

5              PAUL D. BRACHMAN, ESQUIRE

6              PAUL WEISS

7              2001 K Street, NW

8              Washington, D.C. 20006

9              202.223.7440

10

11             ALSO PRESENT:

12             JOSHUA P. DAVIS

13             JOE CERDA – VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

Page 41

1       A.   Well, I don't ultimately offer a

2   conclusion on that.  My conclusion, I guess, is

3   the evidence is capable of showing that.  And so,

4   thus, I model the scenarios in which the

5   factfinder would so conclude and show what the

6   damages would be and what the effect would be on

7   common impact.

8       Q.   In the but-for world, you conclude that

9   service pricing would be at least 12 percent less;

10  correct?

11      A.   Yes.

12      Q.   In the but-for world, you conclude that

13  Intuitive would still have monopoly power in your

14  defined relevant market; correct?

15      A.   Yes.  Well, in all three, I guess.

16  There's three relevant markets.  They have

17  monopoly power in all three.

18      Q.   What three relevant markets are you

19  referencing?

20      A.   The market for MIST surgery robots, the

21  market for EndoWrist repair and replacement, and

22  the da Vinci service market.

Page 42

1    Q.   In the but-for world, it's your

2    conclusion that Intuitive would have monopoly

3    power in each of those three relevant markets?

4    A.   Yes.

5    Q.   In the but-for world, are you making any

6    conclusions about what rival robotic surgical

7    offerings would be available?

8         MR. SNYDER:  Objection to form.

9         THE WITNESS:  Well, I think it would

10   include the same ones that exist in the actual

11   world.

12   BY MS. BASS:

13   Q.   In the actual world in the U.S., you

14   note in your report that that included two rival

15   brands for minimally invasive soft tissue surgical

16   robots, the Senhance, S-E-N-H-A-N-C-E, and the

17   Flex; correct?

18   A.   Correct.

19        MR. SNYDER:  Objection.

20   BY MS. BASS:

21   Q.   So it's your conclusion that the

22   Senhance and the Flex would still be available in

7/24/2024          In re: Da Vinci Surgical Robot Antitrust Litigation          Einer Elhauge

Page 43

1    the but-for world, correct?

2         A.    Yes, I don't see any reason to think

3    they wouldn't be.

4         Q.    Are you reaching any conclusions

5    regarding whether the competitive impact of the

6    Senhance on Intuitive would change at all in the

7    but-for world?

8         A.    Can you state that again?

9         Q.    Sure, I'll restate it.  Maybe that will

10   help.

11             So as part of your class certification

12   report, are you offering any conclusions as to

13   whether the competitive impact of the Senhance

14   would change in the but-for world on Intuitive?

15        A.    No, I'm not offering a conclusion that

16   the competitive impact of Senhance would change in

17   the but-for world.

18        Q.    And, similarly, are you offering a

19   conclusion that the competitive impacts on the

20   Flex would change in the but-for world on

21   Intuitive?

22        A.    No.

7/24/2024          In re: Da Vinci Surgical Robot Antitrust Litigation          Einer Elhauge

Page 44

1       Q.   And in your report, you detail evidence

2   that customers found the da Vinci to be far more

3   attractive than the Senhance or the Flex; correct?

4            MR. SNYDER:  Objection.

5            THE WITNESS:  Say that again.

6   BY MS. BASS:

7       Q.   In your report, you detail evidence that

8   customers found the da Vinci to be far more

9   attractive than the Senhance or the Flex; correct?

10      A.   Yes.

11           MR. SNYDER:  Same objection.

12  BY MS. BASS:

13      Q.   You even noted evidence that some

14  surgeons had referred to the Senhance as a piece

15  of junk; correct?

16      A.   I recall that as to one of the two.

17  Like, sitting here, I can't remember whether it

18  was the Flex or the Senhance.

19      Q.   You conclude in your class certification

20  report that these rival robots were missing many

21  of the capabilities of the da Vinci robot;

22  correct?

Page 45

1      A.   Yeah, at least some of them are missing

2   some capabilities.

