Samuel Maida (SBN 333835)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94104
Tel: 415-633-1908
Fax: 415-633-4980
Email: smaida@hausfeld.com

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
Email: jdominguez@cohenmilstein.com

Jeffrey J. Corrigan (*pro hac vice*)
SPECTOR CALDES & CORRIGAN, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@scc.law

*Co-Lead Counsel for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.: 4:21-cv-03825-AMO-LB<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**<br><br>Hearing Date: April 1, 2027<br>Time: 2:00 PM<br>Judge: The Honorable Araceli Martínez-Olguín |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 1, 2027 at 2:00 PM or as soon as the matter can be heard by the above-titled court, in the courtroom of the Honorable Araceli Martínez-Olguín located at the Ronald V. Dellums Federal Building & United States Courthouse, 1301 Clay Street, Oakland, CA 94612, Larkin Community Hospital ("Larkin"), Franciscan Alliance, Inc. ("Franciscan") and King County Public Hospital District No. 1, d/b/a Valley Medical Center ("Valley Medical") (collectively, "Plaintiffs"), on behalf of themselves and the Class, will move the Court for preliminary settlement approval under Fed. R. Civ. P. 23. Plaintiffs' Motion is based on this Notice and Motion, the Memorandum of Points and Authorities, declarations filed in support thereof, the complete records and files of this action, all other matters of which the Court may take judicial notice, and any other such evidence and oral argument as may be made at the hearing of this matter.

DATED: November 20, 2026

By: /s/ *Reena A. Gambhir*

Jeffrey J. Corrigan (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
SPECTOR CALDES & CORRIGAN, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
jcorrigan@scc.law
jspector@scc.law

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
jdominguez@cohenmilstein.com

Benjamin D. Brown (SBN 202545)
Daniel McCuaig (*pro hac vice*)
Zachary Glubiak (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Ave., Suite 800
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699

Reena A. Gambhir (*pro hac vice*)
HAUSFELD LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel: 202-540-7145
Fax: 202-540-7201
rgambhir@hausfeld.com

Jeannine M. Kenney (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-3271
jkenney@hausfeld.com

Daniel P. Weick (*pro hac vice*)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: 646-647-1282
Fax: 212-202-4322
dweick@hausfeld.com

Samuel Maida (SBN 333835)
Gary I. Smith, Jr. (SBN 344865)

bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com
zglubiak@cohenmilstein.com

Christopher J. Bateman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
199 Water Street, 21st Floor
New York, NY 10038
Tel: 212-838-7797
Fax: 212-838-7745
cbateman@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs and the Class*

HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94104
Tel: 415-633-1908
Fax: 415-633-4980
smaida@hausfeld.com
gsmith@hausfeld.com

Michael J. Boni
BONI LAW FIRM LLC
1820 Rittenhouse Square, Unit 1401
Philadelphia, PA 19103
Tel: 610-348-2526
mike@boni.law

*Counsel for Plaintiffs and the Class*

# TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
I. PRELIMINARY STATEMENT ........ 1
II. BACKGROUND ........ 2
A. Proceedings to Date ........ 2
B. The Settlement ........ 3
1. Settlement Negotiations ........ 3
2. Settlement Consideration and Release of Claims ........ 4
a. Monetary Relief ........ 4
b. Structural Relief ........ 5
c. Settlement Release ........ 6
3. Plan of Allocation ........ 6
4. Notice and Implementation of Settlement ........ 7
III. LEGAL STANDARD ........ 8
IV. THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL ........ 10
A. The Settlement is Fair, Reasonable, and Adequate ........ 10
1. The Class Has Been Zealously and Effectively Represented ........ 10
2. The Settlement Agreement Resulted from Arm's-Length Negotiations ........ 10
3. The Settlement Confers Substantial Relief on the Class ........ 10
4. The Class Faces Significant Litigation Risk Both at Trial and on Appeal ........ 13
5. The Settlement Treats Class Members Equitably ........ 15
6. The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance ........ 15
a. The Settlement Class Mirrors the Certified Class ........ 15
b. The Settlement Release ........ 16
c. A.B. Data and Huntington Bank Should be Approved to Serve as Claims Administrator and Escrow Agent, Respectively, Because They are Both Eminently Qualified and Were Selected by Class Counsel Through Competitive Bidding Processes… ........ 17
d. A.B. Data Anticipates a Substantial Claims Rate ........ 18
e. Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs ........ 19
f. Plaintiffs Intend to Request Reasonable Service Awards for Plaintiffs ........ 20
g. Past Settlements ........ 20
B. The Court Should Maintain Its Existing Certification of the Class for Purposes of the Settlement ........ 21
C. The Court Need Not Provide a Second Opt-Out Opportunity ........ 21
D. The Court Should Direct Notice to the Class ........ 23

E. Proposed Schedule for Notice and Final Approval ........ 24
V. CONCLUSION ........ 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alvarez v. Farmers Ins. Exch.*, 2017 WL 2214585 (N.D. Cal. Jan. 18, 2017) .......... 20

*Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) .......... 20

*Castro v. Sanofi Pasteur Inc.*, 2017 WL 4776626 (D.N.J. Oct. 23, 2017) .......... 11, 20

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .......... 23

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .......... 22

*de Mira v. Heartland Emp. Serv., LLC*, 2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) .......... 19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......... 14

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .......... 14

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023) .......... 16

*Fleming v. Impax Lab'ys Inc.*, 2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) .......... 11

*Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994) .......... 19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) .......... 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 3648478 (N.D. Cal. July 7, 2016) .......... 11

*In re HIV Antitrust Litig.*,
2023 WL 11897610 (N.D. Cal. Sept. 25, 2023) .......... 11

*In re Linerboard Antitrust Litig.*,
2004 WL 1221350 (E.D. Pa. June 2, 2004) .......... 11

*In re Lithium Ion Batteries Antitrust Litig.*,
2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) .......... 11, 13

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......... 19

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) .......... 19

*In re Resistors Antitrust Litig.*,
2020 WL 2791922 (N.D. Cal. Mar. 24, 2020) .......... 15

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) .......... 8

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2013 WL 12327929 (C.D. Cal. July 24, 2013) .......... 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
229 F. Supp. 3d 1052 (N.D. Cal. 2017) .......... 10

*Low v. Trump University, LLC*,
881 F.3d 1111 (9th Cir. 2018) .......... 22

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) .......... 12, 13

*Nitsch v. DreamWorks Animation SKG Inc.*,
2017 WL 399221 (N.D. Cal. Jan. 19, 2017) .......... 9

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*,

688 F.2d 615 (9th Cir. 1982) ........ 12, 22

*Pacheco v. JPMorgan Chase Bank, N.A.*,
2017 WL 3335844 (N.D. Cal. Aug. 4, 2017) ........ 15

*Raffin v. Medicredit, Inc.*,
2018 WL 6011551 (C.D. Cal. May 11, 2018) ........ 7

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
187 F.4th 1092 (9th Cir. 2026) ........ 13, 14

*Vasquez v. USM Inc.*,
2015 WL 12857082 (N.D. Cal. Apr. 13, 2015) ........ 9

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*,
540 U.S. 398 (2004) ........ 12

