**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No.: 4:21-cv-03825-AMO-LB<br><br>**DECLARATION OF CLASS COUNSEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**<br><br>Judge: The Honorable Araceli Martínez-Olguín |

We, Reena A. Gambhir, Jeffrey J. Corrigan, and Manuel J. Dominguez, declare as follows:

1. We are partners at the law firms of Hausfeld LLP, Spector Caldes & Corrigan, P.C., and Cohen Milstein Sellers & Toll LLP, respectively. The Court appointed our firms as Co-Lead Class Counsel in its order granting class certification. ECF No. 333 at 10.

2. We submit this declaration in support of Plaintiffs' Motion for Preliminary Settlement Approval (the "Motion"). We have personal knowledge of the facts set forth in this declaration and, if called as witnesses, could and would testify competently to them.

3. Attached as **Exhibit A** is a true and correct copy of the Settlement Agreement that Plaintiffs Larkin Community Hospital, Franciscan Alliance, Inc., and King County Public Hospital District No. 1, d/b/a Valley Medical Center (collectively, "Plaintiffs"), on behalf of themselves and the Class, and Defendant Intuitive Surgical, Inc. ("Intuitive") executed on October 16, 2026 (the "Settlement Agreement" or "Settlement"), including its Exhibit 1, the [Proposed] Final Order and Judgment Approving Class Action Settlement.[1]

## I. The Litigation

4. Plaintiffs filed their operative Consolidated Amended Class Action Complaint on September 10, 2021, asserting six antitrust causes of action against Intuitive. ECF No. 52. Plaintiffs claim that Intuitive engaged in unlawful tying, exclusive dealing, and monopolization in the markets for da Vinci service and EndoWrist repair and replacement in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

5. Motion practice in this Action was complex and hotly contested. On January 3, 2022, the Court denied Intuitive's motion to dismiss in its entirety, finding that, *inter alia*, Plaintiffs plausibly alleged the existence of separate product markets and "sufficiently alleged that their injuries flow from the challenged conduct." ECF No. 69.

6. On March 31, 2024, the Court partially granted Plaintiffs summary judgment, ruling that the

[1] Unless otherwise noted, capitalized terms used in this declaration have the meanings defined in the Settlement Agreement and/or the Motion.

da Vinci surgical robot and EndoWrists constitute separate products, and denied Intuitive's cross-motion in its entirety. ECF No. 232. The Court also largely denied Intuitive's four *Daubert* motions challenging the testimony of Plaintiffs' experts. *See* ECF No. 231.

7. On March 31, 2025, the Court granted Plaintiffs' Motion for Class Certification and concluded that Professor Einer Elhauge's methodology for showing classwide impact and damages was sound. ECF No. 333 at 14–20. On May 22, 2025, the U.S. Court of Appeals for the Ninth Circuit denied Intuitive's Rule 23(f) petition. No. 25-2395, ECF No. 15.1.

8. On January 29, 2026, the Court granted Plaintiffs' Motion to Authorize Class Notice and Appoint Notice Administrator. ECF No. 359. The class certification notice plan was implemented on February 19, 2026: direct notice was mailed to the Class, the class-dedicated website went live, and media notice was initiated. Class Members had until April 20, 2026 to opt out. Three hospital systems opted out.

9. The Court set a trial date, and the case was in the trial-preparation stage when it settled.

10. Class Counsel are experienced antitrust litigators with a track record of success in antitrust class actions. In appointing Class Counsel, the Court considered our knowledge, experience, resources, substantial work on behalf of the Class, and diligent prosecution of the case. ECF No. 333 at 10.

## II. Fact Discovery

11. The litigation generated an extensive fact discovery record. Plaintiffs served 130 requests for production and 20 interrogatories, while Intuitive served 34 requests for production, 61 interrogatories, and 68 requests for admission.

12. The Parties and non-parties produced more than 564,000 documents, including over 338,000 produced by Intuitive and over 38,000 produced by Plaintiffs. Plaintiffs also obtained over 188,000 third-party documents. Intuitive separately produced approximately 12 gigabytes of transactional data.

13. Plaintiffs deposed 21 Intuitive witnesses, and Intuitive deposed 19 Plaintiffs' witnesses. The

Parties also conducted 10 third-party depositions. In total, the Parties conducted 50 fact depositions.

