**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION | Lead Case No. 4:21-cv-03825-AMO |

# DECLARATION OF PROFESSOR EINER R. ELHAUGE

**November 20, 2026**

I, Einer R. Elhauge, hereby declare as follows:

1. I have submitted four expert reports in this matter.[1] This work included the development and execution of damages models for class purchases of Intuitive Surgical, Inc. ("Intuitive") EndoWrists and da Vinci service.

2. I have now been asked by class counsel to calculate the net present value ("NPV") of the injunctive relief provided by the proposed settlement.[2]

3. The fundamental benefit of the proposed injunctive relief is that it opens these markets to competition. I use my damages methodology—which I understand this Court determined to be reliable—as the starting point to value the proposed injunctive relief. Relying on that methodology and additional market information that has become available since the filing of my earlier reports, I conclude that the

[1] (1) Corrected Expert Report of Professor Einer Elhauge, dated January 10, 2023 ("Elhauge Merits Report"); (2) Rebuttal Expert Report of Professor Einer Elhauge, dated March 3, 2023 ("Elhauge Rebuttal Report"); (3) Corrected Class Certification Expert Report of Professor Einer Elhauge, dated July 13, 2024 ("Elhauge Class Report"); (4) Class Certification Rebuttal Expert Report of Professor Einer Elhauge, dated October 8, 2024. (Collectively "Elhauge Reports.")

[2] Settlement Agreement, October 16, 2026 ("Settlement Agreement"), at ¶ 6. I assume the proposed settlement has an Effective Date of April 1, 2027. The NPV is calculated as of that date.

net present value (assuming an effective date of April 1, 2027) falls in the range of $1,055,911,032 to $1,926,255,838.

## QUALIFICATIONS

4. I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects. I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *Research Handbook on The Economics of Antitrust Law* and *The Fragmentation of U.S. Health Care*. I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues. I have received the Jerry S. Cohen Memorial Fund Writing Award for best antitrust article three times, in 2010, 2017, and 2022, as well as receiving the 2015 Antitrust Writing Award for Best Academic Anticompetitive Practice Article. My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years. Exhibit B to this declaration describes my compensation and the cases in which I have testified at trial or in a deposition in the past four years. I am being compensated at a rate of $1500 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $235-1095 per hour for the work of my staff on this declaration. None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case, including the content of my declaration and opinions.

5. I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases. I have testified as an expert witness on antitrust economics in dozens of federal cases, and I have been qualified as an expert in antitrust economics in all twenty-nine court opinions that addressed that question, and my economic and econometric methodologies have been repeatedly sustained and found reliable. I have also served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the US, EC, Korea, and Brazil. My testimony as an economics expert has spanned a wide range of topics, including reverse-payment settlements, other horizontal agreements, vertical agreements, mergers, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics. My clients have included leading corporations, law firms, and the United States government. I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*. I have

received the AAI award for Outstanding Antitrust Litigation Achievement in Economics three times, in 2016, 2020, and 2026.

6. I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries. I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization. I also regularly attend workshops on those and other topics regarding the economic analysis of law. I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics.

## I. Summary of Conclusions

7. Several relevant events have occurred since the filing of my 2024 Class Reports. They include:

a) The number and usage of da Vinci robots continues to grow. Average annual growth rates from 2016 to 2025 were 11% for installed base and 15% for procedures. At the same time, average spending per procedure on instruments and the average annual service cost per robot remained relatively flat. *Infra* Section IV.A.

b) The da Vinci S/Si robot and the compatible EndoWrists have essentially been phased out. *Infra* Section IV.B.

c) The da Vinci 5 robot was introduced in 2024, years after Plaintiffs filed their complaint. Its share of the da Vinci installed base has continued to grow each quarter. Service on the da Vinci 5 is beyond the complaint's allegations and is not covered by the proposed injunctive relief. *Infra* Section IV.C.

d) The da Vinci 5 relies mostly on X/Xi EndoWrists, but there have been a limited number of "force feedback" EndoWrists released with the da Vinci 5 that are compatible only with the da Vinci 5 and are not covered by the proposed injunctive relief. Adoption of these force feedback EndoWrists has been slow, with the overwhelming

majority of da Vinci 5 procedures relying exclusively on X/Xi-compatible EndoWrists. *Infra* Section IV.C.

e) Independent Repair Companies ("IRCs") have obtained 510(k) clearances to remanufacture three types of X/Xi EndoWrists. They have had only a small impact on the overall price paid for EndoWrists thus far. *Infra* Section IV.D.

f) As of 2026, Intuitive has eliminated the overlap in ten-use and extended-use EndoWrist types. As a result, there are only 25 different X/Xi EndoWrists instead of the 36 in my original damages analysis. *Infra* Section IV.E.

8. The value of the proposed injunctive relief is based on opening the markets for EndoWrists and da Vinci service to more competition from Intuitive's actual and potential rivals. I estimate the net present value of the proposed injunctive relief to be in the range of $1,055,911,032 to $1,926,255,838. As described more fully in Section V.B, this is based on using my classwide damages methodology, modified as follows:

a) Start with X/Xi EndoWrist and service revenue for the last year of available data: 2023.

b) Project historical revenue forward based on the recent historical growth in da Vinci installed base and usage.

c) Adjust the total revenue downward for the transition in use from the da Vinci X/Xi to da Vinci 5.

d) Apply a phasing-in of savings based on (1) the da Vinci service pilot program, and (2) the time necessary for IRCs to fully enter the relevant EndoWrist and service markets.

e) Calculate the total savings for EndoWrists and da Vinci service. For EndoWrists, I use two scenarios: (1) the average but-for discounts offered by Intuitive; or (2) the lowest but-for discount offered by Intuitive in the damage scenarios in my earlier Reports. For da Vinci service, I use an average of the but-for discounts offered by Intuitive in the damage scenarios in my earlier Reports, estimates of the

discounts for in-house (hospital-provided) servicing, and record evidence of prices charged for third-party servicing.

f) Calculate the NPV of these savings assuming an Effective Date of April 1, 2027.

9. This calculation is conservative—i.e., it tends to understate the true value of the proposed injunctive relief—for the following reasons, which are described more fully in Section V.D below:

a) Use limits could potentially have been raised even further than what is modeled.

b) Intuitive's profit margins are so high that if competition pushes EndoWrist or da Vinci service pricing to commodity levels, the savings will be greater than my calculations assume.

c) I exclude *all* X/Xi EndoWrists used in da Vinci 5 procedures involving *any* force feedback EndoWrists in modeling future revenue from X/Xi EndoWrists. This likely understates the true volume of X/Xi EndoWrists that will be used with the da Vinci 5 and therefore will benefit from the proposed injunctive relief.

d) [redacted]

e) Savings are limited to the five years covered by the proposed Settlement Agreement and to the da Vinci X/Xi. However, competition unleashed due to the proposed injunctive relief could continue past the end of the five-year injunctive relief period and could expand to the da Vinci 5 and its force feedback EndoWrists.

## II. Injunctive Relief Included in the Proposed Settlement

10. In addition to the cash compensation for past purchases, the proposed settlement includes injunctive relief (labeled "structural relief" in the settlement)

lasting five years from the Effective Date of the settlement.[3] This injunctive relief consists of the following five topics:

a) ". . . Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA. For agreements entered into for a period of five years from the Effective Date, Intuitive shall include in its United States (i) Sales, License, and Service Agreements and (ii) Use, License, and Service Agreements contractual language consistent with the language currently on Intuitive's website confirming that da Vinci customers may use refurbished or remanufactured Eligible EndoWrists that either (i) have received 510(k) clearance from the FDA; or (ii) have been authorized by Intuitive pursuant to Intuitive's Third Party Compatibility Program[.]"[4]

b) "Intuitive shall maintain . . . an authorization process for the refurbishment and use-counter reset of Eligible EndoWrists continuously owned by their original purchaser[.]"[5]

c) ". . . Intuitive shall in the United States refrain from any threats or acts to void da Vinci robot warranties, cease da Vinci robot servicing, or stop selling EndoWrists for use with a da Vinci robot to which an authorized or 510(k)-cleared refurbished or remanufactured EndoWrist instrument has been attached[.]"[6]

d) ". . . Intuitive shall in the United States refrain from taking any action that prohibits authorized independent third-party companies or remanufacturers, or entities whose refurbished and remanufactured Eligible EndoWrists have received 510(k) clearance, to provide modified or refurbished Eligible EndoWrists[.]"[7]

---

[3] Settlement Agreement ¶ 6. *See also*, *id.* at ¶ 1(l) ("'Effective Date' means the date on which Final approval has been obtained in this Action, as set forth in Paragraph 43 below.").
[4] *Id.* at ¶ 6(a).
[5] *Id.* at ¶ 6(b).
[6] *Id.* at ¶ 6(c).
[7] *Id.* at ¶ 6(d).

e) ". . . Intuitive shall maintain, develop and pilot, with the goal and expectation of implementing, an authorization process for United States hospitals or third-party independent service organizations to conduct preventative maintenance and field-based repairs for da Vinci X/Xi robots; . . . The Parties acknowledge and agree that Intuitive's current projected launch timing for a pilot of the program . . . is Q1 2028; that Intuitive projects the initial piloting phase to take 18-24 months[.]"[8]

11. These five injunctive relief topics address what I understand to be the principal areas of challenged conduct that excluded competition from the EndoWrist and da Vinci service markets.[9]

12. Regarding the authorization process for rival EndoWrist refurbishment, the Settlement Agreement includes the requirements that Intuitive shall be:

a) ". . . making available, on commercially reasonable terms, to customers and legitimate independent third-party companies who participate in Intuitive's Third Party Compatibility Program each Eligible EndoWrist's technical specifications reasonably necessary to conduct safety and reliability testing[.]"[10]

b) ". . . providing a reasonable opportunity for customers and legitimate independent third-party companies to demonstrate (based on transparent and objective criteria), and to provide Intuitive with necessary and sufficient information (including technical specifications) to evaluate, their ability to dependably return Eligible EndoWrists to OEM specs and function with equal safety and reliability as the original instrument, at which point Intuitive will (A) authorize such servicing (for continued customer use, not for resale)[.]"[11]

---

[8] *Id.* at ¶ 6(e).

[9] Consolidated Amended Class Action Complaint in *In Re: Da Vinci Surgical Robot Antitrust Litigation*, Case 3:21-cv-03825-VC (N.D. Cal. 09/10/21) (hereinafter "CAC"). *See also* Elhauge Class Report ¶¶ 3, 235, 358, and § III.

[10] Settlement Agreement ¶ 6(b)(i).

[11] *Id.* at ¶ 6(b)(ii).