3      Q.   In the but-for world, are you reaching

4   any conclusions as to whether Intuitive would

5   behave as a rational economic actor?

6           MR. SNYDER:  Objection.

7           THE WITNESS:  I assume that it would

8   behave as a rational economic model in the but-for

9   world.

10  BY MS. BASS:

11     Q.   In the but-for world -- Mr. Elhauge, in

12  your report, you note that the da Vinci is a

13  must-have product with 100 percent penetration

14  among leading hospitals; correct?

15     A.   Yes.

16     Q.   Are you assuming -- well, start over.

17          Are you drawing the conclusion that that

18  same -- that same conclusion would apply in the

19  but-for world; in other words, the da Vinci would

20  be a must-have product with 100 percent

21  penetration among leading hospitals?

22     A.   Yes, I think that would continue to be

Page 46

1    true in the but-for world.

2        Q.    In the but-for world, is it your opinion

3    that M-I-S-Ts, so MIST surgical robots would

4    continue to have powerful, functional advantages

5    over traditional surgical technologies?

6              MR. SNYDER:  Objection.

7              THE WITNESS:  Yes.

8    BY MS. BASS:

9        Q.    In the but-for world, do you conclude

10   that hospitals would treat traditional surgical

11   techniques as not able to replace MIST surgery

12   robots?

13       A.    I think enough hospitals would view them

14   as not an adequate substitute, that it would

15   continue to be a separate relevant market.

16       Q.    In your report, you note that MIST

17   surgery robots can attract patients and increase

18   revenues; correct?

19       A.    Yes.

20       Q.    The same conclusion would apply in the

21   but-for world; correct?

22       A.    Yes.

Page 49

1    to speak fast.

2              "In his damages analysis, Dr. Smith also

3    repeats his baseless claims that (1) if EndoWrist

4    repair or da Vinci service prices were reduced in

5    the but-for world, Intuitive might have

6    compensated by raising its robot prices; and (2)

7    that might have responded to the entry of rivals

8    into the EndoWrist repair market by raising new

9    EndoWrist prices, either which he argues would

10   have resulted in 'negative' damages."

11             Do you see that?

12       A.   Yes.

13       Q.   And that's paragraph 846.  And then

14   under that there's some subbullets of Sections a

15   and b.

16             Do you see that?

17       A.   Yes.

18       Q.   So for the points that you were just

19   making for your belief that Intuitive would not

20   have raised the prices on robots in the but-for

21   world, it may have reduced the prices, if

22   anything, does paragraph 846 and subsections a and

Page 50

1    b, does that summarize your support for your

2    conclusion?

3         A.    It has some of the evidence for my

4    conclusion, but I also have a whole section

5    explaining why the Single Monopoly Profit Theory

6    doesn't apply as a matter of theory.  And I have a

7    concluding section in paragraph 8 [sic] that

8    directly discusses the possibility that robot

9    prices might increase, and I explained why that

10   would not occur.

11        Q.    Just to make sure I got that, so in

12   your -- you have a portion of your report that

13   discusses a Single Monopoly Profit Theory, and

14   that's where you discuss these issues as a matter

15   of theory; correct?

16        A.    Yes, I discuss them as a matter of

17   theory, at least there, probably in other

18   sections, as well.  But that's a section dedicated

19   to the theoretical question about whether reduce

20   prices for a tied product -- and tied products

21   here would be offset by increased prices for the

22   tying product.

7/24/2024          In re: Da Vinci Surgical Robot Antitrust Litigation          Einer Elhauge

Page 51

1              And I detail the various reasons why

2    such a premise wouldn't hold in this case.  And

3    the deviations there suggest that, if anything,

4    robot prices would go down in the but-for world,

5    consistent with that empirical evidence that I

6    summarized in paragraph 846.

7         Q.   And I think in your prior answer you may

8    have also referenced -- you said paragraph 8, but

9    I think perhaps you meant Section VIII?

10        A.   Yes, I meant Part VIII.

11        Q.   Apologies, Part VIII; correct?

12        A.   Yes.

13        Q.   So let's start by looking at what's in

14   paragraph 846a.