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........ 20

*Wren v. RGIS Inventory Specialists*,
2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ........ 19

**Statutes**

15 U.S.C. §§ 1, 2 ........ 2

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ........ 23

Fed. R. Civ. P. 23(e)(1)(A) ........ 9

Fed. R. Civ. P. 23(e)(1)(B) ........ 9

Fed. R. Civ. P. 23(e)(2) ........ 9

Fed. R. Civ. P. 23(e)(2)(C) ........ 10

Fed. R. Civ. P. 23(e)(2)(D) ........ 15

**Other Authorities**

U.S. Dist. Ct. for the N. Dist. of Cal., *Procedural Guidance for Class Action Settlements*, https://cand.uscourts.gov/sites/default/files/documents/CAND-ProceduralGuidanceforClassActionSettlements.pdf....................................9, 15, 16, 19, 20, 23

## GLOSSARY OF DEFINED TERMS[1]

| Term | Definition |
|---|---|
| Parties | Plaintiffs and Intuitive Surgical, Inc. |
| Class Counsel | Hausfeld LLP, Spector Caldes & Corrigan, P.C., and Cohen Milstein Sellers & Toll LLP. |
| Counsel Decl. | Declaration of Class Counsel in Support of Plaintiffs' Motion for Preliminary Settlement Approval. |
| Elhauge Decl. | Declaration of Professor Einer Elhauge. |
| Lindstrom Decl. | Declaration of Gregory Lindstrom of Phillips ADR. |
| Miller Decl. | Declaration of Eric J. Miller of A.B. Data, Ltd. Regarding the Proposed Notice Plan. |
| Notice Plan | A.B. Data's proposed plan for providing notice of the Settlement to Class Members, as described in the declaration of Eric J. Miller. |
| Class Member List | The list of Class Members' mailing and email addresses developed for the class certification notice. Miller Decl. ¶¶ 7, 16. |
| Summary Notice | The short-form notice of the Settlement to be sent to Class Members, attached to the declaration of Eric J. Miller as Exhibit 5. |
| Detailed Notice | The long-form notice of the Settlement to be sent to Class Members, attached to the declaration of Eric J. Miller as Exhibit 6. |
| Claim Form | The claim form to be sent to Class Members, attached to the declaration of Eric J. Miller as Exhibit 7. |
| Notice Packet | The Detailed Notice and Claim Form to be sent by First-Class Mail to Class Members. Miller Decl. ¶ 19. |

[1] Capitalized terms in this Motion that are not defined in this Glossary have the meanings defined in the Settlement Agreement.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. PRELIMINARY STATEMENT

On October 16, 2026, Plaintiffs and Defendant Intuitive Surgical, Inc. ("Intuitive") signed a Settlement Agreement that confers on the Class $450 million cash and structural relief valued at $1-2 billion. If approved, the Settlement would resolve classwide claims against Intuitive for alleged anticompetitive conduct relating to EndoWrist instruments and da Vinci surgical robot service. The Court-certified Class, comprising approximately 2,200 hospitals and surgery centers (collectively, "hospitals"), depends on da Vinci robots to perform minimally invasive robotic surgery, and the Settlement resolves their claims without the cost, delay, and risk of a trial and any appeals. Under the Settlement, Class Members will receive substantial monetary payments along with structural relief that provides competitive alternatives to Intuitive's limitations on EndoWrist uses and da Vinci service, including safely refurbished EndoWrists, and service by properly trained in-house hospital technicians and independent service organizations ("ISOs").

The Settlement establishes a $450 million interest-bearing Settlement Fund that, net of Court-approved fees, expenses, and service awards will be distributed *pro rata* to Eligible Claimants based on Plaintiffs' experts' damages calculations. If the Settlement becomes final, no portion of the fund will revert to Intuitive.

The Settlement also provides exceptional structural relief designed to significantly alter the competitive landscape. As detailed below (*see infra* Section II(B)(2)(b)), Intuitive has agreed to (1) permit its customers to use FDA-cleared EndoWrists remanufactured by third parties; (2) permit its customers to use refurbished or remanufactured Eligible EndoWrists authorized pursuant to Intuitive's Third Party Compatibility Program; and (3) maintain, develop, and pilot an authorization process for hospitals or ISOs to perform preventative maintenance and field-based repairs on da Vinci X/Xi robots. Much of this relief likely exceeds what could be imposed on Intuitive through an injunction following a successful trial verdict.

The Settlement is the product of arm's-length negotiations among experienced counsel and facilitated by a nationally-respected mediator with extensive experience in antitrust litigation,

Gregory Lindstrom. The case was in the trial-preparation stage when it settled. The Parties completed fact and expert discovery, and the Court ruled in favor of Plaintiffs on summary judgment, *Daubert*, and class certification motions, and set a trial date. Antitrust cases are inherently risky, and this one is no exception. While Plaintiffs believe their claims are strong, recovery at trial is far from certain. If approved, the Settlement will deliver prompt, assured, substantial relief to a Class that could receive less, or nothing at all, from a litigated outcome.

Plaintiffs respectfully request an Order that (1) preliminarily approves the proposed Settlement; (2) maintains the existing certification of the Class and appointment of Class Counsel for purposes of the Settlement; (3) approves the manner and form of notice and proposed plan of allocation to Class Members; (4) appoints A.B. Data as Claims Administrator; (5) appoints Huntington Bank as Escrow Agent; and (6) sets a schedule for final approval and related deadlines.

## II. BACKGROUND

### A. Proceedings to Date

Plaintiffs filed their operative Consolidated Amended Class Action Complaint on September 10, 2021, asserting six antitrust causes of action against Intuitive. ECF No. 52. Plaintiffs claim that Intuitive engaged in unlawful tying, exclusive dealing, and monopolization in the markets for da Vinci service and EndoWrist repair and replacement in violation of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. *Id.* Intuitive disputed those allegations.

The litigation has generated an extensive fact discovery record. Plaintiffs served 130 requests for production and 20 interrogatories, while Intuitive served 34 requests for production, 61 interrogatories, and 68 requests for admission. Counsel Decl. ¶ 11. The Parties and non-parties produced more than 564,000 documents, including over 338,000 produced by Intuitive and over 38,000 produced by Plaintiffs. *Id.* ¶ 12. Plaintiffs also obtained over 188,000 third-party documents. *Id.* Intuitive separately produced approximately 12 gigabytes of transactional data. *Id.* The Parties conducted 50 fact depositions. *Id.* ¶ 13.

As for expert discovery, the record is also voluminous. Plaintiffs worked closely with economics, engineering, FDA, and surgery experts to develop and advance their claims. *Id.* ¶ 15.

Between summary judgment and class certification, Plaintiffs served 9 expert reports totaling more than 1,200 pages, and Intuitive served 6 expert reports. *Id.* Plaintiffs conducted 6 depositions of Intuitive's various experts, while Intuitive conducted 5 depositions of Plaintiffs' experts. *Id.* ¶ 16.

Motion practice was complex and hotly contested. On January 3, 2022, the Court denied Intuitive's motion to dismiss in its entirety, finding that, *inter alia*, Plaintiffs plausibly alleged the existence of separate product markets and "sufficiently alleged that their injuries flow from the challenged conduct." ECF No. 69.