14. The named Plaintiffs actively participated in the litigation as well. Each Plaintiff reviewed pleadings and consulted with Class Counsel regarding case developments, including settlement. Plaintiffs conducted document searches and collected materials, resulting in their production of over 38,000 documents. They also collectively responded to 163 written discovery requests and produced significant treatment information from their databases after extensive negotiation with Intuitive. They devoted numerous hours to preparation for the 19 depositions of their witnesses. They also kept Class Counsel informed of market conditions, producing product pricing, treatment and use information, and historical facts central to Plaintiffs' claims.

## III. Expert Work

15. Plaintiffs worked closely with economics, engineering, FDA, and surgery experts to develop and advance their claims. In connection with summary judgment and class certification, Plaintiffs served 9 expert reports from their 4 experts totaling more than 1,200 pages, and Intuitive served 6 expert reports from its 6 experts.

16. Plaintiffs conducted 6 depositions of Intuitive's experts, and Intuitive conducted 5 depositions of Plaintiffs' experts.

## IV. Settlement Negotiations

17. In early 2022, the Parties, with Court approval, retained private mediator Gregory Lindstrom of Phillips ADR. ECF No. 77. In February 2022, the Parties participated in a formal, half-day mediation by Zoom. The case was in its infancy, and no resolution was reached. Over the next several years, the Parties had separate discussions with Mr. Lindstrom regarding key developments in the case.

18. In March 2026, with the encouragement of Mr. Lindstrom, the Parties started a dialogue regarding a potential resolution of Plaintiffs' claims. After several months, the Parties made

sufficient progress on both monetary and non-monetary issues to warrant an in-person mediation.

19. The Parties participated in a two-day mediation in San Francisco on October 8 and 9, 2026. Beforehand, the Parties submitted mediation statements. At the end of the second day, Mr. Lindstrom made a double-blind mediator's proposal of $450 million plus the non-monetary relief that had been discussed and negotiated over the course of the mediation. Both sides accepted the proposal, and the Parties executed the Settlement Agreement on October 16, 2026. *See* Exhibit A.

20. The Settlement Agreement is the product of vigorous, arm's-length negotiations between experienced counsel. The negotiations were facilitated by an experienced mediator and required discussions over several years, culminating in a two-day, in-person mediation.

21. Having worked on this case for over five years, Class Counsel fully understand both the risks and the potential recovery of further litigation. Class Counsel believe that the Settlement Agreement is more than fair, reasonable, and adequate.

## V. Settlement Administration

22. Following the Court's class certification order, Class Counsel issued a request for bids covering class notice and claims administration to three firms with extensive experience as class administrators in antitrust cases: RG/2 Claims Administration LLC, Kroll, LLC, and A.B. Data, Ltd. ("A.B. Data"), all of which Class Counsel have worked with previously. Class Counsel received bids from all three and closely evaluated them for cost, comprehensiveness of the proposal, and the capacity to properly handle notice and claims administration in this matter. Following the initial bids, Class Counsel negotiated further with all three in order to secure the lowest possible pricing for the greatest range of services. A.B. Data ultimately submitted the most attractive bid, and Class Counsel retained it on August 12, 2025, under an agreement covering all aspects of class administration, subject to the Court's approval.

23. The Court appointed A.B. Data to administer notice to the Class of the pendency of this

litigation, which it did successfully. ECF Nos. 359, 364. Given that A.B. Data now has a comprehensive database of Class Members and will otherwise bring extensive experience to the claims administration process, Class Counsel believe that continuing with A.B. Data is the best and most cost-effective path for giving Class Members notice of the Settlement and administering claims on the Net Settlement Fund.

24. Following the signing of the Settlement Agreement, Class Counsel prepared a request for proposal for an escrow agent and sent it to Citibank, Huntington Bank, and Morgan Stanley, all of which are financial institutions Class Counsel have previously worked with on claims administration and which have experience as escrow agents in similar matters. Class Counsel received independent bids from all three and reviewed the proposals closely for cost, anticipated interest rates, and security. The Parties then engaged in further negotiations, resulting in proposals that provided more favorable financial terms for the Class. Upon review of the final proposals, Class Counsel determined that Huntington Bank is the most appropriate escrow agent considering the overall bid and its extensive experience handling escrow accounts for class action settlements, and expect to enter into an agreement for Huntington Bank to serve as Escrow Agent, subject to the Court's approval.

## VI. Plaintiffs' Proposed Plan of Allocation

25. Plaintiffs propose allocating the Net Settlement Fund on a *pro rata* basis to Eligible Claimants according to Professor Elhauge's damages calculations, which apply the overcharges he found attributable to Intuitive's alleged anticompetitive conduct to the dollar value of Class Member purchases of EndoWrists and da Vinci service. This *pro rata* allocation is reasonable and treats all Class Members equitably.