13. An additional relevant issue is that the Settlement Agreement's injunctive relief applies only to S/Si and X/Xi models of EndoWrists and, with respect to da Vinci service, only X/Xi da Vinci robots:

a) "'Eligible EndoWrists' means S/Si and X/Xi models of Intuitive EndoWrist instruments purchased by customers."[12]

b) Describing a program for "United States hospitals or third-party independent service organizations to conduct preventative maintenance and field-based repairs for da Vinci X/Xi robots."[13]

14. In the event of a dispute, for example as to whether Intuitive has lived up to the terms of the agreement: ". . . the Parties agree to submit any dispute in connection with the Settlement, or any antitrust, competition, or comparable claim except for any claims alleging collusion between Intuitive and any competitor, accruing in the period of five years from the Effective Date, to alternative dispute resolution, consisting of mandatory mediation by videoconference (if agreed by the Parties) or in San Francisco, California, followed by binding arbitration, if necessary, before a panel of neutral experts to be mutually selected by the Parties and with costs divided between Intuitive and the Class Member(s) initiating such proceeding."[14] This provides a streamlined neutral process for enforcing the terms of the Settlement Agreement.

## III. Overcharges Calculated in My Prior Reports

15. I calculated overcharges for EndoWrists and da Vinci service by focusing on the but-for discounts that would have been offered by Intuitive on its sales of EndoWrists and da Vinci service in a hypothetical world in which Intuitive did not engage in the conduct challenged by this lawsuit. In this section, I briefly describe these damage scenarios.

16. I calculated three but-for overcharge scenarios for EndoWrists:[15]

---

[12] *Id.* at ¶ 1(m).
[13] *Id.* at ¶ 6(e).
[14] *Id.* at ¶ 8.
[15] I calculated damages for each of these scenarios assuming various plausible but-for dates of competitive entry. *See, e.g.*, Elhauge Class Report ¶ 783.

a) A 20% discount on a mixture of new and refurbished EndoWrists. This results in an overcharge equal to 20% of the actual price paid.[16]

b) An increase in use limits from their current value (usually ten) to 20.[17] This results in an overcharge equal to 35% of the actual price paid on the mix of EndoWrists purchased in 2023.[18]

c) A combination of the 20% discount and increased use limits.[19] This results in an overcharge equal to 48% of the actual price paid on the mix of EndoWrists purchased in 2023.[20,21]

17. I calculated one but-for overcharge scenario for da Vinci service: a 12% discount on Intuitive's service price.[22]

18. I calculated a range of total overcharges with but-for competitive entry as early as May 2017, as well as later plausible entry dates, through the end of the period for which data was available.[23]

---

[16] Elhauge Class Report ¶¶ 781-782, 784-785.

[17] Elhauge Class Report ¶¶ 800-802 and Corrected Exhibit E. I modeled also an earlier start to the Extended Use program and the extension of that program to S/Si EndoWrists. *See* Elhauge Class Report ¶¶ 810-811.

[18] Elhauge Class Rebuttal Report workpaper "IS28 Damages Estimation v26 (only 2023).xlsx" tabs *Table 5* and *Table 6*. In 2023, X/Xi overcharges from just the price effect equaled $206.5 million and from just the use effect equaled $360.0 million; 20% x 360.0 / 206.5 = 35%).

[19] Elhauge Class Report ¶¶ 813-815.

[20] Elhauge Class Rebuttal Report workpaper "IS28 Damages Estimation v26 (only 2023).xlsx" tabs *Table 5* and *Table 7* (In 2023, overcharges from just the price effect equaled $206.5 million and from a combination of price effect and use effect equaled $494.4 million; 20% x 494.4 / 206.5 = 48%).

[21] Intuitive's expert Dr. Loren Smith calculates that this "is equivalent to an effective 55.4 percent" overcharge while Intuitive's other expert Dr. James Hughes indicates it is an effective overcharge "of about 56.5 percent[.]" Those calculations include years in which there were no extended-use EndoWrists and therefore had lower average use limits and correspondingly higher overcharges. Amended Expert Rebuttal Report of Loren K. Smith, Ph.D., February 10, 2023 ("Smith Merits Report"), ¶ 252. Amended Expert Rebuttal Report of James W. Hughes, Ph.D., August 16, 2024 ("Hughes Class Report"), n. 163.

[22] Elhauge Class Report ¶¶ 824, 828.

[23] Elhauge Class Rebuttal Report Appendix B. The latest available data in my earlier reports was 2021, so those reports calculated overcharges through 2021.

19. It is my understanding that three entities have opted out of the Rule 23(b)(3) Class: (1) Indiana University Health, Inc.;[24] (2) RWJBarnabas Health and all Affiliates;[25] and (3) Providence Health & Services and all affiliated entities.[26] Their EndoWrist damages represent 6.4%, and da Vinci service damages represent 6.1%, of classwide damages through 2023.[27] While the opt-outs will not be entitled to any of the $450 million that Intuitive will pay as part of the proposed Settlement Agreement (and will not release their claims), my understanding is they remain part of the Rule 23(b)(2) Class and they still will benefit from the injunctive relief in the proposed Settlement Agreement.

## IV. Relevant Events Since My 2024 Class Reports

20. Several developments since my 2024 Class Report and Class Rebuttal Report are relevant to valuing the proposed injunctive relief. I address these in the sections below.

### *A. Continued Growth in da Vinci Usage*

21. There has been continued growth in da Vinci usage. This can be seen in terms of the installed base of da Vinci robots, the number of da Vinci procedures performed, and the revenues associated with da Vinci usage. **Table 1** below summarizes the growth reported in Intuitive's 10-K filings going back to 2016, which is the earliest continuous year for which Intuitive broke out revenues specific to the U.S.

[24] Derek E. Empie, *332596 Notice to Opt-Out of the Class in In Re: Da Vinci Surgical Robot Antitrust Litigation*, April 20, 2026.
[25] Lauren Zalepka, *332544 Da Vinci Surgical Robot Antitrust Class Opt-Out Notice*, April 20, 2026.
[26] Jack D. Ross, *332427 In Re: Da Vinci Surgical: Providence Health & Services Opt-Out Request*, April 20, 2026.
[27] IS135 Opt-outs Volume Damages v1, which relies on Elhauge Class Rebuttal Report workpapers "IS52 full data.dta" (containing transaction data) and "IS91 Damages by Customer 2023.dta" (containing IDN numbers used to identify entries corresponding to the three opt-out entities).

| **Table 1: U.S. Growth[28]** | | | | |
|---|---|---|---|---|
| **Year** | **da Vinci Installed Base (all models)** | **da Vinci Procedures** | **Intuitive's Instruments & Accessories Revenue (USD millions)** | **Intuitive's Service Revenues (USD millions)** |
| *[a]* | *[b]* | *[c]* | *[d]* | *[e]* |
| 2016 | 2,563 | 563,000 | 1,077.3 | 377.8 |
| 2017 | 2,862 | 644,000 | 1,263.1 | 419.2 |
| 2018 | 3,196 | 753,000 | 1,485.2 | 456.1 |
| 2019 | 3,531 | 883,000 | 1,790.4 | 508.4 |
| 2020 | 3,720 | 876,000 | 1,785.1 | 482.6 |
| 2021 | 4,139 | 1,109,000 | 2,225.1 | 603.3 |
| 2022 | 4,563 | 1,282,000 | 2,507.2 | 684.4 |
| 2023 | 5,111 | 1,532,000 | 3,059.8 | 763.3 |
| 2024 | 5,807 | 1,757,000 | 3,626.4 | 840.4 |
| 2025 | 6,364 | 2,012,000 | 4,203.4 | 1,030.6 |

22. Note that the **columns *[d]*** and ***[e]*** in **Table 1** above contain more than just EndoWrist and da Vinci service revenue. Intuitive's "Instruments & Accessories" category includes products beyond EndoWrists. Intuitive's service revenues include service of a separate, unrelated device called the Ion as well as service of the da Vinci.

23. Based on **Table 1** above, the average annual growth rate of installed base is 11% per year, and of procedures is 15% per year. I use the actual historical growth rate of these categories to calculate EndoWrist and da Vinci revenue growth through 2025. I then use their average growth rates to project future revenues through the end of the five-year period of injunctive relief in mid-2032.

24. Based on **Table 1** above, the average Instruments & Accessories spend per procedure was $2,003 and the average annual service expense per robot was

[28] Source: Intuitive 2016 10-K p. 9; Intuitive 2017 10-K p. 8; Intuitive 2018 10-K pp. 9, 44, 71; Intuitive 2021 10-K pp. 12, 63, 102; Intuitive 2022 10-K pp. 12, 67, 105; Intuitive 2025 10-K p. 72. Intuitive does not break out Instrument & Accessories or Service revenues between da Vinci robots and Ion robots, so these totals include both lines of robot. The installed base and number of Ion procedures are far smaller than the da Vinci's. In 2025 worldwide, there were 144,100 Ion procedures but 3,153,000 da Vinci procedures; in that same year there were 995 installed Ions but 11,106 installed da Vincis. Intuitive 2025 10-K pp. 70-72.

$146,206.[29] These averages have remained relatively flat even as da Vinci procedures and installed base have grown.[30]

### *B. Phasing Out of S/Si*

25. The da Vinci S/Si now has a *de minimis* share of use in the United States. The da Vinci S was the second-generation robot commercialized in 2006, and the Si was the third-generation robot commercialized in 2009.[31] Intuitive has not sold an S robot in the U.S. since at least 2013 and has not sold an Si robot since at least 2018.[32] The S/Si made up less than 20% of the installed base of da Vinci robots in Q1 2021.[33]

26. Intuitive's expert Dr. Hughes' analysis showed that S/Si EndoWrist sales had collapsed by 2023.[34] As noted in my Class Rebuttal Report:

> Whereas there were hundreds of millions of dollars in annual sales of S/Si-compatible EndoWrists in 2018 and earlier (when but-for entry would have occurred without the challenged restraints), in 2023 S/Si-compatible EndoWrist sales were under $4 million and in 2024Q1 were negative.[35]

27. Intuitive's da Vinci instrument website does not currently mention S/Si EndoWrists.[36] The current Intuitive product catalog for multiport instruments, which is the category that would cover the S/Si, does not mention S/Si EndoWrists.[37]

---

[29] The standard deviations—a measure of the dispersion or variability from year to year—are $51 and $7,512, respectively.
[30] Intuitive's SEC filings do not break out EndoWrist revenues separately from the larger category of Instruments & Accessories.
[31] Intuitive 2020 10-K, p. 52, cited at Elhauge Class Report ¶¶ 34-35.
[32] Elhauge Merits Report Figure 3, citing to Intuitive Robot Transaction Data.
[33] Elhauge Merits Report Figure 4.
[34] Hughes Class Report Figure 19; Elhauge Class Rebuttal Report ¶ 124.
[35] Elhauge Class Rebuttal Report ¶ 124, citing to Hughes Class Report Figure 6 Work Paper, "Instrument Sales by Year.xlsx" tab *volume_instr_sold*.
[36] Intuitive, *Da Vinci Instruments*, https://www.intuitive.com/en-us/products-and-services/da-vinci/instruments. (Only mention of S/Si is of third party 510(k)s.)
[37] Intuitive, *Da Vinci Multiport Instrument and Accessory Catalog*, January 2026, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/da-vinci-x-xi-instruments-accessories-catalog.pdf.