15             Here it says, "I showed that his" -- and

16   you're referring to Dr. Smith.

17             I showed that his first claim conflicts

18   with his own data, which indicates that:

19   (i) when, in response to competitive pressure,

20   Intuitive lowered per-use X/Xi EndoWrist prices

21   from 2020 to 2021, it did not raise Xi robot

22   prices, but rather lowered them.

Page 52

1            Do you see that sentence?

2        A.    Yes.

3        Q.    So for this description, my

4    understanding is that you are referencing the

5    charts in Dr. Smith's report that you refer to in

6    Footnote 1916; is that correct?

7        A.    Yes, that's part of the evidence that

8    I'm citing.

9        Q.    So I'm trying to understand what the

10   empirical evidence is that supports each of the

11   points in paragraph 846.  So for this point where

12   you say in response to competitive pressure,

13   Intuitive lowered per use X/Xi EndoWrist prices

14   from 2020 to 2021, it did not raise Xi robot

15   prices, but rather lowered them.

16           Other than Dr. Smith's figures that you

17   cite in the footnote, is there any other empirical

18   evidence that supports that point?

19           MR. SNYDER:  Objection.

20   BY MS. BASS:

21       Q.    That you're relying upon.

22       A.    Well, whatever is also cited in

Page 53

1    Sections II.C.2.iv and Section VI.B.5.  So I --

2    and I'm not sure I can remember everything in

3    there, but it does include the empirical evidence

4    that the extended use program did lower per-use

5    prices for EndoWrists from 2020 to 2021, which I

6    don't think is disputed between me and the defense

7    expert, Dr. Smith.

8         Q.   But in 846a(i), you're making the point

9    that when Intuitive introduced its X/Xi

10   extended-use instruments in 2020 to 2021, it did

11   not raise Xi robot prices, but rather lowered

12   them.

13        For the portion of that sentence that

14   says it did not raise Xi robot prices, but rather

15   lowered them, what are you relying upon?

16        A.   For that I was relying on Dr. Smith's

17   own data, as this paragraph says.

18        Q.   Moving to the next section, ii, it says,

19   When Intuitive was actually faced with increased

20   competition from rivals, providing EndoWrist S/Si

21   repair from 2018 to 2021, Intuitive reduced real

22   prices not only for da Vinci instruments, but also

Page 73

1    was a type of robot and one of the possibilities

2    was refurbished.

3          But then I point out in Table 20 what

4    the actual prices were, and they're all really

5    based upon robot type and not based on whether

6    it's refurbished or not.  And I just found some

7    documents that confirmed that refurbished, which

8    in the documents they call it recertified robots,

9    were being sold at the same prices -- had the same

10   service prices, I should say, as the service

11   prices for non-refurbished robots.

12       Q.   Okay.  Were there any other documents

13   other than those two kind of buckets that you can

14   think of that you looked at that may not be cited

15   in your report?

16       A.   No.

17       Q.   Just to clarify one of your prior

18   answers, I asked earlier in the but-for world did

19   you believe that Intuitive would have been a

20   rational economic actor.

21          What's your answer to that question?

22       A.   Yes.  I mean, as an economist, I assume

7/24/2024          In re: Da Vinci Surgical Robot Antitrust Litigation          Einer Elhauge

Page 74

1   throughout that firms are rational economic

2   actors, both in the actual world and the but-for

3   world.

4        Q.   And, also, in terms of your conclusions,

5   so have you reached the conclusion that robot

6   prices would have decreased in the but-for world?

7        A.   Yes, I think they would have.  None of

8   my analysis depends upon that conclusion, but I

9   conclude at least they wouldn't have increased,

10  but that the evidence and the economic theory

11  suggests, if anything, they would have decreased

12  somewhat in the but-for world.

13       Q.   And for your conclusion that robot

14  prices would have decreased in the but-for world,

15  what evidence do you believe supports that

16  conclusion?