On March 31, 2024, the Court partially granted Plaintiffs summary judgment, ruling that the da Vinci surgical robot and EndoWrists constitute separate products. ECF No. 232.[2] The Court denied Intuitive's cross-motion in its entirety. In doing so, the Court found that Plaintiffs offered "evidence of a market-wide impact theory" tending to show "that, absent Intuitive's exclusionary restraints, Intuitive would have lowered EndoWrist prices and/or increased their artificially suppressed use limits for all customers to meet IRC competition." ECF No. 232 at 27.

On March 31, 2025, the Court granted Plaintiffs' Motion for Class Certification and concluded that Professor Elhauge's methodology for showing classwide impact and damages was sound. ECF No. 333 at 8–10, 16–21. Less than two months later, on May 22, 2025, the Ninth Circuit denied Intuitive's Rule 23(f) petition. No. 25-2395, ECF No. 15.1.

On January 29, 2026, the Court granted Plaintiffs' Motion to Authorize Class Notice and Appoint Notice Administrator. ECF No. 359. Pursuant to that notice plan, direct notice was mailed to the Class, the class-dedicated website went live, and media notice was initiated. Only three hospital systems opted out. Counsel Decl. ¶ 8.

### B. The Settlement

#### 1. Settlement Negotiations

In early 2022, the Parties, with Court approval, ECF No. 77, retained private mediator Gregory

[2] The Court also granted Plaintiffs' summary judgment on the definition of the EndoWrist repair and replacement market and Intuitive's power in that market. On July 30, 2024, the Court granted in part Intuitive's motion for reconsideration of the March 31, 2024, Order and vacated those holdings, but left its separate-products ruling in place. ECF No. 287.

Lindstrom of Phillips ADR. In February 2022, the Parties participated in a formal, half-day mediation by Zoom. Lindstrom Decl. ¶ 4. The case was in its infancy, and no resolution was reached. *Id.* Over the next several years, the Parties had separate discussions with Mr. Lindstrom regarding key developments in the case. *Id.* ¶ 5. In March 2026, with the encouragement of Mr. Lindstrom, the Parties started a dialogue regarding potential resolution of Plaintiffs' claims. *Id.* ¶ 7. After several months of communications, the Parties made sufficient progress on both monetary and non-monetary issues to warrant an in-person mediation. *Id.*

The Parties participated in a two-day mediation in San Francisco on October 8 and 9. *Id.* ¶ 8. Beforehand, the Parties submitted mediation statements highlighting the substantial risk that each side faced. *Id.* In the mediation, Mr. Lindstrom engaged in "shuttle diplomacy" between the Parties, during which substantial, arm's-length negotiations took place. *Id.* ¶ 9. Mr. Lindstrom also moderated two joint sessions on the non-monetary issues. *Id.* Plaintiffs' counsel advocated vigorously on behalf of the Class, and Intuitive carefully considered forward-looking relief. *Id.* ¶ 11. Throughout the process, each side was prepared to revert to its litigation position if the negotiations failed. *Id.*

At the end of the second day, Mr. Lindstrom made a double-blind mediator's proposal of $450 million plus the non-monetary relief which had been extensively discussed and negotiated over the course of the two-day mediation. *Id.* ¶ 9. Both sides accepted Mr. Lindstrom's proposal, and negotiated what would become the Settlement Agreement executed on October 16, *i.e.*, the Settlement Plaintiffs now submit for preliminary approval. *Id.* ¶ 9–10. Mr. Lindstrom reviewed the Settlement Agreement and confirmed that it accurately reflects the terms the Parties agreed to during the mediation. *Id.* ¶ 10.

**2. Settlement Consideration and Release of Claims**

The Settlement provides significant monetary and structural relief in exchange for a release of claims. The elements of the proposed Settlement are addressed in turn below.

**a. Monetary Relief**

Intuitive has agreed to pay $450 million into a Settlement Fund for the benefit of the Class Members. Counsel Decl. Ex. A ¶ 2. Payment is due within 30 calendar days after entry of the

Preliminary Approval Order, and interest earned on the payment becomes part of the Settlement Fund. *Id.* ¶¶ 1(dd)–(ee), 2–3. No portion of the fund will return to Intuitive if the Settlement becomes final. *Id.* ¶¶ 3, 37.

**b. Structural Relief**

The Settlement also provides substantial structural relief designed to make EndoWrist pricing and robot servicing more competitive. Such relief will be provided for a period of five years after the Effective Date, a period sufficient for additional competition to take root during and after the five-year period.

**Third-party instruments.** Consistent with the language currently on Intuitive's website and memorialized in the Settlement Agreement, Intuitive will not void a service contract, cease doing business with a United States customer, or consider the customer in breach because it purchases instruments remanufactured by a third party pursuant to and in compliance with FDA clearance. Counsel Decl. Ex. A ¶ 6(a). Intuitive will also include language in agreements entered into during that period confirming that customers may use qualifying refurbished or remanufactured EndoWrists that have received FDA clearance or authorization through Intuitive's Third Party Compatibility Program. *Id.*

**Refurbishment and use-counter resetting.** Intuitive will maintain an authorization process for refurbishment and use-counter resetting of Eligible EndoWrists continuously owned by their original purchasers through Intuitive's Third Party Compatibility Program. *Id.* ¶ 6(b). That process provides access on commercially reasonable terms to technical specifications reasonably necessary to conduct safety and reliability testing, and an opportunity for customers and independent third-party companies to demonstrate restoration to original specifications under transparent and objective criteria. *Id.* Upon meeting the requirements, Intuitive will authorize such customers and ISOs for refurbishment and use-counter resetting.

**Customer protections.** Intuitive will refrain from threats or actions to void robot warranties, cease da Vinci robot servicing, or stop selling EndoWrists for use with a da Vinci robot because an authorized or FDA-cleared instrument has been attached to a robot, absent evidence of damage,

malfunction, or danger to patient safety. *Id.* ¶ 6(c).

**Access to refurbishment providers.** Intuitive will refrain from prohibiting qualifying third parties from providing refurbished or remanufactured Eligible EndoWrists, including conduct preventing customers from supplying used instruments to those providers. Intuitive retains the ability to promote its products and offer lawful pricing or contractual terms encouraging customers to do business with it. *Id.* ¶ 6(d).

**Third-party robot servicing.** Intuitive will maintain, develop, and pilot, with the goal and expectation of implementation, an authorization process for United States hospitals or independent service organizations to perform preventative maintenance and field-based repairs on da Vinci X/Xi robots. Authorized participants will receive access to service training, software, tools, and parts, subject to licensing, training, capability, safety, and other requirements. *Id.* ¶ 6(e). The proposed Settlement projects a first-quarter 2028 pilot launch and an 18-to-24-month initial pilot phase, with potential subsequent expansion. *Id.* The Settlement preserves Intuitive's ability to make bona fide product improvements in either instruments or robots and expressly addresses enhanced security chips. *Id.* ¶ 7.