26. Class Counsel believe that proper planning and persistence in contacting Eligible Claimants will result in complete depletion of the Net Settlement Fund. If the Net Settlement Fund is not fully depleted, Class Counsel will seek Court approval of an appropriate *cy pres* recipient to be paid any residual funds.

## VII. Attorneys' Fees, Costs, and Service Awards

27. Any fees and expenses awarded to Class Counsel by the Court will be deducted from the Settlement Fund, and the Settlement is not contingent on the award of any amount of fees or expenses. *See* Exhibit A ¶ 44.

28. In their motion for an award of fees and expenses, Class Counsel will seek an award of attorneys' fees of up to one-third of the total Settlement Fund, and out-of-pocket expenses of up to $10,000,000. Before the objection deadline, Class Counsel will provide an itemized list of their expenses by category.

29. Class Counsel continue to audit their time and expense records to ensure that all fees and expenses conform to the agreed-upon time and expense protocols. Class Counsel have invested tens of thousands of hours of attorney and paralegal time in this Action.

30. Class Counsel intend to apply for service awards of $100,000 for each of the three Plaintiffs. The potential $100,000 service awards in aggregate represent just 0.066% of the Settlement Fund. No Plaintiff derived a personal benefit beyond any recovery to the Class.

## VIII. Comparable Settlements

31. Pursuant to § 11 of the Procedural Guidance, Class Counsel have compiled information for three comparable class settlements, which is set forth in the chart below.

| | ***In re HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC (N.D. Cal.)** | ***In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420-YGR (N.D. Cal.)** | ***Castro v. Sanofi Pasteur Inc.*, No. 2:11-cv-07178-JMV-MAH (D.N.J.)** |
|---|---|---|---|
| **Claims Being Released** | Released claims include those arising from or relating to conduct alleged in the Action or that could have been alleged from substantially the same subject matter, regardless of legal theory. Ordinary-course UCC, negligence, product-liability, implied-warranty, contract, and personal-injury claims are | Released claims include known and unknown claims arising from purchases or sales of lithium-ion batteries (including batteries in finished products) through May 31, 2011, and alleged agreements or conspiracies to raise, fix, maintain, or stabilize prices; restrict, reduce, alter, or allocate supply, quantity, or quality; or otherwise restrain competition. The release encompasses federal, state, local, and foreign antitrust | Released claims include those based on the action's factual predicate concerning Sanofi's pricing, sales, marketing, and contracting practices, including alleged tying, bundling, exclusionary conduct, restraints of trade, anticompetitive conduct, monopolization, attempted monopolization, and similar unfair |

| | | | |
|---|---|---|---|
| | generally carved out (subject to the stated exception for challenged conduct). | and related claims, subject to stated exclusions for unrelated product liability, contract, warranty, personal injury, and settlement-enforcement claims. | competition/business practices. The release also covered substantially similar post-settlement conduct. |
| **Total Settlement Fund** | $246,750,000 | $113,450,000 | $61,500,000 |
| **Number of Class Members** | 78 | Approximately 8.6 million | Approximately 30,000 |
| **Potential Class Members to Whom Notice Was Sent** | 78 | 8,644,344 | 29,627 |
| **Method(s) of Notice** | Mail, Email, Publications, Online, Telephone | Mail, Email, Publications, Online, Telephone | Mail, Email, Publications, Online, Telephone |
| **Attorneys' Fees and Costs** | Fees: $75,000,000<br><br>Costs: $2,887,478.45 | Fees: $33,829,176<br><br>Costs: $6,751,735.84 | Fees: $20,500,000<br><br>Costs: $7,245,427.71 |
| **Total Exposure if Plaintiffs Prevailed on Every Claim** | Approximately $2.08 billion in single damages | Approximately $967 million in single damages | Approximately $439 million in single damages |
| **Injunctive and Non-Monetary Relief, If Any** | N/A | N/A | N/A |

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: November 20, 2026

By: /s/ *Manuel J. Dominguez*
Manuel J. Dominguez (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL LLP
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: 561-515-2604
Fax: 561-515-1401
Email: jdominguez@cohenmilstein.com

By: /s/ *Jeffrey J. Corrigan*
Jeffrey J. Corrigan (*pro hac vice*)
SPECTOR CALDES & CORRIGAN, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@scc.law

By: */s/ Reena A. Gambhir*
Reena A. Gambhir (*pro hac vice*)
HAUSFELD LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel: 202-540-7145
Fax: 202-540-7201
Email: rgambhir@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Class*