28. Consistent with a phase-out of S/Si, by 2022 Intuitive was promoting its ability "to recycle parts from end-of-life da Vinci Si systems" in its Environmental, Social, and Governance report.[38] By 2025, Intuitive's financial filings noted that there was "a smaller number of third-generation [Si] da Vinci surgical systems available for trade-in."[39]

### *C. Introduction of the da Vinci 5 and Force Feedback EndoWrists*

29. As noted in my Class Report:

> In March 2024, Intuitive received FDA clearance for a fifth generation which it calls Da Vinci 5. It 'will initially be available to a small number of customers' and will be launched more broadly in the U.S. after Intuitive learns from and works with those customers.[40]

30. It was reported in late 2024 that "Intuitive Surgical is on track to take the da Vinci 5 robot from a limited rollout to a broader launch in mid-2025."[41] As shown in **Table 2** below, Intuitive has continued to grow the installed base of da Vinci 5 robots.

---

[38] Intuitive, *ESG: Environmental Sustainability, Social Responsibility, Governance and Transparency*, 2022, https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/2022-intuitive-esg-report.pdf, at p. 8.

[39] Intuitive Surgical, Form 10-K for the fiscal year ended December 31, 2025, https://isrg.intuitive.com/static-files/f684d492-5169-48b5-9723-8ebcaa05c098, at p. 72. This same filing indicated there were no da Vinci S robots in use as of 2025. *Id.* at p. 7.

[40] Elhauge Class Report n. 65, citing to Intuitive Announces FDA Clearance of Fifth-Generation Robotic System, da Vinci 5, https://isrg.intuitive.com/news-releases/news-release-details/intuitive-announces-fda-clearance-fifth-generation-robotic.

[41] Susan Kelly, Intuitive readies da Vinci 5 for broader launch after placing 110 robots in Q3, MedTech Dive, October 18, 2024, https://www.medtechdive.com/news/Intuitive-ISRG-Q3-da-Vinci-5-launch/730298/.

| **Table 2: Growth in da Vinci 5 Installed Base**[42] | | |
|---|---|---|
| **Quarter** | **Worldwide Installed Base** | **U.S. Installed Base** |
| 2024 Q1 | 8 | 8 |
| 2024 Q2 | 78 | 78 |
| 2024 Q3 | 188 | 188 |
| 2024 Q4 | 362 | 359 |
| 2025 Q1 | 509 | 505 |
| 2025 Q2 | 689 | 683 |
| 2025 Q3 | 929 | 911 |
| 2025 Q4 | 1,231 | 1,170 |
| 2026 Q1 | 1,464 | 1,359 |
| 2026 Q2 | 1,710 | 1,574 |
| 2026 Q3 | 2,023 | 1,846 |

31. As shown in **Table 3** below, the da Vinci 5 has continued to increase its share of the U.S. installed base. Growth for the two years Q3 2024 to Q3 2026 was 24.7 percentage points, equal to 12.4 percentage points per year (after rounding).

[42] Source: Intuitive 2024-2026 10-K and 10-Q filings; Intuitive, *Q3'26 Financial Data Tables for Earnings Release*, https://isrg.intuitive.com/static-files/6aa98b60-679d-4112-b561-ffbb8c8e819a. For 2024-2025, Intuitive does not report the quarterly U.S. installed base of da Vinci 5 robots. I approximate the U.S. installed base for 2024-2025 by taking the worldwide installed base and subtracting cumulative outside-of-U.S. installations.

| Table 3: Share of U.S. Installed Base of da Vinci[43] | | | |
|---|---|---|---|
| **Quarter** | **Total da Vinci Installed Base (X, Xi, and 5)** | **da Vinci 5 Installed Base** | **da Vinci 5 Share** |
| *[a]* | *[b]* | *[c]* | *[d]=[c]/[b]* |
| 2023 Q4 | 4,958 | - | 0% |
| 2024 Q1 | 5,081 | 8 | 0.2% |
| 2024 Q2 | 5,216 | 78 | 1.5% |
| 2024 Q3 | 5,407 | 188 | 3.5% |
| 2024 Q4 | 5,619 | 359 | 6.4% |
| 2025 Q1 | 5,764 | 505 | 8.8% |
| 2025 Q2 | 5,888 | 683 | 11.6% |
| 2025 Q3 | 6,018 | 911 | 15.1% |
| 2025 Q4 | 6,150 | 1,170 | 19.0% |
| 2026 Q1 | 6,251 | 1,359 | 21.7% |
| 2026 Q2 | 6,373 | 1,574 | 24.7% |
| 2026 Q3 | 6,544 | 1,846 | 28.2% |

32. Most X/Xi instruments—such as EndoWrists—are compatible with the da Vinci 5.[44] However, there are a limited number of new EndoWrists that are compatible only with the da Vinci 5. These EndoWrists have a technology called "force feedback" that "enables the surgeons to sense the push and pull exerted on

[43] Source: Da Vinci 5 installed base in the U.S. for 2024-2025 is assumed to be equal to the worldwide installed base minus cumulative outside-of-U.S. installations. Intuitive Surgical 2023 10-K p. 12; Intuitive Surgical 2024 10-K pp. 13, 72; Intuitive Surgical 2025 10-K pp. 13, 62, 72; Intuitive Surgical 2026Q1 10-Q p. 25; Intuitive Surgical 2026Q2 10-Q p. 27; Intuitive Surgical 2026Q3 10-Q p. 28; Intuitive, *Q3'26 Financial Data Tables for Earnings Release*, https://isrg.intuitive.com/static-files/6aa98b60-679d-4112-b561-ffbb8c8e819a.

[44] Intuitive, *Da Vinci 5: Surgery, transformed*, p. 14 ("Cross-compatibility with most da Vinci X/Xi instruments and accessories allows da Vinci 5 to blend into program workflows."); Intuitive *da Vinci 5*, https://www.intuitive.com/en-us/products-and-services/da-vinci/5 (sub-menu for "Streamlined workflows" after clicking "+ Learn more": "Similar patient cart design to Xi for consistency of experience with key setup tasks; compatibility with most da Vinci X and Xi instruments[.]").

tissue during surgery."[45] Those new force feedback EndoWrists are not covered by the injunctive relief in the proposed settlement.[46]

33. In October 2026, Intuitive's CEO Dave Rosa noted that in the latest quarter "about 8% of Da Vinci 5 cases involve force feedback."[47] The da Vinci 5 has been out for over two years. Therefore, the share of da Vinci 5 procedures using the new force feedback EndoWrists has grown by less than four percentage points per year.

34. To ensure that I do not understate the impact of force feedback EndoWrists and thereby overstate the value of the proposed injunctive relief, I assume that each year an additional four percentage points of da Vinci 5 cases will involve force feedback EndoWrists.

35. Intuitive does not report the mix of X/Xi EndoWrists and force feedback EndoWrists used with the da Vinci 5. I therefore assume that *any* procedure using force feedback EndoWrists will use *only* force feedback EndoWrists and will not use any X/Xi-compatible EndoWrists. That assumption ensures that I am not understating the impact of force feedback EndoWrists in a way that overstates the value of the proposed injunctive relief.

36. However, there are only a limited number of force feedback EndoWrist models (6) compared to X/Xi-compatible EndoWrist models (25). It is therefore almost certainly true that some procedures using force feedback EndoWrists also use X/Xi-compatible EndoWrists. My assumption about force feedback EndoWrists therefore generates some amount of under-valuation of the proposed injunctive relief. In economic parlance, this is therefore a "conservative" assumption.

37. The projected growth trend of force feedback EndoWrist usage is shown in **Table 4** below.

---

[45] Intuitive, *Da Vinci 5 has Force Feedback Technology*, https://www.intuitive.com/en-us/about-us/newsroom/force-feedback.

[46] Settlement Agreement at ¶ 1(m) ("'Eligible EndoWrists' means S/Si and X/Xi models of Intuitive EndoWrist instruments purchased by customers. Eligible EndoWrists include those X/Xi EndoWrists capable of being used on the da Vinci 5.").

[47] Benzinga Insights, *Intuitive Surgical Q3 2026 Earnings Call Transcript*, October 20, 2026, https://www.benzinga.com/news/26/10/62484475/intuitive-surgical-q3-2026-earnings-call-transcript.

| **Table 4: Projected Share of da Vinci 5 Procedures Involving Force Feedback Instruments Based on Historical Growth**[48] | |
|---|---|
| **Year** | **Share of da Vinci 5 Procedures** |
| 2027 | 12% |
| 2028 | 16% |
| 2029 | 20% |
| 2030 | 24% |
| 2031 | 28% |
| 2032 | 32% |

### *D. IRCs Have Obtained 510(k) Clearance for Some EndoWrists*

38. Multiple IRCs have obtained 510(k) clearances for remanufactured EndoWrists, as summarized in **Table 5** below.

[48] Source: Benzinga Insights, *Intuitive Surgical Q3 2026 Earnings Call Transcript*, October 20, 2026, https://www.benzinga.com/news/26/10/62484475/intuitive-surgical-q3-2026-earnings-call-transcript.

| Table 5: 510(k) Clearances for EndoWrists[49] | | | | |
|---|---|---|---|---|
| **EndoWrist** | **Part Num.** | **Robot** | **IRC** | **510(k) Num.** |
| 8mm Monopolar Curved Scissors | | S, Si | Iconocare Health (a subsidiary of Restore Robotics[50]) | K210478 |
| ProGrasp Forceps | 420093 | S, Si | Rebotix | K241872 |
| Monopolar Curved Scissors | 470179 | X, Xi | Iconocare Health | K242610 |
| Cobra Grasper | 420190 | S, Si | Rebotix | K250417 |
| Long Tip Forceps | 420048 | S, Si | Rebotix | K250387 |
| Cadiere Forceps | 420049 | S, Si | Rebotix | K250399 |
| Tenaculum Forceps | 420207 | S, Si | Rebotix | K250539 |
| Permanent Cautery Hook | 470183 | X, Xi | Restore Robotics | K252926 |
| Permanent Cautery Spatula | 470184 | X, Xi | Restore Robotics | K252926 |

39. According to Rocuvex Medical, "a trusted regional distributor working under Restore Robotics and Encore Medical Device Repair," Restore Robotics' remanufactured EndoWrists are available to hospitals at a "20-25% savings" relative to Intuitive's prices for equivalent new EndoWrists.[51]

40. Encore, which "has exclusive rights to sell [Restore Robotics'] remanufactured Da Vinci Xi Monopolar Scissors,"[52] offers the three remanufactured X/Xi EndoWrists at a 20% discount relative to Intuitive's price for the equivalent new EndoWrist.[53]

41. By removing barriers to competition, the proposed injunctive relief will encourage entry and further competition among IRCs, resulting in even greater discounting. As noted in my Class Report, "Rebotix advertised that its list price for

---

[49] Source: Intuitive, *Da Vinci Instruments*, https://www.intuitive.com/en-us/products-and-services/da-vinci/instruments.