17            MR. SNYDER:  Objection to form.

18            THE WITNESS:  Well, empirically, there's

19  all the evidence we already discussed about how,

20  in fact, they lowered robot prices when they

21  lowered per-use EndoWrist prices, and that cuts in

22  prices for EndoWrists and service coincide with

Page 75

1    drops in the robot prices, the fact that they

2    couldn't adjust for S/Si robot prices because they

3    weren't selling new ones after 2018, and on the

4    theory I point out that some of the assumptions

5    that don't hold, and thinking those through, those

6    would suggest that, if anything, they would lower

7    prices in the but-for world.

8            And here I'm thinking about the fact

9    that one of the assumptions doesn't hold this, we

10   don't have a fix amount of tying market power.

11   One reason here is that service would be a partial

12   substitute for robots, that is the more -- you

13   need to buyer fewer robots the more you spend on

14   service so that the service prices go down, that

15   will tend to suppress robot prices.

16           The other thing I point out is that

17   there's not a fixed ratio that permits the use of

18   ties to engage price discrimination by tying a

19   robot to a price inflated EndoWrist or service,

20   and that the -- whatever the optimal ratio is for

21   price -- price ratio is for that price

22   discrimination would indicate that if you lower

1    one price, you should lower the robot price, as

2    well.

3            So I guess a combination of the direct

4    empirics on what they did in terms of robot

5    pricing, but also the implications of the

6    conclusions about why the Single Monopoly Profit

7    Theory doesn't hold.

8            And I guess the last factor is there's

9    no reason to think their market power would go up

10   in robots in the but-for world.  So they

11   wouldn't -- there's no reason to think that they

12   would have a higher profit maximizing price.

13           Presumably, they're already at their

14   profit maximizing price.  So there's no real

15   factor to advising them to raise that and there

16   are factors to decrease it and that's consistent

17   with the empirical evidence that we see.

18   BY MS. BASS:

19      Q.   I had a follow-up question for you about

20   one thing that you said there.

21           When you said that service would be a

22   partial substitute for robots, could you please

Page 77

1    expand on that?

2        A.    Sure.  So I discuss this in

3    paragraph 680 of my report, where I say that one

4    of the assumptions that's key for the Single

5    Monopoly Profit Theory is that the tying market

6    competitiveness is fixed and that if this doesn't

7    hold, tying can create additional anticompetitive

8    effects by making the degree of tying market power

9    higher than it would have been without tying.

10           And this applies to this case, I say,

11   because servicing da Vincis is a partial

12   substitute for buying new da Vincis, in the sense

13   that the more servicing one buys, the less one

14   needs to buy a new da Vinci.  And as a result,

15   lowering service prices would predictably mean

16   more servicing, longer lasting da Vincis and thus

17   lower prices for new da Vincis.

18           So the implications of that factor not

19   holding are that the but-for price for robots

20   should be somewhat reduced because lower servicing

21   prices would lower the price of a partial

22   substitute.

Page 107

1        A.    Yes.

2        Q.    If you could turn to paragraph 860 of

3    your report.

4        A.    Okay.

5        Q.    So here, you say that -- you define the

6    class in paragraph 860, and you say, "with the

7    caveat that government entities such as military

8    or veterans' hospitals are excluded."

9              Do you see that?

10       A.    Yes.

11       Q.    So was it your intent in your analyses

12    to exclude military and veterans hospitals from

13    the class?

14       A.    That's what -- yeah, that's what -- I

15    don't know if I had my intent, but that's the

16    definition that my staff and I use in our

17    analysis.  So we did exclude military and veterans

18    hospitals from the customer list when we defined

19    the class.

20       Q.    Other than military or veterans

21    hospitals, did you exclude anyone else on the

22    basis of this government entity's exclusion in the

Page 108

1    class definition?

2        A.    No, my understanding from plaintiffs'

3    counsel is by "government entities" they meant

4    military or veterans hospitals.

5        Q.    So the -- basically, the plaintiffs'

6    counsel instructed you that "government entities"

7    meant military or veterans hospitals, and you took

8    that instruction and only based your analyses off

9    of excluding military and veterans hospitals; is

10   that correct?

11       A.    Yes, I'm relying on their definition of

12   the class.

13       Q.    So earlier we started talking a little

14   bit about tied and tying products.  So just so

15   that the record is clear here, what are the tied

16   products in this case?