#### c. Settlement Release

In exchange for the settlement benefits conferred on the Class, Plaintiffs' Releasing Parties will release specified claims arising out of or relating to conduct alleged, raised, or that could have been alleged or raised in this Action. The release includes related claims accruing during the term of the structural relief, claims concerning the future effects of the challenged conduct, and unknown claims. It does not release claims to enforce the Settlement or unrelated claims, including unrelated contract, warranty, product-liability, and personal-injury claims. *Id.* ¶¶ 9–11. Intuitive and its Released Parties will reciprocally release claims arising from or relating to the institution, prosecution, settlement, or subject matter of the Action, excluding enforcement claims. *Id.* ¶ 14.

### 3. Plan of Allocation

The Net Settlement Fund will be distributed to Class Members who submit timely, valid claims and qualify as Eligible Claimants. Plaintiffs propose allocating the Net Settlement Fund on a

*pro rata* basis to Eligible Claimants according to Professor Elhauge's damages calculations, which are based on the dollar value and composition of Class Members' purchases of EndoWrist and da Vinci service. Such uniform distribution is fair and equitable. *See, e.g.*, *Raffin v. Medicredit, Inc.*, 2018 WL 6011551, at *8 (C.D. Cal. May 11, 2018).

Class Counsel believe that proper planning and persistence in contacting Eligible Claimants will result in complete depletion of the Net Settlement Fund. Counsel Decl. ¶ 25. If the Net Settlement Fund is not fully depleted, then Class Counsel will seek Court approval of an appropriate *cy pres* recipient to be paid any residual funds. *Id.* ¶ 26, Ex. A ¶ 37.

**4. Notice and Implementation of Settlement**

Plaintiffs have attached to this motion a declaration from the proposed Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), that proposes a comprehensive notice program and includes a proposed Summary Notice, Detailed Notice, and Claim Form. *See* Miller Decl. ¶¶ 6–50, Exs. 5–7. The Court previously appointed A.B. Data as Notice Administrator, ECF No. 359, and A.B. Data implemented the Court-approved class certification notice plan in this Action. Miller Decl. ¶¶ 3–11. The proposed Notice Plan closely tracks the plan A.B. Data followed during class certification. It provides direct notice by email and First-Class Mail to all reasonably identifiable Class Members and supplemental digital and social media notice, and it maintains the existing case-specific website and toll-free telephone line, where Class Members can learn more about the Settlement and their options. *Id.* ¶¶ 14–28.

For direct notice, A.B. Data will use the Class Member List developed for class certification notice, which contains the mailing and email addresses to which A.B. Data previously sent and delivered notice. *Id.* ¶¶ 7, 16. A.B. Data will email the Summary Notice to every Class Member with an available email address. *Id.* ¶ 17. Before sending, A.B. Data will check that each address is deliverable and will follow best practices to avoid spam filters, such as omitting attachments and sending the emails in tranches. *Id.* ¶¶ 17–18. A.B. Data will also mail a Notice Packet, consisting of the Detailed Notice and a Claim Form, by First-Class Mail to each Class Member with a known mailing address. *Id.* ¶ 19. It will update addresses through the USPS National Change of Address

database and re-mail any packet returned as undeliverable, either to a forwarding address or to an updated address located through a subscription information provider. *Id.* ¶¶ 20–21.

The notices will provide general information about the Action and the Settlement in plain language and will inform Class Members of their options, including how to file a claim and object to the Settlement. *Id.* ¶ 29, Exs. 5–6. The Detailed Notice will be available for download in English and Spanish. *Id.* ¶ 25.

To the extent possible, each Claim Form will be pre-populated with the Class Member's da Vinci service payments and EndoWrist purchases, drawn from Intuitive's records. *Id.* ¶ 34. Each form will also include a unique ID number that Class Members can use to file their claims online. *Id.* Claims may be submitted by mail or through the case website. *Id.* ¶ 33. Class Members who disagree with their pre-populated data, or whose data is missing, can submit supplemental information and supporting documentation. *Id.* ¶ 35. A.B. Data will review each claim and send claimants with deficient claims an explanation of the deficiency, the deadline to cure it, and their right to contest A.B. Data's determination. *Id.* ¶ 37. Eligible Claimants will be paid by wire transfer or check. *Id.* ¶ 39.

To reach Class Members who do not receive direct notice, A.B. Data will run a 30-day digital and social media campaign. It will place banner ads in e-newsletters on websites serving the medical device and diagnostics industry and LinkedIn ads targeted to hospital decision-makers, each linking directly to the case website. *Id.* ¶ 23. A.B. Data will also update the existing case-specific website, www.DaVinciAntitrustClassAction.com, and maintain the toll-free telephone line, 1-888-208-9630. *Id.* ¶¶ 24–27. On the website, Class Members will be able to view general information about the Action, read relevant court documents, including the Settlement Agreement, and review important dates and deadlines. *Id.* The website and toll-free number will appear on every form of notice. *Id.* Exs. 5–6.

## III. LEGAL STANDARD

There is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).

Preliminary approval is not a dispositive assessment of the fairness of a proposed settlement; rather, preliminary approval assesses only whether a proposed settlement falls within the "range of possible approval." *Vasquez v. USM Inc.*, 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015). Preliminary approval establishes an "initial presumption of fairness, such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response." *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017) (internal quotation marks omitted).

Rule 23(e) sets forth a multi-step process for determining whether a proposed class action settlement should be preliminarily approved by the Court. The parties must first "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). The Court must then direct notice to all class members who would be bound by the proposal if the parties show "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Federal Rule of Civil Procedure 23(e)(2) provides:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). To assess whether certification is likely under Rule 23(e)(1), the Court conducts a two-step analysis under Rules 23(a) and 23(b). The Court also considers the District's Procedural Guidance for Class Action Settlements ("Procedural Guidance").[3] All preliminary

[3] *See* https://cand.uscourts.gov/sites/default/files/documents/CAND-ProceduralGuidanceforClassActionSettlements.pdf.

approval requirements are met here.

## IV. THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A. The Settlement is Fair, Reasonable, and Adequate

#### 1. The Class Has Been Zealously and Effectively Represented

The Court previously found that the Class was adequately represented during class certification. ECF No. 333 at 9–10. The Court found that Plaintiffs' interests were aligned with those of the Class, that Plaintiffs had diligently litigated the Action, and that any asserted conflicts among Class Members would be speculative. *Id.* The Court also appointed Co-Lead Class Counsel based on their knowledge, experience, resources, substantial work on behalf of the Class, and diligent prosecution of the case. *Id.*

#### 2. The Settlement Agreement Resulted from Arm's-Length Negotiations

The Settlement is the product of vigorous, arm's-length negotiations between experienced counsel with a track record of success in antitrust class actions. Counsel Decl. ¶ 20; Lindstrom Decl. ¶ 9. Negotiations were facilitated by an experienced mediator and required discussions over years, culminating in a two-day in-person mediation. Counsel Decl. ¶ 20; Lindstrom Decl. ¶¶ 5–9. Having worked on this case for years, Class Counsel fully understand both the risks and potential recovery of further litigation. Counsel Decl. ¶ 21. Counsel's determination that the settlement is fair and reasonable is afforded "great weight" in the approval analysis. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017).

#### 3. The Settlement Confers Substantial Relief on the Class

Preliminary approval requires consideration of whether the "relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C). It certainly is here.