[50] Restore Robotics, *Restore Robotics Seeks FDA 510(k) Clearance for Remanufacturing Da Vinci Xi® 8mm Monopolar Curved Scissors*, October 8, 2024, https://www.restorerobotics.com/press ("Restore Robotics, a leader in surgical robotics innovation, today announced that its subsidiary, Iconocare Health, submitted an additional 510(k) application[.]").

[51] Rocuvex Medical, *Reduce the Cost of Robotic Surgery*, https://rocuvexmed.com/.

[52] Encore Medical Device Repair, *Remanufactured Robotic Instruments*, https://encoremdr.com/remanufactured-robotic-instruments/.

[53] Encore-Restore EndoWrist price list; Intuitive USD Pricing5.1.2026.

EndoWrist repair was, on average, a 45% discount relative to the list price of a new EndoWrist."[54]

42. Restore Robotics has announced that "more than 300 hospitals and surgery centers across the United States have joined its growing recycling and remanufacturing program for da Vinci Xi® robotic surgical instruments."[55] It is reported that there are more than 2,000 hospitals with a da Vinci robot,[56] implying as much as 15% of hospitals are using remanufactured EndoWrists.[57]

43. To date, IRCs have made commercially available remanufactured versions of only three of the 25 X/Xi EndoWrists. The new versions of those three EndoWrists accounted for [redacted] of Intuitive's X/Xi EndoWrist revenue in 2023.[58] This suggests that the share of remanufacturing from among all EndoWrist sales is likely far below 15%.[59]

44. Based on IRCs' current advertised prices and implied shares of the EndoWrist market, competition from IRCs has likely produced overall savings of around 1% of total EndoWrist revenues.[60] To ensure that I do not overstate the value of the proposed injunctive relief by crediting the injunctive relief for competition that likely would have emerged anyway, I conservatively assume that IRC growth would have continued at approximately the same pace in the absence of the Settlement Agreement.

45. Given that the X/Xi 510(k) clearances were granted in March 2025 and March 2026, this corresponds to a competition-generated overall EndoWrist price reduction of approximately 1% in the first year of competition from remanufactured

---

[54] Elhauge Class Report ¶ 250, citing to Papit (Sales, Marketing, and Customer Relationships at Benjamin Biomedical; taken in *Rebotix*) 30(b)(6) Dep. at 179:10-16.
[55] Restore Robotics, *Restore Robotics Surpasses 300 Hospitals in Robotic Instrument Recycling and Remanufacturing Program*, October 14, 2025, https://www.prnewswire.com/news-releases/restore-robotics-surpasses-300-hospitals-in-robotic-instrument-recycling-and-remanufacturing-program-302583572.html.
[56] iData Research, https://idataresearch.com/hospital-adoption-of-surgical-robotics-in-2025/.
[57] 15% = 300 / 2,000.
[58] Elhauge Class Rebuttal Report workpaper "IS28 Damages Estimation v26 (only 2023)."
[59] Furthermore, for there to be a remanufactured EndoWrist, there must at some point be a predicate new EndoWrist. This puts a ceiling on the remanufactured EndoWrist share that depends on the number of cycles of remanufacturing that the device can dependably support and that are allowed under the 510(k) clearance.
[60] For example, (15% share of hospitals) x ([redacted] of EndoWrist revenue as of 2023 is attributable to the three EndoWrists being remanufactured) x (20% savings) = 1% overall savings.

EndoWrists.[61] If this trend continued, it would result in an average competition-generated EndoWrist price reduction of approximately 4% during the five-year relief period.[62]

### *E. Elimination of Certain X/Xi EndoWrist Product Numbers*

46. My damages analysis calculated overcharges on 36 different X/Xi EndoWrist product numbers.[63] This includes the ten-use-limit EndoWrists and the extended-use EndoWrists. By 2026, Intuitive had eliminated the overlap in ten-use and extended-use EndoWrist types. Where there is an extended-use version, Intuitive no longer offers the ten-use version. As such, there are only 25 different product numbers for the period 2027-2032.

47. This is relevant because Intuitive's actual and potential rivals can efficiently address all, or almost all, of the demand for each of the overlapping EndoWrists by obtaining clearance or authorization for just the extended use versions of those instruments. Therefore, a potential entrant would have fewer products needing clearance or authorization for it to compete across the full spectrum of X/Xi EndoWrists.

### *F. Intuitive Announces Future EndoWrist Use Limit Increases*

48. On May 21, 2026, Intuitive announced, "In 2027, we anticipate that the number of uses on certain core instruments will again increase, reducing per-procedure costs for da Vinci surgery[.]"[64] However, Intuitive did not at that time provide any further details as to which instruments will be affected, how much their use limits will be raised, and the specific timing of any potential use limit increase.

49. Intuitive provided additional details in its October 20, 2026 earnings call. At that time, Intuitive indicated that the use limit increases were part of an "in process" 510(k) clearance application and that, when combined with a "significant"

---

[61] FDA, *Letter Re: K242610*, March 11, 2025 (clearance for X/Xi monopolar curved scissors on March 11, 2025); FDA, *Letter Re: K252926*, March 26, 2026 (clearance for X/Xi permanent cautery hook and permanent cautery spatula on March 26, 2026).
[62] Based on linear growth of one percentage point per year, the first year of relief would be approximately 2% and the last year of relief would be approximately 6%, for an average of 4%.
[63] Elhauge Class Rebuttal Report Exhibit D.
[64] Intuitive, *Intuitive Announces Innovations to Advance Quintuple Aim*, May 21, 2026, https://isrg.intuitive.com/node/23136/pdf.

reduction in Intuitive's prices in China, they will lower "revenue per procedure by approximately 3% to 5%."[65]

50. Much remains unclear. For example, no further details were given as to how much of the price reduction will be specific to the Chinese market and how much will be relevant to the U.S. market. Because of the uncertainty surrounding the ultimate competitive effects of Intuitive's planned use limit increases, I have not modeled them in my calculations.

## V. Value of Injunctive Relief on EndoWrists and da Vinci Service

51. I have been asked to calculate the value of the proposed injunctive relief, assuming an effective date for the Settlement Agreement of April 1, 2027.[66] The value of the proposed injunctive relief is generated by the way it will open the markets for EndoWrists and for da Vinci service to much more extensive competition from Intuitive's actual and potential rivals.

52. Opening these markets to competition will provide benefits including (1) lower prices, (2) higher use limits (which effectively lower per-use prices), (3) greater buyer choice, (4) greater innovation, and (5) lower environmental costs.[67]

53. As described in my earlier Reports, there are no countervailing benefits from the challenged conduct that would be eliminated by the injunctive relief.[68] As described in my earlier Reports as well, Intuitive's pricing history indicates that Intuitive would not raise robot prices or other product prices if the proposed injunctive relief eliminated the challenged conduct.[69]

54. Many of the benefits of injunctive relief—such as greater buyer choice and greater innovation—are difficult to quantify in dollar terms. My analysis focuses on the benefits included in my earlier damages calculations: lower prices due to

[65] Benzinga Insights, *Intuitive Surgical Q3 2026 Earnings Call Transcript*, October 20, 2026, https://www.benzinga.com/news/26/10/62484475/intuitive-surgical-q3-2026-earnings-call-transcript.
[66] The five years covered by the Settlement Agreement therefore run from Q2 2027 through Q1 2032.
[67] Elhauge Class Report § VI.A.
[68] Elhauge Class Report § VI.F; Elhauge Class Rebuttal Report § II.
[69] Elhauge Class Report §§ VI.E, VII.F.

direct price cuts as well as higher use limits, which lower per-use prices. Therefore, my conclusions below understate the full value of the proposed injunctive relief.

### *A. Starting Point: My Classwide Damages Calculations*

55. I use my classwide overcharge methodology as my starting point.[70] My damages calculations take annual revenues by EndoWrist and/or da Vinci model and then apply a relevant overcharge percentage to calculate overcharges. Total overcharges are then calculated by summing up the designated products and services for the relevant period.

56. I addressed the question of future damages in my Class Report by projecting them from damages incurred during 2021, the last full year of available data at that time:

> "Assuming Intuitive's volume of sales remains the same or higher, this implies that as long as the anticompetitive restraints continue, the proposed class will continue to suffer at least $487 million in harm annually" consisting of "$59 million from da Vinci servicing and $428 million for EndoWrists[.]"[71]

57. Intuitive produced additional transaction data through 2023, which I incorporated into my damages calculations for my Class Rebuttal Report.[72] My Class Rebuttal Report Table 9A reports "Per-Year Classwide and Named Plaintiff Damages After 2023 (Extrapolated from Damages During 2023)" of annual EndoWrist damages of $207.6 million to $497.6 million and annual da Vinci service damages of $71.1 million.

### *B. Necessary Adjustments to Use My Historical Damages Calculations to Predict the Value of Injunctive Relief*

58. I modify my classwide damages methodology to the extent necessary to calculate the expected future savings from the injunctive relief. My methodology proceeds in **six** steps.

---

[70] Elhauge Class Report § VII.
[71] Elhauge Class Report ¶ 843.
[72] *See* updated tables in Elhauge Class Rebuttal Report Appendix B, which are damages "Through 2023[.]"