17       A.    The tied products are the EndoWrist, the

18   market for EndoWrist replacement and repair, and

19   the market for da Vinci service are both tied

20   markets.

21       Q.    And what is the tying product here?

22       A.    The da Vinci product, I guess the tying

Page 118

1    necessarily lower that price.  And there's other

2    factors that bear here.  As I point out, part of

3    the tie here is to a partial substitute.  And if

4    you tie to a partial substitute, then inflate its

5    price, you're going to increase pricing on the

6    tied product market, not decrease it, for reasons

7    that I explain in my report.

8              And I think to the extent you're price

9    discriminating, if -- in the but-for world, we

10   have to take into account that they wouldn't be

11   able to inflate the price of EndoWrists.  And,

12   thus, to maintain the right ratio of prices to

13   optimize their price discrimination, that would

14   give them incentives to lower the monopoly price

15   on the robots rather than increase it in the

16   but-for world.

17             So for all those reasons, those are all

18   the theoretical reasons related to the literature

19   that I mentioned.  And, of course, there's this

20   empirical evidence here that, in fact, they charge

21   very high prices for robots, extraordinarily high,

22   and that they -- to the extent that there was

Page 132

1    BY MS. BASS:

2         Q.   Okay.  So let's take it out of the

3    article then.

4              Just from your perspective, if you have

5    reached the conclusion that a tie has a negative

6    impact on consumer welfare, do you think that that

7    conclusion would necessarily answer the question

8    of whether or not the tie had a net economic

9    impact on all of the entities that were subject to

10   the tie?

11             MR. SNYDER:  Objection.

12             THE WITNESS:  I think I need to know

13   more about the hypothetical, but I don't think

14   it -- as I sit here today, I don't think it

15   uniformly follows from the fact that ties can harm

16   consumer welfare, that they necessarily harm all

17   consumers.  That alone -- in this case, that

18   effect follows, but in the abstract, I think maybe

19   one could imagine scenarios where some consumers

20   wouldn't be harmed even though consumers overall

21   are harmed.

22

Page 140

1    increase the robot price, not decrease it.  And

2    that's what we see with the evidence.  It's

3    consistent with the evidence.  We have higher

4    robot prices with the restraints, not lower robot

5    prices.

6        Q.   And when you were just talking about

7    the -- that's your five-factor test; right?

8    That's your view here, that based off of that

9    test, that there wouldn't be any adjustment on

10   robot prices; is that right?

11       A.   The five factors are ones that disprove

12   the Single Monopoly Profit Theory that there

13   necessarily would be an adjustment on robot

14   prices, that is, would make it lower in response

15   to a higher tied product price.  So that's wrong.

16            But I don't show that there's no

17   adjustment in robot prices.  Instead, what I show

18   is the robot prices would be lower in the but-for

19   world without the restraints; that is, that the

20   restraints are inflating not only EndoWrists

21   prices and service prices, but also inflating

22   robot prices.

Page 141

1       Q.   I know we covered this today, but what's

2   your basis for saying that robot prices are

3   inflated with the tie?

4       A.   Well, there's all the empirical evidence

5   that we have, that when they -- with the tie, when

6   they lowered the per-use price for EndoWrists,

7   they actually lowered the robot price.  There's

8   the fact that during the period of the alleged

9   anticompetitive restraints, they were, in fact,

10  lowering robot prices when they lowered EndoWrist

11  and service prices rather than raising the robot

12  prices.

13          There's a fact that the tying product

14  is, you know, for the S/Si repairs is S/Si robots,

15  and they're not selling them anymore.  So they

16  can't really adjust by -- offset any price by

17  raising the robot -- by lowering the robot prices

18  in those cases.

19          There's the economic theory that

20  indicates that there's partial substitutes, which

21  would mean that without the challenged restraints,

22  we would expect the robot prices to be lower.  And

Page 142

1    there's the fact that we're increasing -- sorry,

2    the market power in the tied market, which would

3    make this particular metering model inapplicable.