The $450 million Settlement Fund provides substantial relief. Professor Elhauge's primary estimated classwide single damages through 2023 (without subtracting opt-outs) ranged from $984.4 million to $3.0889 billion for EndoWrists and from $294.6 to $371.8 million for da Vinci servicing.

*See* ECF No. 343-13 updated tbl. 9.[4] The Settlement Fund represents approximately 13.0% to 35.2% of these estimated damages.

The Settlement Fund also exceeds the adjusted damages figure calculated by Intuitive's expert, Dr. Loren K. Smith. After applying his proposed adjustments to Professor Elhauge's earlier damages analysis, Dr. Smith calculated purported classwide damages of $419,800,234. ECF No. 267-18, ¶ 268 & tbl. 5. The $450 million Settlement Fund is therefore approximately 107.2% of Dr. Smith's adjusted damages estimate.

The proposed Settlement compares favorably to other antitrust settlements. *See, e.g.*, *In re HIV Antitrust Litig.*, 2023 WL 11897610, at *2 (N.D. Cal. Sept. 25, 2023) (granting approval of a $246,750,000 settlement representing approximately 12% of the antitrust class's damages); *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (finding "excellent" that the $113,450,000 "common fund of the settlement equates to 11.7 percent of the single damages" for the antitrust class); *Castro v. Sanofi Pasteur Inc.*, 2017 WL 4776626, at *6 (D.N.J. Oct. 23, 2017) (granting approval of a $61,500,000 settlement representing approximately 14% of the antitrust class's damages); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016) (approving a settlement representing 20% of single damages and citing a survey of 71 settled antitrust cases which showed a weighted mean settlement of 19%); *Fleming v. Impax Lab'ys Inc.*, 2021 WL 5447008, at *10 (N.D. Cal. Nov. 22, 2021) (settlement recovery representing 12.5% of total recoverable damages is "in a range consistent with the median settlement recovery in class actions"); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of estimated single damages in complex

[4] These percentages use Professor Elhauge's damages estimates through December 31, 2023. Professor Elhauge estimated that damages continue accruing at a range between $278.7 to $568.7 million annually. ECF No. 343-13 tbl. 9A. These percentages also do not account for the three opt-outs. Professor Elhauge estimates that the opt-outs' EndoWrist damages represent 6.4%, and their da Vinci service damages represent 6.1%, of classwide damages through 2023. Elhauge Decl. ¶ 19. Including post-2023 damages would lower the recovery percentages; excluding opt-out damages would raise them. Professor Elhauge also estimated damages under alternative but-for-world assumptions that yielded lower EndoWrist damages, *see, e.g.*, ECF No. 343-13 tbl. 11, which similarly would raise the percentage of recovery represented by $450 million.

antitrust actions).

The Settlement's structural relief also confers substantial benefits to the Class. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013 WL 12327929, at *29 n.7 (C.D. Cal. July 24, 2013) (in valuing a settlement, "Plaintiffs' experts appropriately have included the non-monetary benefits"); *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982) ("where monetary relief is but one form of the relief requested by the plaintiffs[,] [i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness."). The proposed Settlement's structural relief addresses the restrictions challenged in this Action by protecting customers' ability to use qualifying third-party EndoWrists and establishing pathways for authorized robot servicing. *See* Counsel Decl. Ex. A.

For five years from the Effective Date, Intuitive will protect customers' use of qualifying FDA-cleared third-party remanufactured instruments against service-contract termination, refusal to do business, or breach claims, and confirm permitted use of qualifying refurbished or remanufactured Eligible EndoWrists in its agreements. *Id.* ¶ 6(a). Intuitive will also maintain an authorization process for refurbishment and use-counter resetting of Eligible EndoWrists continuously owned by their original purchasers, providing necessary technical specifications, transparent and objective safety and reliability criteria, and compatibility for authorized instruments. *Id.* ¶ 6(b). Notably, access to technical specifications would have been unlikely through a post-trial injunction. *See, e.g.*, *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (explaining that enforced sharing "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited" (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004))). The Settlement further protects robot servicing, warranties, and EndoWrist purchases when customers use FDA-cleared or authorized refurbished instruments, subject to specified damage, malfunction, and patient-safety exceptions, and protects qualifying third-party refurbishment and customers' supply of used instruments to those providers. Counsel Decl. Ex. A ¶¶ 6(c)–(d).

Intuitive will also maintain, develop, and pilot an authorization process for hospitals and independent service organizations to perform preventative maintenance and field-based repairs on da Vinci X/Xi robots, with access to service training, software, tools, and parts, subject to licensing and other requirements. *Id.* ¶ 6(e). Again, Plaintiffs are unlikely to obtain access to training, software, tools, and parts comparable to that provided by the Settlement through a post-trial injunction. *See, e.g.*, *MetroNet*, 383 F.3d at 1133.

Plaintiffs retained their expert, Professor Einer Elhauge, to calculate the net present value of the proposed Settlement's structural relief. Professor Elhauge previously submitted four expert reports in this Action and developed and ran the damages models for the Class's purchases of EndoWrists and da Vinci service. Elhauge Decl. ¶¶ 1–2. He started with his damages methodology, which this Court found reliable at summary judgment, *Daubert*, and class certification, ECF Nos. 231, 232, 333, and updated it with market information that has become available since those reports were prepared. Elhauge Decl. ¶ 3. Applying that methodology, Professor Elhauge estimates that the value of the structural relief is between $1,055,911,032 and $1,926,255,838, assuming an Effective Date of April 1, 2027. *Id.* ¶¶ 3, 87. Combined with the Settlement Fund, the proposed Settlement provides the Class with total value of approximately $1.5 billion to $2.37 billion.

#### 4. The Class Faces Significant Litigation Risk Both at Trial and on Appeal

The value of the Settlement must also be weighed against the risks of further litigation. Plaintiffs believe their claims are meritorious, but the path forward is not without peril. "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *Lithium Ion Batteries*, 2020 WL 7264559, at *15. "The best case can be lost and the worst case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *Id.* (internal quotation marks omitted).

Continued litigation would require Plaintiffs to establish the elements of their tying, exclusive-dealing, and monopolization claims concerning EndoWrist repair and replacement and da Vinci service. Although Plaintiffs remain confident in their evidence, there is risk that a jury will accept Intuitive's patient safety procompetitive justification. *See Surgical Instrument Serv. Co., Inc. v.*

*Intuitive Surgical, Inc.*, 187 F.4th 1092, 1100 (9th Cir. 2026) ("*SIS*") ("Intuitive maintains that the use counter was put in place because of engineering limitations and patient safety considerations."). Similarly, the jury could accept Intuitive's authorization defense. *Id.* at 1112 ("[T]he evidence relied upon by Intuitive could have persuaded a jury that Intuitive's third party approval process was not illusory"). Should that happen, it would materially impact Plaintiffs' ability to prevail at trial.