59. **First**, I start with X/Xi revenue by EndoWrist for the last full year of available data: 2023.[73] I rely on intermediate output from programs that were produced as part of the backup to my Class Rebuttal Report: "IS28 Damages Estimation v26 (only 2023)" and "IS52 Overcharges for Service v13 (only 2023)."[74] This excludes S/Si EndoWrists and service, so the total revenue for 2023 is $1.614 billion ($0.585 billion from da Vinci X/Xi servicing and $1.029 billion from X/Xi EndoWrists).[75]

60. **Second**, I project the historical revenue forward based on the recent historical growth in da Vinci usage. For EndoWrists, I rely on the growth rate in procedures because EndoWrist usage is driven by the number of procedures. For da Vinci service, I rely on the growth rate in installed base because service is linked to the number of robots. See **Table 6** below.

| **Table 6: Projected Growth Rates for EndoWrist and da Vinci Service Revenue [76]** | | | |
|---|---|---|---|
| **Year** | **EndoWrist Growth Rate** | **da Vinci Service Growth Rate** | **Basis** |
| 2024 | 15% | 14% | Actual rate 2023-2024 |
| 2025 | 15% | 10% | Actual rate 2024-2025 |
| 2026 | 15% | 11% | Average rate 2016-2025 |
| 2027 | 15% | 11% | Average rate 2016-2025 |
| 2028 | 15% | 11% | Average rate 2016-2025 |
| 2029 | 15% | 11% | Average rate 2016-2025 |
| 2030 | 15% | 11% | Average rate 2016-2025 |
| 2031 | 15% | 11% | Average rate 2016-2025 |
| 2032 | 15% | 11% | Average rate 2016-2025 |

[73] *See* updated tables in Elhauge Class Rebuttal Report Appendix B, which are damages "Through 2023[.]"
[74] Elhauge Class Rebuttal Report, nn. 442-443, 444-445, 463-464, 466-469.
[75] Elhauge Class Rebuttal Report workpaper "IS28 Damages Estimation v26 (only 2023)", tab *Sheet2*; Elhauge Class Rebuttal Report workpaper "IS52 Overcharges for Service v13 (only 2023)", tab *Sheet1 2023*. These EndoWrists are a subset of the larger category of Instruments & Accessories reported in Table 1 above.
[76] Source: **Table 1** above. EndoWrist rate of growth based on rate of growth in procedures. Service rate of growth based on rate of growth in installed base.

61. **Third**, I adjust downward the total revenue based on the transition in use from the da Vinci X/Xi to the da Vinci 5. Because X/Xi instruments are compatible with and used on the da Vinci 5, the adjustment will account for the switch to the da Vinci 5 combined with the switch from using X/Xi instruments to using the force feedback instruments specific to the da Vinci 5 and not covered by the proposed Settlement Agreement:

a) I assume straight-line growth of the da Vinci 5 share through 2030 based on **Table 3**. I then adjust based on the experience of the previous generation of da Vinci, the X/Xi, when it was introduced. The Xi was commercialized in 2014 and seven years later, in 2021, the prior-generation Si still had a 16% share of the installed base.[77] I therefore assume the da Vinci 5 share will be 84% in 2031. I then assume a linear increase in da Vinci 5 share to 100% in 2033, which implies that half the remaining X/Xi share goes to da Vinci 5 in 2032.

b) For the share of da Vinci 5 procedures using force feedback EndoWrists, I continue the growth pattern seen through 2026 as displayed in **Table 4** above.

62. As shown in **Table 7** below, this analysis combines the growth in the da Vinci 5 share of the installed base along with the growth in share of da Vinci 5 procedures utilizing at least one force feedback EndoWrist.

[77] Intuitive 2020 10-K, p. 52; Intuitive-00702284.

| **Table 7: Projected Share of EndoWrist Revenue That Is Not From X/Xi-EndoWrists[78]** | | | |
|---|---|---|---|
| **Year** | **da Vinci 5 share of installed base** | **Share of da Vinci 5 procedures using force feedback** | **Share of EndoWrist revenues conservatively not attributed to X/Xi-compatible EndoWrists** |
| *[a]* | *[b]* | *[c]* | *[d]=[b]*[c]* |
| 2027 | 38.9% | 12.0% | 4.7% |
| 2028 | 51.3% | 16.0% | 8.2% |
| 2029 | 63.7% | 20.0% | 12.7% |
| 2030 | 76.1% | 24.0% | 18.3% |
| 2031 | 84.0% | 28.0% | 23.5% |
| 2032 | 92.0% | 32.0% | 29.4% |

63. It is necessary to perform separate adjustments for EndoWrists and da Vinci service because their situations are different from one another. X/Xi EndoWrists benefit from injunctive relief when used on either the da Vinci X/Xi or the da Vinci 5, but da Vinci 5 service is not directly subject to injunctive relief.[79]

64. Because X/Xi instruments are compatible with and used on the da Vinci 5, the adjustment will account for the switch to the da Vinci 5 combined with the switch from using X/Xi instruments to using the force feedback instruments specific to the da Vinci 5. See **column *[d]*** in **Table 7** above.

65. For da Vinci service, the downward adjustment is made based on the projected share of installed base that is da Vinci 5. See **column *[b]*** in **Table 7** above. Although the possibility of da Vinci 5 third-party service and/or self-service by hospitals will likely be greater as a result of the service authorization program Intuitive develops for the X/Xi robots, I assign zero savings for da Vinci 5 service so as to be conservative and not overstate the value of the proposed settlement's injunctive relief.

[78] Source: **Tables 3 and 4** above. I calculate the da Vinci 5 share of installed base in 2026 as the average of the Q2 and Q3 values (26.5%). Each subsequent year is assumed to be 12.4 percentage points higher based on the growth rate described in Section IV.C above.
[79] Settlement Agreement at ¶ 6(e) (addressing "preventative maintenance and field-based repairs for da Vinci X/Xi robots" but not da Vinci 5 robots).

66. **Fourth**, I apply a phasing-in of savings. Given the built-in limits of the da Vinci service pilot program, the phasing-in will occur on different timelines for EndoWrists and da Vinci service.

67. For the EndoWrist injunctive relief phase-in, I assume a two-year phase-in process. This phase-in process has 33% relief in the first year, 67% relief in the second year, and then 100% relief in years three through five. See **Figure 1** below.




68. A two-year period reflects the time it would take to obtain authorization from Intuitive and/or 510(k) clearance from the FDA,[80] achieve IRC market

[80] For example, in the case of the three X/Xi EndoWrists that already obtained clearance, the FDA review process took 189 days to review 470179, and 192 days to review 470183 and 470184 (both were part of the same application). https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm?ID=K242610; https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm?ID=K252926. It is my opinion that the experience IRCs have gained with the 510(k) process, the EndoWrist technical

penetration, and elicit a competitive response from Intuitive. Intuitive internally had modeled penetration of 11% in just the first year, indicating rapid penetration.[81]

69. Furthermore, hospitals and other healthcare providers will presumably be less reluctant to use remanufactured or refurbished EndoWrists once the language in their contracts with Intuitive is modified by Paragraph 6(a) of the proposed Settlement Agreement. This is because hospitals will then be able to rely on the language in their contracts and/or a court-ordered injunction, rather than the readily changeable language of a website controlled by Intuitive. Moreover, Settlement Agreement Paragraph 6(b) provides another pathway—Intuitive's own authorization—that does not require 510(k) clearance so long as the same hospital maintains ownership of the EndoWrist and other conditions are met. In addition to offering a potentially quicker path to market, that option will likely smooth the path to 510(k) clearance should an IRC later seek it.

70. 510(k) clearance also provides at least two further benefits. First, it allows for resale rather than requiring (as Intuitive's authorization does) that hospitals retain ownership of any EndoWrists that will be refurbished.[82] Second, it gives IRCs a binding right to continue to compete without the risk of it being treated like a breach of contract or triggering the cessation of Intuitive contracts on service or other business by incorporating Intuitive's current website language into a binding obligation under the Settlement Agreement.[83]

71. <u>For da Vinci service injunctive relief phase-in</u>, the Settlement Agreement describes a pilot program launching in Q1 2028 and taking one-and-a-half to two years.[84] I therefore model the pilot program as lasting until the end of 2029. It is unclear how many hospitals will participate in this pilot program, and I

---

specifications Intuitive will provide as part of its Third Party Compatibility Program, and the experience of going through that process itself all provide reasons to anticipate future 510(k) proceedings may go quicker than prior ones.

[81] Elhauge Class Report ¶ 633, citing to Intuitive-00104952.

[82] Settlement Agreement ¶ 6(b) ("…an authorization process for the refurbishment and use-counter reset of Eligible EndoWrists continuously owned by their original purchaser").

[83] Intuitive, *Da Vinci Instruments*, https://www.intuitive.com/en-us/products-and-services/da-vinci/instruments. *See also*, Elhauge Class Rebuttal Report ¶ 123, citing to Hughes Class Report ¶¶ 107-109 and Smith Merits Report ¶ 246. Settlement Agreement ¶ 6(a) ("Consistent with the language currently on Intuitive's website . . . Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.").

[84] Settlement Agreement ¶ 6(e).

conservatively assign no value to that time period. Following the conclusion of the pilot program, I assume it will take one year for a full phase-in of the price effect of servicing. See **Figure 2** below.

Figure 2: Phasing in of da Vinci Service Injunctive Relief by Calendar Year




72. With Intuitive's ramp-up to implementing the pilot program in Q1 2028 plus the one-and-a-half to two-year pilot program, the full pilot process will take more than two years of the injunctive relief period. IRCs and hospitals will have ample time to become aware of the progress of the pilot program and be prepared to begin performing service at a discount relative to Intuitive's pricing.

73. Furthermore, absent any restraints by Intuitive, entry and expansion of IRC and in-house hospital servicing will likely be more rapid than we have observed with EndoWrists for at least two reasons. First, there is no contention that 510(k) clearance is needed to maintain or repair robots.[85] Second, many hospitals already

[85] Elhauge Class Report ¶ 256.

self-supply maintenance and repair services for at least some of their other surgical equipment.[86]

74. **Fifth**, I calculate the total savings for EndoWrists and for da Vinci service.

a) For EndoWrists, I consider two savings percentages. First, the lower-bound 20% price reduction. Second, the average of the three EndoWrist scenarios I relied upon, which comes to a 34% savings.[87] Both of these are offset against a projected growing rate of IRC market penetration and thus EndoWrist savings absent the Settlement Agreement. This projection averages 4% savings over the injunctive relief period and results in net savings attributable to the proposed Settlement Agreement's injunctive relief provisions of 16% and 30%.[88]

b) For da Vinci servicing, I consider a single savings percentage: 41%. This is an average of the 12% savings I projected as a conservative measure of the discount Intuitive would have given absent the challenged conduct,[89] the lower end of the [redacted] savings offered by IRC Restore,[90] and the 50% expected savings described by Plaintiff Franciscan Alliance's Karen Waninger.[91,92] There is no current competition for da Vinci servicing to offset against these savings.

---

[86] Elhauge Class Report ¶ 553. *See also*, Deposition of Karen Waninger (Franciscan), October 6, 2022 ("Waninger (Franciscan) Dep.") at 61:1-18, 78:23-79:23 (discussing in-house service of medical devices by hospitals).

[87] *See* Section III above. 34% is the average of 20%, 35%, and 48% savings.

[88] *See* Section IV.D above.

[89] Elhauge Class Report ¶¶ 824, 828. *See also*, *id*. at ¶ 672 ("The average profit margin of medical equipment repair and maintenance services, accounting for just wages and purchasing, was 43%. Intuitive's average contribution margin for da Vinci service was [redacted], which is [redacted][.]" (citations omitted)).