4        Q.    So are you aware of any economic

5    literature about metering ties in which the

6    monopolist isn't described as lowering the price

7    of the capital good in order to extract a higher

8    price on the tied products or the consumables?

9            Could you point us to that academic

10   literature?

11           MR. SNYDER:  Objection to form.

12           THE WITNESS:  I don't know -- I mean,

13   there might be -- sometimes it is the case that

14   they lower the price, but I don't know of any

15   literature that indicates that that's universally

16   what happens.  There may be people who think that

17   happens a lot, but I don't think anything in the

18   economic proofs proves that that happens,

19   especially when you consider all the other

20   anticompetitive effects of tying.

21           MS. BASS:  We've been going about an

22   hour.  Would it be okay to take a break?

Page 143

1           THE WITNESS:  Sure.

2           MR. SNYDER:  Sure.  We can go off the

3   record.

4           THE VIDEOGRAPHER:  Okay.  Team, stand

5   by.  We are now going off the record.  The time is

6   1:57 p.m.

7           (Recess from the record.)

8           THE VIDEOGRAPHER:  We are now going back

9   on the video record.  The time is 2:18 p.m.

10  BY MS. BASS:

11      Q.   So, Professor Elhauge, returning to the

12  questions that we were just discussing before the

13  break.  So I know that you don't agree that

14  Intuitive would have had to lower the price of its

15  robots in order to engage in metering, but assume

16  that contrary to your opinion, Intuitive did lower

17  its prices of robots to engage in metering and,

18  therefore, robot prices would have been higher in

19  the but-for world.

20          Have you done any analysis to show what

21  the net effect would be in the but-for world on

22  hospitals that were less-intensive users, taking

Page 144

1   into account the higher prices for robots and the

2   lower prices for EndoWrist?

3            MR. SNYDER:  Objection to form.

4            THE WITNESS:  I did not base my analysis

5   on the premise that they would raise robot prices

6   in a but-for world.  So I didn't weigh those

7   against each other.  But, also, I think implicit

8   in your question was that prohibiting the

9   challenge restraints would prohibit all metering

10  in the but-for world.

11           I don't think that follows, because it

12  would still have power over new EndoWrists.  So it

13  would reduce their market power in the EndoWrist

14  repair market, but it would not eliminate it or

15  eliminate the price inflation.  Because they still

16  make the only EndoWrists that can work with the

17  da Vinci robot.  I don't think that premise quite

18  holds either.

19  BY MS. BASS:

20       Q.   So just to break that down a little bit,

21  so I think you were agreeing that you haven't

22  conducted an analysis of what the net effect would

Page 145

1    be in the but-for world if the robot prices would

2    be higher; correct?

3              MR. SNYDER:  Objection to form.

4              THE WITNESS:  Correct, because that's

5    not what the evidence indicates.  Robot prices

6    would not have been higher in the but-for world,

7    so there's no trade-off to make.

8    BY MS. BASS:

9        Q.   Correct.  I understand you don't accept

10   the premise of the question, but that's not an

11   analysis that you've undertaken; correct?

12       A.   Correct.  Because the analysis I

13   concluded would be irrelevant in this case.

14       Q.   So then to go back to the point that you

15   were making about the new EndoWrists, so were you

16   saying that there would be metering in the but-for

17   world?

18       A.   I think there could be metering in the

19   but-for world, as well, because it would still

20   have price-inflated new EndoWrists.  It would be

21   constrained, though, by rival repair competition.

22             But to the extent there's metering now,

Page 159

1    STATE OF MARYLAND      )

2                              ss:

3    COUNTY OF MONTGOMERY  )

4

5          I, Matthew Goldstein, Notary Public within

6    and for the State of Maryland, do hereby certify:

7          That I reported the proceedings in the

8    within entitled matter, and that the within

9    transcript is a true record of said proceedings.

10          I further certify that I am not related to

11    any of the parties to the action by blood or

12    marriage, and that I am in no way interested in the

13    outcome of this matter.

14          IN WITNESS WHEREOF, I have hereunto set my

15    hand this 27th day of July, 2024.

16

17

18

19

20    _____

21          Matthew Goldstein, RMR, CRR

22