Market definition remains contested and could determine Plaintiffs' success at trial. The Ninth Circuit recently held that the *Epic/Kodak* factors do not apply when a defendant has power in the foremarket. *Id.* at 1108 (discussing *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946 (9th Cir. 2023); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)). Although favorable to Plaintiffs, the inapplicability of the *Epic/Kodak* factors depends on a jury finding that the market is limited to MIST robots. If the jury finds that the market includes laparoscopic and open surgery and Intuitive lacks market power in that market, Plaintiffs will have to prove the *Epic/Kodak* factors—a requirement that would increase the difficulty of proving their claims, as it did in *SIS*. *See id.* at 1102.

Impact and damages likewise remain contested. In certifying the Class, the Court accepted Professor Elhauge's methodology for demonstrating classwide impact and damages and rejected Intuitive's competing expert analysis. ECF No. 333 at 8–10, 16–21. Nevertheless, acceptance of a methodology for class-certification purposes does not itself determine the recovery ultimately obtained (or upheld on appeal). Plaintiffs would still need to persuade the jury that the challenged conduct caused injury and establish the amount of resulting damages.

In light of these risks, and the risks inherent in any complex trial, a litigated recovery could be materially smaller than Plaintiffs seek, or the Class could obtain no monetary recovery at all. Even a favorable verdict would remain subject to appeal, exposing the Class to the risk of reversal or a reduced recovery and further delaying payment while generating additional litigation expense. There is also no guarantee as to what injunctive relief, if any, the Court might allow assuming Plaintiffs secured a favorable verdict. The Settlement eliminates these risks, ensuring that Class Members receive substantial and prompt relief.

**5. The Settlement Treats Class Members Equitably**

In addition to evaluating the adequacy of the Settlement overall, the Court must consider whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). A plan of allocation is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015).

Here, the Net Settlement Fund will be allocated to Class Members on a *pro rata* basis based on Professor Elhauge's damages calculations, which apply the overcharges he found attributable to Intuitive's alleged anticompetitive conduct to the dollar value of Class Member purchases of EndoWrists and da Vinci service. This *pro rata* allocation is reasonable and treats all Class Members equitably. *See Pacheco v. JPMorgan Chase Bank, N.A.*, 2017 WL 3335844, at *1 (N.D. Cal. Aug. 4, 2017) (preliminarily approving plan to apportion fund "pro rata based upon the amount each settlement class member paid to [defendant] in connection with the allegedly unlawful [conduct]"); *Cathode Ray Tube*, 2015 WL 9266493, at *7 (collecting cases); *In re Resistors Antitrust Litig.*, 2020 WL 2791922, at *2 (N.D. Cal. Mar. 24, 2020) (finding plan to allocate "on a pro rata basis based on the dollar value of approved purchases . . . [to be] fair, reasonable, and adequate").

**6. The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance**

This District's Procedural Guidance instructs parties to address certain factors in any motion to preliminarily approve a class settlement. A number of these factors are addressed throughout this submission. The remaining applicable factors are addressed below.

**a. The Settlement Class Mirrors the Certified Class**

The Settlement does not expand or narrow the Class certified by the Court. The Court certified a Class consisting of all entities that purchased EndoWrists and da Vinci service from Intuitive in the United States at any time from May 21, 2017, through December 31, 2021, excluding hospitals run by the Departments of Defense and Veterans Affairs. ECF No. 333 at 26. The proposed Settlement adopts that same definition, including the purchase period, geographic scope, covered purchases, and

exclusions. Counsel Decl. Ex. A ¶ 1(d).

**b. The Settlement Release**

The Procedural Guidance calls for identifying differences between the claims to be released and those certified for class treatment and explaining why those differences are appropriate. Procedural Guidance § 1. Here, the certified claims concern tying, exclusive dealing, and monopolization relating to EndoWrist instruments and da Vinci service. ECF No. 333. While the Settlement's release extends beyond those particular causes of action and the certified purchase period, it remains connected to the conduct underlying this Action. Counsel Decl. Ex. A ¶ 9.

First, the release covers claims arising out of or relating to conduct alleged or otherwise raised in the Action, or that could have been alleged or raised, including claims concerning the future effects of that conduct. *Id.* ¶ 9. This formulation serves the legitimate settlement objective of resolving the underlying controversy rather than leaving the same challenged conduct subject to renewed litigation under alternative labels. In exchange, Intuitive provides substantial future structural commitments directed at the instrument-refurbishment and robot-service restrictions challenged here. The connection between the released controversy and the relief obtained supports the release of related claims.

Second, the release's temporal scope corresponds to the Settlement's prospective relief. Although the certified Class is defined by entities that purchased from May 21, 2017, through December 31, 2021, the release encompasses related claims accruing through five years after the Effective Date. *Id.* That additional period is part of the negotiated exchange for structural commitments generally lasting five years from the Effective Date, including protections for qualifying third-party instruments and authorization processes for refurbishment and servicing. *Id.* ¶¶ 1(d), 6, 9. Plaintiffs submit that resolving related claims over that defined period provides stability for implementing the structural relief while securing prospective benefits that a cash-only settlement would not provide. The release is limited in duration, and the proposed Settlement expressly limits its operation in accordance with federal law. *Id.* ¶ 9. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023) (approving release that "extend[s] to, but only to, the fullest

extent permitted by federal law”).

Third, the release promotes finality without eliminating unrelated rights. The proposed Settlement provides that discovery of additional facts or legal theories will not reopen the released controversy. Counsel Decl. Ex. A ¶¶ 9–11. That protection is appropriate to the negotiated compromise because otherwise the same dispute could resume after the Parties have exchanged consideration and begun implementing the structural relief. Importantly, the Settlement expressly preserves claims to enforce the Settlement and excludes unrelated claims, including unrelated sales-of-goods, negligence, product-liability, warranty, contract, and personal-injury claims. *Id.* These limitations distinguish final resolution of the controversy being settled from a general surrender of Class Members’ rights against Intuitive.

Taken together, any differences between the certified claims and the release reflect the Settlement’s combined retrospective and prospective resolution: substantial monetary consideration, defined future structural relief, finality concerning the related controversy, and preservation of unrelated claims and enforcement rights. Plaintiffs therefore submit that the scope is appropriate when assessed against the consideration secured for the Class.

**c. A.B. Data and Huntington Bank Should be Approved to Serve as Claims Administrator and Escrow Agent, Respectively, Because They are Both Eminently Qualified and Were Selected by Class Counsel Through Competitive Bidding Processes**

Following this Court’s class certification order, Class Counsel issued a request for bids covering class notice and claims administration to three firms with extensive experience as class administrators in antitrust cases: RG/2 Claims Administration LLC, Kroll, LLC, and A.B. Data, Ltd. Counsel Decl. ¶ 22. Counsel received bids from all three and closely evaluated them for cost, comprehensiveness of the proposal, and the capacity to properly handle notice and claims administration in this matter. *Id.* Following the initial bids, Class Counsel negotiated further with all three in order to secure the lowest possible pricing for the greatest range of services. *Id.* A.B. Data ultimately submitted the most attractive bid, and counsel retained it on August 12, 2025, under an

agreement covering all aspects of class administration, subject to this Court's approval. *Id.* This Court appointed A.B. Data to administer notice to the Class of the pendency of this litigation, which it did successfully. ECF Nos. 359 & 364. Given that A.B. Data now has a comprehensive database of Class Members and will otherwise bring extensive experience to the claims administration process, Class Counsel believe continuing with it will be the best and most cost-effective path for giving the Class notice of the settlement and administering claims on the Net Settlement Fund. Counsel Decl. ¶ 23.