[90] Elhauge Class Report ¶ 669 (Restore offering an hourly rate of [redacted], which was [redacted] than Intuitive's rate of [redacted]; Restore bidding [redacted]—or [redacted]—than the [redacted] charged by Intuitive). *See also*, *id*. at ¶ 824 ("Clif Parker of Restore testified, 'We felt that we could get 50 to 60 percent of the – the customers to use us for some form of da Vinci service on the robot.'" Citing to Parker (CEO at Restore Robotics; taken in *In re da Vinci*) Dep. at 166:4-16).

[91] Waninger (Franciscan) Dep. at 78:20-79:23 (indicating their in-house benchmark was that service costs each year were 4% of initial purchase price versus Intuitive charging 8%).

[92] [redacted].

75. **Sixth**, I calculate the NPV of these savings. I use as a discount rate the weighted average cost of capital (WACC) for Intuitive. A discount rate based on Intuitive's capital cost is appropriate because it reflects the uncertainty regarding Intuitive's cashflow—i.e., the underlying revenues on which savings are being calculated.

76. I calculate this using the widely accepted Capital Asset Pricing Model ("CAPM model").[93] The CAPM model uses the formula Ri = Rf + β x ERP.[94] These are:

a) Ri = cost of equity capital.

b) Rf = the Risk-free rate. The yield on 20-year constant maturity treasuries was 5.44% as of November 18, 2026, the latest date prior to finalizing this declaration.[95]

c) β = beta, a measure of the systematic risk of the asset. I use a value of 1.44, as reported by Yahoo Finance.[96]

d) ERP = Equity Risk Premium. Kroll, formerly Duff & Phelps, reports a current U.S. ERP of 5.0%.[97]

---

[93] *See, e.g.*, Federal Judicial Center, *Reference Guide on Estimation of Economic Damages*, 3e, p. 459 ("A common approach for determining the interest on lost business profits is to use the Capital Asset Pricing Model (CAPM) to calculate the risk-adjusted discount rate. The CAPM is the standard method in financial economics to analyze the relationship between risk and discounting."). *See also*, JONATHAN B. BERK AND PETER M. DEMARZO, CORPORATE FINANCE (Boston: Pearson, 2017), pp. 347-348.

[94] BERK AND DEMARZO, CORPORATE FINANCE, pp. 347-8 (written as Ri = Rf + βi x E(Rm – Rf), where E(Rm – Rf) is the equity risk premium.

[95] Federal Reserve Bank of St. Louis, *Market Yield on U.S. Treasury Securities at 20-Year Constant Maturity, Quoted on an Investment Basis (DGS20)*, updated November 19, 2026, https://fred.stlouisfed.org/series/DGS20. Kroll, *Kroll Cost of Capital Recommendations Updated to Use Spot Risk-Free Rates*, September 10, 2026, https://edge.sitecorecloud.io/krollllc17bf0-kroll6fee-proda464-0e9b/media/cost-of-capital/kroll-cost-of-capital-recommendations-updated-to-use-spot-risk-free-rates-september-2026.pdf ("We recommend using the spot 20-year U.S. Treasury yield as the proxy for the risk-free rate" for the U.S.); BERK AND DEMARZO, CORPORATE FINANCE, pp. 411-412.

[96] https://finance.yahoo.com/quote/ISRG/ ("Beta (5Y Monthly) 1.44"). A beta of 1.44 means the stock tends to move 1.44% for every 1% move in the stock market. BERK AND DEMARZO, CORPORATE FINANCE, p. 343.

[97] Kroll, *Kroll Cost of Capital Recommendations Updated to*

77. Using these inputs, CAPM = Rf + β x ERP = 5.44% + 1.44 x 5.0% = 12.6%. Intuitive has minimal debt,[98] so its WACC is equal to its cost of equity.[99] The discount rate for calculating the NPV of the savings of EndoWrist and da Vinci service revenue is therefore 12.6%.

78. A higher discount rate results in a lower NPV. Therefore, the discount rate I use is conservative relative to the discount rate Intuitive has used internally when evaluating EndoWrist and da Vinci service revenue of [redacted].[100]

### *C. The Total Estimated Value of Injunctive Relief*

79. The combined effect of the injunctive relief covering EndoWrists and da Vinci servicing is summarized in **Table 8** below. A detailed calculation that breaks out the savings by year can be found in **Appendices A** and **B**.

---

*Use Spot Risk-Free Rates*, September 10, 2026, https://edge.sitecorecloud.io/krollllc17bf0-kroll6fee-proda464-0e9b/media/cost-of-capital/kroll-cost-of-capital-recommendations-updated-to-use-spot-risk-free-rates-september-2026.pdf. Kroll, *Duff & Phelps Announces Plan to Unify Company Under Kroll Brand*, February 24, 2021, https://www.kroll.com/en/newsroom/duff-and-phelps-unifies-under-kroll-brand.

[98] *See, e.g.*, Intuitive 2025 10-K, p. 89. Google Finance reports Intuitive as having no long-term debt. https://www.google.com/finance/quote/ISRG:NASDAQ?tab=financials.

[99] The vast majority of Intuitive's revenues are from da Vinci-related business, so it is not necessary to apply a further adjustment to isolate the discount rate for EndoWrists and da Vinci service from Intuitive's other lines of business, such as the Ion.

[100] Intuitive-00334582 at 592 ([redacted]); Intuitive-00333576 at 600 ([redacted]). *See also*, Intuitive-00389301 at 406 ([redacted]). Analyst reports calculated a WACC of 8-10% for Intuitive at that time. Intuitive-00321483 at 493 (Morgan Stanley, May 23, 2019: 8% WACC); Intuitive-00321435 at 449 (Raymond James, May 24, 2019: 10% discount rate for the Ion); Intuitive-00320280 at 290 (Morgan Stanley, April 9, 2019: 10% WACC); Intuitive-00422361 at 363 (RBC Capital Markets, April 19, 2019: 9% WACC).

| Table 8: NPV of Total Savings from Injunctive Relief[101] | |
|---|---|
| **Product/Service** | **2027 Q2 – 2032 Q1 Total** |
| X/Xi-compatible EndoWrists (at net 30% savings) | $ 1,826,997,754 |
| X/Xi-compatible EndoWrists (at net 16% savings) | $ 956,652,948 |
| X/Xi Service (at 41% savings) | $ 99,258,084 |
| Total | $1,055,911,032 – $1,926,255,838 |

### *D. The Estimated Total Value of Injunctive Relief is Conservative*

80. The above calculations are conservative for at least **four** reasons.

81. **First**, [redacted]. The average savings offered by rival robot manufacturers in 2022 was [redacted] used in my calculation. See **Table 9** below.

| Table 9: da Vinci X/Xi Service Cost Relative to Other Surgical Robot Manufacturers[102] | | |
|---|---|---|
| **Manufacturer** | **Annual Service Cost** | **Savings Relative to Intuitive** |
| Intuitive | [redacted] | [redacted] |
| Medtronic | [redacted] | [redacted] |
| J&J | [redacted] | [redacted] |
| Avatera | [redacted] | [redacted] |
| CMR | [redacted] | [redacted] |
| **Average** | [redacted] | [redacted] |

82. **Second**, as to EndoWrist pricing, Intuitive was concerned that competition from IRCs could push Intuitive "into a commodity position[.]"[103]

[101] Source: **Tables A6** and **B6** below.
[102] Source: Elhauge Class Report ¶ 670, citing to Intuitive-00751403-440 at 424.
[103] *See, e.g.*, Elhauge Class Report ¶ 615.

Commodity pricing would be far lower than the 20% to 34% discount calculated above. This is because Intuitive's contribution margin on EndoWrists is at least [redacted], which implies its prices are [redacted] above the normal range for a "reasonably" competitive market, as described in my Class Report.[104] Reducing the contribution margin to the normal range for a reasonably competitive market would therefore imply a [redacted] discount,[105] rather than the 20% to 34% modeled above.

83. In terms of use limits, class counsel's engineering expert Dr. T. Kim Parnell indicates that Intuitive's use limits were set by marketing personnel, and Intuitive did not test to see the highest limit that could reliably be set.[106] The use limits could potentially have been increased by a factor of four, resulting in up to a 75% effective discount rather than the 20% to 34% discount modeled above:

> Glenn Papit of Rebotix testified, "We have validated testing up to 29 times. We have not done past 20 [i.e., two resets] in our brief presence in the marketplace due to interference [from Intuitive] that precedes this discussion," but that might "mean 29 times in addition to the original 10," which would come to 39 total uses.[107]

84. **Third**, I conservatively exclude all EndoWrists used in procedures involving the da Vinci 5 robot in which any force feedback EndoWrists are used. Only a subset of EndoWrists have a force feedback version, so it is likely that this understates the number of X/Xi EndoWrists being used with da Vinci 5 procedures.

85. **Fourth**, I conservatively cut off the benefits at the end of the five-year injunctive relief period. To the extent that there are additional 510(k) clearances

---

[104] Elhauge Class Report ¶ 346. Marshall Mohr, former CFO of Intuitive, testified that Intuitive's "[c]ontribution margin incorporates direct labor, direct material, and…a few other costs" which "are things that only occur if there is a sale." M. Mohr (in *In re: da Vinci*) Dep. at 33:22-34:5, cited at Elhauge Class Report n. 424.

[105] If prices are [redacted] above the reasonably competitive range—a benchmark that is likely higher than where a commodity product will be priced—they are [redacted] of that competitive range. Reducing them to [redacted] of the reasonably competitive range implies an [redacted] reduction. Similarly, if prices are [redacted] above the reasonably competitive range, there will be a [redacted] reduction required to reduce them to the competitive range.

[106] Parnell Merits Rebuttal Report ¶¶ 26, 29, 147, 215, 250-261. Cited at Elhauge Class Report ¶ 652.

[107] Elhauge Class Report ¶ 667, citing to Papit (Sales, Marketing, and Customer Relationships at Benjamin Biomedical; taken in *Rebotix*) 30(b)(6) Dep. at 74:15-75:8.

granted by the FDA, these will not disappear at the end of five years and will allow some limited competition under Intuitive's current pre-Settlement-Agreement website language.[108] Likewise, IRCs and hospitals themselves providing da Vinci service at the end of the injunctive relief period will possess customer relationships and knowledge of repair and service methods past the end of the five-year period, as well as perhaps active service licenses from Intuitive.

86. Furthermore, given that there will be hospitals and IRCs providing da Vinci service at the end of the injunctive relief period, such provision will be the "default" or "anchor" situation for many or most customers. This will create inertia in favor of continued competition following the injunctive relief period rather than against such competition, as it has up to this point. The same is true with respect to Intuitive's EndoWrist refurbishment and use-counter reset authorization program.

## VI. Conclusion

87. I have used my prior damages methodology—which I understand this Court found to be reliable—as the baseline from which to value the injunctive relief in the proposed Settlement Agreement. I conclude its net present value, assuming an effective date of April 1, 2027, falls in the range of $1,055,911,032 to $1,926,255,838.

88. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Einer R. Elhauge

[108] *Supra* Section IV.D (indicating some level of current competition from 510(k) cleared EndoWrists even without the Settlement Agreement); ¶ 70 (indicating that Intuitive currently allows some level of competition from 510(k) cleared EndoWrists); Settlement Agreement ¶ 6(a).

# EXHIBIT A

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, MA 02138**

**Tel: (617) 496-0860** **Hauser Hall 502**
**Fax: (617) 496-0861** **elhauge@law.harvard.edu**

## EMPLOYMENT

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications & Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, 2010 Jerry S. Cohen Memorial Fund Writing Award, for "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory"

Recipient, Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards, for "Robust Exclusion and Market Division Through Loyalty Discounts"

Recipient, 2016, Award for being one of the top 10 corporate and securities articles of the year,

for "Horizontal Shareholding"

Recipient, 2017 Jerry S. Cohen Memorial Fund Writing Award, for "Horizontal Shareholding"

Recipient, 2017, Society of Investment Law Prize for best investment law scholarship, for "Horizontal Shareholding"

Recipient, 2022 Jerry S. Cohen Memorial Fund Writing Award, for Best Antitrust Article on Common Ownership for "The Causal Mechanisms of Horizontal Shareholding"

Books

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (4th ed. 2022) (Foundation Press: 3d ed. 2018; 2d ed. 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2007).

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (Edward Elgar Publishing Ltd. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com.

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2D ED. HART PUBLISHING 2011; 1ST ED. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

Academic Articles

Brito, Elhauge, Ribeiro, and Vasconcelos, *Modeling the Objective Function of Managers in the Presence of Overlapping Shareholding,* INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 87 (2023) 102905, https://doi.org/10.1016/j.ijindorg.2022.102905.

Elhauge, *Should the Competitive Process Test Replace the Consumer Welfare Standard?*, PROMARKET (May 24, 2022), https://www.promarket.org/2022/05/24/should-the-competitive-process-test-replace-the-consumer-welfare-standard/.

Elhauge, *The Inevitability and Desirability of the Corporate Discretion to Advance Stakeholder Interests*, 106 CORNELL LAW REVIEW (2021).

Elhauge, *The Causal Mechanisms of Horizontal Shareholding*, 82 OHIO STATE L.J. 1 (2021)

Einer Elhauge, Sumit K. Majumdar & Martin C. Schmalz, *Confronting Horizontal Ownership Concentration*, 66 Antitrust Bull. 3 (2021).

Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It,* 10 HARVARD BUSINESS LAW REVIEW 207 (2020).

Elhauge, *New Evidence, Proofs, and Legal Theories on Horizontal Shareholding* (Jan. 11, 2018), https://ssrn.com/abstract=3096812.

Elhauge, *The Growing Problem of Horizontal Shareholding,* 3 ANTITRUST CHRONICLE 1 (June 2017).

Elhauge & Nalebuff, *The Welfare Effects of Metering Ties,* 33 JOURNAL OF LAW, ECONOMICS & ORGANIZATION 68 (2017).

Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail,* 83 U. CHICAGO LAW REVIEW 503 (2016).

Elhauge, *Horizontal Shareholding*, 129 HARVARD LAW REVIEW 1267 (2016) (Awarded the Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article, the Society of Investment Law Prize for best investment law scholarship, and an Award for being one of top ten corporate and securities articles of the year).

Elhauge, *Rehabilitating Jefferson Parish: Why Ties Without a Substantial Foreclosure Share Should Not Be Per Se Legal*, 80 ANTITRUST LAW JOURNAL 463 (2016).

McGuire, Drake, Elhauge, Hartman & Starr, *Resolving Reverse-Payment Settlements With The*

*Smoking Gun Of Stock Price Movements*, 101 IOWA L. REV. 1581 (2016).

Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts,* 43 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 111 (2015) (Awarded Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards).

Elhauge*, How* Italian Colors *Guts Private Antitrust Enforcement by Replacing It With Ineffective Forms Of Arbitration,* 38 FORDHAM INT'L LAW JOURNAL 771 (2015).

Elhauge, *Obamacare and the Theory of the Firm,* in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., U. Chicago Press 2015).

Elhauge, *Treating RAND Commitments Neutrally,* 11 JOURNAL OF COMPETITION LAW & ECONOMICS 1 (2015).

Elhauge, *I'm Not Quite Dead Yet—And Other Health Care Observations*, 49 TULSA L. REV. 607 (2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate,* NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011).

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It,* in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397 (2009). (Awarded 2010 Jerry S. Cohen Memorial Fund

Writing Award for Best Antitrust Article).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009).

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008).

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008).

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court Decisions*?, 3(2) COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest,* 80 N.Y.U. LAW REVIEW 733 (2005).

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76 (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005).

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681 (2003).

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002).

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002).

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328 (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*, 5 SUPREME COURT ECON. REV. 59 (1997).

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV. 1525 (1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994).

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993).

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993).

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992).

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992).

Bundy & Elhauge, *Do Lawyers Improve the Adversary System? A General Theory of Litigation Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991).

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31 (1991).

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991).

Media Publications

"Donald Trump: The Protector," The Atlantic (March 2, 2016).

"Ted Cruz Is Not Eligible to Run for President," Salon (Jan. 20, 2016).

"The Best Way to Reform Health Care—and Cut the Deficit," The Daily Beast (January 6, 2013).

"Roberts' Real Long Game?," The Atlantic (July 20, 2012).

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July 1, 2012).

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012).

"Even The Most Conservative Supreme Court Justices Have Already Declared Mandates Constitutional," The New Republic (June 21, 2012) (with Emily Bass).

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May 23, 2012) (with Kevin Caves).

"A Further Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 21, 2012).

"A Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 19, 2012).

"It's Not About Broccoli!: The False Case Against Health Care," The Atlantic (April 16, 2012).

"If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?" The New Republic (April 13, 2012).

"Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal (March 28, 2012).

"Don't Blame Verrilli for Supreme Court Health-Care Stumble," The Daily Beast (March 28, 2012).

"Economists Argue Over the Cost of Caring for the Uninsured," The Daily Beast (March 26, 2012).

"The Broccoli Test," New York Times (Nov. 16, 2011).

"Coverage vs Coercion," The Huffington Post (March 3, 2008).

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003).

"Soft on Microsoft," The Weekly Standard (March 25, 2002).

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002).

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 ).

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001).

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001).

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001).

"Competition Wins in Court," New York Times, (June 30, 2001).

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000).

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000).

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000).

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999).

"Foul Smoke," The Washington Post, A15 (August 4, 1998).

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998).

"Microsoft Gets an Undeserved Break," The New York Times,A21 (June 29, 1998).

"Medi-Choice," The New Republic, 24 (November 13, 1995).

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995).

Harvard Committees

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-2014).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).

**Past Academic Positions**

| | |
|---|---|
| 1988-95 | Professor of Law, Boalt Hall, University of California at Berkeley |
| 1995 | Visiting Professor of Law, Univ. of Chicago Law School |
| 1994 | Visiting Professor of Law, Harvard Law School |
| 1993 | Visiting Olin Faculty Fellow, Yale Law School |

1991-92 Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence

**Clerkships**

1987-88 Clerk for Justice William J. Brennan, Jr., United States Supreme Court

1986-87 Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit

1986 Clerk for U.S. Solicitor General's Office, Washington, D.C.

**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States (1997).

## ECONOMICS EXPERT WORK

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007.

Recipient in 2016, 2020, and 2026 of the AAI award for Outstanding Antitrust Litigation Achievement in Economics.

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *In re Local TV Advertising Antitrust Litigation,* a case alleging price-fixing and anticompetitive information exchanges in local TV spot ads.

Testifying Expert in *Linet Americas, Inc. v. Hill-Rom Holdings, Inc., et al.,* a case alleging exclusionary conduct in hospital bed markets.

Testifying Expert in *Kaiser Foundation Health Plan, Inc., v. Merck & Company, Inc, Humana Inc. v. Merck,* and *Centene Corporation, v. Merck & Company, Inc*., cases alleging an

anticompetitive reverse-payment settlement.

Testifying Expert in *Blue Cross and Blue Shield of Vermont v. Teva Pharmaceutical Industries, Ltd,*, a case alleging anticompetitive conduct that restrained generic competition.

Testifying Expert in *Dinosaur Financial Group LLC v. S&P Global, Inc.*, a case alleging anticompetitive monopolization of the CUSIP Use Market.

Testifying Expert in *Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*, a case alleging anticompetitive bundling.

Testifying Expert in *In Re: Google Digital Advertising Litigation,* a case alleging tying and other exclusionary restraints in the ad tech stack.

Testifying Expert in *Pacific Steel Group v. Commercial Metals Company,* a case alleging exclusivity restraints in the steel rebar market.

Testifying Expert in *NFL Sunday Ticket Antitrust Litigation,* a case alleging horizontal restraints, exclusive dealing, and tying restraints on NFL telecasts.

Testifying Expert in *PlusPass, Inc. v. Verra Mobility Corp.* a case alleging exclusionary restraints and an anticompetitive merger in the market for rental car electronic toll payment services.

Testifying Expert in *In Re Da Vinci Surgical Robot Antitrust Litigation,* a case alleging exclusionary restraints related to robot surgery devices.

Testifying Expert in *Illinois, ex rel. Edelweiss Fund, LLC v. J.P. Morgan Chase & Co;, New York, ex rel. Edelweiss Fund, LLC v. J.P. Morgan Chase & Co.;* and *State of California, ex rel., Edelweiss Fund v. J.P. Morgan Chase Bank,* cases alleging that certain financial institutions falsely represented they were individually marketing VRDOs.

Testifying Expert in *Moehrl v. Nat'l Ass'n of Realtors,* a case alleging that Realtor associations have agreements that restrain the market for real estate broker services.

Testifying Expert in *Markson v. CRST Int'l,* a case alleging an agreement not to poach truck drivers from rival trucking companies.

Testifying Expert in *In re Broiler Chicken Antitrust Litigation*, a case alleging that producers of

broiler chickens engaged in conspiracies to share information, restrict output, and manipulate or fix prices.

Testifying Expert in *Cameron v. Apple,* a class action by app developers alleging that Apple has anticompetitively excluded competition for app distribution.

Testifying Expert in *In Re Novartis And Par Antitrust Litigation,* a case alleging a reverse payment patent settlement delayed generic competition with the branded pharmaceutical Exforge.

Testifying Expert in *In Re EpiPen Marketing Sales Practices and Antitrust Litigation*, a case alleging anticompetitive reverse payments and foreclosing agreements.

Testifying Expert in *Roxul USA, Inc. v. Armstrong World Industries, Inc.*, a case alleging exclusive dealing agreements in the market for suspended acoustical ceiling tiles.

Testifying Expert in *Sitts v. Dairy Farmers of America, Inc.*¸ a case alleging a conspiracy to suppress raw milk prices.