Following the signing of the Settlement, Class Counsel prepared a request for proposal for an escrow agent and sent it to Citibank, Huntington Bank, and Morgan Stanley, all of which have experience as escrow agents in similar matters. *Id.* ¶ 24. Class Counsel received independent bids from all three and reviewed the proposals closely for cost, anticipated interest rates, and security. *Id.* Upon review, Class Counsel determined that Huntington Bank will be the most appropriate escrow agent considering the overall bid and its extensive experience handling escrow accounts for class action settlements and expect to enter into an agreement for Huntington Bank to serve as Escrow Agent, subject to this Court's approval. *Id.*

#### d. A.B. Data Anticipates a Substantial Claims Rate

Claims rates in other healthcare-related settlements and settlements involving known class members provide a useful yardstick for estimating the claims rate here. In *San Miguel Hospital Corp. v. Johnson & Johnson*, No. 1:23-cv-00903-KWR-JFR (D.N.M.), for example, A.B. Data was involved with claims administration for a class of hospitals and had a claims rate of nearly 75% (class size 5,732). Miller Decl. ¶ 41. In other healthcare matters, a very high percentage of purchases were accounted for in the claims, and, in cases where class size is known, filing rates comprised a very high percentage of the class. *Id.* The Notice Plan here will reach Class Members through the same contact information A.B. Data used to deliver class certification notice. *Id.* ¶ 16. A.B. Data has also designed the claims process to simplify and encourage participation. To the extent possible, each Claim Form will be pre-populated with the Class Member's da Vinci service and EndoWrist purchase data from Intuitive's records, along with a unique ID number for filing online. *Id.* ¶ 34. Based on its

experience administering antitrust settlements, A.B. Data anticipates a substantial portion of Class Members will submit claims. *Id.* ¶¶ 41–42.

**e. Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs**

Any fees and expenses awarded to Class Counsel by the Court will be deducted from the Settlement Fund. Counsel Decl. Ex. A ¶ 16. Any reduction in requested fees and expenses will benefit the Class, not Intuitive. As a result, and consistent with the Procedural Guidance, while the Court need not decide the amount of fees and expenses to be awarded to Class Counsel at this stage, the Settlement is not contingent on the award of any amount of fees or expenses and the future fee request poses no obstacle to preliminary approval. *Id.* ¶ 44.

In their motion for an award of fees and expenses, which will be heard only after Class Members have had an opportunity to object, Class Counsel will seek an award of attorneys' fees of up to one-third of the total Settlement Fund, and out-of-pocket expenses of up to $10,000,000. Procedural Guidance § 6; Counsel Decl. ¶ 28; *see also Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted) (attorneys may recover "out-of-pocket expenses that 'would normally be charged to a fee paying client'"). Before the objection deadline, Class Counsel will provide an itemized list of their expenses by category. *See Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011).

Class Counsel's fee request will be reasonable. When applying the percentage-of-the-fund method, the Ninth Circuit has established a benchmark of 25% to be used as the "starting point" for analysis. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949, 955 (9th Cir. 2015). "That percentage amount can then be adjusted upward or downward depending on the circumstances of the case." *de Mira v. Heartland Emp. Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014). Courts in this district have recognized that "'in most common fund cases, the award *exceeds* the benchmark.'" *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)). And while Class Counsel continue to audit their time and expense records to ensure that all fees and expenses conform to the agreed time and expense protocols, they have invested tens of thousands of hours of attorney and paralegal time in this Action, Counsel Decl. ¶ 29, and they fully

expect that the lodestar multiplier on their time will fall within a range approved by the Ninth Circuit. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (noting approved fee awards with multipliers in "a range of 0.6-19.6, with most (20 of 24, or 83%) from 1.0-4.0"). Class Counsel will present complete arguments in support of a proposed fee and expense award in their forthcoming motion per the proposed schedule below.

**f. Plaintiffs Intend to Request Reasonable Service Awards for Plaintiffs**

Pursuant to § 7 of the Procedural Guidance, Class Counsel intend to request service awards of $100,000 for each of the three Plaintiffs. These service awards are fair and reasonable.

Plaintiffs have been actively involved in the litigation, and, as hospital systems, their involvement and discovery obligations have been more onerous than is typical for consumer class representatives. All Plaintiffs reviewed pleadings and consulted with Class Counsel regarding case developments. Counsel Decl. ¶ 14. All conducted document searches and collected materials, producing over 38,000 documents, and collectively responded to 163 written discovery requests. *Id.* They produced a total of 19 witnesses for depositions and devoted numerous hours to deposition preparation. *Id.* They also kept Class Counsel informed of current market conditions and product pricing and supplied historical facts central to Plaintiffs' claims. *Id.* No Plaintiff derived a personal benefit beyond any recovery to the Class. *Id.* ¶ 30. In addition, the $100,000 service awards in aggregate represent just 0.066% of the Settlement Fund. *Id.*; *see Alvarez v. Farmers Ins. Exch.*, 2017 WL 2214585, at *1-2 (N.D. Cal. Jan. 18, 2017) (finding service awards of $10,000 per plaintiff, which in the aggregate comprised 1.8% of the total settlement, to be reasonable); *Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403, at *6 (N.D. Cal. Oct. 18, 2013) (approving $10,000 service award where average settlement recovery was estimated to be $595.91); *Castro*, 2017 WL 4776626, at *10 (approving $100,000 service awards in a healthcare-related antitrust class action).

**g. Past Settlements**

The Procedural Guidance, § 11, instructs Class Counsel to provide certain information for at least one comparable class settlement. Class Counsel have compiled that information for three comparable settlements in a chart included in the Counsel Declaration. Counsel Decl. ¶ 31.

**B. The Court Should Maintain Its Existing Certification of the Class for Purposes of the Settlement**

The Court has already certified the Class following a contested motion and examination of the evidence. ECF No. 333. The Settlement adopts the same Class definition and excludes the three opt-outs at the class certification stage. *Id.* at 26; Counsel Decl. Ex. A ¶¶ 1(d)–(e). The Court should maintain the existing certification for purposes of the Settlement.

The Court found all Rule 23(a) requirements satisfied: the Class contains thousands of members; common questions concern Intuitive's alleged marketwide conduct; Plaintiffs' claims are typical; and Plaintiffs and Class Counsel adequately represent the Class. ECF No. 333 at 3–10. The Court specifically found Plaintiffs' interests aligned with those of absent Class Members and recognized counsel's diligent prosecution of the Action. *Id.*

The Court also found that common questions of antitrust violation, impact, and damages predominate under Rule 23(b)(3) and that class treatment is superior given the efficiency of resolving the claims together and the substantial costs of individual litigation. ECF No. 333 at 14, 19–24. For Rule 23(b)(2), the Court concluded that relief addressing the challenged marketwide conduct would be indivisible and appropriate for the Class as a whole. *Id.* at 24–25. The proposed Settlement's monetary recovery and structural commitments address those same claims, supporting continued certification for settlement purposes. Counsel Decl. Ex. A ¶¶ 2, 6.