Testifying Expert in *In Re Qualcomm Antitrust Litigation*, a case alleging tying and exclusive dealing involving modem chipsets and cellular standard essential patents.

Testifying Expert in *In Re Niaspan Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In Re Lamictal Direct Purchaser Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In re Namenda Antitrust Litigation*, a case alleging a reverse payment patent settlement and product hop.

Testifying Expert in *In re Lidoderm Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *Valassis Communications v. News Corp,* a case alleging anticompetitive bundling and other exclusionary conduct.

Testifying Expert in *GN Netcom v. Plantronics,* a case alleging exclusive dealing in the distribution of contact center and office headsets.

Testifying Expert in *Louisiana Wholesale Drug v. Unimed Pharmaceuticals (Androgel case),* a case alleging a reverse payment patent settlement.

Testifying Expert in *Garber v. Office of the Commissioner of Baseball,* a case alleging horizontal territorial restraints on broadcasting baseball games.

Testifying Expert in *Suture Express v. Cardinal Health*, a case alleging tying and bundled loyalty contracts in medical distribution.

Testifying Expert in *Savant v. Crestron*, a case alleging exclusive dealing in the high-end home control system market.

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition in a pharmaceutical market.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts in a pharmaceutical market, which resulted in a $784 million settlement for the United States.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case

alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning medical sharps containers and GPO markets.

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v. Ethicon, Inc*, concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners*, concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford*, concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association*, concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

## EDUCATION

**Harvard Law School** J.D., June 1986

*Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

*Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*, 98 HARV. L. REV. 1471-1500 (1985).

**Harvard College** B.A., June 1982

Graduated in three years, majoring in Biochemical Sciences. GPA 3.9

# EXHIBIT B

## EINER ELHAUGE STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION EXPERT TESTIMONY, AND COMPENSATION

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Expert Testimony

Within the past four years, I have provided trial testimony as an expert in *In Re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637) on September 18-19, 2023; and *In re NFL Sunday Ticket Antitrust Litigation* (C.D. Ca. 15-cv-2668) on June 24, 2024. Within the past four years, I have provided deposition testimony as an expert in *In Re Da Vinci Surgical Robot Antitrust Litigation* (N.D. Ca. 21-cv-3825) on March 17, 2023, and July 24, 2024; *Illinois ex rel. Edelweiss Fund v. J.P. Morgan* (IL state court 2017-L-000289) on March 27, 2023; *Moehrl v. Nat'l Ass'n of Realtors* (N.D. Ill. 19-cv-1610) on April 27, 2023, and August 25, 2023; *PlusPass, Inc. v. Verra Mobility Corp.* (C.D. Cal. 2:20-cv-10078-SB-SK) on May 23, 2023; *In re NFL's Sunday Ticket Antitrust Litigation* (C.D. Ca. 15-cv-2668) on July 6, 2023; *Pacific Steel Group v. Commercial Metals Company* (N.D. Ca. 20-cv-7683) on August 31, 2023; *New York ex rel. Edelweiss Fund v. J.P. Morgan* (NY state court 1005559/2014) on May 1, 2024; *In Re: Google Digital Advertising Litigation* (S.D.N.Y. 21-md-3010) on March 11, 2025; and *State of California, ex rel., Edelweiss Fund v. J.P. Morgan Chase Bank* (Ca. state court, CGC-14-540777) on May 7-8, 2025; *Dinosaur Financial Group LLC v. S&P Global, Inc.*, (S.D.N.Y. 22-cv-1860) on October 21, 2025; *Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.* (E.D.Pa. 23-cv-828) on December 8, 2025; *In Re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637) on July 23, 2026, and Nov. 13, 2026; *Kaiser Foundation Health Plan, Inc., v. Merck & Company, Inc* (N.D.Cal., 4:21-cv-05497-HSG), *Humana Inc. v. Merck & Company, Inc* (D.NJ. 2:23-cv-23023), and *Centene Corporation, v. Merck & Company*, Inc. (D.NJ. 2:23-cv-23033), on August 26, 2026; *In re Local TV Advertising Antitrust Litigation* (N.D.Ill. MDL No. 2867, No. 18 C 6785) on September 18, 2026; and *Linet Americas, Inc. v. Hill-Rom Holdings* (N.D.Ill. Civil Action No.: 1:21-cv-6890) on October 23, 2026.

## III. Compensation

I am being compensated at a rate of $1500 per hour for my work on this case, and the consulting firm that I own, Legal Economics LLC, is being compensated $235-1095 per hour for the work of my staff on this report.

## EXHIBIT C: DOCUMENTS RELIED UPON

The materials I rely on are those cited in the footnotes of my declaration, which I incorporate by reference here.

## APPENDIX A: ENDOWRIST SAVINGS CALCULATION

**Table A1: Projected Annual EndoWrist Sales Through 2027**[109]

| 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|
| $ 1,029,338,451 | $ 1,180,514,137 | $ 1,351,846,582 | $ 1,560,155,406 | $ 1,800,562,965 |

**Table A2: Projected Annual EndoWrist Revenue by EndoWrist (Not Adjusting For da Vinci 5 Introduction)**[110]

| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
|---|---|---|---|---|---|
| $ 1,350,422,224 | $ 2,078,015,421 | $ 2,398,221,096 | $ 2,767,767,924 | $ 3,194,258,983 | $ 921,617,232 |

**Table A3: Projected Annual X/Xi-compatible EndoWrist Revenue (Adjusting for da Vinci 5 Introduction)**[111]

| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
|---|---|---|---|---|---|
| $ 1,287,384,514 | $ 1,907,451,915 | $ 2,092,687,728 | $ 2,262,262,790 | $ 2,442,969,270 | $ 650,293,119 |

**Table A4-1: Projected Annual Savings on X/Xi-compatible EndoWrist Revenue (average net 30% savings)**[112]

| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
|---|---|---|---|---|---|
| $ 137,307,283 | $ 344,940,743 | $ 575,494,357 | $ 656,056,209 | $ 684,031,396 | $ 175,579,142 |

**Table A4-2: Projected Annual Savings on X/Xi-compatible EndoWrist Revenue (average net 16% savings)**[113]

| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
|---|---|---|---|---|---|
| $ 77,235,347 | $ 189,161,053 | $ 306,930,324 | $ 339,339,419 | $ 342,015,698 | $ 84,538,105 |

---

[109] Source: 2023 value taken from Elhauge Class Rebuttal Report workpapers file "IS28 Damages Estimation v26 (only 2023).xlsx"; subsequent growth rates based on **Table 6** above.
[110] Source: **Table A1** above; growth rates based on **Table 6** above. 2027 and 2032 are prorated by 75% and 25% of their full annual values based on an April 1, 2027 (Q2 2027) effective date of the Settlement Agreement.
[111] Source: **Table A2** above; **Table 7** above.
[112] Source: **Table A3** above; **Figure 1** above.
[113] Source: **Table A3** above; **Figure 1** above.

| **Table A5-1: NPV of Projected Annual Savings on X/Xi-compatible EndoWrist Revenue (average net 30% savings)[114]** | | | | | |
|---|---|---|---|---|---|
| **2027 (partial year)** | **2028** | **2029** | **2030** | **2031** | **2032 (partial year)** |
| $ 131,330,826 | $ 297,386,676 | $ 440,635,711 | $ 446,109,304 | $ 413,083,526 | $ 98,451,711 |

| **Table A5-2: NPV of Projected Annual Savings on X/Xi-compatible EndoWrist Revenue (average net 16% savings)[115]** | | | | | |
|---|---|---|---|---|---|
| **2027 (partial year)** | **2028** | **2029** | **2030** | **2031** | **2032 (partial year)** |
| $ 73,873,590 | $ 163,083,016 | $ 235,005,712 | $ 230,746,192 | $ 206,541,763 | $ 47,402,676 |

| **Table A6: Total NPV of Projected Annual Savings on X/Xi-compatible EndoWrists 2027 Q2 – 2032 Q1[116]** | |
|---|---|
| **Average Net Savings Percentage** | **2027 Q2 – 2032 Q1 Total** |
| 30% | $ 1,826,997,754 |
| 16% | $ 956,652,948 |

[114] Source: **Table A4-1** above; discount rate described in Section V.B above.
[115] Source: **Table A4-2** above; discount rate described in Section V.B above.
[116] Source: **Tables A5-1** and **A5-2** above.

## APPENDIX B: DA VINCI SERVICE SAVINGS CALCULATION

| Table B1: Projected Annual Service Revenue Through 2027[117] | | | | |
|---|---|---|---|---|
| 2023 | 2024 | 2025 | 2026 | 2027 |
| $ 585,177,371 | $ 664,864,996 | $ 728,637,994 | $ 806,276,222 | $ 892,186,999 |

| Table B2: Projected Annual Service Revenue (Not Adjusted for da Vinci 5 Entry)[118] | | | | | |
|---|---|---|---|---|---|
| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
| $ 669,140,249 | $ 987,251,788 | $ 1,092,445,971 | $ 1,208,848,862 | $ 1,337,654,776 | $ 370,046,322 |

| Table B3: Projected Annual Service Revenue for X/Xi Robots (Adjusted for da Vinci 5 Entry)[119] | | | | | |
|---|---|---|---|---|---|
| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
| $ 408,844,692 | $ 480,791,621 | $ 396,557,888 | $ 288,914,878 | $ 214,024,764 | $ 29,603,706 |

| Table B4: Projected Annual Savings on X/Xi Service[120] | | | | | |
|---|---|---|---|---|---|
| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
| $ - | $ - | $ - | $ 58,746,025 | $ 87,036,737 | $ 12,038,840 |

| Table B5: NPV of Projected Annual Savings on X/Xi Service[121] | | | | | |
|---|---|---|---|---|---|
| 2027 (partial year) | 2028 | 2029 | 2030 | 2031 | 2032 (partial year) |
| $ - | $ - | $ - | $ 39,946,499 | $ 52,561,100 | $ 6,750,485 |

[117] Source: 2023 values taken from Elhauge Class Rebuttal Report workpaper "IS52 Overcharges for Service v13 (only 2023)." Growth rates through 2027 based on **Table 6** above.
[118] Source: **Table B1** above; growth rates based on **Table 6** above. 2027 and 2032 are prorated by 75% and 25% of their full annual values based on an April 1, 2027 (Q2 2027) effective date of the Settlement Agreement.
[119] Source: **Table B2** above; **Table 7** above.
[120] Source: **Table B3** above; **Figure 2** above.
[121] Source: **Table B4** above; discount rate described in Section V.B above.

| **Table B6: Total NPV of Projected Annual Savings on X/Xi Service 2027 Q2 – 2032 Q1** [122] | |
|---|---|
| | $ 99,258,084 |

[122] Source: **Table B5** above.