The Court previously appointed and confirmed Co-Lead Class Counsel in its class-certification order. ECF No. 333 at 10. Plaintiffs request that the existing appointment remain in effect for purposes of the Settlement.[5]

**C. The Court Need Not Provide a Second Opt-Out Opportunity**

Rule 23(e)(4) permits, but does not require, a court to afford a second opportunity to request exclusion when a previously certified Rule 23(b)(3) class settles. The question is therefore whether an additional opportunity is warranted under the circumstances. Plaintiffs respectfully submit that

[5] Although some law firm names have changed since the Court's class certification order, Class Counsel remain the same.

here, it is not.

Due process does not require a second opt-out opportunity. The Ninth Circuit held that a class member's rights are "protected by the mechanism provided in the rule: approval by the district court after notice to the class and a fairness hearing at which dissenters can voice their objections, and the availability of review on appeal." *Officers for Just.*, 688 F.2d at 635. A contrary rule "would impede the settlement process so favored in the law." *Id.* The Ninth Circuit reaffirmed that holding in *Low v. Trump University, LLC*, explaining that Circuit "precedent squarely forecloses" a due process claim to a settlement-stage opt-out, because due process requires only "a single opportunity to opt out of a Rule 23(b)(3) class." 881 F.3d 1111, 1121–22 (9th Cir. 2018). *Low* affirmed approval of a settlement "despite its prohibition on additional opt-outs." *Id.* at 1122. Simply put, where class members had notice and an opportunity to opt out at certification, as three class members timely did here, and later receive notice of the settlement and an opportunity to object, "[t]his is all that Rule 23 requires." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1289 (9th Cir. 1992).

On January 29, 2026, the Court granted Plaintiffs' Motion to Authorize Class Notice and Appoint Notice Administrator. ECF No. 359. The certification notice plan was implemented on February 19, 2026. That notice specifically advised Class Members that if they did not opt out at that time, they would be bound by the outcome of the case, including settlement. ECF No. 345-2. Class Members then had until April 20, 2026—sixty days after implementation—to opt out. Three members of the Class exercised that right, Counsel Decl. ¶ 8, demonstrating that Class Members had a meaningful opportunity to choose whether to pursue their claims outside this Action.

The proposed Settlement adopts the same purchase period, covered transactions, geographic scope, and exclusions as the Court's class certification order. Counsel Decl. Ex. A ¶ 1(d). The proposed Settlement expressly limits Class Members to those who did not timely request exclusion. *Id.* ¶ 1(e). The three entities that opted out therefore remain outside the Settlement for purposes of monetary relief, and the remaining Class Members comprise the same Class that proceeded following the original exclusion deadline. *Id.* ¶¶ 1(d)–(e); ECF No. 333 at 26.

The proposed notice explains Class Members' right to object. *See* Miller Decl. Ex. 6. The

objection process will allow concerns about the Settlement to be presented to the Court before final approval. Accordingly, Plaintiffs maintain that the Court need not provide a second opt-out opportunity.

**D. The Court Should Direct Notice to the Class**

Rule 23(e)(1)(B) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal." In addition, for a Rule 23(b)(3) class, the court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific information to be included in the notice).

The proposed Notice Plan is the best practicable plan and, given the contact information available, will reach all or virtually all of the Class. A.B. Data's previous dissemination of notice to the Class following class certification evidences its ability to effectuate notice that comports with Rule 23 and due process.

As set forth in the accompanying declaration of Eric J. Miller, A.B. Data will use the Class Member List developed for class certification notice to direct email and/or mail notice to all or virtually all Class Members. Miller Decl. ¶¶ 7, 16. A.B. Data will run deliverability analyses and update mailing addresses to facilitate delivery, and it will provide further notice through a supplemental digital and social media campaign. *Id.* ¶¶ 18, 20–21, 23. Notice will be provided in plain terms and easy-to-understand language. *Id.* ¶ 29. To encourage engagement, A.B. Data's Summary Notice will be a short-form version of the Detailed Notice, which will be accessible on the case website. *Id.* ¶¶ 22, 30. The Detailed Notice will contain the information required by Rule 23(c)(2)(B) and the Procedural Guidance. *Id.* ¶ 31; Miller Decl. Ex. 6; *see* Procedural Guidance § 3. The Summary Notice will direct Class Members to the case website, where they can obtain additional information about the Settlement. Miller Decl. ¶¶ 22, 30, Ex. 5. The Notice Packet mailed to each Class Member

will include a Claim Form pre-populated, where possible, with the Class Member's purchase data. *Id.* ¶¶ 19, 22, 34. The proposed notice satisfies Rule 23 and will provide the Class with a fair opportunity to review and respond to the Settlement.

### E. Proposed Schedule for Notice and Final Approval

| Event | Proposed Deadline |
|---|---|
| Notice Campaign and Claims Period Begins | 30 days from Preliminary Approval Order |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 45 days from Preliminary Approval Order |
| Objection Filing/Service Deadline | 80 days from Preliminary Approval Order |
| Motion for Final Approval and Response to Objections | 95 days from Preliminary Approval Order |
| Final Approval Hearing | At least 130 days after Preliminary Approval Order (at the convenience of the Court) |

## V. CONCLUSION

Plaintiffs respectfully request that the Court enter the accompanying [Proposed] Order that (1) preliminarily approves the proposed Settlement; (2) maintains the existing certification of the Class and appointment of Class Counsel for purposes of the Settlement; (3) approves the manner and form of notice and proposed plan of allocation to Class Members; (4) appoints A.B. Data as Claims Administrator; (5) appoints Huntington Bank as Escrow Agent; and (6) sets a schedule for final approval and related deadlines.

DATED: November 20, 2026

By: /s/ *Reena A. Gambhir*

Jeffrey J. Corrigan (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
SPECTOR CALDES & CORRIGAN, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
jcorrigan@scc.law
jspector@scc.law

Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
jdominguez@cohenmilstein.com

Reena A. Gambhir (*pro hac vice*)
HAUSFELD LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel: 202-540-7145
Fax: 202-540-7201
rgambhir@hausfeld.com

Jeannine M. Kenney (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-3271
jkenney@hausfeld.com

Daniel P. Weick (*pro hac vice*)
HAUSFELD LLP

Benjamin D. Brown (SBN 202545)
Daniel McCuaig (*pro hac vice*)
Zachary Glubiak (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Ave., Suite 800
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com
zglubiak@cohenmilstein.com

Christopher J. Bateman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
199 Water Street, 21st Floor
New York, NY 10038
Tel: 212-838-7797
Fax: 212-838-7745
cbateman@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs and the Class*

Michael J. Boni
BONI LAW FIRM LLC
1820 Rittenhouse Square, Unit 1401
Philadelphia, PA 19103
Tel: 610-348-2526
mike@boni.law

*Counsel for Plaintiffs and the Class*

33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: 646-647-1282
Fax: 212-202-4322
dweick@hausfeld.com

Samuel Maida (SBN 333835)
Gary I. Smith, Jr. (SBN 344865)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94104
Tel: 415-633-1908
Fax: 415-633-4980
smaida@hausfeld.com
gsmith@hausfeld.com